UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RECEIPT # _____
AMOUNT $ 150 -
SUMMONS ISSUED 2
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 2-12-04

| | |
|---|---|
| DEBORAH CHIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) CIVIL ACTION NO. _____ |
| Plaintiff, | ) ) 04 CV 10294 DPW |
| vs. | ) CLASS ACTION COMPLAINT ) FOR VIOLATIONS OF |
| SONUS NETWORKS, INC., HASSAN AHMED, PH.D. and STEPHEN NILL, | ) FEDERAL SECURITIES LAWS ) MAGISTRATE JUDGE Bowler ) |
| Defendants. | ) JURY TRIAL DEMANDED ) |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Sonus Networks, Inc. ("Sonus" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of the securities of Sonus between June 3, 2003 and February 11, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein occurred in substantial part in this Judicial District. The Company maintains it headquarters within this Judicial District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Deborah Chin, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Sonus at artificially inflated prices during the Class Period and has been damaged thereby.

7. Defendant Sonus is a Delaware corporation and maintains its principal executive offices at 5 Carlisle Road, Westford, MA 01886. Sonus is a provider of voice infrastructure solutions for the new public network. The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks. By

enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network.

8. (a) Defendant Hassan Ahmed, Ph.D. ("Ahmed") was, at all relevant times, President, Chief Executive Officer and Director of Sonus.

(b) Defendant Stephen Nill ("Nill") was, at all relevant times, Chief Financial Officer of Sonus.

(d) Defendants Ahmed and Nill are collectively referred to herein as the "Individual Defendants."

9. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Sonus, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to

confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Sonus, each of the Individual Defendants

4

had access to the adverse undisclosed information about Sonus's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Sonus and its business issued or adopted by the Company materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sonus securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Sonus's business, operations, management and the intrinsic value of Sonus common stock; (ii) enabled insiders to sell more than 250,000 shares of their personally-held stock for gross proceeds of approximately $2 million; (iii) allowing the Company to complete a public offering of 17 million shares of common stock at a per share price of $7.75 whereby the Company reaped approximately $126.14 million in proceeds; and (iv) caused Plaintiff and other members of the Class to purchase Sonus securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Sonus between June 3, 2003 and February 11, 2004, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sonus common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sonus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.  Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sonus; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

21. Sonus describes itself as the leading provider of packet voice infrastructure solutions for wireline and wireless service providers. With its Open Services Architecture(TM) (OSA), Sonus delivers end-to-end solutions addressing a full range of carrier applications, including trunking, residential access and Centrex, tandem switching, and IP voice termination, as well as enhanced services.

22. Throughout the Class Period, Sonus issued numerous press releases touting their increasing quarterly revenues and filed quarterly reports with the Securities & Exchange Commmisison ("SEC") on Forms 10-Q which described the Company's internal revenue recognition policies.

23. In truth and in fact, however, Sonus was improperly and untimely recognizing revenue from certain customer transactions in violation of Generally Accepted Accounting Principles ("GAAP") and its own stated policies on revenue recognition.

24. On February 11, 2004, after the close of regular trading, Sonus shocked the market when it announced that the Company had identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods. The Company is reassessing the proper periods in which revenue should be recognized for these transactions.

Prior to disclosing these adverse facts to the investing public, Sonus completed a $126.14 million public offering of 17 million shares, and Sonus insiders sold approximately $2 million of their personally-held shares to the unsuspecting public.

25. The next morning, when the market opened for trading, shares of the Company's stock fell as low as $5.02 per share, a decline of $1.67 per share, or 24.9%, on extremely high trading volume.

## Pre-Class Period Statements

26. On March 19, 2003, the Company filed its Form 10-K for the fourth quarter and year end 2002 with the SEC which confirmed its previously-announced financial results and was signed by

defendants Ahmed and Nill, among others. Concerning the Company's revenue recognition policy, the Company stated, in pertinent part, as follows:

Revenue Recognition

Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

27.    On April 9, 2003, the Company issued a press release announcing its financial results for the first quarter of 2003, the period ended March 31, 2003. Sonus reported revenues of $16.0 million and a net loss of $4.4 million or $0.02 per share. Defendant Ahmed commented positively on the results, stating, in pertinent part, as follows:

Our financial results for the first quarter reflected good progress toward our business objectives. <u>We grew our revenues 27 percent over last quarter</u>, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1, we also continued to add new customers around the globe and made important additions to our product family. [Emphasis added.]

28.    On April 22, 2003, the Company announced that it had completed a public offering of 20 million shares of Common Stock at a per share price of $3.05, raising $61 million.

29. On May 9. 2003, the Company filed its Form 10-Q for the first quarter of 2003 with the SEC which confirmed the previously-announced financial results and was signed by defendant Nill. Concerning the Company's revenue recognition policies, the 10-Q stated, in pertinent part, as follows:

> Revenue Recognition. We recognize revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, we recognize revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, we use the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue.

30. The statements referenced above in ¶¶ 26-29 remained alive and uncorrected throughout the Class Period.

## Materially False And Misleading Statements Issued During The Class Period

31. The Class Period begins on June 3, 2003, the first day that Sonus common stock traded above $5.02 per share.

32. On July 10, 2003, the Company issued a press release announcing its financial results for the second quarter of 2003, the period ended June 30, 2003. Sonus reported revenues of $21.4 million and a net loss of $3.2 million or $0.01 per share. Defendant Ahmed commented positively on the results, stating, in pertinent part, as follows:

> <u>We are pleased with the progress that we made in the second quarter, particularly with our 33% sequential revenue growth</u>. We executed across all areas of the business - broadening and strengthening our customer base, expanding our leading product

10

offering, bolstering our balance sheet and advancing our drive to profitability. [Emphasis added.]

Defendant Ahmed continued, stating, in pertinent part, as follows:

> <u>Our revenue growth, coupled with premier customer wins like Verizon Communications underscores our belief that the packet voice market is entering a new phase</u>. Incumbent carriers are now adopting packet voice solutions and Sonus Networks is proud to be at the forefront of this transition. [Emphasis added.]

33.     On August 14, 2003, the Company filed its Form 10-Q for the second quarter of 2003 with the SEC which confirmed the previously-announced financial results and was signed by defendant Nill. Concerning the Company's revenue recognition policies, the 10-Q provided, in pertinent part, as follows:

> Revenue Recognition.   We recognize revenues from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, we recognize revenues when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, we use the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenues from maintenance and support arrangements are recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue.

34.     On September 23, 2003, the Company issued a press release announcing that it had completed a public offering of 17 million shares of Common Stock at a per share price of $7.75 less applicable underwriter discounts.

35.     On October 8, 2003, the Company issued a press release announcing its financial results for the third quarter of 2003, the period ended September 30, 2003. Sonus reported revenues

of $28.6 million and net income of $1.2 million, or $0.01 per diluted share – its first quarterly profit ever. Defendant Ahmed commented on the results, stating, in pertinent part, as follows:

> <u>This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth. Our revenues grew 34% sequentially to $28.6 million, reflecting increased market demand for packet telephony and the expanding number of customers who have adopted Sonus' solutions. We achieved an important milestone in reporting our first quarterly profit on a GAAP basis.</u> Additionally, we bolstered our balance sheet to capitalize on the opportunity ahead, adding $126 million to our cash and marketable securities through a common stock offering in September. [Emphasis added.]

36. On November 10, 2003, the Company filed its Form 10-Q for the third quarter of 2003 with the SEC which confirmed the previously-announced financial results and was signed by defendant Nill. Concerning the Company's revenue recognition policies, the 10-Q provided, in pertinent part, as follows:

> Revenue Recognition. We recognize revenues from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, we recognize revenues when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, we use the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenues are recognized as the services are provided. Revenues from maintenance and support arrangements are recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenues.

37. The statements referenced above in ¶¶ 32-33 and 35-36 were each materially false and misleading when made as they failed to disclose and/or misrepresented the following material adverse facts which were then known to defendants or recklessly disregarded by them:

(a) that defendants had improperly and untimely recognized revenue on certain of the Company's customer transactions;

12

(b) that defendants violated GAAP and the Company's own internal policies regarding the timing of revenue recognition; and

(c) as a result of the foregoing, the Company's revenues, net income and earnings per share published during the Class Period were materially false and misleading.

## The Truth Begins to Emerge

38. On January 20, 2004, the Company announced that it would postpone the release of its fourth quarter and full year 2003 financial results pending the completion of its 2003 audit. Upon completion of the audit, the Company will reschedule the conference call and provide further details.

39. Then, on February 11, 2004, more than 20 days after postponing its fourth quarter and full year results, after the close of regular trading, the Company shocked the market when it issued a press release announcing that it had identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Defendant Ahmed commented on the shocking revelation, stating, in pertinent part, as follows:

> We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting.

40. The next morning, when the market opened for trading, shares of the Company's stock fell as low as $5.02 per share, a decline of $1.67 per share, or 24.9%, on extremely high trading volume.

41. The market for Sonus's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Sonus's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Sonus common stock relying upon the integrity of the market price of Sonus's common stock and market information relating to Sonus, and have been damaged thereby.

42. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Sonus's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

43. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Sonus's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Sonus and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class

Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

44. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Sonus, their control over, and/or receipt and/or modification of Sonus's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sonus, participated in the fraudulent scheme alleged herein.

45. Defendants were further motivated to engage in this course of conduct in order to generate proceeds from a public offering of 17 million shares of Common Stock at a per share price of $7.75 whereby the Company reaped approximately $126.14 million in proceeds.

46. Lastly, prior to the disclosure of the adverse facts alleged herein, Sonus insiders engaged in a substantial insider-selling campaign – selling over 250,000 shares of their personally-held Sonus shares for gross proceeds of approximately $2 million, as illustrated in the following chart:

| Insider | Date of Sale | Amount of Shares | Price Per Share | Proceeds |
|---|---|---|---|---|
| Edward T. Anderson, Director | 7/18/03 | 32,378 | $6.85 | $221,789.30 |
|  | 7/18/03 | 33,206 | $6.84 | $227,129.04 |
| Total |  | 65,584 |  | $448,918.34 |
| Edward Harris, Vice President | 7/18/03 | 30,000 | $6.81 | $204,300.00 |
| John Francis O'Hara, Vice President | 7/22/03 | 15,000 | $6.95 | $104,250.00 |
|  | 7/22/03 | 15,000 | $7.03 | $105,450.00 |
|  | 7/22/03 | 15,000 | $6.82 | $102,300.00 |
|  | 7/22/03 | 10,000 | $6.92 | $69,200.00 |
|  | 10/22/03 | 5,000 | $7.90 | $39,500.00 |
|  | 10/22/03 | 5,000 | $7.85 | $39,250.00 |
|  | 10/22/03 | 3,750 | $7.91 | $29,662.50 |
| Total |  | 68,750 |  | $489,612.50 |
| Paul R. Jones, Vice President | 10/10/03 | 100,000 | $8.57 | $857,000.00 |
| Grand Total |  | 264,334 | $7.57 | $1,999,830.84 |

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

47. At all relevant times, the market for Sonus's common stock was an efficient market for the following reasons, among others:

(a) Sonus's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Sonus filed periodic public reports with the SEC and the NASDAQ;

(c) Sonus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Sonus was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48. As a result of the foregoing, the market for Sonus's common stock promptly digested current information regarding Sonus from all publicly-available sources and reflected such information in Sonus's stock price. Under these circumstances, all purchasers of Sonus's common stock during the Class Period suffered similar injury through their purchase of Sonus's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

49. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sonus who knew that those statements were false when made.

### FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

50.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Sonus's business, operations, management and the intrinsic value of Sonus common stock; (ii) enable insiders to sell more than 250,000 shares of their personally-held stock for gross proceeds of approximately $2 million; (iii) allow the Company to complete a public offering of 17 million shares of Common Stock at a per share price of $7.75 whereby the Company reaped approximately $126.14 million in proceeds; and (iv) cause Plaintiff and other members of the Class to purchase Sonus common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

52.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and

deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Sonus's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Sonus as specified herein.

54. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sonus's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Sonus and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Sonus common stock during the Class Period.

55. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior