# EXHIBIT 1

Westlaw.

1996 WL 1082812                                                                 Page 1
(Cite as: 1996 WL 1082812 (D.Ariz.))

H
Only the Westlaw citation is currently available.

United States District Court, D. Arizona.

Derric C. CHAN and Anna Chan as attorney-in-fact
for Moon-Yung Chow, on Behalf
of Themselves and All Others Similarly Situated, et
al., Plaintiffs,
v.
ORTHOLOGIC CORPORATION, et al.,
Defendants.

No. CIV 96-1514 PHX RCV.

Dec. 19, 1996.

ORDER

BROOMFIELD, J.

*1 This is a securities fraud class action brought pursuant to the Securities Exchange Act of 1934 and the Private Securities Litigation Reform Act of 1995. Since it was filed it has been consolidated with eleven other cases filed in this district. Now before the court are two motions to be appointed lead plaintiff and for the appointment of lead plaintiff's counsel; one from the *Chan* plaintiffs and one from the *Boren, Draker, Rutkin, DeFelice* and *Longacre* plaintiffs ("Philadelphia plaintiffs"). Oral argument was heard on November 18, 1996, at which time these matters were taken under advisement. Now, having carefully considered the arguments of counsel and the issues involved therein, the court rules.

FACTS

The facts relevant to the issues now before the court are few. Defendant OrthoLogic Corporation ("OrthoLogic" or "Company") manufactures and sells a bone growth stimulation device, known as the OrthoLogic 1000. Apparently this is the company's flagship product. Right after approval by the Food and Drug Administration ("FDA") in March of 1994, sales of the OrthoLogic 1000 began. This suit, and those consolidated with it, centers on defendants' alleged false and misleading public statements regarding the Orthologic 1000, including the scope of its FDA approval, its sales success and efficacy.

After approximately two years of selling the OrthoLogic 1000, the Company made a number of rosy public statements concerning both the success rate of the OrthoLogic 1000 and its profits from those sales. Apparently these statements pushed OrthoLogic stock to record highs. However, plaintiffs allege that at the same time, "unknown to plaintiffs and the investing markets, OrthoLogic was under investigation by the FDA for false representations about and improper marketing and uses of the OrthoLogic 1000." (Philadelphia Motion at 6.)

On May 31, 1996 the FDA sent OrthoLogic a letter expressing concern over the Company's sales and marketing of the OrthoLogic 1000 and requesting data to support its product effectiveness claims. Defendants did not make public the existence of this letter. Instead, plaintiffs allege that upon receipt of this letter the Company's Chief Executive Officer, defendant Weinstein, as well as defendants Dunaway, Derminio and MaGee, all sold off large portions of their OrthoLogic stock.

On June 17, 1996, the May 31, 1996 letter was publicly revealed in a medical device industry publication known as the "Gray Sheet." Plaintiffs allege that on that same day the Company falsely told media outlets that it did not know why there was a sell off of its stock. Plaintiffs also allege that "[a]fter the close of business on June 18, 1996, defendant Weinstein admitted for the first time that he was aware, as of April 1996, of the FDA probe. The price of OrthoLogic's stock collapsed from a closing price on Friday, June 14, 1996 of $47.50 to $29.75 by the close of the market on June 18, 1996." (Philadelphia Motion at 7-8.) All plaintiffs, as stockholders in OrthoLogic, have lost money because of this drop in price.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1996 WL 1082812                                                                                          Page 2
(Cite as: 1996 WL 1082812 (D.Ariz.))

## DISCUSSION

*2 The Securities Exchange Act of 1934 was amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The section relevant to these proceedings states, in relevant part:

> Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class--
> (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. § 77z-1(a)(3)(A)(i). The parties do not dispute that both the *Chan* and *Boren* plaintiffs properly published the required "60 day notice." Nor do they dispute that what resulted is the two motions for the appointment of lead plaintiff, both of which are properly before the court.

With regards to the appointment of a lead plaintiff, the PSLRA provides for certain rebuttable presumptions:

> Subject to subclause (II), for purposes of subclause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this subchapter is the person or group of persons that--
> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
> (bb) in the determination of the court has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* at § 77z-1(a)(3)(B)(iii)(I). These presumptions may be rebutted if the presumptive lead plaintiff either "will not fairly and adequately protect the interest of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* at § 77z-1(a)(3)(B)(iii)(II)(aa) & (bb).

It is undisputed that the Philadelphia plaintiffs have, without question, the largest financial stake in these proceedings. Consequently, they fall within the purview of § 77z-1(a)(3)(B)(iii)(I)(bb) and are the presumptive lead plaintiffs. [FN1]

> FN1. At oral argument the *Chan* plaintiffs argued, for the first time, that they are the presumptive lead plaintiffs for their shorter class period. This argument is based upon their assertion that from May 31, 1996 to June 17, 1996 they bought more shares of Orthologic than the Philadelphia plaintiffs. However, there are two reasons why this argument cannot prevail.
> First, it appears that between May 31 and June 17 the Philadelphia plaintiffs purchased 2500 shares of Orthologic. Specifically, plaintiff Jeffrey Boren bought 1000 shares on June 4, plaintiff Dallas Warehouse Co. bought 500 shares on June 4 and 500 shares on June 17, and plaintiff Charles Peterson bought 500 shares on June 10. This compares favorably to the 2000 shares purchased by the *Chan* plaintiffs during the same time frame. Thus, as an initial matter, because it appears that they did not purchase the most shares, the *Chan* plaintiffs are not the presumptive lead plaintiffs for the May 31 to June 17 time frame.
> More importantly, however, is that even were the above analysis somehow incorrect, the *Chan* plaintiffs are not the presumptive lead plaintiffs for their shorter class period in any event. Although the *Chan* plaintiffs focus on June 17 as the closing date, their proposed class period does not end on June 17. Rather, it ends on June 18. However, on June 18 the City of Philadelphia purchased in excess of 10,000 shares of Orthologic stock. Thus, regardless of the purchases made by other Philadelphia plaintiffs, because the *Chan* plaintiffs purchases were less than the City of Philadelphia's June 18 purchase, the *Chan* plaintiffs are not the presumptive lead plaintiffs for their own class period.

Recognizing this presumption, the *Chan* plaintiffs seek to rebut it by arguing that the Philadelphia plaintiffs are susceptible to "typicality" attack under

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1996 WL 1082812                                                                                       Page 3
(Cite as: 1996 WL 1082812 (D.Ariz.))

Fed.R.Civ.P. 23 and are subject to possible unique defenses. Cf. id. at § 7 7z-1(a)(3)(B)(iii)(II)(aa) & (bb). The *Chan* plaintiffs also argue that their temporally shorter class period fundamentally conflicts with the Philadelphia plaintiffs' temporally longer class period. The upshot of these arguments is the *Chan* plaintiffs' request to be appointed either co-lead plaintiffs (with certain members of the Philadelphia plaintiffs), or alternatively, to be named their own subclass. For the sake of clarity, the court shall address each argument in turn.

*3 A. Conflicting Class Period.

The essence of this argument is really quite simple. The Philadelphia plaintiffs assert a class for all persons having purchased OrthoLogic stock between April 1, 1996 and June 18, 1996. The *Chan* plaintiffs, however, assert a narrower class of purchasers; those who obtained their OrthoLogic stock between May 31, 1996 and June 18, 1996. This distinction is significant in the eyes of the *Chan* plaintiffs for their class period, unlike that of the Philadelphia plaintiffs, begins on the date that the FDA issued its letter to Orthologic. Because of this, the *Chan* plaintiffs argue that their class period fundamentally conflicts with the Philadelphia plaintiffs' class period:

> Thus, the Chan Plaintiffs, who neither allege nor seek damages for OrthoLogic's nondisclosure of the FDA investigation prior to May 31, 1996, have a dramatically different and, indeed, far simpler burden to establish liability here, and are subject to far fewer defenses by defendants. For instance, they will *not* be required to prove that the defendants were aware of the FDA investigations well before the Warning Letter or that these allegedly early FDA investigations were a "material" event requiring disclosure. Therefore, the Chan Plaintiffs may be less susceptible to certain defenses (such as reliance on advice of counsel), which may have greater impact at the time the FDA investigation began, but may not be asserted credibly as of the beginning of the Chan Class Period, after the issuance of the Formal Warning Letter.

(Chan Resp. at 9.)

Unlike the *Chan* plaintiffs, however, the court does not perceive this minor divergence as a conflict requiring the substitution of the Philadelphia plaintiffs as the presumptive lead plaintiffs. First, as the Philadelphia plaintiffs correctly note, all parties to this litigation have acquiesced in, if not actively sought, the consolidation of these class actions. This includes the *Chan* plaintiffs. Apparently, then, these concerns regarding the different class periods did not cause the *Chan* plaintiffs the same concern at the consolidation stage as they evidently do now.

More importantly, however, is that there is presently nothing before the court which indicates that these different class periods are, as the *Chan* plaintiffs characterize them, "in conflict." Rather,

> Here, the conflict, if any, is peripheral, and substantially outweighed by the class members' common interests.... Every class member shares an overriding common interest in establishing the existence and materiality of misrepresentations. The major portion of the inflation alleged is attributed to causes which allegedly persisted throughout the [conflicting] class period[s]. It will be in the interest of each class member to maximize the inflation from those causes at every point in the class period, both to demonstrate the *sine qua non*--liability--and to maximize his own potential damages--the more the stock is inflated, the more every class member stands to recover.

*4 *Blackie v. Barrack*, 524 F.2d 891, 909-10 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976). In other words, the mere fact that some of the Philadelphia plaintiffs' purchases occurred before the *Chan* plaintiffs' class period does not necessarily create a conflict. "The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether all members have been injured by the same course of conduct." *Koenig v. Benson*, 117 F.R.D. 330, 335 (E.D.N.Y.1987) (quoting *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981)); *see also Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985) (same). Based upon these criteria, the parties interests are, at this point, the same. *See Schwartz*, 108 F.R.D. at 282 ("Nor do potential conflicts arising from differences in the date of purchase and therefore in proof of damages preclude plaintiff's representative status at this point."). Of course, should the progression of this case reveal that the different class periods do significantly affect the nature of the parties claims, the court is free to split the class into appropriate subclasses at that time. *See id.; Blackie*, 524 F.2d at

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1996 WL 1082812  
(Cite as: 1996 WL 1082812 (D.Ariz.))

Page 4

909; *see also Opiela v. Bruck*, 139 F.R.D. 257, 260 (D.Mass.1990).

B. Typicality and Unique Defenses under Rule 23.

Again the *Chan* plaintiffs argument in this regard is straight-forward:

> As a result of the inclusion of the City of Philadelphia, the Philadelphia Plaintiffs' typicality and adequacy will likely be challenged by defendants on the alleged grounds that: (i) the City of Philadelphia was allegedly engaged in sophisticated investment strategies during the Class Period, which might establish atypicality or inadequacy; and/or (ii) the City of Philadelphia, in purchasing after disclosure of bad news, was merely a "speculator" and not relying on the positive information disseminated to the market by defendants. Moreover, the City of Philadelphia's status as an institutional investor arguably suggests that it operates according to methods and investment criteria which are not typical of those employed by the smaller individual investors typical of the Chan Plaintiffs and the predominant members of the Class.

(Chan Resp. at 12.)

Regarding the City of Philadelphia's investment strategies, it seems clear that "whether a named plaintiff is a sophisticated speculator or a conservative novice is irrelevant unless those differences make his claims inconsistent with those of his class as a whole." *Koenig*, 117 F.R.D. at 335. As has already been discussed, all plaintiffs presently have consistent interests. Therefore, Philadelphia's investment strategy is not a bar to its appointment as a lead plaintiff.

As to the assertion that in purchasing stock the City of Philadelphia did not rely on OrthoLogic's alleged deception, the law is clear that in cases such as this, "where plaintiffs allege omissions or fraud on the market, proof of direct reliance is not required, but is presumed where materiality is shown." *In re AM Int'l, Inc. Securities Litig.*, 108 F.R.D. 190, 194 (S.D.N.Y.1985); *see also Blackie*, 524 F.2d at 906 ("We think causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance."). The mere fact that some of these purchases occurred after the publication of the June 17, 1996 Gray Sheet is not dispositive. First, as noted by the Philadelphia plaintiffs, whether the information published in the Gray Sheet constituted full disclosure is a merits question. Second, as the Ninth Circuit has noted, "interim corrective disclosures ... do not necessarily bring predisclosure purchasers into conflict with post-disclosure purchasers." *Blackie*, 524 F.2d at 910. Third, the *Chan* plaintiffs' own class period includes investors who, like the City of Philadelphia, purchased stock after the disclosures in the Gray Sheet. Finally, even throwing out Philadelphia's purchases on June 18, 1996, the City's prior purchases of OrthoLogic stock still vastly outnumber the purchases of the *Chan* plaintiffs. For all these reasons, therefore, the court does not see the potential allegation that the City was merely a "speculator" as impeding its role as presumptive lead plaintiff.

*5 This leaves Philadelphia's "institutional investor" status as the last remaining issue. Although the *Chan* plaintiffs cite a number of cases for the proposition that "sophisticated" investors (such as institutional investors) are atypical of the class, and therefore make improper lead plaintiffs, *see Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 746 (5th Cir.1984); *J.H. Cohn & Co. v. American Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir.1980); *Garonzik v. Shearson Hayden Stone, Inc.*, 574 F.2d 1220, 1221 (5th Cir.1978), *cert. denied*, 439 U.S. 1072 (1979), these cases are inapposite for a number of reasons. First, these cases all were decided prior to the PSLRA. As the *Chan* plaintiffs concede, the legislative history of the PSLRA shows that it was designed to encourage the participation of institutional investors in securities class action litigation. Indeed, the Philadelphia plaintiffs' reply argues this point at length, liberally quoting from the PSLRA's legislative history. Therefore, in light of the PSLRA, the landscape under which both the Fifth and Seventh Circuits made their prior decisions has clearly shifted in favor of institutional investors.

Second, and perhaps more importantly, is that under Ninth Circuit law, "[d]ifferences in sophistication, etc., among purchasers have no bearing in the impersonal market fraud context, because dissemination of false information necessarily translates through market mechanisms into price inflation which harms each purchaser identically." *Blackie*, 524 F.2d at 905. Thus, "[s]ophisticated investors are as entitled to rely on

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1996 WL 1082812                                                                                        Page 5
(Cite as: 1996 WL 1082812 (D.Ariz.))

the fraud-on-the-market theory as anyone else." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 506 (9th Cir.1992); *see also In re MDC Holdings Securities Litigation*, 754 F.Supp. 785, 802 (S.D.Cal.1990) (rejecting argument that simply because of its status as a sophisticated investor the proposed lead plaintiff was atypical of the class and subject to unique defenses). Thus, the mere sophistication of the Philadelphia plaintiffs' is not enough to rebut their presumption as adequate lead plaintiff.

In sum, the *Chan* plaintiffs have failed to rebut the PSLRA's presumption that the Philadelphia plaintiffs, as the plaintiffs with the largest financial stake in the instant litigation, are the most adequate lead plaintiffs for this case. Moreover, the court finds that the Philadelphia plaintiffs otherwise satisfy the requirements of Rule 23. The Philadelphia plaintiffs, therefore, are appointed as the lead plaintiffs in this action.

Finally, the PSLRA provides that, subject to court approval, the lead plaintiffs are entitled to select and retain the counsel who will represent the class. 15 U.S.C. § 77z-1(a)(3)(B)(v). The Philadelphia plaintiffs have retained the law firms of Milberg Weiss Bershad Hynes & Lerach, Barrack Rodos & Bacine, and Bonnett Fairbourn Friedman & Balint. The court has reviewed the resumes of these firms and notes their extensive experience in the area of class action securities fraud. Based upon this review, the court is satisfied that these firms will provide capable representation to the class as a whole. Accordingly, the law firms of Milberg Weiss Bershad Hynes & Lerach, Barrack Rodos & Bacine, and Bonnett Fairbourn Friedman & Balint are appointed as co-lead counsel in this action.

*6 IT IS ORDERED granting the Philadelphia plaintiffs' motion to be appointed lead plaintiffs and for appointment of lead plaintiffs' co-lead counsel (doc. 14).

IT IS FURTHER ORDERED denying the *Chan* plaintiffs' motion for appointment of lead plaintiffs and lead plaintiffs' counsel (doc. 8).

1996 WL 1082812, 1996 WL 1082812 (D.Ariz.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works