UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. LITIGATION | ) Civil Action No. 04-10294-DPW<br>) (Lead Case)<br>)<br>) |
| THIS DOCUMENT RELATES TO:<br>ALL CASES | ) **AFFIDAVIT OF CHARLES E.**<br>) **SWEENEY IN SUPPORT OF BPI**<br>) **GLOBAL ASSET MANAGEMENT LLP'S**<br>) **MOTION TO BE APPOINTED LEAD**<br>) **PLAINTIFF**<br>)<br>) |

| | |
|---|---|
| State of Florida | ) |
| | ) ss. |
| County of Orange | ) |

I, Charles E. Sweeney, being duly sworn, deposes and says:

1.    I am the Controller of BPI Global Asset Management LLP ("BPI Global"), which has moved to serve as the Lead Plaintiff in this action. I submit this affidavit in support of BPI Global's motion to serve as Lead Plaintiff.

2.    As previously set forth in my Declaration filed on April 26, 2004, BPI Global is a limited liability partnership formed under the laws of Delaware having its principal place of business at 1900 Summit Tower Boulevard, Suite 450, Orlando, Florida 32810. BPI Global has more than $5 billion under management.

1

6745

3.    BPI Global serves as the investment advisor for BPI Global Equity Fund and BPI American Equity Fund, which is sometimes referred to as BPI American Equity Value Fund. CI Mutual Funds Inc. ("CI Funds") acts as the manager and trustee for, and is the ultimate controlling entity of, these funds. Exhibit A hereto is a true and correct copy of the Amended and Restated Investment Advisory Agreement between BPI Capital Management Corporation ("BPI Capital") and BPI Global. BPI Capital was acquired by CI Funds as of January 1, 2000. The above-referenced investment advisory agreement is the operative agreement pursuant to which BPI Global renders investment advisory services to CI Funds and the mutual funds it controls, including BPI Global Equity Fund and BPI American Equity Fund. This agreement remains operative today and was the governing agreement at the time BPI Global purchased the Sonus Networks, Inc. ("Sonus") stock that is the subject of this action.

4.    Pursuant to the investment advisory agreement, BPI Global had full investment discretion to purchase the shares reflected in its Certificate Of Plaintiff previously submitted to the Court. See Exhibit A to the Declaration Of Joseph M. Barton In Support Of Motion Of BPI Global Asset Management LLP To Be Appointed As Lead Plaintiff And For Its Counsel To Be Appointed As Lead Counsel, filed April 12, 2004. Pursuant to the investment advisory agreement, BPI Global has sole voting authority over those shares and was solely responsible for making the investment decisions to purchase the Sonus shares. Such decisions were based upon, among other things, BPI Global's review of the publicly-available financial statements issued by Sonus and other public representations made by the company. BPI Global concluded that in keeping with its fiduciary obligation to CI Funds and the underlying mutual funds, it should pursue the Lead Plaintiff position in this litigation to attempt to recover the substantial losses incurred. I have been informed that CI Funds and the mutual funds fully support this decision

2

6745

and agree to be bound by the result of this litigation if BPI Global is appointed as the Lead Plaintiff.

5.    The losses resulting from BPI Global's purchase of Sonus shares during the Class Period exceed $5.3 million, as reflected in its Certificate Of Plaintiff. BPI Global Equity Fund sustained a loss of $2,370,550.03 and BPI American Equity Fund sustained a loss of $1,202,751.86. Both of these entities purchased their Sonus shares on or about September 23, 2003 pursuant to a Prospectus Supplement of the same date for a secondary offering of Sonus common shares.

6.    In the course of its business, BPI Global interacts with attorneys on a regular basis. I understand the responsibilities BPI Global would undertake as Lead Plaintiff and BPI Global fully intends to fulfill those responsibilities for the benefit of all Class members.

**Sworn under the penalty of perjury under the laws of the United States of America.**

_____
Charles E. Sweeney

Sworn to before me this _1st_ day
of July 2004

State of <u>Florida</u>
County of <u>Orange</u>

The foregoing instrument was acknowledged before me this _1st_ day of _July, 2004_, by _Charles E. Sweeney_, who is personally known to me or has produced _____ <u>personally known</u> ___ as identification and did not take an oath.

_____
Notary Public

Latricia K. Ewen
My Commission # DD321007

Latricia K Ewen
My Commission DD321007
Expires July 29, 2008

My Commission Expires: July 29, 2008

Submitted By:

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
Gwendolyn R. Giblin
595 Market Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 777-2230
Fax: (415) 777-5189

**GRAHAM & ALBANO, P.C.**
**Patricia A. Szumowski, BBO #653839**
**100 Russell Street**
**P.O. Box 377**
**Hadley, Massachusetts 01035**
**Telephone: (413) 586-5055**
**Facsimile: (413) 532-3387**

Attorneys for Proposed Lead Plaintiff
BPI Global Asset Management LLP

4

6745

# EXHIBIT A

# BPI CAPITAL MANAGEMENT CORPORATION

- and -

# BPI GLOBAL ASSET MANAGEMENT LLP

## AMENDED AND RESTATED
## INVESTMENT ADVISORY AGREEMENT

**May 31, 1999**

## AMENDED AND RESTATED
## INVESTMENT ADVISORY AGREEMENT

THIS AGREEMENT is made as of the 31st day of May, 1999.

AMONG:

> BPI CAPITAL MANAGEMENT CORPORATION, a corporation amalgamated under the *Canada Business Corporations Act* having its principal place of business at 161 Bay Street, Suite 3900, Toronto, Ontario M5J 2S1
>
> (the "Manager")
>
> - and -
>
> BPI GLOBAL ASSET MANAGEMENT LLP, a limited liability partnership formed under the laws of Delaware having its principal place of business at Suite 450, 1900 Summit Tower Blvd., Orlando, Florida, 32810
> (the "Investment Advisor")

RECITALS:

A. The Manager and the Investment Advisor are parties to an Investment Advisory Agreement dated as of March 31, 1997 (the "1997 Agreement") and desire to amend and restate the 1997 Agreement on the terms and conditions set out herein;

The BPI American Equity Value Fund, BPI American Small Companies Fund, BPI Global Equity Fund, BPI Global Small Companies Fund, BPI Emerging Markets Fund, BPI International Equity Value Fund, the BPI Global Opportunities Fund and the BPI Global Opportunities II Fund (the "Funds") are mutual fund or unit trusts established by declarations of trust executed by BPI Capital Management Corporation, as trustee, under the laws of Ontario;

B. The Manager has been engaged to act as the manager of each of the Funds pursuant to management agreements (the "Management Agreements") made among the Manager and each of the Funds;

C. The assets of each of the Funds are to be invested in accordance with the investment objectives, restrictions and practices set out in Schedule 1 to this Agreement as the same may be amended from time to time by the Manager in accordance with applicable securities laws and the declarations of trust of the Funds; and

D. The Investment Advisor provides investment management services in American and other non-Canadian equities and the Manager desires to appoint the Investment Advisor to provide to the Manager investment management services in respect of the Funds and their Investment Assets.

-2-

**NOW THEREFORE** in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration (the receipt and sufficiency of which are acknowledged), the parties agree that the 1997 Agreement is amended and restated as follows:

## Definitions and Interpretation

1.    In this Agreement:

**"Advice"** means the provision of investment advice by the Investment Manager to the Manager pursuant to paragraphs 5 a), b) and c) hereof;

**"Affiliate"** has the meaning attributed to it in the *Securities Act* (Ontario), as amended from time to time;

**"Agreement"** means this agreement as it may be amended or supplemented from time to time, and the expressions **"hereto"**, **"herein"**, **"hereof"**, **"hereby"**, **"hereunder"** and similar expressions refer to this agreement and include every instrument supplemental or ancillary to this agreement and, unless otherwise indicated, references to paragraphs are to paragraphs in this agreement;

**"Business Day"** means any day, other than Saturday, Sunday and any statutory holiday in the Province of Ontario;

**"Custodian"** means such entity as may be appointed by a Fund respecting the safekeeping of the Investment Assets of the Fund from time to time;

**"Funds"** has the meaning given to it in the recitals hereto, and "Fund" shall mean any of the Funds and, in addition, shall include any other mutual fund as may be agreed to between the Manager and the Investment Advisor pursuant to Section 5 of this Agreement;

**"Investment Assets"** of a Fund means all monies deposited in the particular Fund's account and all investments purchased with such monies from time to time, excluding cash on deposit;

**"Investment Objective"** in respect of a Fund means the investment objective of the Fund as set out in the simplified prospectus of the Fund from time to time;

**"Investment Policy"** of a Fund means the Investment Objective and the Investment Restrictions and Practices;

**"Investment Restrictions and Practices"** of a Fund means the investment restrictions and practices of the Fund from time to time;

**"NP 39"** has the meaning ascribed to it in Section 7 hereof;

**"1997 Agreement"** has the meaning given to it in the recitals hereto;

**"Opportunities Funds"** means the BPI Global Opportunities Fund and the BPI Global

Opportunities II Fund;

**"Person"** means any individual, partnership, limited partnership, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, regulatory body or agency, government or governmental agency, authority or entity however designated or constituted;

**"Prime Rate"** means the Canadian dollar prime rate of the principal bankers of the Manager; and

**"Securities Authorities"** means the Ontario Securities Commission and equivalent regulatory authorities in each other Province and Territory of Canada.

## Headings

2.    The inclusion of headings in this Agreement is for convenience of reference only and shall not affect the construction or interpretation hereof.

## Governing Law and Submission to Jurisdiction

3.    This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and shall be treated in all respects as an Ontario contract. The Manager and the Investment Advisor each agrees that any suit, action or proceeding arising out of or relating to this Agreement against it or any of its assets may be brought in any court of the Province of Ontario or Canada and hereby irrevocably and unconditionally attorns and submits to the jurisdiction of such courts over the subject matter of any such suit, action or proceeding. The Manager and the Investment Advisor each irrevocably waives and agrees not to raise any objection it might now or hereafter have to any such suit, action or proceeding in any such court including, without limitation, any objection that the place where such court is located is an inconvenient forum or that there is any other suit, action or proceeding in any other place relating in whole or in part to the same subject matter. Nothing in this section shall restrict the bringing of any such suit, action or proceeding in the courts of any other jurisdiction. Forthwith after execution of this Agreement, the Investment Advisor shall designate and appoint, on terms satisfactory to the Manager acting reasonably, an agent for service of any notice, pleading, subpoena, summons or other process in any proceedings relating in whatever manner to this Agreement.

## Invalidity of Provisions

4.    Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of such provision by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof.

## Appointment

-4-

5.    a.    **Appointment For Current Funds**: The Manager hereby appoints the Investment Advisor to advise the Manager in respect of the investment of the Investment Assets during the term of this Agreement of the Funds, in accordance with the Investment Policy of each Fund. The Investment Advisor accepts such appointment and agrees to act in accordance with the terms and conditions set forth herein.

    **b.**    **Appointment for New Funds:** It is agreed that in the event that the Manager should become the investment manager to a Canadian based mutual fund (a "New Fund") with an investment objective of investing primarily in American, global or emerging markets equities (other than Asia Pacific and global resource securities), the Manager shall provide by written notice to the Investment Advisor the opportunity (at the discretion of the Investment Advisor) to amend this Agreement to provide that the Investment Advisor shall provide Advice to the Manager (on such terms as the Manager and the Investment Adviser may agree to) pursuant to this Agreement in respect of the assets of such New Fund and that, except as otherwise agreed, the term "Funds" shall for the purposes of this Agreement include the New Fund.

    **c.**    **Appointment for "Foreign Content":** It is agreed that the Manager may require the Investment Advisor to advise the Manager in respect of a portion of the assets of other Canadian based mutual funds managed by the Manager in accordance with such investment instructions as may be given by the Manager to the Investment Advisor from time to time.

    **d.**    **Fiduciary:** The Investment Advisor acknowledges that it is a fiduciary to the Manager and each of the Funds and assumed the duties, responsibilities and obligations of such a fiduciary. The Manager acknowledges that pursuant to applicable Canadian securities regulatory policies it is responsible to each of the Funds for the investment advisory services rendered to the Manager by the Investment Advisor pursuant to this Agreement and that such shall be disclosed in the simplified prospectus and annual information form or other disclosure document of each of the Funds in effect from time to time.

## Duties of the Investment Advisor

6.    The Investment Advisor shall provide the Advice in respect of each of the Funds during the term of this Agreement in accordance with the Investment Policy of each of the Funds and, without limiting the generality of the foregoing, shall, on the instructions or approval of the Manager in respect of each of the Funds:

a.    invest and reinvest the Investment Assets in accordance with the Investment Objective and in a manner consistent and in compliance with the Investment Restrictions and Practices;

b.    implement portfolio purchases and sales respecting the Investment Assets, including the selection of market and broker or dealer and, where applicable, the negotiation of compensation for such dealers or brokers, and shall provide (i) to the Manager and the Custodian immediate advice of all portfolio transactions respecting the Investment Assets, and (ii) to the Manager such information relating in any manner to portfolio transactions respecting the Investment Assets as the Manager may require for reports or filings with Securities Authorities or may reasonably require for disclosure in offering, marketing or promotional materials relating to the Fund;

c.    provide or cause to be provided to the Manager such daily, weekly and monthly reports with respect to the cost and current value of the Investment Assets as the Manager may reasonably request and such information regarding the Investment Manager's activities hereunder as the Manager may from time to time reasonably request;

d.    participate to the extent reasonably required by the Manager in its marketing and promotional efforts or activities in respect of the Fund, provided that the Investment Advisor shall not bear any of the expenses incurred by the Manager relating to the marketing and promotion of the Fund other than the costs of travelling to Canada;

e.    unless otherwise directed by the Manager, determine or cause to be determined under its supervision whether and in what manner to vote, or execute or cause to be executed proxies respecting the voting of, securities held in the Investment Assets at all meetings of holders of such securities;

f.    determine whether to exercise any rights to acquire, convert or exchange into other securities, securities held in the Investment Assets; and

g.    provide or cause to be provided such information as the Manager may reasonably require for reports to clients of the Manager or such information as the Manager may require to meet regulatory requirements or requests relating in any manner to the Investment Assets, whether made pursuant to

law, regulatory policy, or any interpretation by Securities Authorities thereof.

It is acknowledged that the investment strategies of the Opportunities Funds permit the Investment Advisor to borrow money in the name of and on behalf of the Fund (whether through the creation of margin accounts with investment dealers and brokers or otherwise) and cause the Fund to enter into transactions which may expose the Fund to other liabilities, (whether through short sale programs or otherwise). The Investment Advisor will use is reasonable best efforts to include in any agreement entered into in the name of and on behalf of the Fund, a provision to the effect that the third party creditor of the Fund or other party that may have a claim against the Fund will be restricted to a claim against the Investment Assets and will have no recourse against any unitholder of the Fund.

## Relationship with the Manager

7. In carrying out its functions hereunder in respect of each of the Funds, the Investment Advisor agrees to comply with the Investment Objective, as amended from time to time, and the Investment Restrictions and Practices of each of the Funds, which are based on the current investment restrictions and investment practices relating to mutual funds established by the *Securities Act* (Ontario) (the "Act"), National Policy Statement No. 39, or any successor rule, policy or guideline thereto, adopted by the Securities Authorities ("NP 39") (for each Fund other than the Opportunities Funds) including the restrictions applicable to dealer managed mutual funds in NP 39, the declaration of trust and the offering memorandum for BPI Global Opportunities Fund, the declaration of trust and the annual information form for BPI Global Opportunities II Fund and the *Income Tax Act* (Canada) (collectively, the "Investment Restrictions and Practices"). The Manager will promptly advise the Investment Advisor in writing of any changes to the Investment Objective and/or the Investment Restrictions and Practices of any of the Funds from time to time and Schedule 1 shall thereafter be deemed to be amended accordingly. The Investment Advisor agrees to make investment recommendations and decisions thereafter consistent with any such changes. So long as the Investment Advisor has complied with Section 13 hereof, it shall not be liable to any of the Funds, the Manager or any other Person for any failure to comply with any changes to the Investment Restrictions or Practices if prior notification thereof has not been given by the Manager.

8. The Investment Advisor agrees to comply with the directions of the Manager relating to the disposal of any of the Investment Assets of a Fund, whether for the purpose of servicing redemptions, satisfying liabilities or otherwise, and relating to any other matters concerning the Investment Assets provided that, prior to taking any such action, the Manager shall consult with the Investment Advisor with respect to any such proposed direction and that the Investment Advisor shall not be liable to the Fund, the Manager or any other Person for any and all consequences of such direction.

9.  The Investment Advisor agrees to maintain the strictest confidence with regard to the investment program of each of the Funds and its Investment Assets. It further agrees to keep confidential all information concerning each of the Funds or the Manager which is not in the public domain, except as may be required to be disclosed by law or otherwise provided in this Agreement. The Manager agrees to maintain the strictest confidence with respect to the investment program of each of the Funds, including the timing or any proposals relating to acquisitions or dispositions, except that the Manager may disclose the Investment Assets actually held, bought or sold by the Fund after the same has occurred as it is required to do pursuant to the Act, regulations, policies, notices and directions of Securities Authorities or as it may deem appropriate or desirable.

10.  The Investment Advisor agrees that any information supplied by it to any of the Funds or the Manager will be materially accurate and complete and will contain no material misrepresentations.

11.  The Investment Advisor shall maintain complete and accurate books and records relating to the Investment Assets, including records relating to the accounting for portfolio transactions of the Investment Assets. Each of the Funds and the Manager shall have access at all reasonable times to all books and records maintained by the Investment Advisor relating to the Investment Assets of the particular fund. The Investment Advisor agrees that all books and records which it maintains relating to the Investment Assets of each of the Funds are the property of the Fund and that it will surrender any of such books and records to the Fund promptly upon the Fund's request, provided that the Investment Advisor may keep copies of such books and records to the extent necessary for the Investment Advisor to comply with any applicable laws. The Investment Advisor further agrees to preserve such records for such periods as may be prescribed by the laws of Canada and of the United States provided that before disposing of any such records it will advise the Manager and deliver the same to the Manager if the Manager so requests.

12.  The Investment Advisor agrees to take all necessary steps to ensure that no person or company within its control having access to confidential information concerning the investment program in respect of the Investment Assets shall purchase or sell securities of an issuer for his, her or its account where the portfolio securities of the Investment Assets include securities of that issuer and where such confidential information is used by the person or company for his, her or its direct benefit or advantage. The Investment Advisor agrees that it shall ensure that each of its employees who have access to information relating to portfolio transactions shall be bound by the applicable Rules for Personal Investing of the Manager and all similar laws applicable to them in the United States.

## Standard of Care

13.    The standard of care required of the Investment Advisor in exercising its powers and authorities in carrying out its functions hereunder shall be that it exercises its powers and authorities and carries out its functions honestly, in good faith and with a view to fulfilling each Fund's Investment Objective in compliance with the Investment Restrictions and Practices of each of the Funds and that, in connection therewith, it exercises that degree of care, diligence and skill that a reasonably prudent investment manager would exercise in comparable circumstances.

## Fees

14.    In consideration for the performance of the services provided by the Investment Advisor pursuant to this Agreement, the Manager agrees to pay to the Investment Advisor such amount as calculated and paid in accordance with Schedule "2".

## Liability and Indemnification

15.    So long as the Investment Advisor has complied with Section 13 hereof and the specific provisions of this Agreement, the Manager shall indemnify the Investment Advisor, its directors and officers from and against all costs, charges and expenses whatsoever that the Investment Advisor may sustain or incur in or about any action, suit or proceeding that is brought, commenced or prosecuted against the Investment 'Advisor for or in respect of any act, deed, matter or thing whatsoever, made, done, or permitted by the Investment Advisor in or about the performance of its services provided hereunder, including for greater certainty (i) any liability which would arise under Sections 7, 8, and 13 hereof where such paragraphs specifically contemplate no liability on the part of the Investment Advisor, or (ii) in respect of any liability the Investment Advisor may incur as a result of any untrue statement or omission in the prospectus, annual information form or other offering document (whether preliminary, pro forma or final and including any documents incorporated therein by reference) except that the foregoing does not apply to statements or omissions made in reliance upon and in conformity with written information furnished to the Manager by the Investment Advisor specifically for use in such document.

16.    Nothing herein shall be deemed to protect the Investment Advisor against any liability to any Person in respect of any matter relating to this Agreement in any circumstance where the Investment Advisor has failed to act in accordance with the standard of care set out in Section 13 hereof or to the extent that the Investment Advisor may have failed to fulfill its duties and obligations as set forth in this Agreement.

## Representations, Warranties and Covenants

17.  The Investment Advisor represents, warrants and covenants to the Manager that:

   a.  it is organized and validly existing under the laws of its jurisdiction of formation;

   b.  it has the corporate power and capacity to enter into, and to perform its obligations under, this Agreement;

   c.  it is registered as an "investment adviser" under the *Investment Advisers Act* of 1940, as amended, of the United States;

   d.  this Agreement has been duly authorized, executed and delivered by it and constitutes a valid and binding obligation of the Investment Advisor, enforceable in accordance with its terms;

   e.  the execution, delivery and performance of this Agreement by the Investment Advisor will not violate or result in any default under the Investment Advisor's constating documents, any other agreements to which the Investment Advisor is a party or its assets may be bound, or any statute or any rule, regulation or order of any government agency or body;

   f.  it has all the necessary registrations, to provide all the services to be rendered in this Agreement and that such registrations are in good standing; and

   g.  it shall advise the Manager in writing of any changes in the membership of the Investment Advisor.

18.  The Manager represents and warrants to the Investment Advisor that:

   a.  it is a corporation organized and validly existing under the laws of its jurisdiction of incorporation;

   b.  it has the corporate power and capacity to enter into, and to perform its obligations under, this Agreement;

   c.  this Agreement has been duly authorized, executed and delivered by it and constitutes a valid and binding obligation of the Manager, enforceable in accordance with its terms;

   d.  the execution, delivery and performance of this Agreement by the Manager will not violate or result in any default under the Manager's constating documents, any other agreement to which the Manager is a party or its assets may be bound, or any statute or any rule, regulation or order of any government agency or body; and

-10-

e.     it is a registered dealer, investment counsel and portfolio manager pursuant to the *Securities Act* (Ontario) and that such registration is in good standing.

19. The Manager will provide the Investment Advisor with copies of the declaration of trust, management agreement, simplified prospectus, annual information form or offering memorandum and all amendments and renewals thereto of each of the Funds. The Manager is not required to obtain the approval of the Investment Advisor for any changes to these documents other than solely with respect to material changes in the substance or form of disclosure regarding the Investment Advisor.

20. The Investment Advisor shall, at the request of the Manager, diligently pursue an application for registration with the Ontario Securities Commission as an international advisor, shall advise the Manager regularly as to the status of the application for registration until registration is obtained, and shall forthwith notify the Manager of any material difficulties encountered in obtaining such registration. The Investment Advisor shall use its best efforts to maintain its registrations to conduct business as an investment advisor (including its registrations as an investment advisor under the *Investment Advisers Act* of 1940 of the United States and as an international Advisor with the Ontario Securities Commission if and when obtained) in good standing. The Investment Advisor shall forthwith notify the Manager if any of such registrations have been rescinded, suspended or made subject to materially adverse conditions and of any change in its directors within a reasonable time after such change. The Manager agrees to notify the Investment Advisor of any changes to Canadian securities laws or written policies of Securities Authorities that would affect the Investment Advisor's activities under this Agreement forthwith after becoming aware of such changes.

## Term and Termination

21.   a. The term of this Agreement shall terminate on March 31, 2012, subject to automatic one year extensions unless either party gives written notice to the other not less than 90 days prior to March 31, 2012 or to the expiry of any subsequent one year extension of its intention to terminate this Agreement on March 31, 2012 or at the expiry of any extension term.

    b. Notwithstanding paragraph a) of this Section, the Manager or the Advisor may at any time during the term of this Agreement terminate this Agreement on not less than thirty (30) months prior written notice (the "Termination Notice") to the other party, whereupon this Agreement shall terminate on the date that is thirty (30) months from the date of receipt by the other party of the Termination Notice (determined in accordance with Section 29 hereof).

    In the event that the Manager issues a Termination Notice, the Investment Advisor will have the right to cancel the Agreement at any time prior to

-11-

the end of the thirty months' notice period, upon payment to the Manager or an Affiliate of an amount equal to the then net present value of BPI Global Holdings USA Inc.'s percentage interest pursuant to the Partnership Agreement in all management or advisory fees (other than performance fees) payable to the Investment Advisor by any party (other than in respect of assets advised by the Investment Advisor pursuant to this Agreement) from the date the Investment Advisor elects to cancel the Agreement to the end of the notice period (based on the asset levels at the date of cancellation).

In the event that the Investment Advisor issues a Termination Notice, the Manager will have the right to cancel the Agreement at any time prior to the end of the thirty months' notice period, upon payment to the Partnership of an amount equal to the then net present value of JBS Advisors, Inc.'s percentage interest pursuant to the Partnership Agreement in all management or advisory fees (other than performance fees) payable to the Investment Advisor pursuant to this Agreement from the date the Manager elects to cancel the Agreement to the end of the notice period (based on the asset levels at the date of cancellation).

c.    This Agreement may be immediately terminated by any party hereto by notice in writing to the other party if the other party shall default on any material obligation under or term of this Agreement, cease to carry on business, become bankrupt or insolvent, resolve to wind up or liquidate or if a receiver of any of its assets is appointed provided that such other party shall have a period of 15 business days to cure such default to the reasonable satisfaction of the party giving such notice. In addition, this Agreement may be immediately terminated by the Manager by notice in writing to the Investment Advisor if the Manager establishes that the Investment Advisor or any of its officers has committed any material fraud or material wrongdoing in conducting its business.

22.    Upon termination of the Investment Advisor's appointment hereunder, the Investment Advisor shall forthwith deliver to the Funds all written records, documents and books of account, and all materials and supplies which have been supplied by the Funds or the Manager or for which the Investment Advisor has been paid by the Manager, which are in the possession or control of the Investment Advisor and which relate to the performance by the Investment Advisor of its obligations under this Agreement provided, however, that the Investment Advisor may retain notarial or other copies of such records, documents, books of account, materials and supplies and the applicable Fund shall produce at its principal office the originals of such records, documents, books of account, materials and supplies whenever reasonably required to do so by the Investment Advisor for the purpose of legal proceedings or dealings with any governmental authorities.

23.    Upon termination of the Investment Advisor, the Manager shall pay to the

-12-

Investment Advisor such fees as may be due hereunder up to and including the date of such termination. The provisions included in Sections 9 and 16 shall survive the termination of this Agreement.

## Consent to Use of Names

24.    When referring to the Investment Advisor in connection with the Fund and in any promotional and marketing material relating thereto, the Manager may use the Investment Advisor's corporate name and trade names, if any.

## Conflict of Interest

25.    Subject to Section 27 hereof, the Manager acknowledges that the Investment Advisor may act as an investment counsel, manager and portfolio manager to other Persons. In connection therewith, the Investment Advisor agrees that, if the availability of any particular security is limited and investment in that security is in keeping with the Investment Policy and also with the investment objective of one or more client accounts for which the Investment Advisor is responsible, it will ensure that each of the Fund's requirements are treated on an equitable basis.

26.    So long as this Agreement remains in force, the Investment Advisor will not act, without the prior written consent of the Manager, as investment counsel, portfolio manager or manager of any other mutual fund which distributes or has distributed its securities to the public in Canada or the United States pursuant to a prospectus, offering memorandum or otherwise except for mutual funds of which the Manager is the manager, administrator or trustee.

## Risk Disclosure Statement

27.    To the extent applicable, the Manager is hereby notified that the risk of loss in trading futures contracts or options can be substantial. In some circumstances, the Manager may sustain losses in excess of its initial margin funds. Placing contingent orders, such as "stop-loss" or "stop-limit" orders, will not necessarily achieve the desired results. Market conditions may make it impossible to execute such orders. The Manager may be called upon at short notice to deposit additional margin funds. If the required funds are not provided within the prescribed time, the Manager's position may be liquidated. The Manager will remain liable for any resulting deficit in its account. The Manager should therefore study and understand futures contracts and options before it trades and carefully consider whether such trading is suitable in the light of its own financial position and investment objectives.

## Amendments

28.    This Agreement may not be amended or modified in any respect except by written instrument signed by the parties hereto provided that the parties hereto agree that this

Agreement shall be amended from time to time as required by applicable law or regulatory policy or by Securities Authorities or to amend Schedule "1" pursuant to Section 7 hereof. Each of the Manager and the Investment Advisor undertakes to notify the other in the event of any material change to the particulars of this Agreement.

## Notices

29. Except as otherwise provided, any notice or other communication required or permitted to be given hereunder shall be in writing and shall be given by facsimile or other means of electronic communication or by delivery as hereafter provided. Any notice or other communication, if sent by facsimile or other means of electronic communication, shall be deemed to have been received on the business day in the jurisdiction of receipt following the sending, or if delivered by hand shall be deemed to have been received at the time it is delivered to the applicable address noted below either to the individual designated below or to an individual at such address having apparent authority to accept deliveries on behalf of the addressee. Notice of change of address shall be governed by this section. Notices and other communications shall be addressed as follows:

   a.    if to the Manager:

         BCE Place
         161 Bay Street, Suite 3900
         Toronto, Ontario
         M5J 2S1

         Attention: President and Chief Executive Officer

         Telecopier No.:  416 - 861-0715

   b.    if to the Investment Advisor:

         Suite 450
         1900 Summit Tower Blvd.
         Orlando, Florida
         32810

         Attention:  President

         Telecopier No.: (407) 660-5778

## Assignment

30. This Agreement shall not be assigned by any of the parties hereto, without the express prior written consent of the other parties, provided that the Manager may on

-14-

written notice to the Investment Advisor assign this Agreement to an Affiliate.

## Enurement

31.   This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

## Counterparts

32.   This Agreement may be executed in any number of counterparts all of which taken together shall constitute this Agreement.

## Nature of Agreement

33.   This Agreement is not intended to be and shall not be treated as anything other than an investment advisory agreement relating to the provision of investment advisory services, with the rights of the parties being none other than the rights ascribed to them under this Agreement. Without limitation, this Agreement shall not be deemed in any way or for any purpose to constitute any party a partner or agent of the other parties to this Agreement in the conduct of any business or otherwise or a member of a joint venture or joint enterprise with the other parties to this Agreement.

**Entire Agreement**

34.    This Agreement constitutes the entire agreement between the parties hereto concerning the matters addressed in this Agreement, and cancels and supersedes any prior agreements, undertaking, declarations or representations, written or verbal in respect thereof, including without limitation the 1997 Agreement.

IN WITNESS WHEREOF the parties have executed this Agreement.

BPI CAPITAL MANAGEMENT CORPORATION

By: _____

By: _____

BPI GLOBAL ASSET MANAGEMENT LLP

By: _____

By: _____

-16-

## SCHEDULE 1

## INVESTMENT OBJECTIVES, PRACTICES AND RESTRICTIONS

### Investment Objective of each of the Funds (other than the Opportunities Funds)

The Investment Objective of each of the Funds (other than the Opportunities Funds) are as set out in the Simplified Prospectus of the Funds from time to time.

### Investment Restrictions of Securities Regulatory Authorities (not applicable to the Opportunities Funds)

1.    In respect of the Investment Assets, each of the Funds (other than the Opportunities Funds) shall not without the prior approval of the Securities Authorities:

(a)    purchase the securities of any issuer (other than securities issued or guaranteed by the Government of Canada, Government of any Province of Canada, or Government of the United States of America, or any agency of any such governments) if, as a result:

   (i)    more than 10% of the net assets of the Fund (taken at market value at the time of purchase) are invested in securities of such issuer; or

   (ii)   the Fund would hold more than 10% of any class or series of a class of securities of such issuer, provided that for the purpose of making this determination, all debt obligations of an issuer maturing in less than one year and all unlisted permitted derivatives (as defined below) of an issuer shall be regarded as a single series of a class of securities;

(b)    purchase real estate;

(c)    purchase mortgages or other than permitted mortgages (as such term is defined in NP 39);

(d)    purchase permitted mortgages if following such purchase more than 10% of the total assets of the Fund (taken at market value at the time of purchase) would consist of permitted mortgages;

(e)    purchase restricted securities (as defined below) if following such purchase more than 10% of the total assets of the Fund (taken at market value at the time of purchase) would consist of illiquid investments (as defined below);

(f)    purchase securities for the purpose of exercising control or management of the issuer of such securities;

(g)    purchase gold or gold certificates if following such purchase more than 10% of the total assets of the Fund (taken at market value at the time of purchase) would consist

-17-

of gold and gold certificates, provided that any purchase of gold certificates shall be restricted to gold certificates issued by an issuer approved by the Securities Authorities;

(h)    subject to paragraph 3, purchase or sell derivatives except for permitted derivatives (as defined below), and except as specifically permitted by NP 39;

(i)    purchase or sell commodities, provided that this shall not restrict the Fund from purchasing or selling gold or gold certificates to the extent that such purchase or sale is not otherwise restricted pursuant to paragraph (g) above; and

(j)    invest in securities of any mutual fund provided that this shall not restrict the Fund from investing in:

    (i)    securities of any mutual fund where:

        (A)    adequate provisions are made to address any conflicts which result in the Fund and the other mutual fund by reason of such investment and such provisions are described in the prospectus of the Fund; and

        (B)    the arrangement between or in respect of the Fund and the other mutual fund is such so as to avoid the duplication of management fees and sales charges and such arrangement is described in the prospectus of the Fund; and

        (C)    either such other mutual fund is qualified for sale pursuant to a prospectus which has been filed and accepted in the Provinces or Territories of Canada where the securities of the Fund are qualified for sale pursuant to a prospectus which has been filed and accepted in such Provinces or Territories of Canada; or

        (D)    the only way that the Fund may invest in a foreign country is through a mutual fund established with the approval of the Government of such foreign country and there is disclosure in the prospectus of the Fund of the risk factors which may be associated with the investment in foreign countries such as the imposition of foreign investment and exchange control laws and the fact that financial and other reporting and auditing standards and practices and disclosure may be less extensive than comparable requirements in Canada and the United States; or

    (ii)    Toronto 35 Index Participation Units which are listed or are qualified for sale pursuant to a prospectus which has been filed and accepted in the Provinces and Territories of Canada;

and provided that the prior approval of the Securities Authorities is obtained before

the Fund may:

    (i)    invest more than 10% of its net assets (taken at market value at the time of such investment) in a mutual fund, or

    (ii)    hold more than 10% of any class or series of a class of securities of a mutual fund;

2.    Subject to paragraph 3, the Fund may purchase, sell or otherwise take a position in a permitted derivative for non-hedging purposes, provided that, for the purpose of complying with the restrictions in the foregoing paragraph 1, the Fund must determine its exposure to the investment that forms the underlying interest of the permitted derivative by adding:

    (i)    the underlying market exposure that the position in the permitted derivative provides to such investment;

    to:

    (ii)    the underlying market exposure to such investment provided by other permitted derivatives, if any, held by the Fund for non-hedging purposes: and

    (iii)    the exposure represented by the direct holding of such investment, if any, held by the Fund;

provided that, with respect to a permitted derivative which has underlying market exposure to a stock or bond index that includes the investment as a component, the market exposure that such investment represents in such index shall not be included in the foregoing calculation where the investment represents less than 10% of the stock or bond index.

3.    Each Fund (other than BPI Emerging Markets Fund and the Opportunities Funds) will limit its use of permitted derivatives to foreign currency forward exchange contracts for hedging purposes as disclosed in the simplified prospectus from time to time.  BPI Emerging Markets Fund may use foreign currency forward exchange contracts for hedging and non-hedging purposes and debt-like securities (defined in NP 39), including structured fixed income securities, as described in the simplified prospectus from time to time.  For a description of the derivatives transactions which are permitted for the Opportunities Funds, see "Investment Restrictions" for these Funds below.

**Investment Practices Required by Securities Regulatory Authorities Relating to each of the Funds (not applicable to the Opportunities Funds)**

In respect of the Investment Assets, the Fund shall not without the prior approval of the Securities Authorities:

    (a)    mortgage or pledge any of the Investment Assets (except as may be required for posting margin to effect permitted derivatives) or borrow money except as a

-19-

temporary measure for the purpose of accommodating requests for the redemption of securities issued by the Fund while effecting an orderly liquidation of portfolio securities, and then only if after giving effect to such borrowing the outstanding amount of all such borrowing does not exceed 5% of the net assets taken at market value at the time of such borrowing;

(b)    invest more than 10% of the net assets (taken at market value at the time of investment) in illiquid investments (as defined below);

(c)    purchase securities on margin;

(d)    sell securities short;

(e)    purchase any security which may by its terms require the Fund to make a contribution in addition to the payment of the purchase price other than a permitted derivative, provided that this restriction shall not apply to the purchase of securities which are paid for on an installment basis where the total purchase price and the amount of all such installments is fixed at the time the first installment is paid;

(f)    engage in the business of underwriting securities or marketing to the public securities of any other issuer;

(g)    lend money, provided that this restriction shall not apply to as to prevent the purchase of debt obligations;

(h)    lend portfolio securities;

(i)    guarantee the securities or obligations of any person or company;

(j)    purchase securities other than through normal market facilities unless the purchase price approximates the prevailing market price or is negotiated on an arm's length basis;

(k)    enter into any portfolio transaction with any of the following acting as a principal in such transaction: (I) the Investment Advisor, the Manager, or affiliates thereof; (ii) any director or officer of the Investment Advisor, the Manager, or affiliates thereof; (iii) any associate of the foregoing; or (iv) any entity having fewer than 100 participants of record of which any director or officer of the Investment Advisor, or the Manager may be a director, officer or participant.

**Dealer Managed Mutual Fund Requirements of Securities Regulatory Authorities (applicable to all Funds other than the Opportunities Funds)**

A "dealer managed mutual fund" means a mutual fund whose portfolio advisor (i.e. the Manager or Investment Advisor) is a dealer manager. A "dealer manager" means:

(i)     any dealer who acts as portfolio advisor;

(ii)    any portfolio advisor in which any dealer or any partner, director, officer, salesman or principal shareholder of a dealer, directly or indirectly, has in the aggregate more than 10% interest; and

(iii)   any partner, director or officer of any portfolio adviser referred to in clause ii).

If the Fund is a "dealer managed mutual fund" within the meaning of the foregoing definitions, the following additional restrictions apply:

In respect of the Investment Assets, no investment shall knowingly be made in any class of securities of any issuer (other than those issued or guaranteed by the Government of Canada, the Government of a Province of Canada or an agency of such governments):

(a)

for which the Manager or the Investment Advisor or an associate or affiliate has acted as an underwriter in the distribution of such class of securities of the issuer (except as a member of the selling group distributing 5% or less of the securities underwritten) for a period of at least 60 days following the conclusion of the distribution of the underwritten securities to the public; or

(b)     · of which any partner, director, officer or employee of the Manager or the Investment Advisor or any partner, director, officer or employee of any affiliate or associate is an officer or director, except where any such partner, director, officer or employee does not (i) participate in the formulation of investment decisions respecting the Fund; (ii) have access prior to implementation to investment decisions respecting the Fund; and (iii) influence (other than through research, statistical and other reports generally available to clients) the investment decisions respecting the Fund.

## BPI GLOBAL OPPORTUNITIES FUND

### Investment Objective

To achieve long-term capital appreciation by investing in a globally diversified portfolio of stocks, bonds and other securities likely to benefit in the near term from structural change affecting specific companies, industries and national economies.

### Investment Strategies and Restrictions

1.    To achieve the Fund's investment objectives, the Investment Advisor shall:

(a)    focus on restructuring and cost-cutting undertaken by companies to improve profitability, where the valuation of the company's improvements are not yet fully recognized by the marketplace.

(b)    look for low absolute valuations, growth stocks that have impaired valuations caused by temporary events and companies selling at substantial discounts to private market value where private market value is growing.

(c)    look for opportunities in rapidly growing sectors where key market participants may be undervalued and sectors where profitability of industry participants may benefit from favourable regulatory reform.

(d)    seek out companies where international accounting analysis has identified assets and/or cash flows in the financial statements which are not generally recognized in their home markets.

In addition, the Investment Assets may include securities from emerging markets where political volatility has let to deeply discounted stock and bond prices and "pre-emerging" markets where a lack of brokerage research coverage has left many productive assets undervalued.

2.    In addition to a core basket of approximately 30 equity and bond securities representing the Investment Advisor's selection of higher value, more secure investments, the Investment Assets may also include:

(a)    listed securities which, due to risk, liquidity or custodial concerns, may not be suitable for traditional mutual fund investment.

(b)    options on stocks, bonds, currencies or market indices which allow the Fund to leverage its returns from specific securities or timely market calls, in limited instances.

(c)    options which hedge against sudden fluctuations in markets.

(d)    where financial analysis has identified companies which are believed to be

-22-

overvalued, short sale equity positions in marketable securities to a maximum of up to 50% (at the time of investment) of the net asset value of the Fund, less the amount of any other leverage activities of the Fund at the time of investment.

(e)    closed-end funds that offer exposure to regions and individual emerging stock markets and that often sell at sizeable discounts to net asset values, limited to 10% (at the time of investment) of the net asset value of the Fund.

3.(a)    The Investment Assets may include securities of unquoted companies or other illiquid entities with an emphasis on emerging markets where listed equity opportunities are limited, provided that there is believed to be a means to dispose of the investment within one year of its acquisition and further provided that no more than 25% (at the time of investment) of the net asset value of the Fund may be invested on this basis.

(b)    To the extent that the Fund utilizes leverage it shall comply with the following restrictions:

    (i)    The Fund may engage in derivatives transactions currently permitted by NP39, subject to any registration restrictions which apply to the Manager from time to time. The Fund is currently prohibited from using futures contracts or options on futures pursuant to these restrictions.

    (ii)    The Fund may also utilize the forms of leverage described below *to a maximum of 50% in the aggregate*, of the net asset value of the Fund

(c)    Leverage activities are limited to the following:

    (i)    Purchasing Marketable Securities on Margin or with Borrowed Funds

        maximum limit (including principal and interest) of 25% (at time of investment) of net asset value of the Fund's portfolio

        only "marketable securities" may be purchased using this form of leverage (i.e., securities for which a ready market exists and therefore can be sold easily and quickly)

        all securities purchased in this manner must be "qualified investments" for RRSP's under the *Income Tax Act (Canada)*

        all borrowings by the Fund for this purpose must be from arm's length financial institutions and must be on normal commercial terms

        all purchases on margin must comply with the margining requirements of any applicable exchange or other regulatory body

the Fund must meet the minimum margin requirements set by any applicable recognized exchange

(ii)   Short Selling

only in respect of stocks which are listed on a recognized Canadian or international stock exchange.   Margined short sales must meet minimum margin requirements set by the applicable regulatory authorities

maximum limit of 50% (at time of investment) of net asset value of Fund's portfolio (less the amount of any other leverage of the Fund at the time of investment)

(iii)   Writing or Acquiring Uncovered Options

*Acquiring Uncovered Options*

Fund may acquire clearing corporation options, over-the-counter options, listed warrants and debt-like securities which have an options component (NP39, section 2.07)

maximum limit of 10% (at time of investment) of net asset  value of the Fund's portfolio

*Writing Uncovered Options*

all options written by the Fund must be traded on recognized options exchanges

the options must be in respect of publicly listed stocks or bonds, a recognized stock or bond index (i.e. S&P 500 Index) or currencies

must be sold through broker and must conform with standardized rules issued by applicable exchanges

maximum limit of 50% (at time of investment of net asset value of the Fund's portfolio (less the amount of any other leverage of the Fund at the time of investment)

(d)   From the time to time the relative proportions of the Investment Assets invested in any one geographic region may vary in order to take advantage of international stock market cycles, to obtain a greater degree of geographic diversification for the portfolio or for other investment considerations determined by the Investment Advisor.

-24-

# BPI GLOBAL OPPORTUNITIES II FUND

## Investment Objective

To achieve long-term capital appreciation by investing in a globally diversified portfolio of stocks, bonds and other securities likely to benefit in the near term from structural change affecting specific companies, industries and national economies.

## Investment Strategies and Restrictions

1.    The Investment Advisor shall ensure that the Fund qualifies as a "unit trust" within the meaning of the *Income Tax Act* (Canada) (the "Tax Act"). As a result, the Investment Advisor shall manage the Fund so as to ensure that it complies at all times with the following investment restrictions (the "Restrictions"):

(a)    at least 80% of the property of the Fund must consist of any combination of (i) shares, (ii) any property that, under the terms or conditions of which or under an agreement, is convertible into, is exchangeable for or confers a right to acquire, shares, (iii) cash, (iv) bonds, debentures, mortgages, notes and other similar obligations, (v) marketable securities, and (vi) other investments permitted under the Tax Act from time to time;

(b)    at least 95% of its income for each year must be derived from, or from dispositions of, investments described in (a) above; and

(c)    at no time may more than 10% of its property consist of shares, bonds or securities of any one corporation or debtor other than Her Majesty in right of Canada or a province or a Canadian municipality.

Notwithstanding the foregoing, the Investment Advisor need not comply with the Restrictions during a taxation year of the Fund if the Fund shall have received an opinion from legal counsel to the effect that compliance with the Restrictions is no longer necessary because the Fund will otherwise qualify as a "unit trust" under the Tax Act throughout that year.

Subject to this overriding policy, the Investment Advisor will manage the Investment Assets of the Fund in accordance with the following strategies and restrictions:

2.    In selecting investments the Fund will:

(a)    focus on companies with a global presence and dominance in their industry;

(b)    focus on companies in sectors that demonstrate value because of increasing margins, for example, companies in a sector with significant pricing power;

(c)    seek out companies that are trading at a discount to earnings, assets or cash flow compared to their global peers;

(d)  look for short-term trading opportunities in companies with impaired valuations caused by temporary events, for example, lower-than-anticipated quarterly financial results or market overreaction to negative corporate news; and

(e)  look for strategic short sale opportunities in overvalued companies, for example, companies whose fundamentals are deteriorating and such deterioration is not reflected in the stock price and may also invest in listed options and warrants and write options.

3.    The Fund may include in its portfolio securities from emerging markets where political volatility has led to deeply discounted stock and bond prices, and "pre-emerging" markets where a lack of brokerage research coverage has left many productive assets undervalued.

4.    In addition to a core basket of equity and bond securities representing the Investment Advisor's selection of higher value, more secure investments, the Fund's portfolio may also include:

(a)  listed securities which, due to risk, liquidity or custodial concerns, may not be suitable for traditional mutual fund investment;

(b)  options on stocks, bonds, currencies or market indices which allow the Fund to leverage its returns from specific securities or timely market calls, in limited instances;

(c)  options which hedge against sudden fluctuations in markets;

(d)  where financial analysis has identified companies which are believed to be overvalued, short sale equity positions subject to the restrictions in section 5 below;

(e)  closed-end funds that offer exposure to regions and individual emerging stock markets and that often sell at sizeable discounts to net asset values, limited to 10% (at the time of investment) of the net asset value of the Fund; and

(f)  investment trusts and partnerships, including real estate investment trusts.

From time to time, the Fund may also invest in initial public offerings, private placements and offshore investments.

5.    The Fund will not own more than 10% of the securities of any one class of the securities of any one issuer or purchase securities of an issuer for purposes of exercising control or management of such issuer.

6.    The Fund will not:

(a)  guarantee the securities or obligations of any issuer;

(b)  purchase or sell commodities, mortgages, securities issued by mutual funds or real

estate or interests therein, other than securities of entities the principal business of which is investing in real estate; or

(c)    act as an underwriter.

7.    The Fund will not purchase securities from, sell securities to, or otherwise contract with the Investment Advisor or any of its affiliates, any officer, director or shareholder of any of them, any person, trust, firm or corporation managed by the Investment Advisor or any of its affiliates or any firm or corporation in which any officer, director or shareholder of the Investment Advisor may have a material interest (which, for these purposes, includes beneficial ownership of more than 10% of the voting securities of such entity) unless, with respect to any purchase or sale of securities, any such transaction is effected through normal market facilities and the purchase price approximates the prevailing market price.

8.    The Fund's portfolio may include securities of unquoted companies or other illiquid entities, with an emphasis on emerging markets where listed equity opportunities are limited, provided that there is believed to be a means to dispose of the investment within one year of its acquisition and further provided that no more than 25% (at the time of investment) of the net asset value of the Fund may be invested on this basis.

9.    To the extent that the Fund utilizes leverage it shall comply with the following restrictions:

(a)    The Fund may engage in derivatives transactions as permitted by National Policy No. 39 (the policy of the Canadian securities administrators governing publicly-offered mutual funds) (as such policy is amended or replaced from time to time), subject to any registration restrictions which apply to the Manager or the Investment Advisor from time to time.

(b)    In addition to the activities described in (a), the Fund may also utilize the following forms of leverage to a maximum of 50% (at the time of investment), in the aggregate, of the Fund's net asset value:

(c)    the Fund may purchase marketable securities on margin or with borrowed funds provided that:

(i)    the maximum limit (including principal and interest) does not exceed 25% (at the time of investment) of the Fund's net asset value;

(ii)    only "marketable securities" may be purchased using this form of leverage and these are securities for which a ready market exists and therefore, can be sold easily and quickly;

(iii)    all borrowings by the Fund for this purpose must be from arm's length financial institutions and must be on normal commercial terms; and

-27-

(iv)    all purchases on margin must comply with the margining requirements of any applicable stock exchange or other regulatory body.

(d)    the Fund may take short sale positions in respect of stocks which are listed on a recognized Canadian or international stock exchange up to 50% (at the time of investment) of the Fund's net asset value (less the amount of any other leverage of the Fund at the time of investment). Margined short sales must meet minimum margin requirements set by the applicable regulatory authorities;

(e)    the Fund may write uncovered options provided that;

(i)    all options written by the Fund must be traded on recognized options exchanges;

(ii)    the options must be in respect of publicly listed stocks or bonds, a recognized stock or bond index or currencies;

(iii)    the option written must be sold through a broker and must conform with standardized rules issued by applicable exchanges;

(iv)    to the extent that the Fund writes uncovered options, such investments will not exceed 50% (at the time of investment) of the Fund's net asset value (less the amount of any other leverage of the Fund at the time of investment).

From time to time the relative proportions of the Fund's investment portfolio invested in any one geographic region may vary in order to take advantage of international stock market cycles, to obtain a greater degree of geographic diversification for the portfolio or for other investment considerations determined by the Investment Advisor.

## Self-Dealing Restrictions Required by Securities Regulatory Authorities Relating to each of the Funds (including the Opportunities Funds)

1.    In respect of the Investment Assets, the Fund shall not:

(a)    knowingly invest in an issuer in which (i) any officer or director of the Manager or the Investment Advisor or an associate of any of them, or (ii) any person or company who is a substantial security holder (as defined below) of the Fund, the Manager or the Investment Advisor, has a significant interest (as defined below);

(b)    knowingly make an investment in any person or company who is a substantial security holder of the Fund, the Manager or the Investment Advisor or in which the Fund, alone or together with any mutual funds managed by the Manager or the Investment Advisor, is a substantial security holder;

(c)    knowingly make a loan to (i) any director or officer of the Manager, or the Investment Advisor, or an associate of any of them, or (ii) any individual, where the

-28-

individual or an associate of the individual is a substantial security holder of the Fund, the Manager or the Investment Advisor.

2.    The Fund, the Manager or the Investment Advisor shall not knowingly enter into any contract or other arrangement that results in the Fund being directly or indirectly liable or contingently liable in respect of any loan to or other investment in any person or company to whom or in which it is prohibited by the foregoing paragraphs 1(a), (b) or (c) from making a loan or any other investment, and for the purpose of these paragraphs, any such contract or other arrangement shall be deemed to be a loan or an investment, as the case may be.

## Definitions

For the purpose of this Schedule, the following terms have the meanings attributed to them in the Securities Act (Ontario) or NP 39 as applicable , each as amended from time to time, and, as of the date hereof, have the following meanings:

(a)    "affiliate":

(i)    a company shall be deemed to be an affiliate of another company if one of them is the subsidiary of the other or if both are subsidiaries of the same company or if each of them is controlled by the same person or company;

(ii)    a company shall be deemed to be a subsidiary of another company if,

(a)    it is controlled by

(i)    that other, or

(ii)    that other and one or more companies each of which is controlled by that other, or

(iii)    two or more companies each of which is controlled by that other, or

(b)    it is a subsidiary of a company that is that other's subsidiary.

(iii)    a company shall be deemed to be controlled by another person or company or by two or more companies if,

(a)    voting securities of the first-mentioned company carrying more than 50% of the votes for the election of directors are held, otherwise than by way of security only, by or for the benefit of the other person or company or by or for the benefit of the other companies;

(b)    the votes carried by such securities are entitled, if exercised, to elect a majority of the board of directors of the first-mentioned company;

-29-

(c)    a person shall be deemed to own beneficially securities beneficially owned by a company controlled by the person or by an affiliate of such company;

(d)    a company shall be deemed to own beneficially securities beneficially owned by its affiliates;

(e)    "voting security" means any security other than a debt security of an issuer carrying a voting right either under all circumstances or under some circumstances that have occurred and are continuing.

(b)    "associate" where used to indicate a relationship with any person or company means,

(i)    any company of which such person or company beneficially owns, directly or indirectly, voting securities carrying more than 10 per cent of the voting rights attached to all voting securities of the company for the time being outstanding,

(ii)    any partner of that person or company,

(iii)    any trust or estate in which such person or company has a substantial beneficial interest or as to which such person or company serves as a trustee or in a similar capacity,

(iv)    any relative of that person who resides in the same home as that person,

(v)    any person of the opposite sex who resides in the same home as that person and to whom that person is married or with whom that person is living in a conjugal relationship outside marriage, or

(vi)    any relative of a person mentioned in clause (v) who has the same home as that person;

(c)    "foreign securities" means securities issued by an issuer that is constituted under the laws of a jurisdiction other than Canada or a Province or Territory of Canada and carries on a substantial portion of its activities outside of Canada;

(d)    "illiquid investments" means investments which may not be readily disposed of, in a marketplace where such investments are normally purchased and sold and public quotations in common use in respect thereof are available, at an amount at least equal to the amount at which such investments are valued for the purpose of determining the net asset value of the Fund. Where in the case of any investment there is no marketplace where such investment may normally be purchased and sold and public quotations in common use in respect thereof are available, such investment will be considered to be an illiquid investment notwithstanding the fact that the Manager or the Investment Advisor or a director or officer of the Manager or the Investment

Advisor or any of their respective associates or affiliates has agreed to purchase the investment. Examples of illiquid investments include but are not limited to: limited partnership interests that are not listed and securities of a private company. Over-the-counter options entered into for non-hedging purposes are deemed to be illiquid investments.   Over-the-counter options entered into for hedging purposes in accordance with NP 39 are not deemed to be illiquid investments;

(e)    "permitted derivatives" means clearing corporation options, futures contracts, options on futures, over-the-counter options, forward contracts, debt-like securities and listed warrants;

(f)    "restricted securities" means securities, the resale of which is restricted or limited by means of a representation, undertaking or agreement by the Fund or by the Fund's predecessor in title or by law;

(g)    a person or company or a group of persons or companies has a "significant interest" in an issuer, if,

    (i)    in the case of a person or company, he, she or it, as the case may be, owns beneficially, either directly or indirectly, more than 10 percent, or

    (ii)    in the case of a group of person or companies, they own beneficially, either individually or together and either directly or indirectly, more than 50 percent,

of the outstanding shares or units of the issuer.

(h)    a person or company or a group of persons or companies is a "substantial security holder" of an issuer if that person or company or group of persons or companies owns beneficially, either individually or together or directly or indirectly, voting securities to which are attached more than 20% of the voting rights attached to all the outstanding voting securities of the issuer.

## SCHEDULE 2

## FEES

| Average Assets* | Annual Fee (%) |
|---|---|
| Assets up to $750 Million (U.S.) | 0.50 |
| Assets between $750-$1.5 Billion (U.S.) | 0.40 |
| Assets over $1.5 Billion (U.S.) | 0.35 |

* Excluding assets of the Opportunities Funds, for which the annual fee shall be 0.75% of the average assets of the Funds

Such fees shall be calculated monthly based on the U.S. dollar value of the average daily Investment Assets of each of the Funds (less the liabilities of the applicable Fund) as calculated by the Manager (less amounts invested by any of the Funds in another mutual fund managed by the Manager) during such month. Such monthly fees shall be paid by the Manager to the Investment Advisor in U.S. dollars within 15 days of the end of such month and shall be pro rated on a daily basis for part months.

It is agreed that the minimum assets for the purposes of the calculation of the foregoing fees (including the assets of the Opportunities Funds) shall be U.S. $500 Million.

## Performance Fee for the Opportunities Funds

The Manager is entitled to receive from:

(a) unitholders of the BPI Global Opportunities Fund a performance fee equal to 20% of the gain in the net asset value of the units of any particular unitholder in excess of 10% per annum calculated and payable as at the last business day of each calendar year and, for units which are redeemed during a calendar year, calculated on an annualized basis and paid upon the day upon which the redemption of units was effected (the "Opportunities I Performance Fees"); and

(b) BPI Global Opportunities II Fund (formerly BPI Canadian Opportunities II Fund) an annual performance fee equal to 20% of the amount by which the percentage increase in net asset value per Unit exceeds a threshold annualized increase of 10%. The performance fee is calculated daily for the purposes of determining the net asset value of the Fund and payable on the last day of each fiscal year of the Fund based on the cumulative increase in the net asset value per Unit. For purpose of calculating the performance fee, to the extent that the increase in net asset value per Unit in any given year does not exceed the threshold, then the amount by which such increase falls below the threshold will be carried forward and deducted from the

amount of any increase in the net asset value on which the performance fee is calculated in subsequent years, (the "Opportunities II Performance Fees").

The Manager shall pay to the Investment Advisor an additional fee (an "Additional Fee") in respect of each calendar year equal to 45% of all Opportunities I Performance Fees and 50% of all Opportunities II Performance Fees received by the Manager in respect of such calendar year. Such Additional Fee shall be payable and remitted to the Investment Advisor forthwith following the end of each calendar year.

U:\arf\bpi\purch\adv-ag6.doc

-33-