postponed the release of its financial results: "January 20, 2004 – Sonus Networks. . . today

postponed the release of its Q4 and full year 2003 financial results pending the completion of its

2003 audit." January 20, 2004 Sonus Press Release, "Sonus Networks Delays Release of its Q4

and FY2003 Financial Results."

> 76.     On February 11, 2004, Sonus issued the following press release:

> WESTFORD, Mass., February 11, 2004 – Sonus Networks
> (Nasdaq: SONS) today provided additional information regarding
> the delay in reporting its fourth quarter and full fiscal year financial
> results for the year ended December 31, 2003. In connection with
> the year-end audit, Sonus Networks and its independent auditors
> have identified certain issues, practices and actions of certain
> employees relating to both the timing of revenue recognized from
> certain customer transactions and to certain other financial
> statement accounts, which may affect the Company's 2003
> financial statements and possibly financial statements for prior
> periods.

> The revenue issues identified relate to the proper timing of
> recognizing revenue from certain customer transactions, and not
> whether the sales can be recorded as revenue. For the customer
> transactions under review, the products have been delivered,
> customers are using the products in their networks and Sonus
> Networks has either received payment or is receiving payment for
> the products in the ordinary course. The Company is reassessing
> the proper periods in which revenue should be recognized for these
> transactions. Revenue or deferred revenue in periods previously
> reported could increase, decrease or remain unchanged in those
> periods as a result of this reassessment.

> In response to the issues identified, the Company has taken the
> following steps:

> •     The Company is performing a detailed review of the timing issues
> and practices and of certain other financial statement accounts.

> •     The Audit Committee of Sonus Networks' Board of Directors is
> conducting an independent investigation, employing the services of
> Hale and Dorr LLP and PricewaterhouseCoopers.

- The Company has terminated certain non-executive employees.

- Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.

"We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting," said Hassad Ahmed, president and CEO, Sonus Networks. . . .

At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.

77.    On March 15, 2004, Sonus announced its intention to seek a filing extension from

the SEC:

CHELMSFORD, Mass., March 15, 2004 – Sonus Networks (Nasdaq: SONS) announced that it intends to file its 2003 Annual Report on Form 10-K for the year ended December 31, 2003 today, excluding its audited financial statements and other related financial information.  The Company also announced that it plans to file a Form 12b-25 (Notification of Late Filing) with the Securities and Exchange Commission (SEC) today requesting a 15-day extension to file the audited financial statements and other related financial information for its 2003 Annual Report on Form 10-K.

The delay in filing the financial statements is the result of the Company's previously announced detailed review of certain revenue timing issues and practices and of certain other financial statement accounts.

78.    Thereafter, Sonus issued the following press release on March 29, 2004:

CHELMSFORD, Mass., March 29, 2004 – Sonus Networks (Nasdaq: SONS), a leading provider of voice over IP (VoIP) infrastructure solutions, today announced that the filing of its amended Annual Report on Form 10-K/A for the fiscal year ended

December 31, 2003 will be delayed. The Company, having made substantial progress towards the completion of its review of 2003 and 2002 financial results, is now considering whether to expand the review to include additional prior periods. . . .

Sonus Networks is performing a detailed review of the timing of revenue recognized from customer transactions and of other financial statement accounts. The revenue issues under examination relate to the proper timing of revenue recognition and not whether the sales could ultimately be recorded as revenue. For the customer transactions under review, the products have been delivered and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course.

At this time, the Company expects that review will lead to a restatement of historical financial statements for the fiscal year ended December 31, 2002 and for the first three quarters of fiscal year 2003. As a result, existing financial statements for those periods should not be relied upon. . . .

As a result of the Company's delay in filing its Form 10-K for 2003, Sonus Networks expects to receive notification from Nasdaq that it is not in compliance with the filing requirements for continued listing on Nasdaq and that its securities could be subject to delisting from the Nasdaq National Market.

79.    Soon thereafter, Sonus received a notice from NASDAQ that as a result of

Sonus's delinquency, its shares would be traded under the symbol "SONSE":

CHELMSFORD, Mass., March 30, 2004 -- Sonus Networks (Nasdaq: SONS) . . . today announced that consistent with the information provided in its press release on March 29, 2004, the Company has received a Nasdaq Staff Determination. The letter indicates that because the Company has not timely filed its Form 10-K for the fiscal year ended December 31, 2003, it is not in compliance with the Nasdaq continued listing requirements set forth in Nasdaq Marketplace Rule 4310(c)(14). As a result of the delinquency, Sonus Networks will begin trading under the symbol "SONSE" effective at the opening of business on Wednesday, March 31, 2004.

Sonus Networks will request a hearing with the Nasdaq Listing Qualifications Panel within seven days of the date of the

> Determination for continued listing on the Nasdaq National
> Market. Sonus Networks' securities will remain listed on the
> Nasdaq National Market pending the outcome of the hearing.
> There can be no assurance that the Panel will grant a request for
> continued listing.

80.    In recognition of the severity of its accounting problems, Sonus sought assistance

with the leadership of the Company and hired Bert Notini to serve as President and COO and to

take charge of Sonus's financial operations:

> CHELMSFORD, Mass., April 6, 2004 – Sonus Networks (Nasdaq:
> SONSE). . . today announced that Bert Notini has joined Sonus as
> president and Chief Operating Officer (COO), reporting to Hassan
> Ahmed. Ahmed will continue to serve as chief executive officer
> (CEO) and, in addition, has been appointed chairman of Sonus's
> board of directors. Rubin Gruber, a founder of the company, has
> been named chairman emeritus, and will continue to focus on
> business development, reporting to Ahmed.
>
> Notini brings strong leadership and perspective to Sonus,
> combining broad operations experience in global technology
> companies with an extensive background in the financial and legal
> fields. He most recently served as chief financial officer (CFO) of
> Manufacturers Services Limited.
>
> . . . Reporting to Ahmed, Notini will lead the company's day-to-
> day operations. **Notini will also assume responsibilities for the
> financial operations of the company as Stephen Nill, Sonus's
> CFO, today transitions to a new role as vice president of
> business operations. Notini will serve as head of financial
> operations until a new CFO is named.** (Emphasis added).

81.    As a result of Sonus's inability to timely file its financial results, the NASDAQ

staff sent Sonus a letter alerting the company that it was not in compliance with NASDAQ's

filing requirements:

> CHELMSFORD, Mass., May 24, 2004 – Sonus Networks
> (Nasdaq: SONSE). . . reported that the Company has received a
> letter from the Nasdaq staff indicating that the Company has failed
> to file its Form 10-Q for Q1 Fiscal 2004.

Sonus Networks announced on March 30, 2004 that it was not in compliance with the filing requirements for continued listing on Nasdaq as required by Nasdaq Marketplace Rule 4310(c)(14) due to the Company's inability to timely file its Form 10-K for the 2003 Fiscal Year. The Company appealed the delisting notification to the Nasdaq Listings Qualifications Panel and is currently in the appeals process, which will address the delinquency of both the Form 10-K and the Form 10-Q.

Sonus's securities will remain listed pending a decision.

82.     Sonus thereafter disclosed that the SEC had launched an inquiry:

CHELMSFORD, Mass., June 29, 2004 – Sonus Networks (Nasdaq: SONSE) . . . today announced that it has received a formal order of private investigation from the Securities and Exchange Commission. On February 11, 2004, Sonus announced that it had notified the Commission of the Company's independent investigation following the delay in reporting its fourth quarter and full fiscal year financial results for the year ended December 31, 2003. The matter has been the subject of an informal inquiry by the Commission. Sonus has been fully cooperating with the Commission and will continue to cooperate in this formal investigation.

83.     The need for a restatement of fiscal year 2001, 2002, and the first three quarters of

2003 was announced on July 19, 2004:

CHELMSFORD, Mass., July 19, 2004 – Sonus Networks, Inc. (Nasdaq: SONSE) . . . today provided an update on its previously announced financial review. Sonus Networks has completed the detailed review of its financial statements for fiscal years 2003, 2002 and 2001. Additionally, the Audit Committee of Sonus's Board of Directors has completed its internal investigation.

As a result of the financial review, Sonus will restate its consolidated financial results for fiscal 2001 and 2002, and the first three quarters of fiscal 2003. As previously reported, the primary impact of the restatements is the adjustment to the timing of revenue recognition and certain other financial statement accounts. Principal adjustments to revenue relate to the timing of revenue where the revenue has been deferred and recognized in subsequent periods. In addition, other material restatements include

adjustments to purchase accounting, impairments, accruals and
deferred compensation.

## SONUS'S FAILURE TO IMPLEMENT AND
## MAINTAIN ADEQUATE INTERNAL ACCOUNTING CONTROLS

84.    All defendants knew or recklessly disregarded, throughout the Class Period, that

Sonus was experiencing such pervasive deficiencies in its internal controls and accounting

practices that the financial information generated for inclusion in Sonus's financial statements

was grossly inaccurate and unreliable.

85.    The Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §78m(b)(2), was enacted

on the principle that accurate record-keeping is an essential ingredient in promoting management

responsibility and is an affirmative requirement for publicly held American corporations to

strengthen the accuracy of corporate books and records, which are "the bedrock elements of our

system of corporate disclosure and accountability." Remarks of Senator Harrison Williams, 123

Cong. Rec. 519, 400 (Daily Edition Dec. 6, 1977), quoted in D. Goelzer, "The Accounting

Provisions of the FCPA – The Federalization of Corporate Recordkeeping and Internal Control,"

5 J. Corp. L. 1 (1979). The representations made by a company in its financial statements and in

other financial disclosures to the public are the representations of that company's management.

86.    Pursuant to the FCPA, every issuer having a class of securities registered pursuant

to §12 of the Exchange Act, 15 U.S.C. §78l, shall:

a.    Make and keep books, records, and accounts which, in reasonable detail,

accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.    Devise and maintain a system of internal accounting controls sufficient to

provide reasonable assurances that

#108434                                                                                              -44-

                 i.       transactions are executed in accordance with management's general or specific authorization;

                 ii.      transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (2) to maintain accountability for assets;

                 iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

                 iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

87.      Moreover, SEC Rule 13b-2, promulgated pursuant to the FCPA, was enacted to (1) assure that an issuer's books and records accurately and fairly reflect its transactions and the disposition of assets, (2) protect the integrity of the independent audit of issuer financial statements that are required under the Exchange Act, and (3) promote the reliability and completeness of financial information that issuers are required to file with the Commission or disseminate to investors pursuant to the Exchange Act. Rule 13b-2 provides:

a.      Rule 13b2-1: No person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act.

b.      Rule 13b2-2: No director or officer of an issuer shall, directly or indirectly, make or cause to be made a materially false or misleading statement, or to omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with (1) any audit or examination of the financial statements of the

issuer required to be made pursuant to this subpart or (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

88.     To comply with the FCPA, GAAP and SEC rules, and to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a public company is required to establish and maintain adequate internal financial and accounting controls. Contrary to the requirements of the FCPA, GAAP and SEC rules, Sonus and the Individual Defendants failed to implement and maintain adequate internal accounting and financial controls when issuing and publicly disseminating the Company's financial statements. The Company's lack of adequate internal controls and a working internal audit function created an environment that encouraged the type of accounting irregularities that defendants now admit caused the material misstatements of Sonus's financial results during the Class Period. Moreover, the Individual Defendants knew of material problems in the Company's accounting systems.

89.     Defendants knew or recklessly disregarded numerous red flags evidencing the fact that the Company's internal controls were grossly deficient and that the financial data being generated by the Company's financial reporting system was so pervasively inaccurate and unreliable that reliance on that information for financial statement purposes was precluded by GAAP and GAAS. Nevertheless, despite the utter lack of trustworthiness of Sonus's financial reporting system, defendnats issued and/or consented to the issuance of numerous false and misleading financial statements as alleged herein, falsely representing that those financial statements had been prepared in accordance with GAAP.

## GAAP VIOLATIONS

90.    GAAP are those principles recognized by the accounting profession as the

conventions, rules and procedures necessary to define accepted accounting practice at a particular

time. SEC Regulation S-X (17 C.F.R. §§210.4-01(a)(1)) provides that financial statements filed

with the SEC which are not prepared in compliance with GAAP are presumed to be misleading

and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim

financial statements must also comply with GAAP, with the exception that interim financial

statements need not include disclosure which would be duplicative of disclosures accompanying

annual financial statements. 17 C.F.R. §§210.10-01(a).

91.    The responsibility for preparing financial statements that conform to GAAP rests

with corporate management as set forth in Section 110.02 of the AICPA Professional Standards:

> The financial statements are management's responsibility...
> Management is responsible for adopting sound accounting policies
> and for establishing and maintaining internal controls that will,
> among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities, and
> equity are within the direct knowledge and control of management
> . . . Thus, the fair presentation of financial statements in conformity
> with [GAAP] is an implicit and integral part of management's
> responsibility.

92.    The Individual Defendants knowingly or with recklessness caused Sonus to

materially misstate the Company's revenues throughout the Class Period as alleged herein, in

violation of GAAP.  Sonus's disclosure that it would restate its previously reported financial

results during the Class Period constitutes an admission that each of the Company press releases

and Forms 10-K and 10-Q issued during the Class Period were materially false and misleading

when issued.  Under Statement of Financial Accounting Standards No. 16, Prior Period

Adjustments, restatements are only permitted – and are required – for material accounting errors

or irregularities.  Section 316 of the American Institute of Certified Public Accountant's

Codification of Statements on Auditing Standards defines accounting irregularities as,

> [I]ntentional misstatements or omissions of amounts or disclosures
> in financial statements.  Irregularities include fraudulent financial
> reporting undertaken to render statements misleading, sometimes
> called management fraud ... Irregularities may involve acts such as
> the following: manipulation, falsification, or alteration of
> accounting records or supporting documents from which financial
> statements are prepared; misrepresentations or intentional omission
> of events, transactions, or other significant information; intentional
> misapplication of accounting principles relating to amounts,
> classification, manner of presentation, or disclosure.

93.    As a result of its accounting improprieties, particularly with respect to revenue

recognition during the Class Period, defendants caused Sonus's reported financial results to

violate at least the following provisions of GAAP for which each defendant is responsible:

a.    the principle that revenues must be realizable (collectible) and earned prior

to recognition.  Statement of Financial Concepts ("Concepts Statement"), No. 5, ¶83;

b.    the principle that financial reporting should provide information that is

useful to present and potential investors and creditors and other users in making rational

investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

c.    the principle that financial reporting should be reliable in that it represents

what it purports to represent.  That information should be reliable as well as relevant is a notion

that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

d. the principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79);

e. the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97);

f. GAAP's requirement of the disclosure of an existing condition, situation or set of circumstances involving an uncertainty when there is at least a reasonable possibility that a loss or an additional liability may have been incurred. (Statement of Financial Accounting Standards No. 5 (Accounting for Contingencies.));

g. the principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42); and

h. the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers common stock of the enterprise to the public, it voluntarily accepts wider responsibilities

for accountability to prospective investors and to the public in general. (Concepts Statement No. 1, ¶50).

94.    The magnitude, duration and pervasiveness of the accounting manipulations alleged herein, all of which violated the foregoing provisions of GAAP, compels the conclusion that these methods were implemented by defendants intentionally, or that, at a minimum, defendants recklessly disregarded the overwhelming prevalence of these improper procedures and the resulting material falsifications of Sonus's financial statements.

95.    Sonus sells telecommunications equipment and software. The AICPA has adopted guidelines concerning revenue recognition and has issued a Statement of Position ("SOP") on this subject, SOP 97-2. SOP 97-2 states that revenue related to software must not be recognized until the following are established:

> (1)    There is persuasive evidence that an arrangement exists;
>
> (2)    Delivery (and acceptance) has occurred;
>
> (3)    The cost of the software is fixed and determinable; and
>
> (4)    Collectibility is likely (probable).

Before revenue relating to software can be recognized, all four aspects of this test must be satisfied. Despite setting forth the clear, established rules regarding revenue recognition in its publicly available financial statements filed with the SEC, Sonus failed to adhere to SOP 97-2 by improperly recognizing revenue relating to software transactions. The Individual Defendants knew the proper method of recognizing revenue from software transactions yet ignored these rules in order to inflate and make "predictable" Sonus's reported revenues.

#108434

96.    The AICPA adopted the current guidelines relating to software recognition in October 1997, making them effective on January 1, 1998, approximately four years prior to the filing of Sonus's misleading 2001 Form 10-K. Defendants Ahmed and Nill were both extremely sophisticated with years of experience in the software industry. Defendant Ahmed has led Sonus since November 1998. Prior to that position, he was the Executive Vice President and General Manager of the "Core Switching Division" of Ascend Communications., "a provider of wide area network switches and access data networking equipment." Prior to that position, Ahmed was the Chief Technology Officer and Vice President of Engineering for Cascade Communications Corp. – "a provider of wide are network switches." Prior thereto Ahmed was "a founder and President of WaveAccess, Inc., a supplier of wireless communications." He also held positions at Analog Devices and VLSI Systems at Motorola Codex. Ahmed had years of experience working in and is intimately familiar with the telecommunications and software industries, including the rules for revenue recognition.

97.    Defendant Nill also had vast experience working with software revenue issues. Although defendant Nill has since resigned from Sonus at the request of the Company, his resignation came only after he had worked as Sonus's CFO, its Vice President of Finance and Administration (since September 1999) and as Sonus's Treasurer (since 2000). Prior to holding these finance-related positions at Sonus, Nill was the Vice President of Finance and Chief Financial Officer of VideoServer, Inc., now Ezenia!, Inc. Prior thereto, Nill served as Corporate Controller and Chief Accounting Officer at Lotus Development Corporation – a software supplier. Nill had previously held various financial positions with Computervision, Inc., a supplier of workstation-based software, International Business Machines Corporation and Arthur

Andersen LLP. Nill graduated with a B.A. in accounting from New Mexico State University and has an M.B.A. from Harvard University. Defendant Nill has had extensive experience working with some of the world's most prominent software companies and accounting firms and was thereby fully familiar with the requirements of GAAP and, in particular, SOP 97-2.

98.    Sonus and the Individual Defendants publicly represented that it was the policy of Sonus to recognize revenue only in conformity with GAAP. For example, in Sonus's Form 10-K for the year ended 2001, Sonus and the Individual Defendants represented as follows:

> REVENUES. Revenue is recognized from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. **If uncertainties exist, we recognize revenue when those uncertainties are resolved**. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, we use the residual method to recognize revenue when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. We estimate and record warranty costs at the time of product revenue recognition.

This policy was also set forth or incorporated in each of the SEC filings made by Sonus during the Class Period as alleged in Paragraph 3 hereof. Thus, despite publicly representing that Sonus's policies for recognizing revenue complied with the requirements of the relevant GAAP, Sonus and the Individual Defendants failed to follow the Company's own policies, eventually requiring Sonus to issue restatements of its financial results.

//

//

#108434                                                                                    -52-

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

99.   Despite their knowledge, or recklessness in not knowing, of the existence of the

foregoing improper practices and accounting manipulations, defendants during the Class Period

issued numerous financial statements and other statements concerning the nature and status of

Sonus's operations.  These statements were false when made because of Sonus's fraudulent

accounting practices alleged above and because of a complete breakdown in internal controls.

These events resulted in material misstatements of revenue and other indicia of Sonus's financial

performance.

### A.    2001 Year-End Results

100.   The Class Period begins on March 28, 2002, when Sonus filed its Form 10-K for

the year ended December 31, 2001 (hereinafter, "2001 Form 10-K").  It was signed by, among

others, defendants Ahmed and Nill.  These defendants reviewed, approved of, and caused

Sonus's 2001 Form 10-K to be filed with the SEC.

101.   By virtue of the restatement of its reported 2001 financial results, Sonus has

admitted that these results were false.  In its 2003 Form 10-K/A, Sonus announced that its 2001

product revenues were overstated by $48.002 million and that its 2001 service revenues were

understated by $3.603 million.  Sonus thus overstated its 2001 total revenues by $44.399 million,

misstated its net loss by $9.813 million, and misstated its net loss per share by $0.06.  Absent the

accounting improprieties, Sonus would have reported net income (loss) per share of ($3.68).  In

addition, Sonus misstated its cost of revenues for products by $12.505 million and its cost of

revenues for services by $0.415 million, resulting in an adjustment for the total cost of revenues

of $12.920 million.  With respect to expenses, Sonus misstated its research and development

expenses by $1.108 million, misstated its sales and marketing expenses by $1.391 million, and misstated its general and administrative expenses by .241 million. Further, Sonus misstated its stock-based compensation by $1.368 million, misstated its amortization of goodwill and purchased intangible assets by $37.208 million, misstated its write-off of goodwill and purchased intangible assets by $17.652 million, misstated its restructuring charges by $18.486 million, and misstated its in-process research and development expenses by $0.800 million. Sonus misstated its total operating expenses by $41.350 million. In addition, Sonus misstated its loss from operations by $9.871 million and its interest expenses by $0.058 million.

102.     In Sonus's Consolidated Statement of Cash Flows in its original 2001 Form 10-K, Sonus lists deferred revenue as ($6.781 million). However, Sonus's 2003 Form 10-K/A lists the restated deferred revenue as ($4.801 million) – an adjustment of $1.98 million. With respect to inventories stated in terms of cash flows, Sonus's original 2001 Form 10-K lists "inventories" at $2.284 million while Sonus's 2003 Form 10-K/A lists "inventory" at ($8.571 million) – an adjustment of $10.885 million. With respect to Sonus's accrued expenses as stated in terms of cash flows, Sonus's 2001 Form 10-K lists $27.659 million in accrued expenses while its 2003 Form 10-K/A lists its accrued expenses as $18.356 million – an adjustment of $9.303 million.

103.     Sonus originally falsely claimed its 2001 excess, obsolete and evaluation reserve balance/inventory reserve to be $9.629 million. In its 2003 Form 10-K/A, "Sonus increased its reserves and charged cost of product revenues by . . . $3,297,000 as of and for the year[] ended December 31, . . . 2001," for a restated total of $12.926 million.

104.     In addition to the foregoing quantitative misstatements, Sonus made materially false statements in its 2001 Form 10-K concerning Sonus's policies respecting revenue

recognition.  The Company falsely claimed that "[o]ur revenue recognition policy complies with

SEC Staff Accounting Bulletin No. 101, REVENUE RECOGNITION IN FINANCIAL

STATEMENTS."  In the 2001 Form 10-K, Sonus discussed its revenue recognition policy and

continued to falsely claim that:

> Sonus recognizes revenue from product sales to end users, resellers
> and distributors upon shipment, provided there are no uncertainties
> regarding acceptance, persuasive evidence of an arrangement
> exists, the sales price is fixed or determinable and collection of the
> related receivable is probable.  If uncertainties exist, Sonus
> recognizes revenue when those uncertainties are resolved.  In
> multiple element arrangements, in accordance with Statement of
> Position 97-2 and 98-9, Sonus uses the residual method when
> vendor-specific objective evidence does not exist for one of the
> delivered elements in the arrangement.  Service revenue is
> recognized as the services are provided.  Revenue from
> maintenance and support arrangements is recognized ratably over
> the term of the contract.  Amounts collected prior to satisfying the
> revenue recognition criteria are reflected as deferred revenue.
> Warranty costs are estimated and recorded by Sonus at the time of
> product revenue recognition.

As confirmed by the restatements, Sonus did not recognize revenue in conformity with its

announced policy.

### B.    2002 First Quarter Results

105.    On April 9, 2002, Sonus issued a press release announcing its

financial results for the first quarter of 2002, which ended on March 31, 2002.  The press release

represented that:

> Revenues for the first quarter of fiscal 2002 were $21.2 million
> compared with $41.5 million in the same period last year.
> Adjusted net loss for the first quarter of fiscal 2002 was $12.8
> million or $0.07 per share compared with adjusted net income for
> the first quarter of fiscal 2001 of $0.2 million or $0.00 per share.
> Actual net loss for the first quarter of fiscal 2002 was $16.2 million
> or $0.09 per share compared with an actual net loss for the first

quarter of fiscal 2001 of $82.5 million or $0.51 per share.
(Emphasis added.)

106.    On May 10, 2002, Sonus filed with the SEC its report on Form 10-Q for the

quarterly period ended March 31, 2002 (hereinafter "1Q 2002 Form 10-Q"). The numbers in

Sonus's 1Q 2002 Form 10-Q match those reported in its April 9, 2002 press release, and are

materially incorrect. Defendant Nill signed the 1Q 2002 Form 10-Q. Defendant Nill reviewed,

approved of, and caused the 1Q 2002 Form 10-Q to be filed with the SEC. The 1Q 2002 Form

10-Q stated that:

> The accompanying unaudited condensed consolidated financial
> statements have been prepared by Sonus Networks, Inc. (Sonus)
> and reflect all adjustments, consisting only of normal recurring
> adjustments, which in the opinion of management are necessary for
> a fair statement of the results for the interim periods. The
> unaudited condensed consolidated financial statements have been
> prepared in accordance with the regulations of the Securities and
> Exchange Commission (SEC), and omit or condense certain
> information and footnote disclosure pursuant to existing SEC rules
> and regulations.

The 1Q 2002 Form 10-Q report included Sonus's false financial results for the first quarter of

fiscal 2002.

107.    By virtue of its restatement of its reported 2002 first quarter results as announced

in the Company's 2003 Form 10-K/A filed July 28, 2004, Sonus has admitted that its reported

financial results for the first quarter of 2002 were materially false. According to the Quarterly

Results of Operations (unaudited) section in Sonus's 2003 Form 10-K/A filed July 28, 2004,

Sonus's revenues were overstated by $0.650 million, its net income (loss) was overstated by

$17.373 million, and its net income (loss) per share was overstated by $0.09. Thus, absent the

accounting improprieties, the Company would have reported net income (loss) per share of

($0.18). The 2003 Form 10-K/A also states that revenues, as restated, were $20.508 million and

that net income (loss), as restated, was ($33.567 million). In addition, Sonus's cost of revenues

were overstated by $2.521 million – restated as $16.788 million. Sonus misstated its gross profit

by $1.871 million – restated as $3.720 million. Sonus misstated its research and development

expenses by $0.316 million. Restated, Sonus's research and development expenses were

$14.931 million. Sonus misstated its sales and marketing expenses by $0.948 million. Restated,

Sonus's sales and marketing expenses were $7.459 million. Sonus misstated its general and

administrative expenses by $1.121 million. Restated, Sonus's general and administrative

expenses were $2.587 million. Sonus misstated its stock-based compensation expenses by

$1.056 million. Restated, Sonus's stock-based compensation expenses were $6.799 million.

Sonus misstated its amortization of goodwill and purchased intangible assets by $0.784 million.

Restated, Sonus's amortization of goodwill and purchased intangible assets were $1.190 million.

Sonus misstated its restructuring charges (benefit), net by $7.389 million. Restated, Sonus's

restructuring charges were $4.752 million. Sonus misstated its total operating expenses by

$19.222 million. Restated, Sonus's total operating expenses were $37.718 million. Sonus

misstated its income (loss) from operations by $17.351 million. Restated, Sonus's income (loss)

from operations was ($33.998 million).

     108.   In addition to the previously mentioned quantitative misstatements, Sonus made

materially false statements in its 1Q 2002 Form 10-Q concerning Sonus's policies on revenue

recognition. With respect to revenue recognition, the Company falsely claimed that:

> Sonus recognizes revenue from product sales to end users, resellers
> and distributors upon shipment, provided there are no uncertainties
> regarding acceptance, persuasive evidence of an arrangement
> exists, the sales price is fixed or determinable and collection of the

related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

As confirmed by the restatements, Sonus did not recognize revenue in conformity with its announced policy.

### C.    2002 Second Quarter Results

109.    On July 11, 2002, Sonus issued a press release announcing its financial results for the second quarter of 2002, which ended June 30, 2002. The press release represented that:

> Revenues for the second quarter of fiscal 2002 were $21.3 million compared with $52.6 million in the same period last year. Adjusted net loss for the second quarter of fiscal 2002 was $10.5 million or $0.06 per share compared with adjusted net income for the second quarter of fiscal 2001 of $1.2 million or $0.01 per share. Actual net loss for the second quarter of fiscal 2002 was $17.8 million or $0.09 per share compared with an actual net loss for the second quarter of fiscal 2001 of $51.4 million or $0.30 per share. (Emphasis added.)

110.    Sonus has now admitted that its reported financial results for the second quarter of 2002 were materially false. Sonus's revenues were understated by $30.480 million, its net loss was misstated by $21.393 million, and its net loss per share was misstated by $0.11. Absent the accounting improprieties, the Company would have reported revenues of $51.775 million, net income (loss) of $3.575 million, and net income (loss) per share of $0.02. In addition, Sonus

understated its cost of revenues by $9.712 million. Restated, Sonus's cost of revenues was $19.660 million. Sonus understated its gross profit by $20.768 million. Restated, Sonus's gross profit was $32.115 million. Sonus misstated its research and development expenses by $1.06 million. Restated, Sonus's research and development expenses were $11.165 million. Sonus misstated its sales and marketing expenses by $1.137 million. Restated, Sonus's sales and marketing expenses were $9.417 million. Sonus misstated its general and administrative expenses by $0.498 million. Restated, Sonus's general and administrative expenses were $1.192 million. Sonus misstated its stock-based compensation expenses by $1.032 million. Restated, Sonus's stock-based compensation expenses were $4.918 million. Sonus misstated its amortization of goodwill and purchased intangible assets by $0.807 million. Restated, Sonus's amortization of goodwill and purchased intangible assets was $1.190 million. Sonus misstated its total operating expenses by $0.646 million. Restated, Sonus's total operating expenses were $28.895 million. Sonus misstated its loss from operations by $21.414 million. Restated, Sonus's income (loss) from operations was $3.220 million.

111.    On August 14, 2002, Sonus filed with the SEC its report on Form 10-Q for the second quarter of fiscal 2002 (hereinafter, "2Q 2002 Form 10-Q"). It was signed by defendant Nill. Furthermore, both defendant Nill and defendant Ahmed signed and certified the 2Q 2002 Form 10-Q pursuant to the Sarbanes-Oxley Act of 2002. Defendants Ahmed and Nill reviewed and caused the 2Q 2002 Form 10-Q report to be filed with the SEC. The 2Q 2002 Form 10-Q report stated that:

> The accompanying unaudited condensed financial statements have
> been prepared by Sonus Networks, Inc. (Sonus) and reflect all
> adjustments, consisting only of normal recurring adjustments,
> which in the opinion of management are necessary for a fair

> statement of the results for the interim periods. The unaudited
> condensed consolidated financial statements have been prepared in
> accordance with the regulations of the Securities and Exchange
> Commission (SEC), and omit or condense certain information and
> footnote disclosures pursuant to existing rules and regulations.

Despite this claim, the 2Q 2002 Form 10-Q included false financial results for the second quarter

of 2002, which were materially misstated as alleged in the preceding paragraph.

112.    In addition, Sonus made materially false statements in its 2Q 2002 Form 10-Q

concerning Sonus's policies on revenue recognition. With respect to revenue recognition, the

Company falsely claimed that:

> Sonus recognizes revenue from product sales to end users, resellers
> and distributors upon shipment, provided there are no uncertainties
> regarding acceptance, persuasive evidence of an arrangement
> exists, the sales price is fixed or determinable and collection of the
> related receivable is probable. If uncertainties exist, Sonus
> recognizes revenue when those uncertainties are resolved. In
> multiple element arrangements, in accordance with Statement of
> Position 97-2 and 98-9, Sonus uses the residual method when
> vendor-specific objective evidence does not exist for one of the
> delivered elements in the arrangement. Service revenue is
> recognized as the services are provided. Revenue from
> maintenance and support arrangements is recognized ratably over
> the term of the contract. Amounts collected prior to satisfying the
> revenue recognition criteria are reflected as deferred revenue.
> Warranty costs are estimated and recorded by Sonus at the time of
> product revenue recognition.

As confirmed by the restatements, Sonus did not recognize revenue in conformity with its

announced policy.

Sonus falsely claimed to comply with SEC revenue recognition guidelines: "[o]ur

revenue recognition policy complies with SEC Staff Accounting Bulletin No. 101, REVENUE

RECOGNITION IN FINANCIAL STATEMENTS." Sonus's misstated and misleading financial

results confirm that Sonus's statements about revenue recognition were materially false when

made.

113.    Defendants Ahmed and Nill made materially false claims on August 14, 2002

when they certified the 2Q 2002 Form 10-Q, as follows:

> In connection with the Quarterly Report of Sonus Networks, Inc.
> (the "Company" on Form 10-Q for the period ending June 30,
> 2002, as filed with the Securities and Exchange Commission on
> the date hereof (the "Report"), each of the undersigned, Hassan M.
> Ahmed, President and Chief Executive Officer and Stephen J. Nill,
> Chief Financial Officer, Vice President of Finance and
> Administration and Treasurer of the Company, certify, pursuant to
> 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the
> Sarbanes-Oxley Act of 2002, that:
>
> (1) The Report fully complies with the requirements of Section
> 13(a) or 15(d) of the Securities and Exchange Act of 1934; and
>
> (2) The information contained in the Report fairly presents, in all
> material respects, the financial condition and results of operations
> of the Company.

### D.    2002 Third Quarter Results

114.    On October 9, 2002, Sonus issued a press release announcing its

financial results for the third quarter of 2002, which ended September 30, 2002. The press

release falsely represented that:

> Revenues for the third quarter of fiscal 2002 were $7.4 million
> compared with $40.3 million in the same period last year.
> Adjusted net loss for the third quarter of fiscal 2002 was $14.6
> million or $0.08 per share compared with an adjusted net loss for
> the third quarter of fiscal 2001 of $11.4 million or $0.06 per share.
> Actual net loss for the third quarter of fiscal 2001 of $498.2 million
> or $2.81 per share.

115.    Sonus has admitted that its reported financial results for the third quarter of 2002

were materially false. Sonus's third quarter 2002 revenues were understated by $1.713 million,

its actual net loss was misstated by $8.816 million, and its net loss per share was misstated by $0.05. Absent accounting improprieties, the Company would have reported revenues of $9.158 million, net income (loss) of ($30.454 million), and net income (loss) per share of ($0.16) according to Sonus's restated 2003 Form 10-K/A. Furthermore, Sonus misstated its total cost of revenues by $3.172 million. Restated, Sonus's total cost of revenues was $7.919 million. Sonus misstated its gross profit by $1.459 million. Restated, Sonus's gross profit was $1.239 million. Sonus misstated its research and development operating expenses by $0.467 million. Restated, Sonus's research and development expenses were $9.218 million. Sonus misstated its sales and marketing expenses by $1.054 million. Restated, Sonus's sales and marketing expenses were $4.466 million. Sonus misstated its general and administrative expenses by $0.487 million. Restated, Sonus's general and administrative expenses were $2.932 million. Sonus misstated its stock-based compensation expenses by $1.734 million. Restated, Sonus's stock-based compensation expenses were $2.228 million. Sonus misstated its amortization of goodwill and purchased intangible assets by $0.806 million. Restated, Sonus's amortization of goodwill and purchased intangible assets was $1.173 million. Sonus misstated its write-off of goodwill and purchased intangible assets by $9.277 million. Restated, Sonus's write-off of goodwill and purchased intangible assets was $10.950 million. Sonus misstated its restructuring charges (benefit), net by $0.02 million. Restated, Sonus's restructuring charges were $1.007 million. Sonus misstated its total operating expenses by $7.335 million. Restated, Sonus's total operating expenses were $31.974 million. Sonus misstated its loss from operations by $8.794 million. Restated, Sonus's income (loss) from operations was ($30.735 million).

116.    On November 13, 2002, Sonus filed with the SEC its report on Form 10-Q for the third quarter of 2002 (hereinafter "3Q 2002 Form 10-Q"). It was signed by defendant Nill. In addition, defendants Ahmed and Nill certified this 3Q 2002 Form 10-Q pursuant to the requirements of the Sarbanes-Oxley Act of 2002. Defendants Ahmed and Nill reviewed and caused the 3Q 2002 Form 10-Q to be filed with the SEC. The 3Q 2002 Form 10-Q report falsely stated that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus Networks, Inc. (Sonus) and reflect all adjustments, consisting only of normal recurring adjustments, which in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing rules and regulations.

Despite the above assurance, Sonus's 3Q 2002 Form 10-Q included Sonus's false financial results for the third quarter of fiscal 2002, which were materially misstated.

117.    Sonus made additional materially false statements in its original 3Q 2002 Form 10-Q concerning Sonus's policies about revenue recognition. With respect to revenue recognition, the Company falsely claimed that:

> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from

> maintenance and support arrangements is recognized ratably over
> the term of the contract. Amounts collected prior to satisfying the
> revenue recognition criteria are reflected as deferred revenue.
> Warranty costs are estimated and recorded by Sonus at the time of
> product revenue recognition.

As confirmed by the restatements, Sonus did not recognize revenue in conformity with its

announced policy.

Sonus repeated its materially false claim that it adhered to SEC guidelines concerning

revenue recognition: "[o]ur revenue recognition policy complies with SEC Staff Accounting

Bulletin No. 101, *Revenue Recognition in Financial Statements*." Sonus's claims about

compliance with revenue recognition guidelines were materially false when made.

118.    Sonus also made materially false statements concerning its internal controls and

procedures in its 3Q 2002 Form 10-Q:

> (a) *Evaluation of disclosure controls and procedures.* Sonus's
> chief executive officer and chief financial officer have reviewed
> and evaluated the effectiveness of Sonus's disclosure controls and
> procedures (as defined in Exchange Act Rules 240.13a-14c) and
> 15d-14c)) as of a date within ninety days before the filing of this
> quarterly report. Based on that evaluation, the chief executive
> officer and chief financial officer have concluded that Sonus's
> current disclosure controls and procedures are effective to ensure
> that information required to be disclosed by Sonus in reports that it
> files or submits under the Exchange Act is recorded, processed,
> summarized and reported within the time periods specified in SEC
> rules and forms.

> (b) *Changes in internal controls.* There have not been any
> significant changes in Sonus's internal controls or in any other
> factors that could significantly affect these disclosure controls
> subsequent to the date of their evaluation. There were no
> significant deficiencies or material weaknesses in the internal
> controls, and therefore no corrective actions were taken.

119.    Defendant Ahmed made materially false statements on November 12, 2002 when

he certified the following:

> I, Hassan M. Ahmed, President and Chief Executive Officer of
> Sonus Networks, Inc., certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Sonus
> Networks, Inc. (the "Registrant");
>
> 2. Based on my knowledge, this quarterly report does not contain
> any untrue statement of a material fact or omit to state a material
> fact necessary to make the statements made, in light of the
> circumstances under which such statements were made, not
> misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other
> financial information included in this report, fairly present in all
> material respects the financial condition, results of operations and
> cash flows of the Registrant as of, and for, the periods presented in
> this quarterly report;
>
> 4. The Registrant's other certifying officer and I are responsible
> for establishing and maintaining disclosure controls and procedures
> (as defined in Exchange Act Rules 13a-14 and 15d-14) for the
> Registrant and we have:
>
> (i) designed such disclosure controls and procedures to ensure that
> material information relating to the Registrant, including its
> consolidated subsidiaries, is made known to us by others within
> those entities, particularly during the period in which this quarterly
> report is being prepared;
>
> (ii) evaluated the effectiveness of the Registrant's disclosure
> controls and procedures as of a date within 90 days prior to the
> filing date of this quarterly report (the "Evaluation Date"); and
>
> (iii) presented in this quarterly report our conclusions about the
> effectiveness of the disclosure controls and procedures based on
> our evaluation as of the Evaluation Date;
>
> 5. The Registrant's other certifying officer and I have disclosed,
> based on our most recent evaluation, to the Registrant's auditors
> and the audit committee of Registrant's board of directors:

#108434

(i) all significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

(ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6. The Registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Sonus later admitted that the published financial results and assertions regarding internal controls were untrue, as it acknowledged the existence during the Class Period of "significant internal control matters that collectively constitute 'material weaknesses.'" Defendant Ahmed's certification was thereby materially false when made.

120. Defendant Nill made materially false statements on November 12, 2002 when he certified the following:

I, Stephen J. Nill, Chief Financial Officer and Vice President of Finance and Administration and Treasurer of Sonus Networks, Inc., certify that:

1. I have reviewed this quarterly report on Form 10-Q of Sonus Networks, Inc. (the "Registrant");

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this quarterly report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and we have:

(i) designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(ii) evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

(iii) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors:

(i) all significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

(ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6.  The Registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent

> evaluation, including any corrective actions with regard to
> significant deficiencies and material weaknesses.

Sonus later admitted that the published financial results and assertions regarding internal controls

were untrue, as it acknowledged the existence during the Class Period of "significant internal

control matters that collectively constitute 'material weaknesses.'" Defendant Nill's certification

was thereby materially false when made.

121.    In his Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002, defendant Ahmed made additional material

misstatements on November 12, 2002 by certifying that:

> (1) the Report fully complies with the requirements of Section
> 13(a) or 15(d) of the Securities Exchange Act of 1934; and

> (2) the information contained in the Report fairly presents, in all
> material respects, the financial condition and results of operations
> of the Company.

As Sonus's 3Q 2002 Form 10-Q contains several material misstatements, defendant Ahmed's

certification was materially false when made.

122.    In his Certification Pursuant to 18 U.S.C. Section 1350, as adopted Pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002, defendant Nill made additional material

misstatements on November 12, 2002 by certifying that:

> (1) the Report fully complies with the requirements of Section
> 13(a) or 15(d) of the Securities Exchange Act of 1934; and

> (2) the information contained in the Report fairly presents, in all
> material respects, the financial condition and results of operations
> of the Company.

As Sonus's 3Q 2002 Form 10-Q contains several material misstatements, defendant Nill's

certification was materially false when made.

E.     **2002 Fourth Quarter and Year-End Results**

123.     On January 22, 2003, Sonus issued a press release announcing its financial results

for 2002, which ended December 31, 2002. The press release represented that:

> Sonus Networks, Inc. (Nasdaq: SONS) . . . today reported its
> financial results for its fourth quarter and fiscal year ended
> December 31, 2002, in accordance with generally accepted
> accounting principles (GAAP).
>
> Revenues for the fourth quarter of fiscal 2002 were $12.7 million
> compared with $38.9 million in the same period last year. Net loss
> for the fourth quarter of fiscal 2002 was $12.8 million or $0.07 per
> share compared with a net loss for the fourth quarter of fiscal 2001
> of $13.4 million or $0.07 per share.
>
> Revenues for fiscal year 2002 were $62.6 million compared with
> $173.2 million for fiscal year 2001.
>
> Net loss for fiscal year 2002 was $68.5 million or $0.36 per share
> compared with a net loss for fiscal year 2001 of $645.4 million or
> $3.74 per share. (Emphasis added.)

124.     Sonus has admitted that its reported financial results for the fourth quarter of

fiscal 2002 included in its Form 10-K for the year ended December 31, 2002 (hereinafter, "2002

Form 10-K") were false. Sonus's revenues were overstated by $0.184 million and its net loss

was misstated by $0.575 million. Absent the accounting improprieties, the Company would have

reported revenues for the fourth quarter of $12.476 million and net income (loss) of ($13.395

million). In addition, Sonus misstated its fourth quarter 2002 cost of revenues by $0.911 million.

Restated, Sonus's cost of revenues was $7.209 million. Sonus misstated its fourth quarter 2002

gross profit by $1.095 million. Restated, Sonus's gross profit was $5.267 million. Sonus

misstated its fourth quarter 2002 research and development expenses by $0.494 million.

Restated, Sonus's research and development expenses were $9.277 million. Sonus misstated its

sales and marketing expenses by $0.788 million. Restated, Sonus's sales and marketing expenses were $6.444 million. Sonus misstated its fourth quarter 2002 general and administrative expenses by $2.001 million. Restated, Sonus's general and administrative expenses were ($1.463 million). Sonus misstated its fourth quarter 2002 stock-based compensation expenses by $0.915 million. Restated, Sonus's stock-based compensation expenses were $2.926 million. Sonus misstated its fourth quarter 2002 amortization of goodwill and purchased intangible assets by $0.317 million. Restated, Sonus's amortization of goodwill and purchased intangible assets was $0.676 million. Sonus misstated its fourth quarter 2002 write-off of goodwill and purchased intangible assets by $0.175 million. Restated, Sonus had no write-off of goodwill and purchased intangible assets. Sonus misstated its fourth quarter 2002 restructuring charges (benefit), net by $0.951 million. Restated, Sonus's restructuring charges were $0.967 million. Sonus misstated its fourth quarter 2002 total operating expenses by $0.541 million. Restated, Sonus's total operating expenses were $18.827 million. Sonus misstated its fourth quarter 2002 loss from operations by $0.554 million. Restated, Sonus's income (loss) from operations was ($13.560 million).

125.    In addition, Sonus has admitted that its reported financial results for 2002 as a whole were false. Sonus's 2002 Form 10-K reported the same false 2002 financial results that appeared in the January 22, 2003 press release, which were materially misstated due to improper accounting entries requiring an adjustment to revenues of $31.359 million, an adjustment to net income (loss) for fiscal year 2002 of $5.285 million, and an adjustment to net income (loss) per share of $0.03.

126.    By virtue of the restatement of its reported 2002 financial results, Sonus has admitted that its reported fiscal 2002 financial results were false. In its 2003 Form 10-K/A, Sonus announced that its 2002 product revenues were understated by $27.177 million and that its 2002 service revenues were understated by $4.182 million. Sonus thus understated its 2002 total revenues by $31.359 million, misstated its net loss by $5.371 million, and misstated its net loss per share by $0.03. Absent the accounting improprieties, Sonus would have reported net income (loss) per share of ($0.39). In addition, Sonus misstated its write-off of inventory and purchase commitments by $3.304 million, its cost of revenues for products by $14.038 million, and its cost of revenues for services by $0.540 million, resulting in an adjustment for the total cost of revenues of $11.274 million. With respect to expenses, Sonus misstated its research and development expenses by $0.717 million, misstated its sales and marketing expenses by $0.077 million, and misstated its general and administrative expenses by $0.893 million. Sonus misstated its stock-based compensation by $2.624 million, misstated its amortization of goodwill and purchased intangible assets by $2.715 million, misstated its write-off of goodwill and purchased intangible assets by $9.102 million, and misstated its restructuring charges by $17.864 million. Sonus misstated its total operating expenses by $25.370 million. In addition, Sonus misstated its loss from operations by $5.285 million.

127.    In Sonus's Consolidated Balance Sheets Statement in its original 2002 Form 10-K, Sonus lists deferred revenue as $29.235 million. However, the 2003 Form 10-K/A divides deferred revenue into "current portion of deferred revenue" (restated as $51.728 million, adjusted by $22.493 million) and "long-term deferred revenue" (restated as $8.024 million, adjusted by $8.024 million). Total deferred revenue, $59.752 million, minus the current position of deferred

revenue, ($51.728 million), results in a restated figure of $8.024 million for 2002. With respect to inventories as stated on Sonus's Consolidated Balance Sheets, Sonus's original 2002 Form 10-K lists "inventories" at $10.776 million while Sonus's 2003 Form 10-K/A lists "inventory, net" at $10.449 million – an adjustment of $0.327 million. With respect to Sonus's accrued expenses as stated on Sonus's Consolidated Balance Sheets, Sonus's 2002 Form 10-K lists $33.379 million in accrued expenses while its 2003 Form 10-K/A restates its accrued expenses as $16.489 million – an adjustment of $16.890 million.

128.    Sonus originally misstated its 2002 excess, obsolete and evaluation reserve balances/inventory reserves as $17.784 million. In its 2003 Form 10-K/A, Sonus announced that inventory reserves "were not consistently calculated and, as a result of its review of these reserves and consideration of contemporaneous facts and circumstances, Sonus increased its reserves and charged cost of product revenues by $522,000 . . . for the year[] ended December 31, 2002. . . .", for a total of $18.306 million.

129.    Sonus improperly reported the assessment of the 2002 carrying value of goodwill and purchased intangible assets, originally reporting a total impairment charge of $1.848 million. As a result of Sonus performing a new impairment assessment with the assistance of a new third-party, Sonus restated its 2002 impairment charge in its 2003 Form 10-K/A for the year ending 2002 as $10.950 million – an adjustment of $9.102 million.

130.    In addition to the previously mentioned quantitative misstatements, Sonus made materially false statements in its 2002 Form 10-K concerning its controls and procedures, claiming that:

> (a) *Evaluation of disclosure controls and procedures.* Sonus' chief executive officer and chief financial officer have reviewed and

evaluated the effectiveness of Sonus' disclosure controls and
procedures (as defined in Exchange Act Rules 13a-14 and 15d-14)
as of a date within ninety days before the filing of this annual
report. Based on that evaluation, the chief executive officer and
chief financial officer have concluded that Sonus' current
disclosure controls and procedures are effective to ensure that
information required to be disclosed by Sonus in reports that it files
or submits under the Exchange Act is recorded, processed,
summarized and reported within the time periods specified in SEC
rules and forms.

(b) *Changes in internal controls.* There have not been any
significant changes in Sonus' internal controls or in any other
factors that could significantly affect these disclosure controls
subsequent to the date of their evaluation. There were no
significant deficiencies or material weaknesses in the internal
controls, and therefore no corrective actions were taken.

131.    Sonus also made material misstatements concerning revenue recognition in its

2002 Form 10-K under "Critical Accounting Policies and Estimates":

We recognize revenue from product sales to end users, resellers
and distributors upon shipment, provided there are no uncertainties
regarding acceptance, persuasive evidence of an arrangement
exists, the sales price is fixed or determinable and collection of the
related receivable is probable. If uncertainties exist, we recognize
revenue when those uncertainties are resolved. In multiple element
arrangements, in accordance with Statement of Position 97-2 and
98-9, we use the residual method when vendor-specific objective
evidence does not exist for one of the delivered elements in the
arrangement. Service revenue is recognized as the services are
provided. Revenue from maintenance and support arrangements is
recognized ratably over the term of the contract.

Furthermore, Sonus falsely claimed that "Amounts collected prior to satisfying the revenue

recognition criteria are reflected as deferred revenue. We estimate and record warranty costs at

the time of product revenue recognition."

132.    Defendant Ahmed made additional material misstatements on March 19, 2003 by

certifying the following:

I, Hassan M. Ahmed, President and Chief Executive Officer of Sonus Networks, Inc., certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2002 ("Annual Report") of Sonus Networks, Inc. (the "Registrant");

2. Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make this statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Annual Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Annual Report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and have:

(a) Designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Annual Report is being prepared;

(b) Evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this Annual Report (the "Evaluation Date"); and

(c) Presented in this Annual Report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors:

(a) All significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6. The Registrant's other certifying officer and I have indicated in this Annual Report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

133. Defendant Nill made additional material misstatements on March

19, 2003 by certifying the following:

I, Stephen J. Nill, Chief Financial Officer and Vice President of Finance and Administration and Treasurer of Sonus Networks, Inc., certify that:

1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2002 ("Annual Report") of Sonus Networks, Inc. (the "Registrant");

2. Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make this statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Annual Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Annual Report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures

(as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and have:

(a) Designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Annual Report is being prepared;

(b) Evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this Annual Report (the "Evaluation Date"); and

(c) Presented in this Annual Report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors:

(a) All significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and

6. The Registrant's other certifying officer and I have indicated in this Annual Report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

134.    In his Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002, defendant Ahmed made additional material

misstatements by certifying on March 19, 2003 that:

> (1) the Report fully complies with the requirements of Section
> 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) the information contained in the Report fairly presents, in all
> material respects, the financial condition and results of operations
> of the Company.

135.    In his Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002, defendant Nill made additional material

misstatements by certifying on March 19, 2003 that:

> (1) the Report fully complies with the requirements of Section
> 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) the information contained in the Report fairly presents, in all
> material respects, the financial condition and results of operations
> of the Company.

136.    On March 19, 2003, Sonus filed with the SEC its 2002 Form 10-K for the fiscal

year ending December 31, 2002.  Defendants Ahmed and Nill, among others, signed Sonus's

2002 Form 10-K.  These defendants reviewed, approved of, and caused Sonus's 2002 Form 10-K

to be filed with the SEC, which included Sonus's materially false statements for both the fourth

quarter and year end 2002.

**F.    Prospectus Supplement Dated April 22, 2003**

137.    Sonus's Prospectus Supplement dated April 21, 2003, incorporates by reference

other SEC filings as follows: Form 10-K for the year ended December 31, 2001, Form 10-K for

the year ended December 31, 2002, Form 10-Q for the quarterly period ended March 31, 2002,

Form 10-Q for the quarterly period ended June 30, 2002, and Form 10-Q for the quarterly period

ended September 30, 2002.  Because the foregoing identified SEC filings were materially false

and misleading for the reasons alleged hereinabove, the April 21, 2003 Prospectus Supplement

was also materially false and misleading. There was no disclosure in the April 21, 2003

Prospectus Supplement of any of the material adverse facts as alleged herein which were in

existence as of that date.

G.    **2003 First Quarter Results**

138.    On April 9, 2003, Sonus issued a press release announcing its financial results for

the first quarter of 2003, which ended on March 31, 2003. Sonus falsely represented that:

> Sonus Networks, Inc. (Nasdaq: SONS) . . . today reported its
> financial results for the first quarter ended March 31, 2003, in
> accordance with generally accepted accounting principles (GAAP).
>
> Revenues for the first quarter of fiscal 2003 were $16.0 million
> compared with $12.7 million the fourth quarter of fiscal 2002. Net
> loss for the first quarter of fiscal 2003 was $4.4 million or $0.02
> per share compared with a net loss for the fourth quarter of fiscal
> 2002 were $21.2 million and the net loss for the first quarter of
> fiscal 2002 was $16.2 million or $0.09 per share.
>
> "Our financial results for the first quarter reflected good progress
> toward our business objectives," said Hassan M. Ahmed, president
> and CEO, Sonus Networks. "We grew our revenues 27 percent
> over last quarter, and by continuing to manage our business with
> precision, we further narrowed our net loss. . . ." (Emphasis
> added.)

139.    Sonus has admitted that its reported financial results for the first quarter of fiscal

2003 were false and restated its first quarter 2003 financial results in its first quarter 2004 Form

10-Q (hereinafter, "1Q 2004 Form 10-Q"). Sonus's revenues were overstated by $6.810 million,

its net loss was misstated by $5.326 million, and its net loss per share was misstated by $0.03.

Absent the accounting improprieties, the Company would have reported revenues of $9.209

million, net income (losses) of ($9.707 million), and basic and diluted net loss per share of

($0.05). Furthermore, Sonus misstated its first quarter 2003 product revenues by $7.61 million.

Restated, Sonus's product revenues were $3.517 million. Sonus misstated its first quarter 2003 service revenues by $0.800 million. Restated, Sonus's service revenues were $5.692 million. Sonus misstated its first quarter 2003 cost of revenues for products by $1.692 million. Restated, Sonus's cost of revenues for products is $1.538 million. Sonus misstated its first quarter 2003 cost of revenues for services by $0.380 million. Restated, Sonus's cost of revenues for services was $2.555 million. Sonus misstated its first quarter 2003 write-off (benefit) of inventory and purchase commitments by $0.735 million. Sonus included no write-off (benefit) of inventory and purchase commitments in its restatement in its 1Q 2004 Form 10-Q. Sonus misstated its first quarter 2003 total cost of revenues by $1.337 million. Restated, Sonus's total cost of revenues was $4.093 million. Sonus misstated its first quarter 2003 gross profit by $5.473 million. Restated, Sonus's gross profit was $5.116 million. Sonus misstated its first quarter 2003 research and development operating expenses by $0.003 million. Restated, Sonus's research and development operating expenses were $7.705 million. Sonus misstated its first quarter 2003 sales and marketing expenses by $1.303 million. Restated, Sonus's sales and marketing expenses were $3.971 million. Sonus misstated its general and administrative expenses by $0.759 million. Restated, Sonus's general and administrative expenses were $1.839 million. Sonus misstated its first quarter 2003 stock-based compensation expenses by $0.030 million. Restated, Sonus's stock-based compensation expenses were $0.924 million. Sonus misstated it first quarter 2003 amortization of goodwill and purchased intangible assets by $0.331 million. Restated, Sonus's amortization of purchased intangible assets was $0.602 million. Sonus misstated its first quarter 2003 total operating expenses by $0.18 million. Restated, Sonus's total operating expenses were $15.041 million. Sonus misstated its first quarter 2003 loss from

operations by $5.293 million. Restated, Sonus's income (loss) from operations was ($9.925 million). Sonus made several material misstatements of its financial results for the first quarter of 2003 financial reporting period.

140.    In Sonus's original first quarter 2003 Consolidated Statements of Cash Flows in its Form 10-Q for the quarterly period ended March 31, 2003 (hereinafter, "1Q 2003 Form 10-Q"), Sonus listed deferred revenue as $2.596 million. However, the 1Q 2004 Form 10-Q restated deferred revenue as $3.616 million – an adjustment of $1.020 million. With respect to inventories as stated on Sonus's first quarter 2003 Consolidated Statement of Cash Flows, Sonus listed "inventories" as ($0.511 million) while Sonus's 1Q 2004 Form 10-Q listed "inventory" as ($2.521 million) – an adjustment of $2.01 million. With respect to Sonus's accrued expenses as stated in its first quarter 2003 Consolidated Statements of Cash Flows, Sonus's 1Q 2003 Form 10-Q listed ($4.379 million) in accrued expenses while its 1Q 2004 Form 10-Q restated its accrued expenses as ($3.694 million) – an adjustment of $0.685 million.

141.    In addition, defendant Ahmed's statement ~ "[w]e grew our revenues 27 percent over last quarter. . . ." ~ made in Sonus's April 9, 2003 press release was materially false. Based on restated revenues set forth in Sonus's 2003 Form 10-K/A, revenues decreased from $12.476 million to $9.209 million during this period.

142.    On May 9, 2003, the Company filed with the SEC its 1Q 2003 Form 10-Q. It was signed by defendant Nill. In addition, defendants Ahmed and Nill signed both the "Certification" and the "Certification Pursuant to 18 U.S.C. Section 1350, as adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002." Defendants Ahmed and Nill reviewed, approved of, and

caused the 1Q 2003 Form 10-Q report to be filed with the SEC.  The 1Q 2003 Form 10-Q stated that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments, that in the opinion of management are necessary for a fair statement of the results for the interim periods.  The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.

The 1Q 2003 Form 10-Q report included Sonus's false financial results for the first quarter of fiscal 2003, which were materially misstated.

143.    Sonus also made material misstatements concerning revenue recognition in the first quarter of 2003:

> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable.  If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved.  In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement.  Service revenue is recognized as the services are provided.  Revenue from maintenance and support arrangements is recognized ratably over the term of the contract.  Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue.  Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Despite the preceding, materially false representation, Sonus did not follow the SEC, the AICPA, or its own policies for appropriately recognizing revenue.