**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
IN RE SONUS NETWORKS, INC.              )
LITIGATION                              )        Civil Action No. 04-10294-DPW
                                        )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SONUS' MOTION TO
DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

I.  Sonus' Business And Relevant Accounting Principles ................................................. 2

II.  Sonus' Investigation And Initial Disclosure of Accounting Errors ........................... 3

III.  Sonus' Restatement Of Its Financial Results ........................................................ 3

ARGUMENT .................................................................................................................... 4

I.  The Section 10(b) Claim Must Be Dismissed Because Plaintiff Fails To Plead Scienter
    Adequately ............................................................................................................ 4

    A.  The Restatement Does Not Relieve Plaintiff's Burden of Pleading Scienter ............ 5

    B.  Because The Individual Defendants Sold No Sonus Stock, Plaintiff Resorts To
        Generic Motive Allegations That Offer No Inference Of Scienter ......................... 7

    C.  Plaintiff's "Confidential Sources" And Conclusory Allegations Do Not Give Rise
        To A Strong Inference Of Conscious Wrongdoing .......................................... 8

        1.  Unsourced, Conclusory Allegations Are Insufficient To Plead Scienter ......... 8

        2.  Plaintiff's "Confidential Sources" Are Inadequately Described ................... 9

        3.  The Allegations Supported By "Confidential Sources" Lack Sufficient Detail
            And Do Not Give Rise To A Strong Inference Of Scienter ....................... 11

II.  The § 12(a)(2) Claim Must Be Dismissed Because Plaintiff Has Not Alleged That
    Defendants Are Statutory Sellers .......................................................................... 18

CONCLUSION ............................................................................................................... 20

## TABLE OF AUTHORITIES

### Federal Cases

In re Bausch & Lomb, Inc. Sec. Litig.,
No. 01-CV-6190-CJS, 2003 WL 23101782 (W.D.N.Y. Mar. 28, 2003) .................................10

In re Blockbuster Inc. Sec. Litig.,
No. 3:03-CV-0398-M, 2004 WL 884308 (N.D. Tex. Apr. 26, 2004) ......................................11

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,
-- F.3d --, 2004 WL 3015578 (3d Cir. Dec. 30 2004) ............................................................11

In re Cabletron Sys., Inc.,
311 F.3d 11 (1st Cir. 2002).......................................................................................5, 8, 10, 15

Carney v. Cambridge Tech. Partners, Inc.,
135 F. Supp. 2d 235 (D. Mass. 2001)..................................................................................9, 10

In re CIENA Corp. Sec. Litig.,
99 F. Supp. 2d 650 (D. Md. 2000) ...........................................................................................7

Colby v. Hologic, Inc.,
817 F. Supp. 204 (D. Mass. 1993) ...........................................................................................9

In re Corrpro Sec. Litig.,
No. 1:02CV1198, 2003 WL 23138459 (N.D. Ohio May 27, 2003),
aff'd 116 Fed. Appx. 592 (6th Cir. 2004) .................................................................................6

In re Craftmatic Sec. Litig.,
890 F.2d 628 (3d Cir. 1990) ...........................................................................................18, 20

Ernst & Ernst v. Hochfelder,
425 U.S. 185 (1976)...................................................................................................................4

Fidel v. Farley,
392 F.3d 220 (6th Cir. 2004) ....................................................................................................6

Fitzer v. Security Dynamics Techs.,
119 F. Supp. 2d 12 (D. Mass. 2000) .......................................................................................12

In re Focus Enhancements, Inc. Sec. Litig.,
309 F. Supp. 2d 134 (D. Mass. 2001) .........................................................................5, 12, 13

In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.,
103 Fed. Appx. 465, 2004 WL 1541232 (3d Cir. July 9, 2004).................................................7

Greebel v. FTP Software, Inc.,
194 F.3d 185 (1st Cir. 1999)...........................................................................................5, 6, 13

Greenstone v. Cambex Corp.,
    975 F.2d 22 (1st Cir. 1992)................................................................................9

Gross v. Summa Four, Inc.,
    93 F.3d 987 (1st Cir. 1996)...............................................................................13

Hayduk v. Lanna,
    775 F.2d 441 (1st Cir. 1985)...............................................................................9

Lirette v. Shiva Corp.,
    27 F. Supp. 2d 268 (D. Mass. 1998) .................................................9, 13, 14, 15

In re Loewen Group Inc.,
    No. Civ.A. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug 18, 2004) ...........................9

Maher v. Durango Metals, Inc.,
    144 F.3d 1302 (10th Cir. 1998) ........................................................................20

Maldonado v. Dominguez,
    137 F.3d 1 (1st Cir. 1998)...................................................................................9

Marra v. Tel-Save Holdings,
    No. 98-3145, 1999 WL 317103 (E.D. Pa. May 18, 1999)........................................9

McNamara v. Bre-X Minerals, Ltd.,
    57 F. Supp. 2d 396 (E.D. Tex. 1999)....................................................................7

In re Metawave Communications Corp. Sec. Litig.,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ..........................................................17

Meyer v. Biopure Corp.,
    221 F. Supp. 2d 195 (D. Mass. 2002) ..................................................................8

In re MSC Indus. Direct Co., Inc.,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...........................................................11, 17

Novak v. Kasaks,
    216 F.3d 300, 307 (2d Cir. 2000) ...................................................................7, 10

Orton v. Parametric Tech. Corp.,
    344 F. Supp. 2d 290 (D. Mass. 2004) ...............................................................5, 6

In re Peritus Software Servs., Inc. Sec. Litig.,
    52 F. Supp. 2d 211 (D. Mass. 1999) ...........................................................5, 6, 17

Pinter v. Dahl,
    486 U.S. 622 (1988).........................................................................................18

Reiger v. Price Waterhouse Coopers LLP,
  117 F. Supp. 2d 1003 (S.D. Cal. 2000) .......................................................................6

Rosenzweig v. Azurix Corp.,
  332 F.3d 854 (5th Cir. 2003) ...........................................................................18, 20

In re Royal Ahold N.V. Sec. & ERISA Litig.,
  -- F.R.D. --, 2004 WL 2955934 (D. Md. Dec. 21, 2004) .........................................20

Serabian v. Amoskeag Bank Shares, Inc.,
  24 F.3d 357 (1st Cir. 1994) ..........................................................................................6

Shalala v. Guernsey Memorial Hosp.,
  514 U.S. 87 (1995) .......................................................................................................6

In re Segue Software, Inc. Sec. Litig.,
  106 F. Supp. 2d 161 (D. Mass. 2000) .....................................................................5, 6

Shaw v. Digital Equip. Corp.,
  82 F.3d 1194 (1st Cir. 1996) ...........................................................................18, 19, 20

Shushany v. Allwaste, Inc.,
  992 F.2d 517 (5th Cir. 1993) .....................................................................................13

In re Smith Gardner Sec. Litig.,
  214 F. Supp. 2d 1291 (S.D. Fla. 2002) .....................................................................10

In re Stone & Webster, Inc. Sec. Litig.,
  253 F. Supp. 2d 102 (D. Mass. 2003) .........................................................................7

In re Trex Co., Inc. Sec. Litig.,
  212 F. Supp. 2d 596 (W.D. Va. 2002) .......................................................................13

Van Ormer v. Aspen Tech., Inc.,
  145 F. Supp. 2d 101 (D. Mass. 2000) ......................................................................10

In re WebSecure, Inc. Sec. Litig.,
  182 F.R.D. 364 (D. Mass. 1998) ...............................................................................20

Wietschner v. Monterey Pasta Co.,
  294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...............................................................15, 16

## Other Authority

T. Hazen, TREATISE ON THE LAWS OF SECURITIES REGULATION § 7.2 (4th ed. 2002)............20

## INTRODUCTION

The Amended Consolidated Class Action Complaint ("Complaint" or "Compl.") is a failed attempt to circumvent the long-standing rule in this circuit against pleading "fraud-by-hindsight" in support of a Rule 10b-5 claim. Lacking any facts to support a "strong inference" that any defendant knowingly committed or was reckless as to any misconduct, plaintiff resorts to colorful adjectives and vague rumors to support its argument that the defendants knew all along what they subsequently discovered and announced -- that the Company's financial statements were inaccurate because revenue had been allocated to the wrong quarter. Absent from the Complaint, however, are the particularized facts needed to give rise to a strong inference that such revenue recognition errors were intentional or committed knowingly or recklessly.

The Company's Restatement details how much revenue was moved to which quarter and for what reason, but plaintiff is still unable to plead with sufficient particularity any fraudulent transaction, much less knowledge of any fraud by the individual defendants. Plaintiff does not challenge the accuracy of the Restatement, and in an attempt to distort it into claims of fraud, misapprehends the complex accounting judgments which it reflects.

Not surprisingly, given the complexity of the accounting issues, plaintiff nowhere pleads with particularity facts showing that any defendant knew of, condoned or engaged in misconduct. Instead, plaintiff relies on conclusory assertions of "accounting trickery" and "revenue manipulation" supposedly designed to create the "illusion of linear revenue growth." When the innuendo is stripped away, there are no facts linking any defendant to such misconduct, nor any adequately described sources. The generic allegations of motive and opportunity are particularly weak and fail as a matter of law because the Complaint does not allege that either individual defendant sold a single share of stock during the two-year class period. Plaintiff's failure to plead with particularity is also fatal to its section 11 and 12 claims,

- 1 -

which for the reasons described in the individual defendants' memoranda are subject to Rule 9(b) because they "sound in fraud."

Similarly deficient is plaintiff's claim that defendants are liable under §12(a)(2) for selling securities pursuant to a misleading prospectus. Plaintiff's claim ignores directly applicable Supreme Court and First Circuit authority holding that in a firm commitment underwriting arrangement, the underwriter (not the issuer) is the "seller" of the securities. Nor does plaintiff fare any better with its conclusory allegations of defendants' involvement in the drafting or selling process, which are as a matter of law insufficient to create liability.

## FACTUAL BACKGROUND

### I.    Sonus' Business And Relevant Accounting Principles

Sonus, a Delaware corporation headquartered in Massachusetts, is a provider of voice infrastructure solutions that enable voice services to be delivered over packet-based networks. (Compl. ¶ 15.) Sonus provides its customers with products pursuant to complex contractual arrangements involving multiple elements (such as hardware, software, and maintenance) over time (e.g., future software releases). (Id. ¶ 40.)

Sonus accounts for these transactions in accordance with Statement of Position 97-2, which provides revenue recognition principles for transactions involving software. (Compl. ¶¶ 40, 104.) Under SOP 97-2, revenue is recognizable when there is persuasive evidence of an arrangement, delivery has occurred, the fee is fixed or determinable, and collectibility is probable. See id. ¶ 95; SOP 97-2 ¶ .08 (attached to Transmittal Affidavit of Daniel H. Gold ("Aff.") as Ex. A). In "multiple element" arrangements, "the portion of the fee allocated to an element should be recognized as revenue when the criteria in paragraph .08 of [SOP 97-2] are met with respect to the element." See SOP 97-2 ¶ .13. The revenue associated with a delivered element is only required (or even allowed) to be deferred where there is insufficient vendor-

specific objective evidence ("VSOE") of the fair value of an element to be delivered in the future, in other words when the total contract revenue cannot be accurately allocated among the elements. See id. ¶ .12.

## II.     Sonus' Investigation And Initial Disclosure of Accounting Errors

On January 20, 2004, Sonus announced that it was delaying the release of its financial results for the fourth quarter and year 2003 pending completion of its 2003 audit. (Compl. ¶ 75.)    Thereafter, on February 11, 2004, Sonus issued a press release announcing that it had identified actions of certain employees that might affect its previous financial statements; that it was undertaking a detailed review of certain financial statement accounts; that the Company had terminated certain non-executive employees; that its Audit Committee was conducting an independent investigation; and that Sonus had notified the SEC of that investigation. (Id. ¶ 76.) The very next day, on February 12, the first of 20 securities fraud complaints was filed, alleging that Sonus and certain of its officers had knowingly committed accounting fraud.

In the ensuing months, Sonus conducted a detailed review of certain financial statement accounts, and the Audit Committee conducted its internal investigation, giving the public periodic status reports. (Id. ¶¶ 77, 78, 83.) On July 19, 2004, the Company announced that it had completed the review of its financial statements, that the Audit Committee had completed its internal investigation, and that it would restate its financial results for 2001 and 2002, and the first three quarters of 2003. (Id. ¶ 83.)

## III.     Sonus' Restatement Of Its Financial Results

On July 28, 2004, Sonus filed a Form 10K/A with the SEC, restating its financial results for fiscal years 2001 and 2002 and the first three quarters of fiscal year 2003. (Id. ¶¶ 4, 49, 50.) The impact of the restatement on product revenue was an adjustment to the timing of recognition, and

not whether the sales were *bona fide*. (Id. ¶¶ 49, 50, 83.)  The bulk of this product revenue was deferred because the Company concluded during its detailed review that at the time certain revenue had been recognized, it had insufficient support to establish VSOE with respect to certain software features that were to be delivered in the future, requiring that revenue associated with previously delivered products be deferred until certain software features under the arrangement were delivered.  (Id. ¶¶ 54, 55.)

For example, the Company had previously recognized $27.5 million of revenue in 2001 upon delivery and acceptance of certain products under a complex multiple element arrangement.  After a comprehensive, technical accounting analysis of this transaction, the Company determined that there was insufficient support to establish VSOE with respect to certain software features that were to be delivered in the future.  As a result, the Company deferred revenue associated with the products that it had delivered in 2001 until the second quarter of 2002, when all software features under the arrangement were delivered.  (Id. ¶ 54.)[1]

Significantly, Sonus nowhere restated or reversed any revenue because product had not been delivered.  Instead, the restatement of revenue centered around complex accounting judgments as to when to recognize revenue for products that were in fact delivered.

## ARGUMENT

**I.    The Section 10(b) Claim Must Be Dismissed Because
       Plaintiff Fails To Plead Scienter Adequately**

Under Section 10(b), there can be no liability without scienter, "a mental state embracing intent to deceive, manipulate, or defraud."  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976).  A Section 10(b) claim fails unless a plaintiff alleges "with particularity facts giving

---

[1]    Similarly, Sonus deferred $10.9 million in revenues that had previously been recognized upon delivery of products in the fourth quarter of 2002 and each of the first three quarter of 2003 until certain specified software features were delivered in the fourth quarter of 2003. (Id. ¶ 55.)

rise to a strong inference" that the defendants acted with scienter.  See 15 U.S.C. § 78u-4(b)(2).

The inference must be both reasonable and strong.  See In re Cabletron Sys., Inc., 311 F.3d 11,

28 (1st Cir. 2002); Greebel v. FTP Software, Inc., 194 F.3d 185, 195-96 (1st Cir. 1999).

Judged by these standards, plaintiff's allegations fail.  The well-pleaded factual allegations

do not give rise to the requisite strong inference that Messrs. Ahmed or Nill intentionally caused

revenue to be recognized at the wrong time, knew that revenue had been incorrectly recognized

or recklessly disregarded any accounting problem, and the generic allegations of motive-and-

opportunity have long been rejected.  In short, plaintiff has alleged nothing more than fraud by

hindsight -- Sonus restated its revenues, so it must have known earlier that they were inaccurate.

Such allegations are insufficient to withstand a motion to dismiss.

### A.    The Restatement Does Not Relieve Plaintiff's Burden of Pleading Scienter

Alleging accounting fraud based on a restatement of a company's financial results is classic

"fraud-by-hindsight" and fails to provide a strong inference of scienter.  See, e.g., In re Focus

Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 160 (D. Mass. 2001) ("James attempts to

plead 'fraud by hindsight,' alleging that because of the announced restatement, the defendants

must have known of the problems at the time they occurred. Such an allegation is clearly

insufficient").  "[A] restatement of earnings, without more, does not support a 'strong inference'

of fraud, or for that matter, a weak one."  In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d

161, 169 (D. Mass. 2000).[2]

---

[2]    See also Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 306 (D. Mass. 2004) ("the fact that a
defendant voluntarily restates income does not, standing alone, support a strong inference of scienter"); In re Peritus
Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 223 (D. Mass. 1999)  ("after-the-fact accounting admissions . .
. do not by themselves suffice to show that the misstatements occurred knowingly or recklessly").  Moreover, as the
court recognized in Segue, inferring scienter from a restatement "would create a perverse incentive for management
to conceal mistakes, thereby defeating a core purpose of the securities laws."  Segue, 106 F. Supp. 2d at 170.

The First Circuit has reached the same conclusion when a defendant seeks to infer scienter from the mere fact that there have been violations of GAAP.  See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir. 1994).[3]  Indeed, GAAP is not a bright-line set of rules that can be applied by simply following a checklist.  See Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 101 (1995) ("GAAP is not [a] lucid or encyclopedic set of pre-existing rules . . . . GAAP changes and, even at any one point, is often indeterminate").  Rather, as the name suggests, GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management."  See Greebel, 194 F.3d at 205 (quoting Thor Power Tool Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544 (1979)).

As a corollary, and contrary to the plaintiff's refrain that the "magnitude, duration and pervasiveness" of the accounting errors "compel[] the conclusion" that defendants acted with scienter, see Compl. ¶ 94, neither the size nor duration of a particular accounting error changes the well-reasoned conclusion that GAAP violations are not by themselves evidence of intentional wrongdoing.  See Fidel v. Farley, 392 F.3d 220, 231 (6th Cir. 2004) ("[a]llowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter'").[4]

---

[3]    See also Orton, 344 F. Supp. 2d at 306 ("defendant's violation of GAAP is insufficient, by itself, to support a strong inference of scienter under the PSLRA"); Segue, 106 F. Supp. 2d at 169 ("Accounting judgments, even imperfect ones that violate GAAP, do not, absent 'other circumstances,' support an inference of scienter"); Peritus, 52 F. Supp. 2d at 223 ("A host of courts have held that a mere failure to recognize revenue in accordance with GAAP does not, in itself, suffice to establish scienter").

[4]    See also In re Corrpro Sec. Litig., No. 1:02CV1198, 2003 WL 23138459, at *4 (N.D. Ohio May 27, 2003), aff'd 116 Fed. Appx. 592 (6th Cir. 2004) ("Plaintiff argues that restatements involving high magnitude support a strong inference of scienter. But GAAP violations alone are not enough to establish scienter."); Reiger v. Price Waterhouse Coopers LLP, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000) ("To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences.").

**B.    Because The Individual Defendants Sold No Sonus Stock, Plaintiff Resorts To Generic Motive Allegations That Offer No Inference Of Scienter**

The fact that neither Mr. Ahmed nor Nill is alleged to have sold even a single share of Sonus stock during the putative class period strongly negates any inference that the defendants were motivated by personal gain.  See, e.g., In re Stone & Webster, Inc. Sec. Litig., 253 F. Supp. 2d 102, 128 (D. Mass. 2003) ("most cases in which courts have found motive and opportunity to be present involve the sale of stock by defendants at artificially inflated prices"); In re CIENA Corp. Sec. Litig., 99 F. Supp. 2d 650, 662 (D. Md. 2000) ("[Defendant] did not sell a single share of his stock during the class period.  Thus, his motive could not have been to inflate the value of [the company's] stock"). [5]

Unable to point to any personal benefit realized by Messrs. Ahmed or Nill, plaintiff resorts to generic motives that could be imputed to any officer of a public company, claiming that they sought to "manage" earnings to create an "illusion of linear revenue growth" or so that Sonus could "sell stock in follow-on offerings or otherwise access the capital markets."  Compl. ¶¶ 5, 6. Colorful phrases such as "earnings management" and "linear growth" do not suffice.  See In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig., 103 Fed. Appx. 465, 2004 WL 1541232, at *3 (3d Cir. July 9, 2004) (rejecting company's "desire to manage its earnings in order to meet analyst and market expectations" as "general corporate motive [insufficient] to give rise to a strong inference of *scienter*"); Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000) ("plaintiffs [cannot] proceed based on motives possessed by virtually all corporate insiders, including . . . the appearance of corporate profitability"); McNamara v. Bre-X Minerals, Ltd., 57 F. Supp. 2d 396,

---

[5]    Mr. Ahmed and Mr. Nill beneficially owned, respectively, 8,037,091 and 1,301,510 shares of Sonus common stock as of January 31, 2002, none of which they are alleged to have sold thereafter.  See Form 14A filed March 28, 2002 at 10 (Aff. Ex. B).

405 (E.D. Tex. 1999) (allegations that a defendant acted to improve a company's financial health

or reputation, or to increase capital, are insufficient to allege motive).[6]

### C.    Plaintiff's "Confidential Sources" And Conclusory Allegations Do Not Give Rise To A Strong Inference Of Conscious Wrongdoing

Plaintiff's allegations of knowing or reckless behavior are either wholly conclusory or based

on "confidential sources," and do not comply with the heightened requirements for information

and belief pleading.  The sources are not adequately described and do not provide sufficient

information to form "an adequate basis for believing" the inferences attributed to them.  See

Cabletron, 311 F.3d at 28-30 (court should examine "the level of detail provided by the

confidential sources, the corroborative nature of the other facts alleged …, [the] plausibility of

the allegations, the number of sources, the reliability of the sources, and similar indicia.").

Moreover, the Complaint is careful to avoid directly attributing to most of the sources any

allegation that either Mr. Ahmed or Mr. Nill knew of any improper revenue recognition.

### 1.    Unsourced, Conclusory Allegations Are Insufficient To Plead Scienter

While the Complaint repeatedly asserts in conclusory fashion that Sonus personnel

intentionally or knowingly engaged in improper revenue recognition,[7] "mere allegations of fraud

---

[6]    See also Meyer v. Biopure Corp., 221 F. Supp. 2d 195, 209 (D. Mass. 2002) (defendant's attempt to secure $75 million in private financing in order to continue operations not sufficient "to create a blanket presumption that any omissions were made with intent to defraud").

[7]    See, e.g., Compl. ¶ 5 ("Sonus's improper accounting practices . . . occurred with the knowledge, acquiescence and direct participation of at least two of Sonus's senior officers, defendants Ahmed and Nill"); ¶ 6 ("Sonus's senior finance and accounting personnel, with the knowledge, acquiescence and approval of Sonus's senior management, including defendants Ahmed and Nill, engaged in a wrongful pattern of conduct"); ¶ 22 ("The Individual Defendants . . . were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature"); ¶ 36 ("Sonus's finance and accounting staff, with the knowledge, approval and acquiescence of Sonus's senior management, including defendant Nill, engaged in a series of financial and accounting irregularities"); ¶ 45 ("defendant Ahmed, Sonus's CEO, knew or at a minimum was reckless in disregarding that Sonus had improperly manipulated its revenues"); ¶ 84 ("All defendants knew or recklessly disregarded, throughout the Class Period, that Sonus was experiencing such pervasive deficiencies in its internal controls and accounting practices that the financial information generated for inclusion in Sonus's financial statements was grossly inaccurate and unreliable"); ¶ 88 ("the Individual Defendants knew of material problems in the Company's accounting systems"); ¶ 92 ("The Individual Defendants knowingly or with recklessness caused Sonus to materially misstate the Company's revenues . . . in violation of GAAP. ").

. . . averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985); see also Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992) (mere averment that defendant "knew" a fact insufficient).[8] Moreover, because none of these allegations are attributed to any source or based on any contemporaneous documents, they cannot give rise to a strong inference of scienter. See, e.g., Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 282 (D. Mass. 1998) (allegations "based solely on information and belief. . . . do not support a 'strong inference' of the required state of mind"); Colby v. Hologic, Inc., 817 F. Supp. 204, 212 (D. Mass. 1993) ("without specified sources or supporting facts," allegations "must be regarded as speculative and fatally defective").

### 2.    Plaintiff's "Confidential Sources" Are Inadequately Described

The only allegations purporting to show intentional wrongdoing for which a source is provided appear in ¶¶ 40- 47, where plaintiff attributes certain allegations to "confidential sources."[9] None of these "confidential sources," however, is adequately identified as required by the Reform Act, and thus should not even be considered in assessing whether plaintiff has alleged scienter. See, e.g., In re Loewen Group Inc., No. Civ.A. 98-6740, 2004 WL 1853137, at

---

[8]    Similarly insufficient is plaintiff's suggestion that scienter can be inferred from the individual defendants' "executive and managerial positions," in which they allegedly "had access to the adverse undisclosed information about Sonus's business prospects and financial condition." See Compl. ¶ 22; Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998) (rejecting allegations that defendants must have been aware of facts by virtue of their positions); Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 255 (D. Mass. 2001) ("status" and "general allusions to unspecified corporate information" insufficient to plead scienter).

[9]    Remarkably, the portions of the Complaint entitled "Defendant [Ahmed/Nill] Directly Participated In And Furthered The Fraudulent Accounting Practices" do not allege any facts regarding the individual defendants' knowledge or participation in any wrongdoing. See Compl. ¶¶ 72- 73. Instead, these inaptly named paragraphs simply list the SEC filings signed by each of the individual defendants, which may suffice to show that they "made" the statement, but is insufficient to plead scienter. See, e.g., Marra v. Tel-Save Holdings, No. 98-3145, 1999 WL 317103, at *6 (E.D. Pa. May 18, 1999) (dismissing complaint where "only mention of the individual defendants' involvement with the communication of the allegedly fraudulent statements are three averments that the individual defendants signed various annual reports").

*9 (E.D. Pa. Aug 18, 2004) ("Because the identification of the source is insufficient under the pleading requirements of the Reform Act," court would "not consider the source's assertions").

The Reform Act established "especially heightened pleading standards" for claims based on information and belief.  See Cabletron, 311 F.3d at 28; 15 U.S.C. § 78u-4(b)(1).[10]  The First Circuit has made clear that this heightened pleading standard applies to allegations based on "confidential sources" and approved of the Second Circuit's holding that confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  See Cabletron, 311 F.3d at 29 (citing favorably Novak, 216 F.3d at 314).

Here, the sparse descriptions of plaintiff's sources make it impossible to assess their reliability or basis of knowledge.  For example, plaintiff attributes information to "former [Company/Sonus] employees" and a "former senior Sonus employee," see Compl. ¶¶ 41, 42, 44, 46, 47, without providing even a job title or any indication of job responsibilities.  See In re Bausch & Lomb, Inc. Sec. Litig., No. 01-CV-6190-CJS, 2003 WL 23101782, at *22-23 (W.D.N.Y. Mar. 28, 2003) ("former employee" inadequate description of source); In re Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1301 (S.D. Fla. 2002) (rejecting allegations attributed to a "former employee" where no description of source's position).

Similarly defective are generic descriptions such as a "former senior sales person" or "former senior sales executive" (Compl. ¶ 40) or  "several former Sonus sales and technical staff" (Compl. ¶ 43).  See Van Ormer v. Aspen Tech., Inc., 145 F. Supp. 2d 101, 105 (D. Mass.

---

[10]    Plaintiff's statement that its allegations are based upon the "investigation of Lead Plaintiff's Counsel" (Compl. ¶ 215) is equivalent to pleading on information and belief, and does not avoid this pleading burden.  See, e.g., Carney, 135 F. Supp. 2d at 247.

2000) ("Allegations supported only by unidentified 'sales managers' who got their information from unspecified sources fall woefully short of meeting particularity requirements.").

These deficiencies are particularly glaring because **_none of plaintiff's sources are alleged to have worked in Sonus' finance department_**, undermining not only any basis for believing they knew how Sonus accounted for any transaction, but also any basis for believing they understand GAAP or proper accounting.  There is no basis to believe that generically-described former Sonus employees or sales personnel "had any connection with [Sonus'] accounting department or that their work responsibilities would provide them a basis for knowing the details of the accounting at [Sonus]." In re MSC Indus. Direct Co., Inc., 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003); see Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., -- F.3d --, 2004 WL 3015578, at *17  (3d Cir. Dec. 30 2004) (rejecting plaintiffs' "attempt to substantiate claims of accounting fraud by reference to a number of former employees who held positions that would not appear to render them privy to the company's bookkeeping practices, let alone the specific accounting that went into the company's financial reporting").[11]

### 3.    The Allegations Supported By "Confidential Sources" Lack Sufficient Detail And Do Not Give Rise To A Strong Inference Of Scienter

Even if the allegations based on the inadequately described sources are considered, they are insufficient to plead scienter.  Plaintiff's sources do not provide specific factual allegations from which to infer that either Mr. Ahmed or Mr. Nill knew, at some earlier time, of any of the accounting errors identified in the Restatement, much less that such errors were intentional.

---

[11]    In re Blockbuster Inc. Sec. Litig., No. 3:03-CV-0398-M, 2004 WL 884308, at *13 (N.D. Tex. Apr. 26, 2004) ("no facts [are] alleged from which one could conclude that the employees quoted were privy to how or when the costs of MOP were accounted for on Blockbuster's financial statements . . . . without further description of a district manager's job, it is not probable that a district manager would be privy to how the costs of MOP were reflected in Blockbuster's financial statements.).

As an initial matter, a number of plaintiff's sources do not even purport to describe any involvement by Mr. Ahmed or Mr. Nill in any misconduct. Some point instead to unnamed personnel or "Sonus" in the abstract,[12] allegations too vague to plead scienter because they do not identify who purportedly engaged in wrongdoing. See Orton, 344 F. Supp. 2d at 307-08 (allegations that "Parametric" improperly allocated revenue and that "Parametric management" encouraged channel-stuffing insufficient for failure to identify "who" did these things).[13]

A number of the allegations that do purport to assert wrongdoing by either individual defendant are carefully drafted so as not to actually attribute the key allegations to any source. For example, while plaintiff alleges in ¶ 40 that "Sonus's senior accounting and finance staff, with the knowledge and approval of the Company's senior management, including but not limited to Mr. Nill, employed accounting trickery," this allegation is not directly attributed to the "former senior sales person" mentioned in the same paragraph. See Compl. ¶ 40. Similarly, in ¶ 42, plaintiff claims that "defendant Nill, working in concert with Sonus's former controller, Peter Hemme, improperly recognized tens of millions dollars in revenues under a contract with Sonus's then largest customer, Qwest," without directly attributing this conclusory allegation to the "former Sonus employee" quoted later in the paragraph. See id. ¶ 42.[14] The only reasonable

---

[12]    See, e.g., Compl. ¶ 40 ("Sonus was able to manage the timing of its reported revenues"); ¶ 41 ("Sonus was able to, and did, manipulate the timing of its reported revenues"); ¶ 46 ("Sonus's senior management was 'managing' quarterly revenues").

[13]    See also Fitzer v. Security Dynamics Techs., 119 F. Supp. 2d 12, 25 (D. Mass. 2000) (refusing to "speculate that because former employees in the corporation knew of [adverse facts], the corporate executives must also have known"); cf. Focus Enhancements, 309 F. Supp. 2d at 145, 150 (strong inference of scienter as to inventory parking allegations where named source was told by defendant CEO that company recognized income when product was loaded on trailer).

[14]    See also Compl. ¶ 43 (alleging that improper revenue recognition was "known, approved and condoned by defendant Nill" but not directly attributing that assertion to the previously referenced "former Sonus sales and technical staff," who instead are merely sources for the generic allegation that the misstatement of revenues was "material and ongoing").

inference from this careful drafting is that plaintiff's sources did not in fact directly implicate either Mr. Nill or Mr. Ahmed in any wrongdoing.

Of equal importance, the information provided by plaintiff's sources lacks the requisite transactional detail required to plead scienter based on improper revenue recognition.  "To support even a reasonable inference of scienter," a complaint must describe the accounting violations "with sufficient particularity." Greebel, 194 F.3d at 203.  A complaint "clearly falls short" where it does not include "such basic details" as the amount of revenue involved,[15] the products involved in the challenged transactions, the dates of the transactions and the identities of the customer or company's employees involved in those transactions.  Id. at 203-04; Focus Enhancements, 309 F. Supp. 2d at 158 ("To plead financial fraud based on improper revenue recognition under GAAP adequately, the complaint must allege, 'at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of the specific transactions, when the transactions occurred, and the approximate amount of the [allegedly] fraudulent transactions.'") (quoting Lirette, 27 F. Supp. 2d at 278).[16] Measured against these standards, the allegations of ¶¶ 40-47 fall short.[17]

In paragraphs 40-42, plaintiff alleges that defendants, "[i]n violation of GAAP," "improperly unbundled certain software delivery elements" and "treated them separately from

---

[15]    Allegations as to the amount of the revenue involved are needed to plead materiality.  See Gross v. Summa Four, Inc., 93 F.3d 987, 995-96 (1st Cir. 1996) (affirming dismissal of revenue recognition claim where plaintiff did not allege "the amount of the putative overstatement or the net effect it had on the company's earnings"); In re Trex Co., Inc. Sec. Litig., 212 F. Supp. 2d 596, 611-12 (W.D. Va. 2002) (dismissing allegations of improper revenue recognition where plaintiffs failed to identify "the amount or percentage of revenues those transactions generated" because "plaintiffs have not plead their allegations in a context that permits the court to conclude that the allegations if proven are indeed material").

[16]    See also Shushany v. Allwaste, Inc., 992 F.2d 517, 522 (5th Cir. 1993) (complaint insufficient where it "did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into Allwaste's financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position").

[17]    ¶¶ 40-47 contain the only allegations even remotely attributed to any source.

the hardware obligations" in a contract with Qwest.   See Compl. ¶40.  They did this, plaintiff

says, in order to "improperly claim[] that the software updates and releases had been delivered,"

ostensibly in violation of SOP 97-2.  See id. ¶¶ 40-42.  However, all three of these paragraphs

fail (1) to specify which part of SOP 97-2 was violated by this practice, (2) to explain intelligibly

*why* the practice violated SOP 97-2,[18] (3) to identify who at Sonus "claimed" software had been

delivered or when or in what context such "claims" were made, (4) to identify *which* software

elements were "unbundled," *when* or *how much* revenue was improperly recognized,[19] or (5) to

identify *which* statement during the class period was materially false as a result.

Plaintiff instead substitutes rhetoric for fact, quoting a "former Sonus employee" for the

meaningless conclusion that "Sonus was simply gerrymandering results as to the Qwest

contract."  Compl. ¶ 42.  And equally critically, Mr. Ahmed is not even mentioned in the three

paragraphs.  The only mentions of Mr. Nill are the unsourced and conclusory allegation that the

"accounting trickery" was carried out with his non-specific "knowledge and approval," see id. ¶

40, and that he somehow "work[ed] in concert" with a non-defendant to improperly recognize

revenue.  See id. ¶ 42.  No information is provided as to what Mr. Nill did, what he knew, or

when, or how.

In paragraph 43, plaintiff finally purports to address the matters that were disclosed in the

Restatement.   Even though Sonus clearly laid out the basis for the Restatement in detail, see

---

[18]    Even Plaintiff's explanation of how this conduct allegedly violated GAAP is confusing and fails to tie back
to the Company's Restatement.  Plaintiff alleges that defendants acted "improperly [by] unbundl[ing] certain
software delivery elements" from "hardware obligations," because under SOP 97-2 "Sonus was [supposedly]
required to report revenues from these contracts as they were bundled, with no segregation of the hardware and
software components." See Compl. ¶ 40.  SOP 97-2, to the contrary, makes clear that "unbundling" the separate
elements of a multiple element arrangement for the purposes of revenue recognition may be entirely appropriate and,
in fact, requires specifically that "the portion of the fee allocated to an element should be recognized as revenue
when the criteria in paragraph .08 of this SOP [evidence of arrangement, delivery, fee fixed, collectibility probable]
are met with respect to the element."  See SOP 97-2 ¶ .13.

[19]    The vague reference in ¶ 42 to "tens of millions [of] dollars" adds little in the way of specificity.

Compl. ¶¶ 54-55, plaintiff nonetheless manages to get the specifics of the transaction completely wrong. Plaintiff alleges that Sonus "improperly recognize[d] $27.5 million in Q2 2002 by recording revenues on software updates that had not been delivered to Qwest," see id. ¶ 43, when in fact the revenue at issue was originally recognized in *2001* and reclassified during the restatement as being *properly recognized in Q2 2002*. See id. ¶ 54; Form 10K/A filed July 28, 2004 at 4-5 (Aff. Ex. C). Plaintiff makes the same mistake with the $11 million supposedly improperly recorded in Q4 2003. In fact, as is clear from Compl. ¶ 55 and the 10K/A at 5, $10.9 million was moved *from* previous periods *to* Q4 2003. The bare allegation that this "unlawful practice occurred with other accounts, including a contract with ATT" does not add anything by way of specificity.

Nor do the allegations of the paragraph adequately attribute knowledge of any of these vague "facts" to either individual defendant. No information is provided as to how the "several former Sonus sales and technical staff" supposedly knew about the accounting matters at issue. Therefore, the allegations cannot be credited, even giving plaintiff the benefit of the doubt that the sources actually implicate Nill and Ahmed.[20] The allegations that the practice described was "known, approved and condoned" by Nill, or that it occurred "under the supervision" of Ahmed, are naked conclusions that do not comply with the PSLRA.

In paragraph 44, plaintiff alleges that *before the class period*, "in *either* Q3 or Q4 2001," Nill *or* Hemme requested that a letter be sent to Qwest to confirm delivery of (once again unidentified) "hardware and software" when the product had not in fact been delivered. Given that plaintiff cannot specify whether the alleged wrongdoing occurred in Q3 or Q4, it is

---

[20]    See Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1112 (N.D. Cal. 2003) (where complaint does not "provide any detail as to how the witness came to learn much of the information attributed to him . . . . [the] Court has no basis for relying on the witness' statements as sufficient to draw an inference of fraud under the requirements of the PSLRA."); see also Cabletron, 311 F.3d at 29-30.

speculative to infer that the product had not been delivered by the end of 2001, particularly where the purpose of the alleged "scheme" was to move revenue from quarter to quarter, rather than recognize revenue it never received. Thus, there is no basis to infer whether the first class period statement– the 10K for 2001 - is inaccurate in this respect or not. The allegations about "similar" letters to Global Crossing and XO Communications are devoid of any details.

Moreover, even looking past these fundamental problems, plaintiff makes no allegations from which knowledge of any "facts" can be imputed to either Individual Defendant. The "former senior employee" is unwilling even to say whether Nill *or* Hemme (a non-defendant) issued the Qwest letter. The vague allegation that "Ahmed was made aware of these improper practices in 2001 …. but took no action to stop them" not only refers to a time *before* the Class Period, but also is devoid of any particulars that would meaningfully ascribe knowledge to Ahmed, such as *who* made him aware, *how* he was made aware, and *what* he was told. Attributing this allegation to "a former Vice President," without any details showing *how* that individual was in a position to know what Ahmed was "made aware" of, adds nothing to the scienter analysis. See Wietschner, 294 F. Supp. 2d at 1112 (rejecting source's claim that "'the Company's aggressive third quarter sales efforts were authorized by defendant'" without any "explanation as to how the source knew of such authorization by [defendant]").

Paragraphs 45 and 46 consist of nothing more than the unsupported conclusions that Ahmed and "senior management" knew or recklessly disregarded that Sonus had improperly manipulated revenues (without identifying even the most basic information such as when, how or in what transactions), coupled with the speculative allegation that he was motivated to do so because of his dealings with analysts. They add nothing of substance, and merely attribute to a "former senior sales employee" the meaningless assertion that it was "well known" to other

unidentified Sonus personnel that "senior management" was "managing" revenue.  See Compl. ¶ 46.  Such "vague quotes and conclusory rumors" are insufficient to plead accounting fraud.  See MSC, 283 F. Supp. 2d at 846; In re Metawave Communications Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo'" ).

Finally, paragraph 47 is a model of confusion.  It claims that Sonus violated SOP-97 by "segregating out future deliverables" from its contracts and putting them into "side deals" so that it could recognize revenues even though there were really "unmet future obligations" under the contracts.  Even leaving aside plaintiff's mistaken interpretation of SOP 97-2 in this context, see supra at n.18, the paragraph is utterly lacking in any transactional detail.  Among other things, plaintiff does not identify *who* at Sonus "began th[is] practice" or *when*, *which* "deliverables" or "future unmet obligations" were "segregated" from Sonus' contracts, the terms of any "side deals," *how much* revenue was improperly recognized as a result of this alleged practice, *when* the revenue was improperly recognized, or *which* financial statements were rendered false or misleading as a result.  Moreover, and critically, the only allegation purporting to show knowledge of either individual defendant of this "segregation" practice is the unsourced and conclusory allegation that Nill "approved" of the practice.  Ahmed is not even mentioned.

In summary, plaintiff's "well-pleaded" allegations are insufficient to give rise to a strong inference of scienter, and accordingly the 10(b) claim should be dismissed.[21]

---

[21]    Plaintiff's § 20(a) "controlling person" claim fails and must be dismissed because it has not adequately pleaded an underlying violation of § 10(b).  See In re Peritus, 52 F. Supp. 2d at 230.  Furthermore, plaintiff's § 11 claim (and the derivative controlling person claim) must be dismissed for the reasons described in the separate memoranda filed by Messrs. Ahmed and Nill, whose arguments Sonus incorporates by reference.

**II.    The § 12(a)(2) Claim Must Be Dismissed Because Plaintiff Has Not Alleged That Defendants Are Statutory Sellers**

Under § 12(a)(2)[22] of the Securities Act, suit may be brought only against a party who fits the statutory definition of a "seller" of securities to the plaintiff.  In relevant part, § 12(a)(2) provides that "*[a]ny person who . . . offers or sells a security* . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . *shall be liable . . . to the person purchasing such security from him.*"  15 U.S.C. § 77*l*(a) (emphasis added).

The controlling Supreme Court case on § 12's "seller" requirement, Pinter v. Dahl, 486 U.S. 622 (1988), held that the only proper § 12 defendants are (1) "the owner who passed title, or other interest in the security, to the buyer for value," id. at 642, and (2) "an individual who engages in solicitation" of the sale for the principal, "motivated at least in part by a desire to serve his own financial interests or those of the securities owner," such as a broker acting as a paid agent of the selling securities owner, see id. at 642, 646-47.[23]

Because the September 23, 2003 secondary offering[24] of Sonus shares was a "firm commitment" underwriting, plaintiff cannot contend that defendants directly "passed title" to the plaintiff.   This was a firm commitment underwriting because the underwriter, Goldman, Sachs & Co., first purchased all of the offered shares from Sonus and thereafter, Goldman Sachs

---

[22]    Prior to the PSLRA, the two clauses of § 12 were numbered 12(1) and 12(2).  The PSLRA renumbered these sections 12(a)(1) and 12(a)(2).

[23]    Although Pinter arose under § 12(a)(1), the Court itself suggested, see Pinter, 486 U.S. at 642 n.20, and the First Circuit has subsequently held, that Pinter's analysis of who is a § 12 seller is equally applicable to § 12(a)(2) because of the identical statutory language involved.  See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1214 (1st Cir. 1996); accord Rosenzweig v. Azurix Corp., 332 F.3d 854, 871 n.10 (5th Cir. 2003); In re Craftmatic Sec. Litig., 890 F.2d 628, 635-36 (3d Cir. 1990).

[24]    Sonus also issued shares pursuant to an April 21, 2003 prospectus supplement, see Compl. ¶ 68, but plaintiff only brings a § 12 claim regarding the September 2003 offering, see id. ¶¶ 25, 206.

sold the shares to the public on its own behalf.  See Prospectus Supplement Filed September 24, 2003 at S-1 (Aff. Ex. D) ("In accordance with the terms of the underwriting agreement, Goldman, Sachs & Co. has agreed to purchase all of the 17,000,000 shares.").[25]  Sonus and its officers therefore did not pass title to plaintiff BPI Global or any members of the putative § 12 class.  Goldman Sachs did.  See Shaw, 82 F.3d at 1216.  Accordingly, Sonus and its officers can only be liable as § 12 statutory sellers if they engaged in direct and active financially-motivated solicitation of plaintiff BPI Global's purchase.  See Shaw, 82 F.3d at 1216.

In the few paragraphs of the amended complaint concerning defendants' purported status as § 12 sellers, plaintiff alleges:

- "On September 23, 2003, Sonus filed a . . . Prospectus Supplement to its June 25, 2001 Registration Statement and Prospectus, relating to the offering of 17,000,000 shares of its common stock."  See Compl. ¶ 70.  "Lead Plaintiff and members of the [Section 12] Subclass acquired Sonus shares pursuant to the Prospectus Supplement."  Id. ¶ 206.

- Sonus, Ahmed and Nill caused the false and misleading Prospectus Supplement to be drafted, and approved it.  See id. ¶ 207.  "But for" these actions, the offering could not have closed and plaintiffs could not have purchased Sonus shares.  Id.

- Sonus, Ahmed and Nill "solicited institutional investors, fund managers and other investment professionals to acquire Sonus shares pursuant to the Prospectus Supplement."  Id. ¶ 207.  "Absent the selling efforts by Sonus, Ahmed and Nill, as set forth above, the sale of Sonus shares pursuant to the Prospectus Supplement would not have been consummated."  Id. ¶ 208.

None of these allegations suffice.  Under Shaw, to state a claim under § 12, a plaintiff must allege that the defendant directly solicited its purchase – not that it solicited investors generally.  See Shaw, 82 F.3d at 1215 (holding, in firm commitment underwriting, that the issuer and its CEO and CFO were not statutory sellers because the complaint lacked a non-conclusory factual

---

[25]    See generally Shaw, 82 F.3d at 1200 n.1 (describing a firm commitment underwriting as one in which the company issuing the securities "sold all of the offered shares to the underwriter at a discount, who then in turn sold the shares to the public").

allegation that the defendants "actively 'solicited' *the plaintiffs'* purchase of securities to further their own financial motives, in the manner of a broker or vendor's agent") (emphasis supplied).[26]

The Complaint contains no allegation that defendants solicited BPI Global's purchase, alleging only that "[defendants] solicited institutional investors, fund managers and other investment professionals. . . ."  See Compl. ¶ 207.  This allegation is defective as a matter of law under the cases and principles set forth above.[27]

Equally deficient are allegations concerning defendants' involvement in drafting or approving offering materials, see Compl. ¶ 207.  See Shaw, 82 F.3d at 1216 ("neither involvement in preparation of a registration statement or prospectus nor participation in activities relating to the sale of securities, standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status.") (emphasis in original).[28]

Plaintiff, therefore, fails to state a claim under § 12.[29]

## CONCLUSION

For all the foregoing reasons, the defendants request that the Court dismiss the Complaint with prejudice.

---

[26]    See also In re WebSecure, Inc. Sec. Litig., 182 F.R.D. 364, 369 (D. Mass. 1998) (dismissing § 12 claim against underwriter because the "complaint does not allege that any plaintiff -- as distinct from any 'investor' -- purchased directly from [the underwriter]"); see generally Rosenzweig, 332 F.3d at 871 ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer. . . . The issuer may only be liable under § 12(a)(2) if the plaintiff alleges 'that an issuer's role was not the usual one; that it went farther and became a vendor's agent.'"); Maher v. Durango Metals, Inc., 144 F.3d 1302, 1307 (10th Cir. 1998) (similar); Craftmatic, 890 F.2d at 636 (similar).

[27]    A fortiori, the Complaint is also deficient because it fails to make any allegation that defendants solicited BPI Global's purchase "to further their own financial motives, in the manner of a broker or vendor's agent."  Shaw, 82 F.3d at 1215.  Of course, Section 12 allegations that "sound in fraud" must set forth their allegations of fraud with particularity, which this complaint fails to do.  See Shaw 82 F.3d at 1223.

[28]    Accord T. Hazen, TREATISE ON THE LAWS OF SECURITIES REGULATION § 7.2 at 579 (4th ed. 2002) ("Even substantial involvement in the preparation of registration and offering materials will not create liability unless there is also active involvement in the negotiations leading to the sale in question."); In re Royal Ahold N.V. Sec. & ERISA Litig., -- F.R.D. --, 2004 WL 2955934, at *56 (D. Md. Dec. 21, 2004) ("Mere participation in the preparation of the prospectus will not trigger § 12(a)(2) liability.").

[29]    Plaintiff's § 15 "controlling person" claims in Count 3 are derivative of its § 12 claims, and accordingly fail as well.  See Shaw 82 F.3d at 1201 n. 2.

Respectfully Submitted,

SONUS NETWORKS, INC.

By its attorneys,

/s/ Daniel H. Gold
Jeffrey B. Rudman (BBO #433380)
James W. Prendergast (BBO #553073)
Daniel W. Halston (BBO #548692)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Dated: January 28, 2005