UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. LITIGATION | ) Civil Action No. 04-10294-DPW<br>) (Lead Case)<br>)<br>)<br>)<br>) |
| THIS DOCUMENT RELATES TO: ALL CASES | )<br>)<br>)<br>)<br>)<br>) |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
Steven O. Sidener
Gwendolyn R. Giblin
Kenneth A. Frost
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone ( 415) 777-2230
Facsimile: (415) 777-5189

Attorneys for Lead Plaintiff
BPI Global Asset Management LLP

#109708

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................... 1

II.  SUMMARY OF FACTUAL ALLEGATIONS ................................ 6

III. THE COMPLAINT STATES A CLAIM FOR SECURITIES LAW
     VIOLATIONS ...................................................... 12

     A.   Standard Of Review On A Motion To Dismiss ......................... 12

     B.   The Claim Under Section 10(b) Of The 1934 Act Is Adequately Alleged ..... 14

          1.   *Scienter* Is Adequately Alleged ............................... 14

          2.   Defendants' Conscious Misbehavior Or, At A Minimum,
               Recklessness Is Alleged .................................... 16

          3.   Lead Plaintiff's Sources Are Adequately Identified ............... 19

          4.   Sonus's Admission Of Accounting Improprieties, The
               Restatements, And The Magnitude Of The Fraud Raise A Strong
               Inference Of *Scienter* .................................... 24

          5.   Knowledge Of The Accounting Deficiencies And Improprieties
               May Be Attributed To Defendants ............................ 27

          6.   Violation of One's Own Accounting Policies Shows *Scienter* ....... 29

          7.   The Absence of Insider Selling Is Irrelevant ..................... 30

     C.   The Claim Under Section 11 Of The 1933 Act Is Adequately Alleged ....... 31

     D.   The Claim Under Section 12(a)(2) of the 1933 Act is Adequately Alleged .... 37

          1.   Lead Plaintiff Has No Way Of Verifying The Existence Of A Firm
               Commitment Underwriting ................................... 37

          2.   Lead Plaintiff Has Properly Alleged That Defendants Are Statutory
               Sellers Through Solicitation ................................. 39

**TABLE OF CONTENTS**
**(Continued)**

                                                                                          **Page**

      E.    The "Control Person" Claims Are Adequately Alleged  . . . . . . . . . . . . . . . . . . . 42

IV.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aldridge v. A.T. Cross Corp.*
284 F.3d 72 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Artuz v. Bennett*
531 U.S. 4 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Badaracco v. Commissioner*
464 U.S. 386 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Blatt v. Muse Technologies, Inc.*
2002 WL 31107537, *11 (D. Mass. Aug. 27, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25

*Breard v. Sachnoff & Weaver, Ltd.*
941 F.2d 142 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Chalverus v. Pegasystems, Inc.*
59 F.Supp.2d 226 (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25, 27, 29, 30

*Cooperman v. Individual, Inc.*
171 F.3d 43 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Cosmas v. Hassett*
886 F.2d 8 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Crowell v. Ionics, Inc.*
343 F.Supp.2d 1 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25, 27-31

*Eastern Food Services, Inc. v. Pontifical Catholic University Ass'n, Inc.*
357 F.3d 1 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Epstein v. Itron*
993 F.Supp. 1314 (E.D.Wash. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ernst & Ernst v. Hochfelder*
425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORITIES
### (Continued)

Page

*FDIC v. Consol. Mortgage and Fin. Corp.*
805 F.2d 14 (1st Cir. 1986) ................................................... 44

*Fitzer  v. Security Dynamics Technologies, Inc.*
119 F.Supp.2d 12 (D. Mass. 2000) ......................................... 22

*Foman v. Davis*
371 U.S. 178 (1962) .......................................................... 44

*Geffon v. Micrion Corp.*
249 F.3d 29 (1st Cir. 2001) ............................................. 14, 25

*Giarraputo v. UNUMProvident*
2000 WL 1701294, *9 (D. Me. 2000) ...................................... 32

*Gooley v. Mobil Oil Corp.*
851 F.2d 513 (1st Cir. 1988) ................................................. 13

*Greebel v. FTP Software, Inc.*
194 F.3d 185 (1st Cir. 1999) .......................................... 13, 14, 25

*Gross v. Medaphis*
977 F.Supp. 1463 (N.D. Ga. 1997) ......................................... 30

*Gustafson v. Alloy Co., Inc.*
513 U.S. 561 (1995) .......................................................... 39

*Herman & MacLean v. Huddleston*
459 U.S. 375 (1983) ................................................... 4, 32, 33

*Hoffman v. Estabrook & Co.*
587 F.2d 509 (1st Cir. 1978) ................................................. 14

*In re Advanta Corp. Sec. Litig.*
180 F.3d 525 (3d Cir. 1999) ................................................. 24

*In re American Bank Note Holographics Sec. Litig.*
93 F.Supp.2d 424 (S.D.N.Y. 2000) ......................................... 26

## TABLE OF AUTHORITIES
### (Continued)

Page

*In re Ancor Communs., Inc. Sec. Litig.*
    22 F.Supp.2d 999 (D. Minn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re AnnTaylor Stores Sec. Litig.*
    807 F.Supp. 990 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Cabletron Sys., Inc.*
    311 F.3d 11 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-17, 19, 20, 23, 25, 43

*In re Campbell Soup Sec. Litig.*
    145 F.Supp.2d 574 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Cell Pathways*
    2000 WL 805221, *7 (E.D. Pa. June 20, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Chambers Dev. Sec. Litig.*
    848 F.Supp. 602 (W.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Daou Systems, Inc. Sec. Litig.*
    397 F.3d 704 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Digi Inc., Sec. Litig.*
    6 F.Supp.2d 1089 (D. Minn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Enron Corp. Sec., Derivative & ERISA Litig.*
    258 F.Supp.2d 576 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In Re Enron Corp. Secs. Litig.*
    2004 WL 764663 at *8 (S.D. Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*In re Fine Host Corp. Sec. Litig.*
    25 F.Supp.2d 61 (D. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

*In re First Merchants Acceptance Corp. Sec. Litig.*
    1998 WL 781118, at *11-12 n. 6 (N.D. Ill. Nov. 4, 1998) . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Focus Enhancements, Inc. Sec. Litig.*
    309 F.Supp.2d 134(D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

**TABLE OF AUTHORITIES**
(Continued)

Page

*In re IKON Office Solutions, Inc. Sec. Litig.*
    66 F.Supp.2d 622 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Initial Public Offering*
    241 F.Supp.2d 281 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re JDS Uniphase Corp. Secs. Litig.*
    2005 WL 43463 at *9 (N.D. Cal. Jan. 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Keegan Management Co. Sec. Litig.*
    1991 WL 253003 (N.D.Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*In re MicroStrategy Inc. Sec. Litig.*
    115 F.Supp.2d 620 (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re NationsMart Corp. Sec. Litig.*
    130 F.3d 309 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34, 37

*In re Number Nine Visual Tech Corp. Sec. Litig.*
    51 F.Supp.2d 1 (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-36

*In re Paracelsus Corp.*
    6 F.Supp.2d 626 (S.D.Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Providian Financial Corp. Sec. Litig.*
    152 F.Supp.2d 814 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Proxima Corporation Sec. Litig.*
    1994 WL 374306 (S.D.Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Raytheon Sec. Litig.*
    157 F.Supp.2d 131 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25

*In re Rent-Way Sec. Litig.*
    209 F.Supp.2d 493 (W.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Scholastic Sec. Litig.*
    252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

#109708

## TABLE OF AUTHORITIES
### (Continued)

Page

*In re SeaChange International, Inc. Sec. Litig.*
2004 WL 240317 (D. Mass. Feb. 6, 2004) .................................. 35, 42

*In re Sepracor, Inc. Sec. Litig.*
308 F.Supp.2d 20 (D. Mass. 2004) ........................................ 14

*In re Stratosphere Sec. Litig.*
1 F.Supp.2d 1096 (D.Nev. 1998) .......................................... 40

*In re Tel-Save Sec. Litig.*
1999 WL 999427, *5 (E.D. Pa. Oct. 19, 1999) ............................ 27, 28

*In re Telxon Corp. Sec. Litig.*
133 F.Supp.2d 1010 (N.D. Oh. 2000) ...................................... 25

*In re Ultrafem, Inc. Sec. Litig.*
91 F.Supp.2d 678 (S.D.N.Y. 2000) ........................................ 36

*In re Wellcare Mgmt. Group Sec. Litig.*
964 F.Supp. 632 (N.D.N.Y. 1997) ......................................... 25

*In re Xerox Corporation Sec. Litig.*
165 F.Supp.2d 208 (D. Conn. 2001) ....................................... 20

*KA Investments LDC v. Number Nine Visual Technology Corp.*
2002 WL 31194865 at *10  (D.Mass. Aug. 26, 2002) ....................... 44

*Kensington Capital Management v. Oakley*
1999 WL 816964, *2 (C.D. Cal. Jan. 14, 1999) .......................... 33, 41

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*
238 F.3d 363 (5th Cir. 2001) ............................................ 33

*Maldonado v. Dominguez*
137 F.3d 1 (1st Cir. 1998) ............................................. 13, 15

*Marksman Partners v. Chantal Pharm. Corp.*
927 F.Supp. 1297 (C.D. Cal. 1996) ....................................... 25

# TABLE OF AUTHORITIES
## (Continued)

Page

*Monahan v. Dorchester Counseling Ctr., Inc.*
   961 F.2d 987 (1ˢᵗ Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Novak v. Kasaks*
   216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22

*Orton v. Parametric Tech. Corp.*
   344 F.Supp.2d 290 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*
   940 F.Supp. 1101 (W.D.Mich. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Pinter v. Dahl*
   483 U.S. 622 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-40

*Provenz v. Miller*
   102 F.3d 1478 (9ᵗʰ Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Reinfeld v. Riklis*
   722 F.Supp. 1077 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Roeder v. Alpha Indus., Inc.*
   814 F.2d 22 (1ˢᵗ Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Shaw v. Digital Equipment Corp.*
   82 F.3d 1194 (1ˢᵗ Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 32, 38-40

*Sundstrand Corp. v. Sun Chem. Corp.*
   553 F.2d 1033 (7ᵗʰ Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Swack v. Credit Suiss First Boston*
   2004 WL 2203482, *15 (D. Mass. Sept. 24, 2004) . . . . . . . . . . . . . . . . . . . 15, 16, 35, 42

*U.S. v. Josleyn*
   206 F.3d 144 (1ˢᵗ Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Van de Velde v. Coopers & Lybrand*
   899 F.Supp. 731 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Vess v. Ciba-Geigy Corp., USA*
317 F.3d 1098 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

United States Code

15 U.S.C. §77k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 31

15 U.S.C. §77k(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. §77k(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. §77l(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 37

15 U.S.C. §77o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. §77z-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

15 U.S.C. §77z-2(c)(1)(B)(I), (ii)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

15 U.S.C. §78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. §78t(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. §78u-4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

15 U.S.C. §78u-4(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. §7241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Rules of Civil Procedure

Rule 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Rule 8(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Rule 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Rule 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 16, 31-36

**TABLE OF AUTHORITIES**
(Continued)

**Page**

Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rule 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Securities Act of 1933

Section 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 31-35, 37

Section 12(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Section 12(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34, 39

Section 12(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Section 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 42, 43

Securities Exchange Act of 1934

Section 10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 14, 25, 30, 31, 33, 35

Section 20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 42, 43

OTHER AUTHORITIES

2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th Ed.2002) . . . . . . . . 43

#109708

**I.**

## INTRODUCTION

In seeking dismissal of the federal securities law claims alleged in the Amended Consolidated Class Action Complaint, filed December 1, 2004 (hereinafter "Complaint"), defendants Sonus Networks, Inc. ("Sonus" or the "Company"), Hassan M. Ahmed ("Ahmed"), and Stephen J. Nill ("Nill") resort to shopworn arguments which are clearly belied by the allegations of the Complaint.[1] They argue that the Complaint pleads only "fraud by hindsight," and that the admitted material misstatements at issue in this restatement case involved "complex accounting judgments," as to which there was no intentional or reckless misconduct.[2]

These broad assertions respecting supposedly innocuous accounting misjudgments are far afield from what the Complaint alleges. Obviously, the allegations of the Complaint ultimately must control the outcome of the defendants' motions to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. for failure to state a claim for relief. The Complaint alleges, as to the claim under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §78j(b), intentional and/or reckless conduct by the defendants designed to "smooth" Sonus's publicly reported earnings. The allegations of the Complaint reveal this to be a case involving egregious

---

[1]  All references hereinafter to "¶___" are to paragraphs of the Complaint.

[2]  The class of investors identified in the Complaint includes all persons who purchased Sonus securities between March 28, 2002, the date Sonus filed its Annual Report on SEC Form 10-K for the year ending January 31, 2001, through March 26, 2004, when news of an additional delay in the filing of Sonus's Form 10-K for the year ended December 31, 2003 hit the market. This period is referred to herein as the "Class Period." In addition, the Complaint identifies a Sub-Class of investors who acquired Sonus shares offered on September 24, 2003 pursuant to a materially false and misleading Prospectus Supplement and registration statement.

revenue manipulation and improper earnings management. It was precisely because of the increasingly prevalent and glaring examples of manipulation of earnings such as that alleged here, that Congress passed the Sarbanes-Oxley Act of 2002, requiring that the senior officers of a public company take direct, personal responsibility for the accuracy of the issuer's reported financial results. *See* 15 U.S.C. §7241. In this case, among the allegedly false statements are certifications of defendants Ahmed and Nill, pursuant to Sarbanes-Oxley, attesting that Sonus's reported financial results were truthful and accurate when issued. *E.g.*, ¶¶112-113, 119-122, 132-135, 145-148, 157-160, 170-173. The restatement has confirmed that they were not. ¶¶49-67. Eager to cast his Sarbanes-Oxley certifications aside, Ahmed, the CEO of Sonus, has the temerity to suggest that he should not be held to answer the claims against him based on the inaccuracy of the financial results he certified, because he allegedly has no accounting expertise. Ahmed Brief at 2. Of course, this has never been a defense for an officer or director of a public company who signs materially false SEC filings, especially in the face of Sarbanes-Oxley.

Indeed, the Complaint alleges in detail how Ahmed was at the heart of the revenue manipulation scheme. Ahmed sought to create the appearance of consistent revenue growth at Sonus, so as to entice Wall Street analysts and the investing public with a false depiction of Sonus's consistency in generating revenues. This was critical to the Company's ability to conduct the stock offerings it concluded during the Class Period. It raised $57 million in an April 2003 offering. In the September 2003 offering, which forms the basis of the claims arising under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §77k,

1(a)(2), Sonus raised $126 million.[3]

Defendants portray the accounting issues as ones involving difficult fact based questions on complex transactions where the accounting errors implicated "only" the timing of revenue recognition for the sale of Sonus products, rather than the *bona fides* of the sales transactions in the first instance. The federal securities laws require that financial reporting information, including such basic data as earned revenues, be accurately and truthfully reported on a quarterly and annual basis. Investors rely on the accuracy of this information in making their investment decisions. If, as occurred here, material amounts of revenue are improperly recorded in one quarter when the known facts of the transaction required that they should have been recorded in a different quarter, the company's published financial results are materially misleading. Indeed, that is why there was a restatement here. It matters not that the transactions in question were not entirely fictitious. That is simply a red herring.

Moreover, the suggestion that the case is based on innocent accounting misjudgments is entirely inconsistent with the dismissals of defendant Nill, the CFO during the relevant period, together with the Company's controller, following revelation of the accounting manipulations. It is highly improbable that personnel at such high levels are dismissed from their positions for innocent failures to correctly apply complex accounting pronouncements. The suggestion that

---

[3]    Sonus has continued to experience serious problems in financial reporting since the filing of the Complaint. As recently as March 3, 2005, Sonus announced that it was delaying release of its 2004 financial results until the filing of its Annual Report on Form 10-K, which occurred on March 16, 2005. The delay was attributed, in part, to the continuing "material weaknesses in its internal control." On the March 3 announcement, Sonus shares dropped almost 20%. Lead Plaintiff is investigating whether this latest surprise from Sonus can properly be included as a part of this litigation.

these were "innocent" errors also does not square with the upgrading of the SEC's investigation to a formal inquiry following the revelations of serious revenue misstatements.

The Complaint provides great detail as to how the defendants deliberately manipulated revenues purportedly derived from Sonus software sales contracts, to falsely portray to Wall Street analysts and the investing public that Sonus had achieved linearity and predictability in its revenues. Because Lead Plaintiff's allegations are sufficiently detailed and adequately corroborated, the motion to dismiss the securities fraud claim arising under Section 10(b) of the 1934 Act should be denied.

Similarly, the claims brought pursuant to Sections 11 and 12(a)(2) of the 1933 Act should be permitted to go forward. These claims relate to a secondary offering of Sonus common shares conducted on September 24, 2003 pursuant to a Prospectus Supplement and shelf registration statement. ¶¶70, 161.[4] Section 11 of the 1933 Act imposes strict liability upon an issuer for a material misstatement in the registration statement pursuant to which the shares for the offering were issued. 15 U.S.C. §77k(b); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). It also imposes liability on signers of the registration statement such as defendants Ahmed and Nill, based on their negligence, subject to their right to establish certain statutory defenses. 15 U.S.C. §77k(a)(1), (b). In an attempt to avoid having to answer these claims, all defendants assert that because, in their view, the Complaint as a whole "sounds in fraud," the particularity standards for pleading fraud under Rule 9(b), Fed.R.Civ.P., should apply to the 1933

---

[4]    A description of the shelf registration process and its high degree of vulnerability to abuse can be found in the First Circuit's decision in *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1208-1209 (1st Cir. 1996). There, the appellate court reinstated improvidently dismissed claims under Section 10(b) of the 1934 Act and Section 11 of the 1933 Act.

Act claims. This suggestion is seriously misguided. The 1933 Act claims stand on their own. The Court should not effectively re-write these statutes by requiring that they be pled with the specificity required for a different, fraud-based claim. Plainly, at a trial, the statutorily required strict liability (as to the issuer) and negligence standard (as to the individual defendants) will apply for these claims, and that is how a jury will have to be instructed. There is no sound rationale for altering these requirements simply for purposes of the pending pleading motions. In any event, the Complaint makes clear that the Section 11 claim does not depend on the sufficiency of the fraud allegations, as Lead Plaintiff has specifically excluded such allegations with regard to this claim. ¶193. Even if the Court were to conclude that the explicit exclusion of the fraud allegations is for some reason invalid, and that such claims must have the specificity required by Rule 9(b), the Complaint in fact provides the requisite detail. *See* Section III.B., *infra* at 14-31.

A separate argument is made by all defendants concerning the claim arising under Section 12(a)(2) of the 1933 Act. Thus, each defendant argues that it was not a statutory seller and can face no liability for this claim because the September 2003 offering was conducted pursuant to a "firm commitment" underwriting, and the underwriter was the only "seller" of shares. However, dismissal of this claim would be premature. Lead Plaintiff should be permitted to conduct discovery to determine the precise mechanism used by Sonus to distribute the newly issued shares it sold in September 2003. Defendants' self-serving factual assertions should not be accepted at face value at this stage. Furthermore, under at least one line of decisional authority, discussed below, the allegations of the Complaint are sufficient to allege a "statutory seller" claim based on solicitation against each of the defendants. For these reasons,

the Section 12(a)(2) claim should not be dismissed.

Finally, all elements of Lead Plaintiff's "control person" claims against defendants Ahmed and Nill based on Section 20(a) of the 1934 Act, 15 U.S.C. §78t(a), and Section 15 of the 1933 Act, 15 U.S.C. §77o, are properly alleged under applicable standards. These claims should not be dismissed.

In sum, the Complaint makes serious and specific allegations of accounting manipulations which resulted in material misstatements of Sonus's publicly reported financial results. Sonus dismissed its CFO based on these events, issued a major restatement, continues to acknowledge material deficiencies in its internal accounting procedures and controls, and is facing a formal SEC investigation. Under these circumstances, defendants should be held to answer the Complaint.

## II.

## SUMMARY OF FACTUAL ALLEGATIONS

The Complaint alleges that defendants engaged in a scheme to create and maintain a false illusion regarding Sonus's financial performance. The purpose of the wrongful conduct was to "smooth out" Sonus's reported quarterly revenues in order to make it appear to investors that the Company was generating steady, reliable growth. ¶37. In truth, however, because of segmented ("lumpy") ordering patterns and high customer concentration, the Company experienced egregiously non-linear quarter-over-quarter revenues. ¶36. Defendants knew, and it is common knowledge in financial circles, that such a "boom-or-bust" revenue cycle is devastating in terms of the markets's perception of a company's growth prospects. They also knew that a perceived lack of linearity would be detrimental to the value of Sonus's shares because analysts would be

unable to construct reliable revenue projections for inclusion in their investment recommendations. ¶¶5, 37. Thus, as detailed in the Complaint, Sonus's senior accounting and finance managers, under the direction of Sonus's senior management, including defendants Ahmed and Nill, engaged in illegal revenue recognition practices designed to smooth out the gyrations in Sonus's quarterly revenues, making it appear as though the Company was following a predictable, sequential upward growth curve. ¶40.

In an effort to perpetuate the image of revenue linearity, Sonus's senior mangers continually represented to Wall Street during the Class Period that Sonus was enjoying sequential revenue growth. ¶38. For example, on April 9, 2003, Sonus announced its Q1 2003 financial results by proclaiming that revenues had increased "27% sequentially." ¶38. Similarly, on July 10, 2003, the Company issued a press release announcing its Q2 2003 financial results. The release quoted defendant Ahmed as saying: "'We are pleased with the progress that we made . . . particularly with our 33% sequential revenue growth." ¶38. On October 8, 2003, in its press release announcing its Q3 2003 financial results, Sonus again reiterated its drumbeat proclamation of sequential revenue growth by quoting defendant Ahmed as saying: "This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth . . ." ¶38.

An additional key motivation for defendants to foster the illusion of consecutive revenue growth was the need to raise capital by issuing shares of Sonus's common stock in follow-on stock offerings during the Class Period. ¶¶5, 39. Defendants knew that such offerings would not be well received by Wall Street, or might even be impossible to successfully complete, if Sonus's revenues were perceived to be sporadic, irregular or unpredictable. ¶¶5, 39. Two such offerings are identified in the Complaint as occurring during the Class Period. ¶¶137, 161. The Company

#109708

7

garnered $183 million from these offerings. Thus, defendants sought to, and did, manipulate Sonus's reported revenues in order to make Wall Street believe that the Company had "visibility" as to its future revenues so as to allow these offerings to proceed. ¶¶5, 37, 38, 40.

Defendants' illegal conduct is spelled out in great detail in the Complaint. Sonus's senior accounting and finance staff, with the knowledge and approval of defendants, manipulated Sonus's contracts with certain of its large telecom customers. ¶¶40-41, 43, 44. These contracts, by their very nature, included bundled hardware and software elements, performance milestones, software upgrades, maintenance services, customer acceptance features and other features. Under Statement of Position ("SOP") 97-2, Sonus was required to report revenues from these contracts as bundled. ¶40. Defendants, however, in direct and knowing violation of GAAP, improperly unbundled certain software delivery elements, using undisclosed side agreements, in order to manipulate the booking of revenues. ¶¶40, 42, 43, 44, 47.

Contrary to defendants' assertions, the Complaint does not rest on broad generalizations, but rather provides specific examples of defendants' wrongdoing based upon information obtained from sources with actual knowledge. ¶¶40-44, 46, 47. It is alleged that in violation of GAAP, defendants improperly unbundled certain software delivery elements in a key deal with its major customer, Qwest Communications International, Inc. ("Qwest"), treating the software separately from the hardware obligations, so that they could manipulate the timing of recognition of revenue by improperly claiming that the software updates and releases had been delivered. According to a former senior sales executive of Sonus, in this way, Sonus was able to manage the timing of its reported revenues. ¶40. The unbundling of the contracts for the purposes of manipulating software deliverables and, ultimately, to "smooth" out reported revenues was

#109708

8

known to and/or recklessly disregarded by defendants Ahmed and Nill. ¶40. Defendants ignored

the proper method of recognizing revenue from software transactions in order to inflate and make

"predictable" Sonus's reported revenues. ¶95. The Complaint describes how defendant Nill,[5]

working in concert with Sonus's former controller, Peter Hemme, improperly recognized tens of

millions dollars in revenues under the Company's contract with Qwest. This was accomplished

by manipulating the supposed delivery of certain software releases and updates, in violation of

SOP 97-2. ¶¶42, 43. Indeed, defendant Nill, working with Hemme, arranged for Sonus to

improperly recognize $27.5 million in Q2 2002 by recording revenues on software updates that

had not in fact been delivered to Qwest during that quarter. ¶43. Similarly, Sonus violated SOP

97-2 by improperly recording $11 million in Q4 2003 under the Qwest contract, again by falsely

recording revenues on software updates that were not delivered during the quarter. ¶43. As one

former Sonus employee put it: "Sonus was simply gerrymandering results as to the Qwest

contract." ¶42.[6] This unlawful practice occurred with other accounts, including Sonus's ATT

---

[5]    Defendant Nill has had extensive experience working with some of the world's most
prominent software companies and accounting firms and was thereby fully familiar with the
requirements of GAAP and, in particular, SOP 97-2. ¶97. Nill served as Sonus's CFO, Vice
President of Administration, and Treasurer during the Class Period. He was Sonus's CFO from
September 1999 until April 2004 and Treasurer from 2000 until April 2004. After information
concerning Sonus's improper accounting practices became publicly known, defendant Nill was
transferred to the position of Vice President of Operations. He later resigned at the request of the
Company. ¶17.

[6]    The software element of Sonus's contracts necessarily included a large deferred revenue
component. Under GAAP and the Company's own revenue recognition guidelines, such deferred
revenues could only be recognized upon the performance of future obligations, such as the
delivery of software updates and releases required by the terms of the contracts. Nevertheless,
defendants knowingly manipulated the timing of Sonus's reported revenues by claiming that the
updates had in fact been delivered when, in truth, they had not been delivered. ¶41. In many
instances, the updates were not even ready to be delivered. ¶41.

account. This improper revenue recognition practice was known, approved of, and condoned by defendant Nill, who, together with former controller Hemme, tightly controlled the revenue reporting function at Sonus, under the supervision of defendant Ahmed. ¶43.

There is more. The Complaint alleges that a former senior Sonus employee observed that, in either Q3 or Q4 2001, defendant Nill, along with former controller Hemme, had an acceptance letter sent to Michael Perruse, a former senior vice president of Engineering at Qwest. ¶44. The purpose of the acceptance letter was to purportedly confirm the delivery of approximately $18 million worth of hardware and software to Qwest, pursuant to its $100 million contract with Sonus. The letter was issued, under either Nill or Hemme's signature, even though the product had not been delivered, and in fact was not even ready to be delivered. Perruse went along with the fraud because of reciprocal revenue arrangements which he had entered into with Sonus.[7] Letters were sent to other customers as well, including Global Crossing and XO Communications, each for the purpose of "confirming" the delivery of product or the performance of contract milestones, even though no such delivery or performance had actually occurred. ¶44.

To enable defendants' illegal revenue reporting scheme during the Class Period, a former Company sales employee described how Sonus began the practice of segregating out future "deliverables" from its major contracts, including the Qwest contract, for the purpose of "pushing" reported revenues, all in violation of GAAP and SOP 97-2. In order to make an end-

---

[2/]    Qwest recently settled an enforcement action brought by the SEC by paying $250 million and agreeing to an injunction. On March 15, 2005, numerous high former senior executives of Qwest were sued by the SEC for engaging in a massive accounting fraud involving a panoply of improper accounting practices. *See http://www.sec.gov/news/2005-36.htm.*

run around SOP 97-2's future delivery obligations, Sonus's senior accounting and finance management, including defendant Nill, approved of a practice of pulling out Sonus's obligations to provide future deliverables (i.e., software updates and releases) from the contracts, and instead would agree to deliver them as part of special "side deals." In this way, defendants were able to spread revenues over several reporting quarters, instead of waiting until such time that the software updates had in fact been delivered. According to a former Sonus employee, this improper practice occurred in the Company's contracts with Qwest, XO Communications, Epana, IDT and Verizon, among others. ¶47. These improper revenue recognition practices were repeatedly and continually used by defendants for the purpose of smoothing out the sharp serrations in Sonus's revenue curve. Nill signed numerous public statements issued during the Class Period which materially misstated Sonus's financial condition as a result of his accounting manipulations. ¶73.

The illegal accounting practices were known to and approved by defendant Ahmed. The Complaint specifically alleges that Ahmed knew about and acquiesced in these illegal practices as early as 2001. ¶¶5, 44. Ahmed is alleged to have known about and approved of a plan to improperly report revenues from the purported delivery of improperly "unbundled" software releases under the Qwest contract, even though the releases were not in fact delivered (or even ready to be delivered). ¶¶44, 45. Ahmed approved of the illegal revenue recognition practices because he was the person within the Company with primary responsibility for interfacing with Wall Street analysts, and he was intent on making analysts believe that the Company's revenues were more linear than they really were. ¶45. The unbundling of contracts for the purpose of manipulating software deliverables and, ultimately, to smooth out reported revenues, was done in

#109708

violation of SOP 97-2 and was known to, and/or recklessly condoned, by each of the defendants. ¶¶40, 43, 44, 45, 46.

Furthermore, defendants Ahmed and Nill knew or recklessly disregarded, throughout the Class Period, that Sonus was experiencing pervasive deficiencies in its internal controls and accounting practices. ¶84. Contrary to the requirements of GAAP, SEC rules, and the Foreign Corrupt Practices Act, the defendants failed to implement and maintain adequate internal accounting and financial controls when issuing and publicly disseminating the Company's financial statements. ¶88. Nevertheless, defendants issued and/or consented to the issuance of numerous false and misleading financial statements as alleged herein, falsely representing that those financial statements had been prepared in accordance with GAAP. ¶89. Significantly, despite representing in its SEC filings that Sonus's revenue recognition policies complied with the requirements of GAAP, defendants failed to adhere to the Company's own publicly stated revenue recognition policies, eventually requiring Sonus to issue a major restatement of its reported financial results. ¶98.

III.

## THE COMPLAINT STATES A CLAIM FOR SECURITIES LAW VIOLATIONS

### A.    Standard Of Review On A Motion To Dismiss

In reviewing a motion to dismiss, the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir. 1992). The Court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987)

(citations omitted). Thus, plaintiffs' factual allegations may be either direct or inferential. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988).

The procedural posture of the case should be considered in determining whether a complaint should be dismissed. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002) ("under our circuit law, the procedural posture of the case matters, and we will scrutinize a post-discovery motion to dismiss even more stringently than a pre-discovery motion.").[8] Additionally, plaintiffs cannot be held to "a standard that would effectively require them, pre-discovery, to plead evidence." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 48-9 (1st Cir. 1999). *See also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 81 (1st Cir. 2002) (distinguishing *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999), on basis of difference in amount of discovery); *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998) (noting limit on expectations of securities fraud pleadings when discovery is incomplete).

Moreover, the First Circuit has recently ruled that the proper standard in evaluating a securities fraud complaint is whether "the complaint as a whole is sufficiently particular" to pass muster under the PSLRA. *Cabletron*, 311 F.3d at 32; *see also In re Daou Systems, Inc. Sec. Litig.*, 397 F.3d 704, 720-21 (9th Cir. 2005). As demonstrated below, the Complaint meets all applicable pleading standards and the motions to dismiss should be denied.

//

//

---

[8]   Here, of course, there has been no discovery. The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(b)(3)(B), bars discovery during the pendency of a motion to dismiss.

**B.**     <u>The Claim Under Section 10(b) Of The 1934 Act Is Adequately Alleged</u>

       **1.**     ***Scienter* Is Adequately Alleged**

There is only one issue raised in defendants' motions with respect to the claim under Section 10(b) of the 1934 Act. That issue is whether Lead Plaintiff has adequately alleged defendants' *scienter*. It has.

To prevail on a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, a plaintiff must show that defendants had the requisite *scienter*, *i.e.*, an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F.Supp.2d 134, 144 (D. Mass. 2001). *Scienter* may be established by knowing conduct. *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001). Alternatively, *scienter* may be shown by recklessness. *Greebel*, 194 F.3d at 198-99; *Cabletron*, 311 F.3d at 39 ("*Scienter* may be demonstrated by indirect evidence, and may extend to a form of extreme recklessness that is closer to a lesser form of intent."). *See also Hoffman v. Estabrook & Co.*, 587 F.2d 509, 515-16 (1st Cir. 1978) (recklessness means "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.") (*quoting Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

"The First Circuit has adopted a fact-specific, case-by-case approach rather than a rigid formula for alleging *scienter*." *In re Sepracor, Inc. Sec. Litig.*, 308 F.Supp.2d 20, 30 (D. Mass. 2004) (*quoting Cabletron*, 311 F.3d at 39). *Scienter* may be established by allegations of

defendants' motive and opportunity to commit the alleged fraud, although "'catch-all allegations,' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA." *Cabletron*, 311 F.3d at 39 (citations omitted). Where *scienter* is pled by intent, the plaintiff must allege "specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading." *Maldonado*, 137 F.3d at 9; *Swack v. Credit Suiss First Boston*, 2004 WL 2203482, *15 (D. Mass. Sept. 24, 2004) (Woodlock, J.).

In accounting fraud cases, the courts of this District have held that violations of applicable accounting standards may be probative of *scienter* if combined with "other circumstances" showing *scienter*. *Focus Enhancements*, 309 F.Supp.2d at 150; *see also Crowell v. Ionics, Inc.*, 343 F.Supp.2d 1, 17 (D. Mass. 2004) ("Thus, though by no means conclusive, violations of GAAP and of a corporation's own corporate revenue recognition policies are obviously probative of *scienter*."); *Blatt v. Muse Technologies, Inc.*, 2002 WL 31107537, *11 (D. Mass. Aug. 27, 2002) (Woodlock, J.) (allegations of revenue recognition fraud were stated with sufficient particularity to give rise to a strong inference of *scienter*); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 148 (D. Mass. 2001); *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 235 (D. Mass. 1999) ( GAAP violations combined with other circumstances may raise a strong inference of *scienter*).

Here, the Complaint is replete with specific factual allegations regarding defendants' *scienter*. It sets forth the "who, what and where" of defendants' fraud. It also details the specific GAAP violations committed by defendants, the specific contracts involved, the amount of the financial overstatements, and the fact that defendants knew that the Company was booking revenues from software items that were not even ready to be shipped. ¶¶40-48. When viewed in

their totality, these *scienter* allegations are more than adequate to meet the heightened pleading standards of the PSLRA and Rule 9(b).

### 2. Defendants' Conscious Misbehavior Or, At A Minimum, Recklessness Is Alleged

The Complaint adequately pleads *scienter* by alleging that defendants either knew of, or recklessly disregarded, severe accounting violations that caused Sonus to materially overstate its financial results for fiscal years 2001 and 2002 and for the first three reporting quarters of fiscal 2003. ¶¶40, 42, 43, 44, 45, 46, 47, 99. The Complaint describes the amounts by which revenues and earnings were overstated, and describes precisely how the improper accounting practices violated GAAP.[9]

Defendants nevertheless challenge Lead Plaintiff's *scienter* allegations, claiming that they are inadequate. This assertion is incorrect. Even a cursory reading of the Complaint shows that it contains more than ample factual detail from which to draw a strong inference of defendants' *scienter*. Indeed, based on information provided by sources who were in a position to know, the individual defendants are alleged to have had actual knowledge of the fraud and, further, to have condoned and supervised it.

As the First Circuit has pointed out, conscious misbehavior may provide the "something more" needed to allege *scienter*. *Cabletron*, 311 F.3d at 39 (("[T]he obvious should not go unstated, and that is that allegations of intentionally fraudulent conduct also will permit the drawing of a strong inference of *scienter*.") (citing law review article); *Swack*, 2004 WL 2203482

---

[9]   *See* ¶¶8, 48, 54, 55, 56, 90, 91, 92, 93, 94, 95, 98, 101, 102, 105, 106, 107, 109, 110, 114, 115, 123, 124, 125, 126, 127, 138, 139, 140, 141, 149, 150, 151, 152, 153, 162, 163, 165, 166.

at * 16 (*citing Cabletron*); *In re Fine Host Corp. Sec. Litig.*, 25 F.Supp.2d 61, 70 (D. Conn. 1998) (noting that under Second Circuit law, "an allegation of specific facts indicating that a defendant consciously falsified financial statements is sufficient to meet the pleading standard for *scienter*.")

Here, Lead Plaintiff has alleged facts which indicate that both Ahmed and Nill had actual knowledge of the wrongdoing.[10]  Indeed, Ahmed is alleged to have been informed of the accounting manipulations regarding the Qwest contract but took no action to stop them.  ¶44. These allegations of knowing misconduct, especially when combined with the particularized detail regarding the specific contracts that were manipulated, the specific accounting principles that were violated; the specific amount of the revenue overstatements, and the fact that the allegations are based in part on sources who were in a position to know, including a former Sonus Vice President, are more than enough to meet the standards for pleading *scienter* in this Circuit. That *scienter* has been adequately pled is also bolstered by the fact of the multi-year restatements themselves and that former senior finance and accounting staff of the Company (including former controller Hemme and former CFO Nill) were terminated as a result of the accounting fiasco.  ¶7.

The Complaint does not rest on generalized allegations of wrongdoing, as defendants incorrectly argue. For example, defendants allegedly began the practice of segregating out future software "deliverables" from Sonus's major contracts, including the Qwest contract, for the purpose of "pushing" reported revenues into other reporting quarters, in violation of of GAAP

---

[10]    These senior officers' *scienter* is imputed to Sonus. *See Reinfeld v. Riklis*, 722 F.Supp. 1077, 1085 (S.D.N.Y. 1989) (*scienter* of agent is imputed to principal).

and SOP 97-2. ¶47. Under SOP 97-2, it was improper for the Company to recognize revenues under the contracts if there were any unmet future obligations, including an obligation to deliver software releases, which would thus render the seller's obligations under the contract incomplete or indeterminable. In an effort to make an end-run around SOP 97-2, however, Sonus's senior accounting and finance management, with the knowledge and approval of defendants, improperly "unbundled" future software deliverables (*i.e.*, software updates and releases) from the contracts, and instead agreed to deliver them as part of special "side deals." In this way, defendants were able to manipulate the timing of revenues and spread reported revenues over several quarters, in violation of GAAP and SOP 97-2. ¶47.

The Complaint leaves little doubt as to defendants' knowledge or, at a minimum, reckless disregard of the accounting fraud. For example, the Complaint alleges that in either Q3 or Q4 2001, defendant Nill, along with former controller Hemme, requested an acceptance letter be sent to Michael Perruse, a former Senior Vice President of Engineering at Qwest. ¶44. The purpose of the acceptance letter was to purportedly confirm the delivery of approximately $18 million worth of hardware and software to Qwest, pursuant to its $100 million contract with Sonus. ¶44. The letter was issued under either Nill or Hemme's signature, even though the product had not been delivered, and in fact was not even ready to be delivered. ¶44. Instead, the product remained in the laboratory of Sonus's Telecom Technologies, Inc. subsidiary in Richardson, Texas, long after the letter had been sent to Perruse. ¶44. Nevertheless, Sonus improperly recognized $18 million in revenue upon the issuance of the letter. ¶44. Similar letters were sent to other customers, including Global Crossing and XO Communications, each for the purpose of "confirming" the delivery of product or the performance of contract milestones, even though no

such delivery or performance had yet occurred. ¶44. In many cases, the product upon which the revenues were improperly booked was not even ready to ship, a fact known to Nill and Ahmed. ¶¶42, 43, 44.

These specific allegations, which clearly did not come from the public record, seriously undermine defendants' argument that Lead Plaintiff has done nothing more than plead "fraud by hindsight." Indeed, defendants make a half-hearted attempt to sidestep these serious allegations, stating that "Sonus nowhere restated or reversed any revenue because product had not been delivered" and claiming that the restatement "centered around complex accounting judgments as to when to recognize revenue for products that were in fact delivered." Sonus Brief at 4. That, however, hardly constitutes a denial that such illegal conduct had in fact occurred. In any event, the key issue is not whether the products were delivered eventually, but rather whether the deliveries occurred in the accounting quarters in which the revenues were recorded.[11]

### 3.    Lead Plaintiff's Sources Are Adequately Identified

Defendants argue at length that Lead Plaintiff has not adequately identified the sources of its allegations, claiming that there is no "adequate basis for believing" the allegations. This argument is specious.

First, there is no requirement that Lead Plaintiff identify its confidential sources by name. *Cabletron*, 311 F.3d at 20-21; *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("no

---

[11]    Defendants have not denied that Nill, Hemme and several others at the Company were terminated for their alleged participation in the accounting fraud. Senior accounting and finance officers, such as former CFO Nill, generally do not get fired for making innocuous errors as to "complex accounting judgments." Nor do innocent "mistakes" generally result in SEC investigations being quickly upgraded from informal to formal status, as happened here. ¶7.

requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources . . ."); *In re Xerox Corporation Sec. Litig.*, 165 F.Supp.2d 208, 223 (D. Conn. 2001).

In *Cabletron*, the First Circuit expressly endorsed the Second Circuit's test with regard to using confidential sources to allege *scienter*:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

*Cabletron*, 311 F.3d at 29 (*citing Novak*, 216 F.3d at 314).

Here, the Complaint meets the *Cabletron* standard because the information provided by Lead Plaintiff's sources is corroborated by their positions within the Company, such as a former senior sales executive and a former Vice President. These sources are described with sufficient particularity to permit the Court to assess whether the detailed information they have provided is believable:

- According to a former senior sales executive of Sonus, in this way, Sonus was able to manage the timing of its reported revenues (¶40);

- According to several former Company employees, Sonus was able to, and did, manipulate the timing of its reported revenues by claiming that the software updates had in fact been delivered at the time revenue therefrom was recorded (¶41);

- According to one former Sonus employee, "Sonus was simply gerrymandering results as to the Qwest contract." (¶42);

- According to several former Sonus sales and technical staff, the misstatement of the Company's revenues resulting from these improper accounting methods was material and ongoing (¶43);.

- One former senior Sonus employee described how, in either Q3 or Q4 2001, defendant Nill, along with former Controller Hemme, had requested that an acceptance letter be sent to Michael Perruse, a former senior vice president of Engineering at Qwest (¶44);.

- According to a former Vice President of Sonus, defendant Ahmed was made aware of these improper practices in 2001, specifically with regard to the Qwest contract, but took no action to stop them (¶44);

- According to a former senior sales employee, the fact that Sonus's senior management was "managing" quarterly revenues was well known and openly discussed by Sonus's personnel, including the sales and technical personnel involved with servicing the Qwest contract (¶46);

- [A] former Company sales employee described how Sonus began the practice of segregating out future "deliverables" from its major contracts, including the Qwest contract, for the purpose of "pushing" reported revenues (¶47); and

- According to a former Sonus employee, this improper practice occurred in connection in the Company's contracts with Qwest, XO Communications, Epana, IDT and Verizon, among others (¶47).

Defendants complain that these descriptions are too generic. They also suggest that the

sources could not have had any knowledge of the wrongdoing because they did not work in the

Company's finance department. These arguments are misplaced. Assuming *arguendo* that none

of Lead Plaintiff's sources worked in finance, it does not necessarily follow that the Company's

sales personnel (especially senior ones, such as those described in the Complaint) or technical

staff (such as those involved with servicing the relevant contracts) would not be in a position to know about the alleged wrongdoing. For example, the unbundling of contracts and the resulting segregation of software deliverables, pursuant to undisclosed "side deals," *e.g.*, ¶47, would necessarily affect the commission compensation to be received by sales people involved with the contracts. Moreover, technical staff involved with servicing the contracts would know if performance milestones or software deliverables were being manipulated or changed.

In considering whether Lead Plaintiff has provided an adequate description of its sources, the Court can also look at other corroborating facts. *See Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.Supp.2d 12, 22 (D. Mass. 2000) ("Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.") (*citing Novak*, 216 F.3d at 313) (emphasis added). Here, the highly-particularized nature of Lead Plaintiff's allegations permit this Court to evaluate the believability of its sources.[12] For example, the Complaint describes how defendants manipulated Sonus's revenues by identifying the specific contracts at issue, the amount of the revenue misstatements and the resulting GAAP violation. ¶¶42, 43. One concrete example highlights this point:

> In either Q3 or Q4 2001, defendant Nill, along with former
> Controller Hemme, had requested that an acceptance letter be sent

---

[12]    There are other facts which corroborate the information provided by Lead Plaintiff's sources. For example, there is the fact of the multi-year restatements themselves, the formal SEC investigation, the fact that Sonus fired its senior finance and accounting staff, including its controller (Hemme) and CFO (Nill) because of the accounting imbroglio, and the continuing acknowledgement of material weaknesses in internal controls. ¶¶4, 7. These facts, which are **uncontested**, support the credibility of Lead Plaintiff's sources and the information they have provided.

to Michael Perruse, a former senior vice president of Engineering
at Qwest. The purpose of the acceptance letter was to purportedly
confirm the delivery of approximately $18 million worth of
hardware and software to Qwest, pursuant to its $100 million
contract with Sonus. The letter was in fact issued, under either Nill
or Hemme's signature, even though the product had not been
delivered, and in fact was not even ready to be delivered. Instead,
the product remained in the laboratory of Sonus's Telecom
Technologies, Inc. subsidiary in Richardson, Texas, after the letter
had been sent to Perruse. Perruse went along with the fraud
because of certain reciprocal revenue arrangements which he had
entered into with Sonus. Letters were sent to other customers as
well, including Global Crossing and XO Communications, each for
the purpose of "confirming" the delivery of product or the
performance of contract milestones, even though no such delivery
or performance had actually occurred. In many instances, Sonus
did not even have product ready to deliver at the time the revenues
were booked. According to a former Vice President of Sonus,
defendant Ahmed was made aware of these improper practices in
2001, specifically with regard to the Qwest contract, but took no
action to stop them. As a result, Sonus was able to improperly
book millions of dollars in revenues, in violation of GAAP and, in
particular, SOP 97-2.

¶44.

The level of detail in these allegations provides a reasonable basis for assessing the

believability of the information provided by Lead Plaintiff's sources. Moreover, the sources are

adequately described. Indeed, one of the sources regarding Ahmed's alleged knowledge of the

illegal accounting manipulations is a former officer of the Company – a Vice President. ¶44. It

is reasonable to infer that a person with such a high rank within the Company would have been in

a position to know. When viewed against the highly factual nature of the allegations, there is no

need for any additional description of Lead Plaintiff's sources. *Cabletron*, 311 F.3d at 29-30.

Lastly, it is inconceivable that defendants did not have knowledge of any of these serious

problems which plainly called into question the reliability and accuracy of the Company's

accounting systems. If, somehow, they were totally oblivious to these issues, then signing and

issuing SEC filings and making positive public statements about the condition of the Company

constitutes gross recklessness, an "egregious departure from the range of reasonable business

decisions," clearly supporting a strong inference of *scienter*. *In re Advanta Corp. Sec. Litig.*,

180 F.3d 525, 540 (3d Cir. 1999). *See also In re Scholastic Sec. Litig.*, 252 F.3d 63, 75 (2d Cir.

2001) ("Where the complaint alleges that defendants knew facts or had access to non-public

information contradicting their public statements, recklessness is adequately pled for defendants

who knew or should have known they were misrepresenting facts with respect to the corporate

business"); *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir. 1992) ("egregious

refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an

inference of . . . recklessness").

> **4.    Sonus's Admission Of Accounting Improprieties, The Restatements,
> And The Magnitude Of The Fraud Raise A Strong Inference Of
> *Scienter***

Defendants make predictable arguments regarding the purported inadequacy of Lead

Plaintiff's *scienter* allegations. For example, they claim that *scienter* cannot be inferred from the

fact of a financial restatement or alleged GAAP violations. As set forth in the Complaint,

however, the Company's restatements constitute admissions that Sonus's previously reported

financial results were false when made, that its financial results were achieved through the use of

improper accounting practices, and that defendants violated GAAP. ¶¶8, 92, 93, 94. Because

extensive and ongoing accounting manipulations of the sort alleged here are, of necessity, the

product of conscious behavior by the Company through its high-level executives, these

allegations raise a strong inference of *scienter. See, e.g., In re Ancor Communs., Inc. Sec. Litig.*,

22 F.Supp.2d 999, 1006 (D. Minn. 1998) ("'A violation of GAAP may be used to show company overstated its income, which may be used to show the *scienter* for a violation of Section 10(b) and Rule 10b-5'") (quoting *Marksman Partners v. Chantal Pharm. Corp.*, 927 F.Supp. 1297 (C.D. Cal. 1996)); *In re Telxon Corp. Sec. Litig.*, 133 F.Supp.2d 1010, 1029 (N.D. Oh. 2000) (*scienter* found from allegations of large financial restatements and accounting manipulations of substantial magnitude); *In re Wellcare Mgmt. Group Sec. Litig.*, 964 F.Supp. 632, 640 (N.D.N.Y. 1997) (upholding allegations that corporate executive "had knowledge of, condoned, and/or encouraged. . .the deliberate overstatement of earnings by a number of means"); *Fine Host*, 25 F.Supp.2d at 70 (allegations that defendants consciously falsified financial statements are sufficient to meet pleading standard for *scienter*).

The Complaint identifies numerous GAAP violations, a fact which is confirmed by the Company's restatements. Although GAAP violations, in the absence of other circumstances showing *scienter*, may not support the requisite strong inference of *scienter*, the First Circuit has observed that "significant" GAAP violations can nevertheless "provide evidence of *scienter*." *Cabletron*, 311 F.3d at 39; *Greebel*, 194 F.3d at 203; *Geffon*, 249 F.3d at 36 (accounting shenanigans are among the characteristic types of circumstances which may demonstrate *scienter* for securities fraud.); *Crowell*, 343 F.Supp.2d at 17 ("Thus, though by no means conclusive, violations of GAAP and of a corporation's own corporate revenue recognition policies are obviously probative of *scienter*."); *Blatt*, 2002 WL 31107537, *11 (Woodlock, J.) (allegations of revenue recognition fraud were stated with sufficient particularity to give rise to a strong inference of *scienter*); *Raytheon*, 157 F.Supp.2d at 148; *Chalverus*, 59 F.Supp.2d at 235 (GAAP violations combined with other circumstances, including company's violation of own revenue

recognition policy, may raise a strong inference of *scienter*).[13]

The pervasiveness and duration of the accounting manipulations here -- as well as the magnitude of the subsequent restatements -- indicate that defendants either knew of, or recklessly disregarded, the alleged accounting fraud. *See, e.g., In re MicroStrategy Inc. Sec. Litig.*, 115 F.Supp.2d 620, 637 (E.D. Va. 2000) ("GAAP violations and the subsequent restatements are of such a great magnitude . . . as to compel an inference that fraud or recklessness was afoot"). Here, the Complaint alleges that defendants' improper accounting endured for nearly three years and resulted in a huge, multi-million dollar restatement of Sonus's financial statements for that period. *E.g., In re American Bank Note Holographics Sec. Litig.*, 93 F.Supp.2d 424, 447 (S.D.N.Y. 2000) (the admitted falsity of financial statements and, inter alia, the extraordinary degree to which they were false, combine to raise a strong inference of consciousness or recklessness).

The alleged GAAP violations do not involve intricate or complex accounting judgments, but rather out-and-out deception and fraud. *See, e.g.*, ¶44 (defendants allegedly recognized $18 million in phony revenue on the purported delivery of software that was not delivered). Such brazenly illegal conduct does not involve an honest mistake or error. Clearly, a strong inference of *scienter* can reasonably be drawn.

//

//

---

[13]   The decision in *Orton v. Parametric Tech. Corp.*, 344 F.Supp.2d 290 (D. Mass. 2004) does not require that defendants' motions be granted as to the Section 10(b) claim. The Complaint herein at issue contains far greater detail as to the defendants' wrongdoing than the complaint considered by the Court in that case.

5.    **Knowledge Of The Accounting Deficiencies And Improprieties May Be Attributed To Defendants**

Defendants' arguments regarding their purported "lack of *scienter*" also ignore well-established precedent which holds that knowledge concerning a company's key business or transactions may be attributable to the company, its officers and directors. The courts of this district have consistently held that "[k]nowledge of accounting problems may be imputed to the Company and its directors and officers." *Chalverus*, 59 F.Supp.2d at 235 ("as matter of law . . . certain information, particularly "facts critical to ... an important transaction[,] generally are so apparent that their knowledge may be attributed to the company and its key officers"); *see also U.S. v. Josleyn*, 206 F.3d 144, 159 (1st Cir. 2000) (reasoning that whether a given relationship is sufficient to support the imputation of knowledge may, in some cases, depend on an assessment of the person's "level of responsibility"); *see also In re Tel-Save Sec. Litig.*, 1999 WL 999427, *5 (E.D. Pa. Oct. 19, 1999); *Cosmas v. Hassett*, 886 F.2d 8, 10 (2d Cir. 1989)) ("[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers.").

In *Crowell*, 343 F.Supp.2d 1, Chief Judge Young recently found that knowledge of a scheme that involved important sales transactions could be imputed to the top executives of the defendant company:

> As to the allegation that the Ionics Defendants knowingly or recklessly failed to reveal this fraudulent scheme in disclosures to the investing public, it can be inferred that top executives at Ionics were aware of a scheme involving systemically fraudulent sales practices, given the importance of the Aqua Cool sale to Ionics' business that year.

*Id.* at 19 (citations omitted).

Defendants cannot seriously argue that they knew nothing of Sonus's improper accounting practices and faulty accounting systems, or that their professed lack of knowledge about the Company's finances was not reckless. Numerous courts have held that where the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the officers and directors of the company. *See, e.g., In re Providian Financial Corp. Sec. Litig.*, 152 F.Supp.2d 814, 825 (E.D. Pa. 2001) (knowledge of deficiencies in accounting and other fraudulent practices that "permeated" the company's "core business" attributed to individual defendants); *In re Campbell Soup Sec. Litig.*, 145 F.Supp.2d 574, 599 (D.N.J. 2001) (company's CEO and CFO presumed to have knowledge of matters that are "the bread and butter" of the company's business); *In re Cell Pathways*, 2000 WL 805221, *7 (E.D. Pa. June 20, 2000) ("where the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants"); *In re Tel-Save Sec. Litig.*, 1999 WL 999427, * 5 (E.D. Pa. Oct. 19, 1999) ("Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors."); *Epstein v. Itron*, 993 F.Supp. 1314, 1325 (E.D.Wash. 1998) ("facts critical to a business' core operation or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers").

It is beyond dispute that the matters at issue here -- serious deficiencies in Sonus's internal accounting and financial controls and systems, as well as the repeated, blatant and improper manipulations of the Company's reported revenues, all of which led directly to the restatement of more than two years of publicly-issued financial statements -- are "central" to the "core business" of the Company. As Chief Judge Young observed in *Crowell*, a failure to maintain adequate internal

controls is "probative" of *scienter* and "can add to the strength of a case based on other allegations." *Crowell*, 343 F.Supp.2d at 20; *see also Chalverus*, 59 F.Supp.2d at 235; *In re IKON Office Solutions, Inc. Sec. Litig.*, 66 F.Supp.2d 622, 631 (E.D. Pa. 1999) (holding that knowing or reckless disregard of grossly deficient internal controls may gave rise to inference of *scienter*); *In re Rent-Way Sec. Litig.*, 209 F.Supp.2d 493, 515-16 (W.D. Pa. 2002). Even as recently as March 2005, Sonus announced that it was delaying the disclosure of Q4 2004 financial results, citing "material weaknesses in Sonus's internal control over financial reporting as of December 31, 2004." *See http://biz.yahoo.com/bw/050303/35785_1.html.* Clearly, it is hard to imagine something more "central" to the "core business" of a company than the ability to properly account for its revenues and earnings in a particular accounting period.

### 6.    Violation of One's Own Accounting Policies Shows *Scienter*

*Scienter* can also be inferred from defendants' violation of Sonus's own revenue recognition policies. For example, in Sonus's Form 10-K for the year ended 2001, the Company represented that its policy was to only recognize revenue in conformity with GAAP. ¶98. Further, the Company represented that "[i]f uncertainties exist, we recognize revenue when those uncertainties are resolved." *Id.* The Company also claimed that "[o]ur revenue recognition policy complies with SEC Staff Accounting Bulletin No. 101, REVENUE RECOGNITION IN FINANCIAL STATEMENTS." ¶104.

Each of these representations was false. Defendants in fact recorded revenues in violation of the Company's own revenue recognition policies. *See* ¶¶104, 108, 112, 117, 131, 143, 155, 168. Violation of Sonus's internal revenue recognition policies is probative of defendants' *scienter*. *Crowell*, 343 F.Supp.2d at 17 (violations of GAAP and of a corporation's

own corporate revenue recognition policies are obviously probative of *scienter*); *Chalverus*,

59 F.Supp.2d at 235 (GAAP violations combined with other circumstances, including company's

violation of own revenue recognition policy, may raise a strong inference of *scienter*); *see also*

*Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731, 735-37 (D. Mass. 1995) (auditor's

knowledge that a company violated its own internal policies is sufficient to plead *scienter*);

*Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).

For this additional reason, the Complaint adequately alleges defendants' *scienter* for

purposes of the Section 10(b) claim.

### 7.    The Absence of Insider Selling Is Irrelevant

Defendants argue that the Complaint does not allege defendants' motive because neither

Ahmed nor Nill sold any Sonus shares during the Class Period.  Although not required to plead

and prove *scienter*, motive allegations nevertheless can be used to support an inference of

*scienter*.  Here, defendants had a clear motive to misrepresent the state of Sonus's finances

because they wanted to enable the Company to engage in follow-on stock offerings.  ¶¶5, 39.  In

particular, they allegedly manipulated Sonus's publicly reported financial results for the purpose

of creating an illusion of revenue linearity and visibility so that the Company could pursue such

offerings.  ¶39.  In similar cases, the courts have found "motive" in support of *scienter* where

defendants were alleged to have engaged in wrongdoing in furtherance of a specific corporate

aim.  *See Gross v. Medaphis*, 977 F.Supp. 1463, 1472 (N.D. Ga. 1997) (motive of inflating

results for the purpose of furthering corporate acquisitions was sufficient to show *scienter*).  In

*Crowell*, Chief Judge Young found that the defendants in that case had a "clear motive" to

overstate the financial statements of the issuing company:

> Here, moreover, the Ionics Defendants had a clear motive to inflate Ionics' stock price artificially by engaging in a fraudulent scheme to inflate Aqua Cool's sales and customer base artificially. They wanted to maximize Aqua Cool's sale price. Deliberate overstatement of revenues to consummate a major sale or acquisition of stock or assets is sufficient to support a strong inference of scienter.

*Crowell*, 343 F.Supp.2d at 19. Nor does an absence of insider trading negate a finding of motive. *Crowell*, 343 F.Supp.2d at 15 ("Even if none of the Ionics Defendants profited from stock trades during the Class Period, that does not establish that they lacked any motive to mislead the investing public. . . ").

Put simply, when viewed in their totality, the allegations regarding defendants' motive to craft the illusion of revenue linearity, along with the other detailed allegations of accounting fraud, are more than sufficient to permit a strong inference of *scienter*. *See In re Digi Inc., Sec. Litig.*, 6 F.Supp.2d 1089 (D. Minn. 1998) (allegations of motive and opportunity along with substantial restatements of financial disclosures are enough to establish *scienter*). The particularized allegations of wrongdoing in the Complaint raise a strong inference of defendants' *scienter*. Accordingly, defendants' motions to dismiss the Section 10(b) claim should be denied.

### C.    The Claim Under Section 11 Of The 1933 Act Is Adequately Alleged

Defendants' only argument in support of dismissal of the claim arising under Section 11 of the 1933 Act, 15 U.S.C. §77k, is that the particularity requirements of Rule 9(b), Fed.R.Civ.P. for pleading fraud should apply to this claim and have not been met. They make this argument notwithstanding that Section 11 itself imposes strict liability on an issuer for a materially misleading registration statement, and individual signers thereof such as defendants Ahmed and

Nill can be held liable under the statute for mere negligence. *Huddleston*, 459 U.S. at 382.[14]

This argument should be rejected for two reasons. First, assuming *arguendo* that defendants' legal position is correct, and the fraud-based pleading standard applies to this negligence claim, as demonstrated in Section III.B., *supra*, the Complaint sufficiently alleges defendants' fraud in compliance with Rule 9(b). Accordingly, the Section 11 claim is adequately alleged even applying this erroneous standard.

However, for the reasons discussed below, the defendants' invitation to apply the standards for pleading fraud to the Section 11 claim should be declined. Section 11 is not a fraud claim, and the fraud pleading standards are inapplicable.[15]

According to the First Circuit, "[f]raud is not an element of a claim under either Section 11 or 12(2), and a plaintiff asserting such claims may avoid altogether any allegations of *scienter* or reliance." *Shaw*, 82 F.3d at 1223 (citations omitted). The general rule is that "the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA do not generally apply to Section 11 and Section 12(a)(2) claims." *Giarraputo v. UNUMProvident*, 2000 WL 1701294, *9 (D. Me. 2000). As noted by the Eighth Circuit, "the particularity requirement of Rule 9(b) does not apply to claims under §11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under §11." *In re NationsMart Corp. Sec. Litig.*, 130 F.3d

---

[14]    The Section 11 claim is based on the Prospectus Supplement and related registration statement issued by Sonus on September 24, 2003 by which it raised $124 million from the investing public. ¶¶25, 193-199.

[15]    Defendants also seek to have the fraud pleading standards applied to the claim arising under Section 12(a)(2) of the 1933 Act. ¶¶205-209. *See, e.g.*, Nill Br. at 9-11. For the same reasons as are applicable to the Section 11 claim, the fraud pleading standard should not apply to the Section 12(a)(2) negligence claim.

309, 314 (8th Cir. 1997). Defendants nonetheless claim that the Complaint "sounds in fraud," triggering the heightened fraud pleading requirements. They are wrong.

Lead Plaintiff's claims under the 1933 Act do not require allegations of fraud, are not "grounded in fraud," and therefore are not subject to Rule 9(b) and the requirement that the claims be pled with the particularity required by that Rule. It is settled that "in a case where fraud is not an essential element of a claim, only allegations (averments) of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1098, 1105 (9th Cir. 2003).[16] The overwhelming weight of authority holds that Rule 9(b)'s pleading requirements do not apply to 1933 Act claims. *See, e.g., Huddleston*, 459 U.S. at 385 (Rule 9(b) is inapplicable to §11 claim, even though the complaint also alleged §10(b) claim of fraud); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1310 (S.D.N.Y. 1996) (Rule 9(b) inapplicable to §§11 and 12(a)(2) claims even where §10(b) fraud claims are alleged); *In re AnnTaylor Stores Sec. Litig.*, 807 F.Supp. 990, 1003 (S.D.N.Y. 1992) (citing cases). In short, alleging fraud requires pleading an intent to deceive which is clearly not an element of the 1933 Act claims in the Complaint. *Kensington Capital Management v. Oakley*, 1999 WL 816964, *2 (C.D. Cal. Jan. 14, 1999).

As recognized in *Vess*, "a plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent

---

[16]     The *Vess* Court cites with approval *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) which held: "Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to *disregard* averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated."

conduct." *Vess*, 317 F.3d at 1105. Here, the Section 11 claim expressly disavows reliance on, or incorporation of, allegations that may be deemed as "sounding in fraud." ¶193. *See, e.g., In re NationsMart*, 130 F.3d at 315 (Rule 9(b) inapplicable because the complaint "expressly disavows any claim of fraud in connection with the §11 and §12(2) counts."). Defendants cannot refute that courts recognize the long-standing principle that the plaintiff is the master of his pleading and should not be penalized for judicious and wholly proper pleading. *See, e.g., In re Chambers Dev. Sec. Litig.*, 848 F.Supp. 602, 624 (W.D. Pa. 1994) (where "plaintiffs here have selectively parsed their complaint to indicate that their claims under Section 11 are based upon negligence" in connection with a registration statement, Rule 9(b) does not apply); *see also In re Number Nine Visual Tech Corp. Sec. Litig.*, 51 F.Supp.2d 1, 12-13 (D. Mass. 1999) (same); *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *11-12 n. 6 (N.D. Ill. Nov. 4, 1998). The fact that other fraud-based claims are pled in one complaint with the 1933 Act non-fraud claims is merely incidental to the true nature of the claims. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F.Supp.2d 576, 646 (S.D. Tex. 2003) ("because its §11 claim against [defendant] Savage is a "non-fraud" claim, according to explicit statements by Lead Plaintiff in the complaint, and is thus a strict liability or negligence claim, Lead Plaintiff insists . . . that the heightened pleading standard of Rule 9(b) does not apply . . . The Court agrees.").

Further, when Congress amended the federal securities laws by enacting the PSLRA, it specifically required particularized allegations for claims based on fraud, but not for 1933 Act claims other than "forward-looking" statements, none of which are present in this case. *See In re Initial Public Offering*, 241 F.Supp.2d 281, 339-40 (S.D.N.Y. 2003) ("the Supreme Court has

made it clear [not] . . . to stray from the language of the applicable statute or Rule.") (*citing Artuz*

*v. Bennett*, 531 U.S. 4, 10 (2000); *Badaracco v. Commissioner*, 464 U.S. 386, 398 (1984)).

Thus, Rule 9(b) is inapplicable to the 1933 Act claims asserted in the Complaint.[17]

Lead Plaintiff begins its Section 11 allegations with an explicit disclaimer: ". . . for

purposes of this claim, Lead Plaintiff expressly disclaims and excludes any allegations that could

be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely

on a claim of strict liability (as to defendant Sonus) or negligence (as to defendants Ahmed and

Nill). . . ." ¶193.[18] As noted, the decision from this district in *Number Nine*, 51 F.Supp.2d 1,

---

[17]   *Compare* 15 U.S.C. §78u-4(b) (new section requiring particularized pleading of 1934 Act claims referring specifically to "requirements for securities **fraud** actions") *with* 15 U.S.C. §77z-1(b) (parallel provision added to 1933 Act does not require particularized allegations). In its opinion in *In re SeaChange International, Inc. Sec. Litig.*, 2004 WL 240317 (D. Mass. Feb. 6, 2004) (Woodlock, J.), where plaintiffs alleged only 1933 Act claims, this Court found that §78u-4(b)(1) of the PSLRA did away with the need to determine whether a complaint "sounds in fraud," even for purposes of 1933 Act claims. The Court held that there is a heightened pleading requirement for all claims under Sections 11 and 12(a)(2) of the 1933 Act if such claims are based on alleged misrepresentations or omissions. *Id.* at *3. However, the cited statute (§78u-4(b)(1)) appears only in the provisions of the PSLRA amending the 1934 Act relating to fraud claims. In any event, the allegations at issue in *SeaChange* are far afield from those at issue here. *SeaChange* was purely a projections case. The PSLRA does impose an actual knowledge of falsity requirement for such forward looking statements, even in a registration statement claim arising under Section 11 of the 1933 Act. 15 U.S.C. §77z-2(c)(1)(B)(I), (ii)(II). There are no projections at issue here, however. There is no *scienter* requirement of any sort for the 1933 Act claims alleged in this case. Not only is this **not** a projections case, here there has been an admission that materially false financial statements were published in the applicable offering documents, a virtual admission that the 1933 Act claims are properly stated. In *Swack*, 2004 WL 2203482, *4, this Court again noted that §78u-4(b)(1) had done away with the need to determine as a threshold matter whether a complaint "sounds in fraud," but that case involved only claims arising under Section 10(b) of the 1934 Act.

[18]   It was Lead Plaintiff's intention to incorporate such a disclaimer in Paragraph 205 of the Complaint with regard to the Section 12(a)(2) claim. However, such language was inadvertently omitted when the Complaint was filed. Lead Plaintiff will incorporate the disclaimer for purposes of this claim at the appropriate time.

confirms the validity of such a disclaimer:

> First, the Court rules that the Complaint's disclaimer of fraud-type
> allegations *is effective to prevent the Securities Act claims from
> 'sounding in fraud.'* . . . . Second, the Court rules that, even
> ignoring the Complaint's disclaimer, the allegations . . . do not
> 'sound in fraud' because they 'appear to contend only that there
> was negligent or even innocent misrepresentation.' *Cooperman*,
> 1998 WL 953726, at *7 (holding that Rule 9(b) does not apply to a
> Section 11 claim; *accord In re WebSecure*, 182 F.R.D. at 367
> (holding that Rule 9(b) did not apply to Section 11 and Section
> 12(a)(2) claims because no allegations of scienter were made.

*Id.* at 12-13 (emphasis added). Thus, the *Number Nine* Court held that the mere presence of the

disclaimer was sufficient to prevent the claim from sounding in fraud. In support of its holding,

the Court noted its beneficial policy implications: "This will minimize litigation costs by

ensuring that plaintiffs need file only one complaint and one civil action to pursue their securities

claims." *Id.* at 13.[19] The Eighth Circuit has also adopted this common sense approach, ruling

that:

> [E]ven if the plaintiffs were alleging fraudulent conduct under
> § 11, as the defendants argue in their brief, any such allegation
> would be surplusage. The only consequence of a holding that Rule
> 9(b) is violated with respect to a §11 claim would be that any
> allegations of fraud would be stripped from the claim. The
> allegations of innocent or negligent misrepresentation, which are at
> the heart of a §11 claim, would survive. The plaintiffs' case
> should not have been dismissed because they alleged more than
> was necessary to recover under §11 of the Securities Act.

---

[19]    Defendant Nill disingenuously argues that "courts **uniformly** reject such one-sentence
boilerplate efforts to disavow claims of fraud." Nill Brief at 7 (emphasis added). As noted, not
only is this incorrect, it is contrary to the law of this District. *Number Nine*, 51 F. Supp. 2d at 12.
Even a case on which Nill relies recognizes that there is no "uniform" rule as to whether Rule
9(b) applies to Section 11 and Section 12(a)(2) claims. *See In re Ultrafem, Inc. Sec. Litig.*,
91 F.Supp.2d 678, 690 (S.D.N.Y. 2000) ("The Court of Appeals has not decided this issue, and
the courts in this district disagree on the application of Rule 9(b).").

*NationsMart*, 130 F.3d at 315. *See also In re JDS Uniphase Corp. Secs. Litig.*, 2005 WL 43463 at *9 (N.D. Cal. Jan. 6, 2005) (statement that "any allegations based on fraud or deliberate recklessness" are excluded from the Section 11 claim is effective because "Lead Plaintiff is permitted to plead its claims in the alternative in this manner. Fed.R.Civ.P. 8(e)(2)."). Separating the fraud and non-fraud allegations, especially where they are, as here, explicitly brought as distinct claims, is appropriate. Here, the Court should view the 1933 Act claims as negligence-based only, and find that they are adequately alleged.

D.    **The Claim Under Section 12(a)(2) of the 1933 Act is Adequately Alleged**

Section 12(a)(2) is designed to encourage issuers, individuals and underwriters to sell and/or solicit securities based on accurate prospectuses and prospectus supplements in order to preserve the salutary goals of accurate, efficient, and transparent markets. Section 12(a)(2) holds those individuals and firms that sell, offer for sale, or solicit securities based on inaccurate prospectuses and prospectus supplements liable for rescission or damages. 15 U.S.C. §77l(a)(2). The statute allows a plaintiff to recover from a defendant who offers or sells securities by means of a prospectus containing untrue statements and/or omissions of material fact. Lead Plaintiff has adequately alleged seller status as to all defendants and their motions to dismiss the Section 12(a)(2) claim should be denied. ¶¶207-208. At a minimum, it would be premature to dismiss these claims before discovery has created a factual record pursuant to which the Court can meaningfully evaluate whether defendants were statutory sellers.

1.    **Lead Plaintiff Has No Way Of Verifying The Existence Of A Firm Commitment Underwriting**

Defendants claim that Sonus's September 2003 "shelf" offering was conducted pursuant

to a "firm commitment" underwriting and, as a result, defendants cannot properly be deemed statutory "sellers." They assert that the existence of a "firm commitment" underwriting means Lead Plaintiff cannot show that the defendants named in the Complaint passed title to the securities, thus precluding their designation as statutory sellers under the test laid out in *Pinter v. Dahl*, 483 U.S. 622, 642 (1988).[20]

The Court should not, at this stage of the proceedings, fully credit the accuracy of defendants' assertions as to the existence of a "firm commitment" underwriting. Lead Plaintiff has not had the opportunity to verify that it was this precise type of underwriting agreement which was utilized here, has not been able to analyze its terms, and has not had the opportunity to discern whether conditions in the contract preclude it from being properly considered as a "firm commitment" underwriting. Lead Plaintiff has had no practical way of determining whether the actions taken by Sonus and Goldman, Sachs & Co. can be characterized as behavior commensurate with a "firm commitment" underwriting. The Court should not at this stage simply take defendants' assertions in this regard as the gospel truth. The motion to dismiss should be denied to allow Lead Plaintiff to conduct discovery as to the precise nature of the underwriting which occurred here. Absent more information, Lead Plaintiff cannot confirm as a matter of fact that Sonus sold all of the shares issued pursuant to the September 2003 offering to Goldman, Sachs & Co. The motion to dismiss is therefore premature and should be denied, as

---

[20]    The First Circuit has defined "firm commitment" underwritings, as follows: "In a firm commitment underwriting, the issuer of the securities sells all of the shares to be offered to one or more underwriters, at some discount from the offering price. Investors thus purchase shares directly from the underwriters (or broker-dealers who purchase from the underwriters), not directly from the issuer." *Shaw*, 82 F.3d at 1215.

all of the elements of the claim have been adequately alleged.[21]

### 2.   Lead Plaintiff Has Properly Alleged That Defendants Are Statutory Sellers Through Solicitation

The second component of the Section 12(a)(2)[22] statutory test under *Pinter v. Dahl* concerns solicitation. The Supreme Court held that "the range of persons potentially liable under §12(1) is not limited to persons who pass title." *Id.* at 643. Rather, a defendant "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner" may also be liable under §12(a)(2). *Id.* at 647.[23]

In *Shaw*, 82 F.3d 1194, the First Circuit noted that the Supreme Court in *Pinter* did not limit Section 12 liability to those who actually pass title to the suing purchaser. *Id.* at 1215. Thus, a non-owner of securities can still be liable under the statute for successfully soliciting the plaintiff's purchaser, provided that the solicitor is "motivated at least in part by a desire to serve

---

[21]   This is a different scenario than that presented to the Court in *Shaw*. There, the First Circuit stated, "the March 1994 public offering was made pursuant to a 'firm commitment' underwriting, as disclosed in the registration statement and prospectus supplement. **The plaintiffs do not contend otherwise**.... Here it is undisputed that the public offering was conducted pursuant to a firm commitment underwriting." 82 F.3d at 1215-16 (emphasis added). Significantly, the First Circuit went on to note that, "on a different set of allegations, an issuer involved in a firmly underwritten public offering could be a 'seller' for purposes of Section 12(2)..." *Id.* at 1216. As noted, Lead Plaintiff does not concede at this point that the underwriting arrangement for the September 2003 offering falls within the rubric of "firm commitment."

[22]   Although the Supreme Court specifically limited its analysis in *Pinter* to Section 12(2), *see id.* at 642 n. 20, the First Circuit in *Shaw*, 82 F.3d at 1214, ruled that "*Pinter's* analysis of 'seller' for purposes of Section 12(1) applies with equal force to the interpretation of 'seller' under Section 12(2). (citations omitted)."

[23]   The claim here is based on the issuance of the September 24, 2003 Prospectus Supplement. The Supreme Court has defined the term "prospectus" as "a document **soliciting** the public to acquire securities." *Gustafson v. Alloy Co., Inc.* 513 U.S. 561, 574 (1995) (emphasis added).

his own financial interests or those of the securities owner." *Id.* citing *Pinter*, 486 U.S. at 647. A defendant must be "directly involved in the actual solicitation of a securities purchase" to qualify as a statutory seller. *Pinter*, 486 U.S. at 644, n. 21 (citations omitted)." *Shaw*, 82 F.3d at 1215. The First Circuit ruled that this buyer-solicitor relationship could not be demonstrated by "involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities standing alone. . . ." *Id.* at 1216 (emphasis added).

The allegations of the Complaint are sufficient to satisfy the broad standards articulated in *Shaw* for seller liability. First, Lead Plaintiff has alleged that the defendants signed materially misleading prospectus supplements, prospectuses, registration statements, and/or SEC filings, which were incorporated into Sonus's Prospectus Supplement. ¶¶16, 17, 68, 69, 70, 71, 72, 73, 137, and 161. Second, it is sufficiently alleged that the defendants assisted in and/or supervised in the drafting, producing, revising, reviewing, approving, and/or executing relevant SEC documents. ¶¶16, 17, 19, 20, 22, 207. Finally, Lead Plaintiff has sufficiently alleged that the Sub-Class members who bought on the September 2003 offering would not have been able to acquire the Sonus shares without the "selling efforts" undertaken by the defendants (¶¶27, 31(c), 207, and 208), and that the defendants engaged in such solicitation in order to further their own financial interests in the manner of a broker or vendor's agent, including the financial interests of Sonus. ¶¶5, 24, and 39.

In addition, determining whether a defendant is a seller for purposes of Section 12(a)(2) is a fact-intensive exercise requiring discovery. Such a determination should not be made on a motion to dismiss. For example, *In re Stratosphere Sec. Litig.*, 1 F.Supp.2d 1096, 1120 (D.Nev. 1998), the Court ruled that signing a registration statement or prospectus alone is insufficient to

designate a defendant a Section 12 seller. However, it went on to state that, "[t]his Court finds that the question of whether an individual is a seller under Section 12 is a question of fact, not properly decided on a motion to dismiss." *See also In re Paracelsus Corp.*, 6 F.Supp.2d 626, 632 (S.D.Tex. 1998); *Degulis v. LXR Biotechnology, Inc.*, 1997 WL 20832, *6 (S.D.N.Y. 1997).

Some courts have taken an approach that adheres closely to the goal associated with Section 12, *i.e.*, assuring that the investing public can rely on accurate prospectuses and prospectus supplements in making their investment decisions. Thus, in *Kensington Capital Management v. Oakley, Inc.*, 1999 WL 816964 (C.D.Cal. 1999), the district court found that defendant issuers could be found liable as statutory sellers, even in circumstances involving firm commitment underwritings. The Court denied the defendants' motion to dismiss for purposes of Section 12 because it (i) found that signing registration statements could be sufficient solicitation to justify a statutory seller designation and (ii) found that it was reasonable to infer that the issuer appeared to the plaintiffs to be the true seller for purposes of Section 12. *Id.* at *5.

Several courts have found that the signing of a prospectus is sufficient to show solicitation at the motion to dismiss stage.[24] In *In re Proxima Corporation Sec. Litig.*, 1994 WL 374306 (S.D.Cal. 1994), the district court emphasized that solicitation need not occur "face-to-face" and that "since the Prospectus itself is a solicitation document, those individual defendants who signed the Registration Statement. . . effectively were soliciting the public to purchase Proxima stock." *Id.* at *5. Another district court has held that signing prospectuses is significant

---

[24] Lead Plaintiff acknowledges that there is authority contrary to this position. Given the differing approaches used by courts, Lead Plaintiff submits that the better course of action is to allow discovery on the issue of defendants' "seller" activity, and evaluate the claim based on a more developed factual record.

for purposes of determining seller status: "the Prospectus itself is considered a solicitation document. Thus, the . . . defendants who actually **signed** the Registration Statements may be said to have solicited the public to purchase [defendant-issuer] stock." *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1133 (W.D.Mich. 1996) (emphasis in original). The district court in *In re Keegan Management Co. Sec. Litig.*, 1991 WL 253003 (N.D.Cal. 1991) also found that Section 12 liability had been adequately alleged:

> In this case, it would not be uncommon to say that defendants "sold" the stock to aftermarket purchasers even though defendants did not own legal title to the stock. To one who studies corporate filings and news releases before purchasing via a dealer on an impersonal and anonymous market, the corporation, its officers and directors, and other promoters of the stock appear to be true 'sellers.' Thus, it is reasonable to infer that Congress intended Section 12(2) to apply to persons such as defendants.

*Id.* at *8.

Simply put, a determination as to statutory seller status should not be made at the motion to dismiss stage. Lead Plaintiff has made appropriate factual allegations sufficient to survive defendants' motions to dismiss with respect to the Section 12(a)(2) claim. The Court should permit the factual bases for this claim to be explored in discovery.

### E.    The "Control Person" Claims Are Adequately Alleged

To state a control person claim under either Section 20(a) of the 1934 Act or Section 15 of the 1933 Act, a plaintiff must allege: (1) an underlying primary violation of the securities laws; and (2) that the individual defendant had control over the primary violator. *See, e.g., SeaChange*, 2004 WL 240317 at *16 (involving a §15 claim); *Swack*, 2004 WL 2203482 at *17 (involving a §20(a) claim). Here, Lead Plaintiff has adequately alleged control person liability

under Section 20(a) (Count I) and Section 15 (Counts II and III) as to defendants Ahmed and Nill, and they do not seriously contend otherwise.

Whether a defendant is a control person is an intensely factual question that "will not ordinarily be resolved summarily at the pleading stage." *Cabletron*, 311 F.3d at 41 quoting 2 T.L. Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th Ed.2002); *see also In Re Enron Corp. Secs. Litig.*, 2004 WL 764663 at *8 (S.D. Tex. 2004) (noting that control person liability ordinarily is not decided on a motion to dismiss because "[d]iscovery is necessary to flesh out the facts for the record before the issue can properly be resolved"). Indeed, "notice pleading under Rule 8 (a 'short plain statement of the claim showing the pleader is entitled to relief'), rather than heightened pleading under Rule 9, applies to control person liability claims," making it unnecessary for a plaintiff to make detailed control person allegations in the complaint. *Id.*

Moreover, even if the control person claims are evaluated at this time, they are adequately alleged. Defendant Ahmed served at the relevant time as Sonus's CEO and Chairman of the Board, and previously served as the Company's President. ¶16. He participated in the Company's day-to-day operations and exercised control over Sonus, including the issuance of the false or misleading statements alleged in the Complaint. *Id.* Ahmed also owned more than 8.8 million shares of Sonus stock as of May 31, 2004 and had a large number of stock options. *Id.* Defendant Nill was Sonus's CFO, Vice President of Finance and Administration, and Treasurer. ¶17. Nill was actively involved in preparing and reviewing the false or misleading statements alleged in the Complaint, and signed SEC documents containing false financial information. *Id.* Through their positions within the Company, defendants Ahmed and Nill had the power to, and

did influence and control the decisions made by Sonus, including those regarding the content and dissemination of the false or misleading statements. Thus, the Complaint sufficiently alleges that Ahmed was a "controlling person" of both Sonus and defendant Nill, and that Nill was a "controlling person" of Sonus.

## IV.

## CONCLUSION

For all of the foregoing reasons, defendants' motions to dismiss should be denied in their entirety.[25]

Dated: March 22, 2005

GOLD BENNETT CERA & SIDENER LLP

By ___ /s/ Solomon B. Cera _____

595 Market Street, Suite 2300
San Francisco, California 94105
Telephone ( 415) 777-2230
Facsimile: (415) 777-5189
E-mail: scera@gbcslaw.com

Attorneys for Lead Plaintiff
BPI Global Asset Management LLP

---

[25] If for any reason the Court finds the allegations of the Complaint insufficient to state a claim for relief, Lead Plaintiff respectfully requests leave to amend pursuant to Rule 15(a), Fed.R.Civ.P. "[T]he Supreme Court has instructed that leave to amend should be freely given '[i]n the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]'" *KA Investments LDC v. Number Nine Visual Technology Corp.*, 2002 WL 31194865 at *10  (D.Mass. Aug. 26, 2002) (Woodlock, J.), quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962). *See also FDIC v. Consol. Mortgage and Fin. Corp.*, 805 F.2d 14, 16 (1st Cir. 1986); *Eastern Food Services, Inc. v. Pontifical Catholic University Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004).

CERTIFICATE OF SERVICE

I, KimLane E. Gantan, hereby declare under penalty of perjury as follows:

I am employed by Gold Bennett Cera & Sidener LLP, 595 Market Street, Suite 2300, San Francisco, California, 94105-2835. I am over the age of eighteen years and am not a party to this action.

On March 22, 2005, a true and correct copy of the aforementioned **"LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS"** was delivered to all counsel of record by electronic service pursuant to the Court's Order Regarding Electronic Service and served to counsel not on the Court's electronic service by causing true and correct copies of same to be enclosed in sealed envelopes and deposited in the U.S. Mail, postage prepaid, or delivered as otherwise indicated on the attached Exhibit I.

Executed on March 22, 2005, at San Francisco, California.

_____
KimLane E. Gantan

109222

## EXHIBIT I

**VIA FEDEX**
Thomas J. Doughtery
Matthew J. Matule
Michael S. Hines
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA 02108
Telephone: (617) 573-4800

**VIA FEDEX**
Robert S. Frank, Jr.
John R. Baraniak, Jr.
Paul E. Bonanno
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 248-5000

**VIA FEDEX**
Jeffrey B. Rudman
James W. Prendergast
Daniel W. Halston
Daniel H. Gold
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000