UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
IN RE SONUS NETWORKS, INC.          )
LITIGATION                          )   Civil Action No. 04-10294-DPW
                                    )
_____)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF DEFENDANT SONUS' MOTION TO DISMISS
<u>THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

Lead Plaintiff's Memorandum of Law In Opposition To Defendants' Motions To Dismiss ("Opposition" or "Opp.") does not salvage the Complaint. Rather than attempting to refute Defendants' arguments and authorities, Plaintiff devotes the bulk of its opposition to simply repeating verbatim the allegations of the Complaint and then decreeing that they are sufficient to plead a conscious scheme of accounting fraud. Conspicuously absent, however, is the identification of any properly-sourced, particularized allegation that Defendants contemporaneously knew or recklessly disregarded that Sonus was incorrectly applying complex revenue recognition principles to complex transactions, much less intended that this be done in order to overstate the Company's financial condition. At the end of the day, Plaintiff is left with little more than what Sonus already has acknowledged – that it restated revenues for historical periods because it later determined that mistakes had been made in the timing of recognizing certain revenues. This is insufficient to plead the strong inference of scienter required to state a 10(b) claim.

Plaintiff also does nothing to rescue its defective Section 12 claim. Simply put, Plaintiff has not pleaded that any Defendant was a statutory seller of securities in the secondary offering, and Plaintiff cannot avoid dismissal by speculating what discovery might reveal, or by making arguments that are directly foreclosed by binding First Circuit authority.[1]

---

[1] Sonus incorporates by reference the Individual Defendants' reply memoranda, which respond to Plaintiff's arguments regarding the Section 11 claim and further demonstrate why the Section 10 and Section 12 claims must be dismissed.

## I. The Complaint Does Not Plead Facts Permitting the Requisite Strong Inference of Scienter

Plaintiff's Opposition does little more than repeatedly ask the Court to infer conscious wrongdoing from the mere fact that Sonus has acknowledged the existence of accounting problems with its past financial statements. But a securities fraud plaintiff cannot discharge its burden of pleading scienter merely by alleging the existence of a restatement, or its magnitude, or violations of GAAP or internal accounting policies. Unsupported conclusory assertions of "schemes" to "smooth out" revenue and "manage earnings" are similarly insufficient. To make the leap from hindsight and mistake to fraud, Plaintiff must either allege particularized, appropriately-sourced facts showing that Defendants knew at the time that revenue was being recognized improperly, or acted with reckless disregard for the truth; or must at the very least plead facts concerning the Defendants' "motive and opportunity" to commit fraud from which a strong inference of scienter can be drawn. Plaintiff here has done neither.

### A. Plaintiff's Opposition Confirms The Inadequacy Of Its Confidential Sources

The Opposition confirms, not undermines, the conclusion that Plaintiff's confidential sources cannot be credited because they are inadequately described and are not alleged to have been in a position to know about Sonus' accounting. See Memorandum of Law in Support of Defendant Sonus' Motion to Dismiss the Amended Consolidated Class Action Complaint ("Sonus Mem.") at 9-11.

As an initial matter, Plaintiff blithely asserts that its "sources are described with sufficient particularity," without citing a single case holding that such generic descriptions are adequate. Opp. at 20-21. Nor does Plaintiff even attempt to distinguish the authority holding nearly identical descriptions inadequate as a matter of law. Compare Opp. at 20-21 with Sonus Mem. at 10-11.

Equally importantly, Plaintiff essentially concedes that none of its sources worked in the finance department or were personally involved with the Company's accounting. See Opp. at 21-22.[2] Instead of explaining directly how these non-finance personnel were in a position to know that Sonus was purportedly committing accounting fraud, Plaintiff (who obviously knows who the sources are) instead offers only confusing double-negatives and speculation, arguing that "it does not necessarily follow" that sales and technical personnel "would not be in a position to know about the alleged wrongdoing" and offering (apparently hypothetical) "example[s]" of how non-finance personnel might acquire relevant knowledge. Opp. at 21-22.[3]

However, as Judge Saris recently recognized, confidential sources do not meet the Cabletron standard when they do not "have personal knowledge of the most important facts they allege." In re Vertex Pharms. Inc., Sec. Litig., 357 F. Supp. 2d 343, 353 (D. Mass. 2005). The "sources" in this case suffer from this precise problem. For example, the "former senior sales employee" in ¶46 of the Complaint merely states that "the fact that Sonus's senior management was 'managing' quarterly revenues was well known and openly discussed by Sonus's personnel," not that the source ever personally witnessed or saw evidence of such activity. Compare Compl. ¶46 with Vertex, 357 F. Supp. 2d at 347, 353-54 (rejecting allegation of "a common feeling among co-workers that the Company rushed compounds through the testing process" because not based on the sources' "own observations").[4] Similarly, the "former Vice

---

[2] Basing an accounting fraud complaint on information provided by non-accounting personnel may explain why Plaintiff misconstrues the application of GAAP to the relevant transactions and misunderstands the specifics of the transactions disclosed in the restatement, neither of which it denies having done. Compare Sonus Mem. at 14 n.18, 14-15, 17.

[3] These examples are deficient on their face. Even if sales people's commission compensation were somehow affected by the segregation of software deliverables or technical staff knew of changes in software deliverables, see Opp. at 22, that does not show that they were in a position to know how the Company accounted for those changes. They would therefore have no basis to know when revenue was recognized, much less whether such recognition was improper under GAAP.

[4] See also Vertex, 357 F. Supp. 2d at 354 ("Mere rumors cannot reasonably satisfy the requirement" of Cabletron).

President" in ¶44 carefully uses the passive tense to claim that "Ahmed was made aware of these improper practices" without stating whom or what purportedly made Ahmed aware. Compare Compl. ¶44 with Vertex, 357 F. Supp. 2d at 347, 353-54 (rejecting allegation that scientists "informed management" of their views that the drug would fail its clinical trials because source "does not rely on personal observations").

### B. Plaintiff Has Not Pleaded Conscious Misbehavior Or Recklessness

Even leaving aside the failure to identify sources adequately, the Complaint does not plead conscious misbehavior or recklessness because the information attributed to those sources is defectively vague as to what any Individual Defendant knew. For example, even the purportedly sourced allegations that "Sonus was simply gerrymandering results" or that revenue management was "well know and openly discussed," see Compl. ¶¶ 42, 46, provide no basis to infer the knowledge of Messrs. Ahmed or Nill. See, e.g., Fitzer v. Sec. Dynamics Techs. Inc., 119 F. Supp. 2d 12, 25 (D. Mass. 2000) (refusing to "speculate that because former employees in the corporation knew of [adverse facts], the corporate executives must also have known").[5]

Moreover, many of the allegations of wrongdoing by either Individual Defendant are not, on close reading, attributed to any source at all and therefore need not be credited. See Sonus Mem. at 12-13. Defendants previously argued that this careful drafting suggested that these sources did not in fact implicate either Mr. Ahmed or Mr. Nill, and this conclusion is now inescapable in light of Plaintiff's failure to argue otherwise.

Plaintiff's Opposition focuses almost entirely on the allegations contained in ¶44 and claims they show "that both Ahmed and Nill had actual knowledge of the wrongdoing." See Opp. at 16-19. This claim does not withstand scrutiny. The allegation that Mr. Ahmed was "made

---

[5]  Plaintiff also does not even contest that allegations regarding unspecified personnel or "Sonus" in the abstract are too generic to contribute to an inference of scienter. See Sonus Mem. at 12.

aware" of improper practices, is not only fatally vague as to who made him aware, how he was made aware and what he was told, but also does not appear to be based on the personal knowledge of any source. See Sonus Mem. at 16; supra at 2-4. Because it fails to specify the content of anything Mr. Ahmed allegedly read or anything that was allegedly said to him, the allegation is analytically indistinct from universally rejected attempts to plead scienter by allegations that defendants were aware of facts from "internal reports" whose content is unspecified. See, e.g., Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 n.38 (1st Cir. 1996) ("plaintiffs' allegations of a 'highly-efficient reporting system' may speak to the question of *how* defendants might have known what they allegedly knew, but absent some indication of the specific factual *content* of any single report generated by the alleged reporting system, do not independently provide a factual basis for inferring any such knowledge").

As to the acceptance letter that Mr. Nill *or* Mr. Hemme purportedly sent to Qwest to confirm delivery of some hardware and software, see Compl. ¶44, that allegation too is inadequate to plead scienter.[6] First, the "either/or" nature of the allegation renders it defectively vague. See Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 276 n.7 (D. Mass. 1998) ("complaint does not sufficiently identify the speaker of an allegedly misleading statement if it refers to a defendant in an 'and/or' manner"). Second, even assuming arguendo the allegation was limited to Mr. Nill, there is of course nothing improper about confirming delivery of a product, and the only thing that would make such a letter suggestive of accounting fraud is if Mr. Nill knew that the product had not in fact been delivered. Plaintiff, however, is careful not to specifically allege if or when Mr. Nill knew that product had not been delivered. See Compl. ¶44 (alleging only that "product had not been delivered" without specific allegation of knowledge).

---

[6] Plaintiff does not even acknowledge that the acceptance letter was purportedly sent sometime before the class period (in Q3 or Q4 2001). See Compl. ¶44. This allegation provides no basis to infer that the product had not been delivered before the end of the year, and therefore is inadequate to plead that the first class period statement incorrectly included revenue from this purportedly undelivered product. See Sonus Mem at. 15-16.

Third, even if the ¶44 allegations can be read to assert such knowledge, they are defective because they are based on information from an inadequately identified source -- a "former senior Sonus employee" from an unspecified department with unidentified job responsibilities. See Sonus Mem at 9-11.[7]  Fourth, even crediting the source, the Complaint does not provide any detail as to when, from whom or how Mr. Nill learned that product had not been delivered, making this allegation indistinguishable from a general averment of knowledge that has long been held insufficient to plead scienter.  See Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992).

In sharp contrast to these vague allegations regarding the Individual Defendants' knowledge of any accounting problems (which Plaintiff argues the hardest, see Opp. at 18, 22-23), the accounting fraud cases in which this Court has previously found scienter have included specific allegations regarding the defendants' knowledge.  See In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 145-46 (D. Mass. 2001) (upholding allegations of inventory parking and improper revenue recognition where a named source stated that the defendant CEO personally witnessed employees loading products onto trucks at close of quarter, another named source was told by the defendant CEO that the company recognized revenue as soon as the products were loaded on the trucks, and CEO and other defendants had access to distributor's computer system that tracked sell-through of orders to final customers); Blatt v. Muse Techs., Inc. No. Civ.A. 01-11010, 2002 WL 31107537, at *10-11 (upholding allegations of improper revenue recognition where plaintiffs possessed draft restatements prepared by the company but not filed, which admitted that the company's subsidiary had not recognized revenue in compliance with GAAP).

---

[7]     The Complaint also does not indicate how this same person would have any knowledge as to why Mr. Perruse from Qwest would go along with such a scheme by making a false representation that product had been delivered when it had not been.  Nor does the Complaint (or the Opposition) suggest that other Sonus customers had any reason to go along with this purported "fraud."

Nor can Plaintiff survive dismissal by claiming that defendants acted with recklessness even if "they were totally oblivious to these issues." Opp. at 24. As this Court has previously made clear, "[w]here the plaintiff opts to prove scienter by recklessness, he must still allege, with sufficient particularity, that 'the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors.'" In re Focus, 309 F. Supp. 2d at 144 (quoting In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251, 261 (D. Mass. 2001)).[8] Rhetorical allegations about "obliviousness" do not approach this standard.[9]

### C. Plaintiff Cannot Plead Scienter Based On The Fact Of The Restatement

Plaintiff concedes, as it must, that scienter cannot be inferred from the fact of a restatement. See Opp. at 15, 25. Nonetheless, apparently recognizing its failure to plead particularized facts showing contemporaneous culpable knowledge of any accounting issues, Plaintiff attempts to circumvent this principle by asking the Court to infer scienter from various aspects of the restatement – for example, its magnitude, the fact that Sonus acknowledged prior violations of internal accounting policies, and the fact that certain resignations followed the restatement. These efforts add nothing to the scienter analysis and underscore that Plaintiff's reliance on the restatement is classic fraud-by-hindsight.[10]

---

[8] The First Circuit has also made clear that a plaintiff cannot rest on allegations that a defendant "should have known" about adverse facts without facts sufficient to raise a strong inference of "reckless disregard." See Geeebel v. FTP Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999).

[9] Plaintiff's own citation to In re Scholastic Sec. Litig. demonstrates that scienter, even of the recklessness variety, requires well-pleaded facts showing that defendants were on notice of the allegedly adverse facts. There, the Second Circuit found that the complaint adequately pleaded recklessness because it "contain[ed] detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade of Goosebumps books, while at the same time making public statements that painted a different picture." In re Scholastic Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001).

[10] Plaintiff's effort to twist the restatement into an inference of wrongdoing is clearest when it argues that the undisputed fact that the accounting issues relate to timing issues, not fictitious sales, is a "red herring." See Opp. at 3. Different types of GAAP violations, however, logically give rise to different inferences. While it might be the case that fictitious sales can only be explained by intentional misconduct, misapplication of complex timing rules gives rise to no such inference. And even in the most egregious case, facts must still be pleaded from which a strong inference of scienter can be drawn concerning one or more individual defendants or some other individual whose knowledge can be imputed to the corporate defendant.

### 1. "Magnitude" Of The Restatement

Plaintiff asks the Court to infer scienter from the "magnitude" of the restatement. See Opp. at 26. Plaintiff provides no response, however, to the substantial authority recognizing that attempts to infer scienter from the size or duration of a restatement are inconsistent with the basic principle that GAAP violations and restatements do not give rise to a strong inference of knowing or reckless wrongdoing. See Sonus Mem. at 6; see also DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) ("even a large column of big numbers need not add up to fraud"); In re Loewen Group Inc., No. Civ.A. 98-6740, 2004 WL 1853137, at *22 (E.D. Pa. Aug. 18, 2004) ("the size of a financial adjustment or loss does not by itself evidence fraud"); Kennilworth Partners L.P. v. Cendant Corp., 59 F. Supp. 2d 417, 429-30 (D. N.J. 1999) ("sheer magnitude" of restatement does not lead to inference of scienter).

### 2. Violation Of Internal Accounting Policy

Plaintiff similarly attempts to circumvent this established principle by claiming that Sonus' violation of its internal accounting policy shows scienter. See Opp. at 29-30. Because GAAP violations are insufficient to raise a strong inference of scienter, so too violation of an internal policy to only recognize revenue in accordance with GAAP, see id. at 29, obviously adds nothing of consequence.

### 3. Imputation Of Knowledge Of Accounting Problems

Next, Plaintiff asks the Court to infer scienter despite its lack of pleaded facts by touting the sweeping principle that "knowledge of accounting problems may be imputed to the Company and its directors and officers." Opp. at 27. ***Plaintiff purports to quote Judge Young's decision in Chalverus v. Pegasystems, 59 F. Supp. 2d 226 (D. Mass 1999) for this dubious proposition, even though the quoted language appears nowhere in that decision***. Even beyond this miscitation, the per se rule advocated by Plaintiff fails for a number of reasons.

- 8 -

To begin with, the argument is inconsistent with the clear law in this circuit against pleading scienter-by-status. Attributing knowledge to defendants of purportedly key or important facts is no different than alleging that defendants "must have known" facts by virtue of their positions, an allegation that the First Circuit "on numerous occasions, has determined to be inadequate." Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998); see Sonus Mem. at 9 n.8; Orton v. Parametric Technology Corp., 344 F. Supp. 2d 290, 306 (D. Mass. 2004) (insufficient to assert "that a defendant must have known about the fraud by virtue of his position of authority"); Baron v. Smith, 285 F. Supp. 2d 96, 108 (D. Mass. 2003) ("not enough" to allege that "defendants were in positions of authority and possessed insider knowledge"); In re Focus, 309 F. Supp. 2d at 144 ("Nor is scienter pleaded sufficiently by allegations that defendants 'must have known the facts solely by virtue of their positions with the issuer of the securities'").[11]

Moreover, as seen from the cases relied on by Plaintiff, any exception to the "scienter by status" rule is limited to facts regarding the company's core business or vital transactions, not the company's accounting. See, e.g., Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 6, 19 (D. Mass. 2004) (imputing to management knowledge of "systemically fraudulent sales practices" consisting of having the sales force deliver an unordered bottled water product to every customer, and charging the customer for the extra bottle unless the customer complained); Chalverus, 59 F. Supp. 2d at 235 ($50 million deal announced in press release contained undisclosed $13 million obligation, and defendants did not claim they were unaware of the obligation); Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) (inferring knowledge by management that company's "core product is technologically incapable of

---

[11] This "presumption" is also inconsistent with the strict scienter pleading requirements of the PSLRA. See Collmer v. U.S. Liquids, Inc., 268 F. Supp. 2d 718, 754 (S.D. Tex. 2003) ("the purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation [of fact's critical to core operations], without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter").

meeting requirements that are central to Itron's continued survival as a business entity"); In re Cell Pathways, Inc. Sec. Litig., No. 99-725, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000) (design of Phase III drug study).[12]

As one court noted in rejecting an extension of this exception to accounting issues:

> The Plaintiffs also argue that the individual Defendants, each of whom held top-level management positions at AFC, presumably knew about the accounting errors because they related to operations central to AFC's business. Most of the case law supporting the Plaintiffs' argument concerns representations regarding core production or sales components of a defendant's business. The Plaintiffs do not allege misrepresentations regarding production or sales, but rather allege GAAP violations. It is more tenuous to impute knowledge of cumulative accounting errors generally to operational officers and directors of a corporation. Any inference that the Director Defendants knew of the GAAP violations is also mitigated by AFC's reliance on an outside accounting firm to audit its financials. The Defendants' positions within AFC, thus, do not suggest that they had knowledge of or intent to commit any of the alleged GAAP violations.

In re AFC Enters., Inc. Sec. Litig., 348 F. Supp. 2d 1363, 1374 (N.D. Ga. 2004) (citations omitted).

Finally, the per se rule advocated by plaintiff is untenable. If knowledge of accounting problems could somehow automatically be imputed to officers and directors, then there would be no need for courts ever to analyze the scienter issue in restatement cases. Yet this is obviously not the law. This Court and others in this circuit have repeatedly held that the mere fact of a restatement is insufficient to plead scienter, and have analyzed the factual allegations of the complaint to determine if they raise a strong inference of scienter. See Sonus Mem. at 5-6 (citing cases).

---

[12] Moreover, many of the cases relied upon by Plaintiff turned not on the attribution of information to management, but on the presence of specific facts putting management on notice of the adverse facts. See, e.g., In re Providian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (plaintiffs alleged that individual defendants received specified internal reports that "should have roused the individual defendants' suspicions" about improper business practices); In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 599 (D. N.J. 2001) (plaintiffs alleged that individual defendants were involved in discussions during which "reservations were expressed about the propriety of [the company's] practices" and that one defendant "rejected recommendations that the practices stop").

### 4. Changes In Accounting Personnel

Again relying on after-the-fact developments, Plaintiff points to the departure of Mr. Nill and other employees following the Company's discovery of the accounting issues, and suggests that the Court should infer that the departures were related to "participation in [] accounting fraud." Opp. at 19 n.11. However, Plaintiff does not plead any facts concerning the basis for Mr. Nill's (or anyone else's) resignation, nor does it cite even a single case where scienter was inferred from personnel changes following a restatement. The inference suggested by Plaintiff is unwarranted in this vacuum, because changes in accounting personnel after a restatement is "unremarkable" absent "specific allegations" probative of conscious or reckless wrongdoing:

> [A]fter a restatement of earnings . . . it is unremarkable that the Company would seek to change its management team. Plaintiff can point to no particularized allegation refuting the reasonable assumption that Defendant Stone was fired simply because the errors that lead to the restatement occurred on his watch or because he failed adequately to supervise his department. Any inference beyond that is unwarranted without more specific allegations.

In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1073-74 (N.D. Cal. 2002).[13]

### 5. "Formal" SEC Inquiry

Plaintiff's similar effort to draw an unwarranted and unsupported inference from the SEC investigation becoming "formal" should also be rejected. Contrary to Plaintiff's suggestion that such change in status somehow reflects a conclusion of wrongdoing, see Opp. at 19 n.11, a formal order of investigation is required before the SEC staff can subpoena documents; it simply means that the SEC is exercising its independent regulatory authority to review the issues previously disclosed by the Company. See 17 C.F.R. 202.5 ("In [a] preliminary investigation no

---

[13] See also Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003) (rejecting plaintiff's argument that resignation of key officials was probative of scienter because they were more likely probative of the fact that company was failing); In re Cornerstone Propane Partners, L.P., 355 F. Supp. 2d 1069, 1092-93 (N.D. Cal. 2005) ("whether [executives] were terminated or resigned, these notable departures are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions"); Kurtzman v. Compaq Computer Corp., No. Civ.A.H-99-779, 2000 WL 34292632, at *32 (S.D. Tex. Dec. 12, 2000) ("Nor do the resignations of certain executives raise a strong inference of scienter. . . . [e]xecutives often resign when they have not met business objectives or for other business, professional or personal reasons, and their resignations do not mean they have committed fraud").

process is issued or testimony compelled"); see also Ferber v. Travelers Corp., 802 F. Supp. 698, 714 (D. Conn. 1992) (holding that "[i]n the absence of any additional, particularized facts, the allegation [of the existence of an SEC investigation] raises neither an inference of fraud nor a strong inference of fraud"), overruled on other grounds by Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000).

### D. The Absence of Insider Selling Is Relevant And Weakens Any Inference of Scienter

Plaintiff not only has failed to offer any facts suggesting conscious wrongdoing or recklessness, but also has come up with nothing suggesting that either Individual Defendant had the "motive and opportunity" to commit fraud. Plaintiff has not alleged that either Individual Defendant sold any of their substantial holdings of Sonus common stock during the class period, thereby weakening any inference that they were motivated to commit accounting fraud for personal gain. See Sonus Mem. at 7-8. Plaintiff's argument that the absence of insider selling is "[i]rrelevant," is belied by Crowell v. Ionics, the very case on which Plaintiff relies. See Opp. at 30. As Judge Young recently wrote, "the absence of insider trading does weaken a case for scienter." Ionics, 343 F. Supp. 2d at 15. Furthermore, the individual defendants' substantial losses on their holdings of company stock "make the case for scienter even more difficult." Id.; see also In re PEC Solutions, Inc. Sec. Litig., No. 04-1257, 2005 WL 646070, at *7 (4th Cir. Mar. 18, 2005) ("If [small stock sales by defendants and substantial losses] gives rise to a 'strong inference' of anything, it is that no scienter exists"); Guerra v. Teradyne Inc., No. Civ.A. 01-

11789, 2004 WL 1467065, at *28 (D. Mass. Jan 16, 2004) (lack of insider selling and decline in value of insider's holdings "weighs against any inference of scienter").[14]

Although not dispositive, the fact that Messrs. Ahmed and Nill did not obtain any personal benefit and instead, like every Sonus shareholder, suffered substantial losses when the accounting issues were discovered and disclosed, weighs heavily against an inference that they were at the heart of any fraudulent "scheme."

### II. The Complaint Does Not Plead That Defendants Are Statutory Sellers And Plaintiff Is Not Entitled To Discovery In Search of A Claim

As demonstrated in Sonus' opening memorandum, Plaintiff's section 12(a)(2) claim must be dismissed because Plaintiff has not alleged that Defendants are statutory sellers. See Sonus Mem. at 18-20. Plaintiff's arguments to the contrary are directly foreclosed by the First Circuit's decision in Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996), and speculation about what discovery might show is no basis to avoid dismissal.

#### A. Plaintiff Cannot Avoid Dismissal By Refusing To "Concede" That The Offering Was A Firm Underwriting

Plaintiff cannot show that any Defendant passed it title as part of the September 23, 2003 offering because that offering was a "firm commitment" underwriting, meaning that the underwriter, Goldman Sachs, sold the shares to the public. See Sonus Mem. at 18-19. As the

---

[14] Plaintiff fares not better with its generic allegations that Defendants were motivated to inflate the price of Sonus stock so they could raise capital. The weight of authority holds that no inference of scienter can be drawn from these generalized allegations of motive shared by all corporate executives. See Sonus Mem. at 7-8; Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) (rejecting allegations that secondary public offering showed motive absent personal gain to defendants); In re Capstead Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533, 564 (N.D. Tex. 2003) ("motive to raise capital . . . insufficient to support an inference of scienter"); In re Metricom Sec. Litig., No. C 01-4085, 2004 WL 966291, at *35 (N.D. Cal. Apr 29, 2004) ("[a]s numerous courts have recognized, the desire to raise capital is a generic motive held by all companies, and is therefore insufficient to establish scienter"); Salinger v. Projectavision, 972 F. Supp. 222, 233 (S.D.N.Y.1997) ("It is not sufficient ... to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising of additional capital."). The "motive" cases on which Plaintiff relies involved specific allegations regarding particular corporate goals. See Ionics, 343 F. Supp. 2d at 15 (issuer planning sale of its "Aqua Cool" bottled water operations); Gross v. Medaphis, 977 F. Supp. 1463, 1465 (N.D. Ga. 1997) ("aggressive growth strategy through acquisitions of more than 40 companies . . . us[ing] primarily its common stock as currency").

First Circuit made clear in Shaw, "the issuer in a firm commitment underwriting does not pass title to the securities." Shaw, 82 F.3d at 1215.

Plaintiff cannot overcome this clear authority by claiming that absent discovery it "cannot confirm" that the offering was a firm commitment underwriting. Opp. at 37-39. Plaintiff does not claim to have any reason to doubt that the offering was a firm commitment underwriting as disclosed in the prospectus supplement. See Sonus Mem. at 18-19 & Aff. Ex. D. Nor does Plaintiff cite a single case where a plaintiff avoided dismissal and obtained discovery merely by refusing to "concede" that an offering was a firm commitment underwriting. Compare Opp. at 39 n.21 with Maher v. Durango Metals, Inc., 144 F.3d 1302, 1307 (10th Cir. 1998) (rejecting plaintiff's argument that "the district court dismissed his claim prematurely, depriving him of the opportunity to discover facts sufficient to satisfy the § 12(a)(1) test").

Furthermore, Plaintiff presumably does not need discovery to know from whom it bought *its own* Sonus stock. Tellingly, it nowhere alleges in the Complaint (or claims in the Opposition) to have bought its stock from anyone other than Goldman Sachs. Thus, Plaintiff lacks standing to bring a claim against any Defendant under §12(a)(2), and it is irrelevant whether another investor might have purchased stock from somebody else. See, e.g., Lewis v. Casey, 518 U.S. 343, 357 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.").

**B.   Plaintiff's Allegations Are Insufficient To Plead Solicitation**

Similarly deficient is Plaintiff's claim that it has sufficiently alleged that Defendants are statutory sellers through solicitation. See Opp. at 39-42. Once again, this argument is directly foreclosed by Shaw.

- 14 -

First, Plaintiff is clearly incorrect when it decrees that its allegations "are sufficient to satisfy the broad standards articulated in *Shaw* for seller liability." Opp. at 40. The First Circuit in Shaw rejected as insufficient allegations nearly indistinguishable from those in the Complaint: defendants' "involvement in preparing the registration statement [and] prospectus," "activities necessary to effect the sale of the [ ] securities to the investing public, " and other conclusory allegations of solicitation. Compare Shaw, 82 F.3d at 1216 with Opp. at 40 (relying on conclusory allegations that defendants signed and assisted in preparing the prospectus, and engaged in unspecified selling efforts). Shaw and other decisions make clear that the Plaintiff's claim must be dismissed because it does not allege that any Defendant solicited its purchase (as opposed to purchases by other investors). See Sonus Mem. at 19-20.

Second, Plaintiff's suggestion that Defendants' mere signing of the prospectus is sufficient to state a claim, see Opp. at 41, should be rejected as an unpersuasive, minority view[15] that is inconsistent with Shaw. As noted above, the Shaw court and other Courts of Appeal have held that the proper focus of the solicitation inquiry is on the direct interaction between the purported seller and the purchaser. See Shaw, 82 F.3d at 1216; Sonus Mem. at 19-20. That is why "involvement in preparation of a registration statement" does not establish statutory seller status. See Shaw, 82 F.3d at 1216.[16] Signing a prospectus or registration statement by a corporate officer is merely a preparatory activity and does not involve any personal contact with

---

[15] Plaintiff relies on older case law from district courts in California, but more recent authority from those courts, and the weight of authority from other courts, hold that signing a prospectus does not make a defendant a seller. Compare Opp. at 41 with, e.g., Azurix Corp., 332 F.3d at 871; In re Infonet Servs. Corp. Sec. Litig., 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003); In re Musicmaker.com Sec. Litig., No. CV00-2018, 2001 WL 34062431, at *14 (C.D. Cal. June 4, 2001); In re Cendant Corp. Sec. Litig., 190 F.R.D. 331, 339 (D. N.J. 1999); In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1120 (D. Nev. 1998).

[16] Although Shaw does not specifically say that one of the defendants signed the prospectus, it is reasonable to assume that one of the non-underwriter defendants (the issuer's CEO or CFO) did so.

prospective investors. The rationale of Shaw therefore leaves no doubt that merely signing a prospectus does not make one the seller of securities.[17]

Third, Plaintiff is incorrect that "determining whether a defendant is a seller . . . is a fact-intensive inquiry requiring discovery. . . [that] should not be made on a motion to dismiss." Opp. at 40. Again this suggestion is directly contrary to Shaw, which affirmed dismissal of section 12 claims against all defendants, other than the underwriter, because the complaint did "not contain sufficient non-conclusory factual allegations which, if true, would establish that [the issuer] or the individual defendants qualify" as statutory sellers. Shaw, 82 F.3d at 1216. Moreover, Plaintiff obviously knows whether any Defendant solicited it, and the only inference from the absence of such allegations is that there was no solicitation. The claim that discovery is required lacks any merit.

## CONCLUSION

For the reasons set forth above, in Sonus' opening memorandum, and in the memoranda filed by the Individual Defendants, the Complaint should be dismissed with prejudice.

---

[17] As the Infonet Servs. court observed, the Supreme Court has noted that the difference in the statutory language of §11 and §12 strongly suggests that Congress did not intend signatories to be liable as sellers. See In re Infonet Servs., 310 F. Supp. 2d at 1101, citing Pinter v. Dahl, 486 U.S. 622 (1988). "Section 11(a) explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions." Pinter v. Dahl, 486 U.S. at 650 n.26. Section 11, of course, includes among the enumerated categories of potential defendants those who "signed the registration statement."

Respectfully Submitted,

SONUS NETWORKS, INC.

By its attorneys,

<u>/s/ Daniel H. Gold</u>
Jeffrey B. Rudman (BBO #433380)
James W. Prendergast (BBO #553073)
Daniel W. Halston (BBO #548692)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Dated: April 29, 2005

- 17 -