UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE SONUS NETWORKS, INC. LITIGATION | ) ) ) ) | Civil Action No. 04-10294-DPW (Lead Case) |
| THIS DOCUMENT RELATES TO: ALL CASES | ) ) ) ) ) ) ) ) | **FIRSTAMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br>**JURY TRIAL DEMANDED** |

#111436

### TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SONUS'S FRAUDULENT ACCOUNTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Sonus's Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    Creating An Illusion of Linear Revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.    Sonus Admits Accounting Misstatements . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.    Revenue Restatements -- Deferral Of Product Revenue . . . . . . . . . . . . 30

        2.    Revenue Restatement -- Maintenance Revenue . . . . . . . . . . . . . . . . . . 32

        3.    Revenue Restatement -- Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        4.    Revenue Restatement -- Customer Acceptance . . . . . . . . . . . . . . . . . . . 33

        5.    Revenue Restatement -- Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        6.    Expense Adjustments -- Accrued Expenses . . . . . . . . . . . . . . . . . . . . . 33

        7.    Expense Adjustments -- Restructuring Expense And Benefits . . . . . . . . 34

        8.    Valuation Of Intangibles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        9.    Impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        10.    Stock-Based Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        11.    Inventory Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        12.    Other Balance Sheet Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    D.    Sonus's False And Misleading April 2003 Public Offering . . . . . . . . . . . . . . . 37

**TABLE OF CONTENTS**
(Continued)

Page

     E.     Sonus's False And Misleading September 2003 Public Offering ............ 38

     F.     Defendant Ahmed Directly Participated In And Furthered The Fraudulent
            Accounting Practices ............................................... 39

     G.     Defendant Nill Directly Participated In And Furthered The Fraudulent
            Accounting Practices ............................................... 40

THE FRAUD BEGINS TO UNRAVEL ......................................... 42

SONUS'S FAILURE TO IMPLEMENT AND
MAINTAIN ADEQUATE INTERNAL ACCOUNTING CONTROLS ............. 47

GAAP VIOLATIONS ......................................................... 50

MATERIALLY FALSE AND MISLEADING
STATEMENTS MADE DURING THE CLASS PERIOD ...................... 56

     A.     2001 Year-End Results ............................................ 56

     B.     2002 First Quarter Results ......................................... 58

     C.     2002 Second Quarter Results ....................................... 61

     D.     2002 Third Quarter Results ......................................... 64

     E.     2002 Fourth Quarter and Year-End Results ........................... 72

     F.     Prospectus Supplement Dated April 21, 2003 ......................... 80

     G.     2003 First Quarter Results ......................................... 81

     H.     2003 Second Quarter Results ....................................... 89

     I.     Prospectus Supplement Dated September 23, 2003 ..................... 99

     J.     2003 Third Quarter Results ......................................... 99

NO SAFE HARBOR ......................................................... 110

## TABLE OF CONTENTS
### (Continued)

Page

FIRST CLAIM

    Violation Of Sections 10(b) And 20(a) Of The Exchange
    Act And Rule 10b-5 Against All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

SECOND CLAIM

    Violation Of Sections 11 And 15 Of The Securities Act . . . . . . . . . . . . . . . . . . . . . . . 115

THIRD CLAIM

    Violation Of Sections 12(a)(2) And 15 Of The Securities Act . . . . . . . . . . . . . . . . . . 118

BASIS OF ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

Lead Plaintiff BPI Global Asset Management LLP ("BPI Global"), on behalf of itself and all others similarly situated, pursuant to the Court's June 1, 2005 Order, for its First Amended Complaint, alleges as follows:

## INTRODUCTION

1.      This is a securities class action brought on behalf of all persons and entities who purchased the publicly-traded securities of Sonus Networks, Inc. ("Sonus" or the "Company") between March 28, 2002 and March 26, 2004, inclusive (the "Class Period"). The defendants are Sonus Networks, Inc., Hassan M. Ahmed, Sonus's Chief Executive Officer ("CEO") and Stephen J. Nill, Sonus's former Chief Financial Officer ("CFO"). The claims asserted are brought to remedy violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a); and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2), 77o.

2.      During the Class Period, defendants misled Sonus's public investors by disseminating a series of materially false and misleading statements concerning Sonus's revenues, earnings, profitability, and financial condition. In particular, as further alleged herein, Sonus improperly recognized revenue and made material errors in its purchase accounting, recording of impairments, recording of accrued expenses, and recording of deferred compensation. The material misstatements regarding the Company's financial results occurred in large part because revenue was recorded in quarters in which it had not been earned, in violation of Generally Accepted Accounting Principles ("GAAP") and Sonus's own publicly stated revenue recognition policy.

3.      Sonus made materially false and misleading statements in ten (10) Securities and Exchange Commission ("SEC") filings issued during the Class Period. These false and misleading SEC filings include the following: (1) Annual Report on Form 10-K for Year-End 2001, filed March 28, 2002; (2) Quarterly Report on Form 10-Q for the First Quarter of 2002, filed May 10, 2002; (3) Quarterly Report on Form 10-Q for the Second Quarter of 2002, filed August 14, 2002; (4) Quarterly Report on Form 10-Q for the Third Quarter of 2002, filed November 13, 2002; (5) Annual Report on Form 10-K for Year-End 2002, filed March 19, 2003; (6) Prospectus Supplement dated April 21, 2003; (7) Quarterly Report on Form 10-Q for the First Quarter of 2003, filed May 9, 2003; (8) Quarterly Report on Form 10-Q for the Second Quarter of 2003, filed August 14, 2003; (9) Prospectus Supplement dated September 24, 2003; and (10) Quarterly Report on Form 10-Q for the Third Quarter of 2003, filed November 10, 2003.

4.      On February 11, 2004, Sonus made an initial, albeit incomplete, disclosure of potential accounting problems. Its stock opened that day at $7.54 per share. By the close of the market on the following day, the price of Sonus shares closed at $5.39, a drop of 28.5%. When the truth about the scope of Sonus's accounting improprieties began to emerge after the close of the market on March 26, 2004, the price of Sonus shares further plummeted to close at $3.92 on March 29, 2004, a drop of 60% from its Class Period high of $9.91 on January 20, 2004. The members of the Class and Subclass as herein defined thereby sustained massive losses. By virtue of the accounting restatements it has issued, Sonus has admitted that it published materially false financial results during the Class Period. Specifically, Sonus restated its financial results for the years ending December 31, 2001 and December 31, 2002 in its Form 10-K/A (Amendment No. 1), filed July 28, 2004. Sonus also restated its financial results in this filing for the third

quarter of 2003. Sonus restated its financial results for the first quarter of 2003 in its Form 10-Q for the quarterly period ended March 31, 2004, filed July 28, 2004. Sonus restated its financial results for the second quarter of 2003 in its Form 10-Q for the quarterly period ended June 30, 2004, filed August 20, 2004. Sonus restated its financial results for the third quarter of 2003 in its Form 10-Q for the quarterly period ended September 30, 2004, filed November 9, 2004.

5.    Sonus's improper accounting practices were ongoing, pervasive and occurred with the knowledge, acquiescence and direct participation of at least two of Sonus's senior officers, defendants Ahmed and Nill. Indeed, the financial irregularities which resulted in the material misstatements of Sonus's publicly-reported financial results during the Class Period were due to an internal decision by Sonus's senior management to publicly portray Sonus's business as generating linear quarterly revenue growth, when in truth the Company's business was characterized by highly irregular, non-linear revenues. Nevertheless, the individually named defendants sought to create and maintain an illusion of linear revenue growth because they wanted Wall Street analysts and investors to believe that there was "visibility" as to the Company's future revenue streams. Sonus's senior management knew that if analysts and other investment professionals did not perceive the Company's revenue model as generating reliable, predictable revenues, they would be unwilling to make projections concerning Sonus's future revenue growth and, as a result, the market would not accord a price multiple to the Company's stock that was at least comparable to that of other growth companies which did report linear revenues. This in turn would cause Sonus's stock to trade at lower prices, thus making it more difficult and expensive for the Company to sell stock in follow-on offerings or otherwise access the capital markets to finance the Company's continuing growth and operations.

6.      For the purpose of creating the illusion of linear revenue growth, Sonus's senior finance and accounting personnel, with the knowledge, acquiescence and approval of Sonus's senior management, including defendants Ahmed and Nill, engaged in a wrongful pattern of conduct whereby they sought to "manage" the Company's reported revenues by, *inter alia*, improperly pulling in revenues from future quarters to the current quarter, and *vice-versa.* They did this by, *inter alia*, improperly executing acceptance letters and/or manipulating the shipment of software updates, oftentimes well in advance of when the updates were ready to ship or were supposed to be delivered.

7.      Subsequent to the discovery of Sonus's accounting misstatements, the Company terminated several members of its finance and accounting department, including Peter Hemme, who served as Sonus's Controller. In addition, defendant Nill, who had worked closely with Hemme in manipulating Sonus's reported revenues during the Class Period, was reassigned from his position as CFO in April 2004, until he was subsequently forced by the Company to resign. Sonus's inability to timely issue its financial statements led to the Company's delisting from the NASDAQ Market System on August 13, 2004.

8.      By restating its financial results, Sonus has admitted that the publicly-issued financial statements for each of the reported periods were not prepared in conformity with GAAP and that Sonus materially misrepresented its financial condition and results of operations. Under GAAP, the restatement of previously issued financial statements is reserved for those circumstances where no lesser remedy is available. Under Accounting Principles Board Opinion No. 20, *Accounting Changes*, restatements are only permitted to correct material accounting errors or irregularities that existed at the time the financial statements were prepared and issued.

By restating its financial statements, Sonus has admitted that each document publishing the original financial results contained an untrue statement of material fact. Thus, the restatement is an admission that each of the press releases and the annual and quarterly reports filed on Forms 10-K and 10-Q with the SEC identified in paragraph 3 hereof contained untrue statements of material fact.

9.    The public dissemination of the materially false and misleading financial information caused Sonus's shares to trade at artificially inflated prices throughout the Class Period. As the false financial results were reported throughout fiscal 2002 and 2003, Sonus's stock price increased from $2.62 at the beginning of the Class Period to a Class Period high of $9.91 per share on January 20, 2004. As the fraud was revealed and assimilated by the marketplace, the price of Sonus's stock declined to a low of $3.92 on March 29, 2004. Lead Plaintiff and all other members of the Class and Subclass sustained substantial damages as a result.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a)), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337(a), Section 27 of the Exchange Act, 15 U.S.C. §78aa, and Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

12.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §78aa, Section 22(a) of the Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation of materially false and misleading financial information, occurred in substantial part in this District. Furthermore, Sonus maintains its corporate headquarters in Chelmsford, Massachusetts, which is within this District.

13.    In connection with the acts, conduct and other wrongs complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United Sates mails, and the facilities of a national securities market.

## THE PARTIES

14.    Lead Plaintiff BPI Global purchased the common stock of Sonus during the Class Period at artificially inflated prices and sustained damages as a result of the violations of law alleged herein. Included among BPI Global's Class Period purchases were shares of newly issued Sonus common shares traceable to the Prospectus Supplement dated September 24, 2003. On August 10, 2004, the Court appointed BPI Global to serve as the Lead Plaintiff in this action pursuant to Section 21D of the Exchange Act, 15 U.S.C. §78u-4.

15.    Defendant Sonus Networks, Inc. is a Delaware corporation with its principal executive offices located at 250 Apollo Drive, Chelmsford, Massachusetts. Sonus asserts that it is a leading provider of packet voice infrastructure solutions for wireline and wireless service providers. The Company claims to offer a new generation of carrier-class switching equipment and software that enable telecommunications service providers to deliver voice services over packet-based networks.

16.    Defendant Hassan M. Ahmed ("Ahmed") is the CEO and Chairman of the Board

of Directors of Sonus. Ahmed assumed the position of CEO as of November 1998 and held such

position throughout the Class Period. He became Chairman of the Board in April 2004. From

November 1998 to April 2004 Ahmed also served as President of the Company. As CEO and

Chairman of the Board, Ahmed participated in the day-to-day operations of Sonus and exercised

control over the Company, including the issuance of the statements alleged herein to be

materially false and misleading. Ahmed was actively involved in the preparation, review, and

authorization of Sonus's publicly-reported financial statements, reports on SEC Forms 10-K and

10-Q, annual shareholder reports, and press releases. Ahmed signed various publicly-available

SEC documents containing materially false and misleading statements concerning the financial

results of Sonus as specifically alleged herein. Ahmed owned approximately 8,845,498 shares of

Sonus stock as of May 31, 2004. In addition, Ahmed was granted 2,000,000 "Securities

Underlying Options/SARs" in 2003 and 640,000 in 2001. By reason of his stock ownership and

his positions at Sonus, Ahmed was, at all relevant times, a "controlling person" of each of the

other defendants, and is therefore liable to the Class and Subclass under Section 20(a) of the

Exchange Act, 15 U.S.C. §78t(a) and Section 15 of the Securities Act, 15 U.S.C. §77o.

17.    Defendant Stephen J. Nill served as Sonus's CFO, Vice President of Finance and

Administration, and Treasurer during the Class Period. Defendant Nill was Sonus's CFO from

September 1999 until April 2004 and Treasurer from 2000 until April 2004. After information

concerning Sonus's improper accounting practices became publicly known, defendant Nill was

transferred to the position of Vice President of Operations. He later resigned at the request of the

company. As CFO, Nill was actively involved in the preparation, review, and authorization of

Sonus's publicly-reported financial statements, reports on SEC Forms 10-K and 10-Q, annual shareholder reports, and press releases. Nill signed various publicly-available SEC documents containing materially false and misleading statements concerning the financial results of Sonus as specifically alleged herein. By reason of his stock ownership and/or the positions he held at Sonus during the Class Period, Nill was, at all relevant times, a "controlling person" of Sonus, and is therefore liable to the Class and Subclass under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a) and Section 15 of the Securities Act, 15 U.S.C. §77o.

18. Ahmed and Nill are sometimes collectively referred to herein as the "Individual Defendants."

19. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases and presentations to securities analysts pertaining to Sonus and to its financial condition and/or performance. Each of the Individual Defendants had the power and influence, and exercised the same, to control the operations and disclosures made by the Company. The Individual Defendants were each provided with copies of Sonus's press releases and/or SEC filings containing materially false and misleading financial information prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Sonus's financial results, operations, and/or future business prospects or to cause and direct that such information be disseminated so that the market price of Sonus's securities would be based on truthful and accurate information.

20.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Sonus, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

21.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based

upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Sonus, each of the Individual Defendants had access to the adverse undisclosed information about Sonus's business prospects and financial condition and performance as particularized herein and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Sonus and its business issued or adopted by the Company materially false and misleading.

23.    Each of the Individual Defendants knew or was reckless in disregarding the fact that the misleading statements and omissions described herein would adversely affect the integrity of the market for Sonus securities and would artificially inflate or maintain the price of Sonus securities. Their actions and/or inaction were the proximate cause for the artificial inflation in the price of Sonus shares during the Class Period and the resultant damages sustained by Lead Plaintiff and the members of the Class and Subclass.

24.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sonus common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Sonus's business, operations, management and the intrinsic value of Sonus common stock; (ii) enabled the Company to

complete public offering(s) of its common stock during the Class Period by which Sonus raised $183 million; and (iii) caused Lead Plaintiff and other members of the Class and Subclass to purchase Sonus securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

25.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of all persons and entities who purchased or otherwise acquired Sonus common stock on the open market between March 28, 2002, the date of filing of Sonus's Form 10-K for Year Ending December 31, 2001, through March 26, 2004, inclusive (the "Class Period"), and who were damaged thereby. In addition, Lead Plaintiff brings this action on behalf of a Subclass for purposes of the claims under Sections 11 and 12(a)(2) of the Securities Act, consisting of all persons and entities who purchased or otherwise acquired newly issued Sonus shares pursuant to the Prospectus Supplement dated September 24, 2003. Excluded from the Class and Subclass are the defendants, officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sonus shares were traded on the NASDAQ market, an efficient market. While the exact number of Class and Subclass members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members of the proposed Class and Subclass. Members of the Class and Subclass can be identified from records

maintained by Sonus or its stock transfer agent and can be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class action lawsuits. As of January 31, 2004, there were 245,730,722 shares of Sonus stock outstanding. A number of securities firms followed Sonus during the Class Period, including Advest, America's Growth Capital, Goldman Sachs, Janco Partners, Legg Mason, Lehman Brothers, Pacific Crest Securities, Pacific Growth, Raymond James & Associates, Salomon Smith Barney, and Wachovia Securities. These firms issued research reports and comments on Sonus during the Class Period based on information obtained from the Company, which reports impacted the market price of Sonus securities.

27.    Lead Plaintiff's claims are typical of the claims of the Class and Subclass as all members of the Class and Subclass are similarly affected by defendants' wrongful conduct in violation of federal law as alleged herein. Lead Plaintiff and all members of the Class and Subclass have purchased and/or acquired shares of Sonus during the Class Period at artificially inflated prices and have sustained damages arising out of defendants' wrongful conduct as alleged herein.

28.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and the Subclass and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff does not have any interests antagonistic to or in conflict with the other members of the Class and Subclass.

29.    Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members thereof. Among the questions of law and fact common to the Class and Subclass are:

a.      Whether the defendants violated the federal securities laws through their acts and/or omissions as alleged herein;

b.      Whether the defendants participated in and pursued the common course of conduct and fraudulent scheme described herein;

c.      Whether the filings, reports, documents, statements, and attestations made by defendants during the Class Period misrepresented material facts about the business, performance, and/or financial condition of Sonus;

d.      Whether the defendants acted knowingly or with reckless disregard for the truth in misrepresenting material facts or, as to the claims of the Subclass, whether defendants acted negligently;

e.      Whether the market price of Sonus common stock during the Class Period was artificially inflated due to the misrepresentations complained of herein; and

f.      Whether and to what extent Lead Plaintiff and other members of the Class and Subclass suffered damages.

30.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class and Subclass members is impracticable. Furthermore, as the damages suffered by individual Class and Subclass members may be relatively small, the expense and burden of individual litigation makes it impossible for them to individually redress the wrongs complained of herein.  There will be no difficulty in the management of this action as a class action and Lead Plaintiff's counsel has substantial experience litigating similar class action cases.

31.    As for claims made by Lead Plaintiff on behalf of the Class under Section 10(b) of the Exchange Act, Lead Plaintiff relies, in part, on the presumption of reliance established by the fraud-on-the-market doctrine. The market for Sonus securities was at all times an efficient market during the Class Period for the following reasons, among others:

a.    During the Class Period, Sonus met the requirements for listing and is listed on the NASDAQ, a highly efficient market that quickly reflects all publicly available information concerning a listed company;

b.    As a regulated issuer, Sonus is required to and has filed periodic reports with the SEC. Many of these reports contained material misrepresentations and/or omitted material facts pertaining to the financial results of Sonus during the Class Period, causing the price of Sonus shares to trade at artificially inflated prices;

c.    Sonus's senior management regularly met with and provided Company-related information to stock market analysts, institutional investors, fund managers, and other market professionals;

d.    The trading volume of Sonus's common stock during the Class Period indicated that there was a liquid market for Sonus stock during the Class Period;

e.    Sonus transmitted information on a market-wide basis through various electronic media services, including issuing press releases through its own website, PR Newswire and Business Wire; and

f.    The market price of Sonus securities reacted efficiently to new information entering the market.

32.    The above facts demonstrate the existence of an efficient market for trading Sonus securities and allow the application of the fraud-on-the-market doctrine. Accordingly, with respect to the claims arising under the Exchange Act, Lead Plaintiff and the other Class members are entitled to a presumption of reliance with respect to the misrepresentations and omissions alleged herein.

### SONUS'S FRAUDULENT ACCOUNTING

#### A.    Sonus's Business

33.    As a provider of voice infrastructure products involving carrier-class switching equipment and software, Sonus is involved in the overlap between the telecommunications and software industries. Sonus's products enable voice services to be delivered over packet-based networks. Sonus characterizes "packet-based networks" as networks having the ability to transport traffic in small bundles, which provide a significantly more flexible, cost-effective and efficient means for providing communications services as opposed to circuit-based networks. Sonus described its target customers as new and established communications service providers, long distance carriers, local exchange carriers, Internet service providers, cable operators, international telephone companies, and carriers that provide services to other carriers. According to Sonus's 2001 Form 10-K, Sonus claims that use of packet-based networks "will accelerate the convergence of voice and data into the new public network."

34.    Sonus produces telecommunications software and equipment, placing it simultaneously in two highly competitive industries. Sonus became a public company by conducting an initial public offering of its shares in May 2000, raising $115 million. In so doing, Sonus received the financial benefits associated with the NASDAQ capital market and

simultaneously assumed corresponding accounting and public reporting obligations. Sonus and the Individual Defendants were well aware of the consequences of becoming a public company, including the requirement to accurately and truthfully report the financial condition of the Company at all times.

35.   As reported in *Telephony Online*, defendant Nill, Sonus's CFO during the Class Period, noted, "[o]ne of the negatives of going public is you have a new party sitting at the table: public investors." When discussing the possibility of a company disappointing Wall Street, Nill acknowledged that "[i]t will be very hard [for that company] to capture their [Wall Street analysts'] attention again."

### B.   Creating An Illusion of Linear Revenues

36.   Sonus's finance and accounting staff, with the knowledge, approval and acquiescence of Sonus's senior management, including defendant Nill, engaged in a series of financial and accounting irregularities designed to make it appear as though the Company's revenue model was capable of delivering steady, reliable revenue growth. In truth, the Company's revenues were anything but steady or reliable because of "lumpy" ordering patterns and high customer concentration.

37.   Notwithstanding the irregular nature of Sonus's revenues, Sonus's senior managers sought to create and maintain the illusion of revenue linearity by smoothing out the Company's reported quarterly revenues. They knew that in the absence of perceived revenue linearity, analysts and investors would not feel comfortable in making revenue and earnings projections for incorporation into their investment recommendations regarding Sonus's stock. It was also understood by defendants that the lack of "visibility" as to future revenues would cause

Sonus's stock to trade at lower prices than it otherwise would have because the market would not attach a high price multiple to the stock if revenues were viewed as sporadic or unreliable. Accordingly, Sonus's senior accounting and finance managers, at the behest of Sonus's senior management, devised a plan by which to smooth out Sonus's reported revenues, quarter-over-quarter, for the purpose of making it appear as though the Company's reported revenues were following a predictable, sequential upward growth curve.

38.     The goal of portraying the Company's revenue model as generating linear quarterly revenues was of overriding importance to Sonus's senior management.  According to a former Sonus officer who previously served as Vice President of Business Development and Sales, the corporate culture of Sonus was always to meet or exceed Wall Street earnings estimates by $.01 or $.02 each quarter no matter what the Company's actual performance reflected.  Indeed, throughout most of the Class Period, the Company continually represented to Wall Street that it was enjoying sequential revenue growth.  For example, on April 9, 2003, Sonus announced its Q1 2003 financial results by proclaiming that revenues had increased "27% sequentially."  Similarly, on July 10, 2003, the Company issued a press release announcing its Q2 2003 financial results.  The release quoted defendant Ahmed as saying: "'We are pleased with the progress that we made . . . particularly with our 33% sequential revenue growth."  On October 8, 2003, in its press release announcing its Q3 2003 financial results, Sonus again reiterated its drumbeat proclamation of sequential revenue growth by quoting defendant Ahmed as saying: "This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth . . . ."  These assertions were known to the Individual Defendants to be materially false when made.

39.    The illusion of linearity was also important because Sonus's senior managers had intended to raise capital by issuing shares of Sonus's common stock in follow-on offerings pursuant to a prior shelf registration, and they knew that such offerings would not be successful if the Company's revenues were deemed to be irregular and unpredictable. Therefore, it was of paramount importance to the Company's senior managers that Sonus report linear quarterly revenues, notwithstanding their occasional boilerplate risk "warnings" about the possibility of unpredictable quarter-over-quarter results. These managers knew that analysts would, in large measure, base their investment opinions and recommendations regarding Sonus's stock on the apparent linearity of revenues and the amount of deferred revenues.

40.    To accomplish their illegal plan, Sonus's senior accounting and finance staff, with the knowledge and approval of the Company's senior management, including but not limited to defendant Nill, employed accounting trickery in order to manipulate contracts to "smooth out" Sonus's otherwise serrated revenue pattern. According to a former senior sales manager who had responsibility for approximately 35% of Sonus' revenues in 2003: "They (senior management) tried to take a business with non-linear revenues and non-linear orders and perceive it to the Street as linear – they were always pulling things into the next quarter to make things linear."

41.    By their nature, Sonus's contracts involved hardware and software items, the delivery of which directly impacted the timing of when Sonus could properly record revenues. Other features of the contracts that impacted the timing of revenue recognition included customer acceptance, the provision of maintenance services, and the delivery of software updates. Under Statement of Position ("SOP") 97-2, Sonus was required to report revenues from these contracts as they were bundled, with no segregation of the hardware and software components. In

violation of GAAP, however, defendants improperly unbundled certain software delivery elements in order to manipulate the timing of revenue recognition, for the purpose of smoothing out Sonus's quarterly revenue curve.

42.    For example, at the behest of senior management, certain elements of Sonus's contract with Qwest Communications International Inc. ("Qwest") – the Company's largest and most significant contract – were improperly unbundled from the contract and treated separately so that the Company could manipulate the timing of recognition of revenue. The elements that were improperly unbundled included software updates and releases that were to be provided to Qwest. By unbundling the contract in this fashion, and making the delivery of the updates and releases subject to separate "side agreements," the Company was able to sidestep GAAP and advance the recognition of revenue under the Qwest contract and, further, manipulate the recognition of future revenues by controlling delivery of the updates and releases which had been improperly pulled from the contract. That Sonus was manipulating the Qwest contract to "manage" its reported quarterly revenues was continually discussed among the sales and technical staff members employed in the Company's Denver-based Western regional sales office, according to a senior sales director who worked in that office. The Denver office was responsible for implementing and maintaining the Qwest contract. According to a former Account Director who reported directly to an officer-level sales executive during the relevant time period, Sonus unbundled the Qwest contract in order to stage-manage the recording of the revenues. The unbundling of the contracts for the purpose of manipulating software deliverables and, ultimately, to "smooth" out reported revenues was known, and/or recklessly condoned, by the Individual Defendants.

43.    The software element of Sonus's contracts necessarily included a large deferred revenue component.  Under GAAP and the Company's own revenue recognition guidelines, deferred revenues could only be recognized upon the performance of future obligations, such as the delivery of software updates and releases required by the terms of the contracts.  According to the source identified in the preceding paragraph, Sonus was able to, and did, manipulate the timing of its reported revenues by claiming that the software updates had in fact been delivered at the time revenue therefrom was recorded.  In truth, the Qwest updates were not delivered and, in many instances, were not even ready to be delivered.

44.    Defendant Nill, working in concert with Sonus's former controller, Peter Hemme, improperly recognized tens of millions dollars in revenues under a contract with Sonus's then largest customer, Qwest.  As part of this plan, these individuals improperly recorded revenues under the Qwest contract by manipulating the supposed delivery of software releases and updates.  In truth, the updates were not in fact delivered, yet Sonus nevertheless recorded revenues as though they were, in violation of SOP 97-2.  According to a former Sonus vice president who had responsibility for, *inter alia*, the Company's soft switches (a significant component of the Qwest contract), "Sonus was simply gerrymandering results as to the Qwest contract."

45.    According to several former senior sales and technical officers and staff, including a former Sonus Vice President in charge of business development, a former sales engineer who reported directly to Sonus's Director of Engineering, and a former Vice President with responsibility for various functions within the Company's Intelligent Internet Protocol division, the misstatement of the Company's revenues resulting from these improper accounting methods

was material and ongoing. For example, defendant Nill, working in tandem with former Controller Hemme, arranged for Sonus to improperly recognize $27.5 million in Q2 2002 by recording revenues on software updates which had not been delivered to Qwest in that quarter. Similarly, the Company improperly recorded $11 million in Q4 2003 under the Qwest contract, again where the software releases had not been delivered. This unlawful practice occurred with other accounts, including a contract with ATT. This improper revenue recognition practice was known, approved and condoned by defendant Nill, who, together with former Controller Hemme, tightly controlled the revenue reporting function at Sonus, under the supervision of defendant Ahmed. According to a former accounting department employee who reported directly to Hemme, Hemme "was told to get a number" in order to make the quarter by senior Company managers, including defendant Nill.

46.    A former Sonus vice president who had responsibility for, *inter alia*, preparing and interacting with Hemme on financial statement preparation, described how, in either Q3 or Q4 2001, defendant Nill, along with former Controller Hemme, had requested that an acceptance letter be sent to Michael Perruse, a former senior vice president of Engineering at Qwest. The purpose of the acceptance letter was to purportedly confirm the delivery of approximately $18 million worth of hardware and software to Qwest, pursuant to its $100 million contract with Sonus. The letter was in fact issued, under either Nill or Hemme's signature, even though the product had not been delivered, and in fact was not even ready to be delivered. Instead, the product remained in the laboratory of Sonus's Telecom Technologies, Inc. subsidiary in Richardson, Texas, after the letter had been sent to Perruse. Perruse went along with the fraud because of certain reciprocal revenue arrangements which he had entered into with Sonus.

Letters were sent to other customers as well, including Global Crossing and XO Communications, each for the purpose of "confirming" the delivery of product or the performance of contract milestones, even though no such delivery or performance had actually occurred. In many instances, Sonus did not even have product ready to deliver at the time the revenues were booked. According to the aforementioned source, defendant Ahmed was made aware of these improper practices in 2001, specifically with regard to the Qwest contract, but took no action to stop them. As a result, Sonus was able to improperly book millions of dollars in revenues, in violation of GAAP and, in particular, SOP 97-2.

47.      The pressure by senior management to smooth out reported revenues was known within several areas of the Company, not just by accounting personnel. For example, many members of Sonus's sales staff knew about and openly discussed senior management's attempt to create a perception of revenue linearity through the manipulation of contract deliverables. The reason is because these sales personnel were constantly under pressure by senior management to pull such deliverables from the contracts and include them instead in special "side agreements" with customers. It was known and understood by Sonus's sales staff that their commission compensation would be withheld if they failed to exclude the deliverables from the contracts. This was an issue that created ill will among the Company's sales personnel. As one former senior sales account manager, who had responsibility for Sonus's Verizon contract, stated:

> "The company was pushing-out or spreading revenues across quarters to get revenue as linear as possible. This was the case with Verizon. There was always some pressure not to include all of the future deliverables. For instance, with Verizon, the 'spreading' had to do with contract maintenance terms that included software updates.

> Qwest was always an account that involved some future
> deliverable that was pushed out quarter after quarter to get revenue
> as linear as possible. I believe that there was informal
> communication involved outside of the contact. XO
> Communications, I believe was another such account. Accounts
> such as Epana and IDT were accounts where some salespeople
> complained that they were not going to get their commissions
> because the future deliverable if left in the contract would delay the
> contract from being recognized."

48.     Sonus's accounting shenanigans were widespread and commonly known throughout the Company. For example, according to a former accounting department employee who reported directly to Hemme, Hemme materially overstated Sonus's reported revenues on its contract with AT&T in Q4 of 2003. He did so by manipulating the delivery of various features under the contract. According to the aforementioned source, "Hemme was taking sales into revenue that were not there." It was also well-known and discussed among the members of the Company's accounting department – including accounting staff members Fergus Ryan, McKenzie Lyons and Richard Sharpe – that this improper conduct had occurred with the AT&T contract, among others. This topic was frequently discussed internally among staffers within the Company, and was a subject of some concern on the part of certain accounting personnel, including Ryan and Lyons. According to the aforementioned source, the Company's revenue manipulations were part of an ongoing pattern and practice at the Company.

49.     The accounting misconduct occurred at the behest and under the direction of Sonus's senior management. Throughout the Class Period, defendant Ahmed, Sonus's CEO, knew or at a minimum was reckless in disregarding that Sonus had improperly manipulated its revenues by booking sales on software releases under the Qwest contract that were in fact not delivered at the time the revenues had been recorded. Ahmed approved of the plan to "smooth

out" Sonus's reported revenues because he was the person within the Company who had primary responsibility for interfacing with Wall Street analysts, and he was intent on making analysts believe and report that the Company's revenues were, for the most part, linear between reporting periods.

50.    According to several former employees, including a former Account Director who reported directly to the Vice President of Sales, a former regional Sales Director who reported directly to a regional Vice President of Sales, and a sales engineer who reported directly to the Company's Director of Engineering, the fact that Sonus's senior management was "managing" quarterly revenues was well known and openly discussed by Sonus's personnel, including the sales and technical personnel involved with servicing the Qwest contract.  These individuals knew and discussed that senior management was under pressure to report continual quarterly growth to Wall Street, notwithstanding the significant downturn in spending by major telecom companies in 2001 and 2002 and the fact that certain customers would fall out of the market from time to time, which, in the absence of defendants' ability to orchestrate the "borrowing" of revenues between quarters, would have caused severe gyrations in reported revenues.  The pressure on salespeople not to include certain deliverables as terms in the contracts was intense and across-the-board, with salespeople being threatened with having their commissions withheld if they failed to exclude such deliverables as contract maintenance from the contracts.  According to a former senior sales manager with responsibility for a significant contract with one of Sonus's larger telecom customers, at least 10 to 15 different salespeople had complained at one time or another about the overt pressure that they received from Sonus's management to improperly pull-out contract deliverables and make them subject to special, undisclosed side-agreements.  This

source also quoted Hemme as repeatedly telling salespeople that "if you can get away from not including future deliverables in contracts – do it!"

51.    To further accommodate defendants' illegal revenue reporting scheme during the Class Period, a former Account Director who reported directly to the Vice President of Sales described how Sonus began the practice of segregating out future "deliverables" from its major contracts, including the Qwest contract, for the purpose of "pushing" reported revenues. This practice violated GAAP and SOP 97-2. Under SOP 97-2, the Company could not properly recognize revenues under the contracts if there were any unmet future obligations, including the obligation to deliver software releases, which would then render the seller's obligations under the contract incomplete or indeterminable. In order to make an end-run around SOP 97-2, Sonus's senior accounting and finance management, including defendant Nill, approved of a practice of pulling out Sonus's obligations to provide future deliverables (i.e., software updates and releases) from the contracts, and instead would agree to deliver them as part of special "side deals." In this way, defendants were able to spread revenues over several reporting quarters, instead of waiting until such time that the software updates had in fact been delivered. According to the aforementioned source, this improper practice occurred in connection in the Company's contracts with Qwest, XO Communications, Epana, IDT and Verizon, among others.

52.    The following graph highlights the linearity of Sonus's reported revenues during the Class Period, as compared to how they should have been reported (per the restatement):



**C.    <u>Sonus Admits Accounting Misstatements</u>**

53.    During the Class Period, Sonus engaged in a variety of improper practices which were designed to make its financial results look attractive to existing and/or potential investors. According to Sonus's own February 11, 2004 press release, "Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods. . . . Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a

#111436

26

result of this reassessment." Echoing the February 11, 2004 press release, on March 29, 2004,

Sonus announced that:

> Sonus Networks is performing a detailed review of the timing of
> revenue recognized from customer transactions and of other
> financial statement accounts. The revenue issues under
> examination relate to the proper timing of revenue recognition . . .

On June 29, 2004, Sonus "announced that it has received a formal order of private investigation

from the Securities and Exchange Commission. . . . The matter has been the subject of an

informal inquiry by the Commission." On July 19, 2004, Sonus announced as follows

> As a result of the financial review, Sonus will restate its
> consolidated financial results for fiscal 2001 and 2002, and the first
> three quarters of fiscal 2003. As previously reported, the primary
> impact of the restatements is the adjustment to the timing of
> revenue recognition and certain other financial statement accounts.
> Principal adjustments to revenue relate to the timing of revenue
> where the revenue has been deferred and recognized in subsequent
> periods. In addition, other restatements include adjustments to
> purchase accounting, impairments, accruals and deferred
> compensation.

On July 28, 2004, Sonus reported its financial results for the fourth quarter and fiscal year ended

2003 and for the first quarter of fiscal year 2004. The press release indicated that "the primary

impact [previously announced] of the restatements is the adjustment to the timing of revenue

recognition and certain other financial statement accounts. Principal adjustments to revenue

relate to the timing of revenue where the revenue has been deferred and recognized in subsequent

periods. In addition, other material restatements include adjustments to purchase accounting,

impairments, accruals, and deferred compensation."

54.     Financial results for the third quarter of fiscal year 2003 likewise were restated

and are contained in Sonus's Form10-K/A (Amendment No. 1) filed July 28, 2004. Sonus's

2003 Form 10-K/A begins with an introductory explanation of the reasons for Sonus's decision

to restate its previously issued results:

> During the course of our review and the audit committee's
> investigation, we determined that the accounting with respect to
> certain prior period transactions required adjustment.  As a result,
> we have restated our consolidated financial statements for the years
> ended December 31, 2002 and 2001 and the nine months ended
> September 30, 2003.  The restated financial statements include a
> number of adjustments, the largest of which relate to revenue,
> deferred revenue, inventory reserves, purchase accounting,
> impairments, accrued expenses and stock-based compensation.
> Adjustments to revenue result primarily in revenue being deferred
> and recognized in subsequent periods.  Adjustments to inventory
> and accrued expenses are primarily to increase or decrease reserve
> levels previously reported.  Adjustments to purchase accounting,
> impairment, and stock-based compensation relate primarily to the
> timing of expense recognition.

     55.     The explanatory section of the Form 10-K/A (Amendment No. 1) also states: "In

connection with our restatement, we and Ernst & Young LLP, our independent auditors,

identified and reported to our audit committee significant internal control matters that

collectively constitute 'material weaknesses.' . . . ." These material weaknesses were described

as follows:

> We have identified material weaknesses in our controls and
> procedures, which, if not remedied effectively, could seriously
> harm our business.  Management and our independent auditors
> have concluded that our controls and procedures had material
> weaknesses as of December 31, 2003.  We have commenced the
> design and implementation of new and enhanced controls and
> procedures to address those material weaknesses.

Sonus later commented on the discovery of problems with its controls and procedures in its Form

10-Q for the quarterly period ended March 31, 2004:

> In connection with the restatement of our consolidated financial
> statements for the years ended December 31, 2002 and 2001 and

> the nine months ended September 30, 2003, we and Ernst & Young
> LLP, our independent auditors, identified and reported to our audit
> committee significant internal control matters that collectively
> constitute "material weaknesses." These internal control matters,
> any one or more of which may individually or together constitute a
> material weakness, include: insufficient contract review and
> documentation; inadequate supervision and review within the
> finance and accounting department; inadequate segregation of
> duties; insufficient supporting documentation for and review of
> account reconciliations; lack of adequate controls over cash
> receipts; lack of adequate technical accounting expertise;
> insufficient equity review procedures and documentation; flawed
> foundations for accounting estimates; and inadequate quarterly and
> year-end financial statement close and review procedures.

56.    Sonus thereby acknowledged that its internal control and disclosure procedures

that related to disclosures and statements made by Sonus during the Class Period were materially

deficient. Sonus discussed these weaknesses again in its Form 10-Q for the quarterly period

ended June 30, 2004, filed August 20, 2004: "Management and our independent auditors have

concluded that our controls and procedures had material weaknesses as of June 30, 2004. . . ."

Sonus again described its control and disclosure procedures as materially weak: "we have

identified material weaknesses in our internal controls and procedures, as they existed as of June

30, 2004." Furthermore, Sonus stated that:

> Based on the evaluation of the effectiveness of our disclosure
> controls and procedures as of June 30, 2004, which included an
> evaluation of the effectiveness of our disclosure controls and
> procedures applicable to the periods covered by the filing of this
> periodic report, and subject to the information set forth in this Item
> 4, our principal executive officer and co-principal financial officers
> have concluded that our disclosure controls and procedure were
> inadequate. . . .

In its Form 10-Q for the quarterly period ended June 30, 2004, Sonus thereby again confirmed that its disclosure controls and procedures were materially inadequate and ineffective during the Class Period.

57.    Sonus's Form 10-K/A further admits that "[w]e do not anticipate amending our previously filed annual reports on Form 10-K or our quarterly reports on Form 10-Q for any periods prior to 2003. The consolidated financial statements and related consolidated financial information contained in previously filed reports, including for the years ended December 31, 2002 and 2001, and for the quarterly reports during 2002 and the first three quarters of 2003 **should no longer be relied upon**." (emphasis added).

### 1.    Revenue Restatements -- Deferral Of Product Revenue

58.    In Sonus's 2003 Form 10-K/A, Sonus admits to:

> [D]eferr[ing] revenues of $36.7 million previously reported in 2001 from a particular customer transaction. The amount of $27.5 million was subsequently recognized in the second quarter of 2002, while the remainder was allocated to maintenance revenue and recognized over the period the services are provided. This transaction involved a complex multiple element arrangement that requires significant analysis with respect to the facts surrounding the transaction and technical accounting analysis to determine when revenue should be recognized. We previously recognized revenue in 2001 under this contractual arrangement upon delivery and acceptance of certain product and software releases. As a result of a comprehensive review and analysis of this arrangement, and based on the application of complex revenue recognition guidance, we have now determined that there was insufficient support to establish vendor specific objective evidence of fair value (VSOE) with respect to certain undelivered software releases and we have determined the existence of certain previously unidentified specified software releases. As a result, we have deferred product revenues associated with products and software releases shipped to this customer in 2001 until the second quarter of 2002, when all software releases under the arrangement were delivered.

Sonus thereby admitted that recognizing $36.7 million in revenue in 2001 from a "particular customer transaction" *i.e.*, Qwest, was improper because a portion of that revenue should not have been recognized by Sonus until the second quarter of 2002 and the remainder should have been recognized on an allocated basis covering the period when the services were provided.

59.    Sonus again improperly recognized revenue with this same customer (Qwest) in the fourth quarter of 2002. According to Sonus's 2003 Form 10-K/A:

> In the fourth quarter of 2002, [Sonus] amended our arrangement with this customer to include, among other items, certain additional future software releases. We previously recognized revenue from this arrangement in the fourth quarter of 2002 and in each of the first three quarters of 2003 upon delivery of the products and software releases. Upon review and analysis of the arrangement, we have determined that, based on a technical analysis of software revenue recognition rules, that VSOE [vendor specific objective evidence] was not established for certain undelivered software releases. As a result, we have deferred revenues of $16.2 million associated with products and software releases shipped to this customer during the fourth quarter of 2002 and the first three quarters of 2003. We recognized $10.9 million of those revenues in the fourth quarter of 2003 when the final software release specified in the amendment was delivered to the customer, and the remaining amount was deferred and allocated to maintenance and estimated discounts on future purchases.

Sonus improperly recognized $16.2 million in revenue from this customer (Qwest) at the outset of the contract. Pursuant to the restatement, recognition of $10.9 million of that revenue should have been delayed until the fourth quarter of 2003. The remaining amount was allocated to maintenance services and future discounts.

60.    Transactions relating to this single customer show that Sonus improperly recognized $52.9 million of revenue.

//

### 2.    Revenue Restatement -- Maintenance Revenue

61.    Many of Sonus's transactions with customers involved receiving revenue for both the delivery of product as well as the provision of maintenance services as part of a bundled offering. Sonus's Form 10-K/A indicates that certain customer transactions involved maintenance services offered to customers at no charge or at discounts, but the associated fair value of the transaction was not properly allocated between product revenue and maintenance revenue. This resulted in revenue associated with the value of the undelivered maintenance services not being properly recognized over the entire service period. The restatements include the reclassification of product revenue to service revenue over the applicable periods. Furthermore, other customer transactions allocated insufficient value to maintenance. Sonus has now reclassified revenues from product revenues to service revenues for applicable periods. The restatement has reclassified revenue relating to the value of undelivered maintenance services originally set out in the second quarter of 2002 and the fourth quarter of 2003. This revenue has been re-allocated so as to apply "over the five-year period in which the maintenance services are provided."

### 3.    Revenue Restatement -- Delivery

62.    Certain Sonus transactions involved delivering some but not all of the contracted-for products. Prior to the restatement, revenue was recognized based on the products that were delivered and deferred the remaining revenue "based on the pricing in the arrangement." Pursuant to the restatement, however, Sonus has deferred all revenue in these circumstances until "all elements of the transaction were delivered."

//

### 4.    Revenue Restatement -- Customer Acceptance

63.    Sonus has admitted that revenue was recognized in a period other than when the customer accepted product or contingencies were settled. Sonus restated this revenue so as to be "recorded in the period in which customer acceptance occurred or other contingencies were resolved." Sonus has further admitted that it actually recognized revenue for some products that had never been accepted by the customer.

### 5.    Revenue Restatement -- Other

64.    The "Other" category involves errors affecting revenue. Sonus's 2003 Form 10-K/A indicates that the Company has identified situations involving Sonus providing equipment to satisfy a contractual requirement and an incident involving a customer providing equipment to Sonus as part of a contractual renegotiation. The restatement reflects adjustments relating to these errors.

### 6.    Expense Adjustments -- Accrued Expenses

65.    Sonus's improper accounting was not limited to manipulating timing and other factors concerning revenue. Sonus also improperly allocated its expenses, requiring a thorough restatement of various types of expenses. Sonus's Form 10-K/A has admitted to adjusting:

> accrual balances as the result of: (1) using more appropriate
> business assumptions to estimate certain liabilities, such as
> warranty reserves and post-shipment obligations to customers; (2)
> in those instances lacking available foundation or support for
> recorded balances at the time the original accrual was established,
> using currently known information, including actual disbursements
> and contemporaneous documentation in order to record the
> appropriate balances, such as royalties and professional fees; and
> (3) appropriately classifying certain balance sheet items, such as
> customer deposits to deferred revenues.

Sonus improperly accounted for accrued expenses and made specific adjustments for employee

compensation and related costs, professional fees, royalties, warranty reserve, post-shipment

obligations to customers, customer deposits, and other accrued expense categories. These

expense categories are identified in Sonus's Form 10-K/A as follows:

| Accrued Expense Category | Dec. 31, 2001 | Dec. 31, 2002 | Sept. 30, 2003 |
|---|---|---|---|
| Accrued expense adjustments – increase/(decrease) for: | | | |
| Employee compensation and related costs | $1,217,000 | $208,000 | ($991,000) |
| Professional fees | ($1,544,000) | ($1,239,000) | ($1,080,000) |
| Royalties | ($1,360,000) | $1,492,000 | $1,163,000 |
| Warranty reserve | ($2,378,000) | ($3,385,000) | ($3,109,000) |
| Post-shipment obligations to customers | ($2,800,000) | ($2,527,000) | ($2,527,000) |
| Customer deposits | -- | ($7,240,000) | ($6,576,000) |
| Other | ($2,360,000) | ($4,199,000) | ($2,333,000) |
| **Total Accrued Expense Adjustments** | **($9,225,000)** | **($16,890,000)** | **($15,453,000)** |

### 7.    Expense Adjustments -- Restructuring Expense And Benefits

66.    Sonus dramatically and improperly allocated restructuring expenses and

associated benefits. As stated in its Form 10-K/A:

> [Sonus] determined that a restructuring benefit of $16,557,000 for
> a lease renegotiation originally recorded in 2002 should have been
> recorded in 2001. In addition, we reduced 2001 restructuring
> expense and related accruals by $1,929,000 related to balances that
> lacked support and increased 2002 expenses by $1,306,000. The
> effect of these adjustments was to reduce restructuring expense
> from $25,807,000 to $7,321,000 in 2001, and to adjust the

restructuring item from a benefit of $10,125,000 to an expense of $7,739,000 in 2002.

In other words, Sonus not only improperly recorded these items in the wrong time period, but blatantly mischaracterized them.

### 8.    Valuation Of Intangibles

67.    Sonus acquired two companies during 2001: Telecom Technologies, Inc. ("TTI") and Linguateq, Inc. ("Linguateq"). Sonus re-examined these acquisitions with the assistance of an "independent third-party appraiser." Based on this re-appraisal, Sonus allocated the purchase price into tangible and intangible assets, determining that the tangible assets should have been adjusted by $1,096,000 for a restated value of $9,392,000 and the intangible assets should have been adjusted by ($3,150,000). The purchase price for these companies should have been adjusted by a total of ($2,054,000) for a restated value of $552,576,000.

### 9.    Impairment

68.    Sonus performed an original impairment assessment on the intangible TTI-acquisition assets "in light of negative industry and economic conditions, a general decline in technology valuations, and our decisions to discontinue the development and use of certain acquired technology." The restatement reflects the result of a "new impairment assessment" that was performed "with the assistance of a new third-party appraiser" to reflect the new valuation given to intangible assets of TTI. The restatement's treatment of impairment reflects an adjustment of $9,102,000 or a total restated "impairment charge" of $10,950,000.

### 10.    Stock-Based Compensation

69.    Sonus improperly accounted for stock-based compensation expenses. As stated in Sonus's Form 10-K/A, "[t]hese items pertain to errors involving the amortization and recapture

of deferred compensation, the 2002 exchange of outstanding employee stock options, and

intrinsic value charges for restricted stock options grants and modifications." Sonus uses the

"accelerated method of amortizing all deferred compensation defined under Financial

Accounting Standards Board (FASB) Financial Interpretation (FIN) 28, *Accounting for Stock*

*Appreciation Rights and Other Variable Stock Option or Award Plans."* As Sonus notes in the

Form 10-K/A:

> In the event of forfeiture of a stock-based award, FIN 44,
> *Accounting for Certain Transactions Involving Stock*
> *Compensation, an interpretation of APB Opinion No. 25,* requires
> that compensation expense be adjusted to recapture the
> compensation expense previously recorded related to unvested
> stock-based awards, in the period of forfeiture. **We previously
> had not recorded recapture of any such excess compensation
> expense upon the forfeiture of a stock-based award upon
> employee termination**. As a result, we have decreased stock-
> based compensation by $229,000 for the nine months ended
> September 30, 2003, $4,926,000 in 2002 and $3,179,000 in 2001,
> in these restated financial statements, which includes the recapture
> of excess compensation related to the items discussed in the
> following two paragraphs. (Emphasis added).

Sonus has admitted to making frequent material errors in accounting for compensation-related

expenses.

### 11.    Inventory Reserves

70.    According to Sonus's 2003 Form 10-K/A, the Company "determined that our

excess, obsolete, and evaluation reserve balances were not consistently calculated and, as a result

of our review of our reserves and consideration of contemporaneous facts and circumstances, we

reduced our reserves and reduced cost of product reserves by $937,000 as of and for the nine

months ended September 30, 2003, and we increased our reserves and charged cost of product

revenues by $522,000 and $3,297,000 as of and for the years ended December 31, 2002 and

2001, respectively." Sonus did not apply consistent accounting principles with respect to inventory reserve accounting categories, resulting in significant restatements.

### 12.    Other Balance Sheet Adjustments

71.    As noted in Sonus's 2003 Form 10-K/A, "[w]e identified certain customer checks received by us prior to the end of fiscal year 2002 and the quarter ended September 30, 2003, which were deposited after the reporting period and not recorded in the period received. Accordingly, we have increased our cash and cash equivalents and deferred revenue balances by $8,078,000 and $6,971,000 as of September 30, 2003 and December 31, 2002." Sonus yet again failed to properly report revenue in the correct time period. In its 2003 Form 10-K/A, Sonus admitted as follows:

> We previously did not record deferred revenue for product shipments and related services for which customers had been invoiced but for which no revenue was recognized and for which payment had not been collected. In this restatement, customer billings for which we have a contractual right to invoice and collectibility is probable have been recorded as accounts receivable on the balance sheet, with a corresponding increase to deferred revenue. Accounts receivable and deferred revenue have increased by $2,123,000 and $90,000 at September 30, 2003 and December 31, 2002.

> We previously reported customer deposits as accrued liabilities. In connection with our review and analysis, we have determined that we should report customer deposits as deferred revenue rather than accrued expenses. Accordingly, deferred revenue has increased and accrued liabilities have decreased by $6,576,000 and $7,240,000 as of September 30, 2003 and December 31, 2002.

### D.    Sonus's False And Misleading April 2003 Public Offering

72.    On April 21, 2003, Sonus filed a Rule 424(b)(5) Prospectus Supplement to its June 25, 2001 Registration Statement and Prospectus, relating to the offering of 20,000,000

shares of its common stock. According to the Prospectus Supplement, "[t]his prospectus is part of a registration statement that we filed with the Securities and Exchange Commission, or SEC, using a 'shelf' registration process." Sonus issued materially false and misleading statements concerning its financial results by incorporating in its April 21, 2003 Prospectus Supplement previously filed SEC reports that contained material misrepresentations and/or omissions.

73.    The following Sonus documents containing material misrepresentations and/or omissions were incorporated by reference in the April 21, 2003 Prospectus Supplement: Form 10-K for the year ended December 31, 2001, Form 10-K for the year ended December 31, 2002, Form 10-Q for the quarterly period ended March 31, 2002, Form 10-Q for the quarterly period ended June 30, 2002, and Form 10-Q for the quarterly period ended September 30, 2002. The April 21, 2003 Prospectus Supplement was materially false and misleading as it incorporated by reference the materially misleading documents identified above, and otherwise made no disclosure of Sonus's revenue manipulations.

E.    **Sonus's False And Misleading September 2003 Public Offering**

74.    On September 23, 2003, Sonus filed a Rule 424(b)(5) Prospectus Supplement to its June 25, 2001 Registration Statement and Prospectus, relating to the offering of 17,000,000 shares of its common stock. According to the Prospectus Supplement, "[t]his prospectus is part of a registration statement that we filed with the Securities and Exchange Commission, or SEC, using a 'shelf' registration process." Sonus issued materially false and misleading statements concerning its financial results by incorporating in its September 23, 2003 Prospectus Supplement previously filed SEC reports that contained material misrepresentations and/or omissions.