# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
IN RE SONUS NETWORKS, INC.              )
LITIGATION                              )          Civil Action No. 04-10294-DPW
                                        )
_____)


# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT SONUS' MOTION TO DISMISS THE FIRST
# AMENDED CONSOLIDATED CLASS ACTION COMPLAINT


Jeffrey B. Rudman (BBO #433380)
James W. Prendergast (BBO #553073)
Daniel W. Halston (BBO #548692)
Peter A. Spaeth (BBO #545202)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000


Dated: September 12, 2005

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   FACTUAL BACKGROUND...................................................................................2

    A.    Sonus' Business And Relevant Accounting Principles ...........................................2

    B.    Sonus' Investigation And Initial Disclosure of Accounting Errors ........................3

    C.    Sonus' Restatement Of Its Financial Results...........................................................4

III.  ARGUMENT.............................................................................................................4

    A.    The Restatement Does Not Diminish Plaintiff's Burden To Plead a Strong
        Inference of Scienter In Order to State a Section 10(b) Claim ...............................5

    B.    Because The Individual Defendants Sold No Sonus Stock, Plaintiff Resorts To
        Generic Motive Allegations That Offer No Inference Of Scienter .........................6

    C.    Plaintiff's "Confidential Sources" And Conclusory Allegations Do Not Give
        Rise To A Strong Inference Of Scienter ..................................................................7

          1.    The Amended Complaint's Unsourced Allegations of Scienter Are, By
                Definition, Conclusory And Insufficient ......................................................7

          2.    The Plaintiffs' "Confidential Sources" Are Either Inadequately
                Described Or Their Assertions Lack Reliability .........................................9

               a)    Plaintiff's "Confidential Sources" Are Inadequately Described .....9

               b)    Even If These Confidential Sources Were Credited, Their
                    Allegations Lack Sufficient Detail to Give Rise to a Strong
                    Inference of Scienter ....................................................................12

          3.    No Accounting Allegation Is Pled With Sufficient Particularity to Be
                Actionable ...................................................................................................13

               a)    Accounting Fraud Allegations Require Transactional Specificity
                    and A Demonstration That The Defendants' Accounting
                    Judgments Were Consciously Or Recklessly Unreasonable. ........13

               b)    The Allegations of Accounting Improprieties Lack Sufficient
                    Particularization for A Strong Inference of Scienter. ...................17

IV.   CONCLUSION.........................................................................................................20

# TABLE OF AUTHORITIES

## Federal Cases

*Blatt v. Muse Technologies*,
    No. CIV. A. 01-11010-DPW, 2002 WL 31107537, Fed. Sec. L. Rep. P 92, 004
    (D.Mass.August 27, 2002) ...................................................................................................4, 5

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ...................................................................................................11

*Carney v. Cambridge Tech. Partners, Inc.*,
    135 F. Supp. 2d 235 (D. Mass. 2001) ...................................................................................7, 8

*Cheney v. Cyberguard Corp.*,
    No. 98-6879-CIV-GOLD, 2000 WL 1140306, Fed. Sec. L. Rep. P. 91, 258
    (S.D. Fla. July 31, 2000) .........................................................................................................13

*Colby v. Hologic, Inc.*,
    817 F. Supp. 204 (D. Mass. 1993) ..........................................................................................8

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .........................................................................................6

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976).................................................................................................................5

*Fidel v. Farley*,
    392 F.3d 220 (6th Cir. 2004) ...................................................................................................6

*Fitzer v. Security Dynamics Tchs.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) ......................................................................................12

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999).......................................................................................4, 5, 13, 14

*Greenstone v. Cambex Corp.*,
    975 F.2d 22 (1st Cir. 1992).......................................................................................................7

*Guerra v. Terradyne, Inc.*,
    No. Civ. A. 01-11789-NG, 2004 WL 1467065 (D. Mass. Jan. 16, 2004) ................................6

*Hayduk v. Lanna*,
    775 F.2d 441 (1st Cir. 1985).....................................................................................................7

*In re Apple Computer, Inc.*,
    2005 WL 752242, Fed. Sec. L. Rep. P. 93, 203 (9th Cir. 2005) .............................................13

*In re Blockbuster Inc. Sec. Litig.*,
No. 3:03-CV-0398-M, 2004 WL 884308, Fed. Sec. L. Rep. P. 98,206
(N.D. Tex. Apr. 26, 2004) ................................................................................................11

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002)..................................................................................5, 7, 10

*In re Corrpro Sec. Litig.*,
No. 1:02CV1198, 2003 WL 23138459 (N.D. Ohio May 27, 2003) ............................................6

*In re Focus Enhancements, Inc. Sec. Litig.*,
309 F. Supp. 2d 134 (D. Mass. 2001) ...................................................................5, 12, 14

*In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*,
103 Fed. Appx. 465 (3d Cir. July 9, 2004) ...............................................................7

*In re MSC Indus. Direct Co., Inc.*,
283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...................................................................11

*In re Peerless Sys. Corp. Sec. Litig.*,
182 F. Supp. 2d 982 (S.D. Cal. 2002)...................................................................20

*In re Peritus Software Servs., Inc. Sec. Litig.*,
52 F. Supp. 2d 211 (D. Mass. 1999) ..................................................................2, 13

*In re Segue Software, Inc., Sec. Litig.*,
106 F. Supp. 2d 161 (D. Mass. 2000) .......................................................................5

*In re Smith Gardner Sec. Litig.*,
214 F. Supp. 2d 1291 (S.D. Fla. 2002) ..................................................................14

*Lirette v. Shiva Corp.*,
27 F. Supp. 2d 268 (D. Mass. 1998) ......................................................................14

*Maldonado v. Dominguez*,
137 F.3d 1 (1st Cir. 1998)......................................................................................7

*Marra v. Tel-Save Holdings*,
No. 98-3145, 1999 WL 317103 (E.D. Pa. May 18, 1999).....................................8, 9

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000......................................................................................7

*Orton v. Parametric Tech. Corp.*,
344 F. Supp. 2d 290 (D. Mass. 2004) ...................................................................12

*Reiger v. Price Waterhouse Coopers LLP*,
117 F. Supp. 2d 1003 (S.D. Cal. 2000)...................................................................6

*Serabian v. Amoskeag Bank Shares Inc.*,
24 F.3d 357 (1st Cir. 1994) ................................................................................13

*Shalala v. Guernsey Memorial Hosp.*,
514 U.S. 87 (1995) ............................................................................................14

*Shushany v. Allwaste, Inc.*,
992 F.2d 517 (5th Cir. 1993) .............................................................................16

*Thor Power Tool Co. v. C.I.R.*,
439 U.S. 522 (1979) ..........................................................................................14

*Van Ormer v. Aspen Tech., Inc.*,
145 F. Supp. 2d 101 (D. Mass. 2000) ................................................................10

*Wietschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003) .......................................................11, 20

<u>Federal Statutes</u>

15 U.S.C. § 78u-4(b)(1) .............................................................................................8

15 U.S.C. § 78u-4(b)(2) .............................................................................................5

<u>Other Authorities</u>

SEC Staff Accounting Bulletin No. 101 .............................................................14, 15

# I.    INTRODUCTION

If this Court's instructions were followed, the August 5, 2005 First Amended Consolidated Class Action Complaint ("Amended Complaint" or "AC") should be – after the eighteen months since this action first commenced – the plaintiff's "best shot" at filing a complaint sufficient to meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").[1] But the Amended Complaint, like the original, continues to rely on unsourced, conclusory allegations or on unnamed sources lacking any indicia that the source was in any position to make the attributed assertion.  With these deficiencies, the Amended Complaint lacks any facts to support a "strong inference" that any defendant knowingly committed or was reckless as to any misconduct.  In fact, even though the Company's Restatement details how much revenue was moved to which quarters and for what reason, plaintiff – not surprisingly given the complexity of the accounting issues – still cannot plead with sufficient particularity any fraudulent transaction, much less knowledge of any fraud by the individual defendants.

Rather, plaintiff continues to resort to colorful adjectives and vague rumors to support its argument that the defendants knew all along what they subsequently discovered and announced – that the Company's financial statements were inaccurate because revenue had been recognized in the incorrect quarter.  For well-pleaded facts, plaintiff instead relies on conclusory assertions of "accounting trickery" and "revenue manipulation" supposedly motivated by the desire to create the "illusion of linear revenue growth."  The deficit of facts in the Amended Complaint, however, cannot be overcome by such generically described motives, particularly when neither individual defendant sold even a single share of stock during the two-year class period and when the Amended Complaint fails to cite a single document or conversation putting either individual

---

[1]    See June 1, 2005 Motion to Dismiss Hearing Transcript ("HT") at 31:5-15, attached as Exhibit ("Ex.") A to the Affidavit of James W. Prendergast ("Aff."), submitted herewith.

defendant on notice of any "accounting trickery." When the innuendo is stripped away, there are no facts establishing any misconduct let alone linking any defendant to any misconduct, nor any adequately described sources. In the end, the Amended Complaint rests wholly on insufficient hindsight – i.e., Sonus restated its revenues, so it must have known earlier that they were inaccurate. Such pleading fails under the PSLRA.[2]

## II.    FACTUAL BACKGROUND

### A.    Sonus' Business And Relevant Accounting Principles

Sonus, a Delaware corporation headquartered in Massachusetts, is a provider of voice infrastructure solutions that enable voice services to be delivered over packet-based networks. (AC ¶ 15). Sonus provides its customers with products pursuant to complex contractual arrangements involving multiple elements (such as hardware, software, software support and maintenance and other services) that are delivered over time.

Sonus accounts for these transactions in accordance with Statement of Position ("SOP") 97-2 (Aff. Ex. B). (AC ¶¶ 41, 107). Under SOP 97-2, and as set forth in greater detail below at Section III (C)(3), *infra*, revenue allocated to an element of a multiple element arrangement should be recognized whenever certain specified criteria judged to have been met. See id. ¶ 95; Aff. Ex. B (SOP 97-2 ¶ .08). Among other criteria, an element must be delivered before recognizing revenue for that element. In a multiple element arrangement, a company must determine (1) the elements that are part of the arrangement; (2) whether each element of the arrangement has vendor-specific objective evidence ("VSOE") of fair value so that the total

---

[2]    With the failure of plaintiff's underlying Rule 10b-5 claims, plaintiff's § 20(a) "controlling person" claim must also fail. See In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 230 (D. Mass. 1999). Similarly, plaintiff's failure to plead with particularity is also fatal to its section 11 and 12 claims for the reasons described in the separate memoranda filed by Messrs. Ahmed and Nill, whose arguments Sonus incorporates by reference.

contract revenue can be accurately allocated among the elements; (3) if delivery of an element has been completed; and (4) whether and when revenue attributable to certain delivered elements can be recognized when other elements, such as maintenance services, will be delivered over time. SOP 97-2, Aff. Ex. B. Needless to say, these determinations require the application of complex accounting rules to complex contract arrangements with customers. These determinations necessarily require both accounting expertise and judgment by the company's finance organization and its independent auditors.

**B.    Sonus' Investigation And Initial Disclosure of Accounting Errors**

On January 20, 2004, Sonus announced that it was delaying the release of its financial results for the fourth quarter and year 2003 pending completion of its 2003 audit. (AC ¶ 79). Thereafter, on February 11, 2004, Sonus issued a press release announcing that it had identified actions of certain employees that might affect its previous financial statements; that it was undertaking a detailed review of certain financial statement accounts; that the Company had terminated certain non-executive employees; that its Audit Committee was conducting an independent investigation; and that Sonus had notified the SEC of that investigation. (Id. ¶ 80). The very next day, on February 12, the first of 20 securities fraud complaints was filed, alleging that Sonus and certain of its officers had knowingly committed accounting fraud.

In the ensuing months, Sonus conducted a detailed review of certain financial statement accounts, and the Audit Committee conducted its internal investigation, giving the public periodic status reports. (Id. ¶¶ 81, 82, 86). On July 19, 2004, the Company announced that it had completed the review of its financial statements, that the Audit Committee had completed its internal investigation, and that it would restate its financial results for 2001 and 2002, and the first three quarters of 2003. (Id. ¶ 86). On June 15, 2005, the SEC terminated its own investigation with the recommendation that no action be taken against the Company.

### C.    Sonus' Restatement Of Its Financial Results

On July 28, 2004, Sonus filed a Form 10K/A with the SEC, restating its financial results for fiscal years 2001 and 2002 and the first three quarters of fiscal year 2003. (Id. ¶¶ 4, 53, 54.)  The impact of the restatement on product revenue was an adjustment to the timing of recognition, and not whether the sales were *bona fide* or product had been delivered.  (Id. ¶¶ 53, 54, 86.)  The Company concluded during its detailed review that at the time certain revenue had been recognized, it should have considered certain software features as separate elements in certain multi-element customer arrangement, had insufficient support to establish VSOE for these separate elements and, therefore, should have deferred the revenue associated with previously delivered products until these other software features under the arrangement were delivered.  (Id. ¶¶58, 59).[3]

### III.    ARGUMENT

Plaintiff conspicuously refuses to follow the form of an appropriate securities fraud complaint – identifying particular statements by Sonus during the class period, and, AS TO EACH STATEMENT, identifying specific contemporaneous facts known to the individual defendants that rendered those statements false or misleading.  Greebel v. FTP Software, Inc., 194 F.3d 185, 191 (1st Cir. 1999) (PSLRA requires statement-by-statement analysis); Blatt v. Muse Technologies, No. CIV. A. 01-11010-DPW, 2002 WL 31107537 at *6, Fed. Sec. L. Rep. P

---

[3]    For example, the Company had previously recognized $27.5 million of revenue in 2001 upon actual delivery and acceptance of certain products under a complex multiple element arrangement with one of its customers.  After a comprehensive, technical accounting analysis of this transaction, the Company determined that the arrangement included the future development of certain additional software features and there was insufficient support to establish VSOE with respect to those software features.  As a result, in the restatement, the Company deferred revenue associated with the products that it had originally delivered in 2001 until the second quarter of 2002, when the remaining software features under the arrangement had been delivered. (Id. ¶ 58).  Similarly, Sonus deferred $10.9 million in revenues that had previously been recognized upon delivery of products in the fourth quarter of 2002 and each of the first three quarter of 2003 until certain other specified software features were delivered in the fourth quarter of 2003. (Id. ¶ 55).

92, 004 (D.Mass. August 27, 2002) ("In this circuit, securities fraud cases are 'decided by a statement-by-staement analysis in which the inquiry made is restricted to the immediate context of each statement") (citations omitted).  Instead, plaintiff sweepingly alleges that all of Sonus' statements were false, and then serves up a host of disconnected allegations about accounting irregularities that are not tied to any financial statement or any number that was restated, are insufficiently tied to any individual defendant, are unsourced or supported only by sources whose reliability is insufficiently pleaded, and that fail to plead the transactional and accounting details necessary to establish a strong inference of scienter.[4]  For these and other reasons set out below, the Amended Complaint should be dismissed.

### A.    The Restatement Does Not Diminish Plaintiff's Burden To Plead a Strong Inference of Scienter In Order to State a Section 10(b) Claim

Under Section 10(b), there can be no liability without scienter, "a mental state embracing intent to deceive, manipulate, or defraud."  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976), reh'g denied, 425 U.S. 986 (1976).  A Section 10(b) claim fails unless a plaintiff alleges "with particularity facts giving rise to a strong inference" that the defendants acted with scienter.  See 15 U.S.C. § 78u-4(b)(2).  The inference must be both reasonable and strong.  See In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002); Greebel, 194 F.3d at 195-96.  Alleging accounting fraud based on a restatement of a company's financial results, however, is classic "fraud-by-hindsight" and fails to provide the requisite strong inference of scienter.  See, e.g., In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 160 (D. Mass. 2001).[5]

---

[4]    As an aid to the Court, attached hereto as Exhibit A, is a chart summarizing, on an allegation by allegation basis, the deficiencies in the only the paragraphs of the Amended Complaint that attempt to allege scienter (see AC ¶¶ 36–51).

[5]    In fact, as the court recognized in In re Segue Software, Inc. Sec. Litig., inferring scienter from a restatement "would create a perverse incentive for management to conceal mistakes, thereby defeating a core purpose of the securities laws." 106 F. Supp. 2d 161, 169-70 (D. Mass. 2000) ("a restatement of earnings, without more, does not support a 'strong inference' of fraud, or for that matter, a weak one.")

As a corollary, and contrary to the plaintiff's refrain that the "magnitude, duration and pervasiveness" of the accounting errors "compel[] the conclusion" that defendants acted with scienter (see AC ¶ 97), neither the size nor duration of a particular accounting error changes the well-reasoned conclusion that GAAP violations are not by themselves evidence of intentional wrongdoing. See Fidel v. Farley, 392 F.3d 220, 231 (6th Cir. 2004) reh'g en banc denied (April 6, 2005) ("[a]llowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter'") (citations omitted).[6]

**B.      Because The Individual Defendants Sold No Sonus Stock, Plaintiff Resorts To Generic Motive Allegations That Offer No Inference Of Scienter**

The fact that neither Mr. Ahmed nor Mr. Nill is alleged to have sold even a single share of Sonus stock during the putative class period strongly "weighs against an inference of scienter." See, e.g., Guerra v. Terradyne, Inc., No. Civ. A. 01-11789-NG, 2004 WL 1467065 at *28 (D. Mass. Jan. 16, 2004); Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 15 (D. Mass. 2004).[7] Consequently, unable to point to any personal benefit realized by Messrs. Ahmed or Nill, plaintiff resorts to insufficient generic motives that could be imputed to any officer of a public company, claming that they sought to "manage" earnings to create an "illusion of linear revenue growth" or so that Sonus could "sell stock in follow-on offerings or otherwise access the capital markets." (See AC ¶¶ 5, 60).  Colorful phrases such as "earnings management" and "linear

---

[6]      See also In re Corrpro Sec. Litig., No. 1:02CV1198, 2003 WL 23138459, at *4 (N.D. Ohio May 27, 2003), aff'd, Stambaugh v. Corrpro Cos., Inc., 116 Fed. Appx. 592 (6th Cir. 2004) ("Plaintiff argues that restatements involving high magnitude support a strong inference of scienter. But GAAP violations alone are not enough to establish scienter."); Reiger v. Price Waterhouse Coopers LLP, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000) ("To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences.").

[7]      Mr. Ahmed and Mr. Nill beneficially owned, respectively, 8,037,091 and 1,301,510 shares of Sonus common stock as of January 31, 2002, none of which they are alleged to have sold thereafter.  See Form 14A, filed March 28, 2002 (Aff. Ex. C) at 10.

growth," however, do not suffice.  See In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.,

103 Fed. Appx. 465, 469, (3d Cir. July 9, 2004) (rejecting company's "desire to manage its

earnings in order to meet analyst and market expectations" as "general corporate motive

[insufficient] to give rise to a strong inference of *scienter*"); Novak v. Kasaks, 216 F.3d 300, 307

(2d Cir. 2000), cert. denied, 531 U.S. 1012 (2000) ("plaintiffs [cannot] proceed based on motives

possessed by virtually all corporate insiders, including . . . the appearance of corporate

profitability").

### C.    Plaintiff's "Confidential Sources" And Conclusory Allegations Do Not Give Rise To A Strong Inference Of Scienter

In this, the plaintiff's "best shot" complaint, the essential allegations of knowing or reckless

behavior remain based either on unsourced, conclusory assertions or on "confidential sources"

lacking adequate indicia of reliability.  See Cabletron, 311 F.3d at 28-30 (court should examine

"the level of detail provided by the confidential sources, the corroborative nature of the other

facts alleged …, [the] plausibility of the allegations, the number of sources, the reliability of the

sources, and similar indicia.").

### 1.    The Amended Complaint's Unsourced Allegations of Scienter Are, By Definition, Conclusory And Insufficient

"Mere allegations of fraud . . . averments to conditions of mind, or referrals to plans and

schemes are too conclusional to satisfy the requirement that fraud be pled with particularity, no

matter how many times accusations are repeated."  Hayduk  v. Lanna, 775 F.2d 441, 444 (1st Cir.

1985); see also Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992) (mere averment

that defendant "knew" a fact insufficient).[8]  "[I]f an allegation regarding the statement or

---

[8]    Similarly insufficient is the suggestion at AC ¶ 22 that scienter can be inferred from the individual defendants' "executive and managerial positions," in which they allegedly "had access to the adverse undisclosed information about Sonus's business prospects and financial condition."  See Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998) (rejecting allegations that defendants must have been aware of facts by virtue of their positions); Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 255 (D. Mass. 2001) (similar).

omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Consequently, information and belief pleadings, like the Amended Complaint,[9] must be supported by reference to documents or sources.  See, e.g., Colby v. Hologic, Inc., 817 F. Supp. 204, 212 (D. Mass. 1993) ("without specified sources or supporting facts," allegations "must be regarded as speculative and fatally defective").  In this regard, the Amended Complaint fails over and over again.[10]  Indeed, when seeking to attribute scienter to Sonus's management, the Amended Complaint offers no documentary support whatsoever and frequently neglects to offer any witness source at all – as is true with respect to virtually every allegation about Mr. Ahmed and often equally true with respect to Mr. Nill.[11]

---

[9]    Plaintiff's statement that its allegations are based upon the "investigation of Lead Plaintiff's Counsel" (AC ¶ 218) is equivalent to pleading on information and belief, and does not avoid this pleading burden.  See, e.g., Carney, 135 F. Supp. 2d at 247.

[10]    The following allegations in support of an inference of scienter, despite the requirements of the PSLRA and this Court's warnings (see Aff. Ex. A , HT at 35:16-38:3), remain both unsourced and conclusory:  AC ¶ 5 ("Sonus's improper accounting practices . . . occurred with the knowledge, acquiescence and direct participation of at least two of Sonus's senior officers, defendants Ahmed and Nill"); ¶ 6 ("Sonus's senior finance and accounting personnel, with the knowledge, acquiescence and approval of Sonus's senior management, including defendants Ahmed and Nill, engaged in a wrongful pattern of conduct"); ¶ 22 ("The Individual Defendants . . . were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature"); ¶ 36 ("Sonus's finance and accounting staff, with the knowledge, approval and acquiescence of Sonus's senior management, including defendant Nill, engaged in a series of financial and accounting irregularities"); ¶ 40 ("To accomplish their illegal plan, Sonus's senior accounting and finance staff, with the knowledge and approval of the Company's senior management, including but not limited to defendant Nill, employed accounting trickery in order to manipulate contracts to 'smooth out' Sonus's otherwise serrated revenue pattern"); ¶ 49 ("defendant Ahmed, Sonus's CEO, knew or at a minimum was reckless in disregarding that Sonus had improperly manipulated its revenues"); ¶ 87 ("All defendants knew or recklessly disregarded, throughout the Class Period, that Sonus was experiencing such pervasive deficiencies in its internal controls and accounting practices that the financial information generated for inclusion in Sonus's financial statements was grossly inaccurate and unreliable"); ¶ 91 ("the Individual Defendants knew of material problems in the Company's accounting systems"); ¶ 95 ("The Individual Defendants knowingly or with recklessness caused Sonus to materially misstate the Company's revenues . . . in violation of GAAP. ").

[11]    Remarkably, the portions of the Amended Complaint entitled "Defendant [Ahmed/Nill] Directly Participated In And Furthered The Fraudulent Accounting Practices" do not allege any facts regarding the individual defendants' knowledge or participation in any wrongdoing. (See AC ¶¶ 76-77).  Instead, these inaptly named paragraphs simply list the SEC filings signed by each of the individual defendants, which may suffice to show that they "made" the statement, but is insufficient to plead scienter.  See, e.g., Marra v. Tel-Save Holdings, No. 98-3145, 1999 WL 317103, at *6 (E.D. Pa. May 18, 1999) (dismissing complaint where the "only mention of the individual

Perhaps recognizing this fatal lack of sourcing, the Amended Complaint continues to use a sleight of hand by including within the same paragraph an allegation of scienter and a source, but without ever attributing the allegation to the source – again a deficiency that Sonus highlighted in its initial motion to dismiss. See Sonus's January 28, 2005 Memorandum of Law ("Sonus Mem.") at 12-13. For example, AC ¶ 42 asserts the existence of "side agreements" as part of the alleged "improper unbundling" of contract revenues and later asserts that the "unbundling of contracts for the purpose of manipulating software deliverables . . . was known, and/or recklessly condoned, by the Individual Defendants." But, these allegations of side agreements and "improper" unbundling are not, in fact, attributed to either of the two sources identified and are as defective as those not naming a source at all.[12]

2.    **The Plaintiffs' "Confidential Sources" Are Either Inadequately Described Or Their Assertions Lack Reliability**

a)    **Plaintiff's "Confidential Sources" Are Inadequately Described**

When the Amended Complaint finally does attempt to offer a confidential source for an allegation of scienter, it fails. To begin with, plaintiff's confidential sources plainly lack knowledge of the matters on which they purport to comment or are so insufficiently described as

---

defendants' involvement with the communication of the allegedly fraudulent statements are three averments that the individual defendants signed various annual reports").

[12]    The pattern is repeated frequently. In AC ¶ 44, plaintiff claims that "[d]efendant Nill, working in concert with Sonus's former controller, Peter Hemme, improperly recognized tens of millions [of] dollars in revenues under a contract with Sonus's then largest customer, Qwest." To the identified source in the paragraph, however, all that is attributed is the meaningless conclusion that "Sonus was simply gerrymandering results as to the Qwest contract" – whatever that may mean. Likewise, in AC ¶ 45, plaintiff lists several accounting conclusions about improper revenue recognition taken from the Company's restatement, all allegedly condoned by Mr. Nill and Mr. Hemme with knowledge of the impropriety. Yet, the identified source only vouches (allegedly) for the different proposition that some unidentified senior manager told Hemme "to get a number." See also AC ¶ 47 (alleging the existence of "special 'side agreements'" but not attributing those allegations to the "senior sales account manager" quoted later in the paragraph); ¶ 51 (failing to attribute to source cited earlier in paragraph, any of the allegations therein regarding violation of GAAP and SOP 97-2 and approval by Nill of "pulling out Sonus's obligations to provide future deliverables . . . [to be provided] as part of special 'side deals'"). As noted above, defendants previously alerted plaintiff to these defects, but the Amended Complaint continues not to attribute the specific scienter allegations in these paragraphs to the sources. See Sonus Mem. at 12-13.

to render their alleged assertions fatally unreliable.  See Cabletron, 311 F.3d at 29 (confidential

sources must be "described in the complaint with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the information

alleged").  As this Court has already observed, information from such sources is of "not much

weight." Aff. Ex. A (HT at 37:7-10).  In fact, the Amended Complaint continues to play what

this Court called "a game of chicken" in which plaintiff attempts to "see whether or not [he] can

make it past the initial hurdle" by making allegations that "simply [hang] out some description of

a job and unnamed holder of that job." Aff. Ex. A (HT at 34:6-9; 37:7-10).

        Although plaintiff's "best shot" now attempts to dress up these same old sources with

slightly more description,[13] such generic descriptions are still not enough to survive a motion to

dismiss.  Plaintiff must (but does not) plead *how* these sources possess their identified

knowledge and *why* their information is reliable.  See Van Ormer v. Aspen Tech., Inc., 145 F.

Supp. 2d 101, 105 (D. Mass. 2000) ("Allegations supported only by unidentified 'sales

managers' who got their information from unspecified sources fall woefully short of meeting

particularity requirements.")

        These deficiencies are particularly glaring because, but for two hazy exceptions,[14] none

of plaintiff's sources are alleged to have worked in Sonus' finance department, undermining not

---

[13]    Compare "former employee[s]" (Compl. ¶ 41, 42, 47) and "former senior Sonus employee," (Compl. ¶ 44, 46) with "former senior sales manager,"(AC ¶ 40), "former senior sales director" (whose information comes from "sales and technical staff members") (AC ¶ 42), and "former Account Director" and "former sales engineer." (AC ¶ 45).

[14]    Plaintiff describes only one "confidential source" as a "former accounting department employee who reported directly to Hemme" but omits the source's title or duties. To this source, two comments are attributed: (1) that Sonus' former controller Peter Hemme was "told to get a number" to make the quarter by  unidentified "senior Company managers" (AC ¶45), and (2) that Hemme allegedly overstated revenues on a contract with AT&T in Q4 2003 (AC ¶ 48). Both comments smack of water cooler gossip rather than factual assertions of a knowledgeable employee.  As to the first comment, the source never tells us what number, when, or by whom, and, more importantly, even if Hemme was told to do anything improper to get the number.  More importantly, the allegation never contends that either Nill or Ahmed knew anything about this purported instruction.  As to the second

only any basis for believing they knew how Sonus accounted for any transaction, but also any basis for believing that they understand GAAP or proper accounting – much less the complex judgments required under SOP 97-2.  See In re MSC Indus. Direct Co., Inc., 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003) (generically-described former employees or sales personnel "had [no] connection with [the Company's] accounting department or that their work responsibilities [that] would provide them a basis for knowing the details of the accounting at [the Company]"); California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 152 (3d Cir. 2004) (former employees held positions that would not appear to render them privy to the company's bookkeeping practices, let alone the specific accounting that went into the company's financial reporting").[15]  As a result, plaintiff fails to provide this Court with any "basis to rely upon the statement of [the] unnamed informant[]."  (Aff. Ex. A, HT at 33:16-17).[16]

---

comment, Sonus did not publicly report overstated Q4 2003 AT&T contract revenues. The planned January 20, 2004 earnings announcement containing these revenues was cancelled.  (See AC ¶ 79).  Therefore, the public reporting of Sonus's Q4 2003, although delayed, was never incorrect or restated, and no public statement regarding those revenues is alleged to have been false.  (See AC ¶¶ 102-177).  Rather than an inference of fraud, the postponement of the revenues announcement to ensure that the Q4 2003 numbers were accurate shows that when Sonus became aware of an accounting issue, it acted.

[15]    See also In re Blockbuster Inc. Sec. Litig., No. 3:03-CV-0398-M, 2004 WL 884308, at *13, Fed. Sec. L. Rep. P. 98,206 (N.D. Tex. Apr. 26, 2004) ("no facts [are] alleged from which one could conclude that the employees quoted were privy to how or when the costs of MOP were accounted for on Blockbuster's financial statements . . . . without further description of a district manager's job, it is not probable that a district manager would be privy to how the costs of MOP were reflected in Blockbuster's financial statements."); Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1112 (N.D. Cal. 2003) (similar).

[16]    See AC ¶ 40 (no facts tending to show how "former sales manager" might have knowledge of the revenue recognition duties and practices of the Company's management and accounting professionals); AC ¶ 42 (no attempt to explain how a "senior sales director" might be privy to any knowledge of purported accounting "manipulation or what basis he or she might have for allegations of "improper unbundling"); AC ¶ 43 (attributing allegations of revenue recognition manipulation to one of two "source[s] identified in the preceding paragraph," without saying which and without explaining how either a "sales director" or an "Account Director" might be in a position to know of purported manipulation); AC ¶ 44 (failing to specify how a "former Sonus vice president who had, inter alia, responsibility for the Company's soft switches" would have knowledge as to the contract manipulation and revenue recognition improprieties alleged in that paragraph); AC ¶ 45 (failing to indicate how a "senior sales and technical officers and staff, including a former Sonus Vice President in charge of business development, a former sales engineer . . . and a former Vice President . . . within the Company's Intelligent Internet Protocol division," all technical personnel, might possess reliable knowledge regarding "the misstatement of the Company's revenues resulting from [these] alleged improper accounting methods"); AC ¶ 46 (failing to explain how "former Sonus vice president who had responsibility for, inter alia, preparing and interacting with Hemme on financial statement

- 11 -

> **b)    Even If These Confidential Sources Were Credited, Their Allegations Lack Sufficient Detail to Give Rise to a Strong Inference of Scienter**

Plaintiff's sources, even if credited, provide no specific factual allegations from which a strong inference can be drawn that either Mr. Ahmed or Mr. Nill knew, at some earlier time, of any of the accounting errors identified in the Restatement, much less that such errors were intentional.   A number of plaintiff's sources do not even purport to describe any involvement by Mr. Ahmed or Mr. Nill in any misconduct, but rather refer to Sonus only in the abstract. (<u>See</u>, <u>e.g.</u>, ¶¶ 42, 43, 44, 47, 51).  Such allegations are too vague to plead scienter because they do not identify who purportedly engaged in any wrongdoing.  <u>See Orton v. Parametric Tech. Corp.</u>, 344 F. Supp. 2d 290, 307-08 (D. Mass. 2004) (allegations that "Parametric" improperly allocated revenue and that "Parametric management" encouraged channel stuffing insufficient for failure to identify "who" did these things).[17]

Although he is not alleged to have made any of the allegedly false public statements,  the Amended Complaint does allege that Hemme had knowledge of so-called accounting "irregularities."  Hemme's knowledge, however, cannot be imputed to Ahmed, Nill, or Sonus for the purposes of pleading scienter sufficiently.  Hemme did not make the allegedly false statements at issue nor can such statements be attributed to him under the group pleading doctrine.  <u>See</u> AC ¶¶ 19-20 (Hemme, Sonus' former controller, not a corporate officer and

---

preparation," had any knowledge of customer acceptance letters or how the nature of the employee's interaction with Hemme would provide a basis from which such knowledge could be strongly inferred); AC ¶ 47 (no basis provided to demonstrate that "one former senior sales account manager, who had responsibility for Sonus's *Verizon* contract," knew anything about the Qwest, XO, Epana and IDT accounts, how the contracts for those accounts were structured, or how revenue for those accounts was recorded); AC ¶ 50 (attributing earnings management allegations to sales and engineering employees, without alleging any basis for knowledge); AC ¶ 51 (same).

[17] <u>See</u> also <u>Fitzer v. Security Dynamics Tchs.</u>, 119 F. Supp. 2d 12, 25 (D. Mass. 2000) (refusing to "speculate that, because former employees knew of [adverse facts], the corporate executives must also have known"); <u>cf. Focus Enhancements</u>, 309 F. Supp. 2d at 145, 150 (strong inference of scienter as to inventory parking allegations where *named* source was told *by defendant CEO* that company recognized income when product was loaded on trailer).

excluded from alleged "group" exercising control over the corporation or responsible for Sonus' public statements).  See also Form 10-K filed March 19, 2003, pp. 39-42 (Items 10 and 11) (Aff. Ex. D); Form 10-K/A filed July 28, 2004 (Aff. Ex. E) at 46-52 (Items 10 and 11); Form 10-K/A filed April 29, 2005, pp. 3-10 (Items 10-11) (Aff. Ex. F) (Hemme not listed as an officer).  Only the scienter of persons who "make" statements matters for purposes of Rule 10b-5. E.g., In re Apple Computer, Inc., 2005 WL 752242  at *6, Fed. Sec. L. Rep. P. 93, 203 (9th Cir. 2005) ("A corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement  . . . We have squarely rejected the concept of 'collective' scienter in attributing scienter to an officer and, through him, to the corporation") (citations omitted).

3.    **No Accounting Allegation Is Pled With Sufficient Particularity to Be Actionable**

a)    **Accounting Fraud Allegations Require Transactional Specificity and A Demonstration That The Defendants' Accounting Judgments Were Consciously Or Recklessly Unreasonable.**

Fatal sourcing defects aside, "to support even a reasonable inference of scienter," a complaint must describe accounting violations "with sufficient particularity."  Greebel, 194 F.3d at 203.  "Courts uniformly hold that allegations of GAAP and GAAS violations are insufficient, without more, to state a securities fraud claim." Cheney v. Cyberguard Corp., No. 98-6879-CIV-GOLD, 2000 WL 1140306 at *11, Fed. Sec. L. Rep. P. 91, 258 (S.D. Fla. July 31, 2000), rev'd in part on other grounds, No. 98-6879-CIV, 2001 WL 1916564  (S.D. Fla. 2001) (quoting Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir. 1994)); see also In re Peritus, 52 F. Supp. 2d at 223).  In this district (and elsewhere), "[t]o plead financial fraud based on improper revenue recognition under GAAP adequately, the complaint must allege, 'at a minimum, some particular transactions where revenues were improperly recorded, including the

names of the customers, the terms of the specific transactions, when the transactions occurred,
and the approximate amount of the [allegedly] fraudulent transactions.'" Focus Enhancements,
309 F. Supp. 2d at 158 (quoting Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 277-278 (D Mass.
1998)).

Here, the Sonus transactions involved multiple element arrangements under SOP 97-2 in
which features for the sale of hardware, software, software support, and maintenance services
were often "bundled." (See AC ¶41).   As recognized by the SEC, however, "determining
whether an obligation represents a separate element [on which revenue can be recognized
separately] *requires significant judgment*." See SEC Staff Accounting Bulletin No. 101: Revenue
Recognition in Financial Statements – Frequently Asked Questions and Answers (1999) ("SEC
Bulletin") (Aff. Ex. G), at Question 4 (emphasis supplied).   Similarly, determining whether each
separate element has VSOE or has been delivered for purposes of revenue recognition, and thus
may be recognized separately from other elements, requires significant judgment.   In this regard,
the district court also has recognized that questions involving revenue recognition and SOP 97-2
"*entail[] a degree of unavoidable guesswork*." Segue, 106 F.Supp. 2d at 169 (emphasis
supplied). "'[G]enerally accepted accounting principles, . . . tolerate a range of 'reasonable
treatments,' leaving the choice among alternatives to management,'" and, therefore,
"[a]ccounting judgments, even imperfect ones that violate GAAP, do not, absent 'other
circumstances' support an inference of scienter." Id. at 170.[18]   Consequently, in addition to
transactional specificity, a plaintiff must allege facts demonstrating that the judgment exercised
was knowingly unreasonable. See In re Segue, 106 F. Supp. 2d at 169 (dismissing claims as

---

[18]     Citing Greebel, 194 F.3d at 205 (quoting Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544 (1979))); In re
Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291, 1302 (S.D. Fla.  2002) (allegations of GAAP SOP 97-2 violations
inadequate in absence of facts showing defendants ignored "red flags" or "warning signs of improprieties"); see also
Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 101 (1995) ("GAAP is not [a] lucid or encyclopedic set of pre-
existing rules . . . . GAAP changes and, even at any one point, is often indeterminate").

"fraud by hindsight" in absence of facts demonstrating that accounting estimates were unreasonably low or that it was unreasonable for management to rely on estimates).

Notably, however, the Amended Complaint ***never*** sets out with any specificity what is required by SOP 97-2 before a company can properly (or must) record revenues from the separate elements of a multiple element arrangement.  This is critical because recognizing revenue for separate elements of a so-called "bundled" multiple element contract is not in itself improper.  On the subject of delivery, the SEC has stated that "failure to deliver one item or perform one service specified by the arrangement" <u>does not</u> "always preclude immediate recognition of any revenue for the sales arrangement" and that *"[a] portion of the contract revenue may be recognized* where the seller has substantially completed or fulfilled the terms of a separate element of a multiple element arrangement."  SEC Bulletin, Question 2 (Aff. Ex. G). (emphasis supplied).  The analysis required by a Company necessarily involves significant judgment.[19]

Therefore, a properly pleaded Rule 10b-5 claim resting on allegations of accounting fraud under SOP 97-2 must include sufficient allegations:  (1) to specify which part of SOP 97-2 was

---

[19]    For example, the delivery element depends on the judgment of whether or not there are undelivered elements that are "*essential to the functionality of the delivered element*," because the customer would not have the full use of the delivered element. SOP 97-2.13, Aff. Ex. B (emphasis supplied).  What is "essential" is often a matter for debate.  Similarly, whether the vendor's fee (*i.e.,* the value of the separate element) is fixed depends on whether the company feels it has sufficient VSOE, regardless of any separate prices stated within the contract for each element.  Such VSOE is either (a) the price charged when the same element is actually sold separately or (b) for an element not yet being sold separately, the price established by management where it its probable that the price, once established, will not change before the separate introduction of the element into the marketplace. SOP 97-2.10. Where, as here, many of the elements of the arrangements between Sonus and its customers were not sold separately, evidence of price becomes a matter of whether in management's judgment there are indicia of value, other than actual price, sufficient to meet the requirements of SOP 97-2.  But, the Amended Complaint never once discusses whether such indicia of value were available to or believed by management, even though much of Sonus's restated revenues resulted from a reassessment of whether adequate VSOE existed when revenues were recognized originally.  <u>See</u> AC ¶¶ 40-43; Form 10-K/A, filed July 28, 2004 (Aff. Ex. F) at 5-6, F-17 – F-18 ("Sonus has now determined that there was insufficient support to establish vendor-specific objective evidence of fair value (VSOE) with respect to certain undelivered software releases . . . ;" setting forth requirements under SOP 97-2 and articulating in detail why Sonus restated under those provisions).

violated by these alleged practices, (2) to explain intelligibly *why* these practices violated SOP 97-2,  (3) to identify who at Sonus made fraudulent accounting judgments, (4) to identify *when* and *how much* revenue was improperly recognized, or (5) to identify *which* statement during the class period was materially false as a result. Shushany v. Allwaste, Inc., 992 F.2d 517, 522 (5th Cir. 1993) (complaint insufficient where it "did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into Allwaste's financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position").

At bottom, it is not enough for the plaintiff to offer conclusory assertions that Sonus "improperly unbundled" contracts (e.g., AC ¶¶ 41)[20] or "improperly pulled" elements from the contracts (e.g., AC ¶¶ 42, 47) or had not yet delivered all aspects of a separate element (e.g., AC ¶¶ 43, 45, 49).   Rather, plaintiff needs to provide (but has not provided) sufficient factual details of the allegedly offending transactions and their accounting treatment from which there is a strong inference that the defendants knowingly or recklessly made incorrect accounting

---

[20]    There is a fundamental disconnect between many of plaintiffs' allegations of "fraud" and the restatement giving rise to the complaint. Paragraph 54 makes clear that to the extent the restatement was based on past revenue recognition errors, the problem was *premature* recognition of revenue that was moved into later quarters: "Adjustments to revenue result primarily in revenue being deferred and recognized in *subsequent* periods." (Emphsis supplied). Yet the Complaint, confusingly, bounces back and forth between faulting Sonus for recognizing revenue *too soon* (e.g, AC ¶¶ 42-46) and *too late* (e.g., AC 40, 47, 51).  To the extent plaintiff claims in these allegations that Sonus "pushed out" revenues by "unbundling" contracts, its sources appear to be conflating the accounting matters at issue in the restatement with Sonus' structuring of contracts resulting in deferral of salespersons' commissions (AC ¶¶ 47, 50), which is not surprising because those sources are not in a position to comment on accounting matters.  Obviously, the latter cannot state a claim for fraud, and even if it could, "unbundling" has no talismanic significance and plaintiff must – but does not – explain how each instance of "unbundling" violated SOP 97-2 or some other GAAP provision, why the accounting judgment involved was knowingly wrong, how a public statement by Sonus was rendered materially misleading, and how the Individual Defendants were aware of the issue.

judgments.  Such an inference is impossible to make here because the Amended Complaint alleges no facts on which the defendants reached any of their SOP 97-2 judgments, such as the elements within a particular customer arrangement, "delivery" (i.e., whether undelivered elements were "essential" to the functionality of the delivered element) and VSOE.

> **b)**    **The Allegations of Accounting Improprieties Lack Sufficient Particularization for A Strong Inference of Scienter.**

Measured against the foregoing standards, the allegations of accounting violations in the Amended Complaint fall short.  Despite the generous use of the terms "GAAP" and "SOP 97-2," not one paragraph of the Amended Complaint provides particularization of any accounting violation sufficient for a strong inference of scienter.  Transaction specifics such as dates, amounts, and terms are sorely missing.  Nor are we ever told which of the multiple facets of SOP 97-2 was violated,  how a particular practice constituted a violation, or whether any such violation was material to the reported financial results of the Company.  The dates are especially important here, where plaintiff is complaining about *both* early and late recognition of revenue and indeed Sonus's restatement resulted in moving revenues both forwards and backwards.  Yet no dates (or other details) are provided.

In AC ¶¶ 41-44, plaintiff alleges that defendants, "[i]n violation of GAAP,"  "improperly unbundled certain software delivery elements," "treated them separately" from the hardware obligations in a contract with Qwest, and "manipulated the recognition of future revenues by controlling delivery of the [software] updates and releases."  Yet, all four of these paragraphs fail (1) to specify which part of SOP 97-2 was violated by these alleged practices, (2) to explain intelligibly *why* these practice violated SOP 97-2,  (3) to identify who at Sonus "claimed" software had been delivered or when or in what context, (4) to identify *which* software elements

were "unbundled" or *when* or *how much* revenue was improperly recognized,[21] or (5) to identify *which* financial statement during the class period was materially false as a result.[22]

Plaintiff substitutes rhetoric for fact, relying on the meaningless conclusions such as "Sonus was simply gerrymandering results as to the Qwest contract." (AC ¶ 44). And equally critically, Mr. Ahmed is not even mentioned in the four paragraphs. The only mentions of Mr. Nill are the conclusory allegation that "accounting trickery" was carried out with his "knowledge and approval" (see id. ¶ 40), and that he somehow "work[ed] in concert" with a non-defendant to improperly recognize revenue (see id. ¶ 44). No information is provided as to what Mr. Nill did, what he knew, or when, or how.

In AC ¶ 45, plaintiff finally purports to address a matter that was disclosed in the Restatement. Even though Sonus clearly laid out the basis for the Restatement in detail, see AC ¶¶ 58-59, and even though Sonus' original motion to dismiss explained plaintiff's misunderstanding (Sonus Mem. at 14-15), plaintiff nonetheless gets the specifics of the transaction completely wrong. Plaintiff alleges that Sonus "improperly recognize[d] $27.5 million in Q2 2002 by recording revenues on software updates that had not been delivered to Qwest" (AC ¶ 45), when in fact the revenue at issue was originally recognized in *2001* and

---

[21]    The vague reference in AC ¶ 44 to "tens of millions [of] dollars" adds little in the way of specificity.

[22]    Other allegations relating to purported GAAP or SOP 97-2 violations are equally deficient. See, e.g., AC ¶41 (no transactional facts or references to GAAP or SOP 97-2 provisions allegedly violated); AC ¶ 42 (no transactional details regarding alleged "side agreements" or how GAAP was "sidestepped"); AC ¶ 43 (no allegation of *who* manipulated timing of revenues, by *how much*, *when*, or in *what* transactions, and no mention of specific provision of GAAP or SOP 97-2 that was violated); AC ¶47 (no transactional detail regarding alleged "side agreements," "future unmet obligations," or "pushing out" of revenues and no mention of specific provision of GAAP or SOP 97-2 that was violated); AC ¶ 48 (alleged "accounting shenanigans" and "manipulations of various features" of contracts and "improper conduct . . . with the AT&T contract and others" unaccompanied by any identification of *which* of the defendants was involved, *how much* revenue might have been involved in such manipulation, *which* features of the contracts were manipulated and *how*, and whether such manipulation was material); AC ¶ 49 (allegation of "accounting misconduct at the behest and under the direction of Sonus' senior management" without transactional details or identification specific provision of GAAP or SOP 97-2 that was violated); AC ¶ 50 (allegation of earnings management without transactional details).

reclassified during the restatement as being *properly recognized in Q2 2002*. See id. ¶ 59; Form 10-K/A filed July 28, 2004 (Aff. Ex. E) at 4-5.  Plaintiff makes the same mistake with the $11 million supposedly improperly recorded in Q4 2003.  In fact, as is clear from AC ¶ 59 and the Form 10-K/A (Aff. Ex. E) at 5, $10.9 million was moved *from* previous periods *to* Q4 2003.

In AC ¶ 46, plaintiff alleges that *before the class period*, "in *either* Q3 or Q4 2001," Nill *or* Hemme requested that a letter be sent to Qwest to confirm delivery of (once again unidentified) "hardware and software" when the product had not in fact been delivered.  But the plaintiff cannot even specify whether the alleged wrongdoing occurred in Q3 or Q4, so it is speculative to infer that the product had not been delivered by the end of 2001, particularly where the purpose of the alleged "scheme" was to move revenue from quarter to quarter, rather than recognize revenue Sonus never received.  Thus, there is no basis to infer whether the first class period statement – the 10K for 2001 – is inaccurate in this respect or not.  The allegations about "similar" letters to Global Crossing and XO Communications are devoid of *any* details with no allegation that any revenues were restated in connection with these contracts, how much or when.

Even looking past these fundamental problems, the Amended Complaint makes no allegation in ¶46 from which knowledge of any "facts" can be imputed to either Individual Defendant.  The "former senior employee" is unwilling even to say whether Nill *or* Hemme (a non-defendant whose knowledge cannot be imputed to Sonus) issued the Qwest letter.  The vague allegation that  "Ahmed was made aware of these improper practices in 2001 . . .  but took no action to stop them" not only refers to a time *before* the Class Period, but also is devoid of any particulars ascribing knowledge to Ahmed, such as *who* made him aware, *how* he was made aware, and *what* he was told.  Attributing this allegation to "a former Vice President," without

any details showing *how* that individual was in a position to know what Ahmed was "made aware" of, adds nothing to the scienter analysis.  See Wietschner, 294 F. Supp. 2d at 1112 (rejecting source's claim that "'the Company's aggressive third quarter sales efforts were authorized by defendant'" with "no explanation as to how the source knew of such authorization by [defendant]").[23]

In summary, because plaintiff's accounting allegations are utterly lacking in detail sufficient to give rise to a strong inference of scienter, the Amended Complaint must be dismissed.  See In re Peerless Sys. Corp. Sec. Litig., 182 F. Supp. 2d 982, 992 (S.D. Cal. 2002) (dismissing complaint where plaintiffs alleging violation of SOP 97-2 "fail[ed] to allege any specifics of the transactions").

## IV.    CONCLUSION

For all the foregoing reasons, and those set forth in the memoranda of Messrs. Nill and Ahmed, the defendants request that the Court dismiss the Amended Complaint with prejudice.

|  | SONUS NETWORKS, INC. |
|  | By its attorneys, |
|  | /S/James W. Prendergast_____ |
|  | Jeffrey B. Rudman (BBO #433380) |
|  | James W. Prendergast (BBO #553073) |
|  | Daniel W. Halston (BBO #548692) |
|  | Peter A. Spaeth (BBO #545202) |
|  | Wilmer Cutler Pickering Hale and Dorr LLP |
|  | 60 State Street |
|  | Boston, MA 02109 |
| Dated:  September 12, 2005 | (617) 526-6000 |

---

[23]    Paragraphs 49-50 similarly consist of nothing more than the unsupported conclusions that Ahmed and "senior management" knew or recklessly disregarded that Sonus had improperly manipulated revenues (without identifying even the most basic information such as when, how or in what transactions), coupled with the speculative allegation that he was motivated to do so because of his dealings with analysts.  They add nothing of substance.