**EXHIBIT G**



**U.S. Securities and Exchange Commission**

## Office of the Chief Accountant:
## Staff Accounting Bulletin No. 101:
## Revenue Recognition in Financial Statements –
## Frequently Asked Questions and Answers

On December 3, 1999, the Securities and Exchange Commission staff issued Staff Accounting Bulletin No. 101 (SAB 101). Staff Accounting Bulletins do not represent rules or interpretations of the Commission but rather represent the interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws. SAB 101 reflects the basic principles of revenue recognition in existing generally accepted accounting principles (GAAP). SAB 101 does not supersede any existing authoritative literature.

Studies on financial reporting, such as the Committee of Sponsoring Organizations (COSO) Report issued in early 1999, indicate that a significant portion of fraudulent financial reporting involves improper revenue recognition. In recent years improper revenue recognition has been the single largest category of financial statement restatements.

One of the goals of SAB 101 is to summarize in one location the existing guidance on revenue recognition and make that guidance more accessible to registrants and their auditors.

Since the issuance of SAB 101, the staff has received inquiries from auditors, preparers, and analysts about how the guidance in accounting standards and SAB 101 would apply to particular transactions. This document responds to those inquiries. The staff worked with accounting firms and preparers to identify the recurring questions and develop answers to those questions.

The staff has deferred the implementation date of SAB 101 until no later than the fourth quarter of fiscal years beginning after December 15, 1999. Prior to implementing SAB 101, the staff reminds registrants and their auditors that certain disclosures are required by SAB Topic 11-M, *Disclosure of the Impact that Recently Issued Accounting Standards will have on the Financial Statements of the Registrant when Adopted in a Future Period*; American Institute of Certified Public Accountants (AICPA) Professional Standards AU section 9410, Item 3, *The Impact on an Auditor's Report of an FASB Statement Prior to the Statement's Effective Date*; and Regulation S-K, Item 303, *Management's Discussion and Analysis of Financial Condition and Results of Operations*.

For further information contact: Scott Taub (taubs@sec.gov) or Scott Blackley (blackleys@sec.gov) in the Office of the Chief Accountant at (202) 942-4400 or Robert Bayless (baylessr@sec.gov) in the Division of Corporation Finance at (202) 942-2960.

### Contents

I.    Topic 13.A. 2 and 13.A.3 – Transfer of Title

**II.** Topic 13.A.3. – Substantial Performance and Acceptance

**III.** Topic 13.A.3. – Nonrefundable Payments

**IV** Topic 13.A.3. – Accounting for Certain Costs of Revenues

**V.** Topic 13.A.4. – Refundable Fees for Services

**VI.** Topic 13.A.4. – Estimates and Changes in Estimates

**VII.** Topic 13.A.4. – Fixed or Determinable Fees

**VIII.** Topic 13.B.2. – Implementing the Guidance in SAB 101

Exhibit A: Effects of Customer Acceptance and Unfulfilled Obligations on Revenue Recognition

## I. Topic 13.A. 2 and 13.A.3 – Transfer of Title

SAB 101 summarizes the staff's views on selected revenue recognition issues based upon existing generally accepted accounting principles. SAB 101 identifies four esser criteria that should be met before product revenue can be recognized. One of the cri is that delivery has occurred. The staff's responses to Questions 2 and 3 in SAB 101 emphasize that a necessary element of the delivery of a tangible product is the trans of its title. The staff has responded to questions concerning that guidance, as discuss below.

## Question 1

**Q:** The laws of some countries do not provide for a seller's retention of a security interest in goods in the same manner as established in the U.S. Uniform Commercial Code (UCC). In these countries, it is common for a seller to retain a form of title to goods delivered to customers until the customer makes payment so that the seller can recover the goods in the event of customer default on payment. Is it acceptable to recognize revenue in these transactions before payment is made and title has transferred?

**A:** Presuming all other revenue recognition criteria have been met, the staff would not object to revenue recognition at delivery if the only rights that a seller retains with the title are those enabling recovery of the goods in the event of customer default on payment. This limited form of ownership may exist in some foreign jurisdictions where, despite technically holding title, the seller is not entitled to direct the disposition of the goods, cannot rescind the transaction, cannot prohibit its customer from moving, selling, or otherwise using the goods in the ordinary course of business, and has no other rights that rest with a titleholder of property that is subject to a lien under the U.S. UCC. On the other hand, if retaining title results in the seller retaining rights normally held by an owner of goods, the situation is not sufficiently different from a delivery of goods on consignment. In this particular case, revenue should not be recognized until payment is received. Registrants and their auditors may wish to consult legal counsel knowledgeable of the local law and customs outside the U.S. to determine the seller's rights.

Cont

## II. Topic 13.A.3. – Substantial Performance and Acceptance

The guidance in Question 3 of SAB 101 applies to the delivery of products and performance of services not directly addressed by authoritative literature. For example, a transaction within the scope of AICPA Statement of Position (SOP) 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, is not subject to the staff's views expressed in SAB 101.

The staff's response to Question 3 in SAB 101 discusses accounting literature that should be considered in a registrant's evaluation of whether delivery of products or performance of services has occurred. The staff's response reiterates accounting literature that states:

(a) a seller should substantially complete or fulfill the terms specified in the sales arrangement,[1] and

(b) after delivery or performance, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs.[2]

The staff has responded to questions concerning that guidance, as discussed below.

## Question 2

**Q:** When accounting for sales of products and/or services in accordance with SAB 101, does the failure to deliver one item or perform one service specified by the sales arrangement *always* preclude immediate recognition of any revenue for the sales arrangement?

**A:** No. Assuming all other recognition criteria are met, the following circumstances exist under which revenue may be recognized for a sales arrangement, notwithstanding the seller's remaining obligation for additional performance or delivery.

(a) Revenue from the sales arrangement may be recognized in its entirety if the seller's remaining obligation is inconsequential or perfunctory. In this case, costs expected to be incurred upon fulfillment of the remaining obligation must be reliably[3] estimable and accrued when the revenue is recognized.[4] Question 3 below discusses how the staff evaluates whether the remaining obligation is inconsequential or perfunctory.

(b) A portion of the contract revenue may be recognized when the seller has substantially completed[5] or fulfilled the terms of a separate element of a multiple-element arrangement. Question 4 below discusses the accounting for multiple-element arrangements.

## Question 3

**Q:** When applying SAB 101, what factors should be considered in the evaluation of whether a remaining obligation is inconsequential or perfunctory?

**A:** A remaining performance obligation is not inconsequential or perfunctory if it is essential to the functionality of the delivered products or services (see Question 7 below). In addition, remaining activities are not inconsequential or perfunctory if failure to complete the activities would result in the customer receiving a full or partial refund or rejecting (or a right to a refund or to reject) the products delivered or services performed to date. The terms of the sales contract regarding both the right to a full or partial refund and the right of return or rejection should be considered when evaluating whether a portion of the purchase price would be refundable. If the company has a historical pattern of granting such rights, that historical pattern should also be

considered even if the current contract expressly precludes such rights. Further, other factors should be considered in assessing whether remaining obligations are inconsequential or perfunctory. For example, the staff also considers the following factors, which are not all-inclusive, in evaluating whether a remaining performance obligation is substantive rather than inconsequential or perfunctory:

- The seller does not have a demonstrated history of completing the remaining tasks in a timely manner and reliably estimating their costs.

- The cost or time to perform the remaining obligations for similar contracts historically has varied significantly from one instance to another.

- The skills or equipment required to complete the remaining activity are specialized or are not readily available in the marketplace.

- The cost of completing the obligation, or the fair value of that obligation, is more than insignificant in relation to such items as the contract fee, gross profit, and operating income.

- The period before the remaining obligation will be extinguished is lengthy. Registrants should consider whether reasonably possible variations in the period to complete performance affect the certainty that the remaining obligations will be completed successfully and on budget.

- The timing of payment of a portion of the sales price is coincident with completing performance of the remaining activity.

Registrants' determinations of whether remaining obligations are inconsequential or perfunctory should be consistently applied.

## Question 4

**Q:** Although SAB 101 does not establish a framework for accounting for multiple-element arrangements, what factors would the staff consider in assessing whether an arrangement is accounted for as a multiple-element arrangement?

**A:** SAB 101 does not modify existing practice in accounting for multiple-element arrangements. Recognizing the diversity in practice in the accounting for multiple-element arrangements and the complexity of these arrangements, the staff asked the Emerging Issues Task Force (EITF) *and* the Auditing Standards Board (ASB) to provide additional accounting and auditing guidance on those transactions. The EITF has added Issue No. 00-21, *Accounting for Multiple Element Revenue Arrangements*, to its agenda to address the accounting issues. Pending additional guidance, registrants should use a reasoned method of accounting for multiple-element arrangements that is applied consistently and disclosed appropriately. In response to questions, the staff has stated that it will not object to a method that includes the following conditions.

> 1. *To be considered a separate element, the product or service in question represents a separate earnings process.* The staff notes that determining whether an obligation represents a separate element requires significant judgment. The staff also notes that the best indicator that a separate element exists is that a vendor sells or could readily sell that element unaccompanied by other elements.

2. *Revenue is allocated among the elements based on the fair value of the elements.* The fair values used for the allocations should be reliable, verifiable and objectively determinable. The staff does not believe that allocating revenue among the elements based solely on cost plus a profit margin that is not specific to the particular product or service is acceptable because, in the absence of other evidence of fair value, there is no objective means to verify what a profit margin should be for the particular element(s). Additional guidance on allocating among elements may be found in SOP 81-1, paragraphs 35 through 42; SOP 97-2, paragraphs 9 through 14; and SOP 98-9, *Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions*. All of the methods of allocating revenue in those SOPs, including the residual method discussed in SOP 98-9, are acceptable. If sufficient evidence of the fair values of the individual elements does not exist, revenue would not be allocated among them until that evidence exists. Instead, the revenue would be recognized as earned using revenue recognition principles applicable to the entire arrangement as if it were a single element arrangement. Prices listed in a multiple-element arrangement with a customer may not be representative of fair value of those elements because the prices of the different components of the arrangement can be altered in negotiations and still result in the same aggregate consideration.

3. *If an undelivered element is essential to the functionality of a delivered element, no revenue allocated to the delivered element is recognized until that undelivered element is delivered.* See Question 7 below.

## Question 5

**Q:** SAB 101 states that, "the staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement. Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse." When applying SAB 101, do circumstances exist in which formal customer sign-off (that a contractual customer acceptance provision is met) is unnecessary to meet the delivery criterion?

**A:** Yes. Formal customer sign-off is not always necessary to recognize revenue provided that the seller objectively demonstrates that the criteria specified in the acceptance provisions are satisfied. Customer acceptance provisions generally allow the customer to cancel the arrangement when a seller delivers a product that the customer has not yet agreed to purchase or delivers a product that does not meet the specifications of the customer's order. In those cases, revenue should not be recognized because a sale has not occurred. In applying this concept, the staff observes that customer acceptance provisions normally take one of four general forms. Those forms, and how the staff generally assesses whether customer acceptance provisions should result in revenue deferral, are described below:

(a) *Acceptance provisions in arrangements that purport to be for trial or evaluation purposes.*[6] In these arrangements, the seller delivers a product to a customer, and the customer agrees to receive the product, solely to give the customer the ability to evaluate the delivered product prior to acceptance. The customer does not agree to purchase the delivered product until it accepts the product. In some cases, the acceptance provisions lapse by the passage of time without the customer rejecting the delivered product, and in other cases affirmative acceptance from the customer is necessary to trigger a sales transaction. Frequently, the title to the product does not transfer and payment

terms are not established prior to customer acceptance. These arrangements are, in substance, consignment arrangements until the customer accepts the product as set forth in the contract with the seller. Accordingly, in arrangements where products are delivered for trial or evaluation purposes, revenue should not be recognized until the earlier of when acceptance occurs or the acceptance provisions lapse.

In contrast, other arrangements do not purport to be for trial or evaluation purposes. In these instances, the seller delivers a specified product pursuant to a customer's order, establishes payment terms, and transfers title to the delivered product to the customer. However, customer acceptance provisions may be included in the arrangement to give the purchaser the ability to ensure the delivered product meets the criteria set forth in its order. The staff evaluates these provisions as follows:

(b) *Acceptance provisions that grant a right of return or exchange on the basis of subjective matters.* An example of such a provision is one that allows the customer to return a product if the customer is dissatisfied with the product.[7] The staff believes these provisions are not different from general rights of return and should be accounted for in accordance with SFAS No. 48. SFAS No. 48 requires that the amount of future returns must be reasonably estimable in order for revenue to be recognized prior to the expiration of return rights.[8] That estimate may not be made in the absence of a large volume of homogeneous transactions or if customer acceptance is likely to depend on conditions for which sufficient historical experience is absent.[9] Satisfaction of these requirements may vary from product-to-product, location-to-location, customer-to-customer, and vendor-to-vendor.

(c) *Acceptance provisions that grant a right of replacement on the basis of seller-specified objective criteria.* An example of such a provision is one that gives the customer a right of return or replacement if the delivered product is defective or fails to meet the vendor's published specifications for the product.[10] Such rights are generally identical to those granted to all others within the same class of customer and for which satisfaction can be generally assured without consideration of conditions specific to the customer. Provided the seller has previously demonstrated that the product meets the specified criteria, the staff believes that these provisions are not different from general or specific warranties and should be accounted for as warranties in accordance with SFAS No. 5. In this case, the cost of potentially defective goods must be reliably estimable based on a demonstrated history of substantially similar transactions.[11] However, if the seller has not previously demonstrated that the delivered product meets the seller's specifications, the staff believes that revenue should be deferred until the specifications have been objectively achieved.

(d) *Acceptance provisions based on customer-specified objective criteria.* These provisions are referred to in this document as "customer-specific acceptance provisions" against which substantial completion and contract fulfillment must be evaluated. While formal customer sign-off provides the best evidence that these acceptance criteria have been met, revenue recognition also would be appropriate, presuming all other revenue recognition criteria have been met, if the seller reliably demonstrates that the delivered products or services meet all of the specified criteria prior to customer acceptance. For example, if a seller reliably demonstrates that a delivered product meets the customer-specified objective criteria set forth in the arrangement, the delivery criterion would generally be satisfied when title and the risks and rewards of ownership transfers unless product performance may reasonably be different under the customer's testing conditions specified by the acceptance provisions. Further, the seller should consider whether it would be successful in enforcing

a claim for payment even in the absence of formal sign-off. Whether the vendor has fulfilled the terms of the contract before customer acceptance is a matter of contract law, and depending on the facts and circumstances, an opinion of counsel may be necessary to reach a conclusion. See Question 6 below.

## Question 6

**Q:** Some arrangements that call for the transfer of title to equipment upon delivery to a customer's site include customer-specific acceptance provisions that permit the customer to return the equipment unless the equipment satisfies certain performance tests. If SAB 101 is applicable to that transaction, must revenue allocable to the equipment *always* be deferred until installation and on-site testing are successfully completed?

**A:** No. The staff would not object to revenue recognition for the equipment upon delivery (presuming all other revenue recognition criteria, including those appropriate for a multiple-element arrangement, have been met) if the seller demonstrates that, at the time of delivery, the equipment already meets all of the criteria and specifications in the customer-specific acceptance provisions. This may be demonstrated if conditions under which the customer intends to operate the equipment are replicated in pre-shipment testing unless the performance of the equipment, once installed and operated at the customer's facility, may reasonably be different from that tested prior to shipment.

Determining whether the delivered equipment meets all of a product's criteria and specifications is a matter of judgment that must be evaluated in light of the facts and circumstances of a particular transaction. Consultation with knowledgeable project managers or engineers may be necessary in such circumstances.

For example, if the customer acceptance provisions were based on meeting certain size and weight characteristics, it should be possible to determine whether those criteria have been met before shipment. Historical experience with the same specifications and functionality of a particular machine that demonstrates that the equipment meets the customer's specifications also may provide sufficient evidence that the currently shipped equipment satisfies the customer-specific acceptance provisions.

If an arrangement includes customer acceptance criteria or specifications that cannot be effectively tested before delivery or installation at the customer's site, the staff believes that revenue recognition should be deferred until it can be demonstrated that the criteria are met. This situation usually will exist when equipment performance can vary based on how the equipment works in combination with the customer's other equipment, software, or environmental conditions. In these situations, testing to determine whether the criteria are met cannot be reasonably performed until the products are installed or integrated at the customer's facility.

Some have requested us to provide examples applying the guidance in SAB 101 to a variety of circumstances that involve customer acceptance. The exhibit to this document provides a few examples. However, the determination of when customer-specific acceptance provisions of an arrangement are met in the absence of the customer's formal notification of acceptance depends on the weight of the evidence in the particular circumstances. Different conclusions could be reached in similar circumstances that vary only with respect to a single variable, such as complexity of the equipment, nature of the interface with the customer's environment, extent of the seller's experience with the same type of transactions, or a particular clause in the agreement. The staff believes management and auditors are uniquely

positioned to evaluate the facts and arrive at a reasoned conclusion. The staff will not object to a determination that is well reasoned on the basis of this guidance.

In light of the integral nature of installation services to equipment sold on an installed basis, a registrant may elect a policy of not recognizing any revenue on equipment sold on an installed basis until installation is complete. Registrants' accounting policies for these types of transactions should be consistently applied and appropriately disclosed. The staff expects that the EITF will provide further guidance on these arrangements as part of its project on accounting for multiple-element arrangements.

## Question 7

**Q:** When applying SAB 101, if a customer is not obligated to pay a portion of the contract price allocable to delivered equipment until installation or similar service has been completed, must recognition of revenue on the delivered equipment *always* be deferred until that service has been performed?

**A:** No. Registrants should evaluate first whether the undelivered service is essential to the functionality of the delivered equipment.[12] Examples of indicators that installation is essential to the functionality of equipment include:

- The installation involves significant changes to the features or capabilities of the equipment or building complex interfaces or connections;

- The installation services are unavailable from other vendors.[13]

Conversely, examples of indicators that installation is not essential to the functionality of the equipment include:

- The equipment is a standard product;

- Installation does not significantly alter the equipment's capabilities;

- Other companies are available to perform that job.[14]

If the undelivered service is essential to the functionality of the delivered equipment, revenue recognition should be deferred until that service has been performed.[15]

If it is determined that the undelivered service is not essential to the functionality of the delivered product but a portion of the contract fee is not payable until the undelivered element is delivered, the staff would not consider that obligation to be inconsequential or perfunctory. Generally, the portion of the contract price that is withheld or refundable should be deferred until the outstanding element is delivered because that portion would not be realized or realizable.[16] However, if the registrant has an enforceable claim at the balance sheet date through which it can realize some or all of the withheld or refundable amount even if it failed to fulfill the remaining obligation, deferral of a lesser amount, but not less than the fair value of the undelivered product or service, would be appropriate. The exhibit to this document includes a few examples demonstrating the analysis of revenue recognition issues in circumstances of undelivered products or services.

As noted in Question 6 above, due to the integral nature of installation services to equipment sold on an installed basis, a registrant may elect a policy of not recognizing any revenue on equipment sold on an installed basis until installation is complete. The staff expects that the EITF will provide further guidance on these arrangements as part of its project on accounting for multiple-element arrangements.

## Question 8

**Q:** If a company (the seller) has a patent to its intellectual property which it licenses to customers, the seller may represent and warrant to its licensees that it has a valid patent, and will defend and maintain that patent. When applying SAB 101, does that obligation to maintain and defend patent rights, in and of itself, constitute an element for which revenue should be allocated and initially deferred?

**A:** No. Provided the seller has legal and valid patents upon entering the license arrangement, existing GAAP on licenses of intellectual property (e.g., SOP 97-2, SOP 00-2, *Accounting by Producers or Distributors of Films*, and SFAS No. 50, *Financial Reporting in the Record and Music Industry*) does not indicate that an obligation to defend valid patents represents an additional deliverable to which a portion of an arrangement fee should be allocated in an arrangement that otherwise qualifies for sales-type accounting. While this clause may obligate the licenser to incur costs in the defense and maintenance of the patent, that obligation does not involve an additional deliverable to the customer. Defending the patent is generally consistent with the seller's representation in the license that such patent is legal and valid. Therefore, the staff would not consider a clause like this to require revenue deferral.

## Question 9

**Q:** Assume that intellectual property is physically delivered and payment is received on December 20, upon the registrant's consummation of an agreement granting its customer a license to use the intellectual property for a term beginning on the following January 1. Should the license fee be recognized in the period ending December 31?

**A:** No. Revenue should not be recognized before the inception of the license term.[17] Until the beginning of the license term, the customer does not yet have the legal right to use the intellectual property. Effective delivery has not occurred in these situations until the license term begins.

Contents

---

### III. Topic 13.A.3. – Nonrefundable Payments

The staff's response to Question 5 in SAB 101 highlights the requirement under GAAP to defer revenue recognition in certain circumstances, notwithstanding the receipt of a nonrefundable upfront payment from the customer.[18] The discussion in SAB 101 demonstrates the need to consider two related questions in the assessment of when a nonrefundable upfront payment may be recognized as revenue:

- What is the earnings process, and when does it culminate?

- Is the undelivered or unperformed obligation essential to the functionality of

the performance or product for which the upfront payment is ostensibly received?

The staff indicated in SAB 101 that a registrant's analysis of these questions should consider the customer's perspective on the transaction. The staff has responded to questions concerning that guidance, as discussed below.

## Question 10

**Q:** In each of the following situations, when should the company receiving the fee recognize the related revenue?

**Example 1:** A company charges users a fee for non-exclusive access to its web site that contains proprietary databases. The fee allows access to the web site for a one-year period. After the customer is provided with an identification number and trained in the use of the database, there are no incremental costs that will be incurred in serving this customer.

**Example 2:** An internet company charges a fee to users for advertising a product for sale or auction on certain pages of its web site. The company agrees to maintain the listing for a period of time. The cost of maintaining the advertisement on the web site for the stated period is minimal.

**Example 3:** A company charges a fee for hosting another company's web site for one year. The arrangement does not involve exclusive use of any of the hosting company's servers or other equipment. Almost all of the projected costs to be incurred will be incurred in the initial loading of information on the host company's internet server and setting up appropriate links and network connections.

**A:** Some propose that revenue should be recognized when the initial set-up is completed in these cases because the on-going obligation involves minimal or no cost or effort and should be considered perfunctory or inconsequential. However, the staff believes that the substance of each of these transactions indicates that the purchaser is paying for a service that is delivered over time. Therefore, revenue recognition should occur over time, reflecting the provision of service.[19] In certain cases, the arrangement with the customer may be a multiple-element arrangement, with separate revenue recognition for those initial services. Question 4 of this document discusses multiple-element arrangements.

## Question 11

**Q:** Question 5 of SAB 101 addresses a telecommunications company's accounting for nonrefundable up-front activation fees. How should the activation fee for telephone service be accounted for in the following situation?

> **Facts:** To provide basic local service to a customer, the registrant must activate the customer's service at the central office. The registrant charges $50 to activate basic local service. On-going fees related to basic local service consist of a flat monthly fee and usage-related charges. There is no contract between the customer and the registrant. The costs associated with activation are $40 and consist primarily of the technician's salary and related benefits.

**A:** The staff believes that the revenue from the fee should be deferred and recognized over the expected term of the customer relationship. The customer can be expected to view activation as a necessary and inseparable part of buying ongoing telephone service, and not as a separate service.

Question 5 of SAB 101 describes a situation in which the activation costs are nominal. The staff has been asked whether the incurrence of more than nominal costs for activation would permit revenue recognition when activation was performed. Question 5 of SAB 101 cited nominal costs solely to make it clear that there was not a separate earnings event in the situation described in that question. However, incurrence of substantive costs does not necessarily indicate that there is a separate earnings event.[20] Whether there is a separate earnings event should be evaluated on a case-by-case basis.

Some have questioned whether revenue may be recognized in these transactions to the extent of the incremental direct costs incurred in the activation. Because there is no separable element or earnings event, the staff would generally object to that approach, except where it is provided for in the authoritative literature (e.g., SFAS No. 51, *Financial Reporting by Cable Television Companies*). However, the staff believes that capitalization of certain contract acquisition and origination costs may be appropriate in these circumstances, as addressed below in Questions 14 through 17.

## Question 12

**Q:** How should a registrant account for a fee received for installation of an additional telephone jack in the following situation?

> **Facts:** Assume the registrant is a provider of wireline telecommunications services. To install a phone jack for a customer, the registrant must dispatch a field technician to a customer's residence. This service may be performed at the same time as activation of phone service or at a different time. The registrant charges the customer $65 to install the additional phone jack. The costs of performing this service are $55 and consist primarily of the field technician's hourly wage, related benefits, materials (e.g., jack and wiring) and transportation costs (e.g., gas). Although rare, the registrant does provide this installation service in situations where it is not also providing basic local service. In addition, customers could choose other vendors to install the additional phone jack in their residence or they could do it themselves.

**A:** The staff believes that revenue should be recognized when the additional jack is installed. In this case, installation of the additional phone jack represents a separate and distinct earnings process, as indicated by the following factors:

- The functionality of the on-going basic local service is unaffected by the number of phone jacks that exist at a customer location, as evidenced by the fact that the timing of the installation of the jack need not coincide with the activation of basic service. The functionality of the jack is unaffected by the extent of future phone service.

- The registrant provides these installation services in situations where it is not also activating basic local service.

- The registrant provides telecommunications services without installation of a phone jack (e.g., when the customer does not want an additional jack).

- Customers may choose other vendors to install the phone jack in their residence.

- Customers may install additional phone jacks themselves.

- The installation of the jack provides an enhancement to the value of the customer's residence, even if no local telephone service is contracted for.

If the installation of the additional phone jack is one element in a multiple-element arrangement, there should be sufficient reliable, objective and verifiable evidence of fair value for the various elements in order to allocate the related fee among the elements. The staff expects that the EITF will provide further guidance on these types of arrangements as part of its project on accounting for multiple element arrangements.

## Question 13

**Q:** Research and development arrangements may have terms that include up-front payments upon contract signing, scheduled payments during the term of the arrangement, and additional payments if and when certain milestones in the product's development are reached. The arrangements often include provisions for ongoing product manufacturing and distribution rights. How should a registrant account for the up-front payment and the other payments?

**A:** The answer depends on the facts and circumstances. Question 5 of SAB 101 specifically addresses only the circumstance when a nonrefundable fee is received at the outset of an arrangement or at another specified date without a corresponding performance or delivery by the registrant that is the culmination of a separate earnings process. In that situation, the on-going research and development services are essential for the customer to receive any benefit from the technology or access to other assets. In addition, a basis does not exist to objectively determine the fair value of technology access separate from the on-going research activities.

Many research and development arrangements in the pharmaceutical and biotechnology industries are more complicated and contain multiple elements. As discussed in Question 4 of this document, the staff has requested that the EITF address the accounting for multiple-element contracts.

While an outright sale of technology by the registrant may qualify for separate revenue recognition if sufficient verifiable and objective evidence of fair value exists, research and development arrangements commonly involve granting access to facilities, technology, and other properties along with an agreement to perform research and development activities.[21] In the latter circumstances, immediate recognition of the fee generally is inappropriate because the registrant has continuing involvement with the technology through its provision of research and development services that precludes the ability to objectively measure the fair value of the any of the elements individually. Similarly, a nonrefundable fee received without any corresponding performance or delivery should be treated as a nonrefundable advance from the customer and recognized as performance occurs. The accounting for other payments specifically related to the achievement of milestones or for any manufacturing or distribution arrangements should be evaluated based on the specific facts of the arrangements between the parties.

Contents

## IV. Topic 13.A.3. – Accounting for Certain Costs of Revenues

Footnote 29 of SAB 101 refers to contract acquisition and origination costs and

indicates that certain incremental and direct "set-up costs" may be deferred and accounted for by analogy to SFAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*, and FASB Technical Bulletin ("FTB") No. 90-1, *Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts*. The staff has responded to questions concerning that guidance, as discussed below.

### Question 14

**Q:** In SAB 101, what is the intended scope of the guidance on incremental direct contract acquisition and origination costs?

**A:** Our comments in footnote 29 of SAB 101 and in this document should be read to apply only to the deferral of incremental direct costs of transactions for which revenue has been deferred. Those comments do not address the accounting for costs of contract acquisition and origination in transactions that do not involve deferred revenue.

### Question 15

**Q:** When applying SAB 101, what is the staff's view of the pool of contract acquisition and origination costs that are eligible for capitalization?

**A:** As noted in footnote 29 of SAB 101, SFAS No. 91 includes a definition of incremental direct costs in its glossary. Paragraph 6 of SFAS No. 91 provides further guidance on the types of costs eligible for capitalization as customer acquisition costs indicating that only costs that result from successful loan origination efforts are capitalized. The FASB staff has published an Implementation Guide on SFAS No. 91 that provides additional guidance on the costs that qualify for capitalization as customer acquisition costs. Further, FTB 90-1 also requires capitalization of incremental direct customer acquisition costs and requires that those costs be "identified consistent with the guidance in paragraph 6 of Statement 91." Although the facts of a particular situation should be analyzed closely to capture those costs that are truly direct and incremental, the staff generally would not object to an accounting policy that results in the capitalization of costs in accordance with paragraph 6(a) and (b) of SFAS No. 91 or FTB 90-1. Registrants should disclose their policies for determining which costs to capitalize as contract acquisition and origination costs.

### Question 16

**Q:** When applying SAB 101, over what period should the seller amortize deferred costs associated with deferred revenue?

**A:** When both costs and revenue (in an amount equal to or greater than the costs) are deferred, the staff believes that the deferred costs should be charged to expense proportionally and over the same period that deferred revenue is recognized as revenue.[22]

### Question 17

**Q:** Is the deferral of contract acquisition and origination costs in the transactions addressed in SAB 101 required or is it merely permitted?

**A:** Such deferral is permitted. In recognition of diversity in practice in accounting for contract acquisition and origination costs, the Accounting Standards Executive Committee (AcSEC) has added a project on the subject to its agenda. Until new guidance is adopted, the staff would not object to either

expensing or capitalizing incremental direct costs of contract acquisition and origination, except in situations where the accounting literature specifically requires one treatment or the other. The accounting policy for these costs should be disclosed and applied consistently.

Contents

## V. Topic 13.A.4. – Refundable Fees for Services

Question 7 of SAB 101 discusses the appropriate timing of recognizing revenue for fees received for services that remain refundable even after the services are provided. While the staff indicated that the preferable method is to account for refundable amounts received as deposits in accordance with SFAS No. 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* paragraph 16, the SAB also indicates that the staff would not object to accounting for those fees by analogy to SFAS No. 48 if certain criteria are met. The staff has responded to questions concerning that guidance, as discussed below.

## Question 18

**Q:** Will the staff accept an analogy to SFAS No. 48 for service transactions subject to customer cancellation privileges other than those specifically addressed in Question 7 of SAB 101, so long as the criteria specified in Question 7 of SAB 101 are met?

**A:** The staff has accepted the analogy in limited circumstances due to the existence of a large pool of homogeneous transactions and satisfaction of the criteria in Question 7 of SAB 101. Examples of other arrangements involving customer cancellation privileges and refundable service fees that the staff has addressed include the following:

- a leasing broker whose commission from the lessor upon a commercial tenant's signing of a lease agreement is refundable (or in some cases, is not due) under lessor cancellation privileges if the tenant fails to move into the leased premises by a specified date.

- a talent agent whose fee receivable from its principal (i.e., a celebrity) for arranging a celebrity endorsement for a five-year term is cancelable by the celebrity if the celebrity breaches the endorsement contract with its customer.

- an insurance agent whose commission received from the insurer upon selling an insurance policy is refundable in whole for the 30-day period that state law permits the consumer to repudiate the contract and then refundable on a declining pro rata basis until the consumer has made six monthly payments.

In the first two of these cases, the staff advised the registrants that the portion of revenue subject to customer cancellation and refund must be deferred until no longer subject to that contingency because the registrants did not have an ability to make reliable estimates of customer cancellations due to the lack of a large pool of homogeneous transactions. In the case of the insurance agent, however, the particular registrant demonstrated that it had a sufficient history of homogeneous transactions with the same characteristics from which to reliably estimate contract cancellations and satisfy all the criteria specified in Question 7 of SAB 101. Accordingly, the staff did not

object to that registrant's policy of recognizing its sales commission as revenue when its performance was complete, with an appropriate allowance for estimated cancellations.

## Question 19

**Q:** If a registrant meets the criteria in Question 7 of SAB 101 regarding reliable estimates of cancellations, in the staff's view, must it analogize to SFAS No. 48, or may it defer all revenue until the refund period lapses as suggested by SFAS No. 125?

**A:** The analogy to SFAS No. 48 is presented as an alternative that would be acceptable to the staff when the listed conditions are met. However, a registrant may choose to defer all revenue until the refund period lapses. The policy chosen should be disclosed and applied consistently.

## Question 20

**Q:** May a registrant that meets the criteria in Question 7 of SAB 101 for reliable estimates of cancellations choose at some point in the future to change from the SFAS No. 48 method to the SFAS No. 125 method of accounting for these refundable fees? May a registrant in that situation change from the SFAS No. 125 method to the SFAS No. 48 method?

**A:** As noted in SAB 101, the staff believes that SFAS No. 125 provides a preferable accounting model for service transactions subject to potential refunds. Therefore, the staff would not object to a change from the SFAS No. 48 method to the SFAS No. 125 method. However, if a registrant had previously chosen the SFAS No. 125 method when it could otherwise have qualified to use the SFAS No. 48 method, the staff would object to a subsequent change from the SFAS No. 125 method to the SFAS No. 48 method.

## Question 21

**Q:** Question 7 of SAB 101 indicates that refundable membership fees can be recognized over the membership term so long as certain criteria are met (i.e., homogeneous pool, ability to reliably estimate refunds, etc.). Is there a minimum level of customers that must be projected not to cancel before use of SFAS No. 48 type accounting is appropriate?

**A:** SFAS No. 48 does not include any such minimum. Therefore, the staff does not believe that a minimum must apply in service transactions either. However, as the refund rate increases, it may be increasingly difficult to make reasonable and reliable estimates of cancellation rates.

## Question 22

**Q:** When a registrant first determines that reliable estimates of cancellations of service contracts can be made (e.g., two years of historical evidence becomes available), how should the change from the complete deferral method to the method of recognizing revenue, net of estimated cancellations, over time be reflected?

**A:** Changes in the ability to meet the criteria set forth in Question 7 of SAB 101 should be accounted for in the manner described in paragraph 6 of SFAS No. 48, which addresses the accounting when a company experiences a change in the ability to make reasonable estimates of future product returns.

## Question 23

**Q:** When the "retrospective approach" to account for changes in estimates of deferred revenue is used in connection with a service transaction that meets the criteria in Question 7 of SAB 101, in the staff's view should related deferred costs being amortized on a basis consistent with the deferred revenue be similarly adjusted?

**A:** Yes.[23]

Contents

---

## VI. Topic 13.A.4. – Estimates and Changes in Estimates

Accounting for revenues and costs of revenues requires estimates in many cases; those estimates sometimes change. Registrants should ensure that they have appropriate internal controls and adequate books and records that will result in timely identification of necessary changes in estimates that should be reflected in the financial statements and notes thereto. The staff has responded to questions concerning the reporting of estimates and changes in estimates when applying SAB 101, which are discussed below.

## Question 24

**Q:** Is the requirement cited in Question 9 of SAB 101 for "reliable" estimates meant to imply a new, higher requirement than the "reasonable" estimates discussed in SFAS No. 48?

**A:** No. "Reliability" of financial information is one of the qualities of accounting information discussed in SFAC No. 2. The staff's expectation that estimates be reliable does not change the existing requirement of SFAS No. 48. If management cannot develop an estimate that is sufficiently reliable for use by investors, the staff believes it cannot make a reasonable estimate meeting the requirements of that standard.

## Question 25

**Q:** Question 7 of SAB 101 identifies specific criteria that should be met if the guidance in SFAS No. 48 is applied by analogy to refundable revenues from service transactions. Does the staff expect registrants to apply the guidance in Question 7 of SAB 101 to sales of tangible goods and other transactions specifically within the scope of SFAS No. 48?

**A:** The specific guidance in Question 7 of SAB 101 does not apply to transactions covered by SFAS No. 48. The views set forth in Question 7 of SAB 101 are applicable to the service transactions discussed in that Question. Service transactions are explicitly outside the scope of SFAS No. 48.

As noted in Question 7 of SAB 101, the staff has not objected to analogies to SFAS No. 48 for service transactions, provided that all of the criteria discussed in that question are satisfied. This guidance is intended to ensure that revenue is recognized based on estimates of cancellation when those estimates are consistent, comparable, reliable, and appropriately disclosed.

## Question 26

**Q:** Question 7 of SAB 101 states that the staff would expect a two-year history of selling a new service in order to be able to make reliable estimates of cancellations. How long a history does the staff believe is necessary to estimate returns in a product sale transaction that is within the scope of SFAS No. 48?

**A:** The staff does not believe there is any specific length of time necessary in a product transaction. However, SFAS No. 48 states that returns must be subject to reasonable estimation. Preparers and auditors should be skeptical of estimates of product returns when little history with a particular product line exists, when there is inadequate verifiable evidence of historical experience, or when there are inadequate internal controls that ensure the reliability and timeliness of the reporting of the appropriate historical information. Start-up companies and companies selling new or significantly modified products are frequently unable to develop the requisite historical data on which to base estimates of returns.

## Question 27

**Q:** If a company selling products subject to a right of return concludes that it cannot reasonably estimate the actual return rate due to its limited history, but it can conservatively estimate the maximum possible returns, does the staff believe that the company may recognize revenue for the portion of the sales that exceeds the maximum estimated return rate?

**A:** No. If a reasonable estimate of future returns cannot be made, SFAS No. 48 requires that revenue not be recognized until the return period lapses or a reasonable estimate can be made.[24] Deferring revenue recognition based on the upper end of a wide range of potential return rates is inconsistent with the provisions of SFAS No. 48.

Contents

## VII. Topic 13.A.4. – Fixed or Determinable Fees

## Question 28

**Q:** Company M performs claims processing and medical billing services for healthcare providers. In this role, Company M is responsible for preparing and submitting claims to third-party payers, tracking outstanding billings, and collecting amounts billed. Company M's fee is a fixed percentage (e.g., five percent) of the amount collected. If no collections are made, no fee is due to Company M. Company M has historical evidence indicating that the third-party payers pay 85 percent of the billings submitted with no further effort by Company M. May Company M recognize as revenue its five percent fee on 85 percent of the gross billings at the time it prepares and submits billings, or should it wait until collections occur to recognize any revenue?

**A:** The staff believes that Company M must wait until collections occur before recognizing revenue. Before the third-party payer has remitted payment to Company M's customers for the services billed, Company M is not entitled to any revenue. That is, its revenue is not yet realized or realizable.[25] Until Company M's customers collect on the billings, Company M has not performed the requisite activity under its contract to be entitled to a fee.[26] Further, no amount of the fee is fixed or determinable or collectible until Company Ms' customers collect on the billings.

Contents

### VIII. Topic 13.B.2. – Implementing the Guidance in SAB 101

The staff has responded to questions concerning how registrants should implement the guidance in SAB 101, as discussed below.

### Question 29

**Q:** SAB 101 indicates that the staff will not object to cumulative effect-type transition so long as the prior accounting does not represent an error. Could a company whose prior accounting does not represent an error voluntarily adopt a new method consistent with SAB 101 by restatement of prior periods, rather than through a cumulative catch-up adjustment?

**A:** In most instances, no. APB Opinion No. 20 does not permit restatement of financial statements for a change in accounting principle that does not represent correction of an error, except in very rare circumstances.[27] An exception is a company that is filing publicly for the first time. As stated in paragraph 29 of APB Opinion No. 20, those companies are permitted to reflect the adoption of the new policy via a restatement, and the staff believes that approach is usually necessary to avoid confusing investors in an initial public offering.

### Question 30

**Q:** Should a registrant reporting a change in accounting principle as a result of SAB 101 file a preferability letter?

**A:** No preferability letter is required if an accounting change is made in response to a newly issued Staff Accounting Bulletin.

### Question 31

**Q:** If a company had not previously adjusted sales revenues, but deferred recognition of the gross margin of estimated returns for a transaction subject to SFAS No. 48, how should it present a current change in accounting to reduce revenue and cost of sales for estimated returns?

**A:** Paragraph 7 of SFAS No. 48 states that "sales revenue and cost of sales reported in the income statement *shall be reduced* to reflect estimated returns." SFAS No. 48 does not provide for recognition of sales and costs of sales while deferring gross margin under any circumstance. SAB 101 provided no new guidance on this point. If a registrant has failed to comply with GAAP, the registrant should retroactively revise prior financial statements in the manner set forth in Accounting Principles Board (APB) Opinion No. 20, *Accounting Changes* and SFAS No. 16, *Prior Period Adjustments*.

Contents

### Exhibit A:  Effects of Customer Acceptance and Unfulfilled Obligations on Revenue Recognition

**Example 1**

Company E is an equipment manufacturer whose main product is generally sold in a standard model. The contracts for sale of that model provide for customer acceptance to occur after the equipment is received and tested by the customer. The acceptance provisions state that if the equipment does not perform to Company E's published specifications, the customer may return the equipment for a full refund or a replacement unit, or may require Company E to repair the equipment so that it performs up to published specifications. Customer acceptance is indicated by either a formal sign-off by the customer or by the passage of 90 days without a claim under the acceptance provisions. Title to the equipment passes upon delivery to the customer. Company E does not perform any installation or other services on the equipment it sells and tests each piece of equipment against its specifications before shipment. Payment is due under Company E's normal payment terms for that product which is 30 days after customer acceptance.

*For each response below, all of the above facts apply, in addition to any others specifically stated in the "Additional Facts" section.*

Scenario A:

**Additional Facts:**  Company E receives an order from a new customer for a standard model of its main product. Based on the customer's intended use of the product, location and other factors, there is no reason that the equipment would operate differently in a customer's environment than it does in Company E's facility.

Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

**Response:** While the staff presumes that customer acceptance provisions are substantive provisions that generally result in revenue deferral, that presumption can be overcome as discussed in Question 5 of this document. Although the contract includes a customer acceptance clause, acceptance is based on meeting Company E's published specifications for a standard model. Company E demonstrates that the equipment shipped meets the specifications before shipment, and the equipment is expected to operate the same in the customer's environment as it does in Company E's. In this situation, Company E should evaluate the customer acceptance provision as a warranty under SFAS No. 5. If Company E can reasonably and reliably estimate the amount of warranty obligations, the staff believes that it should recognize revenue upon delivery of the equipment, with an appropriate liability for probable warranty obligations.

Scenario B:

**Additional Facts:**  Company E enters into an arrangement with a new customer to deliver a version of its standard product modified as necessary to fit into a space of specific dimensions while still meeting all of the published vendor specifications with regard to performance. In addition to the customer acceptance provisions relating to the standard performance specifications, the customer may reject the equipment if it does not conform to the specified dimensions. Company E creates a testing chamber of the exact same dimensions as specified by the customer and makes simple design changes to the product so that it fits into the testing chamber. The equipment still meets all of the standard performance specifications.

Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

**Response:** Although the contract includes a customer acceptance clause that is based, in part, on a customer specific criterion, Company E demonstrates that the equipment shipped meets that objective criterion, as well as the published specifications, before shipment. Therefore, the staff believes that Company E should evaluate the customer acceptance provision as a warranty under SFAS No. 5. If Company E can reasonably and reliably estimate the amount of warranty obligations, it should recognize revenue upon delivery of the equipment, with an appropriate liability for probable warranty obligations.

Scenario C:

**Additional Facts:** Company E enters into an arrangement with a new customer to deliver a version of its standard product modified as necessary to be integrated into the customer's new assembly line while still meeting all of the standard published vendor specifications with regard to performance. The customer may reject the equipment if it fails to meet the standard published performance specifications or cannot be satisfactorily integrated into the new line. Company E has never modified its equipment to work on an integrated basis in the type of assembly line the customer has proposed. In response to the request, Company E designs a version of its standard equipment that is modified as believed necessary to operate in the new assembly line. The modified equipment still meets all of the standard published performance specifications, and Company E believes the equipment will meet the requested specifications when integrated into the new assembly line. However, Company E is unable to replicate the new assembly line conditions in its testing.

Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

**Response:** This contract includes a customer acceptance clause that is based, in part, on a customer specific criterion, and Company E cannot demonstrate that the equipment shipped meets that criterion before shipment. Accordingly, the staff believes that the contractual customer acceptance provision is substantive and is not overcome upon shipment. Therefore, the staff believes that Company E should wait until the product is successfully integrated at its customer's location and meets the customer-specific criteria before recognizing revenue. While this is best evidenced by formal customer acceptance, other objective evidence that the equipment has met the customer-specific criteria may also exist (e.g., confirmation from the customer that the specifications were met).

## Example 2

Company A develops, manufactures, and sells complex manufacturing equipment. Company A enters into a sales contract with Customer B to sell and install a specific piece of equipment for $20 million. Company A is experienced in the production and installation of this type of equipment and has a history of successfully installing the equipment. Company A concludes that installation is neither (a) inconsequential or perfunctory nor (b) essential to the functionality of the equipment.

Company A has developed its own internal specifications for the model of equipment Customer B ordered and has previously demonstrated that the equipment meets those specifications. Company A provides a warranty on all equipment sales that guarantees the delivered equipment will meet Company A's published specifications and be free of defects in materials and workmanship. Title to the equipment passes to the customer upon delivery.

Company A sells the equipment separately to some customers, without installation, for $19,500,000. In those cases, a general contractor installs the equipment. Company A routinely sells separately its services of the type required for equipment

installation on a time and materials basis. Based on the extent of effort expected in an installation of this equipment, Company A determines that the fair value of the installation services approximates $500,000.

*For each response below, all of the above facts apply, in addition to any others specifically stated in the "Additional Facts" section.*

Scenario A:

**Additional Facts:**  The equipment must be integrated into a larger production line that includes other manufacturer's equipment. At Customer B's request, the contract includes a number of customer-specific technical and performance criteria regarding speed, quality, interaction with other equipment, and reliability. Because of the nature of the equipment, Company A is unable to demonstrate that the equipment will meet the customer-specific specifications before installation. The contract includes a customer acceptance provision that obligates Company A to demonstrate that the installed equipment meets all specified criteria before customer acceptance. If customer acceptance is not achieved within 120 days of installation, Customer B can require Company A to remove the equipment and refund all payments. Payment terms are 80% due 30 days after delivery and 20% due 30 days after customer acceptance.

Assuming all other revenue recognition criteria are met (other than the issues raised with respect to the acceptance provision), when should Company A recognize revenue on this transaction?

**Response:**  While Company A believes that its equipment can be made to meet the customer's specifications, it is unable to demonstrate that it has delivered what Customer B ordered until installation and testing occurs. Accordingly, the staff believes that it would be inappropriate for Company A to recognize any revenue until it has demonstrated that it has delivered equipment meeting the specifications set forth in the contract. This would normally occur upon customer acceptance.

Scenario B:

**Additional Facts:**  The equipment must be integrated into a larger production line. At Customer B's request, the contract includes a number of customer-specific technical and performance criteria regarding speed, quality, and reliability. However, the integration of the product into Customer B's factory and production line is not complex. Because of this, the product is tested in Company A's facility before shipment and is shipped only after all specifications are met. The contract includes a customer acceptance provision that obligates Company A to demonstrate that the installed equipment meets all specified criteria before customer acceptance. Because the integration is not complex, there is virtually no uncertainty as to whether the product will continue to meet those specifications, without further modification, once installed in the customer's facility. However, the customer is obligated to pay the fee only upon completed installation. The contract specifies that if Company A does not complete the installation to Customer B's satisfaction, Customer B can require Company A to remove the equipment with no payment becoming due.

Assuming all other revenue recognition criteria are met (other than the issues raised with respect to the acceptance provision), when should Company A recognize revenue on this transaction?

**Response:**  Upon delivery, Company A has completed the earnings process and met the delivery criterion with respect to the equipment because it has demonstrated that the equipment delivered to the customer meets the requirements of the customer's order. However, because the customer is not

obligated to pay Company A if installation of the equipment is not completed, the staff believes that no revenue may be recognized until installation is complete and the customer becomes obligated to pay. Conversely, if Company A has an enforceable claim at the balance sheet date through which it can realize some or all of the $20 million fee even if it failed to fulfill the installation obligation, deferral of a lesser amount, but not less than the estimated fair value of the installation (i.e., $500,000), would be appropriate.

Alternatively, if Company A's policy is to defer all revenue until installation is complete, recognition of the $20,000,000 fee upon completion of installation would be appropriate. Company A's policy should be appropriately disclosed and consistently applied.

Scenario C:

**Additional Facts:**  The equipment must be integrated into a larger production line. At Customer B's request, the contract includes a number of customer-specific technical and performance criteria regarding speed, quality, and reliability. However, the integration of the product into Customer B's factory and production line is not complex. Because of this, the product is tested in Company A's facility before shipment and is shipped only after all specifications are met. The contract includes a customer acceptance provision that obligates Company A to demonstrate that the installed equipment meets all specified criteria before customer acceptance. Because the integration is not complex, there is virtually no uncertainty as to whether the product will continue to meet those specifications, without further modification once installed in Customer B's facility. Customer B is obligated to pay one hundred percent of the fee no later than 90 days after delivery regardless of whether installation has occurred.

Assuming all other revenue recognition criteria are met (other than the issues raised with respect to the acceptance provision), when should Company A recognize revenue on this transaction?

**Response:**  Upon delivery, Company A has completed the earnings process and met the delivery criterion with respect to the equipment because it has demonstrated that the equipment delivered to the customer meets the requirements of the customer's order. In addition, Company B's obligation to pay the fee is not contingent upon completion of installation. Therefore, Company A should recognize the revenue allocable to the equipment, $19,500,000, as revenue upon delivery. The staff believes that the remaining $500,000 of the arrangement fee should be recognized when installation is performed.

Alternatively, if Company A's policy is to defer all revenue until installation is complete, recognition of the $20,000,000 fee upon completion of installation would be appropriate. Company A's policy should be appropriately disclosed and consistently applied.

---

## Footnotes

[1]  Financial Accounting Standards Board (FASB) Statement of Financial Accounting Concepts (SFAC) No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, paragraph 83(b).

[2]  SOP 97-2, *Software Revenue Recognition*, paragraph 20.

[3]  Reliability is defined in SFAC No. 2, *Qualitative Characteristics of Accounting Information*, as "the quality of information that assures that information is

reasonably free from error and bias and faithfully represents what it purports to represent." Paragraph 63 of SFAC No. 5 reiterates the definition of reliability, requiring that "the information is representationally faithful, verifiable, and neutral."

[4] This view is consistent with Statement of Financial Accounting Standards (SFAS) No. 45, *Accounting for Franchise Fee Revenue*, paragraph 17.

[5] SFAC No. 5, paragraph 83(b).

[6] See, for example, SOP 97-2, paragraph 25.

[7] SFAS No. 48, *Revenue Recognition When Right of Return Exists*, paragraph 13.

[8] SFAS No. 48, paragraph 6(f).

[9] SFAS No. 48, paragraphs 8(c) and 8(d).

[10] SFAS No. 5, *Accounting for Contingencies*, paragraph 24 and SFAS No. 48, paragraph 4(c).

[11] SFAS No. 5, paragraph 25.

[12] See SOP 97-2, paragraph 13.

[13] See SOP 97-2, paragraphs 68-71 for analogous guidance.

[14] Ibid.

[15] See SOP 97-2, paragraph 13.

[16] SFAC No. 5, paragraph 83(a) and SFAS No. 48, paragraph 6(b).

[17] See SOP 00-2, paragraphs 7(c), 14, and 76.

[18] SFAC No. 5, paragraph 83(b).

[19] SFAC No. 5, paragraph 84(d).

[20] See footnote 51 of SFAC No. 5 for a description of the "earnings process."

[21] The arrangements may fall within the scope of SFAS No. 68, *Research and Development Arrangements*. Provided that the conditions that require accounting for proceeds received as a liability to repay the funding party are not met, SFAS No. 68, paragraph 10, requires that the arrangement be accounted for as an obligation to perform contractual research and development services. If the research and development arrangement is with the Federal Government, then the arrangement may be within the scope of the AICPA Audit and Accounting Guide, *Audits of Federal Government Contractors*, paragraphs 3.49 through 3.56.

[22] FTB 90-1, paragraph 4.

[23] Such an approach is generally consistent with the amortization methodology in SFAS No. 91, paragraph 19.

[24] SFAS No. 48, paragraph 6(f).

[25] SFAC No. 5, paragraph 83(a).

[26] SFAC No. 5, paragraph 83(b).

[27] See, for example, APB Opinion No. 20, paragraph 27.

*http://www.sec.gov/info/accountants/sab101fq.htm*

Home | Previous Page                                         Modified: 10/26/2001