UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. LITIGATION | ) Civil Action No. 04-10294-DPW<br>) (Lead Case)<br>)<br>)<br>) |
| THIS DOCUMENT RELATES TO: ALL CASES | )<br>)<br>)<br>)<br>)<br>)<br>) |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT**

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
Steven O. Sidener
Gwendolyn R. Giblin
Kenneth A. Frost
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone ( 415) 777-2230
Facsimile: (415) 777-5189
E-mail: scera@gbcslaw.com

Attorneys for Lead Plaintiff
BPI Global Asset Management LLP

#112044

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    Standard Of Review On A Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    The False Statements Are Sufficiently Identified And Rule 9(b) Has Been
            Satisfied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      C.    The Claim Under Section 10(b) Of The 1934 Act Is Adequately Alleged . . . . . 19

            1.    *Scienter* Is Adequately Alleged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            2.    Conscious Misbehavior Or Recklessness Is Alleged . . . . . . . . . . . . . . . . 23

            3.    Sources Are Adequately Identified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            4.    The Restatements And The Magnitude Of The Fraud Raise A
                  Strong Inference Of *Scienter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

            5.    Knowledge Of The Accounting Deficiencies And Improprieties
                  May Be Attributed To Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

            6.    Violation Of One's Own Accounting Policies Shows *Scienter* . . . . . . . . 42

            7.    The Absence of Insider Selling Is Irrelevant . . . . . . . . . . . . . . . . . . . . . . 42

      D.    The Claim Under Section 11 Of The 1933 Act Is Adequately Alleged . . . . . . . . 44

      E.    The Claim Under Section 12(a)(2) of the 1933 Act is Adequately Alleged . . . . 49

            1.    A Firm Commitment Underwriting Is Irrelevant At This Stage . . . . . . . 50

            2.    Defendants Are Statutory Sellers Through Solicitation . . . . . . . . . . . . . 51

      F.    The "Control Person" Claims Are Adequately Alleged . . . . . . . . . . . . . . . . . . . 54

**TABLE OF CONTENTS**
**(Continued)**

Page

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## TABLE OF AUTHORITIES

                                                                      **Page**

**CASES**

*Aldridge v. A.T. Cross Corp.*
  284 F.3d 72 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Artuz v. Bennett*
  531 U.S. 4 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Badaracco v. Commissioner*
  464 U.S. 386 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Blatt v. Muse Technologies, Inc.*
  2002 WL 31107537 (D. Mass. Aug. 27, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 37

*Bockser v. Dorchester Mut. Fire Ins. Co.*
  327 Mass. 473 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Breard v. Sachnoff & Weaver, Ltd.*
  941 F.2d 142 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Chalverus v. Pegasystems, Inc.*
  59 F.Supp.2d 226 (D. Mass. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 37, 38, 40, 42

*City of Austin Police Retirement System v. ITT Educational Serices, Inc.*
  2005 WL 2278123 (S.D. Ind. Sept. 14, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Commonwealth v. L.A.L. Corp.*
  400 Mass. 737, 511 N.E.2d 599 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Cooperman v. Individual, Inc.*
  171 F.3d 43 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cosmas v. Hassett*
  886 F.2d 8 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Crowell v. Ionics, Inc.*
  343 F.Supp.2d 1 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 37, 39, 40, 42, 43

### TABLE OF AUTHORITIES
### (Continued)

Page

*Degulis v. LXR Biotechnology, Inc.*
  928 F.Supp. 1301 (S.D.N.Y. 1996) ........................................ 46, 53

*DeVaux v. American Home Assur. Co.*
  387 Mass. 814 (1983) ................................................... 41

*Druskin v. Answerthink, Inc.*
  299 F.Supp.2d 1307 (S.D. Fla. 2004) ..................................... 41

*Epstein v. Itron*
  993 F.Supp. 1314 (E.D.Wash. 1998) ...................................... 40

*Ernst & Ernst v. Hochfelder*
  425 U.S. 185 (1976) ..................................................... 19

*Fitzer v. Security Dynamics Technologies, Inc.*
  119 F.Supp.2d 12 (D. Mass. 2000) ....................................... 34

*Geffon v. Micrion Corp.*
  249 F.3d 29 (1st Cir. 2001) .......................................... 19, 37

*Giarraputo v. UNUMProvident*
  2000 WL 1701294 (D. Me. 2000) ......................................... 45

*Gooley v. Mobil Oil Corp.*
  851 F.2d 513 (1st Cir. 1988) ............................................ 13

*Greebel v. FTP Software, Inc.*
  194 F.3d 185 (1st Cir. 1999) ...................................... 13, 19, 37

*Gross v. Medaphis*
  977 F.Supp. 1463 (N.D. Ga. 1997) ....................................... 43

*Gustafson v. Alloy Co., Inc.*
  513 U.S. 561 (1995) ..................................................... 51

*Herman & MacLean v. Huddleston*
  459 U.S. 375 (1983) ............................................... 4, 44, 46

**TABLE OF AUTHORITIES**
(Continued)

Page

*In re Advanta Corp. Sec. Litig.*
180 F.3d 525 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re American Bank Note Holographics Sec. Litig.*
93 F.Supp.2d 424 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Ancor Communs., Inc. Sec. Litig.*
22 F.Supp.2d 999 (D. Minn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re AnnTaylor Stores Sec. Litig.*
807 F.Supp. 990 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*In re Cabletron Systems, Inc.*
311 F.3d 11 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . 14, 15, 19, 20, 26, 29, 30, 35, 37, 55

*In re Campbell Soup Sec. Litig.*
145 F.Supp.2d 574 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Cell Pathways*
2000 WL 805221 (E.D. Pa. June 20, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Chambers Dev. Sec. Litig.*
848 F.Supp. 602 (W.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*In re Daou Systems, Inc. Sec. Litig.*
411 F.3d 1006 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Digi Inc., Sec. Litig.*
6 F.Supp.2d 1089 (D. Minn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Enron Corp. Sec., Derivative & ERISA Litig.*
258 F.Supp.2d 576 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Enron Corp. Secs. Litig.*
2004 WL 764663 at *8 (S.D. Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Fine Host Corp. Sec. Litig.*
25 F.Supp.2d 61 (D. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 37

**TABLE OF AUTHORITIES**
**(Continued)**

Page

*In re First Merchants Acceptance Corp. Sec. Litig.*
  1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ..................................... 47

*In re Focus Enhancements, Inc. Sec. Litig.*
  309 F.Supp.2d 134 (D.Mass. May 10, 2001) ............................... 17-20

*In re IKON Office Solutions, Inc. Sec. Litig.*
  66 F.Supp.2d 622 (E.D. Pa. 1999) ........................................... 40

*In re Initial Public Offering*
  241 F.Supp.2d 281 (S.D.N.Y. 2003) ......................................... 47

*In re JDS Uniphase Corp. Secs. Litig.*
  2005 WL 43463 (N.D. Cal. Jan. 6, 2005) .................................... 49

*In re Keegan Management Co. Sec. Litig.*
  1991 WL 253003 (N.D.Cal. 1991) ........................................... 54

*In re MicroStrategy Inc. Sec. Litig.*
  115 F.Supp.2d 620 (E.D. Va. 2000) ......................................... 37

*In re NationsMart Corp. Sec. Litig.*
  130 F.3d 309 (8th Cir. 1997) ....................................... 45, 46, 49

*In re Number Nine Visual Tech Corp. Sec. Litig.*
  51 F.Supp.2d 1 (D. Mass. 1999) ......................................... 47, 48

*In re Paracelsus Corp.*
  6 F.Supp.2d 626 (S.D.Tex. 1998) ........................................... 53

*In re Parmalat Sec. Litig.*
  377 F.Supp.2d 390 (S.D.N.Y. 2005) ......................................... 41

*In re Providian Financial Corp. Sec. Litig.*
  152 F.Supp.2d 814 (E.D. Pa. 2001) ......................................... 39

*In re Proxima Corporation Sec. Litig.*
  1994 WL 374306 (S.D.Cal. 1994) ........................................... 53

**TABLE OF AUTHORITIES**
**(Continued)**

Page

*In re Raytheon Sec. Litig.*
   157 F.Supp.2d 131 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 37

*In re Rent-Way Sec. Litig.*
   209 F.Supp.2d 493 (W.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Scholastic Corp. Sec. Litig.*
   252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 36

*In re SeaChange International, Inc. Sec. Litig.*
   2004 WL 240317 (D. Mass. Feb. 6, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48, 54

*In re Sepracor, Inc. Sec. Litig.*
   308 F.Supp.2d 20 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Stone & Webster, Inc. Sec. Litig.*
   414 F.3d 187 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13-16, 19, 21, 30

*In re Stratosphere Sec. Litig.*
   1 F.Supp.2d 1096 (D.Nev. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*In re Tel-Save Sec. Litig.*
   1999 WL 999427 (E.D. Pa. Oct. 19, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*In re Telxon Corp. Sec. Litig.*
   133 F.Supp.2d 1010 (N.D. Oh. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Vertex Pharmaceuticals, Inc. Sec. Litig.*
   357 F.Supp.2d 343 (D.Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Wellcare Mgmt. Group Sec. Litig.*
   964 F.Supp. 632 (N.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Xerox Corporation Sec. Litig.*
   165 F.Supp.2d 208 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*J.I. Case Co. v. Borak*
   377 U.S. 426 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES
## (Continued)

Page

*Juergens v. Venture Capital Corp.*
  1 Mass.App.Ct. 274 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Kensington Capital Management v. Oakley*
  1999 WL 816964 (C.D. Cal. Jan. 14, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 53

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*
  238 F.3d 363 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Maldonado v. Dominguez*
  137 F.3d 1 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Marksman Partners v. Chantal Pharm. Corp.*
  927 F.Supp. 1297 (C.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Mills v. Electric Auto-Lite Co.*
  396 U.S. 375 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Monahan v. Dorchester Counseling Ctr., Inc.*
  961 F.2d 987 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Novak v. Kasaks*
  216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 34

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*
  940 F.Supp. 1101 (W.D.Mich. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Pinter v. Dahl*
  483 U.S. 622 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-52

*Provenz v. Miller*
  102 F.3d 1478 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Roeder v. Alpha Indus., Inc.*
  814 F.2d 22 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Shaw v. Digital Equipment Corp.*
  82 F.3d 1194 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 45, 50-52

# TABLE OF AUTHORITIES
## (Continued)

Page

*Sundstrand Corp. v. Sun Chem. Corp.*
   553 F.2d 1033 (7th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Swack v. Credit Suisse First Boston*
   2004 WL 2203482 (D. Mass. Sept. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . 20, 26, 48, 54

*U.S. v. Josleyn*
   206 F.3d 144 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Union Old Lowell Nat'l Bank v. Paine*
   318 Mass. 313 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Bank of New England*
   821 F.2d 844 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Van de Velde v. Coopers & Lybrand*
   899 F.Supp. 731 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Vess v. Ciba-Geigy Corp., USA*
   317 F.3d 1098 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

## STATUTES, RULES AND REGULATIONS

United States Code

   15 U.S.C. §7241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   15 U.S.C. §77k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 44

   15 U.S.C. §77k(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   15 U.S.C. §77k(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   15 U.S.C. §77l(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 49

   15 U.S.C. §77o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   15 U.S.C. §77z-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

### TABLE OF AUTHORITIES
**(Continued)**

**Page**

15 U.S.C. §77z-2(c)(1)(B)(I), (ii)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

15 U.S.C. §78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. §78t(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. §78u-4(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

15 U.S.C. §78u-4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

15 U.S.C. §78u-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 47, 48

17 C.F.R. §240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

Federal Rules of Civil Procedure

Rule 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Rule 8(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Rule 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Rule 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 13-15, 44-47

Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Securities Act of 1933

Section 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 44-49

Section 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53, 54

Section 12(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Section 12(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

Section 12(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6, 45-52, 54

Section 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 54, 55

## TABLE OF AUTHORITIES
### (Continued)

**Page**

Securities Exchange Act of 1934

    Section 10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 19, 46, 48

    Section 20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 54, 55

## OTHER AUTHORITIES

*Treatise on the Law of Securities Regulation* §12.24(1) (4th Ed.2002) . . . . . . . . . . . . . . . . . . . . . 55

**I.**

**INTRODUCTION**

The renewed motions to dismiss the federal securities law claims alleged in the First

Amended Consolidated Class Action Complaint, filed August 5, 2005 (hereinafter "Complaint")

filed by defendants Sonus Networks, Inc. ("Sonus" or the "Company"), Hassan M. Ahmed

("Ahmed"), and Stephen J. Nill ("Nill") should be denied because the charging allegations are

clearly sufficient under controlling First Circuit law.[1]  Incredibly, Sonus's motion to dismiss

omits to cite new controlling authority in this Circuit which sets forth what is required to

properly plead a securities fraud claim.  *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187

(1st Cir. 2005).  Perhaps such omission was not inadvertent, because it is clear that Lead

Plaintiff's allegations satisfy the *Stone & Webster* standards.  Defendants repeat in their new

motions old themes, to wit, that the Complaint pleads only "fraud by hindsight," and that the

admitted material misstatements at issue in this restatement case involved "complex accounting

judgments," as to which there was no intentional or reckless misconduct.  The allegations of the

Complaint plainly belie such assertions.[2]

The Complaint does not allege innocuous accounting misjudgments.  The operative

---

[1]    All references hereinafter to "¶__" are to paragraphs of the Complaint.

[2]    The class of investors identified in the Complaint includes all those who purchased Sonus securities between March 28, 2002, the date Sonus filed its Annual Report on SEC Form 10-K for the year ending January 31, 2001, through March 26, 2004, when news of an additional delay in the filing of Sonus's Form 10-K for the year ended December 31, 2003 hit the market.  ¶25. This period is referred to herein as the "Class Period."  In addition, the Complaint identifies a Sub-Class of investors who acquired Sonus shares offered on September 24, 2003 pursuant to a materially false and misleading Prospectus Supplement and registration statement.  *Id.*

allegations, which control the outcome of these motions pursuant to Rule 12(b)(6), Fed.R.Civ.P.

for failure to state a claim for relief, depict intentional or reckless misconduct designed to

mislead the market and artificially prop up Sonus's stock price. Specifically, the Complaint

alleges, as to the claim under Section 10(b) of the Securities Exchange Act of 1934 (the "1934

Act"), 15 U.S.C. §78j(b), intentional and/or reckless conduct by the defendants designed to

"smooth" Sonus's publicly reported earnings. The allegations of the Complaint reveal this to be

a case involving egregious revenue manipulation and improper earnings management. It was

precisely because of the increasingly prevalent and glaring examples of manipulation of earnings

such as that alleged here, that Congress passed the Sarbanes-Oxley Act of 2002, requiring that

the senior officers of a public company take direct, personal responsibility for the accuracy of the

issuer's reported financial results. *See* 15 U.S.C. §7241. In this case, among the allegedly false

statements are certifications of defendants Ahmed and Nill, pursuant to Sarbanes-Oxley, attesting

that Sonus's reported financial results were truthful and accurate when issued. *E.g.*, ¶¶116, 122-

125, 135-138, 148-151, 160-163, 173-176. The restatement has confirmed that they were not.

¶¶53-71. Defendants Ahmed and Nill, the CEO and CFO of Sonus, respectively, must not be

permitted to walk away from the allegations against them in light of their certification of

materially false financial results. Moreover, the extraneous factual argument offered by Ahmed

as a defense, *i.e.*, that he is an engineer by training, not an accountant, is seriously misguided.

The absence of particular accounting expertise has never been a defense for an officer or director

of a public company who signs materially false SEC filings, especially in the face of Sarbanes-

Oxley.

Rather than the unknowing bystander he attempts to portray, the Complaint alleges in detail how Ahmed was at the heart of the revenue manipulation scheme. Ahmed sought to create the appearance of consistent revenue growth at Sonus, so as to entice Wall Street analysts and the investing public with a false picture of Sonus's consistency in generating revenues. This was critical to the Company's ability to conduct the stock offerings it concluded during the Class Period. It raised $57 million in an April 2003 offering. In the September 2003 offering, which forms the basis of the claims arising under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §77k, l(a)(2), Sonus raised $126 million.

Defendants assert that the accounting issues involved difficult fact based questions on complex transactions where the accounting errors implicated "only" the timing of revenue recognition for the sale of Sonus products, rather than the *bona fides* of the sales transactions in the first instance. Again, this is no defense. The federal securities laws require that financial reporting information, including such basic data as earned revenues, be accurately and truthfully reported on a quarterly and annual basis. Investors rely on the accuracy of this information in making their investment decisions. If, as occurred here, material amounts of revenue are improperly recorded in one quarter when the known facts of the transaction required that they should have been recorded in a different quarter, the company's published financial results are materially misleading. Indeed, that is why there was a restatement here. It matters not that the transactions in question were not entirely fictitious.

Moreover, the suggestion that the case is based on innocent accounting misjudgments is entirely inconsistent with the dismissals of defendant Nill, the CFO during the relevant period, together with the Company's controller, following revelation of the accounting manipulations. It

is highly improbable that personnel at such high levels are dismissed from their positions for innocent failures to correctly apply complex accounting pronouncements.

The Complaint provides great detail as to how the defendants deliberately manipulated revenues purportedly derived from Sonus software sales contracts, to falsely lull Wall Street analysts and the investing public into believing that Sonus had achieved linearity and predictability in its revenues. Because Lead Plaintiff's allegations are sufficiently detailed and adequately corroborated, the motion to dismiss the securities fraud claim arising under Section 10(b) of the 1934 Act should be denied.

Similarly, the claims brought pursuant to Sections 11 and 12(a)(2) of the 1933 Act should be permitted to go forward. These claims relate to a secondary offering of Sonus common shares conducted on September 24, 2003 pursuant to a Prospectus Supplement and shelf registration statement. ¶¶74, 164.[3] Section 11 of the 1933 Act imposes strict liability upon an issuer for a material misstatement in the registration statement pursuant to which the shares for the offering were issued. 15 U.S.C. §77k(b); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). It also imposes liability on signers of the registration statement such as defendants Ahmed and Nill, based on their negligence, subject to their right to establish certain statutory defenses. 15 U.S.C. §77k(a)(1), (b). In an attempt to avoid having to answer these claims, all defendants assert that because, in their view, the Complaint as a whole "sounds in fraud," the particularity standards for pleading fraud under Rule 9(b), Fed.R.Civ.P., should apply to the 1933

---

[3]    A description of the shelf registration process and its high degree of vulnerability to abuse can be found in the First Circuit's decision in *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1208-1209 (1st Cir. 1996). There, the appellate court reinstated improvidently dismissed claims under Section 10(b) of the 1934 Act and Section 11 of the 1933 Act.

Act claims. This is wrong. The 1933 Act claims stand on their own. The Court should not effectively re-write these statutes by requiring that they be pled with the specificity required for a different, fraud-based claim. Plainly, at a trial, the statutorily required strict liability (as to the issuer) and negligence standard (as to the individual defendants) will apply for these claims, and that is how a jury will have to be instructed. There is no sound rationale for altering these requirements simply for purposes of the pending pleading motions. In any event, the Complaint makes clear that the 1933 Act claims do not depend on the sufficiency of the fraud allegations, as Lead Plaintiff has specifically excluded such allegations with regard to these claims. ¶¶196, 208. Even if the Court were to conclude that the explicit exclusion of the fraud allegations is for some reason invalid, and that such claims must have the specificity required by Rule 9(b), the Complaint in fact provides the requisite detail. *See* Section III.B., *infra* at 15.

A separate argument is made concerning the claim arising under Section 12(a)(2) of the 1933 Act. Thus, it is argued that defendants were not statutory sellers and can face no liability for this claim because the September 2003 offering was conducted pursuant to a "firm commitment" underwriting, and the underwriter was the only "seller" of shares. However, dismissal of this claim would be premature. Lead Plaintiff should be permitted to conduct discovery to determine the precise mechanism used by Sonus to distribute the newly issued shares it sold in September 2003 pursuant to the complex shelf registration process. Defendants' self-serving factual assertions should not be accepted at face value at this stage. Furthermore, under at least one line of decisional authority, discussed below, the allegations of the Complaint are sufficient to allege a "statutory seller" claim based on solicitation against each of the

defendants. *See* Section III.E.2., *infra* at 51. For these reasons, the Section 12(a)(2) claim should not be dismissed.

Finally, all elements of Lead Plaintiff's "control person" claims against defendants Ahmed and Nill based on Section 20(a) of the 1934 Act, 15 U.S.C. §78t(a), and Section 15 of the 1933 Act, 15 U.S.C. §77o, are properly alleged under applicable standards. These claims should not be dismissed.

In sum, the Complaint makes serious and specific allegations of accounting manipulations which resulted in material misstatements of Sonus's publicly reported financial results. Sonus dismissed its CFO and controller based on these events, issued a major restatement, and acknowledged material deficiencies in its internal accounting procedures and controls. Under these circumstances, defendants should be held to answer the Complaint.

## II.

## SUMMARY OF FACTUAL ALLEGATIONS

The Complaint alleges that defendants engaged in a scheme to create and maintain a false illusion regarding Sonus's financial performance. The purpose of the wrongful conduct was to "smooth out" Sonus's reported quarterly revenues in order to make it appear to investors that the Company was generating steady, reliable growth. ¶37. In truth, however, because of segmented ("lumpy") ordering patterns and high customer concentration, the Company experienced egregiously non-linear quarter-over-quarter revenues during the Class Period. ¶¶36, 52. Defendants knew, and it is common knowledge in financial circles, that such a "boom-or-bust" revenue cycle is devastating in terms of the market's perception of a company's growth prospects. They also knew that a perceived lack of linearity would be detrimental to the value of

Sonus's shares because analysts would be unable to construct reliable revenue projections for inclusion in their investment recommendations. ¶¶5, 37, 39. Thus, as detailed in the Complaint, Sonus's senior accounting and finance managers, under the direction of Sonus's senior management, including defendants Ahmed and Nill, engaged in illegal revenue recognition practices designed to smooth out the gyrations in Sonus's quarterly revenues, making it appear as though the Company was following a predictable, sequential upward growth curve. ¶¶36-38, 40.

In an effort to perpetuate the image of revenue linearity, Sonus's senior managers continually represented to Wall Street during the Class Period that Sonus was enjoying sequential revenue growth. ¶38. For example, on April 9, 2003, Sonus announced its Q1 2003 financial results by proclaiming that revenues had increased "27% sequentially." ¶38. Similarly, on July 10, 2003, the Company issued a press release announcing its Q2 2003 financial results. The release quoted defendant Ahmed as saying: "'We are pleased with the progress that we made . . . particularly with our 33% sequential revenue growth." ¶38. On October 8, 2003, in its press release announcing its Q3 2003 financial results, Sonus again reiterated its drumbeat proclamation of sequential revenue growth by quoting defendant Ahmed as saying: "This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth . . ." ¶38.

An additional key motivation for defendants to foster the illusion of consecutive revenue growth was the need to raise capital by issuing shares of Sonus's common stock in follow-on stock offerings during the Class Period. ¶¶5, 39. Defendants knew that such offerings would not be well received by Wall Street, or might even be impossible to successfully complete, if Sonus's revenues were perceived to be sporadic, irregular or unpredictable. ¶¶5, 37, 39. Two such offerings are identified in the Complaint as occurring during the Class Period. ¶¶72, 74, 140,

164. The Company garnered $183 million from these offerings. Thus, defendants sought to, and did, manipulate Sonus's reported revenues in order to make Wall Street believe that the Company had "visibility" as to its future revenues so as to allow these offerings to proceed. ¶¶5, 37, 38, 40.

Defendants' illegal conduct is spelled out in great detail in the Complaint. Sonus's senior accounting and finance staff, with the knowledge and approval of defendants, manipulated Sonus's contracts with certain of its large telecom customers. ¶¶40-45, 47, 49, 51. These contracts, by their very nature, included bundled hardware and software elements, performance milestones, software upgrades, maintenance services, customer acceptance features and other features. Under Statement of Position ("SOP") 97-2, Sonus was required to report revenues from these contracts as bundled. ¶41. Defendants, however, in direct and knowing violation of GAAP, improperly unbundled certain software delivery elements, using undisclosed side agreements, in order to manipulate the booking of revenues. ¶¶40, 42-48, 50-51.

Contrary to defendants' assertions, the Complaint does not rest on broad generalizations, but rather provides specific examples of defendants' wrongdoing based upon information obtained from sources with actual knowledge. ¶¶40, 42-48, 50-51. The Complaint includes thorough descriptions of the sources that have provided the detailed and particularized allegations discussed herein. These sources are described to such an extent that the information they provide is facially credible. Moreover, the sources' descriptions include their current or former positions, providing the court with sufficient information from which to infer that these sources have knowledge about the details they have provided to Lead Plaintiff. *See, e.g.*, ¶¶38, 40, 42-48, 50-51.

As discussed in detail in Section III.C.3., *infra* at 28, the description of these sources is legally sufficient under applicable law. The sources' positions mostly consist of senior level professionals who have experience working in the accounting or sales departments at Sonus. Moreover, the allegations provided by these sources (*e.g.*, directives to the sales staff to convert future deliverables into special side deals that were to exist outside the original contract) indicate that the sales personnel were carrying out directives from senior management, including defendants Nill and Ahmed, and also former controller Hemme, in order to smooth Sonus's reported revenues. In short, the details provided by these sources are credible.

Specific improper revenue transactions are identified in the Complaint. It is alleged that in violation of GAAP, defendants improperly unbundled certain software delivery elements in a key deal with its major customer, Qwest Communications International, Inc. ("Qwest"), treating the software separately from the hardware obligations, so that they could manipulate the timing of recognition of revenue by improperly claiming that the software updates and releases had been delivered. According to a former senior sales executive of Sonus, in this way, Sonus was able to manage the timing of its reported revenues. ¶42. The unbundling of the contracts for the purposes of manipulating software deliverables and, ultimately, to "smooth" out reported revenues was known to and/or recklessly disregarded by defendants Ahmed and Nill. ¶¶36, 40, 42, 45-46, 49. Defendants ignored the proper method of recognizing revenue from software transactions in order to inflate and make "predictable" Sonus's reported revenues. ¶98. The Complaint describes how defendant Nill,[4] working in concert with Sonus's former controller,

---

[4] Defendant Nill has had extensive experience working with some of the world's most prominent software companies and accounting firms and was thereby fully familiar with the

Peter Hemme, improperly recognized tens of millions dollars in revenues under the Company's contract with Qwest. This was accomplished by manipulating the supposed delivery of certain software releases and updates, in violation of SOP 97-2. ¶¶42-44. Indeed, defendant Nill, working with Hemme, arranged for Sonus to improperly recognize $27.5 million in Q2 2002 by recording revenues on software updates that had not in fact been delivered to Qwest during that quarter. ¶45. Similarly, Sonus violated SOP 97-2 by improperly recording $11 million in Q4 2003 under the Qwest contract, again by falsely recording revenues on software updates that were not delivered during the quarter. ¶45. As one former Sonus employee put it: "Sonus was simply gerrymandering results as to the Qwest contract." ¶44.[5] This unlawful practice occurred with other accounts, including Sonus's ATT account. This improper revenue recognition practice was known, approved of, and condoned by defendant Nill who, together with former controller Hemme, tightly controlled the revenue reporting function at Sonus, under the supervision of defendant Ahmed. ¶45.

The Complaint also alleges that a former senior Sonus employee observed that, in either

---

requirements of GAAP and, in particular, SOP 97-2. ¶100. Nill served as Sonus's CFO, Vice President of Administration, and Treasurer during the Class Period. He was Sonus's CFO from September 1999 until April 2004 and Treasurer from 2000 until April 2004. After information concerning Sonus's improper accounting practices became publicly known, defendant Nill was transferred to the position of Vice President of Operations. He later resigned at the request of the Company. ¶17.

[5]   The software element of Sonus's contracts necessarily included a large deferred revenue component. Under GAAP and the Company's own revenue recognition guidelines, such deferred revenues could only be recognized upon the performance of future obligations, such as the delivery of software updates and releases required by the terms of the contracts. Nevertheless, defendants knowingly manipulated the timing of Sonus's reported revenues by claiming that the updates had in fact been delivered when, in truth, they had not. ¶41. In many instances, the updates were not even ready to be delivered. ¶¶6, 43.

Q3 or Q4 2001, defendant Nill, along with former controller Hemme, had an acceptance letter

sent to Michael Perruse, a former senior vice president of Engineering at Qwest. ¶46. The

purpose of the acceptance letter was to purportedly confirm the delivery of approximately

$18 million worth of hardware and software to Qwest, pursuant to its $100 million contract with

Sonus. The letter was issued, under either Nill or Hemme's signature, even though the product

had not been delivered, and in fact was not even ready to be delivered. Perruse went along with

the fraud because of reciprocal revenue arrangements which he had entered into with Sonus.

Letters were sent to other customers as well, including Global Crossing and XO

Communications, each for the purpose of "confirming" the delivery of product or the

performance of contract milestones, even though no such delivery or performance had actually

occurred. ¶46.

     To enable defendants' illegal revenue reporting scheme during the Class Period, a former

Company sales employee described how Sonus began the practice of segregating out future

"deliverables" from its major contracts, including the Qwest contract, for the purpose of

"pushing" reported revenues, all in violation of GAAP and SOP 97-2. ¶51. In order to make an

end-run around SOP 97-2's future delivery obligations, Sonus's senior accounting and finance

management, including defendant Nill, approved of a practice of pulling out Sonus's obligations

to provide future deliverables (*i.e.*, software updates and releases) from the contracts, and instead

would agree to deliver them as part of special "side deals." In this way, defendants were able to

spread revenues over several reporting quarters, instead of waiting until such time that the

software updates had in fact been delivered. According to a former Sonus employee, this

improper practice occurred in the Company's contracts with Qwest, XO Communications,

Epana, IDT and Verizon, among others. ¶51. These improper revenue recognition practices were repeatedly and continually used by defendants for the purpose of smoothing out the sharp serrations in Sonus's revenue curve. ¶¶5, 45, 48. Nill signed numerous public statements issued during the Class Period which materially misstated Sonus's financial condition as a result of his accounting manipulations. ¶77.

The illegal accounting practices were known to and approved by defendant Ahmed. ¶¶5-6, 45-46, 49. The Complaint specifically alleges that Ahmed knew about and acquiesced in these illegal practices as early as 2001. ¶¶5-6, 42.[6] Ahmed is alleged to have known about and approved of a plan to improperly report revenues from the purported delivery of improperly "unbundled" software releases under the Qwest contract, even though the releases were not in fact delivered (or even ready to be delivered). ¶¶45, 46. Ahmed approved of the illegal revenue recognition practices because he was the person within the Company with primary responsibility for interfacing with Wall Street analysts, and he was intent on making analysts believe that the Company's revenues were more linear than they really were. ¶49. The unbundling of contracts for the purpose of manipulating software deliverables and, ultimately, to smooth out reported revenues, was done in violation of SOP 97-2 and was known to, and/or recklessly condoned, by each of the defendants. ¶¶5-6, 40, 42-46, 49.

Furthermore, defendants Ahmed and Nill knew or recklessly disregarded, throughout the Class Period, that Sonus was experiencing pervasive deficiencies in its internal controls and accounting practices. ¶87. Contrary to the requirements of GAAP, SEC rules, and the Foreign

---

[6]    Pre-Class Period conduct and knowledge is clearly germane to defendants' *scienter* during the Class Period. *E.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

Corrupt Practices Act, the defendants failed to implement and maintain adequate internal accounting and financial controls when issuing and publicly disseminating the Company's financial statements. ¶91. Nevertheless, defendants issued and/or consented to the issuance of numerous false and misleading financial statements as alleged herein, falsely representing that those financial statements had been prepared in accordance with GAAP. ¶92. Significantly, despite representing in its SEC filings that Sonus's revenue recognition policies complied with the requirements of GAAP, defendants failed to adhere to the Company's own publicly stated revenue recognition policies, eventually requiring Sonus to issue a major restatement of its reported financial results. ¶101.

### III.

### ARGUMENT

#### A.    Standard Of Review On A Motion To Dismiss

In reviewing a motion to dismiss, the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir. 1992). The Court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) (citations omitted). A plaintiff's factual allegations may be either direct or inferential. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988).

With regard to Rule 10b-5 claims, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes a "clarity-and-basis" pleading standard that is closely related to Federal Rule of Civil Procedure 9(b). *Stone & Webster*, 414 F.3d at 195; *Greebel v. FTP Software, Inc.*,

194 F.3d 185, 193 (1ˢᵗ Cir. 1999) (PSLRA's pleading standard is "congruent and consistent" with pre-existing Rule 9(b) pleading standards.).  Rule 9(b) provides that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

In deciding a motion to dismiss, the procedural posture of the case should also be taken into account. *See In re Cabletron Systems, Inc.*, 311 F.3d 11, 33 (1ˢᵗ Cir. 2002) ("under our circuit law, the procedural posture of the case matters, and we will scrutinize a post-discovery motion to dismiss even more stringently than a pre-discovery motion."). *See also* 15 U.S.C. §78u-4(b)(3)(B).[7]  Plaintiffs cannot be held to "a standard that would effectively require them, pre-discovery, to plead evidence." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 48-9 (1ˢᵗ Cir. 1999).  As recently stated by the First Circuit:

> We have previously stated that the PSLRA does not require the plaintiff to "plead evidence." *See In re Cabletron Systems, Inc.*, 311 F.3d at 33.  As we understand, it was not Congress's intention to bar all suits as to which the plaintiff could not yet prove a *prima facie* case at the time of the complaint, but rather to prevent suits based on a guess that fraud may be found, without reasonable basis or a clear understanding as to what the fraud consisted of, but in the hope of finding something in the course of discovery. *Cf. In re Cabletron Systems, Inc.*, 311 F.3d at 30 (observing that the "statute was designed to erect barriers to frivolous strike suits, but not to make meritorious claims impossible to bring").

*Stone & Webster*, 414 F.3d at 199.

The First Circuit has recently ruled that the proper standard in evaluating a securities fraud complaint is whether "the complaint as a whole is sufficiently particular" to pass muster

---

[7]    Defendants' repeated motions to dismiss have created a statutorily mandated discovery stay.

under the PSLRA. *Cabletron*, 311 F.3d at 32; *see also In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1024 (9th Cir. 2005).

As demonstrated below, the Complaint meets all applicable pleading standards and the motions to dismiss should be denied.

### B.   The False Statements Are Sufficiently Identified And Rule 9(b) Has Been Satisfied

Sonus begins the "Argument" section of its motion by weakly contending that Lead Plaintiff has failed to identify each statement alleged to be false and why it is false. Sonus Brief at 4. This is demonstrably incorrect. ¶¶56-176. Each false statement has been painstakingly described, together with the reasons for the falsity.

As recently observed by the First Circuit in *Stone & Webster*, 414 F.3d 187, a case which Sonus conspicuously avoids mentioning in its motion, the PSLRA requires that a complaint alleging securities fraud must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, . . ." *Id.* at 194 (citing 15 U.S.C. §78u-4(b)(1)). In satisfying this requirement, a complaint "must provide factual support for the claim that the statements or omissions were fraudulent, that is, facts that show exactly why the statements or omissions were misleading." *Stone & Webster*, 414 F.3d at 194 (citing *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002)). There is no requirement, however, that the plaintiff "plead evidence." *Stone & Webster*, 414 F.3d at 199.

The Complaint identifies each of the alleged misstatements with exacting certitude. Each statement is specifically identified according to what was said, when it was said and how it was said. Moreover, the reasons for the alleged falsity of each statement are laid out in detail. ¶¶56-

#112044

-15-

176. Nothing is left to the imagination. For example, in Paragraph 104 of the Complaint, Lead

Plaintiff has alleged the falsity of Sonus's fiscal 2001 financial results as originally reported in its

Form 10-K filing for that year:

> Sonus thus overstated its 2001 total revenues by $44.399 million,
> misstated its net loss by $9.813 million, and misstated its net loss
> per share by $0.06. Absent the accounting improprieties, Sonus
> would have reported net income (loss) per share of ($3.68). In
> addition, Sonus misstated its cost of revenues for products by
> $12.505 million and its cost of revenues for services by $0.415
> million, resulting in an adjustment for the total cost of revenues of
> $12.920 million.

¶104.

The Complaint identifies each of the other alleged misstatements in similar fashion, with

the same degree of certainty and precision. Moreover, each allegedly false or misleading

financial statement and SEC report is identified. The reasons for the falsity of the statements are

particularized.

In *Stone & Webster*, the First Circuit upheld a Rule 10b-5 claim regarding the failure of

the officer defendants in that case to disclose the illiquidity of their company by observing:

> The Complaint paints a detailed account of the deteriorated
> financial conditions at S&W, replete with factual support and
> citations to sources likely to have knowledge of the matter. The
> Complaint also identifies with specificity the statements alleged to
> be false and misleading and explains in what respect they were
> misleading.

414 F.3d at 210.

The Complaint in the instant case provides even greater detail by identifying the

statements alleged to have been false, why they were false, and how and when they were made.

¶¶56-176. As such, the Complaint fully comports with this Circuit's "clarity and basis" standard.

Defendant Sonus appears to claim that Lead Plaintiff must allege some sort of "transactional specificity." Sonus Brief at 14. This is not the law. Although the PSLRA requires specificity concerning false accounting **statements**, there is no requirement in the statute or case law for "transaction-by-transaction" specificity.

Citing this Court's opinion in *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F.Supp.2d 134, 158 (D.Mass. May 10, 2001), Sonus claims that "'[t]o plead financial fraud based on improper revenue recognition under GAAP adequately, the complaint must allege, "at a minimum, **some particular transactions where revenues were improperly recorded**, including the names of the customers, the terms of the specific transactions, when the transactions occurred, and the approximate amount of the [allegedly] fraudulent transactions."'" (citations omitted) (emphasis added). Lead Plaintiff has done so here. ¶¶36-52, 103-176. However, the test referred to by Sonus is not the only possible method for pleading GAAP violations.

The Court in *Focus Enhancements* analyzed **two separate** complaints, one from a plaintiff group represented by James and the other from a plaintiff group represented by Ridel. The rule stated above referred to James' Second Amended Complaint. *Focus Enhancements*, 309 F.Supp.2d at 157. However, Ridel also pled allegations related to GAAP violations in *Focus Enhancements* (specifically violations related to revenue recognition under FAS 48). *Id.* at 150. Where James' allegations related to Focus's "inability to monitor inventory levels and reserve for returns," Ridel's GAAP allegations related to "channel-stuffing," "inventory parking," and "record[ing] those sales as revenue, despite the resellers' unlimited right of return." *Id.* at 157, 145, 150. Furthermore, Ridel's claim involved allegations that Focus's "financial results were

materially overstated based on improper recognition of revenue in violation of GAAP." *Id.* at

148.

With respect to Ridel's allegation that Focus failed to meet the revenue recognition

requirements of FAS 48, this Court stated that it "recognize[s] that [Plaintiff Ridel] cites *no*

*actual transaction* in which such practices [booking revenue despite a customer's right of return]

occurred." *Id.* at 151 (emphasis added). The Court continued:

> Nevertheless, the alleged violations are described with sufficient
> particularity. . . . Ridel fails to specify "such basic details as the
> approximate amount by which revenues and earnings were
> overstated; the products involved in the contingent transactions;
> the dates of any of the transactions; or the identities of any of the
> customers or [ ] employees involved in the transactions." *Greebel*,
> 194 F.3d at 204 (citations omitted); *see also Lirette v. Shiva Corp.*,
> 27 F.Supp.2d 268, 277 (D.Mass.1998) (citation omitted). . . . Yet,
> while Ridel fails generally to allege which resellers returned Focus
> products, the Ingram Micro shipment is adequately alleged to
> permit the theory to be pursued. According to Bounaira, at the end
> of the 1997 third quarter, Focus booked as revenue a 500-unit
> shipment to Ingram Micro of its TView Gold product. (Ridel 2d
> Am. Compl. ¶ 46.) Based on defendants' alleged access to the
> Ingram BOS which tracked sell-through, Ridel draws the inference
> that the defendants "knew or were reckless in not knowing that
> virtually all of the 500 TView Gold units were going to be
> returned." (*Id.*) Of course, this allegation does not specify when
> the units were returned or the specified reason for the return but the
> nature of the transaction can, at this stage, be treated as evidentiary
> of a broader pattern.

*Focus Enhancements*, 309 F.Supp.2d at 151-52. Plainly, the import of this ruling is that although

inclusion of allegations with sufficient detail to permit the pursuit of a theory of accounting fraud

is necessary, transactional specificity as to each and every allegedly improperly recorded

transaction is not required. Indeed, this aspect of the *Focus Enhancements* opinion clearly and

correctly anticipated the standard that was subsequently set forth by the First Circuit in *Stone & Webster*.

Defendants' focus on the specificity of each transaction is obviously misplaced. Lead Plaintiff has alleged specific behind-the-scenes accounting manipulations at Sonus which, in turn impacted how Sonus's transactions were improperly recorded. Defendants' improper actions (unbundling components from a single contract, recognizing revenue prior to delivering product or providing services, and issuing fake customer acceptance letters) provide a clear basis for allowing the accounting allegations to proceed to the next stage of the litigation.

## C.   The Claim Under Section 10(b) Of The 1934 Act Is Adequately Alleged

### 1.   *Scienter* Is Adequately Alleged

There is only one issue raised in defendants' motions with respect to the claim under Section 10(b) of the 1934 Act. That issue is whether Lead Plaintiff has adequately alleged defendants' *scienter*. It has.

To prevail on a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, a plaintiff must show that defendants had the requisite *scienter*, *i.e.*, an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Focus Enhancements*, 309 F.Supp.2d at 144. *Scienter* may be established by knowing conduct. *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001). *Scienter* may also be shown by recklessness. *Greebel*, 194 F.3d at 198-99; *Cabletron*, 311 F.3d at 39 ("*Scienter* may be demonstrated by indirect evidence, and may extend to a form of extreme recklessness that is closer to a lesser form of intent."). *See also Stone & Webster*, 414 F.3d at 199 ("reckless disregard for the truthfulness of the statements"); *Sundstrand Corp. v. Sun Chem. Corp.*,

553 F.2d 1033, 1045 (7th Cir. 1977) (recklessness means "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.")

"The First Circuit has adopted a fact-specific, case-by-case approach rather than a rigid formula for alleging *scienter*." *In re Sepracor, Inc. Sec. Litig.*, 308 F.Supp.2d 20, 30 (D. Mass. 2004) (quoting *Cabletron*, 311 F.3d at 39). *Scienter* may be established by allegations of defendants' motive and opportunity to commit the alleged fraud, although "'catch-all allegations,' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA." *Cabletron*, 311 F.3d at 39 (citations omitted). Where *scienter* is pled by intent, the plaintiff must allege "specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading." *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998); *Swack v. Credit Suisse First Boston*, 2004 WL 2203482, at *15 (D. Mass. Sept. 24, 2004) (Woodlock, J.).

The courts of this District have also found that violations of applicable accounting standards may be probative of *scienter* if combined with "other circumstances" showing *scienter*. *Focus Enhancements*, 309 F.Supp.2d at 150; *Crowell v. Ionics, Inc.*, 343 F.Supp.2d 1, 17 (D. Mass. 2004) ("Thus, though by no means conclusive, violations of GAAP and of a corporation's own corporate revenue recognition policies are obviously probative of *scienter*."); *Blatt v. Muse Technologies, Inc.*, 2002 WL 31107537, *11 (D. Mass. Aug. 27, 2002) (Woodlock, J.) (allegations of revenue recognition fraud were stated with sufficient particularity to give rise to a strong inference of *scienter*); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 148 (D. Mass.

2001); *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 235 (D. Mass. 1999) (GAAP violations combined with other circumstances may raise a strong inference of *scienter*).

Here, even a cursory review of the Complaint shows that defendants' *scienter* has been pled in conformity with these standards. The Complaint describes in detail how defendants engaged in the practice of segregating out future software "deliverables" from Sonus's major contracts for the purpose of "pushing" reported revenues into other reporting quarters, in violation of GAAP and SOP 97-2. ¶51. Under SOP 97-2, it was improper for the Company to recognize revenues under the contracts if there were any unmet future obligations, including an obligation to deliver software releases, which would thus render the seller's obligations under the contract incomplete or indeterminable. In an effort to make an end-run around SOP 97-2, Sonus's senior accounting and finance management, with the knowledge and approval of defendants, improperly "unbundled" certain future software deliverables (*i.e.*, software updates and releases) from the contracts, and agreed instead to deliver them as part of special "side agreements." ¶¶42, 47. In this way, defendants were able to manipulate the timing of revenues and spread reported revenues over several quarters, in violation of GAAP and SOP 97-2. ¶¶42-45, 47, 49, 50-51.[8]

---

[8]    Sonus claims that plaintiffs have not "set[ ] out with any specificity what is required by SOP 97-2 before a company can properly (or must) record revenues from the separate elements of a multiple element arrangement." Sonus Brief at 15. This, however, is not a plaintiff's task. A plaintiff must, as established in *Stone & Webster*, 414 F.3d at 198, "set forth a clear and precise statement of what the alleged fraud consisted of." As described above, Lead Plaintiff has sufficiently alleged such accounting violations. For example, in paragraph 98 of the Complaint, Lead Plaintiff outlines the affirmative requirements of SOP 97-2 that **mandate that revenue related to software must not be recognized until the following are all established**: (i) there is persuasive evidence that an arrangement exists; (ii) delivery (and acceptance) has occurred; (iii) the cost of the software is fixed and determinable; and iv) collectibility is likely (probable). ¶ 98.

The Complaint sets forth the specifics of defendants' scheme and describes precisely how it was orchestrated. It identifies the specific contracts at issue, the means by which they were manipulated, the corresponding violations of GAAP, and the amount of the overstatement of revenues and earnings in Sonus's financial statements for fiscal years 2001 and 2002 and the first three quarters of fiscal 2003. Against this backdrop of financial wrongdoing, the Complaint alleges precise and detailed facts from which a strong inference of the individual defendants' knowing approval and acquiescence in the accounting improprieties can be drawn.

For example, based upon information provided by sources who were in a position to know, defendants manipulated the timing of Sonus's reported revenues for the purpose of making it appear as though the revenues were more linear than they actually were. ¶¶40, 42, 47. The falsification of Sonus's financial reporting allegedly resulted from an internal decision by senior management to publicly portray Sonus's business as generating predictable, linear quarter-over-quarter revenue growth when in fact the Company's revenues were highly lumpy and irregular. ¶¶36-38.

Defendants deemed it essential to maintain the illusion of linear revenue growth. They knew that if analysts and other investment professionals did not perceive that Sonus was generating linear revenues, Sonus's stock would not be accorded a high price multiple, and hence, it would trade at a lower price. ¶¶37, 39. This was an especially important consideration given

---

In addition, Lead Plaintiff states how the defendants' recognition of revenue from unbundled contracts violated SOP 97-2. ¶41. Lead Plaintiff has properly alleged that defendants violated GAAP.

senior management's decision to raise additional capital by selling Sonus shares in follow-on stock offerings. ¶¶5, 39.

In order to smooth out the Company's reported revenues, defendants improperly "unbundled" certain software delivery obligations from Sonus's contracts with its large telecom customers, and thereafter manipulated the timing of the delivery of these obligations, in violation of GAAP and other accounting principles. ¶¶41-42. In many instances, defendants recognized revenue on the supposed delivery of software updates and releases when in fact no such delivery had been made. ¶¶42-45. Defendants also improperly broke out software delivery and maintenance obligations from the contracts and made them subject to secret "side agreements," another blatant violation of GAAP. ¶¶42, 47, 50. As one former vice president put it, Sonus was simply "gerrymandering" its contracts in order to meet financial targets. ¶44.

### 2.     **Conscious Misbehavior Or Recklessness Is Alleged**

The Complaint's *scienter* allegations, especially when combined with the particularized detail concerning the fraud and how it was carried out, *i.e.*, the specific contracts that were manipulated, the specific accounting principles that were violated, the specific amount of the revenue overstatements, and the fact that the allegations are based on information provided by sources who were in a position to know, are more than sufficient to meet the standards for pleading *scienter* in this Circuit. The *scienter* allegations are also bolstered by the fact of the multi-year restatements themselves and that certain high-ranking finance and accounting staff who had responsibility over the accounting issues alleged in the Complaint (including former controller Hemme and former CFO Nill) were terminated as a result of the wrongdoing. ¶¶4, 7.

The Complaint describes how defendants improperly "unbundled" future deliverables

from the Company's contract with Qwest and other contracts, and instead included them in separate undisclosed "side agreements." ¶¶41-42, 47, 50-51. In this way, defendants were able to sidestep GAAP and advance the recognition of revenue under the Qwest contract. ¶51. This practice, which was a blatant violation of GAAP and SOP 97-2, is described in detail. The Complaint alleges that defendant Nill, working alongside the Company's former controller, Peter Hemme, arranged for Sonus to improperly recognize $27.5 million in Q2 2002 by recording revenues on software updates that had not been delivered pursuant to the Company's contract with Qwest, then Sonus's largest telecom customer. ¶45. By their very nature, Sonus's contracts – including the large Qwest contract – had a large deferred revenue component based upon the obligation to provide maintenance services or to deliver certain software updates and releases in future periods. ¶¶42-43. Under GAAP and the Company's own revenue recognition guidelines, such deferred revenues could only be recognized upon the performance of these future obligations. Yet, as described in the Complaint, Sonus improperly recorded $27.5 million in revenue under the Qwest contract by falsely claiming, among other things, the delivery of software releases and updates in Q2 2002. ¶45.

Although defendants argue that the decision as to when to recognize revenue under the contracts involved complex accounting judgments, in truth there is no leeway under GAAP for falsely recognizing revenues on the performance of obligations **which in reality were not performed** in the accounting quarters in which they were recorded. Such practices are strictly forbidden under GAAP. Moreover, the Complaint leaves no doubt as to the blatantly illegal nature of defendants' misconduct. According to sources who were in a position to know, defendants booked revenues on the supposed delivery of releases and updates that **were not even**

**ready to be delivered**. ¶¶6, 43, 46. Thus, defendants' attempt to downplay the Complaint's serious allegations of revenue recognition improprieties by suggesting that they somehow involved legitimate "judgment calls" is specious.

The Complaint's *scienter* allegations rest on precise, factually-detailed averments. For example, the Complaint alleges that Sonus improperly recorded $11 million on the Qwest contract in Q4 2003 where the delivery of the subject software releases **had not occurred**. ¶45. According to sources with knowledge, this improper revenue recognition practice was known, approved and condoned by defendant Nill, who, together with former controller Hemme, controlled the revenue reporting function at Sonus under the direct supervision of defendant Ahmed. *Id.* Indeed, according to sources who were in a position to know, former controller Hemme "was told to get a number" by defendant Nill and other senior managers, in order to meet the Company's quarterly financial targets. ¶45.

It was well-known within the Company that Sonus's senior management was actively "managing" the Company's quarterly reported revenues to meet targets. It was frequently discussed by the members of the sales and technical team who were involved with servicing the Qwest contract. ¶50. Salespeople were even threatened with having their commissions reduced if they failed to take certain deliverables out of the contracts and make them subject to undisclosed "side agreements." *Id.* According to a former senior sales manager with responsibility for a significant contract with one of Sonus's larger telecom customers, as many as 10 to 15 different salespeople had complained at one time or another about the overt pressure that they received from Sonus's management to improperly pull-out contract deliverables in order to make them subject to secret "side-agreements." *Id.*