Other contracts were similarly manipulated. For example, according to a former accounting department employee who reported directly to former controller Hemme, Hemme materially overstated Sonus's reported revenues on its contract with AT&T in Q4 of 2003. ¶48. As with the Qwest contract, he did so by manipulating the delivery of various features that were part of the contract. According to the source, "Hemme was taking sales into revenue that were not there." *Id.*[9] The Complaint even identifies by name specific individuals who knew about and openly discussed the accounting improprieties committed by defendants, such as various members of the Company's accounting department, including, among others, Fergus Ryan, McKenzie Lyons and Richard Sharpe. *Id.* The Company's accounting improprieties were even a subject of concern by Ryan and Lyons, among others. *Id.*

As the First Circuit has pointed out, conscious misbehavior may provide the "something more" needed to allege *scienter*. *Cabletron*, 311 F.3d at 39 (("[T]he obvious should not go unstated, and that is that allegations of intentionally fraudulent conduct also will permit the drawing of a strong inference of *scienter*.") (citing law review article); *Swack*, 2004 WL 2203482, at *16 (citing *Cabletron*); *In re Fine Host Corp. Sec. Litig.*, 25 F.Supp.2d 61, 70 (D. Conn. 1998) (noting that under Second Circuit law, "an allegation of specific facts indicating that a defendant consciously falsified financial statements is sufficient to meet the pleading standard for *scienter*."). The particularized allegations of *scienter* contained in the Complaint comport with these standards.

---

[9]    The abuses extended well beyond just the Qwest and AT&T contracts. They also included the Company's contracts with XO Communications, Epana, IDT and Verizon, among others. ¶51.

The Complaint leaves little doubt as to Nill and Ahmed's knowledge or, at a minimum, reckless disregard of the accounting fraud. It is alleged that in either Q3 or Q4 2001, defendant Nill, along with former controller Hemme, requested an acceptance letter be sent to Michael Perruse, a former Senior Vice President of Engineering at Qwest. ¶46. The purpose of the acceptance letter was to purportedly confirm the delivery of approximately $18 million worth of hardware and software to Qwest, pursuant to its $100 million contract with Sonus. *Id.* The letter was issued under either Nill or Hemme's signature, even though the product had not been delivered, and in fact was not even ready to be delivered. *Id.* Instead, the product remained in the laboratory of Sonus's Telecom Technologies, Inc. subsidiary in Richardson, Texas, long after the letter had been sent to Perruse. *Id.* Nevertheless, Sonus improperly recognized $18 million in revenue upon the issuance of the letter. *Id.* Similar letters were sent to other customers, including Global Crossing and XO Communications, each for the purpose of "confirming" the delivery of product or the performance of contract milestones, even though no such delivery or performance had yet occurred. *Id.* In many cases, the product upon which the revenues were improperly booked was not even ready to ship, a fact that was known to defendants Nill and Ahmed. ¶¶6, 43, 46. Indeed, Ahmed was specifically made aware of these improper practices and condoned them. According to a former Sonus vice president who had responsibility for, *inter alia*, preparing and interacting with Hemme on financial statement preparation, **defendant Ahmed was expressly made aware of these improper practices in 2001**, specifically with regard to the Qwest contract, but took no action to stop them. As a result, Sonus was able to improperly book millions of dollars in revenues, in violation of GAAP and, in particular, SOP 97-2. ¶46.

Defendants attempt to sidestep these serious allegations by claiming that the Complaint fails to adequately allege that their accounting "judgments" were in fact unreasonable or whether they even violated applicable accounting standards. Defendants, however, gloss over the fact that they were forced to restate the Company's financial statements for fiscal years 2001 and 2002 and the first three quarters of 2003. The restatements themselves are an admission that the Company's previously-published financial results were materially false and misleading when issued. Moreover, defendants' argument that the decision as to when to recognize revenue "requires significant judgment" or a "degree of unavoidable guesswork" is a red herring. GAAP does not permit revenues to be recognized on the supposed delivery of software upgrades and releases when such items are not in fact delivered, or even ready to be delivered. ¶¶6, 43, 46.

The Complaint also alleges that defendants pulled delivery obligations from the contracts and made them subject to secret, undisclosed "side agreements." ¶¶47, 50, 51. This too is improper under even the most strained reading of GAAP. In fact, no matter how mightily defendants attempt to twist and turn the provisions of GAAP and, more particularly, SOP 97-2, such alleged misconduct is not a matter of "unavoidable guesswork." Rather, it is unlawful and improper. The Complaint's allegations of conscious or reckless conduct are well pled.

### 3.    Sources Are Adequately Identified

Predictably, defendants once again make the primary focus of their motions the purported lack of sufficient identification of Lead Plaintiff's sources. These arguments, however, are baseless. The Complaint's sources have been adequately identified. In fact, each of the sources' former job positions, responsibilities or titles are described sufficiently to enable a determination that the source was likely to have been a position to know the information for which he or she is

cited. In many cases, such sources were officer-level employees. It cannot seriously be claimed

that former officers, *i.e.*, former vice presidents, would not be a position to know. By way of

example, the source of the allegations regarding the improper booking of revenues under the

Qwest contract where phony delivery letters were sent – a fact that was allegedly known by both

Nill and Ahmed – was a former vice president who had responsibility for, among other things,

interacting with the Company's controller on financial statement preparation. ¶46. Such a

source was clearly in a position to know.

　　　　The non-officer sources have also been adequately identified. The Complaint identifies

one source as "former senior sales manager with responsibility for a significant contract with one

of Sonus's larger telecom customers." ¶50. Such a person would likely have knowledge of the

manipulation of Sonus's contracts by virtue of his job responsibilities. Moreover, sales

personnel had knowledge of defendants' manipulations because they had been pressured by

defendants to take deliverables out of the contracts and make them subject to secret "side

agreements" instead. Indeed, this type of wrongdoing manifested itself in the way salespeople

were paid commissions. Not surprisingly, some of the sources identified in the Complaint

include a former Account Director who reported directly to the Vice President of Sales and a

former regional Sales Director who reported directly to a regional Vice President of Sales. *Id.*

These individuals were in a position to know what was going on.

　　　　There is no requirement that Lead Plaintiff identify its confidential sources by name.

*Cabletron*, 311 F.3d at 20-21; *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("no

requirement in existing law that, in the ordinary course, complaints in securities fraud cases must

name confidential sources . . ."); *In re Xerox Corporation Sec. Litig.*, 165 F.Supp.2d 208, 223 (D.

Conn. 2001).

In *Cabletron*, the First Circuit expressly endorsed the Second Circuit test with regard to

using confidential sources to allege *scienter*:

> [W]here plaintiffs rely on confidential personal sources but also on
> other facts, they need not name their sources as long as the latter
> facts provide an adequate basis for believing that the defendants'
> statements were false. Moreover, even if personal sources must be
> identified, there is no requirement that they be named, provided
> they are described in the complaint with sufficient particularity to
> support the probability that a person in the position occupied by the
> source would possess the information alleged. In both of these
> situations, the plaintiffs will have pleaded enough facts to support
> their belief, even though some arguably relevant facts have been
> left out.

*Cabletron*, 311 F.3d at 29 (citing *Novak*, 216 F.3d at 314).

Here, the Complaint meets the *Cabletron* standard because the information provided by

Lead Plaintiff's sources is corroborated by their positions within the Company. The source for

the allegations concerning the booking of revenues based on the phony delivery letter

"confirming" the delivery of $18 million worth of product under the Qwest contract (when in fact

no such delivery had been made) is a former Sonus Vice President who had responsibility for,

*inter alia*, preparing and interacting with former Sonus controller Peter Hemme on financial

statement preparation. ¶46. Such a person was obviously in a position to know. Recently, the

First Circuit in *Stone & Webster* found that, "[w]ith respect to basis, while the sources of

information on which the Complaint relies for these allegations are not overwhelmingly

impressive, they include sources within the Company who might well have access to the kind of

information for which they are cited." 414 F.3d at 198-99. Similarly, in this case, given the

description of their former job titles, responsibilities or positions as set forth in the Complaint,

there can be no question that Lead Plaintiff's sources "might well have access to the kind

information for which they are cited." *Id.*

A review of the Complaint shows that Lead Plaintiff's sources are described with

sufficient particularity. For example:

- **According to several former senior sales and technical officers and staff,
  including a former Sonus Vice President in charge of business development,
  a former sales engineer who reported directly to Sonus's Director of
  Engineering, and a former Vice President with responsibility for various
  functions within the Company's Intelligent Internet Protocol division**, the
  misstatement of the Company's revenues resulting from these improper
  accounting methods was material and ongoing. ¶45.

- **According to a former Sonus vice president who had
  responsibility for, inter alia, the Company's soft switches (a
  significant component of the Qwest contract)**, "Sonus was
  simply gerrymandering results as to the Qwest contract." ¶44.

- **According to a former Account Director who reported directly
  to an officer-level sales executive** during the relevant time period,
  Sonus unbundled the Qwest contract in order to stage-manage the
  recording of the revenues. ¶42.

- **According to the source identified in the preceding paragraph**,
  Sonus was able to, and did, manipulate the timing of its reported
  revenues by claiming that the software updates had in fact been
  delivered at the time revenue therefrom was recorded. In truth, the
  Qwest updates were not delivered and, in many instances, were not
  even ready to be delivered. ¶43.

- **According to a senior sales director who worked in Sonus's
  Denver-based Western regional sales office**, the fact that Sonus
  was manipulating the Qwest contract to "manage" its reported
  quarterly revenues was continually discussed among the sales and
  technical staff members employed in that office. ¶42.

- **According to a former senior sales manager who had
  responsibility for approximately 35% of Sonus' revenues in**

#112044                                                              -31-

**2003**: "They (senior management) tried to take a business with non-linear revenues and non-linear orders and perceive it to the Street as linear – they were always pulling things into the next quarter to make things linear." ¶40.

- **According to a former accounting department employee who reported directly to Hemme**, Hemme "was told to get a number" in order to make the quarter by senior Company managers, including defendant Nill. ¶45.

- **According to a former Sonus vice president who had responsibility for, inter alia, preparing and interacting with Hemme on financial statement preparation**, in either Q3 or Q4 2001, defendant Nill, along with former Controller Hemme, had requested that an acceptance letter be sent to Qwest for the purpose of purportedly confirming the delivery of approximately $18 million worth of hardware and software. The letter was in fact issued, under either Nill or Hemme's signature, even though the product had not been delivered, and in fact was not even ready to be delivered. ¶46.

- **According to the same source identified in the preceding paragraph**, defendant Ahmed knew about the phony recognition of $18 million on the Qwest contract. ¶46.

- **According to a former senior sales account manager who had responsibility for Sonus's Verizon contract**, "The company was pushing-out or spreading revenues across quarters to get revenue as linear as possible. This was the case with Verizon. There was always some pressure not to include all of the future deliverables. For instance, with Verizon, the 'spreading' had to do with contract maintenance terms that included software updates." ¶47.

- **According to a former senior sales account manager who had responsibility for Sonus's Verizon contract**, "Qwest was always an account that involved some future deliverable that was pushed out quarter after quarter to get revenue as linear as possible. I believe that there was informal communication involved outside of the contact. XO Communications, I believe was another such account. Accounts such as Epana and IDT were accounts where some salespeople complained that they were not going to get their commissions because the future deliverable if left in the contract would delay the contract from being recognized." ¶47.

- **According to a former accounting department employee who reported directly to Hemme**, Hemme materially overstated Sonus's reported revenues on its contract with AT&T in Q4 of 2003. He did so by manipulating the delivery of various features under the contract. According to the aforementioned source, "Hemme was taking sales into revenue that were not there." ¶48.

- **According to the aforementioned source**, the Company's revenue manipulations were part of an ongoing pattern and practice at the Company. ¶48.

- **According to several former employees, including a former Account Director who reported directly to the Vice President of Sales, a former regional Sales Director who reported directly to a regional Vice President of Sales, and a sales engineer who reported directly to the Company's Director of Engineering**, the fact that Sonus's senior management was "managing" quarterly revenues was well known and openly discussed by Sonus's personnel, including the sales and technical personnel involved with servicing the Qwest contract. ¶50.

- **According to a former senior sales manager with responsibility for a significant contract with one of Sonus's larger telecom customers**, at least 10 to 15 different salespeople had complained at one time or another about the overt pressure that they received from Sonus's management to improperly pull-out contract deliverables and make them subject to special, undisclosed side-agreements. ¶50.

- **According to a former Account Director who reported directly to the Vice President of Sales**, Sonus began the practice of segregating out future "deliverables" from its major contracts, including the Qwest contract, for the purpose of "pushing" reported revenues. ¶51.

- **According to the aforementioned source**, this improper practice occurred in connection in the Company's contracts with Qwest, XO Communications, Epana, IDT and Verizon, among others. ¶51.

Defendants complain that these descriptions are too broad or too vague to permit the Court to determine whether the sources were in a position to know. But this argument is undermined by the senior status of the sources, as well as their specific job responsibilities. All

of the sources had responsibility in either finance, accounting or sales.  *E.g.*, "[A]ccording to a former accounting department employee who reported directly to Hemme, 'Hemme was taking sales into revenue that were not there.'"  ¶48.  Given the precise nature of the factual allegations in question, and the substantial corroboration provided by numerous other sources throughout the Company, the argument that Lead Plaintiff's sources are too vaguely identified is specious.  The Complaint provides more than ample identification of the sources to enable the Court to determine whether they were likely to know the information attributed to them.

In considering whether Lead Plaintiff has provided an adequate description of its sources, the Court can also look at other corroborating facts.  *See Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.Supp.2d 12, 22 (D. Mass. 2000) ("Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.") (citing *Novak*, 216 F.3d at 313) (emphasis added).  Here, the highly-particularized nature of Lead Plaintiff's allegations permit this Court to make such an evaluation.  For example, the Complaint describes how defendants manipulated Sonus's revenues by identifying the specific contracts at issue, the amount of the revenue misstatements and the resulting GAAP violation.  ¶¶41-51, 102, 104-05, 107, 109-10, 113, 118, 127, 127-30, 142-43, 155-56, 167-68, 177.  One concrete example highlights this point:

> A former Sonus vice president who had responsibility for, *inter alia*, preparing and interacting with Hemme on financial statement preparation, described how, in either Q3 or Q4 2001, defendant Nill, along with former Controller Hemme, had requested that an acceptance letter be sent to Michael Perruse, a former senior vice president of Engineering at Qwest.  The purpose of the acceptance letter was to purportedly confirm the delivery of approximately $18

million worth of hardware and software to Qwest, pursuant to its $100 million contract with Sonus. The letter was in fact issued, under either Nill or Hemme's signature, even though the product had not been delivered, and in fact was not even ready to be delivered. Instead, the product remained in the laboratory of Sonus's Telecom Technologies, Inc. subsidiary in Richardson, Texas, after the letter had been sent to Perruse. Perruse went along with the fraud because of certain reciprocal revenue arrangements which he had entered into with Sonus. Letters were sent to other customers as well, including Global Crossing and XO Communications, each for the purpose of "confirming" the delivery of product or the performance of contract milestones, even though no such delivery or performance had actually occurred. In many instances, Sonus did not even have product ready to deliver at the time the revenues were booked. According to the aforementioned source, defendant Ahmed was made aware of these improper practices in 2001, specifically with regard to the Qwest contract, but took no action to stop them. As a result, Sonus was able to improperly book millions of dollars in revenues, in violation of GAAP and, in particular, SOP 97-2.

¶46.

The level of detail in these allegations provides a reasonable basis for assessing the believability of the information provided by Lead Plaintiff's sources. When viewed against the highly specific nature of the allegations, there is no need for any additional description of the sources. *Cabletron*, 311 F.3d at 29-30.[10]

Lastly, it is inconceivable that defendants did not have knowledge of any of these serious problems which plainly called into question the reliability and accuracy of the Company's accounting systems. If, somehow, they were totally oblivious to these issues, then signing and issuing SEC filings and making positive public statements about the condition of the Company

---

[10]    The level of detail and basis for personal knowledge alleged as to the sources identified in the Complaint bear no resemblance whatsoever to the vague source allegations found in *In re Vertex Pharmaceuticals, Inc. Sec. Litig.*, 357 F.Supp.2d 343, 353-54 (D.Mass. 2005).

constitutes gross recklessness, an "egregious departure from the range of reasonable business decisions," clearly supporting a strong inference of *scienter*. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999). *Scholastic*, 252 F.3d at 75 ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting facts with respect to the corporate business"); *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir. 1992) ("egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness").

### 4. The Restatements And The Magnitude Of The Fraud Raise A Strong Inference Of *Scienter*

Defendants also claim that *scienter* cannot be inferred from the fact of a financial restatement or alleged GAAP violations. As set forth in the Complaint, however, the Company's restatements constitute admissions that Sonus's previously reported financial results were materially false when made, that its financial results were achieved through the use of improper accounting practices, and that defendants violated GAAP. ¶¶2, 4, 8, 9 41, 43, 46, 51, 92, 95-97, 101, 177. Because extensive and ongoing accounting manipulations of the sort alleged here are, of necessity, the product of conscious behavior by the Company through its high-level executives, these allegations raise a strong inference of *scienter*. *See, e.g., In re Ancor Communs., Inc. Sec. Litig.*, 22 F.Supp.2d 999, 1006 (D. Minn. 1998) ("'A violation of GAAP may be used to show company overstated its income, which may be used to show the *scienter* for a violation of Section 10(b) and Rule 10b-5'") (quoting *Marksman Partners v. Chantal Pharm. Corp.*, 927 F.Supp. 1297 (C.D. Cal. 1996)); *In re Telxon Corp. Sec. Litig.*, 133 F.Supp.2d 1010,

1029 (N.D. Oh. 2000) (*scienter* found from allegations of large financial restatements and accounting manipulations of substantial magnitude); *In re Wellcare Mgmt. Group Sec. Litig.*, 964 F.Supp. 632, 640 (N.D.N.Y. 1997) (upholding allegations that corporate executive "had knowledge of, condoned, and/or encouraged. . .the deliberate overstatement of earnings by a number of means"); *Fine Host*, 25 F.Supp.2d at 70 (allegations that defendants consciously falsified financial statements are sufficient to meet pleading standard for *scienter*).

The Complaint identifies numerous GAAP violations, a fact which is confirmed by the Company's restatements. Although GAAP violations, in the absence of other circumstances showing *scienter*, may not support the requisite strong inference of *scienter*, the First Circuit has observed that "significant" GAAP violations can nevertheless "provide evidence of *scienter*." *Cabletron*, 311 F.3d at 39; *Greebel*, 194 F.3d at 203; *Geffon*, 249 F.3d at 36 (accounting shenanigans are among the characteristic types of circumstances which may demonstrate *scienter* for securities fraud.); *Crowell*, 343 F.Supp.2d at 17 ("Thus, though by no means conclusive, violations of GAAP and of a corporation's own corporate revenue recognition policies are obviously probative of *scienter*."); *Blatt*, 2002 WL 31107537, *11 (Woodlock, J.) (allegations of revenue recognition fraud were stated with sufficient particularity to give rise to a strong inference of *scienter*); *Raytheon*, 157 F.Supp.2d at 148; *Chalverus*, 59 F.Supp.2d at 235 (GAAP violations combined with other circumstances, including company's violation of own revenue recognition policy, may raise a strong inference of *scienter*).

The pervasiveness and duration of the accounting manipulations here -- as well as the magnitude of the subsequent restatements -- indicate that defendants either knew of, or recklessly disregarded, the alleged accounting fraud. *See, e.g., In re MicroStrategy Inc. Sec. Litig.*,

115 F.Supp.2d 620, 637 (E.D. Va. 2000) ("GAAP violations and the subsequent restatements are of such a great magnitude . . . as to compel an inference that fraud or recklessness was afoot"). Here, the Complaint alleges that defendants' improper accounting endured for nearly three years and resulted in a huge, multi-million dollar restatement of Sonus's financial statements for that period. *E.g., In re American Bank Note Holographics Sec. Litig.*, 93 F.Supp.2d 424, 447 (S.D.N.Y. 2000) (the admitted falsity of financial statements and, *inter alia*, the extraordinary degree to which they were false, combine to raise a strong inference of consciousness or recklessness).

The alleged GAAP violations do not involve intricate or complex accounting judgments, but rather out-and-out deception and fraud. *See, e.g.*, ¶46 (defendants allegedly recognized $18 million in phony revenue on the purported delivery of software that was not delivered). Such brazenly illegal conduct does not involve an honest mistake or error. Clearly, a strong inference of *scienter* can reasonably be drawn.

## 5. Knowledge Of The Accounting Deficiencies And Improprieties May Be Attributed To Defendants

Defendants' *scienter* arguments also ignore well-established precedent which holds that knowledge concerning a company's key business or transactions may be attributable to the company, its officers and directors. The courts of this district have consistently held that knowledge of accounting problems may be imputed to the Company and its directors and officers. *Chalverus*, 59 F.Supp.2d at 235 (certain information, particularly facts critical to an important transaction, generally are so apparent that their knowledge may be attributed to the company and its key officers); *see also U.S. v. Josleyn*, 206 F.3d 144, 159 (1st Cir. 2000)

(reasoning that whether a given relationship is sufficient to support the imputation of knowledge may, in some cases, depend on an assessment of the person's "level of responsibility"); *see also In re Tel-Save Sec. Litig.*, 1999 WL 999427, *5 (E.D. Pa. Oct. 19, 1999); *Cosmas v. Hassett*, 886 F.2d 8, 10 (2d Cir. 1989) (facts critical to a business's core operations or to an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers.).

In *Crowell*, 343 F.Supp.2d 1, Chief Judge Young found that knowledge of a scheme that involved important sales transactions could be imputed to the top executives of the defendant company:

> As to the allegation that the Ionics Defendants knowingly or
> recklessly failed to reveal this fraudulent scheme in disclosures to
> the investing public, it can be inferred that top executives at Ionics
> were aware of a scheme involving systemically fraudulent sales
> practices, given the importance of the Aqua Cool sale to Ionics'
> business that year.

*Id.* at 19 (citations omitted).

Defendants cannot seriously argue that they knew nothing of Sonus's improper accounting practices and faulty accounting systems, or that their professed lack of knowledge about the Company's finances was not reckless. Numerous courts have held that where the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the officers and directors of the company. *See, e.g., In re Providian Financial Corp. Sec. Litig.*, 152 F.Supp.2d 814, 825 (E.D. Pa. 2001) (knowledge of deficiencies in accounting and other fraudulent practices that "permeated" the company's "core business" attributed to individual defendants); *In re Campbell Soup Sec. Litig.*, 145 F.Supp.2d 574, 599 (D.N.J. 2001) (company's

CEO and CFO presumed to have knowledge of matters that are "the bread and butter" of the company's business); *In re Cell Pathways*, 2000 WL 805221, \*7 (E.D. Pa. June 20, 2000) ("where the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants"); *In re Tel-Save Sec. Litig.*, 1999 WL 999427, \*5 (E.D. Pa. Oct. 19, 1999); *Epstein v. Itron*, 993 F.Supp. 1314, 1325 (E.D.Wash. 1998) ("facts critical to a business' core operation or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers").

It is beyond peradventure that the matters at issue here -- serious and ongoing deficiencies in Sonus's internal accounting and financial controls and systems, as well as the repeated, blatant and improper manipulations of the Company's reported revenues, all of which led directly to the restatement of more than two years of publicly-issued financial statements -- are "central" to the "core business" of the Company. As Chief Judge Young observed in *Crowell*, a failure to maintain adequate internal controls is "probative" of *scienter* and "can add to the strength of a case based on other allegations." *Crowell*, 343 F.Supp.2d at 20; *see also Chalverus*, 59 F.Supp.2d at 235; *In re IKON Office Solutions, Inc. Sec. Litig.*, 66 F.Supp.2d 622, 631 (E.D. Pa. 1999) (holding that knowing or reckless disregard of grossly deficient internal controls may gave rise to inference of *scienter*); *In re Rent-Way Sec. Litig.*, 209 F.Supp.2d 493, 515-16 (W.D. Pa. 2002). Clearly, it is hard to imagine something more "central" to the "core business" of a company than the ability to properly account for its revenues and earnings in a particular accounting period.

Defendants also claim that former controller Hemme's knowledge cannot be imputed to the other defendants. That is a misstatement of the law. Hemme was the agent of Nill, Ahmed

and Sonus. He worked under their direction and supervision, and pursuant to their control. Under longstanding principles of agency, Hemme's knowledge is automatically imputed to them, especially since the knowledge sought to be imputed was obtained during the course of his agency – and while working directly under Nill and Ahmed's supervision and control.

"When an agent acquires knowledge in the scope of [his] employment, the principal ... is held to have constructive knowledge of that information." *DeVaux v. American Home Assur. Co.*, 387 Mass. 814, 818 (1983), *citing Bockser v. Dorchester Mut. Fire Ins. Co.*, 327 Mass. 473, 477-78 (1951) and *Union Old Lowell Nat'l Bank v. Paine*, 318 Mass. 313, 323-24 (1945). *See also Juergens v. Venture Capital Corp.*, 1 Mass.App.Ct. 274, 278 (1973) (corporate officer's knowledge of transaction was constructive notice to corporation).[11]

Defendants claim that *scienter* cannot be imputed, notwithstanding Hemme's agency relationship. The courts, however, have never held this. In fact, they have held just the opposite. *See In re Parmalat Sec. Litig.*, 377 F.Supp.2d 390, 409 (S.D.N.Y. 2005) ("As principals, they could be liable for the acts of their agents and their agents' knowledge, and consequently *scienter*, could be imputed to them."); *Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1322 (S.D. Fla. 2004) ("The *scienter* of a corporation's officer may be imputed to the corporation itself under general agency and corporate law principles.")

//

---

[11]   Nor can there be any question that the *scienter* of senior officers, such as Nill, Ahmed and Hemme, is imputed to Sonus. *See Commonwealth v. L.A.L. Corp.*, 400 Mass. 737, 743, 511 N.E.2d 599 (1987) (corporation may be criminally liable for wrongdoings of its agents); *United States v. Bank of New England*, 821 F.2d 844, 856 (1st Cir. 1987) (knowledge obtained by corporate employees acting within scope of their employment is imputed to corporation, in context of corporate criminal liability).

### 6. Violation Of One's Own Accounting Policies Shows *Scienter*

*Scienter* can also be inferred from defendants' violation of Sonus's own revenue recognition policies. For example, in Sonus's Form 10-K for the year ended 2001, the Company represented that its policy was to only recognize revenue in conformity with GAAP. ¶101. Further, the Company represented that "[i]f uncertainties exist, we recognize revenue when those uncertainties are resolved." Id. The Company also claimed that "[o]ur revenue recognition policy complies with SEC Staff Accounting Bulletin No. 101, REVENUE RECOGNITION IN FINANCIAL STATEMENTS." ¶107.

Each of these representations was false. Defendants in fact recorded revenues in violation of the Company's own revenue recognition policies. See ¶¶102, 104, 105-07, 109-11, 113, 115, 118, 120, 127, 128-30, 134, 142-44, 146, 153-56, 158, 166-69, 171, 177. Violation of Sonus's internal revenue recognition policies is probative of defendants' *scienter*. *Crowell*, 343 F.Supp.2d at 17 (violations of GAAP and of a corporation's own corporate revenue recognition policies are obviously probative of *scienter*); *Chalverus*, 59 F.Supp.2d at 235 (GAAP violations combined with other circumstances, including company's violation of own revenue recognition policy, may raise a strong inference of *scienter*); *see also Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731, 735-37 (D. Mass. 1995) (auditor's knowledge that a company violated its own internal policies is sufficient to plead *scienter*); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996). Thus, for this additional reason, the Complaint adequately alleges defendants' *scienter*.

### 7. The Absence of Insider Selling Is Irrelevant

Defendants once again argue that the Complaint does not allege defendants' motive

because neither Ahmed nor Nill sold any Sonus shares during the Class Period. Although not required to plead and prove *scienter*, motive allegations nevertheless can be used to support an inference of *scienter*. Here, defendants had a clear motive to misrepresent the state of Sonus's finances because they wanted to enable the Company to engage in follow-on stock offerings. ¶¶5, 39. In particular, they allegedly manipulated Sonus's publicly reported financial results for the purpose of creating an illusion of revenue linearity and visibility so that the Company could pursue such offerings. ¶¶37-39. In similar cases, the courts have found "motive" in support of *scienter* where defendants were alleged to have engaged in wrongdoing in furtherance of a specific corporate aim. *See Gross v. Medaphis*, 977 F.Supp. 1463, 1472 (N.D. Ga. 1997) (motive of inflating results for the purpose of furthering corporate acquisitions was sufficient to show *scienter*). In *Crowell*, Chief Judge Young found that the defendants in that case had a "clear motive" to overstate the financial statements of the issuing company:

> Here, moreover, the Ionics Defendants had a clear motive to inflate Ionics' stock price artificially by engaging in a fraudulent scheme to inflate Aqua Cool's sales and customer base artificially. They wanted to maximize Aqua Cool's sale price. Deliberate overstatement of revenues to consummate a major sale or acquisition of stock or assets is sufficient to support a strong inference of scienter.

*Crowell*, 343 F.Supp.2d at 19. Nor does an absence of insider trading negate a finding of motive. *Crowell*, 343 F.Supp.2d at 15 ("Even if none of the Ionics Defendants profited from stock trades during the Class Period, that does not establish that they lacked any motive to mislead the investing public. . . ").

When viewed in their totality, the allegations regarding defendants' motive to craft the illusion of revenue linearity, along with the other detailed allegations of accounting fraud, are

more than sufficient to permit a strong inference of *scienter*. *See In re Digi Inc., Sec. Litig.*, 6 F.Supp.2d 1089 (D. Minn. 1998) (allegations of motive and opportunity along with substantial restatements of financial disclosures are enough to establish *scienter*). The particularized allegations of wrongdoing in the Complaint plead the requisite *scienter*.[12]

### D.    The Claim Under Section 11 Of The 1933 Act Is Adequately Alleged

Defendants' only argument in support of dismissal of the claim arising under Section 11 of the 1933 Act, 15 U.S.C. §77k, is that the particularity requirements of Rule 9(b), Fed.R.Civ.P. for pleading fraud should apply to this claim and have not been met. They make this argument notwithstanding that Section 11 itself imposes strict liability on an issuer for a materially misleading registration statement, and individual signers thereof such as defendants Ahmed and Nill can be held liable under the statute for mere negligence. *Huddleston*, 459 U.S. at 382.[13]

This argument should be rejected for two reasons. First, assuming *arguendo* that defendants' legal position is correct, and the fraud-based pleading standard applies to this negligence claim, as demonstrated in Section III.B., *supra*, the Complaint sufficiently alleges defendants' fraud in compliance with Rule 9(b). Accordingly, the Section 11 claim is adequately alleged even applying this erroneous standard.

---

[12]    Sonus claims that termination of the SEC investigation compels dismissal. Sonus Brief at 3. However, this could have been based on any number of factors not related to the merits of this action. *City of Austin Police Retirement System v. ITT Educational Serices, Inc.*, 2005 WL 2278123 at *5 (S.D. Ind. Sept. 14, 2005). It is well settled that private enforcement of the federal securities laws provides a necessary supplement to the activities of the SEC, which is constrained by lack of resources, both people and money. *E.g., J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396-97 (1970).

[13]    The Section 11 claim is based on the Prospectus Supplement and related registration statement issued by Sonus on September 24, 2003 by which it raised $124 million from the investing public. ¶¶25, 193-199.

However, for the reasons discussed below, the defendants' invitation to apply the standards for pleading fraud to the Section 11 claim should be declined.  Section 11 is not a fraud claim, and the fraud pleading standards are inapplicable.[14]

According to the First Circuit, "[f]raud is not an element of a claim under either Section 11 or 12(2), and a plaintiff asserting such claims may avoid altogether any allegations of *scienter* or reliance." *Shaw*, 82 F.3d at 1223 (citations omitted).  The general rule is that "the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA do not generally apply to Section 11 and Section 12(a)(2) claims." *Giarraputo v. UNUMProvident*, 2000 WL 1701294, \*9 (D. Me. 2000).  As noted by the Eighth Circuit, "the particularity requirement of Rule 9(b) does not apply to claims under §11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under §11." *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997).  Defendants nonetheless claim that the Complaint "sounds in fraud," triggering the heightened fraud pleading requirements.  They are wrong.

Lead Plaintiff's claims under the 1933 Act do not require allegations of fraud, are not "grounded in fraud," and therefore are not subject to Rule 9(b) and the requirement that the claims be pled with the particularity required by that Rule.  It is settled that "in a case where fraud is not an essential element of a claim, only allegations (averments) of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." *Vess v. Ciba-Geigy Corp.*,

---

[14]    Defendants also seek to have the fraud pleading standards applied to the claim arising under Section 12(a)(2) of the 1933 Act.  ¶¶205-209.  For the same reasons as are applicable to the Section 11 claim, the fraud pleading standard should not apply to the Section 12(a)(2) negligence claim.

*USA*, 317 F.3d 1098, 1105 (9ᵗʰ Cir. 2003).[15]  Substantial authority provides that Rule 9(b)'s

pleading requirements do not apply to 1933 Act claims. *See, e.g., Huddleston*, 459 U.S. at 385

(Rule 9(b) is inapplicable to §11 claim, even though the complaint also alleged §10(b) claim of

fraud); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1310 (S.D.N.Y. 1996) (Rule 9(b)

inapplicable to §§11 and 12(a)(2) claims even where §10(b) fraud claims are alleged); *In re*

*AnnTaylor Stores Sec. Litig.*, 807 F.Supp. 990, 1003 (S.D.N.Y. 1992) (citing cases).  In short,

alleging fraud requires pleading an intent to deceive which is simply not an element of the 1933

Act claims in the Complaint. *Kensington Capital Management v. Oakley*, 1999 WL 816964, *2

(C.D. Cal. Jan. 14, 1999).

As recognized in *Vess*, "a plaintiff may choose not to allege a unified course of fraudulent

conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent

conduct." *Vess*, 317 F.3d at 1105.  Here, the Section 11 claim expressly disavows reliance on, or

incorporation of, allegations that may be deemed as "sounding in fraud." ¶¶196, 208. *See, e.g.,*

*In re NationsMart*, 130 F.3d at 315 (Rule 9(b) inapplicable because the complaint "expressly

disavows any claim of fraud in connection with the §11 and §12(2) counts.").  Defendants cannot

refute that courts recognize the long-standing principle that the plaintiff is the master of his

pleading and should not be penalized for judicious and wholly proper pleading. *See, e.g., In re*

*Chambers Dev. Sec. Litig.*, 848 F.Supp. 602, 624 (W.D. Pa. 1994) (where "plaintiffs here have

selectively parsed their complaint to indicate that their claims under Section 11 are based upon

---

[15]    The *Vess* Court cites with approval *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d
363, 368 (5ᵗʰ Cir. 2001) which held: "Where averments of fraud are made in a claim in which
fraud is not an element, an inadequate averment of fraud does not mean that no claim has been
stated.  The proper route is to *disregard* averments of fraud not meeting Rule 9(b)'s standard and
then ask whether a claim has been stated."

negligence" in connection with a registration statement, Rule 9(b) does not apply); *see also In re Number Nine Visual Tech Corp. Sec. Litig.*, 51 F.Supp.2d 1, 12-13 (D. Mass. 1999) (same); *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *11-12 n. 6 (N.D. Ill. Nov. 4, 1998). The fact that other fraud-based claims are pled in one complaint with the 1933 Act non-fraud claims is merely incidental to the true nature of the claims. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F.Supp.2d 576, 646 (S.D. Tex. 2003) ("because its §11 claim against [defendant] Savage is a "non-fraud" claim, according to explicit statements by Lead Plaintiff in the complaint, and is thus a strict liability or negligence claim, Lead Plaintiff insists . . . that the heightened pleading standard of Rule 9(b) does not apply . . . The Court agrees.").

Further, when Congress amended the federal securities laws by enacting the PSLRA, it specifically required particularized allegations for claims based on fraud, but not for 1933 Act claims other than "forward-looking" statements, none of which are present in this case. *See In re Initial Public Offering*, 241 F.Supp.2d 281, 339-40 (S.D.N.Y. 2003) ("the Supreme Court has made it clear [not] . . . to stray from the language of the applicable statute or Rule.") (*citing Artuz v. Bennett*, 531 U.S. 4, 10 (2000); *Badaracco v. Commissioner*, 464 U.S. 386, 398 (1984)). Thus, Rule 9(b) is inapplicable to the 1933 Act claims asserted in the Complaint.[16]

---

[16]     *Compare* 15 U.S.C. §78u-4(b) (new section requiring particularized pleading of 1934 Act claims referring specifically to "requirements for securities **fraud** actions") *with* 15 U.S.C. §77z-1(b) (parallel provision added to 1933 Act does not require particularized allegations). In its opinion in *In re SeaChange International, Inc. Sec. Litig.*, 2004 WL 240317 (D. Mass. Feb. 6, 2004) (Woodlock, J.), where plaintiffs alleged only 1933 Act claims, this Court found that §78u-4(b)(1) of the PSLRA did away with the need to determine whether a complaint "sounds in fraud," even for purposes of 1933 Act claims. The Court held that there is a heightened pleading requirement for all claims under Sections 11 and 12(a)(2) of the 1933 Act if such claims are based on alleged misrepresentations or omissions. *Id.* at *3. However, the cited statute (§78u-

Lead Plaintiff begins its Section 11 allegations with an explicit disclaimer: ". . . for

purposes of this claim, Lead Plaintiff expressly disclaims and excludes any allegations that could

be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely

on a claim of strict liability (as to defendant Sonus) or negligence (as to defendants Ahmed and

Nill). . . ." ¶193.[17] As noted, the decision from this district in *Number Nine*, 51 F.Supp.2d 1,

confirms the validity of such a disclaimer:

> First, the Court rules that the Complaint's disclaimer of fraud-type
> allegations *is effective to prevent the Securities Act claims from
> 'sounding in fraud.'* . . . . Second, the Court rules that, even
> ignoring the Complaint's disclaimer, the allegations . . . do not
> 'sound in fraud' because they 'appear to contend only that there
> was negligent or even innocent misrepresentation.' *Cooperman*,
> 1998 WL 953726, at *7 (holding that Rule 9(b) does not apply to a
> Section 11 claim; *accord In re WebSecure*, 182 F.R.D. at 367
> (holding that Rule 9(b) did not apply to Section 11 and Section
> 12(a)(2) claims because no allegations of scienter were made.

*Id.* at 12-13 (emphasis added). Thus, the *Number Nine* Court held that the mere presence of the

disclaimer was sufficient to prevent the claim from sounding in fraud. In support of its holding,

the Court noted its beneficial policy implications: "This will minimize litigation costs by

---

4(b)(1)) appears only in the provisions of the PSLRA amending the 1934 Act relating to fraud
claims. In any event, the allegations at issue in *SeaChange* are far afield from those at issue here.
*SeaChange* was purely a projections case. The PSLRA does impose an actual knowledge of
falsity requirement for such forward looking statements, even in a registration statement claim
arising under Section 11 of the 1933 Act. 15 U.S.C. §77z-2(c)(1)(B)(I), (ii)(II). There are no
projections at issue here, however. There is no *scienter* requirement of any sort for the 1933 Act
claims alleged in this case. Not only is this **not** a projections case, here there has been an
admission that materially false financial statements were published in the applicable offering
documents, a virtual admission that the 1933 Act claims are properly stated. In *Swack*, 2004 WL
2203482, *4, this Court again noted that §78u-4(b)(1) had done away with the need to determine
as a threshold matter whether a complaint "sounds in fraud," but that case involved only claims
arising under Section 10(b) of the 1934 Act.

[17]   A similar disclaimer is made with regard to the Section 12(a)(2) claim. ¶208.

ensuring that plaintiffs need file only one complaint and one civil action to pursue their securities claims." *Id.* at 13. The Eighth Circuit has also adopted this common sense approach, ruling that:

> [E]ven if the plaintiffs were alleging fraudulent conduct under
> § 11, as the defendants argue in their brief, any such allegation
> would be surplusage. The only consequence of a holding that Rule
> 9(b) is violated with respect to a §11 claim would be that any
> allegations of fraud would be stripped from the claim. The
> allegations of innocent or negligent misrepresentation, which are at
> the heart of a §11 claim, would survive. The plaintiffs' case
> should not have been dismissed because they alleged more than
> was necessary to recover under §11 of the Securities Act.

*NationsMart*, 130 F.3d at 315. *See also In re JDS Uniphase Corp. Secs. Litig.*, 2005 WL 43463 at *9 (N.D. Cal. Jan. 6, 2005) (statement that "any allegations based on fraud or deliberate recklessness" are excluded from the Section 11 claim is effective because "Lead Plaintiff is permitted to plead its claims in the alternative in this manner. Fed.R.Civ.P. 8(e)(2)."). Separating the fraud and non-fraud allegations, especially where they are, as here, explicitly brought as distinct claims, is appropriate. The Court should view the 1933 Act claims as negligence-based only, and find that they are adequately alleged.

### E.    The Claim Under Section 12(a)(2) of the 1933 Act is Adequately Alleged

Section 12(a)(2) is designed to encourage issuers, individuals and underwriters to sell and/or solicit securities based on accurate prospectuses and prospectus supplements in order to preserve the salutary goals of accurate, efficient, and transparent markets. Section 12(a)(2) holds those individuals and firms that sell, offer for sale, or solicit securities based on inaccurate prospectuses and prospectus supplements liable for rescission or damages. 15 U.S.C. §77l(a)(2). The statute allows a plaintiff to recover from a defendant who offers or sells securities by means of a prospectus containing untrue statements and/or omissions of material fact. Lead Plaintiff has

adequately alleged seller status as to all defendants and their motions to dismiss the

Section 12(a)(2) claim should be denied.  ¶¶210-211.  At a minimum, it would be premature to

dismiss these claims before discovery has created a factual record pursuant to which the Court

can meaningfully evaluate whether defendants were statutory sellers.

### 1.    A Firm Commitment Underwriting Is Irrelevant At This Stage

Defendants claim that Sonus's September 2003 "shelf" offering was conducted pursuant

to a "firm commitment" underwriting and, as a result, defendants cannot properly be deemed

statutory "sellers."  They assert that the existence of a "firm commitment" underwriting means

Lead Plaintiff cannot show that the defendants named in the Complaint passed title to the

securities, thus precluding their designation as statutory sellers under the test laid out in *Pinter v.*

*Dahl*, 483 U.S. 622, 642 (1988).[18]

The Court should not, at this stage of the proceedings, fully credit the accuracy of

defendants' assertions as to the existence of a "firm commitment" underwriting.  Lead Plaintiff

has not had the opportunity to verify that it was this precise type of underwriting arrangement

which was utilized here, has not been able to analyze it, and has not had the opportunity to

discern whether conditions in the applicable agreement preclude it from being properly

considered as a "firm commitment" underwriting.  Lead Plaintiff has had no practical way of

determining whether the actions taken by Sonus and Goldman, Sachs & Co. can be characterized

as behavior commensurate with a "firm commitment" underwriting.  The Court should not at this

---

[18]    The First Circuit has defined "firm commitment" underwritings, as follows: "In a firm
commitment underwriting, the issuer of the securities sells all of the shares to be offered to one
or more underwriters, at some discount from the offering price.  Investors thus purchase shares
directly from the underwriters (or broker-dealers who purchase from the underwriters), not
directly from the issuer." *Shaw*, 82 F.3d at 1215.

stage simply take defendants' assertions in this regard as the gospel truth. The motion to dismiss should be denied to allow Lead Plaintiff to conduct discovery as to the precise nature of the underwriting which occurred here. Absent more information, Lead Plaintiff cannot confirm as a matter of fact that Sonus sold all of the shares issued pursuant to the September 2003 offering to Goldman, Sachs & Co. The motion to dismiss is therefore premature and should be denied, as all of the elements of the claim have been adequately alleged.[19]

## 2.    **Defendants Are Statutory Sellers Through Solicitation**

The second component of the Section 12(a)(2) statutory test under *Pinter v. Dahl* concerns solicitation. The Supreme Court held that "the range of persons potentially liable under §12(1) is not limited to persons who pass title." *Id.* at 643. Rather, a defendant "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner" may also be liable under §12(a)(2). *Id.* at 647.[20]

In *Shaw*, 82 F.3d 1194, the First Circuit noted that the Supreme Court in *Pinter* did not limit Section 12 liability to those who actually pass title to the suing purchaser. *Id.* at 1215. Thus, a non-owner of securities can still be liable under the statute for successfully soliciting the

---

[19]    This is a different scenario than that presented to the Court in *Shaw*. There, the First Circuit stated, "the March 1994 public offering was made pursuant to a 'firm commitment' underwriting, as disclosed in the registration statement and prospectus supplement. **The plaintiffs do not contend otherwise**.... Here it is undisputed that the public offering was conducted pursuant to a firm commitment underwriting." 82 F.3d at 1215-16 (emphasis added). Significantly, the First Circuit went on to note that, "on a different set of allegations, an issuer involved in a firmly underwritten public offering could be a 'seller' for purposes of Section 12(2)..." *Id.* at 1216. As noted, Lead Plaintiff does not concede at this point that the underwriting arrangement for the September 2003 offering falls within the rubric of "firm commitment."

[20]    The claim here is based on the issuance of the September 24, 2003 Prospectus Supplement. The Supreme Court has defined the term "prospectus" as "a document **soliciting** the public to acquire securities." *Gustafson v. Alloy Co., Inc.*, 513 U.S. 561, 574 (1995) (emphasis added).

plaintiff's purchaser, provided that the solicitor is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* citing *Pinter*, 486 U.S. at 647. A defendant must be "directly involved in the actual solicitation of a securities purchase" to qualify as a statutory seller. *Pinter*, 486 U.S. at 644, n. 21 (citations omitted)." *Shaw*, 82 F.3d at 1215. The First Circuit ruled that this buyer-solicitor relationship could not be demonstrated by "involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities standing alone. . . ." *Id.* at 1216 (emphasis added).

The allegations of the Complaint are sufficient to satisfy the broad standards articulated in *Shaw* for seller liability. First, Lead Plaintiff has alleged that the defendants signed materially misleading prospectus supplements, prospectuses, registration statements, and/or SEC filings, which were incorporated into Sonus's Prospectus Supplement. ¶¶16-17, 68-73, 137, 161. Second, it is sufficiently alleged that the defendants assisted in and/or supervised in the drafting, producing, revising, reviewing, approving, and/or executing relevant SEC documents. ¶¶16-17, 19-20, 22, 207. Finally, Lead Plaintiff has sufficiently alleged that the Sub-Class members who bought on the September 2003 offering would not have been able to acquire the Sonus shares without the "selling efforts" undertaken by the defendants (¶¶27, 31(c), 207, and 208), and that the defendants engaged in such solicitation in order to further their own financial interests in the manner of a broker or vendor's agent, including the financial interests of Sonus. ¶¶5, 24, and 39.

In addition, determining whether a defendant is a seller for purposes of Section 12(a)(2) is a fact-intensive exercise requiring discovery. Such a determination should not be made on a motion to dismiss. For example, *In re Stratosphere Sec. Litig.*, 1 F.Supp.2d 1096, 1120 (D.Nev. 1998), the Court ruled that signing a registration statement or prospectus alone is

insufficient to designate a defendant a Section 12 seller. However, it went on to state that, "[t]his Court finds that the question of whether an individual is a seller under Section 12 is a question of fact, not properly decided on a motion to dismiss." *See also In re Paracelsus Corp.*, 6 F.Supp.2d 626, 632 (S.D.Tex. 1998); *Degulis v. LXR Biotechnology, Inc.*, 1997 WL 20832, *6 (S.D.N.Y. 1997).

Some courts have taken an approach that adheres closely to the goal associated with Section 12, *i.e.*, assuring that the investing public can rely on accurate prospectuses and prospectus supplements in making their investment decisions. Thus, in *Kensington Capital Management v. Oakley, Inc.*, 1999 WL 816964 (C.D.Cal. 1999), the district court found that defendant issuers could be found liable as statutory sellers, even in circumstances involving firm commitment underwritings. The Court denied the defendants' motion to dismiss for purposes of Section 12 because it (i) found that signing registration statements could be sufficient solicitation to justify a statutory seller designation and (ii) found that it was reasonable to infer that the issuer appeared to the plaintiffs to be the true seller for purposes of Section 12. *Id.* at *5.

Several courts have found that the signing of a prospectus is sufficient to show solicitation at the motion to dismiss stage.[21] In *In re Proxima Corporation Sec. Litig.*, 1994 WL 374306 (S.D.Cal. 1994), the district court emphasized that solicitation need not occur "face-to-face" and that "since the Prospectus itself is a solicitation document, those individual defendants who signed the Registration Statement. . . effectively were soliciting the public to purchase

---

[21]    Lead Plaintiff acknowledges that there is authority contrary to this position. Given the differing approaches used by courts, Lead Plaintiff submits that the better course of action is to allow discovery on the issue of defendants' "seller" activity, and evaluate the claim based on a more developed factual record.

Proxima stock." *Id.* at *5. Another district court has held that signing prospectuses is significant for purposes of determining seller status: "the Prospectus itself is considered a solicitation document. Thus, the . . . defendants who actually **signed** the Registration Statements may be said to have solicited the public to purchase [defendant-issuer] stock." *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1133 (W.D.Mich. 1996) (emphasis in original). The district court in *In re Keegan Management Co. Sec. Litig.*, 1991 WL 253003 (N.D.Cal. 1991) also found that Section 12 liability had been adequately alleged:

> In this case, it would not be uncommon to say that defendants "sold" the stock to aftermarket purchasers even though defendants did not own legal title to the stock. To one who studies corporate filings and news releases before purchasing via a dealer on an impersonal and anonymous market, the corporation, its officers and directors, and other promoters of the stock appear to be true 'sellers.' Thus, it is reasonable to infer that Congress intended Section 12(2) to apply to persons such as defendants.

*Id.* at *8.

Simply put, a determination as to statutory seller status should not be made at the motion to dismiss stage. Lead Plaintiff has made appropriate factual allegations sufficient to survive defendants' motions to dismiss with respect to the Section 12(a)(2) claim. The Court should permit the factual bases for this claim to be explored in discovery.

## F.    The "Control Person" Claims Are Adequately Alleged

To state a control person claim under either Section 20(a) of the 1934 Act or Section 15 of the 1933 Act, a plaintiff must allege: (1) an underlying primary violation of the securities laws; and (2) that the individual defendant had control over the primary violator. *See, e.g., SeaChange*, 2004 WL 240317 at *16 (involving a §15 claim); *Swack*, 2004 WL 2203482 at *17

(involving a §20(a) claim). Here, Lead Plaintiff has adequately alleged control person liability under Section 20(a) (Count I) and Section 15 (Counts II and III) as to defendants Ahmed and Nill, and they do not seriously contend otherwise.

Whether a defendant is a control person is an intensely factual question that "will not ordinarily be resolved summarily at the pleading stage." *Cabletron*, 311 F.3d at 41 quoting 2 T.L. Hazen, *Treatise on the Law of Securities Regulation* §12.24(1) (4th Ed.2002); *see also In re Enron Corp. Secs. Litig.*, 2004 WL 764663 at *8 (S.D. Tex. 2004) (noting that control person liability ordinarily is not decided on a motion to dismiss because "[d]iscovery is necessary to flesh out the facts for the record before the issue can properly be resolved"). Indeed, "notice pleading under Rule 8 (a 'short plain statement of the claim showing the pleader is entitled to relief'), rather than heightened pleading under Rule 9, applies to control person liability claims," making it unnecessary for a plaintiff to make detailed control person allegations in the complaint. Thus, the Complaint sufficiently alleges that Ahmed was a "controlling person" of both Sonus and defendant Nill, and that Nill was a "controlling person" of Sonus.

## IV.

## CONCLUSION

For all of the foregoing reasons, defendants' motions to dismiss should be denied in their entirety.

Dated: October 11, 2005         GOLD BENNETT CERA & SIDENER LLP

By   /s/ Solomon B. Cera

Attorneys for Lead Plaintiff
BPI Global Asset Management LLP

CERTIFICATE OF SERVICE

I, KimLane E. Gantan, hereby declare under penalty of perjury as follows:

I am employed by Gold Bennett Cera & Sidener LLP, 595 Market Street, Suite 2300, San Francisco, California, 94105-2835. I am over the age of eighteen years and am not a party to this action.

On October 11, 2005, a true and correct copy of the aforementioned **"LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT"** was delivered to all counsel of record by electronic service pursuant to the Court's Order Regarding Electronic Service and served to counsel not on the Court's electronic service by causing true and correct copies of same to be enclosed in sealed envelopes and deposited in the U.S. Mail, postage prepaid, or delivered as otherwise indicated on the attached Exhibit I.

Executed on October 11, 2005, at San Francisco, California.

KimLane E. Gantan

109222

## EXHIBIT I

**VIA FEDEX**
Thomas J. Dougherty
Matthew J. Matule
Michael S. Hines
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA 02108
Telephone: (617) 573-4800

**VIA FEDEX**
Robert S. Frank, Jr.
John R. Baraniak, Jr.
Paul E. Bonanno
Choate, Hall & Stewart
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000

**VIA FEDEX**
Jeffrey B. Rudman
James W. Prendergast
Daniel W. Halston
Daniel H. Gold
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000