# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------------X

IN RE NUMBER NINE VISUAL TECHNOLOGY        : Master File No.
CORPORATION SECURITIES LITIGATION          : 96-11207(MLW)
                                           :
                                           : JURY TRIAL DEMANDED
----------------------------------------------------------------------X

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by and through their attorneys, make the following allegations upon
information and belief, except as to the allegations of ¶ 15, which are alleged upon personal
knowledge. Plaintiffs' information and belief is based upon the investigation conducted by
plaintiffs' attorneys. which investigation has included, without limitation: (a) review and
analysis of filings made by defendants with the Securities and Exchange Commission
("SEC"); (b) review and analysis of securities analysts' reports concerning defendant Number
Nine Visual Technology Corp. ("Number Nine" or the "Company"); (c) review and analysis
of press releases distributed by defendants; (d) review and analysis of various reports
concerning the Company that have appeared in newspapers, magazines. trade journals and
other publications; and (e) interviews with Number Nine shareholders.

I.

## SUMMARY OF CLAIMS

1.     This is a securities fraud class action brought on behalf of: (a) all persons (the
"Securities Act Class"), except defendants and their affiliates, who purchased shares of the
common stock of defendant Number Nine in or traceable to the Company's initial public
offering (the "IPO" or the "Offering"), which was conducted on May 26, 1995; and (b) all
persons (the "Exchange Act Class"), except defendants or their affiliates, who purchased or
otherwise acquired shares of Number Nine common stock from May 26, 1995 through

January 31, 1996. inclusive (the "Class Period").  The defendants in this action are:

(a) Number Nine; (b) Andrew Najda, who was, at all relevant times, the President, Chief

Executive Officer ("CEO") and Chairman of the Board of Directors of the Company (the

"Board"); (c) Stanley W. Bialek, a co-founder of the Company (together with Mr. Najda)

and a member of the Board at all relevant times; (d) Kevin M. Hanks, who served as the

Company's Chief Financial Officer, Vice President and Treasurer at all material times;

(e) Gill Cogan. Paul R. Low, Fouad H. Nader and William H. Thalheimer, all of whom

were Number Nine directors at the time of the IPO and who signed the registration statement

for the IPO (the "Registration Statement"); and (f) Robertson, Stephens & Co. ("Robertson

Stephens"), Cowen & Co. ("Cowen") and Unterberg Harris ("Unterberg" and, collectively

with Robertson Stephens and Cowen. the "Underwriter Defendants"), the three lead

underwriters for the IPO.

 2. The claims alleged herein arise under §§ 11 and 15 of the Securities Act of

1933 (the "Securities Act") and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934

(the "Exchange Act"), as well as Rule 10b-5 promulgated thereunder by the SEC.

 3. As particularized below, plaintiffs allege Securities Act claims against each of

the defendants based upon alleged misrepresentations and omissions in the Prospectus for the

IPO (the "Prospectus") that concerned: (a) the purported financial status of Number Nine at

the time of the IPO, particularly the Company's inventories and earnings; and (b) the

purported improvement the Company was achieving and would achieve in its gross and

operating margins.

 4. The representations made by each of the defendants in the Prospectus and

Registration Statement were also materially misleading because defendants failed to divulge

material, facts that they were obligated to disclose under the federal securities laws.  Those

material facts included the following: (a) by the time of the IPO, the value of the "64-bit VL Bus" computer video/graphics accelerator products maintained in the Company's inventories had decreased by millions of dollars as a result of the emergence of the superior and more widely-accepted "PCI Bus 64-bit" products;[1] (b) Number Nine's other product offerings appealed to only a small niche of computer purchasers; (c) several components that the Company required to manufacture and sell its products were becoming increasingly difficult to procure and, as a result, the Company was failing to ship such products as scheduled or incurring substantially increased costs to obtain those components; and (d) certain products that the Company reported it would introduce to market in the immediate future were experiencing developmental and manufacturing problems that would prevent them from being sold to consumers on the time schedule announced in the Prospectus.

5.   The foregoing misrepresentations and omissions also serve, in part, as the basis of plaintiffs' Exchange Act claims, which are alleged against defendants Number Nine, Najda, Bialek and Hanks (the "Number Nine Defendants") and which encompass the entire Class Period.

6.   The Number Nine Defendants made a number of additional material misrepresentations and omissions during the Class Period that also form the basis of plaintiffs' Exchange Act claims. The additional misrepresentations specified below include statements concerning: (a) Number Nine's inventories, earnings and shareholder equity; (b) the purported success the Company had enjoyed and would enjoy in marketing its video/graphics accelerator products for Apple PowerMac computers; (c) the Company's

---

[1]   The "Bus" is the computer part that allows data to be transferred between the microprocessor and other components, such as memory storage or graphics cards. The increased performance provided by a graphics accelerator is significantly impacted by the speed of communication between the accelerator and the computer's central processing unit ("CPU"), which occurs across the system bus.

- 3 -

purported success in procuring component parts for its graphics accelerators at competitive prices; and (d) the earnings the Company expected to generate (which estimates were disseminated to the market through analyst reports published by, inter alia, Robertson Stephens and Cowen).

7.    Plaintiffs' Exchange Act claims are also based upon the failure of the Number Nine Defendants to disclose, in derogation of their obligations under the Exchange Act, that: (a) the financial statements published by Number Nine following the issuance of the Prospectus did not properly account for the Company's inventory of 64-bit VL Bus products; (b) Number Nine was experiencing production defects and delays that would prevent the Company from launching its PowerMac video accelerator products on the announced time schedule and the Company would therefore lose millions of dollars in purported orders it had received for such products; (c) the Company was experiencing rapidly increasing costs as a result, inter alia, of Number Nine's inability to procure component parts at competitive prices; and (d) as a result of those increased costs, and operations the Company was experiencing significant decreases in its gross and operating margins.

8.    With respect to the claims alleged by plaintiffs under the Exchange Act only, plaintiffs charge that the Number Nine Defendants knew or recklessly disregarded that their representations and omissions were materially misleading. Among other facts and circumstances that give rise to a strong inference that the Number Nine defendants acted with scienter, plaintiffs have alleged the following:

> (a) Motive: The Number Nine Defendants were motivated to artificially inflate the price of Number Nine common stock throughout the Class Period. In particular, failing to account for the Company's inventory in an appropriate manner allowed the Number Nine Defendants to sell millions of dollars of the Company's stock to unsuspecting investors, thereby significantly enhancing Number Nine's balance sheet and overall financial position (and, in the case of defendants Najda and Bialek, thereby raising millions of dollars for themselves by means of their insider selling). Had the Company properly

- 4 -

accounted for its inventories, Number Nine would have been forced to record a charge that would have wiped out all of the earnings recorded by the Company during at least the previous five years. Thus, in the absence of the fraudulent acts of the Number Nine Defendants, as alleged herein: (i) the IPO would likely never have been conducted or would not have been conducted at the $15 per share price at which Number Nine went public; (ii) Mr. Najda would not have been able to sell $3 million worth of stock to investors at inflated prices; and (iii) Mr. Bialek would not have been able to sell in excess of $9.7 million worth of stock to unsuspecting investors immediately before he apparently retired at age 42.

(b) Contradictions Between Public Statements and Actual Results: In marked contrast to the uniformly positive statements made by the Number Nine Defendants concerning the Company, throughout the Class Period those defendants knew, inter alia, that: (1) VL bus products were virtually obsolete as a result of the development of PCI bus products; (2) as a result of the obsolescence of VL bus products, the Company was required to write down its inventory of such goods by millions of dollars; (3) the Company was experiencing a rapid increase in inventory that was contrary to its historical experience, thereby signaling a significant problem with those inventories: (4) the Company was experiencing severe difficulties in developing its new products. including the second generation of "Imagine 128" graphics accelerators and the Imagine 128 graphics accelerator for the Apple PowerMac: and (5) the Company was experiencing significant cost increases in procuring components for its products. thereby decreasing Number Nine's margins and eliminating profits.

9.    As the manifold problems besetting Number Nine, which at all relevant times

were known to or recklessly disregarded by the Number Nine Defendants. gradually came to

light during the Class Period. the Company's stock price plummeted from a high of $25 to

close at $5.125 on January 31, 1996 (the first trading day after the Company's announcement

of fourth quarter financial results), a decline of over 80%. Members of the Securities Act

and Exchange Act Classes therefore suffered substantial damages because the $15 price at

which Number Nine went public and the market price of Number Nine's common stock

throughout the Class Period were artificially inflated at all relevant times as a result of the

material misrepresentations and omissions made by defendants.

- 5 -

10.    Plaintiffs accordingly seek damages and other appropriate relief to compensate Number Nine investors for the damages caused by defendants' violations of the securities laws, as particularized herein.

## II.

### JURISDICTION AND VENUE

11.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

12.    In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

13.    Thus, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, § 27 of the Exchange Act [15 U.S.C. § 78aa] and § 22 of the Securities Act [15 U.S.C. § 77v].

14.    Number Nine maintains its corporate headquarters and principal place of business in this District at 18 Hartwell Avenue, Lexington, Massachusetts. At all relevant times, the Company's stock was traded on the NASDAQ National Market System. The acts charged herein, including the preparation and dissemination of materially false and misleading disclosures concerning Number Nine, occurred in substantial part in this District. Venue is therefore proper in this District pursuant to § 27 of the Exchange Act, § 22 of the Securities Act and 28 U.S.C. § 1391(b).

- 6 -

## III.

## PARTIES

15.    As set forth in the signed certifications attached to this Consolidated Complaint as Exhibit A, lead plaintiffs RBI, An Alaskan Limited Partnership, Pascal Mouawad, Ernest Bohn and John Foley, and additional plaintiff Robert Schoenhofer purchased Number Nine common stock on dates during the Class Period and in amounts that are specified in the certifications. Plaintiffs' Number Nine shares were purchased in connection with or are traceable to the IPO. The plaintiffs' purchases were made at market prices that were inflated by defendants' misrepresentations and omissions and, as a result, each plaintiff has suffered damages.

16.    (a)    Defendant Number Nine describes itself as a leading innovator and supplier of high-performance visual technology solutions, including video/graphics accelerator subsystems, chips and productivity-enhancing software. According to the Company, its products enable desktop PC's to generate and display the increasingly sophisticated visual content of today's computing environment with greater speed, photo realistic color, high resolution and full-motion video.

(b)    Number Nine's primary business is producing video/graphics accelerators. Video/graphics accelerators render and control the graphic and video images transmitted to desktop PC monitors. Those products perform display and rendering functions that would otherwise be performed by a computer's CPU, thereby enabling the CPU to devote more of its computing power to running applications and processing data. As a

result, graphics accelerators significantly improve the graphics quality of PC systems. as well as their processing speed.[2]

      (c)    During the Class Period, the Company's principal products were the following types of video/graphics accelerators: (i) a 128-bit family of products known as the "Imagine 128"; (ii) two 64-bit families of accelerators -- the newer 64-bit 9FX products and the older-generation 64-bit GXE products: and (iii) the obsolete 32-bit GXE family of products. The Company also marketed small amounts of its proprietary software and accelerator chips.

      17.   (a)    Defendant Andrew Najda is, and at all relevant times was. the Company's President, Chief Executive Officer and Chairman of the Board. Defendant Najda signed the Registration Statement filed by Number Nine in connection with the IPO. the Company's SEC Form 10-Q for the quarterly period ending July 1. 1995, and the Company's SEC Form 10-Q for the quarterly period ending September 30, 1995.

      (b)    Defendant Najda sold 200.000 shares of Number Nine common stock in the IPO at a price of $15 per share. After underwriting commissions, the sale of those shares yielded defendant Najda total proceeds of $2,790,000. The price at which Mr.

---

[2]  In the Prospectus, the Company described the make-up of a video/accelerator subsystem as follows:

> A video/graphics accelerator subsystem consists primarily of an accelerator chip, memory chips, a digital-to-analog converter ("DAC"), and software drivers and utilities. The accelerator chip is the graphics "engine" that enhances speed, image clarity and color by performing functions that would otherwise be executed by the CPU. Memory chips, which are available in standard DRAM and higher-performance VRAM configurations, are used to temporarily store graphics information for display. The DAC converts data from the digital format in which it is typically stored in the graphics memory to the analog format required by the display monitor. Software drivers are used to interface the accelerator chip with the CPU and optimize the overall performance of the subsystem.

- 8 -

Nadja's shares were sold exceeded the $5.125 price at which Number Nine common stock traded on the day after the end of the Class Period by $9.875 per share, or 292%.

18.    (a)    Defendant Stanley W. Bialek was, along with Mr. Najda, a co-founder of the Company.  Mr. Bialek alternated with Mr. Bialek as CEO and Chairman of the Company on an annual basis until 1993, when he became full-time Chairman.  Mr. Bialek served as Chairman of the Company until April 1995 (after which time he remained a Number Nine director) and was Number Nine's Chief Operating Officer until January 1995. At all relevant times, Mr. Bialek was a member of the Company's Board, and he signed the Registration Statement in that capacity.

(b)    Defendant Bialek sold 650,000 shares of Number Nine common stock in the IPO, at a price of $15 per share.  Net of underwriting commissions, the sale of that stock yielded Mr. Bialek $9,067,500. After cashing in those holdings of Number Nine common stock, Mr. Bialek apparently retired at age 42.  The price at which Mr. Bialek's shares were sold to the public exceeded the $5.125 price at which Number Nine common stock traded on the day after the end of the Class Period by $9.875 per share, or 292%.

19.    Defendant Kevin M. Hanks was, at all relevant times, Vice President, Chief Financial Officer and Treasurer of Number Nine.  In that capacity, Hanks signed the Registration Statement for the IPO.

20.    Because of the positions held by defendants Najda, Bialek and Hanks (the "Officer Defendants") as executives and directors of the Company, prior to and throughout the Class Period, they had access to the adverse, non-public information specified below that contradicted defendants' optimistic assessments concerning the Company's business operations, finances, products, markets and future prospects. The Officer Defendants were provided with access to that adverse, non-public information by means of, inter alia, internal

- 9 -

corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and other communications with corporate officers and employees, attendance at meetings of the Company's management, Board and committees thereof and via reports and other information provided to them in connection with such meetings.

21.    Defendants Gill Cogan, Paul R. Low, Fouad H. Nader and William Thalheimer (collectively, the "Director Defendants") were all directors of the Company at the time of the IPO and signed the Registration Statement in that capacity.

22.    Defendant Robertson Stephens is a securities broker-dealer registered with the SEC that maintains its executive offices at 555 California Street, San Francisco, California 94104. Robertson Stephens acted as one of the lead underwriters of Number Nine's IPO. In connection with that role, Robertson Stephens received in excess of $978,000 in fees.

23.    Defendant Cowen is a securities broker-dealer registered with the SEC that maintains its executive offices at Financial Square, New York, New York 10005. Cowen acted as one of the lead underwriters of Number Nine's IPO. In connection with that role, Cowen collected fees in excess of $978,000.

24.    Defendant Unterberg Harris is a securities broker-dealer registered with the SEC that maintains its executive offices at 275 Battery Street, San Francisco, California 94111. Unterberg acted as one of the lead underwriters of Number Nine's IPO. In connection with that role, Unterberg received in excess of $489,000 in fees.

25.    As specified below, each of the Underwriter Defendants participated in the making of the misrepresentations and omissions complained of by plaintiffs in connection with their Securities Act claims.

- 10 -

26.    Prior to the IPO, the Underwriter Defendants conducted a "due diligence investigation" of Number Nine which should have included, inter alia, a review of the Company's business, operations, prospects and financial condition as well as an evaluation of Number Nine's accounting, inventory and management control systems. Had the Underwriter Defendants exercised reasonable diligence during the course of their investigation of Number Nine, they would have obtained knowledge of the adverse facts and accounting manipulations specified below.

27.    In connection with the IPO, all defendants had a duty to disclose a broad range of material information as a result of, among other factors: (a) the false positive representations concerning Number Nine made in the Prospectus and Registration Statement: (b) the fact that each of the defendants sold Number Nine common stock to the public: and (c) the SEC disclosure requirements for the S-1 Registration Statement utilized by Number Nine.

28.    With respect to public statements that post-dated the IPO. each of the Number Nine Defendants was also obligated to disclose material adverse facts concerning the Company's operations as a result of, among other factors: (a) their additional false positive representations concerning Number Nine; and/or (b) the SEC disclosure requirements for the Form 10-Q quarterly reports and additional SEC reports filed by Number Nine during the Class Period.

## IV.

## CLASS ACTION ALLEGATIONS

29.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). The class on behalf of which plaintiffs' Securities Act claims are alleged consists of all persons who purchased shares of Number Nine common stock in or

- 11 -

traceable to the IPO (which became effective on May 26, 1995) and who were damaged thereby. Excluded from the class with respect to all claims alleged by plaintiffs are defendants, all underwriters of the IPO, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors and assigns and any entity in which defendants have or had a controlling interest.

30.    The class on behalf of which plaintiffs' Exchange Act claims are alleged consists of all persons who purchased or otherwise acquired shares of Number Nine common stock during the Class Period (May 26, 1995 through January 31, 1996, inclusive) and who were damaged thereby. Excluded from the class with respect to all claims alleged by plaintiffs are defendants, all underwriters of the IPO, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors and assigns and any entity in which defendants have or had a controlling interest. The persons on whose behalf plaintiffs allege claims under either the Securities Act or the Exchange Act are referred to collectively as the "Class."

31.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds, if not thousands, of Class members. As of November 10, 1995, there were approximately 8.7 million shares of Number Nine common stock outstanding. Those shares were actively traded on the NASDAQ National Market System, an open and efficient market in which millions of shares of the Company's stock were traded during the Class Period. Members of the Class may be identified from records maintained by Number Nine or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities fraud class actions.

- 12 -

32.    Plaintiffs' claims are typical of the claims of the other members of the Class in that all members of the Class have been damaged by the acts of defendants, which caused members of the Class to purchase Number Nine common stock at artificially inflated prices.

33.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class. To assist them in that endeavor, plaintiffs have retained counsel competent and experienced in class and securities litigation. Plaintiffs are not aware of any interest any of them holds which is antagonistic to the interests of the Class.

34.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts, as alleged herein;

(b)    Whether the Registration Statement and Prospectus for the IPO mis-represented material facts about the business, management, products, sales, markets, financial condition, and business prospects of Number Nine;

(c)    Whether statements made by the Number Nine Defendants following the IPO misrepresented material facts about the business and finances of Number Nine;

(d)    Whether the misrepresentations and omissions made by the Number Nine Defendants upon which plaintiffs' Exchange Act claims are based were made with scienter; and

(e)    To what extent the members of the Class have sustained damages and the proper measure of damages.

35.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

- 13 -

Furthermore, because the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the

Class to pursue individual redress for the damages caused to them by defendants' acts.

Plaintiffs are aware of no difficulty that will be presented in managing this action as a class

action.

V.

## DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS AND THE FACTS THAT DEMONSTRATE THAT THEY WERE MATERIALLY FALSE AND MISLEADING

A.   Defendants Conduct The IPO Based Upon The Materially
     False And Misleading Prospectus And Registration Statement

   (i)   Number Nine's Materially False And
         Misleading Financial Statements

   36.   As noted above, the Prospectus, and all of the other documents issued by

Number Nine during the Class Period that included financial statements, materially

overstated the Company's inventories, margins, earnings and shareholders' equity as a result

of Number Nine's failure to properly account for its antiquated inventory of 64-bit VL bus

graphics accelerators and printed circuit boards.

   37.   In the Prospectus, the Company reported inventory of $17,333,000 as of the

close of the first quarter of 1995 (April 1, 1995). Included within that figure was millions of

dollars of inventory of (a) 64-bit VL Bus graphics accelerators that were rapidly approaching

obsolescence and (b) excess printed circuit boards that Number Nine could not realistically

hope to sell at a cost even approaching the cost of producing those products. Accordingly,

by the time of the IPO, Number Nine was required by GAAP to significantly write down the

value of the Company's inventory of 64-bit VL bus products and printed circuit boards to

reflect the amount by which the cost of those products exceeded the expected revenues to be

- 14 -

derived by their sale. Despite the obviously impaired nature of the Company's inventories of 64-bit VL bus products and printed circuit boards, prior to the IPO the Company accrued only what it represented in the Prospectus to be an "immaterial" provision for excess and obsolete inventory at April 1, 1995.

38.    More specifically, a write down of the Company's inventory of 64-bit VL bus products and printed circuit boards was necessary because the financial statements included within the Prospectus, and issued during the Class Period, violated GAAP for the following reasons, among others:

(a)    The financial statements violated FASB Statement of Concepts No. 1 ¶ 34, which dictates that financial reports should provide information that is useful to present to investors, potential investors, creditors and other users in making rational investment, credit and similar decisions.

(b)    The financial statements violated the principle that conservatism should be employed as a prudent reaction to uncertainty, as articulated by FASB Statement of Concepts No. 2 ¶¶ 95 and 97. GAAP demands that conservatism be utilized in accounting for uncertainties to ensure that the risks inherent in business situations are adequately considered.

(c)    The financial statements violated the principle of materiality, as articulated by FASB Statement of Concepts No. 2 ¶ 132. GAAP dictates that the omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

- 15 -

(d)     The financial statements violated the principle of recognition, as articulated by FASB Statement of Concepts No. 5 ¶ 63.  GAAP demands that an item or information about it should be recognized in financial reports when it has met the following four criteria: (i) the item meets the definition of an element of financial statements: (ii) it has a relevant attribute measurable with sufficient reliability; (iii) the information about it is capable of making a difference in user decisions; and (iv) the information is representationally faithful, verifiable and neutral.

(e)     The financial statements violated the principle that inventory should be carried at the lower of cost or market, as articulated by Accounting Research Bulletin ("ARB") No. 43, Chapter 4.  ARB No. 43 provides:

> Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period.

39.     By failing to include a write down of the Company's inventory of 64-bit VL bus products and printed circuit boards in the financial statements included in the Prospectus, each of the defendants violated the foregoing dictates of GAAP and, consequently, materially overstated, inter alia, Number Nine's inventory, net income, earnings per share and stockholder equity.

40.     Thus, the financial statements for the quarter ended April 1, 1995 (the last full quarter prior to IPO) that were included in the Prospectus were materially false and misleading in that they falsely stated: (a) that the Company's inventories amounted to $17.333 million; (b) that net income for the quarter was $751,000; (c) that EPS for the quarter was $0.10; and (d) Number Nine's stockholder equity amounted to $35.67 million. Each of the foregoing figures was overstated by millions of dollars (except the earnings per share figure, which was overstated by a corresponding amount on a per share basis).

- 16 -

41.    The Company's failure to accrue an adequate inventory reserve also rendered materially misleading two additional representations made in the Prospectus. First, in the "Notes To Consolidated Financial Statements" set forth in the Prospectus, defendants falsely stated, "All adjustments (consisting only of normal recurring adjustments) have been made which, in the opinion of management, are necessary for a fair presentation."

42.    Second, defendants made the following specific misrepresentation concerning the manner in which the Company accounted for inventory:

Inventories

Inventories are stated at the lower of cost or market, with cost determined under the first-in, first-out method. Provisions for estimated excess and obsolete inventories are accrued on a quarterly basis. In providing for excess and obsolete inventories, the Company considers the effects of planned new product introductions, anticipated stock rotations and sales activity.

(ii)    The Misleading Claim Of Broad Product Offerings

43.    The Prospectus and Registration Statement falsely represented that the Company offered consumers a broad and diversified range of products and therefore was able to appeal to a disparate range of consumer tastes. At page 30 of the Prospectus, defendants stated:

**Broad Product Line**

The Company's product line addresses both mainstream and high-end segments of the PC video/graphics accelerator subsystem market. A broad product line not only allows the Company to serve as a single-source supplier for OEMs seeking to streamline the procurement of video/graphics solutions, but also facilitates the penetration of the retail channel by spanning a range of prices, beginning at $150 and extending to $2,000.

44.    The following facts, among others, demonstrate that defendants' claim that Number Nine offered consumers a broad array of products from which to choose, thereby facilitating the Company's ability to market its products to original equipment manufacturers ("OEMs") and retail customers, was materially misleading at the time it was made:

- 17 -

(a)     Despite defendants' representations that Number Nine offered a broad range of products capable of satisfying the diverse requirements and preferences of the marketplace, the Company's product offerings suffered from severe competitive disadvantages, including: (i) Number Nine's inventories were vastly overstocked with 64-bit VL bus products that, by the time of the IPO, were rapidly becoming obsolete as a result of the emergence of more technologically advanced 64-bit and 128-bit PCI bus products. which offered computer users significantly enhanced performance. particularly when used in conjunction with the high-speed Intel "Pentium" processors that were rapidly coming to dominate the computer market; and (ii) the Company's prime competitors. including ATI Technologies, Diamond Multimedia, S3 Corp. and Matrox Electronics, were offering significantly less expensive alternatives to the Company's high-priced Imagine 128 products that offered features such as 3-D graphics and superior motion video which were not available in Number Nine's products.

(b)     The second generation Imagine II line of products. which defendants specifically touted in the Prospectus as an example of Number Nine's broad product line. and which defendants claimed would be shipped by the second half of 1995. was experiencing numerous technical problems in development which precluded Number Nine from delivering Imagine II products in accordance with the Company's announced intentions.

(iii)     **Defendants' False And Misleading Portrayal Of The Company's Purported Continuing Growth And Dynamic Business Strategy**

45.     In an effort to create the misleading impression that the Company's main product offerings would enhance profitability, in the section of the Prospectus entitled "Management's Discussion And Analysis of Financial Condition and Results of Operations," defendants stated:

- 18 -

> The Company believes it now has an opportunity to increase margins through (i) potential cost reductions from manufacturing efficiency gains and volume purchasing; (ii) potential changes in product mix reflecting a greater proportion of sales from higher-margin products incorporating Imagine 128 technology, which began volume shipments in the fourth quarter of 1994; and (iii) potential changes in channel mix reflecting increased sales through the two-tier and retail distribution channel. There can be no assurance, however, that the Company will be able to increase or even maintain current margin levels. (Emphasis added).

46.     The following facts, among others, rendered defendants' claims that Number Nine was expecting the Company's margins to increase in the aftermath of the IPO materially misleading:

(a)     As more fully explained below, by the time of the IPO, Number Nine maintained obsolete inventory on its books which the Company would be able to sell, if at all, only by reducing the price of such merchandise substantially below the cost of producing such products. The write-off required by that excess inventory eliminated any possibility of the Company realizing improved margins and, in fact, would eventually result in the Company's margins being substantially reduced.

(b)     One product that defendants were purportedly counting on to increase the Company's gross margins, and which was considered by defendants in representing that the Company anticipated margin improvement, the Company's Imagine 128 graphics accelerator for the Apple PowerMac, was experiencing significant production delays. As a result, Number Nine would be unable to realize millions of dollars in high-margin sales of Imagine 128 graphics accelerators because of the Company's inability to fill outstanding orders or ship that product ahead of competing products (and thereby increase Number Nine's share of the limited, high-end market for such products).

(c)     As is more fully explained below, by the time the Registration Statement became effective, Number Nine was unable to procure from its normal suppliers

- 19 -

adequate quantities of DRAM and VRAM memory chips.[3]  As a result, Number Nine was

forced to procure VRAM and DRAM memory chips from alternative sources, including the

"spot market" for such products.  Procuring DRAM and VRAM memory chips from those

alternative sources significantly increased the Company's cost of goods sold and was

therefore negatively impacting the Number Nine's margins by the time of the IPO.

> (iv)    **Defendants' Materially Misleading
>         Omissions Concerning Memory Supply**

47.    The section of the Number Nine Prospectus entitled "Risk Factors" contains

the following disclosure relating to the supply of DRAM and VRAM memory chips to

Number Nine:

> In addition, the Company purchases a variety of other components from
> multiple suppliers.  Worldwide shortages of DRAM have from time to time
> required the Company to obtain memory from distributors or on the "spot
> market" at higher than anticipated prices, resulting in additional costs that
> generally cannot be fully passed along to customers.  Due to strong PC
> demand, an increase in per-system utilization of DRAM by PCs and a delay in
> increased capital spending by DRAM suppliers, the Company anticipates future
> shortages of DRAM, which are likely to be exacerbated by the introduction of
> Windows 95 due to its increased memory requirements.  Any shortage of
> specialized VRAM or DRAM or other components in the future could
> materially adversely affect the Company's business and operating results.
> [Emphasis added.]

48.    The foregoing representations concerning the Company's ability to procure

VRAM and DRAM memory chips and the "potential" effect of a shortage of such

components upon the Company's operations were materially misleading because of

defendants' failure to disclose the following adverse facts:

---

[3]    DRAM and VRAM memory chips are necessary components for the Company's
graphics accelerators.  DRAM products employ one-directional memory and are significantly
cheaper than VRAM products, which employ two-directional memory, and therefore offer
enhanced performance.

(a)    By the time the Registration Statement became effective, and not merely "from time to time" as was claimed in the Prospectus, Number Nine was experiencing an inability to obtain DRAM and VRAM chips from the Company's usual sources of supply (principally IBM) in the quantities necessary to fill its graphics accelerator orders.

(b)    By the time of the IPO, Number Nine was increasingly resorting to the "spot market" for VRAM and DRAM memory chips as a result of the Company's inability to procure such products in sufficient quantities.

(c)    The spot market prices that Number Nine was being forced to pay for VRAM and DRAM memory chips significantly exceeded the prices the Company had paid in the recent past for such components, thereby significantly increasing the Company's cost of goods sold and decreasing its margins.

(d)    The increased costs for procuring memory chips that were being experienced by the Company could only be passed on to customers to a limited extent. In fact, Number Nine was contemplating, by the time the Registration Statement became effective, lowering its prices in order to respond to its competitors' pricing strategies.

(e)    In addition, the Company's inability to secure adequate supplies of DRAM and VRAM memory chips was preventing Number Nine from shipping products that would otherwise have been delivered to customers and booked as revenue. The negative impact upon the Company's financial performance of this failure to ship products in a timely manner was aggravated by the fact that such failures caused customers, including the Company's largest customer (Dell Computer Corp.), to look to other suppliers for graphic accelerators.

- 21 -

(f)      Accordingly, many of the principal measures of Number Nine's financial statements, including cost of goods sold, gross and operating margins, net income and earnings per share ("EPS") were being adversely impacted by the time the Registration Statement became effective.

**B.      The Number Nine Defendants' Post-IPO False And Misleading Statements**

     (i)      The Number Nine Defendants' False Financial Statements

49.      Following the completion of the IPO, the Company issued additional financial reports concerning the Company's operations during the second and third quarter of 1995 that were materially false and misleading. The first of those materially misleading reports was issued by the Company on July 27, 1995 and concerned the Company's results for the second quarter of 1995. On or about August 16, 1995, the Company filed a report on Form 10-Q for the second quarter (the "Second Quarter 10-Q") with the SEC which reiterated in a different format the financial results reported by the Company on July 27.

50.      In the July 27, 1995 press release and the second quarter 10-Q, the Company reported the following results for the second quarter that were materially false and misleading:

- Net income of $1.4 million.

- Purported earnings per share of $0.17 (calculated on the basis of 8.4 million weighted average shares outstanding).

- Purported operating income of $2.2 million.

- Inventories of $23 million.

- Stockholders' equity of $41.87 million.

51.      The second quarter 10-Q also contained the following specific misrepresentation concerning the Company's accounting policies:

.

The accompanying condensed unaudited financial statements have been prepared . . . in accordance with generally accepted accounting principles for interim financial information and pursuant to the applicable rules and regulations of the Securities and Exchange Commission. . . .

In the opinion of management, the accompanying financial statements contain all adjustments (consisting of normal and recurring accruals) necessary to present fairly all financial statements.

52.    Once again, these reported results (¶ 50) and the Number Nine Defendants' representation concerning Number Nine's purported compliance with GAAP (¶ 51) were false and misleading because they violated the GAAP principles set forth in ¶ 38, supra. Had Number Nine recorded a write down for even a percentage of the diminished value of the inventory of obsolete 64-bit VL bus graphics accelerators and excess printed circuit boards owned by the Company at the end of the second quarter of 1995, Number Nine would have had to report a significant loss and much lower margins, inventory and stockholders' equity for the quarter.

53.    As a result of the Company's failure to record the appropriate reserve, however, Number Nine was able to report a profit of $1.3 million for the second quarter, thereby inflating the market price of the Company's common stock.

54.    The Company also issued materially false and misleading reports concerning its results for the third quarter of 1995. The first of these materially misleading reports was disseminated to the market on October 25, 1995, when Number Nine issued a press release that, inter alia, announced the Company's final third quarter 1995 financial results. On or about November 14, 1995, the Company filed a report with the SEC on Form 10-Q for the quarterly period ending September 30, 1995 (the "Third Quarter 10-Q"). The Third Quarter 10-Q reiterated the materially misleading financial results reported by the Company in its October 25, 1995 press release and made certain additional misrepresentations regarding the Company's purported compliance with GAAP.

- 23 -

55.    In the October 25, 1995 press release and the Third Quarter 10-Q, the

Company represented that:

● Number Nine incurred a purported net loss of ($292,000) for the quarter, compared to reported net earnings of $638,000 in the year-earlier period.

● The Company lost ($.03) per share (on 8.6 million weighted average shares outstanding), compared with earnings of $.09 per share (on 7.4 million weighted shares outstanding) in the same quarter of 1994.

● Number Nine closed the quarter with inventories of $27 million.

56.    The second quarter 10-Q also contained the following specific

misrepresentation concerning the Company's purported compliance with GAAP:

The accompanying condensed unaudited financial statements have been prepared . . . in accordance with generally accepted accounting principles for interim financial information and pursuant to the applicable rules and regulations of the Securities and Exchange Commission. . . .

In the opinion of management, the accompanying financial statements contain all adjustments (consisting of normal and recurring accruals) necessary to present fairly all financial statements.

57.    Once again, these reported results (¶ 55) and the Number Nine Defendants'

representation concerning the compliance of the quarterly financial statements with GAAP

(¶ 56) were false and misleading because they violated the GAAP principles set forth in

¶ 38, supra. Had Number Nine recorded a write down for even a percentage of the

diminished value of the inventory of 64-bit VL bus graphics accelerators and excess printed

circuit boards owned by the Company at the end of the third quarter of 1995, the Company

would have had to report a significant loss, much lower margins and vastly reduced

inventory for the quarter. As a result of the Company's failure to record the appropriate

write down, however, Number Nine was able to report a minimal loss of only $292,000 for

the second quarter, thereby inflating the market price of the Company's common stock.

- 24 -

(ii)   **Additional False And Misleading Representations Disseminated Directly To The Market By The Number Nine Defendants**

58.   Number Nine reported its first quarterly results as a publicly-traded company, i.e., those for the second quarter of 1995 (ended July 1, 1995), on July 27, 1995. On or about August 16, 1995, the Company filed with the SEC the Second Quarter 10-Q, which substantially reiterated the results announced on July 27, 1995. As is specifically alleged below, the financial results reported by the Company in the July 27 press release and the Second Quarter 10-Q included numerous material misrepresentations concerning the Company's results and purported compliance with Generally Accepted Accounting Principles ("GAAP").

59.   Additionally, in announcing the second quarter results in the July 27, 1995 press release, defendant Najda stated, "Gross margin improvement was dampened as a result of unanticipated price increases for DRAM and VRAM memory chips during June, which resulted in higher costs. We are actively working with memory suppliers to secure pricing and volume commitments for future production. However, there can be no assurance that commitments will be secured in sufficient amounts to meet the increasing needs of the Company."

60.   Najda's statement concerning the Company's margins and ability to procure adequate supplies of VRAM and DRAM memory chips was materially misleading because he failed to disclose the following material facts he was obligated to disclose to offset the misleading impact of his representations:

(a)   Contrary to Najda's assertion, the Company's costs of procuring DRAM and VRAM memory had not increased dramatically and unexpectedly in June. Rather, as alleged specifically in ¶¶ 46(c) and 48, supra, the Company was experiencing

- 25 -

increased memory costs, and was apprised of imminent future price hikes well before the IPO took place on May 26, 1995.

(b)     By the time of the July 27, 1995 press release, Number Nine was increasingly resorting to the "spot market" for VRAM and DRAM memory chips to procure the Company's supplies of those products and had no prospects for procuring adequate supplies of those products directly from the Company's usual sources of supply.

(c)     The spot market prices that Number Nine was being forced to pay for VRAM and DRAM memory chips were significantly higher than the prices the Company had paid in the recent past for such components. Thus, the Company was not experiencing "dampened" margin "improvements," but rather materially decreased margins resulting from significant increases in the Company's cost of goods sold.

(d)     Number Nine's margins were also being negatively impacted because the increased cost of memory chips could only be passed on to customers to a limited extent. In fact, Number Nine was being forced to lower its prices in order to respond to its competitors' pricing strategies.

(e)     The Company's inability to secure adequate supplies of DRAM and VRAM memory chips was so severe that it was preventing Number Nine from shipping products that would otherwise have been delivered to customers and booked as revenue. The negative impact upon the Company's financial performance of this failure to ship products in a timely manner was aggravated by the fact that such failures caused customers, including the Company's largest customer (Dell Computer Corp.), to look to other suppliers for graphic accelerators.

(f)     As more fully explained below, by the time of the July 27, 1995 press release, Number Nine maintained obsolete inventory on its books which the Company would

- 26 -

be able to sell, if at all, only by reducing the price of such merchandise by millions of dollars below the cost of producing such products. The write-off required by that excess inventory would eventually result in the Company's margins being substantially reduced.

61.    On August 7, 1995, Number Nine issued a press release concerning the Company's introduction of the Imagine 128 for PowerMac -- a product the Company termed "the world's first and only 128-bit graphics and video accelerator for PCI based Power Macintosh computers." The release continued:

> The new card, marking Number Nine's entry into the Macintosh computing environment, introduces a new level of price/performance to this market. The Imagine 128 for PowerMac is expected to appeal to users of graphics- and video-intensive applications such as Mac-based color pre-press, desktop publishing, multimedia authoring, complex imaging, and other applications requiring photorealistic true color at high resolutions.

62.    The release further elaborated upon the Company's claim that the Imagine 128 for Power Mac represented a "new level of price performance" for Macintosh users. Greg McHalse, Number Nine's Vice President for Marketing and Consumer Sales, was quoted in the release as stating, "Many graphics card makers that have traditionally dominated the Mac market with high-priced boards are about to experience very tough competition from companies like Number Nine. Our 128-bit technology enables us to provide these users with the highest performance graphics they have ever seen for a fraction of what they are used to paying." The release also noted that "[v]olume shipments [of the Imagine 128 for PowerMac] are currently anticipated to begin in September 1995."

63.    The foregoing representations concerning the characteristics of the Imagine 128 for PowerMac, the market for that product and the ability of Number Nine to deliver the product to consumers were materially false and misleading because the Number Nine Defendants failed to disclose the following material facts they were obligated to divulge to alleviate the misleading effects of their optimistic representations:

- 27 -

(a)    By the time of the announcement, Number Nine was experiencing delays in producing the Imagine 128 for PowerMac that would prevent the Company from shipping the product until late November 1995.

(b)    As a result of the delayed launch of shipment of the Imagine 128 for PowerMac, the Company would lose millions of dollars in high-margin sales of the new product because the Company's competitors would be able to ship similar products well before the Imagine 128 for PowerMac was available to consumers.

64.    On August 25, 1996, the Company disseminated a press release "unveiling significant price reductions on all models" of its Imagine 128 graphics and video accelerator. In an effort to suggest that this decision was motivated by something other than competitive pressures which were severely hampering sales and to conceal the fact that those cuts would negatively impact Number Nine's margins, the Company claimed that:

•    the price reductions were "[t]imed with the worldwide unveiling of Microsoft Windows 95" and that "the price cuts are targeted to appeal to Windows 95 users . . ."; and

•    "[w]idespread success of the Imagine 128 to date enables the company, through economies of scale, to make these substantial price reductions."

In addition, Number Nine's director of corporate communications, Phil Parker, was quoted in the press release as stating, "We have sold more Imagine boards -- both in the OEM and retail channels -- than anyone could have anticipated. . . . These volumes have enabled us to substantially reduce our unit cost and we are very pleased to be able to pass these savings on to the growing number of graphics enthusiasts."

65.    The foregoing representations were materially false and misleading because they failed to disclose the following facts that the Number Nine Defendants were obligated to disclose in order to alleviate the misleading effect of their positive statements concerning the Company's price cuts:

- 28 -

.

(a)     The price cuts were not implemented to pass cost savings realized from economies of scale along to consumers. Rather, the Company was unable to maintain its high margins on Imagine 128 products because of the competitive disadvantages specified in ¶ 44(a), supra.

(b)     The price cuts announced by the Company would adversely impact the Company's margins because any increased sales generated as a result of price cuts would be insufficient to offset the gross margin contribution made by the Company's formerly high prices for its Imagine 128 graphics accelerators.

66.     On September 26, 1995, Number Nine issued a press release heralding what the Company termed "important distribution agreements that will put the Company's new Imagine 128 for Power Mac on shelves in Computer City and CompUSA, as well as in the popular MacMall catalog beginning immediately." The press release continued:

> Through an exclusive deal with national distributor Ingram Micro, Number Nine expects to ship significant volumes of its new high-performance graphic cards before the end of the year. CompUSA and Computer City were the first two retailers to place orders through Ingram Micro, making significant commitments in shelf space for the new board. In addition, Number Nine entered an exclusive agreement with Creative Computers for its Mac product catalog business, MacMall, which will begin pre-selling the board this month.

67.     The September 26 press release also contained certain statements attributed to Suzanne Kern, marketing manager for Ingram Micro, which were drafted, reviewed and approved by Number Nine. According to Number Nine's press release, Ms. Kern stated, "The amount of shelf space we have garnered right off the bat for such a newly introduced product is almost unprecedented. . . . Number Nine's reputation for stability, reliability and top performance in the PC market is carrying them a long way with users in the Mac market."

- 29 -

68.   The foregoing statements regarding the Company's introduction and

distribution of its Imagine 128 graphics accelerator for the PowerMac were materially false

and misleading in the manner, and as a result of the facts, alleged in ¶¶ 46(b) and 63, supra.

69.   On October 6, 1995, Number Nine was forced to disclose that the Company's

sales and earnings for the third quarter of 1995 (ending September 30, 1995) would be less

than the amounts forecasted by analysts in reliance upon the false representations of the

Number Nine Defendants. A press release issued by the Company over the PR Newswire on

October 6 stated:

> Lower than expected OEM sales more than offset continued increases in two-
> tier and retail distribution sales, and delays in delivery to the company of
> VRAM memory components resulted in significant order volume being
> deferred into October. While final results for the quarter are expected to be
> announced during the second half of October, the company estimated that sales
> for the three months would be approximately $23.5 million, a 24% increase
> from the third quarter of 1994. The company also estimated that earnings per
> share would approximate break-even, compared to $.09 in the year-earlier
> period.

70.   In disclosing those facts, however, the Number Nine Defendants continued to

make false optimistic representations concerning the Company's performance and prospects.

In the October 6 press release, defendant Najda stated:

> There were two principal factors impacting third quarter sales. One was lower
> sales to the company's largest OEM customer. The second factor was delayed
> delivery to the company of VRAM components. As a result, a significant
> amount of September orders are now scheduled to ship in October. . . . While
> this was disappointing, we currently expect that OEM sales will increase
> significantly in the fourth quarter, based on initial orders and discussions with
> customers. The volume and timing of orders during a quarter [are] very
> difficult to forecast, however, and attaining a specific sales level cannot be
> assured.

71.   In fact, the Number Nine Defendants were so intent upon continuing to create

a positive image of Number Nine in the minds of investors that defendant Najda broke

Number Nine's purported "policy" of not discussing publicly the Company's "backlog" of

orders. In the October 6 press release, Najda is quoted as stating, "<u>Our policy is to not discuss order backlog. In this instance, however, we are making an exception to demonstrate the strength of orders on hand, which exceeded $22 million at the end of September</u>." (Emphasis added).

72.     The foregoing optimistic statements concerning the large backlog of orders Number Nine would purportedly fill during the fourth quarter of 1995 were materially false and misleading. The following undisclosed facts, among others. demonstrate the misleading quality of the Number Nine Defendants' representations:

(a)     A substantial percentage of the purported $22 million in backlog that existed at the end of the third quarter (between $3.5 million and $6 million) related to orders for the Company's PowerMac accelerator products. The reason Number Nine was able to obtain such a large volume of orders for its PowerMac products was that the Company had promised shipment of those products late in the third or early in the fourth quarter of 1995. while the Company's competitors (chiefly Radius. Diamond and ATI) were not planning to ship their products until the middle or latter part of the fourth quarter.

(b)     In fact, however, the Number Nine Defendants knew that the Company would not be able to ship any of its PowerMac-related accelerator products until approximately Thanksgiving 1995, thereby eliminating the time advantage the Company had over its competitors. The Number Nine Defendants were likewise aware from their communications with their distributors and other sources that, by Thanksgiving, Diamond, ATI and Radius PowerMac graphic accelerators would be available to consumers. Thus. the Number Nine Defendants knew or recklessly disregarded that a significant percentage of the purported backlog that the Company highlighted in the October 6 press release would not result in sales during the fourth quarter of 1995. Those lost sales were particularly damaging

- 31 -

to the Company's bottom line because the PowerMac accelerator products produced high-margin sales for Number Nine.

73.    The October 6, 1995 press release contained additional representations made by the Number Nine Defendants that were materially misleading because they failed to disclose the true extent of the problems Number Nine was facing in obtaining adequate supplies of VRAM memory chips.  Defendant Kevin Hanks, Number Nine's CFO, stated:

> Two-tier and retail distribution sales increased sequentially and should exceed 60% of sales for the quarter.  We achieved this growth despite limitations on memory component availability, which may have prevented reorders due to unfilled backlog earlier in the quarter.  <u>A key factor affecting fourth quarter sales growth will be our ability to obtain sufficient VRAM supplies, and we are executing several steps to address the issue</u>.  (Emphasis added).

74.    In addition, defendant Najda stated, "To alleviate our dependence on VRAM, we are designing several new products based on high-density, advanced memory technology.  These 8- and 16-megabit memory chips replace traditional 2- and 4-megabit VRAM, delivering high-performance graphics while requiring fewer memory chips per board.  These products could generate revenues by the first quarter of 1996."

75.    The representations made by defendants Najda and Hanks in the October 6 press release regarding the Company's supply of VRAM memory chips were materially false and misleading in the manner and as a result of the specific facts alleged in ¶¶ 46(c), 48 and 60, supra.

76.    The truth about Number Nine's diminishing value was thus only partially disclosed on or about October 6, 1995.  Despite the Number Nine Defendants' partial disclosures, however, they continued to perpetuate the false impression that Number Nine was a growing Company by characterizing the third quarter earnings disappointment as an unusual and non-recurring event.  Thus, the partial disclosures did not discharge the Number Nine Defendants' disclosure obligations under the federal securities laws.

77.   On October 25, 1995, the Company issued a press release announcing its final third quarter 1995 financial results. On or about November 14, 1995, the Company filed the Third Quarter 10-Q with the SEC. The Third Quarter 10-Q reiterated the financial results first announced by the Company in its October 25, 1995 press release and made certain representations regarding the Company's purported compliance with GAAP.

78.   The representations made by Number Nine concerning the Company's financial results in the October 25, 1995 press release and the Third Quarter 10-Q, as well as the Third Quarter 10-Q's representations concerning the Company's purported compliance with GAAP, were materially false and misleading for the reasons set forth above in the section of the complaint entitled "The Number Nine Defendants' False Financial Statements" (¶¶ 49-57, infra).

79.   In the October 25 press release announcing third quarter results, Number Nine stated:

Sales and gross margins during the quarter were impacted by lower than expected sales to the company's largest OEM customer, and delays in delivery to the company of VRAM memory components required to assemble higher-margin products. As a result, a significant volume of September orders were not shipped until October.

80.   Najda nevertheless attempted to create the impression that Number Nine was expecting improved results for the fourth quarter. In the October 25 press release, Najda stated, "Based on increased OEM orders, historic seasonal demand in the fourth quarter, and the introduction of the Apple PowerMac version of Imagine 128, we currently expect sales to increase significantly from the third quarter. However, attaining a specific sales level cannot be assured."

81.   Najda's representation concerning the increased sales Number Nine was expecting to realize as a result of the introduction of the Imagine 128 graphics accelerator for

- 33 -

the PowerMac (¶ 80) was materially false and misleading in the manner, and as a result of the facts, alleged in ¶¶ 46(b), 63 and 72, supra.

82.    The Number Nine Defendants' representations in the October 25, 1995 press release concerning the Company's purported backlog of orders (¶¶ 79-80) and allegedly improved financial results during the fourth quarter (¶ 80) were materially false and misleading in the manner, and as a result of the facts, alleged in ¶¶ 44, 46, 48. 60, 63, 72. In addition. the following facts. which existed throughout the course of the fourth quarter, rendered those optimistic representations materially false and misleading:

(a)    Imagine 128 products increasingly comprised a smaller percentage of the Company's sales and. as a result, Number Nine's margins were being negatively impacted because the high-priced Imagine 128 graphics accelerators were the Company's highest-margin products.

(b)    The Company's margins were also declining materially during the fourth quarter as a result of the increased concentration of OEM sales recorded throughout the quarter (the Company's sales to Dell represented approximately 53% of total sales during the quarter). Thus, even before the inventory write off taken by the Company during the fourth quarter, Number Nine posted gross margins of only 13%, down from a disappointing 15.6% in the third quarter.

(c)    The Company's SG&A costs were skyrocketing throughout the fourth quarter. In fact, for the quarter, Number Nine recorded SG&A costs of $6.1 million, or 16.6% of sales, which represented a 154% increase over the $2.4 million in SG&A costs (8.7% of sales) recorded during the fourth quarter of 1994.

(d)    Number Nine faced significant undisclosed problems in manufacturing and marketing the Company's Imagine II products that were evident to the Number Nine

- 34 -

Defendants throughout the fourth quarter. During the fourth quarter, the Company shipped only evaluation units of Imagine II to customers for certification. Contrary to the Prospectus's representation that Imagine II products would be shipped in 1995, no production shipments were made until the second quarter of 1996. Equally as important, the Imagine II products suffered from a serious flaw -- the Company was forced to add a VGA controller to the Imagine II products because their built-in VGA function did not work. That remedy significantly increased the cost of Imagine II products to Number Nine and its customers, thereby materially decreasing the market for Imagine II products. In addition, the fact that Number Nine was in the midst of efforts to correct the defects with the Imagine II products' built-in VGA function discouraged OEMs from instituting plans to incorporate the Imagine II graphics accelerators into the OEMs' own products.

(e)    Number Nine was also faced with declining sales through the Company's retail distribution channel throughout the fourth quarter. Overall, the decline amounted to approximately $1 million on a sequential basis from the third quarter of 1995, thereby decreasing the Company's retail channel sales from 68% to 41% of total sales. That decline in retail channel sales was particularly significant because such sales produce higher margins than high-volume sales to OEMs.

(f)    The Company's sales to Dell during the fourth quarter of 1995 were negatively impacted by Number Nine's loss of its position as the supplier of DRAM 64-bit chips to Dell. The loss of that contract occurred late in the third quarter of 1995, when Number Nine found itself behind its competitors Diamond and STB in developing a prototype 64-bit chip based upon the latest product from S-3, a chip manufacturer. As a result, Number Nine lost approximately $4-$5 million of the approximately $16-$17 million in sales the Company was making to Dell on a quarterly basis.

- 35 -

**(iii)  The Number Nine Defendants' Use Of Securities Analysts As A Conduit For False Information**

83.    During the course of their "due diligence" investigation of Number Nine prior to the IPO, each of the Underwriter Defendants was provided with significant access to a wide array of non-public information concerning the Company. That information was conveyed to the Underwriter Defendants by means of, inter alia: (a) due diligence meetings with the Officer Defendants and other executives of the Company; (b) review of the Company's financial projections; (c) review of the minutes of the meetings of the Number Nine board of directors: (d) review of the financial and operational materials distributed in connection with such meetings. including income statement and balance sheet information concerning the Company; (e) review of the Company's most important contracts with its suppliers. including contracts with its suppliers of VRAM and DRAM memory and other component materials: (f) review of the Company's most important contracts with its customers. including Number Nine's various agreements with Dell: (g) review of non-public financial information concerning the performance and future prospects of Number Nine and its various products; (h) meetings held with the Officer Defendants and other Number Nine executives to prepare for "road show" presentations to potential investors in the IPO: and (i) participation in the "road show" meetings themselves.

84.    Following the IPO. it was the Company's practice throughout the Class Period to have key members of its management team communicate directly with securities analysts who covered the Company to discuss the Company's operating results and anticipated future performance, including analysts from Robertson Stephens and Cowen.

85.    Because the publication of analyst reports is viewed by securities issuers as a critical aspect of soliciting investors' interest in purchasing issuers' stock, issuers generally request to be added to the underwriters' analyst coverage list in connection with negotiating

the terms of their initial public offering. Such negotiations took place among Number Nine, Robertson Stephens and Cowen and, as a result, Number Nine was added to the list of companies covered by Robertson Stephens and Cowen. All of the defendants knew well before the Class Period that, as soon as Robertson Stephens and Cowen were permitted to do so by SEC regulations, they would begin to issue securities analysts' reports recommending the purchase of Number Nine common stock.

86.    During the course of their conversations with securities analysts, Number Nine executives provided the analysts, including those employed by Robertson Stephens and Cowen, with guidance regarding numerous aspects of the Company's business strategy and anticipated performance. These communications included, but were not limited to, conference calls and meetings, during which Number Nine executives discussed relevant aspects of the Company's operations.

87.    Even after the conclusion of the IPO, Number Nine and its executives exploited their regular, direct communications with analysts to disseminate positive information to the investment community concerning Number Nine that they knew investors would rely and act upon in deciding to purchase Number Nine common stock.

88.    Investors relied and acted upon the information communicated to the market in analyst reports, including the reports of Cowen and Robertson Stephens. Thus, through their communications with securities analysts, Number Nine's executives were able to inflate the market price of the Company's stock by presenting false information to the market concerning the Company's operations and prospects.

89.    In preparing the reports specified below, analysts for Robertson Stephens and Cowen relied, in large part, upon information provided to Robertson Stephens and Cowen by representatives of Number Nine, including the Officer Defendants, during the due diligence

- 37 -

process for the IPO described in ¶¶ 26, 83, supra. The analyst reports were also based, in substantial part, upon post-IPO public statements made by the Number Nine Defendants, as well as non-public communications between the Company's executives and analysts during the course of various conference calls and private communications.

90.    Thus, in the aftermath of the IPO, an important mechanism utilized by the Number Nine Defendants to maintain and/or increase the price of Number Nine common stock was the optimistic analyst reports concerning Number Nine that were issued by, inter alia, Robertson Stephens and Cowen. By means of those reports, which were disseminated to the market by means of distribution lists maintained by Robertson Stephens and Cowen and closely-followed electronic databases such as Investext and First Call, the Number Nine Defendants were able to disseminate false positive information concerning the Company's performance and future prospects to the market.

91.    A number of the analysts reports issued by Robertson Stephens and Cowen shortly after the IPO contained actionable material misrepresentations and omissions for which the Number Nine Defendants are liable as a result of their entangling contacts with Robertson Stephens and Cowen. On the very first day the Underwriter Defendants were permitted to issue an analyst report concerning Number Nine (see SEC Rule 174, 17 C.F.R. § 230.174), Cowen issued a significant "booster shot" report concerning Number Nine (i.e., a favorable analyst report from an underwriter designed to increase or maintain an issuer's stock price). In a report issued by Cowen on June 19, 1995, Cowen emphasized that Number Nine "IS RATED STRONG BUY."

92.    Cowen's report also included a table of estimated results for the Company that did not materially differ from the earnings estimates provided to Cowen by Number Nine during the due diligence process for the IPO. That table projected, inter alia, that the

- 38 -

Company would earn $0.17 per share in the second quarter of 1995, $0.27 per share in the third quarter of 1995 and $0.39 per share in the fourth quarter. Cowen thus estimated. in reliance upon its communications with Number Nine executives, including the Officer Defendants, that Number Nine would earn $0.96 per share in fiscal 1995. Cowen also projected that Number Nine would earn $1.47 per share in fiscal 1996.

93.    The facts alleged in ¶¶ 36-42, 44, 46, 48, 49-57, 60, 63 and 72. supra, demonstrate that the EPS projections included in the June 19, 1995 Cowen analyst report were materially false and misleading at the time they were made. As a result of the existence of those facts, the truth was that Number Nine had no hope of attaining the significant earnings growth projected by Cowen on the basis of information provided by the Number Nine Defendants.

94.    The June 19, 1995 Cowen report also attempted to further the false impression that Number Nine offered customers a wide range of product offerings. The report stated:

Number Nine is the only PC accelerator board company with products based on proprietary accelerator chips and merchant chips. Its broad product line allows it to serve as a single-source supplier for OEMs and offer a wide range of retail products priced from $150 to $2000.

95.    The foregoing statement was materially false and misleading when made for the reasons, and as a result of the facts, alleged in ¶ 44, supra.

96.    One day later after Cowen issued its glowing report concerning the Company (June 20, 1995) -- again virtually as soon as SEC regulations permitted -- Robertson Stephens followed Cowen with its own "booster shot" report regarding Number Nine. In its June 20 report. Robertson Stephens emphasized that it was "initiating, coverage with a buy."

97.    Like the Cowen report, the Robertson Stephens report set forth a table of estimated results for the Company that did not materially differ from the forecasts that had earlier been provided by Number Nine to Robertson Stephens during the due diligence

- 39 -

process for the IPO. In the earnings estimate table included in its report, Robertson Stephens forecasted that Number Nine would earn $0.15 per share in the second quarter of 1995. $0.28 per share in the third quarter, and $0.40 per share in the fourth quarter. The June 20 Robertson Stephens report also estimated that the Company would earn $0.90 per share in fiscal 1995 and $1.48 per share in fiscal 1996.

98.     The facts alleged in ¶¶ 36-42, 44, 46, 48, 49-57, 60, 63 and 72, supra, demonstrate that the EPS projections included in the June 20, 1995 Robertson Stephens analyst report were materially false and misleading at the time they were made. As a result of the existence of those facts, the truth was that Number Nine had no hope of attaining the significant earnings growth projected on the basis of information provided by the Number Nine Defendants.

99.     The June 20 Robertson Stephens report also included the following information concerning Number Nine's purported ability to procure component parts -- particularly memory products -- which was provided to Robertson Stephens by Number Nine executives:

> Due to shortages of DRAM chips, costs are going up. Traditionally, NINE has purchased a majority of its components in the spot market rather than directly from manufacturers -- this has left the company paying higher prices than its competitors, as most of them do purchase direct. Once the company completed its first round of private financing in December, it was able to begin negotiating the direct purchase of components. As this transition is still underway, the company has not yet yielded the total cost savings available to it, but has had the advantage of beginning to purchase some directly. While NINE is not seeing increased costs for DRAMs, due to its transition to direct sourcing, it is also not seeing prices come down significantly because some manufacturers, in light of serious shortages, are raising prices of these critical components. In our opinion, this is a particularly good time for NINE to be going through this transition, as its competitors are reporting increased costs of DRAM chips. (Emphasis added).

100.    The foregoing statement, with which the Number Nine Defendants entangled themselves by means of the numerous contacts with Robertson Stephens alleged herein, was.

- 40 -

materially false and misleading for the reasons, and as a result of the facts, specified in
¶¶ 46(c), 48 and 60, supra.

101.   On July 28, 1995, a day after Number Nine announced its operating results for
its first quarter as a publicly-traded entity (the second quarter of 1995, ended July 1, 1995)
and held a conference call with, inter alia, analysts from Cowen and Robertson Stephens.
Cowen issued another "booster shot" analyst report concerning Number Nine.

102.   Based upon the representations made to Cowen previously and during the
course of the Number Nine conference call, Cowen's report reiterated its "strong buy" rating
concerning the Company's common stock. The July 28 Cowen report also repeated a
number of additional false representations that were made by Number Nine executives with
the knowledge that they would be passed along to the market by means of Cowen's analyst
reports. For example, the Cowen report stated that Number Nine had moved swiftly to
insulate itself from potential negative financial consequences that could result from increasing
DRAM prices. The report stated:

> Gross Margins Up 70 b.p. Q/Q, But Higher DRAM Prices Slow Rate Of
> Expected Gains -- Gross margins in Q2 were 19.1%, vs. 18.4% in Q1:95 and
> our forecast of 21.8%. Prices for DRAM increased above expectations in June
> and the Company was unable to adjust pricing before the end of the quarter.
> However, NINE has entered into new agreements with its OEM customers that
> will give it protection against price fluctuations in the future, and it is
> continuing to seek stronger relationships with memory suppliers. There were
> no other component supply issues in the quarter, and management indicates
> that its supply of merchant accelerator chips is adequate. [Emphasis added.]

103.   These representations concerning the Company's margins and ability to
procure adequate components for its products were materially misleading for the reasons, and
as a result of the facts, specified in ¶¶ 46, 48 and 60, supra.

104.   The July 28 Cowen analyst report also set forth a table of estimated results for
the Company that did not materially differ from the forecasts that had earlier been provided

by Number Nine to Cowen during the due diligence process for the IPO. In the earnings estimate table included in its report, Cowen forecasted that Number Nine would earn $0.25 per share in the third quarter, and $0.38 per share in the fourth quarter. The July 28 Cowen report also estimated that the Company would earn $0.90 per share in fiscal 1995 and $1.47 per share in fiscal 1996.

105.  Based upon the representations previously made by Number Nine executives, including the Officer Defendants, as well as those made during the course of the conference call explaining Number Nine's results for the second quarter of 1995, Robertson Stephens issued its own "booster shot" analyst report concerning Number Nine on July 28, 1995. In summary, the Robertson Stephens report stated, "While we think the stock may trade off on the gross margin concerns, we recommend purchase, as this may be the best chance we get to own what we think will be a long-term winner in the graphics marketplace." (Emphasis added).

106.  The Robertson Stephens report also revealed that Number Nine was misleading the market to believe that the Company would not be adversely impacted by market conditions that were significantly increasing the cost to the Company of procuring VRAM and DRAM memory chips. The report stated:

> The company experienced significantly higher VRAM and DRAM prices later in the quarter than had been expected. While showing consistently lower VRAM and DRAM prices for the first two months of the quarter, NINE was surprised by the move in June, and the limited availability of chips. As a result, with a heavily back-end-loaded quarter, NINE had no time to react to the increasing prices, and the impact was totally absorbed by the company's gross profits. Since memory prices began to increase, NINE has been searching for innovative ways to reduce the impact on its profits. Late in June, NINE came to an agreement with its largest OEM, Dell Computer Corporation (DELL $67-5/8) that we believe will protect NINE from any further increases in DRAM prices. As the gross margins on products sold to Dell are the lowest that NINE has, this should have a significant impact on future business. We are therefore comfortable with our projected improvements in gross margins over the next few quarters. (Emphasis added).