107.    The foregoing statement, with which the Number Nine Defendants entangled themselves by means of the numerous contacts with Robertson Stephens alleged herein, was materially false and misleading because it did not disclose the following facts that were necessary to alleviate the misleading impact of the statement:

(a)    Contrary to what was stated in the Robertson Stephens report, the higher prices for VRAM and DRAM memory chips did not arise suddenly during June of 1995. Rather, as particularized in ¶¶ 46(c) and 48, supra, the prices of those components were rising dramatically at least by the time the Registration Statement for the IPO became effective.

(b)    Much of the adverse margin impact felt by Number Nine during the second quarter was the result of rising VRAM memory chip prices, not just rising DRAM memory chip prices. Thus, the arrangement with Dell which Number Nine executives claimed would protect the Company from adverse margin trends did not address a principal factor (rising VRAM prices) responsible for the Company's increased margins.

(c)    The arrangement with Dell referred to in the Robertson Stephens report: (i) enabled Number Nine to pass some, but not all, of the increased cost of procuring DRAM memory chips along to Dell; and (ii) did not address at all the Company's ability to pass along increased costs to other customers.

(d)    As a result of the Company's inability to pass the rising cost of DRAM memory along to the vast majority of its customers, the rising cost of component memory chips was continuing to adversely impact the Company's revenues (where the Company attempted to increase prices), margins (where the Company absorbed the increased cost of the components) and profitability.

VI.

## THE BELATED REVELATION OF THE FINANCIAL AND OPERATIONAL DISARRAY OF NUMBER NINE'S BUSINESS

108.   Following the fourth financial quarter of 1995, the substantial operational and financial dilemmas facing Number Nine became too severe to conceal any longer -- particularly in light of the fact that the Company's outside auditors either were in the process of conducting an audit or would soon conduct an audit of Number Nine's financial statements and would thereby inevitably discover that millions of dollars of the Company's inventory would have to be written off.

109.   As a result, on January 31, 1996, the Company announced that it would report a net loss for the fourth quarter (ending December 31, 1995) amounting to $6.5-$7 million, or $0.75-$0.80 per share. Most importantly, Number Nine conceded in the January 31 press release that, while the Company had achieved sales of approximately $36 million during the quarter, it would be forced to report $8 million of charges "primarily for excess inventory."

110.   The obvious materiality of the inventory write off announced by Number Nine in connection with the Company's fourth quarter results is demonstrated by the fact that the charge resulted in a net loss which exceeded the Company's cumulative net income for at least the previous five years!

111.   With respect to the significant loss and the inventory write-off, Number Nine stated:

A majority of the charges relate to VL bus versions of the Company's 64-bit products and to excess printed circuit boards.  These products are not expected to represent significant sales during 1996.  The Company currently expects to report a fourth quarter loss in the range of $6.5 million to $7.0 million, or between $.75 and $.80 per share.  The Company expects to announce final results for the fourth quarter and full fiscal year, as previously scheduled, during the week of February 19, 1996 upon completion of the annual audit. (Emphasis added).

- 44 -

112.   The January 31, 1996 press release also stated, "[T]he loss reflects approximately $8 million of charges, primarily for excess inventory, as well as sales and operating results that were below management expectations." According to the Company's SEC Form 10-K for the year ended December 31, 1995, the inventory charge reduced the value of the Company's inventory of 64-bit VL bus graphics accelerators and printed circuit boards from approximately $11.5 million to $3.5 million, a reduction of approximately 70%.

113.   In conjunction with the revelation of these disastrous results, the Company also announced that Number Nine's Chief Operating Officer, Michael P. Casey, had "resigned."

114.   Wall Street interpreted these disappointing results as an indicator that serious operational problems existed at Number Nine. As a result, Cowen issued an analyst's report on January 31, 1996 that slashed Cowen's 1996 EPS estimate for Number Nine from $0.86 to $0.40, a decline of over 53%, and a reduction of over 72% from the $1.47 1996 earnings estimate maintained by Cowen at the time its first "booster shot" analyst report concerning Number Nine was issued on June 19, 1995.

115.   The poor estimated fourth quarter results announced by Number Nine on January 31, 1996. as well as the Company's results for all of 1995, were finalized by Number Nine and announced to the public on February 21, 1996. According to the Company, those results were as follows:

(a)   Revenues for the fourth quarter were $36.5 million. Revenues for the year were $116.8 million.

(b)   The Company reported a net loss of ($6.9 million), or ($.79) per share, for the fourth quarter, compared to reported net earnings of $1.1 million, or $.14 per share, for fourth quarter 1994. For the year, the reported net loss was ($5.1 million), or ($.64) per share. compared to reported net earnings of $1.7 million, or $.23 per share, for 1994. At

- 45 -

the time of its first booster shot analyst report on June 19, 1995, Cowen had projected, on the basis of the Number Nine Defendants' projections, that the Company would reports EPS of $0.39 for the fourth quarter and $0.96 for the year.

    (c)    Even before the massive inventory write off the Company was forced to record, the Company suffered a $1.5 million loss for the quarter ($0.17 per share).

    (d)    The Company also reported inventories at year-end of $26.4 million.

116.    In the February 21, 1996 press release. Number Nine stated. "The net loss for the quarter includes approximately $8 million of charges primarily related to excess inventory, as well as sales and operating results which were below management expectations. A majority of these charges were related to VL bus versions of the Company's 64-bit products and to excess printed circuit boards. which are not expected to represent significant sales during 1996."

117.    As was stated in a Cowen analyst report published on February 22, 1996. the results posted by Number Nine on February 21. 1996 were even worse than the Company had indicated on January 31. 1996. As a result of the Company's disappointing results. Cowen further reduced its 1996 EPS estimate for Number Nine for the second time in a month to $0.27 from $0.40, a decrease of 32.5% and a decrease of 81.6% from the $1.47 per share estimate Cowen maintained at the time the first booster shot analyst report was issued on June 19, 1995.

118.    In conjunction with the February 21 announcement of the Company's final financial results. the Number Nine Defendants also announced the "resignation" of the Company's CFO, defendant Hanks. Thus, during the course of the Class Period. the Company was forced to announce the "resignations" of its CFO (Hanks) and Chief Operating

- 46 -

Officer (Casey) as well as a purported "lateral move" by the Company's former corporate controller, Chris Benoit.

## VII.

## THE SIGNIFICANT TRADING LOSSES SUFFERED BY CLASS MEMBERS

119.    As a result of the partial disclosure made by Number Nine on October 6, 1995, the belated revelations made by the Company on January 31, 1996, and subsequent disclosures, the price of Number Nine stock (and thus the value of Class members' investments in Number Nine) declined precipitously. On October 6, 1995, Number Nine common stock declined $4.50 per share (from $14.25 per share to $9.75 per share) on heavy volume of more than 1.7 million shares. That decline represented a one-day loss to Number Nine investors of approximately 31% of their investment. Likewise, on January 31, 1996, the stock price plunged $2.375 per share (from $7.50 to $5.125) on heavy volume of over 1.4 million shares. That decline represented a one-day loss for Number Nine investors of approximately 32%.

120.    Overall, during the Class Period, the price of Number Nine's common stock rose from its offering price of $15.00 in connection with the May 25, 1996 IPO to a high close of $25 per share on July 7 and 8, 1995 and then fell precipitously within only six months to the $5.125 price at which it traded in the aftermath of the Company's announcement of its disastrous fourth quarter 1995 results on January 31, 1996. Accordingly, by the end of the Class Period, Number Nine common stock had lost approximately 80% of its value from the market high recorded during the Class Period.

- 47 -

## VIII.

### DEFENDANTS' MATERIALLY FALSE REPRESENTATIONS AND OMISSIONS WERE THE CAUSE OF THE DAMAGES SUFFERED BY PLAINTIFFS AND THE CLASS

121.    The material misrepresentations and omissions particularized in this Complaint directly and proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.

122.    As described herein, during the Class Period, defendants made or caused to be made a series of false statements about Number Nine's financial results, business operations and prospects and failed to disclose material information concerning the same factors. Those material misrepresentations and omissions created an unrealistically positive assessment of Number Nine, its business and its prospects in the market and caused the Company's securities to be overvalued and artificially inflated at all relevant times.

123.    Defendants' false portrayal of Number Nine and its financial results, business operations and prospects during the Class Period resulted in plaintiffs and other members of the Class purchasing Number Nine common stock at market prices significantly in excess of the actual value of those securities. Plaintiffs and other members of the Class would not have purchased the Company's stock at the market prices which prevailed during the Class Period, if at all, had they been aware of the true facts concerning the Company's business operations and prospects.

## IX.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### THE FRAUD-ON-THE-MARKET DOCTRINE

124.    At all relevant times, the market for Number Nine common stock was an efficient one for the following reasons, among others:

(a)    Number Nine common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ National Market System, a highly efficient and automated market;

(b)    As a regulated issuer, Number Nine filed periodic public reports with the SEC and the NASD;

(c)    Number Nine and the Officer Defendants regularly communicated with public investors via established market communication mechanisms, such as through periodic dissemination of press releases on the national circuits of major newswire services and through other widely-followed public disclosure mechanisms, such as communications with the financial press and other similar reporting services; and

(d)    Number Nine was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and the information contained therein was widely distributed to participants in the market for Number Nine common stock. Among the brokerage firms which issued research reports on Number Nine during the Class Period were Robertson Stephens, Cowen and Unterberg.

125.    As a result, the market for Number Nine securities promptly digested information regarding Number Nine from all publicly-available sources and such information was quickly reflected in Number Nine's stock price. Under these circumstances, all purchasers of Number Nine shares during the Class Period are entitled to the rebuttable

presumption of reliance upon defendants' misrepresentations and omissions established by the fraud-on-the-market doctrine for the purposes of class certification and for ultimate proof of their claims because:

      (a)    Defendants made public misrepresentations and omitted material facts during the Class Period;

      (b)    The misrepresentations and omissions were material;

      (c)    Number Nine common stock was traded in an efficient market:

      (d)    The misrepresentations and omissions alleged by plaintiffs tended to induce the securities markets and reasonable investors to overvalue Number Nine common stock: and

      (e)    Plaintiffs and the other members of the Class acquired Number Nine common stock between the time defendants made the misrepresentations and omissions alleged herein and the time the truth was revealed, i.e., during the time the price of Number Nine common stock was inflated.

### X.

#### ADDITIONAL FACTS AND CIRCUMSTANCES THAT DEMONSTRATE THAT THE NUMBER NINE DEFENDANTS ACTED WITH SCIENTER AS TO THE EXCHANGE ACT CLAIMS

126.    The Number Nine Defendants' false representations and material omissions were made with scienter in that they: knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents. The facts alleged in the following paragraphs, among others, indicate that the

- 50 -

misrepresentations and omissions complained of herein were made knowingly or with reckless disregard for the truth.

## A.   The Number Nine Defendants Had Substantial Motives to Commit Their Fraudulent Acts

127.   Each of the Number Nine Defendants possessed substantial motives for misrepresenting Number Nine's financial results and the status of the Company's operations and future prospects throughout the Class Period.

128.   Most importantly, the success of the IPO (and, in fact, whether it would proceed at all) was completely dependent upon the Number Nine Defendants' fraudulent accounting practices. Had the Number Nine Defendants properly accounted for the Company's inventories and written off (or at least significantly decreased the value of) the Company's 64-bit VL Bus products and excess printed circuit boards before the IPO, the Company would have been forced to report a massive loss for the first quarter of 1995 (the quarter that immediately preceded the IPO) that would have exceeded the $4.498,000 in profits earned by the Company in the five years prior to the IPO, rather than the $751.000 profit for the quarter that was reported.

129.   Thus, had Number Nine's inventories been properly accounted for in the financial statements included in the Prospectus, the IPO would most likely not have proceeded and most certainly would not have proceeded at the price level eventually achieved. Similarly, if the Number Nine Defendants had not made the other misrepresentations and omissions in the Prospectus alleged above the Offering price for the IPO would have been materially lower.

130.   The success of the IPO was of great importance to the Company because, inter alia, it allowed the Company to obtain financing at much lower cost than the debt financing

- 51 -

the Company had employed prior to the IPO and the money raised by means of the IPO facilitated the Company's efforts to enter long-term supply contracts for component parts.

131.   Moreover, the motives of defendants Bialek and Najda for guaranteeing that the IPO succeeded ran far deeper than their desire to have the Company raise capital. By means of the IPO, defendants Number Nine, Bialek and Najda were able to enrich themselves at the expense of Class members by selling a substantial percentage of their personal holdings of Number Nine stock at vastly inflated prices.

132.   More particularly, the IPO permitted defendant Najda to sell 200,000 shares of Number Nine stock, nearly 9% of his holdings, for gross proceeds of $3 million and net proceeds after underwriting commissions of $2.79 million. By the end of the Class Period, the shares sold by defendant Najda in connection with the IPO had a market value of $5.125, or 65.83% less than what Najda sold them for in connection with the IPO.

133.   Moreover, the IPO permitted defendant Bialek to sell 650,000 shares of Number Nine common stock, nearly 39% of his holdings in Number Nine, for gross proceeds of $9.75 million and net proceeds after underwriting commissions of $9.068 million. By the end of the Class Period, the shares sold by defendant Najda in connection with the IPO had a market value of $5.125, or 65.83% less than what Najda sold them for in connection with the IPO. Shortly after he raised in excess of $9 million by means of the IPO, Mr. Bialek retired from all positions he held at the Company, other than his directorship, at age 42.

- 52 -

**B.    The Extensive Experience of the Officer Defendants
        and Their Access to Adverse Material Information**

134.    As is revealed by the Prospectus, the Officer Defendants were sophisticated
managers with vast experience in the graphics accelerator business. In fact, two of the
Officer Defendants (Najda and Bialek) were co-founders of the Company -- which the
Prospectus identified as "a leading innovator and supplier of high-performance visual
technology solutions, including video/graphics accelerator subsystems, chips and
productivity-enhancing software."

135.    Moreover, defendants Bialek and Najda alternated in the period between the
Company's founding in 1982 and May 1993 in the positions of Chairman of the Board and
President of the Company. Thereafter, Mr. Najda reassumed the position of President and,
in December 1994, assumed the new position of Chief Executive Officer. In May 1993, Mr.
Bialek assumed the positions of Chairman of the Board, a position he held until April 1995,
and Chief Operating Officer, which he held until January 1995.

136.    Defendant Hanks was also an experienced manager who had held numerous
positions in high technology companies. Hanks had served as the Company's CFO since
joining Number Nine in January 1993. He was named Vice President in December 1994 and
Treasurer in April 1995. From July 1991 through November 1992, Hanks was CFO of
Attitash Software, Inc., a venture capital-financed publisher of Windows utilities software.
From November 1990 through June 1991, Hanks was a financial management consultant to
various high technology companies. Hanks holds a B.S. in accounting and an M.B.A. from
the Harvard Business School.

137.    Thus, the Officer Defendants are sophisticated businessmen with a particular
awareness of the graphics accelerator business who possessed the wherewithal to understand
the significance of the negative developments which affected Number Nine's performance

- 53 -

during the Class Period. In particular, the Officer Defendants were cognizant of the computer industry's rapid abandonment of 64-bit VL bus products in favor of PCI bus 64-bit products and the effect of that market change upon the Company's reported inventories. In addition, the Officer Defendants were aware of the importance that prices of components such as VRAM and DRAM memory played in the Company's financial performance and therefore followed closely the prices at which the Company was obtaining such components. including the Company's purchases on the spot market.

138.    Moreover, the numerous reports the Officer Defendants received prior to and during the Class Period concerning Number Nine's operations, finances. products. markets and future prospects (see ¶ 20, supra) made available to the Officer Defendants the adverse information concerning the Company's operations that is specified herein. That adverse, non-public information was provided to the Officer Defendants by means of, inter alia, internal corporate documents (including the Company's operating plans. budgets and forecasts and reports of actual operations compared thereto), conversations and other communications with corporate officers and employees. attendance at meetings of the Company's management, Board and committees thereof and via reports and other information provided to them in connection with such meetings.

## C.    The Adverse, Non-Public Information Provided to the Number Nine Defendants That Contradicted Their Public Statements Regarding Number Nine

139.    As further particularized below, prior to the time the misrepresentations and omissions specified herein were made. the Officer Defendants were provided with an array of information that made it clear that the Company's inventory required a multi-million dollar write off.

- 54 -

140.   Well before the IPO, the Number Nine Defendants were confronted by a steady stream of financial reports that demonstrated the obsolete nature of the Company's inventory of 64-bit VL bus products, including sales reports, inventory reports and product return reports that demonstrated that sales of those products were being cannibalized by Number Nine's 64-bit PCI bus products and that the Company held inventories of 64-bit VL bus products it had no hope of selling at a price even approaching the price of producing such products.

141.   Thus, it was or should have been evident to the Number Nine Defendants that the Company's financial statements for the first, second and third quarters of 1995 materially overstated Number Nine's inventories, net income, earnings per share and shareholders' equity.

142.   As the Number Nine Defendants were aware throughout the Class Period. Intel Pentium computers, which primarily use the PCI bus, offered customers a significant improvement in performance. Computers that employ the older generation Intel 486 processor primarily use the VL Bus. As the Number Nine Defendants knew, the Pentium computer processor was rapidly coming to dominate the market for computer chips by the time of the IPO, with the previous generation of "486" and slower chips sliding into obsolescence. The Pentium chips, which operated at speeds of 60MHz or higher, were simply too fast for VL bus products. Thus, VL bus graphics cards, like 486 chips, were obsolete by the time of the IPO.

143.   The Number Nine Defendants -- who obviously closely followed trends in the computer industry, particularly those affecting the Company's graphics accelerator business -- either knew of or recklessly disregarded this development. In fact, even general interest magazines regarding computer products contained numerous articles that revealed the

- 55 -

increasing obsolescence of VL bus products. For example, in the February 1995 edition of
the magazine Byte, an article stated:

> In the early years of local-bus graphics, VL bus accelerator cards stole
> the show. But now PCI has overtaken the VL Bus. Most cutting-edge
> Pentium systems include a PCI local bus, and most new systems use some type
> of local bus to accelerate graphics, whether integrated or via a slot.

144. Similarly, the February 1995 edition of the magazine Computer Shopper
stated. "Most modern 486-based PCs have VL Bus slots, while most Pentium systems have
PCI slots, although this is not a hard-and-fast rule. . . . In general, the industry is moving
toward the PCI specification, and for that reason the newest and hottest graphics cards appear
first (and sometime only) for PCI." A January 1995 article in PC Computing magazine
entitled "PCs at the Crossroads," also emphasized that VL Bus technology was quickly
becoming a thing of the past. That article stated. "According to our survey, 80 percent of
executives believe that Pentium and PCI go together like two p's in a pod. As Intel pushes
Pentium prices down, PCI goes along for the ride. VL Bus eventually joins EISA in the
aftermarket niche." Furthermore. a November 7. 1994 article in Computer Reseller News
stated. "The PCI Bus will continue gaining market share as the interface of choice on high-
performance 486 and Pentium desktops with the VL Bus slowly fading away." Similarly, a
July 1995 article in Computer Shopper magazine declared:

> PCs equipped with VL Bus (VLB) video cards are becoming rare.
>
> Many vendors sell only PCI-based graphic cards with both their 486-
> and Pentium-class systems. So if you're buying a new PC, you might
> consider only those systems with PCI architecture. as eventually it will be hard
> to find VLB upgrade cards.

145. Indeed, in the August 1995 issue of Computer Technology Review, an article
entitled "PCI Shaping Up as Intel's Prime Show Stopper" stated, "[A] new crop of fast

peripherals and Pentium's prominence have made the VL bus all but a memory." The article

further explained the substantial operational advantages PCI buses offered over VL buses:

> The VL bus was by all definitions a temporary solution. Severe
> compatibility problems, a lack of burst-write capability, and no support for
> auto-configuration made the VL bus unsuitable for faster processors and high-
> speed peripherals. As a result, the introduction of the Pentium begat PCI, the
> first bus architecture that truly leverages the speed and power of the local bus.

146. In fact, the Prospectus itself highlighted some of the advantages of PCI bus

systems, albeit without comparing such systems to VL bus systems and without giving any

indication that PCI bus systems were rendering VL bus products obsolete. The Prospectus

stated:

> The increased performance provided by an accelerator is significantly
> affected by the speed of communication between the accelerator and the CPU,
> which occurs across the system bus. The PCI bus standard allows high-speed
> 32-bit data transfer, provides a significant increase in data throughput and
> enables both the accelerator and the system itself to operate at higher
> performance levels. In addition, the PCI bus standard is extensible; both
> "faster" (higher clock speed) and "wider" (64-bit data path) versions are being
> developed. Both extensions promise greater "bandwidth" -- higher data
> transfer rate measured in megabytes per second -- thus enabling accelerator
> vendors to design and introduce products that will not be constrained by
> communications "bandwidth bottlenecks." The PCI local bus also offers
> "plug-and-play" functionality, which permits standard compliant subsystems to
> operate in an interchangeable manner.

147. Moreover, the Prospectus itself all but admits that the Number Nine

Defendants were aware of the virtual obsolescence of VL bus products. A glossary included

in the Prospectus stated, "The [VL] bus is typically incorporated into 486 PCs. A limitation

of the VL bus is that it is dependent on 486 CPU architecture and therefore is not readily

extensible. The introduction of the PCI bus has reduced the attractiveness of the VL bus and

slowed its adoption." Nevertheless, the Number Nine Defendants never disclosed that the

Company had millions of dollars worth of VL bus products in its inventory that the Number

Nine Defendants knew were obsolete.

- 57 -

148. Thus, the Number Nine Defendants were well aware by the time of the IPO that the Company was carrying millions of dollars of VL bus products in inventory that was essentially unsalable and that, as a result, the Company's financial statements were materially misleading.

149. The existence of a number of suspicious trends in the Company's inventory levels also supports the conclusion that the Number Nine Defendants either knew or recklessly disregarded the fact that the Company's financial statements were materially misleading. For example, Number Nine's reported inventory increased from $17,333,000 at April 1, 1995 to $27,458,000 at September 30, 1995 -- an increase of $9,797,000, or 55%, in only six months. Thus, Number Nine's inventory levels were rising sharply at the same time that demand for its products and the prices at which Number Nine could sell those products were weakening.

150. The Number Nine Defendants also either knew or recklessly disregarded the fact that the Company's rapidly increasing inventory levels during the Class Period signaled an inability to sell its then-existing inventory. In fact, the Company's inability to sell its inventory evidenced the impairment of the utility of that inventory and the fact that the inventory was obsolete.

151. The Company's inability to sell its inventory is evident upon comparing inventory-related financial measures associated with the second and third quarters of 1994 with the same financial measures associated with the second and third quarters of 1995. For example, during the second quarter of 1994, the rate at which the Company turned over its inventory averaged approximately once every 75 days. During the third quarter of 1994, the Company turned over its inventory at a much faster rate, averaging approximately once every 48 days. Similarly, during the second quarter of 1994, the Company's average inventory of

- 58 -

\$6.3 million represented 66.3% of quarterly sales. During the third quarter of 1994, the Company's average inventory of \$8.3 million represented only 43.8% of quarterly sales.

152.    In 1995, however, the Company's surging inventory levels exhibited precisely the opposite pattern. During the second quarter of 1995, the rate at which the Company turned over its inventory averaged approximately once every 73 days -- roughly equal to the inventory turnover during the same quarter of the previous year. Unlike the significantly faster inventory turn rate exhibited during the third quarter of 1994 (as compared to the second quarter of that year). during the third quarter of 1995, the Company turned over its inventory at much slower rate, averaging approximately once every 116 days -- a rate that was significantly slower than the once every 48 days recorded the previous year. Similarly, during the second quarter of 1995, the Company's average inventory of \$20.2 million represented 64.9% of quarterly sales -- roughly equal to the inventory turnover during the same quarter of the previous year. During the third quarter of 1995. the Company's average inventory of \$25.2 million represented 107.3% of quarterly sales -- a figure that stood in sharp contrast to the one posted during the previous year.

153.    These unexplained increases in the Company's inventory levels on a year-to-year basis should have been all the more obvious to the Number Nine Defendants in light of their representations in the Prospectus and the Second Quarter 10-Q that Number Nine was expecting inventory levels to decrease during 1995. The Prospectus stated:

During 1995, the Company expects to convert a substantial portion of product manufacturing from consignment to turnkey manufacturing, and future inventory levels relative to sales may decline as a result of this transition. . . . The shift to turnkey manufacturing will permit the Company to purchase finished product without the need to procure or supply components, and is expected to yield lower inventory levels and greater liquidity compared to consignment manufacturing.

- 59 -

154. A nearly identical representation concerning the Company's inventories was made in the third quarter Form 10-Q. Thus, the highly unusual increases in the inventory levels reported by the Company during the Class Period were not only contrary to historical patterns but contrary to the results projected by the Number Nine Defendants in the Prospectus. These suspicious patterns were either known to, or recklessly disregarded by, the Number Nine Defendants during the Class Period.

155. Moreover, the Number Nine Defendants knew or recklessly disregarded that significant increases in inventory levels are often a function of inventory fraud. In fact, a 1994 alert issued by the Auditing Standards Division of the American Institute of Certified Public Accountants stated. "Significant and unexpected increases in inventories" are an indicator that an entity may be engaging in inventory fraud.

156. The Number Nine Defendants' close assessment of the Company's existing backlog of sales prior to the time defendant Najda announced in the Company's October 6. 1995 press release that Number Nine maintained a backlog in excess of $22 million also confirms that the Number Nine Defendants knew or recklessly disregarded that the Company maintained millions of dollars in obsolete inventory at values that substantially exceeded the "lower of cost or market."

157. At the time the Number Nine Defendants assessed the existing backlog, they were apprised that the sales the Company had scheduled for the fourth quarter were overwhelmingly for PCI Bus products, not VL Bus products. The nature of the existing backlog confirmed the Number Nine Defendants' knowledge that Number Nine was making very few sales of VL Bus products.

158. The obsolete nature of the Company's inventory of 64-bit VL Bus products was further confirmed by the fact that Number Nine was manufacturing few, if any,

additional 64-bit VL Bus products by the time of the October 6, 1995 press release concerning the Company's backlog because of the Number Nine Defendants' knowledge that such products were unsalable. Thus, because the Number Nine Defendants' examined the Company's backlog of sales prior to the October 6, 1995 press release concerning that backlog, they knew or recklessly disregarded the fact that the Company's enormous inventory of VL Bus products was not being sold and would not be sold at a price remotely approaching the cost of producing such products.

159.    Furthermore, at or before the time of the IPO, a number of sources, including the Company's own negotiations and discussions with its suppliers, apprised the Number Nine Defendants of the Company's inability to secure adequate supplies of VRAM and DRAM memory chips and the increasing costs experienced by the Company in procuring the inadequate quantities it did acquire. The external sources that provided that information to the Number Nine Defendants included the following:

(a)    A March 3, 1995 article in the St. Louis Post-Dispatch stated, "A severe shortage of the computer memory chips that power multimedia and interactive applications is causing prices to skyrocket. On the spot market, the shortage has pushed the price of DRAM chips . . . to as much as 60 percent higher than in current contracts."

(b)    An April 10, 1995 article in Investor's Business Daily noted that "[l]ast week, Japanese suppliers said they plan to increase prices [of DRAM chips] 5% to 10% this year."

(c)    An April 7, 1995 article in InfoWorld stated that "[t]he tight supply of Dynamic RAM (DRAM), combined with a weakening dollar, will drive up memory prices for chips coming from some of the world's largest DRAM suppliers." The article also stated that "NEC Corp., Hitachi Ltd., and Toshiba Corp., three of the largest DRAM suppliers, are

in talks with major customers about immediate price increases ranging from 5 percent to 10 percent, according to Tokyo-based officials of these companies." The article also noted that "[a] number of factors, including the growing popularity of memory-intensive multimedia and networking applications and increasing sales to the consumer market, have made memory scarce."

   (d) A May 1, 1995 article in <u>Computer Reseller News</u> stated, "The anticipated memory crunch hit the channel last month with some memory suppliers hiking DRAM prices as much as 10 percent in response to constrained supplies from Japan and a spike in spot market prices. . . . Spot market prices jumped as much as 14 percent, and April prices from Japanese suppliers rose 6 percent to 7 percent this month, according to various reports."

   (e) A May 1, 1995 article in <u>PC Week</u> reported that "[t]he big memory-chip makers are gearing up for a series of price hikes, and the increases could add as much as 20% to the price of DRAMs and other key products by midsummer." The article also reported that "DRAM prices have already started to climb."

   (f) A May 1, 1995 article in <u>Electronic Engineering Times</u> reported that Japanese semiconductor companies were raising their prices for DRAM memory products for the second time since March of that year. According to the article, (a) "NEC will raise prices by 5 to 7 percent on most products, with the exception of 16Mbit DRAMs." (b) "Toshiba also will boost most product prices by about 5 percent," and (c) "Hyundai Electronics also will increase its 4-Mbit DRAM prices by about 5 percent."

   (g) A May 8, 1995 article in <u>Computer Reseller News</u> reported that computer manufacturers were experiencing a significant shortage of DRAM products. According to the article, "The spike in the spot market price of DRAM chips may be having

- 62 -

the most critical impact on clone vendors right now. . . . The strength of the yen caused Japanese suppliers to raise prices about 5 percent in April and spot market pricing jumped as much as 10 percent, according to some estimates."

      (h)    A May 25, 1995 article in <u>Business Times</u> described a severe shortage in computer components. According to the article, "Electronic Resources' marketing manager Frankie Ngoh said prices have increased for a variety of DRAM chips, with a 20 per cent premium for 16-megabit DRAMs, which are expected to be the standard configuration with the impending launch of Windows 95 software by Microsoft. Prices for 4-megabit chips are about 10 per cent higher."

160.    Thus, the Number Nine Defendants either knew or recklessly disregarded the fact that their positive representations concerning the Company's ability to procure adequate supplies of DRAM and VRAM products at historical price levels were materially misleading. Moreover, the adverse information available to the Number Nine Defendants concerning the pricing of VRAM and DRAM memory chips demonstrates that they either knew or recklessly disregarded the fact that their positive representations concerning the Company's margins were materially misleading.

## FIRST CAUSE OF ACTION

### [For Violations Of Section 11 Of
### The Securities Act Against All Defendants]

161.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except: (a) paragraphs 126-60; (b) any element of any paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth; or (c) any element of a paragraph that otherwise sounds in fraud.

162.    This Count is brought by plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class of all persons who purchased Number Nine

common stock in or traceable to the IPO. Plaintiffs' Section 11 claim does not sound in fraud.

163.    The Registration Statement for the IPO was inaccurate and materially false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

164.    Number Nine was the registrant for the IPO. The Underwriter Defendants were underwriters of the IPO, as defined in Section 2(11) of the Securities Act. Each of the defendants named herein was responsible for the content and dissemination of the Registration Statement and the Prospectus.

165.    As an issuer of the shares, Number Nine is strictly liable to plaintiffs and the Class for the material misstatements or omissions contained in the Registration Statement, of which the Prospectus was part.

166.    As underwriters of the IPO, each of the Underwriter Defendants owed to plaintiffs and the Class of those who purchased shares issued in or traceable to the Offering the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

167.    The Underwriter Defendants did not make a reasonable and diligent investigation of the statements made in the Registration Statement and as of May 26, 1995 -- the effective date of the Registration Statement -- the Registration Statement contained materially false and misleading statements which a reasonable and diligent investigation

- 64 -

would have uncovered. As such, the Underwriter Defendants are liable to plaintiffs and the Class.

168. As signators of the Registration Statement and as officers and directors of Number Nine, each of the Officer Defendants and the Director Defendants also owed to plaintiffs and the Class of those who purchased shares issued in or traceable to the Offering the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

169. The Officer Defendants and the Director Defendants did not make a reasonable and diligent investigation of the statements made in the Registration Statement and. as of May 26. 1995 -- the effective date of the Registration Statement -- it was apparent that the Registration Statement contained materially false and misleading statements which a reasonable and diligent investigation would have uncovered. As such. the Officer Defendants and the Director Defendants are liable to plaintiffs and the Class.

170. Plaintiffs acquired shares of the common stock of Number Nine issued pursuant to, or traceable to, the Registration Statement.

171. Plaintiffs and the Class have sustained damages. The value of the Number Nine common stock they purchased has declined substantially subsequent to the IPO due to defendants' actions.

172. At the times they purchased Number Nine common stock, plaintiffs and other members of the Class had no knowledge of the falsity of the misrepresentations contained in the Registration Statement or that the Registration Statement failed to state material facts required to be stated in order to make the statements contained therein not misleading.

- 65 -

173. Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which their initial complaints were based to the time that plaintiffs filed those complaints. Less than three years have elapsed from the time that the common stock with respect to which this Count is brought was offered to the public to the time plaintiffs filed their initial complaints.

## SECOND CAUSE OF ACTION

### [For Violation of Section 15 Of The
### Securities Act Against The Officer Defendants]

174. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein except: (a) paragraphs 126-60; (b) any element of a paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth: or (c) any element of a paragraph that otherwise sounds in fraud.

175. This Count is brought by plaintiffs pursuant to Section 15 of the Securities Act. 15 U.S.C. § 77o. on behalf of the Class of all those who purchased Number Nine common stock in or traceable to the IPO against the Officer Defendants. This Count does not sound in fraud.

176. Number Nine is liable as an issuer under Section 11 of the Securities Act as set forth in the First Cause of Action herein.

177. By virtue of their positions as senior executives and directors of Number Nine, each of the Officer Defendants exerted substantial influence and control over the Company's operations. financial condition, products, sales and marketing efforts. In fact, prior to the IPO. each of the Officer Defendants had direct involvement in the day-to-day operations of the Company. Thus, the Officer Defendants had the power to influence and control and did influence and control the decision-making of the Company, including the content and dissemination of the false and misleading Prospectus.

- 66 -

178.   In addition, defendants Najda and Bialek were control persons of the Company at the time of the IPO by virtue of their collective beneficial ownership of a controlling block of the outstanding common shares of Number Nine and their relationships with other large holders of Number Nine common stock. In particular, immediately prior to the IPO, Najda and Bialek had the following beneficial ownership interest in the Company's common stock:

| Defendant | Number of Shares | Percentage of Outstanding Shares |
|-----------|------------------|----------------------------------|
| Najda | 2.249 million | 35.7% |
| Bialek | 1.67 million | 26.5% |

179.   None of the Officer Defendants can sustain his burden of demonstrating that he had no knowledge of the facts upon which Number Nine's liability under the First Cause of Action arises or that he had reasonable grounds to believe in the accuracy and the completeness of the statements upon which Number Nine's liability is based.

180.   As a result, the Officer Defendants are liable, jointly and severally with Number Nine and to the same extent as Number Nine, under Section 15 of the Securities Act for Number Nine's primary violations of Section 11 of the Securities Act.

## THIRD CAUSE OF ACTION

### (Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against The Number Nine Defendants)

181.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

182.   This claim is brought against the Number Nine Defendants on behalf of plaintiffs and the Class of those persons who purchased Number Nine common stock between May 26, 1995 and January 31, 1996, with respect to the entire Class Period. This cause of action sounds in fraud.

- 67 -

183. During the Class Period, the Number Nine Defendants, individually and in concert, engaged in a plan, scheme and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon plaintiffs and other members of the Class.

184. The Number Nine Defendants perpetrated this fraudulent scheme by making various statements which were knowingly or recklessly false or which omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. The purpose and effect of the Number Nine Defendants' scheme was to: (i) conceal adverse material facts concerning the business, financial condition, performance, and prospects of the Company; (ii) artificially inflate and maintain the market price of Number Nine's stock; and (iii) cause plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices.

185. Pursuant to this plan, scheme and course of conduct, the Number Nine Defendants participated, directly and indirectly, in the preparation and/or issuance of the false statements and misleading documents referred to above. In particular, by failing to properly and in a timely manner write-off excess and obsolete inventory, the Number Nine Defendants knowingly or recklessly caused or allowed Number Nine's financial statements and reported financial condition to be materially overstated, as alleged in detail above.

186. The Number Nine Defendants' misleading conduct also included the failure to disclose fully all material facts concerning various aspects of Number Nine's business operations and prospects despite the fact that the Number Nine Defendants voluntarily made optimistic public statements regarding such factors while in possession of such adverse material information. The Number Nine Defendants had a duty to disclose all material facts concerning Number Nine to the market as a result of: (a) their making of affirmative

- 68 -

statements and reports, or participation in the making of affirmative statements and reports, to the investing public; (b) their insider sales of Number Nine stock at artificially inflated prices; (c) the integrated disclosure provisions of the SEC as embodied in, inter alia, SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.), SEC Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and the Instructions to the Form S-1 Registration Statement utilized by Number Nine in connection with the IPO.

187.    The Number Nine Defendants also failed to issue disclosures necessary to update and rectify the misleading effect of their earlier disclosures as mounting information concerning the negative developments affecting the Company's operations became available to them through Number Nine's reporting system.

188.    At all relevant times, the Number Nine Defendants had actual knowledge that the statements and documents complained of herein were materially false and misleading and that additional disclosures were necessary to correct the misleading effect of those statements. In the alternative, the Number Nine Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose the critical information available to them throughout the Class Period that demonstrated that the optimistic assessments of the Company's business, operations and prospects set forth above lacked a reasonable basis when made.

189.    As set forth above, while the Number Nine Defendants were issuing false favorable statements about the Company's business prospects, and concealing or obscuring negative information and trends, Number Nine, Najda and Bialek, all of whom had access to confidential information and were aware of the truth about the Company and its products, were benefitting from the course of conduct described in this complaint by selling large blocks of the Company's stock at artificially inflated prices without disclosing the material

- 69 -

adverse facts about the Company to which they were privy. The insider selling of Number Nine, Najda and Bialek was unusual in time and amount in that Number Nine common stock had never before been issued to the public.

190.  As a direct and proximate result of the foregoing material misrepresentations and omissions. the market price of the Company's common stock was artificially inflated during the Class Period.

191.  In ignorance of the materially misleading and/or incomplete nature of the representations described above, plaintiffs and other members of the Class relied to their detriment upon the accuracy and completeness of the Number Nine Defendants' statements and/or upon the integrity and efficiency of the market for the Company's common stock. Plaintiffs and the other members of the Class would not have purchased Number Nine stock at the market prices that prevailed during the Class Period. if at all. had they been aware of the true facts concerning the Company's operations and future prospects.

192.  The market price of the Company's common stock declined materially upon the public disclosure of the facts that had been concealed and misrepresented by the Number Nine Defendants during the Class Period. Plaintiffs and the other members of the Class have suffered substantial damages as a result.

193.  By reason of the foregoing, the Number Nine Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made material misrepresentations of fact and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud

- 70 -

or deceit upon plaintiffs and other members of the Class in connection with their purchases of the Company's common stock during the Class Period.

## FOURTH CAUSE OF ACTION

### (Violation Of Section 20(a) Of The Exchange Act Against The Officer Defendants)

194.   Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

195.   This cause of action is brought by plaintiffs against the Officer Defendants on behalf of the Class of all persons who purchased the common stock of Number Nine between May 26, 1995 and January 31, 1996.

196.   As alleged in detail above, the Officer Defendants acted as controlling persons of Number Nine within the meaning of Section 20(a) of the Exchange Act.

197.   Furthermore, defendants Bialek and Najda exerted their control over Number Nine following the IPO by means of their substantial stock ownership in the Company. More particularly, immediately subsequent to the IPO, defendants Bialek and Najda had the following beneficial ownership interest in the Company's common stock:

| Defendant | Number of Shares | Percentage of Outstanding Shares |
|-----------|------------------|----------------------------------|
| Najda     | 2.049 million    | 24.7%                            |
| Bialek    | 1.02 million     | 12.3%                            |

198.   As set forth above, Number Nine violated Section 10(b) and Rule 10b-5 by means of the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Number Nine, the Officer Defendants are therefore liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Officer

- 71 -

Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and certifying their counsel as class counsel:

(b)    Awarding compensatory damages in favor of plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon:

(c)    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees: and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:   January 22, 1996

MOULTON & WELBURN
Stephen Moulton, BBO # 358480
Nancy F. Gans, BBO #184540
99 Summer Street, Suite 1420
Boston, MA  02110
(617) 737-8383

- and -

SHAPIRO HABER & URMY LLP
Thomas G. Shapiro, BBO #454680
75 State Street
Boston, Massachusetts 02109
(617) 439-3939

Plaintiffs' Co-Liaison Counsel

MILBERG WEISS BERSHAD HYNES
& LERACH LLP

By: _____
Deborah Clark-Weintraub
James P. Bonner
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

-and-

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon the attorney of record for each party
by mail (by hand) on ___ 1/23/97

- 74 -

RABIN & GARLAND

By: _____

I. Stephen Rabin
Marvin L. Frank
275 Madison Avenue
New York, New York 10016
(212) 682-1818

Plaintiffs' Co-Lead Counsel

WOLF POPPER LLP
Marian P. Rosner
Lawrence Levit
845 Third Avenue
New York, New York 10022
(212) 759-4600

Plaintiffs' Counsel

- 74 -

Exhibit A

## CERTIFICATION OF RBI, AN ALASKAN LIMITED PARTNERSHIP
## IN SUPPORT OF CLASS ACTION COMPLAINT

RBI, An Alaskan Limited Partnership ("plaintiff"), by its General Partner, Marilyn A. Crace, declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions relating to Number Nine Software common stock:  See Attachment A

5.    In the past three years, plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

- 1 -

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of June, 1996.

RBI, AN ALASKAN LIMITED
PARTNERSHIP

By: _____
MARILYN /A. CRACE
General Partner

- 2 -

## ATTACHMENT A

### RBI, An Alaskan Limited Partnership Transactions
### In Number Nine Stock

| Date | Action | Amount | Price |
|------|--------|--------|-------|
| 6/5/95 | Bought | 5000 | $20.25 |
| 5/8/95 | Bought | 4000 | $17.25 |
| 7/24/96 | Sold | 4000 | $21.25 |
| 6/2/95 | Bought | 2000 | $23.00 |
| 8/11/95 | Sold | 4000 | $19.00 |
| 10/2/95 | Bought | 2000 | $16.00 |
| 10/6/95 | Bought | 2500 | $14.00 |
| 10/10/95 | Bought | 500 | $13.75 |
| 10/10/95 | Bought | 1000 | $13.50 |
| 10/10/95 | Bought | 1000 | $13.25 |
| 12/22/95 | Sold | 2000 | $ 8.75 |
| 1/5/96 | Sold | 100 | $ 8.50 |
| 1/9/96 | Sold | 400 | $ 9.00 |
| 1/9/96 | Sold | 1000 | $ 8.00 |
| 1/9/96 | Sold | 900 | $ 8.00 |
| 1/9/96 | Sold | 1100 | $ 8.00 |
| 1/9/96 | Sold | 1100 | $ 8.00 |
| 1/9/96 | Sold | 1000 | $ 8.00 |
| 1/9/96 | Sold | 1000 | $ 8.25 |
| 1/9/96 | Sold | 400 | $ 8.00 |
| 1/9/96 | Sold | 1000 | $ 8.00 |

## CERTIFICATION OF ERNEST BOHN
## IN SUPPORT OF CLASS ACTION COMPLAINT

Ernest Bohn ("plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions relating to Number Nine Visual Technology common stock:  See Attachment A

5.    In the past three years, plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _29_ day of June, 1996.

_Ernest Bohn_
ERNEST BOHN

## CERTIFICATION OF PASCAL MOUAWAD
## IN SUPPORT OF CLASS ACTION COMPLAINT

Pascal Mouawad ("plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions relating to Number Nine Visual Technology common stock:   See Attachment A

5.    In the past three years, plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1ˢᵗ day of June, 1996.

_____
PASCAL MOUAWAD

# Number Nine Visual Technology Transactions Between 5/26/95 & 1/31/96

Client : Pascal Mouawad

| Trade Date | Activity | Quantity | Price | Amount | Brocker |
|------------|----------|----------|-------|--------|---------|
| 8/1/95 | Purchase | 4,000 | $ 21.75 | $ 87,000 | Schwab |
| 9/15/95 | Purchase | 3,000 | $ 17.50 | $ 52,500 | MPR |
| 9/26/95 | Purchase | 5,000 | $ 17.18 | $ 85,900 | MPR |
| 10/3/95 | Purchase | 3,000 | $ 14.12 | $ 42,360 | MPR |
| 10/6/95 | Purchase | 5,000 | $ 9.75 | $ 48,750 | MPR |
| | **Total Purchases** | | | **$ 316,510** | |
| 9/18/95 | Sale | 3,000 | $ 19.00 | $ 57,000 | MPR |
| 10/25/95 | Sale | 5,000 | $ 10.87 | $ 54,350 | MPR |
| | **Total Sales** | | | **$ 111,350** | |

## ATTACHMENT A

### Ernest Bohn Transactions
### In Number Nine Stock

| Date | Action | Amount | Price |
|------|--------|--------|-------|
| 9/27/95 | Buy | 2,000 | 16 3/8 |
| 10/3/95 | Buy | 1,000 | 14 1/2 |
| 1/16/96 | Sell | 2,000 | 8 |

## CERTIFICATION OF PLAINTIFF

I, John Foley, do hereby certify that:

I have reviewed the within complaint and authorized its filing.

I did not purchase the shares of common stock of Number Nine Visual Technology Corporation ("Number Nine") that are the subject of the complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

During the Class Period I engaged in the following transactions involving the common stock of Number Nine as follows:

| TRANSACTION | TRADE DATE | NO. OF SHARES | PRICE/SHARE |
|---|---|---|---|
| Bought | 10/6/95 | 2,500 | $9 3/4 |
| Bought | 1/2/96 | 1,000 | $8 3/8 |

I have neither sought to serve nor served as a representative party on behalf of a class in any action brought under the federal securities laws that was filed during the three-year period preceding the date of this certification.

I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court in accordance with section 27(a)(4) of the Securities Act of 1933 and section 21D(a)(4) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 7, 1996.

_John Foley_
John Foley

## PLAINTIFF'S CERTIFICATION OF
## SECURITIES FRAUD CLASS ACTION COMPLAINT

I, Robert Schoenhofer, hereby certify that the
following is true and correct to the best of my knowledge,
information and belief:

1.   I have reviewed the complaint prepared in
Schoenhofer v. Number Nine Visual Technology Corporation (the
"Complaint"), and have authorized its filing.

2.   I am willing to serve as a representative party on
behalf of the class (the "Class") as defined in the Complaint,
including providing testimony at deposition and trial, if
necessary.

3.   My transactions in Number Nine Visual Technology
Corporation common stock during the Class Period are as follows:

| Date | Number of<br>Shares Purchased | Price Per Share |
|------|-------------------------------|-----------------|
| May 26, 1995 | 100 | $15.00 |
| June 15, 1995 | 300 | $19.75 |
| November 3, 1995 | 300 | $13.25 |

4.   I did not purchase these securities at the
direction of my counsel, nor in order to participate in any
private action arising under the federal securities laws.

5.   During the three year period preceding the date of
my signing this Certification, I have not sought to serve, nor
have I served, as a representative to any party on behalf of a

6DJ71.1

class in any private action arising under the federal securities laws.

6.   I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

Signed under the penalties of perjury this 14th day of October, 1996.

Robert Schoenhofer

2