1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9                                    )    No. CV-05-0455-PHX-NVW
                                     )
10                                   )    **ORDER**
                                     )
11  In re Hypercom Corporation Securities)
    Litigation                       )
12                                   )
                                     )
13                                   )
    _____)

14

15         The Court has before it Plaintiffs' Consolidated Amended Class Action Complaint

16  Doc. #48; Defendants' Motion to Dismiss, Doc. # 53; Plaintiffs' Response to Defendants'

17  Motion to Dismiss, Doc. # 65; Defendants' Reply to Plaintiffs' Response, Doc. # 68;

18  Defendants' Declaration in Support of their Motion to Dismiss, Doc. # 54; and Defendants'

19  Request for Judicial Notice, Doc. # 55.

20         Defendants bring this motion pursuant to Federal Rules of Civil Procedure 9(b) and

21  12(b)(6), and the Private Securities Litigation Reform Act of 1995, on the ground that the

22  Complaint fails to state a claim against Defendants.

23  **I.    Statement of the Case**

24         This case began with separate actions.  On May 31, 2005, the court granted a motion

25  to consolidate the actions, Doc. # 42, and on June 9, 2005, the court appointed a lead plaintiff

26  and counsel.  On August 8, 2005, a Consolidated Class Action Complaint ("Complaint") was

27  filed.

28

As set forth in the Complaint, Defendant Hypercom is a Delaware corporation that maintains its principal place of business in Phoenix, Arizona. Doc. # 48 at ¶ 13. Hypercom manufactures, designs, sells, and leases end-to-end electronic payment solutions. *Id.* at ¶ 22. Its securities are traded on the New York Stock Exchange. *Id.* at ¶ 19. At all relevant times, Defendant Alexander was Hypercom's Chairman of the Board, President, and CEO, *Id.* at ¶ 15, and Defendant Smolak was Hypercom's Executive Vice President and Chief Financial and Administrative Officer. *Id.* at ¶ 16.

On February 4, 2005, Hypercom announced that it was restating its financial statements for the first three quarters of 2004 because 3,200 leases entered into by Hypercom's UK subsidiary, Hypercom EMEA, Inc., had been improperly accounted for as sales-type leases, rather than operating leases. Doc. # 54, Exhibit 5, Exhibit 99.1 at 3. Pursuant to Generally Accepted Accounting Principles ("GAAP"), companies structure their leases as either operating leases or sales-type leases. Doc. # 48 at ¶ 23. Such characterization determines how payments to the lessor are recorded. *Id.* at ¶ 24. With an operating lease, the lessor is able to record revenue as it becomes receivable according to the provisions of the lease. *Id.* With a sales-type lease, the lessor may recognize all of the revenue from that lease, except for interest and maintenance, up-front. *Id.*

Hypercom's misclassification resulted in a premature recognition of $3.2 million in revenue and $2.1 million in net income. Doc. # 53 at 2. On March 3, 2005, Hypercom filed a Form 8-K with the SEC, attaching a copy of its press release for that day, which stated, "As previously disclosed, the significant internal control deficiency that caused the recent accounting reclassification of certain leases from sales-type to operating leases and gave rise to a restatement of 2004 interim period financial statements, represents a material weakness in internal controls over financial reporting as defined by PCAOB's Auditing Standard No. 2." Doc. # 54, Exhibit 5, Exhibit 99.1 at 1. The same press release also stated that

Hypercom expected its independent auditors, Ernst & Young LLP, to issue an adverse opinion with respect to Hypercom's internal controls over financial reporting. *Id.*

Following the press release, Hypercom's stock fell by $1.00 per share, or 18.32 percent. Doc. # 48 at ¶ 6. Shortly thereafter, Hypercom announced the resignation of Christopher S. Alexander ("Alexander"), its Chief Executive Officer ("CEO") and Chairman of the Board, and John W. Smolak ("Smolak"), its Chief Financial Officer ("CFO").

Plaintiffs bring this action against four defendants: (1) Hypercom; (2) Hypercom EMEA, Inc., Hypercom's 100% owned subsidiary; (3) Alexander; and (4) Smolak.

Plaintiffs allege (1) that all Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulation, Rule 10b-5 promulgated in 17 C.F.R. § 240.10b-5(b), and (2) that Alexander and Smolak violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants filed a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, arguing that Plaintiffs failed to plead scienter with the requisite particularity.

## II. Legal Standard

### A. General Standard Governing Motions to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), the court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994). When analyzing a complaint for failure to state a claim, all factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *See Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobsen v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir. 1997). When the complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."

1   *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

2   Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow*

3   *Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992).

4          For the purposes of considering Defendants' Rule 12(b)(6) motion, the court will

5   consider documents submitted by Defendants that were referenced by the Complaint, the

6   authenticity of which Plaintiffs have not questioned.  *See No. 84 Employer-Teamster Join*

7   *Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 924 n.2 (9th Cir. 2003).

8   Therefore, Exhibit 1 will be considered to the extent necessary because Plaintiffs referred to

9   the Statement of Financial Accounting Standards No. 13 Accounting for Leases in their

10  Complaint.  Doc. # 48 at ¶¶ 64-5.

11         Defendants also ask the court to take judicial notice of (1) an excerpt from

12  Hypercom's proxy statement that it filed with the SEC on April 6, 2005, Exhibit 2; (2) an

13  excerpt of Hypercom's proxy statement that it filed with the SEC on April 27, 2005, Exhibit

14  3; (3) an excerpt from the report Ernst & Young provided to the Hypercom board of directors

15  and shareholders on March 11, 2005, which Hypercom filed with the SEC, Exhibit 4; and (4)

16  a copy of Hypercom's March 3, 2005 press release that it filed with the SEC on that same

17  day, Exhibit 5.  Courts may take judicial notice of SEC filings.  *See Allison v. Brooktree*

18  *Corp.*, 999 F. Supp. 1342, 1353 n.3 (S.D. Cal. 1998) ("Judicial notice of documents required

19  to be filed by law is appropriate.").  Defendants ask the court to take judicial notice of

20  Exhibits 2 and 3 to demonstrate that Defendants Alexander and Smolak did not sell

21  Hypercom stock during the class period.  Because Plaintiffs have not alleged otherwise, the

22  court declines at this time to take judicial notice of Exhibit 2 and Exhibit 3.  As to Exhibits

23  4 and 5, the Complaint directly references those two SEC filings.  Doc. # 48 at ¶ 69-70.  The

24  court will take judicial notice of Exhibits 4 and 5.

25

26

27

28

- 4 -

1

**B.     Pleading Requirements in Securities Fraud Actions**

2

To state a claim for securities fraud under Section 10(b) of the 1934 Act and Rule

3

10b-5, a complaint must overcome three pleading barriers. First, it must comport with Rule

4

8(a) of the Federal Rules of Civil Procedure, which requires that complaints provide a short

5

and plain statement of the claim.

6

Second, it must conform with the "particularity" obligations imposed by Rule 9(b) of

7

the Federal Rules of Civil Procedure. *In re GlenFed, Inc. Sec. Litig.*, 42 F. 3d 1541, 1545

8

(9th Cir. 1994). Rule 9(b) provides that "in all averments of fraud or mistake, the

9

circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent,

10

knowledge, and other condition of mind may be averred generally."

11

Third, it must meet the pleading requirements provided in the Private Securities

12

Litigation Reform Act ("PSLRA"). The PSLRA amplifies the "particularity" obligations of

13

Rule 9(b) by requiring that the complaint specify "each statement alleged to have been

14

misleading," and by requiring that the complaint specify the reason or reasons why the

15

statement was false or misleading. 15 U.S.C. § 78u-4(b)(1). "[I]f an allegation regarding the

16

statement or omission is made on information and belief, the complaint shall state with

17

particularity all facts on which that belief is formed." *Id.* Moreover, the PSLRA provides

18

that the complaint must "state with particularity facts giving rise to a strong inference that

19

the defendant acted with the required state of mind," or scienter. *Id.* at (b)(2). The required

20

state of mind is one of "deliberate recklessness." *In re Silicon Graphics Sec. Litig.*, 183 F.3d

21

970, 975 (9th Cir. 1999). "Recklessness only satisfies scienter under § 10(b) to the extent that

22

it reflects some degree of intentional conscious misconduct." *Id.* at 977.

23

Therefore, plaintiffs must "plead, at a minimum, particular facts giving rise to a strong

24

inference of deliberate or conscious recklessness." *Id.* at 979. A reasonable inference is not

25

enough. *Id.* at 974. A complaint merely alleging that a defendant had the motive and

26

opportunity to commit fraud is insufficient. *Id.* In assessing whether Plaintiffs have

27

28

1  sufficiently pled scienter, courts consider the totality of the allegations. *Nursing Home*

2  *Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)(omitting

3  quotations and citations). Additionally, courts must consider all reasonable inferences, not

4  just those favorable to the plaintiff. *Id.*

5       Applying these standards, the inquiry before the court is whether the Complaint, read

6  most favorably to Plaintiffs, but considering all reasonable inferences, alleges sufficiently

7  particular facts to raise a strong inference that a given Defendant participated in the making

8  of fraudulent representations or omissions, either with knowledge of their falsity or with

9  deliberate recklessness.

10 **III.    Analysis**

11      Defendants allege that Plaintiffs have failed to plead scienter because the Complaint,

12 in its totality, does not support a strong inference of knowing or deliberately reckless

13 misconduct.  In response, Plaintiffs contend that Hypercom's financial restatement, the

14 GAAP violation, the subsequent resignations of Smolak and Alexander at Hypercom, the

15 confidential witnesses' allegations, Hypercom's detail-oriented management style, the fact

16 that the accounting error involved a "core" product, and Defendants' motivations and

17 opportunity demonstrate that Defendants acted with deliberate recklessness.

18

19      **A.    The Allegations that May Demonstrate Scienter**

20          **1.    The Financial Restatement**

21      On February 4, 2005, Hypercom issued a financial restatement, reducing its 2004

22 revenue by $3.2 million and its 2004 net income by $2.1 million, because of a

23 misclassification of its leases.   Specifically, Hypercom adjusted (1) its first quarter net

24 income from a loss of $2.2 million to a loss of $2.9 million, (2) its second quarter net income

25 from a loss of $9.4 million to a loss of $10.5 million, and (3) its third quarter net income from

26 a profit of $584,000 to a profit of $309,000.

27

28

As part of the news release, as discussed above, Hypercom stated that a "significant internal control deficiency" caused the reclassification of the leases.  Doc. # 54, Exhibit 5, Exhibit 99.1 at 1.  Hypercom also stated that the reclassification "represents a material weakness in internal controls financial reporting."  *Id.*

Defendants argue that the small size of Hypercom's financial restatement detracts from any inference that they acted with scienter.  Restatements are less probative of deliberate wrongdoing or recklessness when the issuer's financial adjustments are small in size.  *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686 (6th Cir. 2004) (determining that a downward restatement of income of $1.3 million for a company with $280 million in revenue and $75 million in total assets for that year did not present a strong inference of scienter).  The converse is also true: the greater the magnitude of the restatement or GAAP violation, the more likely that such a restatement or violation was made consciously or recklessly.  *See id.* at 685.

Here, while Hypercom's adjustments cannot be considered "small," they  are not of the magnitude typically found to support a strong inference of scienter.  For example, in *In re MicroStrategy, Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000), the plaintiffs alleged that MicroStrategy fraudulently reported a "record" net income of $18.9 million over three years, when the company actually incurred a net loss for those years of more than $36 million.  The *MicroStrategy, Inc.* court stated that the "magnitude," "pervasiveness," and "repetitiveness" of the company's violations of "simple" accounting principles "serve[] to amplify the inference of scienter."  *Id.*  By contrast, Hypercom never stated that it was profitable when it was not.  In total, the adjustment of net income was only $2.2. million, compared with MicroStrategy's adjustment of nearly $50 million.  Furthermore, Hypercom still received the revenue at issue–it only changed the period in which the revenue was recorded.

1

### 2.     The GAAP Violations

2      Plaintiffs also contend that the obvious nature of Hypercom's GAAP violations creates

3    a strong inference that Defendants acted with scienter.  However, Plaintiffs have not cited

4    any cases standing for the proposition that GAAP violations alone can establish scienter.

5    Indeed, while "[v]iolations of GAAP standards can . . . provide evidence of scienter," *In re*

6    *Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005)(citations omitted), bare

7    allegations of GAAP violations do not create a strong inference thereof.   *In re McKesson*

8    *Hboc Secs. Litig.*, 126 F. Supp.2d 1248, 1272-73 (N.D. Cal. 2000).  Thus, the fact that a

9    company made an accounting error in violation of GAAP, and subsequently issued a

10   financial restatement and a culpability statement, does not alone satisfy the PSLRA's

11   pleading requirement.  *See In re Alpharma Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004)

12   (determining that the plaintiffs failed to allege that any of the defendants, including

13   Alpharma's CEOs, CFO, and President of the Animal Health Division, were involved in any

14   way with the violations of GAAP).  *Cf. DSAM Global Value Fund v. Altris Software, Inc.*,

15   288 F.3d 385, 390 (9th Cir. 2002) (requiring that the plaintiffs still prove facts demonstrating

16   deliberate recklessness even though the accounting firm had negligently missed obvious

17   violations of GAAP).

18

19      Furthermore, even assuming that establishing the obviousness of a GAAP error could

20   in fact establish a strong inference of scienter, Plaintiffs have not alleged sufficient facts to

21   make such a showing.  Confidential Witness No. 1 alleges that the "the rental agreements

22   were 'very straightforward' and there was no question that they were simply 'strict rental

23   agreements' and not sales or purchase agreements." Doc. # 48 at ¶ 27.  Confidential Witness

24   No. 1 is not an accountant, and his conclusory claim alone does not establish the obviousness

25   of the GAAP violation.  Plaintiffs do dedicate a portion of their Complaint to the GAAP

26   violation,  *Id.* ¶¶ 56-65, but they do not allege facts establishing the obviousness of the lease

27   misclassification.  Merely alleging that a GAAP violation occurred does not establish the

28

1  obviousness of the incorrect classification. Additional facts are necessary. Thus, Plaintiffs

2  have failed to allege with particularity that the lease misclassification was obvious.

3              **3.     The Confidential Witnesses**

4          Plaintiffs rely on five confidential witnesses to help demonstrate that Alexander and

5  Smolak acted with deliberate recklessness. In response, Defendants argue that (1) Plaintiffs

6  have failed to plead facts demonstrating the reliability of each of the CWs' allegations, and

7  (2) the information provided by the CWs does not establish that Alexander and Smolak

8  deliberately or recklessly caused Hypercom to publish erroneous financial results.

9              **a.     Standard for Confidential Witness Allegations**

10         "[P]ersonal sources of information relied upon in a complaint should be described in

11  the complaint with sufficient particularity to support the probability that a person in the

12  position occupied by the source would possess the information alleged." *In re Daou Systems,*

13  *Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citations and quotations omitted).

14  Plaintiffs need not name their sources "so long as the sources are described with sufficient

15  particularity to support the probability that a person in the position occupied by the source

16  would possess the information alleged and the complaint contains adequate corroborating

17  details." *Id.* The *Daou* court concluded that the plaintiffs satisfied the PSLRA requirements

18  for confidential witnesses when they described the witnesses with a large degree of

19  specificity, including each confidential witness's job description and work responsibilities,

20  and attributed each allegation to a specific witness. *Id.* at 1016.

21         Allegations made by confidential witnesses cannot support an inference of scienter

22  if the plaintiff fails to plead the requisite detail regarding the job description and duties of

23  that confidential witness. *See In re Bus. Objects S.A. Secs. Litig.*, 2005 U.S. Dist. LEXIS

24  20215, *16-17 (N.D. Cal. 2005) ("[U]nlike in *Daou Systems*, the Amended Complaint

25  provides no more than the job title of the confidential witnesses. For example, plaintiffs state

26  the exact job title of their first confidential witness–the Senior Director of Customer

27  Technical Support–but fail to provide any other detail regarding his or her job description

28

and responsibilities."); *In re Exodus Communs., Inc. Secs. Litig.*, 2005 U.S. Dist. LEXIS 20222, *95-6 (N.D. Cal. 2005) (not considering allegations from confidential witnesses when there was no explanation for how the confidential witnesses obtained the relevant information).

### 1.    Confidential Witness No. 1

The Complaint alleges that "Confidential Witness No. 1 ("CW-1"), a former Managing Director of EMEA, understands the relationship between EMEA and Hypercom. CW-1 alleges that EMEA's business is very straightforward, and that EMEA personnel handle only the "salesman" aspect of the business.  Doc. # 48 at ¶ 26.  CW-1 further alleges that all other aspects of Hypercom's business, including drafting the lease contracts and making accounting decisions, were handled by Hypercom's headquarters in Phoenix, AZ. *Id.*  CW-1 also alleges that, for every month and accounting period, EMEA transmits its leasing figures to Defendant Smolak and Rob Vreland, Hypercom's U.S. Controller.  *Id.* at ¶ 28.  The Complaint alleges CW-1's title, attributes specific allegations to CW-1, and from his allegations the court can deduce his job description and responsibilities.  Furthermore, it is reasonable that a managing director of EMEA would know the information CW-1 alleges.  Therefore, as to CW-1, the Complaint comports with *Daou*.  CW-1's allegations contribute to an inference of scienter.

### 2.    Confidential Witness No. 2

Plaintiff's Complaint alleges significantly fewer facts about Confidential Witness No. 2 ("CW-2").  Plaintiffs allege only that CW-2 corroborates CW-1's statements, that Hypercom employed CW-2 as an accountant in Hypercom's Accounting Department, that CW-2 worked for Hypercom through August 2004, and that "[a]cording to  CW-2, who was on a first name basis with defendant Alexander, defendant Smolak was one of the only people at the Company who would have known about how the EMEA leases were structured and booked."  *Id.* at ¶ 29.  Plaintiffs fail to allege any facts explaining how CW-2 would know about Defendant Smolak's involvement with the leases and their classification for accounting purposes.  Plaintiffs do not allege any facts describing CW-2's job description,

1  other than alleging that CW-2 is an accountant.  Under *Dauo*, Plaintiffs have failed to allege

2  sufficient facts demonstrating the reliability of CW-2's allegations.  Thus, CW-2's allegations

3  do not contribute to an inference of scienter.

4  ### 3.    Confidential Witness No. 3

5  Plaintiffs allege that Hypercom employed Confidential Witness No. 3 ("CW-3") as

6  an accountant through August 2004, and CW-3 alleges that all "decisions to book revenue

7  were made jointly by defendant Smolak, Vreland, and Hypercom senior vice president of

8  finance, treasury and investor, Scott Tsujita."   *Id.* at 29.   CW-3 alleges that Smolak

9  maintained "tight control" over the accounting department and "'questioned everything'

10  because Hypercom had no internal auditing person or group." *Id.* at ¶ 29.  CW-3 alleges that

11  the decision to book the leases incorrectly was intentional because management questioned

12  all aspects of accounting.  *Id.*  Plaintiffs do not allege any facts describing CW-3's accounting

13  position or his job responsibilities.  Plaintiffs do not allege how CW-3 would know that

14  Smolak reviewed all of the leases or that Smolak determined how the leases were to be

15  classified for accounting purposes.  While CW-3's allegations are relevant to the question of

16  Smolak's knowledge, they must be considered mere conclusory statements that are not

17  reliable under *Daou* because there are no supporting facts demonstrating the reliability of

18  CW-3's allegations.  Thus, CW-3's allegations do not contribute to an inference of scienter.

19  ### 4.    Confidential Witness No. 4

20  Plaintiffs allege that Hypercom employed Confidential Witness No. 4 ("CW-4") as

21  an accountant at Hypercom's headquarters until June 2005.  CW-4 alleges that Hypercom

22  intentionally mischaracterized the leases to "increase and inflate Hypercom's bottom line

23  profits."   *Id.* at ¶ 30 (quotations omitted).   CW-4 further alleges that the sole reason

24  Hypercom corrected its 2004 financial figures was because Ernst & Young, Hypercom's

25  outside auditors, discovered the incorrect classification.  *Id.*  CW-4 claims that he noticed a

26  suspicious moneyless wire-transfer that EMEA sent to Hypercom's headquarters, which CW-

27  4 pointed out to his supervisors, who directed him to post the transfer to Hypercom's books.

28  *Id.* at ¶ 32.  In addition, CW-4 alleges that Smolak "had to know about the transfer because

1    of his strict oversight of EMEA's accounting and finances." *Id.* Finally, CW-4 claims that

2    Smolak and Alexander were only concerned with impressing shareholders, not with proper

3    accounting practices, and that Ernst and Young discovered the wire transfer and called it

4    "suspicious."    *Id.* at ¶¶ 32, 33.

5        Plaintiffs fail to allege sufficient facts regarding CW-4's duties and responsibilities so

6    as to comply with *Daou*.  The only facts alleged in Plaintiffs' Complaint regarding CW-4's

7    duties are that CW-4 personally reviewed the accounting paperwork EMEA sent to

8    Hypercom's headquarters.  There are no additional facts explaining how CW-4 learned that

9    Smolak knew about the error in the lease classifications or about any of CW-4's other

10   allegations.  While CW-4's allegations may be probative on the question whether Defendants

11   acted with scienter, Plaintiffs have failed to plead sufficient facts establishing the reliability

12   of CW-4's allegations.  *See In re Metawave Communs. Corp. Secs. Litig.*, 298 F. Supp.2d

13   1056, 1058 (W.D. Wash. 2002) ("The Court must be able to tell whether a confidential

14   witness is speaking from personal knowledge, or merely regurgitating gossip and

15   innuendo."(citations and quotations omitted)).    Therefore, CW-4's allegations do not

16   contribute to an inference of scienter.

17                    **5.    Confidential Witness No. 5**

18       Plaintiffs allege that Confidential Witness No. 5 ("CW-5") "confirmed the problems

19   at Hypercom.  CW-5 is a former Accounting Manager, who was employed at Hypercom from

20   before the Class Period through June[] 2005.  CW-5 stated (as did CW-3) that Hypercom had

21   no internal audit practice and that the problems with the UK leases were not resolved until

22   Ernst & Young refused to sign off on an audit in early 2005."  Doc. # 48 at ¶34.  Again,

23   Plaintiffs do not allege any facts regarding CW-5's reliability.  While it is conceivable that

24   an Accounting Manager would know such facts, Plaintiffs fail to provide the necessary job

25   duties and responsibilities. Merely providing an employee's title does not comply with *Daou*.

26   CW-5's allegations do not contribute to an inference of scienter.  Even if these allegations

27   are true, they do not go directly to whether the Defendants knew that the EMEA lease

28   accounting classifications were wrong.

1    Because Plaintiffs failed to allege necessary facts regarding most of the confidential

2    witnesses, the court cannot adopt wholesale all of the allegations provided by the unnamed

3    employees in Plaintiffs' Complaint.  Therefore, "the court will rely only on factual allegations

4    which evince reliability through detail, context and corroboration."  *In re Portal Software,*

5    *Inc. Secs. Litig.*, 2005 U.S. Dist. LEXIS 20214, *26 (N.D. Cal. 2005).   Only CW-1's

6    allegations meet the standard enunciated in *Daou*.  None of the remaining Confidential

7    Witnesses' allegations, even if probative, will be considered for the purpose of determining

8    whether Defendants acted with knowledge or deliberate recklessness.

9                    **b.    Statements Made By Confidential Witnesses**

10    Defendants argue that the confidential witnesses have not provided any facts relevant

11    to whether Defendants Smokak or Alexander were aware of the misclassification of the

12    leases.  CW-1, as discussed above, was a Managing Director of EMEA, and his allegations

13    will be considered for the purpose of determining whether the Complaint raises a strong

14    inference of scienter.  According to the Complaint, people at Hypercom's headquarters

15    drafted the leases and made the accounting decisions.  While not identifying either Alexander

16    or Smolak, this allegation establishes that Hypercom and not EMEA made the accounting

17    decisions.  CW-1 further alleges:

18        At the end of each month (and at the end of every quarter), EMEA would
           transmit to defendant Smolak and Rob Vreland ("Vreland"), Hypercom's
19         U.S. Controller, its   leasing figures and revenues.  According to CW-1,
           it was not possible for EMEA, unbeknownst, to have incorrectly booked
20         revenue or lease figures and then sent them to the U.S.–because all figures
           were "double-checked" by Smolak and Verland before they were recorded.
21         CW-1 further stated that in the event that the figures sent by EMEA were
           wrong, Smolak or Vreland would have known.
22    Doc. # 48 at ¶ 28.  CW-1's allegation that Smolak "double-checked" all of the figures is

23    probative on the question whether Smolak acted with deliberate recklessness or knowledge.

24    The allegation is also probative on the question of whether EMEA improperly classified the

25    leases or whether Hypercom did so.

26    CW-1 also alleges that the rental contracts were "'very straightforward' and there was

27    no question that they were simply 'strict rental agreements' and not sales or purchase

28

1   agreements.  *Id.* at ¶ 27.  CW-1 further alleges that Hypercom's headquarters generated all
2   of the leases and that there was never "anything" in any lease contract that would make it
3   unclear that the lease was anything but a simple "rental."  *Id.* at ¶ 27.  There are three
4   problems with these allegations.  First, it is unclear how CW-1, who is not an accountant,
5   knows that the GAAP classification of the lease is "'very straightforward.'"  Second, the
6   allegation does not establish Smolak or Alexander's involvement with the misclassification.
7   CW-1's allegations could simply mean that EMEA misclassified the leases and Smolak failed
8   to notice the error.  It does not necessarily follow that because Hypercom created the leases,
9   Hypercom explicitly defined how the leases were to be accounted for pursuant to GAAP.
10  Third, as discussed above, demonstrating that the GAAP violations were obvious does not
11  necessarily establish scienter.  Plaintiffs need to plead particularized facts establishing a
12  strong inference that Defendants acted with scienter, not mere negligence.  CW-1's
13  conclusory allegations regarding the simplicity of the leases does not aid a court in
14  understanding why and how the error occurred.  These allegations are minimally probative,
15  at best.

16              **4.      Motive and Opportunity**

17          The presence of "motive," while not necessary to satisfy the pleading requirements
18  of the PLSRA, may contribute to a strong inference of scienter.  *See In re McKesson Hboc*
19  *Secs. Litig.*, 126 F. Supp.2d at 1269.  Here, Plaintiffs contend that Defendants Smolak and
20  Alexander had motive and opportunity to misclassify the leases.  Both Defendants stood to
21  receive cash and/or stock bonuses if Hypercom achieved an operating profit for 2004.

22          The general rule is that incentive compensation is not overly probative on the question
23  of fraud–otherwise, the executives of virtually every corporation in the United States would
24  be subject to fraud allegations.  *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061,
25  1068-69 (5th Cir. 1994).  Thus, the bare fact that Anderson and Smolak would have received
26  bonuses if Hypercom had been profitable in 2004 is minimally probative, at best, on the
27  question whether they acted with scienter.

28

1    Moreover, Defendants argue that their decision not to sell shares of Hypercom stock

2    undermines Plaintiffs' "motive" claim.  Because Plaintiffs have made only a very weak

3    "motive" claim, it is unnecessary to address Defendants' argument.

4              **5.      Core Business**

5    Plaintiffs argue that a defendant's knowledge of a fraud is presumed where it concerns

6    a company's core business.  Doc. # 65 at 14.  Presumably, Plaintiffs are arguing that leasing

7    portals was a "core" business of Hypercom and, as such, Defendants should have known

8    exactly how those leases should have been characterized to comply with GAAP.

9    There are two problems with Plaintiff's argument.  First, courts have declined to

10   "presume" scienter in the manner suggested by Plaintiffs.  In fact, in *In re Read-Rite Corp.*

11   *Secs. Litig.*, 335 F.3d 843, 848-49 (9th Cir. 2003)–the case on which Plaintiffs rely for this

12   proposition–the Ninth Circuit refused to impute knowledge to Defendants based on their

13   positions in the company.  Second, even if such a "presumption" existed, it is not clear that

14   the presumption would extend so far as to impute knowledge of the accounting principles

15   applicable to "core" products.

16             **6.      Hypercom's Management Style**

17   A detail-oriented management style may be considered for the purpose of determining

18   whether scienter has been pled with particularity.  *See Nursing Home Pension Fund, Local,*

19   *144*, 380 F.3d at 1234 ("It is reasonable to infer that the Oracle executives' detail-oriented

20   management style led them to become aware of the allegedly improper revenue  recognition

21   of such significant magnitude that the company would have missed its quarterly earnings

22   projection but for the adjustments.").

23   In the present case, Plaintiffs have not alleged that Defendants made the sort of

24   statements that, in *Nursing Home*, supported an inference of scienter.  The only allegation

25   that is even minimally relevant is made by CW-1, who alleges that Smolak received frequent

26   accounts of EMEA sales and "double-checked" all leasing figures.  This single allegation is

27   not enough.  Plaintiffs have failed to allege sufficient facts for this court to consider

28

1  Hypercom's detail-oriented management style as supporting a conclusion that Defendants
2  acted with scienter.

3          **7.        Resignations of Smolak and Alexander**

4          At least one court has stated that resignations following a restatement can be a factor
5  in determining scienter. *See In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS
6  5887, *43 (N.D. Cal. 2002) ("As with the restatement of Adaptive's financials, these changes,
7  taken alone, would not support scienter.  But because the changes occurred as adaptive's
8  financials were being restated and as Adaptive was conducting its own internal investigation
9  (which resulted in a determination that the extension of credit to certain customers was
10 unsupportable), they add one more piece to the scienter puzzle.").

11         Thus, the court will consider the fact that Smolak and Alexander resigned as a factor
12 in its scienter analysis.  However, the fact that there were no firings for cause makes this
13 factor only minimally probative.

14         **B.      Plaintiffs' Allegations Considered as a Whole**

15         In support of their argument that Defendants intentionally misrepresented material
16 information, Plaintiffs have properly alleged the following: (1) Hypercom violated GAAP
17 with its 2004 financial representations; (2) Hypercom issued a financial restatement revealing
18 this accounting violation and reducing its revenue by $3.1 million and its net income by $2.1
19 million; (3) Hypercom issued a statement accompanying the financial restatement providing
20 that there was a significant internal control deficiency; (4) Defendants Alexander and Smolak
21 resigned shortly after the financial restatement; and (5) according to CW-1, EMEA handled
22 the salesman aspect of Hypercom's business, and at the end of each month EMEA would
23 transmit to Smolak its leasing figures and revenues to be "double-checked."[1]

24  _____

25         [1]At oral argument on January 20, 2006, Plaintiffs appeared to argue that Defendants
26 acted with scienter when they reported that they had reviewed Hypercom's internal controls
   and that "the company's disclosure controls and procedures are sufficient and operating
27 effectively" because Hypercom did not have an internal audit practice.  Plaintiffs failed to
   provide adequate legal authority in their brief supporting this argument.  Therefore, to the
28 extent that Plaintiffs are arguing an alternative basis for why Defendants acted with scienter,

1    Based on these allegations, the court finds that Plaintiffs have failed to meet the

2 difficult standard enunciated in *Silicon Graphics*–plaintiffs must "plead, at a minimum,

3 particular facts giving rise to a strong inference of deliberate or conscious recklessness." *In*

4 *re Silicon Graphics, Inc. Sec. Litig*., 183 F.3d at 979.   Plaintiffs allege little more than the fact

5 that Hypercom issued a financial restatement because of GAAP violations.  The amount of

6 the restatement is not overly probative.  Plaintiffs have failed to allege with particularity how

7 the GAAP violations were so obvious that Smolak and Alexander[2] must have known about

8 the misclassification.  The culpability statement only provides that there were internal control

9 deficiencies, which caused the accounting error.   Such a culpability statement does not

10 establish a strong inference that Defendants misrepresented Hypercom's financial figures with

11 knowledge or deliberate recklessness.   Furthermore, the allegations of one confidential

12 witness in this case fail to raise the level of the inference to "strong."  While Plaintiffs may

13 have alleged facts establishing a reasonable inference of scienter, the standard is a strong

14 inference, which Plaintiffs have not raised.   Therefore, Plaintiffs' claim that Defendants

15 violated Section 10(b) of the Securities Exchange Act of 1934 is dismissed without prejudice.

16 **IV.     Section 20(a) of the Exchange Act**

17    To prevail on a Section 20(a) claim, "plaintiffs must first allege a violation of § 10(b)

18 or Rule 10b-5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002).  Unless

19 Plaintiffs plead scienter with particularity, there cannot be any Section 20(a) liability.  *Id.*

20 Plaintiffs's Section 20(a) claim is also dismissed without prejudice.

21 **V.     Conclusion**

22    Plaintiffs have failed to plead particularized facts establishing a strong inference that

23 Defendants acted with scienter, as required by the PSLRA.  Because Plaintiffs may be able

24 _____

25 the court will not address this argument.

26    [2]As Defendants point out, Plaintiffs' Complaint does not allege any facts establishing
a strong inference that Alexander was involved with the incorrect misclassification.  While
27 Defendants have failed to allege the necessary facts suggesting that either Defendant acted
28 with scienter, Plaintiffs' claim is significantly weaker with respect to Alexander.

1  to cure this pleading deficiency, Plaintiffs' Complaint is dismissed without prejudice. They
2  will have thirty days to submit an amended complaint.

3       IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss, Doc. # 53, is
4  granted.

5       IT IS FURTHER ORDERED that Defendants Request for Judicial Notice, Doc. # 55,
6  is granted as to Exhibits 4 and 5 and denied as to Exhibits 2 and 3.

7       IT IS FURTHER ORDERED that Plaintiffs' Amended Complaint, Doc. # 48, is
8  dismissed for failure to comply with the PLSRA's pleading requirements with leave to file a
9  further amended complaint by February 23, 2006.

10      DATED this 24th day of January 2006.

11
12
13  _____
14  Neil V. Wake
    United States District Judge
15
16
17
18
19
20
21
22
23
24
25
26
27
28