Westlaw.

Slip Copy
Slip Copy, 2005 WL 3501414 (D.Ariz.), Fed. Sec. L. Rep. P 93,706
(Cite as: Slip Copy)

Page 1

C
Briefs and Other Related Documents

United States District Court,D. Arizona.
Steven ZACK, individually and on behalf of all others similarly situated; Vicki Cruse, individually and on behalf of all others similarly situated; and Kenneth Moore, individually and on behalf of all others similarly situated, Plaintiffs,
v.
ALLIED WASTE INDUSTRIES, INC.; Thomas H. Van Weelden; Peter S. Hathaway; Thomas W. Ryan; and James E. Gray, Defendants.
No. CIV04-1640PHXMHM, CIV04-1805PHXMHM, CIV04-2058PHXMHM.

Dec. 15, 2005.

Christopher Nelson, Stuart L. Berman, Todd Mosser, Schiffrin & Barroway LLP, Radnor, PA, Franklyn Russell Mead, Jr., Richard Glenn Himelrick, Tiffany & Bosco PA, Phoenix, AZ, for Plaintiffs.
David Hennes, Shahzeb Lari, William McGuinness, Fried Frank Harris Shriver & Jacobson, New York, NY, Doug C. Northup, Fennemore Craig PC, David B. Rosenbaum, Maureen Beyers, Osborn Maledon PA, Phoenix, AZ, for Defendants.

ORDER
MURGUIA, J.
*1 This is a securities fraud case brought pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act"). Currently before the Court is Defendants' Motion to dismiss. (Dkt.# 26) and Defendants' Motion to Strike Plaintiffs' Unauthorized Supplemental Pleading. (Dkt.# 52). After reviewing the motions and hearing oral argument on October 19, 2005, the Court issues the following Order.

FN1. Defendants, Allied Waste, Hathaway, Ryan, and Gray filed a motion to dismiss on April 2, 2005, which Defendant Van Weelden joined. Dkt. # 28. Defendant Van Weeldon also joined in Defendants motion to strike Plaintiffs' Unauthorized Supplemental Briefing. Dkt. # 52.

I. Motion To Strike

On November 17, 2005 Plaintiffs submitted a supplemental letter in support of their Response to Defendants' Motion to dismiss. This supplemental letter was submitted without leave of the Court but allegedly in response to the Court's request for additional briefing at the hearing held on October 19, 2005. The supplemental brief addresses the following issues: (1) the existence of a 10% materiality threshold; (2) Defendant's EBITDA range announcements; and (3) additional evidence in support of Plaintiffs' claim. Defendants move to strike this letter as an unauthorized supplemental brief. See Local Rule of Civil Procedure 7.2.

In reviewing the transcript of the hearing held on October 19, 2005, it is clear that the Court did not request additional briefing from the parties on the above mentioned issues nor did the Court acquiesce to any statement by Plaintiffs that it would accept supplemental briefing regarding the issues addressed at the hearing. Moreover, the issues raised in Plaintiffs' supplemental letter were addressed in the briefing and openly discussed at the hearing. As such, Defendants' motion to strike Plaintiffs' supplemental brief will be granted and it will not be considered by the Court.

II. Factual Background

Plaintiffs assert that statements made by Defendants, to the investing public, misrepresented facts about the business and operations of Allied Waste Industries, Inc, ("Allied Waste"). Plaintiffs brought this class action, on behalf of purchasers of Allied Waste securities from February 10, 2004 to September 13, 2004 ("Class Period") under the Reform Act alleging Defendants violated section 10(b) and Rule 10b-5, and section 20(a) of the Security Exchange Act. Named as Defendants are Allied Waste; Thomas H. Van Wheelden, former President, CEO, and Chairman; Peter S. Hathaway, Executive Vice President and Chief Financial Officer; Thomas W. Ryan, former Executive Vice President and Vice Chairman; and James A. Gray, Controller and Chief Accounting Officer. Consolidated Amended Class Action Complaint ("Am.Compl.") ¶ 1.

FN2. Donald Slager, Chief Operating Officer and current Allied Waste President

is listed in the Amended Complaint as a Defendant. Am. Compl. ¶ 1. However, the docket in this matter neither reflects Mr. Slager as a Defendant nor demonstrates Plaintiffs have served Mr. Slager.

To summarize the sixty-three page complaint, the general theme of Plaintiffs' allegations are that Allied Waste was a profitable and competitive waste management company. In 1999, Allied Waste acquired a competitor with significant debt. While trying to manage the debt of its new acquisition, Allied Waste was simultaneously faced with an aging truck fleet, rising maintenance costs, and increasing consumer complaints. During this period, the Amended Complaint alleges the management of Allied Waste, under pressure to make Allied Waste a profitable business and to refinance debt at a more favorable rate, overstated Allied Waste's projected earnings before interest, taxes, depreciation, and amortization and mismanaged the fleet.

*2 According to the Amended Complaint, in 1999 Allied Waste acquired its competitor Browning-Ferris Industries ("Browning-Ferris"), which had a "staggering debt," over $8 billion. *Id.* at ¶ 2. In 2003, Defendants unveiled a free cash flow plan, to restructure Allied Waste's debt load, whereby Allied Waste would pay down $1 billion of its debt using cash flow, securitizations, and asset sales. *Id.* at ¶ 3. In January 2004, Defendants reported the first phase of the free-cash-flow plan had succeeded in reducing debt and the asset sales had reduced less recurring revenue then originally forecasted.

A. *Alleged False and Misleading Statements*

On February 10, 2004, the Amended Complaint alleges Allied Waste falsely projected earnings before interest, taxes, depreciation, and amortization ("EBITDA") to grow from 1.581 million [sic] in 2003 to $1.60-1.64 billion in 2004. *Id.* at ¶ 84. Mr. Van Weelden stated that in 2004 "[o]perating cost control measures, economic recovery and reduced interest costs should reflect favorably on cash flow and earnings." *Id.* Allied Waste projected free cash flow ("FCF") of $290-330 million. *Id.* The Amended Complaint alleges these statements were false and materially misleading, and the EBITDA was no more than $1.5 billion, because Defendants manipulated the age of Allied Waste's fleet, understated maintenance costs, overstated projected FCF, and underestimated costs of implementing the best-practices initiatives. *Id.* at ¶ 5.

Additionally, in the February 10, 2004 press release Allied Waste announced it was implementing operating cost control measures, known as the "best practices" and "excellence driven" initiatives ("best practices initiatives"), to control costs and increase Allied Wastes' efficiency. *Id.* at ¶ 86. During a conference call on February 10, 2004, Mr. Slager stated in regards to the best practices initiatives, "[t]he objective is to take our best practices and do a better job of sharing capabilities .. so we have a company that is performing at a higher standard than we are today. The operational standards .. have already been successfully executed in certain pockets within the organization ..." *Id.* at ¶ 87. Also during the conference call, Defendant Hathaway stated the best practices initiatives will "benefit us later in '04 and certainly in '05 and years to come." *Id.* at ¶ 88. Mr. Hathaway also stated "... we're all going to be anxiously awaiting ... the April, May, and June months to see how things are shaping up. The first quarter as [sic] tough quarter every year regardless of the economy to gauge what exactly is going to happen for the full year because of the seasonality. And it's a hard quarter to drive annual conclusions off of." Decl. Hennes, Ex. E at p. 10.

FN3. The conference call was cited in Amended Complaint, and therefore, the Court may consider other statements made, but not cited in the Amended Complaint during the conference call. *See Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1240-41 (N.D.Cal.1998).

Plaintiffs contend statements related to the best practices initiatives were materially false and misleading because the best practices initiatives were intended to "shake up the Company's failing ways, not to ensure successful practices were made uniform across the Company." *Id.* at 89. Further, Plaintiffs contend Defendants knowingly and recklessly underestimated best practices expenses. *Id.* at ¶ 90. The Amended Complaint cites to nine confidential witnesses ("CW# "), who all observed the significant expenses spent on consultants. The confidential witnesses noted the consultants were ineffective because there were too many consultants, Allied Waste spent too much money on the consultants, the consultants had too little time to make meaningful observations, and the consultants "did not know what they were doing." *Id.*

*3 In an April 27, 2004 conference call: Defendant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hathaway reconfirmed the February EBITDA forecast. *Id.* at ¶ 91. During the April 27 conference call, Defendants increased the FCF projection to $310-350 million and reported Allied Waste had spent $3 million on the best practices initiatives. *Id.* Also, Mr. Slager stated "[w]e expect to begin to offset some of the implementation costs associated with the [best practices initiatives] later this year," which was also reiterated in the Company's Form 10-Q, filed on May 6, 2004. *Id.* at ¶ 93. Plaintiffs contend these statements were materially misleading as noted above because the best practices initiatives was a "band-aid" and Defendants failed to account for maintenance, repair, aging fleet costs, and needed salary increases, as well as, overestimated EBITDA and FCF.

B. *Condition of Fleet*

CW1 stated the age of the fleet was absolutely manipulated. Plaintiffs allege Mr. Van Weelden would combine two much older trucks and then list them as new. *Id.* at ¶ 50. Additionally, the Amended Complaint maintains Mr. Van Weelden manipulated the age of the fleet by not accounting for spare older trucks. *Id.* In addition to alleging, Defendant knowingly inflated EBITDA and FCF forecasts, Plaintiffs contend Defendants were motivated to overstated EBITDA and FCF in order to obtain favorable debt financing terms. *Id.* ¶¶ 122-126

C. *Negative Announcements:*

On July 27, 2004, Allied Waste lowered its EBITDA forecast from 1.6 billion to $1.536-1.552 billion and FCF from $310-350 million to $275-300 million, attributing results to increased operating expenses, unbudgeted maintenance costs ($7 million) and increased cost in implementing the best practices initiatives. *Id.* at ¶¶ 9,98,99. For the reasons stated above, Plaintiffs contend the July 27, 2004 statement was still materially false and misleading. *Id.* at ¶ 99. On July 28, 2005, Allied Waste securities dropped from $12.22 to $9.69 per share. *Id.* at ¶¶ 10,106.

On September 14, 2004, Allied Waste again reduced its EBITDA forecast to $1.48-1.50 (inline with internal projections, according to Plaintiffs) and FCF to $215-250 million, citing increased capital expenditures to reduce its fleet age and maintenance costs. *Id.* at ¶¶ 11, 107, 108. At some point, Allied Waste's securities again dropped from $10.24 to $9.30 per share. *Id.* at ¶¶ 13,112. In October 2004, after the Class Period, Allied Waste announced Defendant Van Weelden's departure, it would reduce its average fleet age from 8.5 to 7 years, increase capital spending in order to address maintenance and fleet age, and purchase additional trucks. *Id.* at ¶¶ 113, 114. Plaintiffs contend these post-Class period statements demonstrate "Defendants manipulated fleet age figures during the Class Period to avoid raising suspicions that heavy spending would be necessary." *Id.* at ¶ 114.

III. Legal Standards

*4 Under Fed. R. Civ. Pro. Rule 12(b)(6), the court will not dismiss a complaint unless it appears beyond a doubt that the plaintiff can prove no set of facts to support the claim that would entitle the plaintiff to relief. *Morley v. Walker,* 175 F.3d 756, 759 (9th Cir.1999). In determining whether a complaint states a claim, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party, here Plaintiffs. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir.1998). However, "the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001). Additionally, while the Court's primary focus is on allegations contained in the pleadings, the Court may also consider documents attached to the complaint or incorporated by reference. *In re Northpoint Communications Group, Inc.,* 221 F.Supp.2d 1090 (N.D.Cal.2002). Furthermore, judicial notice of documents filed with the Security Exchange Commission is proper in actions alleging securities fraud. *See, e.g., Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1352 n. 3 (S.D.Cal.1998).

Rule 9(b) also imposes particularized pleading requirements on a plaintiff alleging fraud or any claim premised on fraud such that all averments of fraud or mistake must be stated with particularity. Fed. R. Civ. Pro. 9(b) (2005). Additionally, an action brought under the Reform Act is subject to heightened pleading standards that are more rigorous than the Rule 9(b) standards. The Reform Act requires the plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                       Page 4
Slip Copy, 2005 WL 3501414 (D.Ariz.), Fed. Sec. L. Rep. P 93,706
(Cite as: Slip Copy)

The complaint must also state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind with respect to each act or omission alleged to violate securities law. 15 U.S.C. § 78u-4(b)(2). The required state of mind is deliberate recklessness. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 977 (9th Cir.1999). However, if the alleged material false statement or omission is a "forward-looking statement," the required level of scienter is actual knowledge. 15 U.S.C. § 78u-5(c)(1)(B). A motion to dismiss the complaint must be granted if the complaint fails to satisfy these requirements. 15 U.S.C. § 78u-4(b)(3)(A).

In addition, the plaintiff has the burden of proving that the act or omission of the defendant caused the loss for which the plaintiff seeks to recover damages. 15 U.S.C. § 78u4(b)(4). Section 10(b) makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate...." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5(b).

IV. Discussion

*5 To state a securities fraud claim, a plaintiff must allege that a defendant: (1) made a misrepresentation of fact or an omission; (2) of a material fact; (3) with scienter; (4) in connection with the purchase and sale of a security; (5) upon which the plaintiff relied; and (6) that the plaintiff's reliance was the proximate cause of the injury for which plaintiff seeks to recover damages. Securities Exchange Act of 1934, § 10b; *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir.2002).

Plaintiffs bring a securities fraud class action alleging fraud on the market. In these type of fraud on the market securities cases, the focus of the particularity analysis is not the allegedly false or misleading statements of the defendants, but the truth that emerges from the market. "If all investors thought the same things, there would be no trading except that prompted by the need of investors to re-balance their portfolios ... What matters in a [fraud on the market] case is the total mix of information in the market and whether that mix has been altered in some significant way to create a very widely, indeed essentially universal, but wrong view of the value of the security at issue." See *In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d 857, 861-62 (N.D.Cal.2004).

Generally, open market fraud complaints fail to satisfy the required pleading standard in one of several different ways. Most often plaintiffs cannot identify a false statement of defendant that might account for causing a security issue's price to be distorted. Even if a statement that turns out to be false can be identified, it is usually so laden with cautionary language as to be unactionable as a practical matter. In the more common omissions case, plaintiff may be unable to find a ground upon which to allege that defendant knew the omitted fact or had a duty to disclose it.

*Id.* at 861-62.

In the case at hand, the Amended Complaint suffers similar shortcomings. The Amended Complaint reads like an action alleging breach of fiduciary duties, instead of a securities fraud class action. The Amended Complaint is rife with allegations of how Allied Waste should be managed, such as Defendants' knowledge of the fact a waste company should be run from the "bottom up" and how Defendants failed to prioritize local needs, resulting in a fleet in disrepair, dissatisfied employees, and a smaller customer base. The Amended Complaint cites to nine confidential witnesses who either "knew" Allied Waste was in financial trouble or were not the least surprised to learn it did not meet its 2004 EBITDA forecast. Many of the confidential witnesses suspected or "attributed," reduced spending on repair, maintenance, salaries, etc. and inflated EBITDA and FCF forecasts to "senior management." Notably, the Amended Complaint does not contain a single allegation a confidential witness had personal knowledge of a Defendant falsifying (or directing an employee to falsify) EBITDA or FCF forecasts. Even if the Amended Complaint pleaded falsity with particularity, the Amended Complaint fails to allege facts giving rise to a strong inference of scienter.

A. Misstatement or Omission of Material Fact

*6 Under the Reform Act, to adequately allege securities fraud a complaint must: (1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement was misleading;

Slip Copy
Slip Copy, 2005 WL 3501414 (D.Ariz.), Fed. Sec. L. Rep. P 93,706
**(Cite as: Slip Copy)**

Page 5

(2) if an allegation is made on information and belief, state with particularity all facts upon which that belief is formed. 15 U.S.C. 78u-4(b)(1).

Plaintiffs primarily allege Allied Waste's February 2004, April 2004, and July 2004, EBITDA and FCF forecasts were false and materially misleading Am. Compl. at ¶ ¶ 5,84. Mr. Van Weelden stated that in 2004 "[o]perating cost control measures, economic recovery and reduced interest costs should reflect favorably on cash flow and earnings." *Id.* Allied Waste projected EBITDA to grow from 1.581 million [sic] in 2003 to $1.60-1.64 billion in 2004 and projected FCF of $290-330 million. *Id.* The Amended Complaint alleges these statements were false and materially misleading, and the EBITDA was no more than $1.5 billion, because Defendants manipulated the age of Allied Waste's fleet, understated maintenance costs, overstated projected FCF, and underestimated costs of implementing the best-practices initiatives.

1. Particularity Requirement

Plaintiffs argue that, taking as true the allegations in the Amended Complaint and viewing them in the light most favorable to Plaintiffs, the Court must infer Defendants knew its February, April, and July EBITDA and FCF forecasts were false. However, vague and conclusory allegations in the complaint, regardless of whether they are attributed to a confidential witness, fail to satisfy the Reform Act's pleading requirements. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir.2002). If a plaintiff relies on the existence of reports as a means of establishing knowledge, the plaintiff must "include adequate corroborating details," such as the "sources of her information with respect to the reports, how she learned of the reports, who drafted them, ... which officers received them," and "an adequate description of their contents." ' *Silicon Graphics,* 183 F.3d at 985.

The reason for requiring such detail is that "every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts" and permitting a plaintiff "to go forward with a case based on general allegations of negative internal reports would expose all those companies to securities litigation whenever their stock prices dropped." *Silicon Graphics,* 183 F.3d at 988. As the Northern District of California, aptly noted:
Did CW3 personally attend the meeting? The complaint never says. Who among the executives "indicated" that Commtouch had gotten into a fight with the auditors? The complaint never says. What did that executive (or those executives) specifically say? The complaint never says. What do "indicated" and "fight" mean? The questions could go on.

*In re Commtouch Software Ltd. Sec. Litig.,* No. C 01-00719 WHA, 2002 WL 31417998, *10 (N.D.Cal. July 24, 2002) (unpublished opinion). *see also, Yourish v. California Amplifier,* 191 F.3d 983 (9th Cir.1999). In *Yourish,* the Ninth Circuit considered plaintiff's generalized allegation regarding the existence of confidential non-public information available to defendants but provided no details about the information, other than the "true facts" revealed by the information. *Id.* at 994. The allegations contained "none of the particulars" about the information, such as what medium contained the information, when the information was made available to the people inside the company, which of the defendants would have had access to the information or when such defendants would have been aware of such information. *Id.*

*7 Similarly, in the instant case, the Amended Complaint contains confidential witnesses' conclusory allegations of what "senior management" "knew" without particularity or specificity. Am. Compl. at ¶ ¶ 5,49(c)(e)(f),52. For example, Plaintiffs rely on the allegations of CW1, an Internal Reporting Manager and Senior Financial Analyst, whose department compiled field and regional data. Am. Compl. at ¶ ¶ 47,48. CW1's department gathered forecasting data and presented it to John Quinn (the Amended Complaint does not specify Mr. Quinn's position) who in turn presented forecasting data to Defendant Gray's department, who presented the date to Defendant Hathaways' office. *Id.* at ¶ 49. According to the Amended Complaint, Mr. Hathaway and Mr. Slager reviewed the forecast and "CW1 strongly believes Mr. Van Weelden was at the meetings." *Id.* Then the numbers were returned to Mr. Quinn and Mr. Quinn then informed CW1 that forecasts need to be "adjusted up." *Id.* Mr. Quinn verbally told CW1, presumably on Mr. Hathaway's behalf, to "get rid of" the first set of forecasts. *Id.*

Beginning in the fourth quarter of 2003, CW1's department was able to adjust forecasts without evidence of the changes and CW1's department would then make Mr. Hathaway's requested changes and return them to Mr. Hathaway and Mr. Van Weelden. *Id.* According to CW1, Mr. Quinn fought with Mr. Hathaway to keep the revised figures from becoming inflated. *Id.* at ¶ 50. CW1's department

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prepared the 2004 forecasts and budgets, and originally indicated an EBITDA forecast of 1.5 billion. *Id.* at 51. The Amended Complaint alleges a similar process regarding operating costs set unrealistically low, omitting predictable expenses, and under budgeting, which was all presumably at the behest of Mr. Hathaway and/or Mr. Van Weelden.

Other than the original 1.5 billion internal forecast, the Amended Complaint avers no details at all regarding the forecasts CW1 prepared. Notably, the Amended Complaint does not allege CW1 personally received directives from named Defendants, witnessed conversations or even heard of them second-hand through Mr. Quinn. *Id.* Simply, the basis for CW1's statements regarding Mr. Hathaway's, Mr. Van Weelden's, Mr. Slager's, and Mr. Gray's knowledge is not averred. Instead the Amended Complaint seems to allege Mr. Quinn directed CW1 to "get rid of" early forecasts. How does CW1 know senior management wanted the numbers changed? What process did the other departments undergo when reviewing the Complaint? How does CW1 know which Defendants viewed these reports? What information did Defendants rely on when making changes? The questions could go on.

Furthermore, even if the Amended Complaint, stated allegations of falsity with specificity, it fails to state these original forecasts were more reliable or accurate than ultimate forecasts. In *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221 (9th Cir.1980), the Ninth Circuit explained "[i]t is just good general business practice to make such projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to *allow* them to be disclosed to the public. (emphasis in original). Specifically, in the process CW1 describes, the forecast went from CW1's department to Mr. Quinn to Mr. Gray. "After making adjustments, if at all, based upon information not known to field managers, Gray's department presented the forecasts to defendant Hathaway's office." Am. Compl. at ¶ 49(c). There is no allegation CW1's department's forecast was the final forecast. Thus, it is unclear from the Amended Complaint the departments involved in the process and the other sources of data upon which senior management relied upon when making EBITDA and FCF forecasts. Based on the foregoing, the Court finds Plaintiffs have failed to plead with particularity the falsity of Defendants' statements and the source of confidential witnesses' knowledge, and therefore, dismissal is appropriate.

2. Safe-Harbor.

*8 Furthermore, many of Defendants statements are forward looking and not actionable under the Reform Act's safe-harbor provisions. The Reform Act provides a "safe harbor," i.e., exemption from liability, for statements oral or written that explicitly are identified as "forward-looking statements" and which are either "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," are immaterial, or, if material, were not made with actual knowledge that the forward-looking statement was false or misleading. 15 U.S.C.A. § § 77z-2, 78u-5. "Thus, the statute provides that a forward-looking statement cannot be the basis for [section] 10b liability if either the forward-looking statement is accompanied by meaningful cautionary language, or the plaintiff fails to prove that the person making the statement made it with actual knowledge that the statement was false and misleading." *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1068 (N.D.Cal.2001) (citations omitted).

> FN4. The Court will not separately address whether Defendants' statements are protected by the bespeaks caution doctrine. *See In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d 857, 876 (N.D.Cal.2004) (finding it appropriate to consider safe harbor provision and bespeaks caution doctrine simultaneously).

Defendants contend both safe-harbor provisions are applicable to Defendants' forward-looking statements because they were accompanied by meaningful cautionary statements and Plaintiffs have failed to plead Defendants actual knowledge of falsity. As noted above, Plaintiffs primarily allege statements made on February 10, 2004, April 27, 2005, and July 27, 2004 regarding EBITDA, FCF, and the best practices initiatives were materially false and misleading because the original internal EBITDA projection was 1.5 billion and Defendants "knowingly" understated costs.

First, "the cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d 857, 882 (N.D.Cal.2004). However, the Reform Act does not require a listing of all factors that might make the results different from those

forecasted. Instead, the warning must only mention important factors of similar significance to those actually realized. *Id.* "[B]oiler plate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning." *Id.*

First, Defendants identified the February, April, and June, statements as forward-looking. Specifically, in its February 10, 2004 press-release, Allied Waste noted
This press release includes forward-looking statements ... These statements are not guarantees of future performance and involve risks, uncertainties and assumptions that are difficult to predict. Although we believe that the expectations reflected in these forward looking statements are reasonable, we can give no assurance that such expectations will prove to be correct. Forward-looking statements in this press release include, among others statement regarding (a) our "Outlook for 2004", including but not limited to [EBITDA], [FCF], and debt repayment, (b) our expectation related to variations of quarterly earning results and (c) the effect of costs control measures and reduced interest cost on our cash flow earning in 2004 ...
*9 These forward-looking statements involve risks and uncertainties which could cause actual results to differ materially including, without limitation ... we may be unable to raise additional capital to meet our operational ...

Similar cautionary statements were contained in the April 27 and July 27, 2004 press releases. *Id.* at Ex. G, 3-4; Ex. H. 3-4. While the statement specifically referenced EBITDA, FCF, and debt repayment forecasts, the Court cannot conclude as a matter of law, the cautionary language was of sufficient specificity to forewarn investors. Specifically, although as detailed above the Amended Complaint fails to allege knowingly falsity of forecasts, the fact that the fleet was aging and may need maintenance and repair seemed common knowledge. However, none of the warnings refer to the age, condition, repair or maintenance of the fleet as a factor in EBITDA or FCF projections. *Compare In re Copper Mountain Sec. Litig.* 311 F.Supp.2d 857 (N.D.Cal.2004) (finding cautionary statements concerning the timing and amount of customer orders, the concentration of revenue in a small number of customers, fluctuation based cancellation or rescheduling of orders, strategic partnerships with other companies, and the fact that competitor was introducing a competing product sufficiently specific cautionary warnings under Reform Act's safe harbor); *In re Portal Software, Inc. Sec. Litig.*, No C-03-5138 VRW, 2005 WL 1910923, *14 (N.D.Cal. Aug.10, 2005) (finding safe harbor warnings sufficient, where warning specified a number of factors which might effect the projections, including the migration to "larger, multi-year deals) *with In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1035-36 (S.D.Cal.2005) (holding cautionary statement, which announced that "pivotal trial has been initiated to evaluate the safety and efficacy of [particular drug under] investigation," was too generic to invoke safe harbor protection under Reform Act, because the general warning did not present investors with any indications as to likelihood of future drug studies facing obstacles and risk factors were not specified).

Nonetheless, the Court finds the "forward-looking statements" are not actionable under the second-prong of the Reform Act's safe harbor provisions because, for the reasons stated above, Plaintiffs have failed to show "a person making the statement made it with actual knowledge that the statement was false and misleading." *See Splash Tech. Holdings,* 160 F.Supp.2d at 1068.

3. Puffing

Puffing generally is defined as exaggerated, vague, or loosely optimistic statements about a company that are deemed so immaterial and unworthy of reliance that they cannot serve as the basis for liability in securities fraud actions. *In re Cornerstone Propane Partners, L.P.,* 355 F.Supp.2d 1069, 1087 (N.D.Cal.2005). Generally, such statements consist of forward-looking or generalized statements of optimism that are not capable of objective verification, and lack a standard against which a reasonable investor could expect them to be pegged. *Id.* The Ninth Circuit has defined the point at which a projection of optimism becomes an actionable "factual" misstatement under section 10(b), namely, when "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *See Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994).

*10 Plaintiffs have cited various statements regarding the best practices initiatives as materially false and misleading. During a conference call on February 10, 2004, Mr. Slager stated regarding the best practices initiatives, "[t]he objective is to take our best practices and do a better job of sharing capabilities ..

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

so we have a company that is performing at a higher standard than we are today. The operational standards .. have already been successfully executed in certain pockets within the organization ..." *Id.* at ¶ 87. Plaintiffs contend statements related to the best practices initiatives were materially false and misleading because the best practices were intended to "shake up the Company's failing ways, not to ensure successful practices were made uniform across the Company." *Id.* at 89. Also during the conference call, Defendant Hathaway stated the best practices initiatives will "benefit us later in '04 and certainly in '05 and years to come." *Id.* at ¶ 88. Additionally, in relation to the best practices initiatives in an April 27, 2004 conference call, Mr. Slager stated "[w]e expect to begin to offset some of the implementation costs associated with the [best practices initiative] later this year," which was also reiterated in Allied Waste's Form 10-Q, filed on May 6, 2004. Am. Compl. at ¶ 93.

In *Foundry Networks*, at issue was the company's statement that its "business remains on track." *In re Foundry Networks, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 18200, *47 (N.D. Cal. Aug 29, 2003). The court held that the statement was inactionable puffery because the statement was merely a very general statement of optimism about the company's financial prospects, something that reasonable investors would not rely on when making investment decisions. *Id.*; *see also*, *In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1236 (N.D.Cal.1994) (finding that statements such as "business couldn't be better," "it's a great time for a company like ours," and "we already have a sizable lead over our competition" were not actionable).

In contrast, in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir.2003), the Ninth Circuit found statements at issue were not inactionable puffery. Specifically, the court held that "[a] reasonable investor would find significant the information regarding a company's deferred maintenance costs, unsafe maintenance practices, and possible sanction" because "a reasonable investor would consider the potential effects of each of these facts on the overall economic health of the company as 'significantly altering' the 'total mix' of information made available." *Id.* at 935; *see also Scritchfield v. Paolo*, 274 F.Supp.2d 163, 175 (D.R.I.2003) (holding statement that company was the " 'premier provider of high-speed DSL services in the Northeast corridor' ... is much more than mere puffery; it is a statement of [the company's] present status and capabilities, and connotes that [the company] is comparatively superior").

*11 The statements at issue here more closely resemble the statements at issue in *Foundry Networks*. Mr. Slager generically stated the goal of the best practices initiatives is to have a company that is performing better. In April, Mr. Slager said we expect to begin to offset some costs. Similarly, Defendant Hathaway stated the best practices initiatives will benefit us. Both Mr. Hathaway and Mr. Slager's statements were so vague that a reasonable investor could not have expected to rely on it. *See Wenger*, 2 F.Supp.2d at 1245-46 (finding "1995 was a very good year for Lumisys" to constitute nonactionable vague statements).

### 4. Materiality

Defendants argue even if the Court were to conclude the February, April, and July press releases contained statements that were not exempt under the Reform Act's safe-harbor provisions, these statements are not material. While the Ninth Circuit has held that a revenue estimate that was missed by approximately 10% was immaterial, other courts have indicated the numbers are but one factor. *Compare, In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 514 (9th Cir.1991) (holding sales predictions were not actionable, in part, because the company missed those projections by only 10%); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746 (N.D.Cal.1997), *aff'd*, 183 F.3d 970 (9th Cir.1999) with *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829-30 (8th Cir.2003) (revenue overstatement by eight percent over two year period in violation of generally accepted accounting principles alleged material misrepresentation).

Thus, there does not appear to be a bright-line 10% rule, where a projection missed by less than ten percent is immaterial as a matter of law. Furthermore, while the low end of EBITDA's forecast was less than ten percent, the high-end was greater than ten percent and the FCF forecasts were missed by 25-35 percent. As the Court has found the Complaint fails to allege actionable misrepresentations, it is unnecessary to address as a matter of law whether these projections were material.

### 5. Remaining Statements Fail to show Falsity

The Amended Complaint appears to allege because

various confidential witnesses saw numerous consultants and Allied Waste was spending millions on the consultants the April 27, 2004 statement "3 million had been spent on the 'best practices' initiatives roll-out" was false. Am. Compl. at ¶ 93 There is simply no allegation in the Amended Complaint demonstrating how Plaintiffs knew this statement was false, and if it was false, Defendants knew it to be false when made. Accordingly, Plaintiffs fail to allege an actionable material misrepresentation. *See, e.g., In re Pac. Gateway Exch. Inc., Sec. Litig.,* 169 F.Supp.2d 1160, 1166-67 (N.D.Cal.2001).

### B. Scienter

The complaint must also state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind with respect to each act or omission alleged to violate securities law. 15 U.S.C. § 78u-4(b)(2). The required state of mind is deliberate recklessness. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 977 (9th Cir.1999). However, if the alleged material false statement or omission is a "forward-looking statement," the required level of scienter is actual knowledge. 15 U.S.C. § 78u-5(c)(1)(B).

*12 Furthermore, the Reform Act modifies the traditional standard 12(b)(6)-taking all allegations of material fact as true and in the light most favorable to the nonmoving party. *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002). Instead, the Ninth Circuit has held, "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Id.*

Plaintiffs maintain statements of nine confidential witnesses support a strong inference of scienter because the Amended Complaint numbers each witness, describes each witnesses' title and responsibilities and each witness corroborates each others statements. However, merely citing a confidential witness' title and responsibilities without sufficiently pleading the basis of the witness' knowledge is insufficient. *In re Daou Sys. Inc. Sec. Litig.,* 397 F.3d 704, 712 (9th Cir.2005) (commenting "[n]aming sources is unnecessary so long as the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains 'adequate corroborating details.'")

In *In re Commtouch Software Ltd. Sec. Litig.,* Fed. Sec. L. Rep. (CCH) ¶ 91985, 2002 WL 31417998 (N.D.Cal.2002) Plaintiffs alleged several announcements of Commtouch's financial results were falsely inflated because Commtouch intentionally booked revenue that was never reasonably assured of receipt and engineered some sham transactions. *Id.* at *9. The Court had previously dismissed the first amended complaint, in part, because the plaintiffs had failed to plead confidential witnesses' basis of knowledge. *Id.* at *10. At issue was whether the plaintiffs had sufficiently plead falsity and scienter with particularity. While noting that many of the confidential witness statements still lacked specificity, the Court concluded the second amended complaint included better-detailed confidential witness allegations sufficient to give rise to a strong inference of scienter. The Court reasoned the complaint alleged confidential witnesses: were directly involved in booking contracts, allegedly heard Defendants direct employees to book revenue as soon as a contract was signed, customers were billed after services were rendered, and several confidential witnesses had commissions deducted from their own paychecks due to customer nonpayment. The Court concluded these allegations supported a strong inference that Commtouch was reporting revenue as soon as a contract was signed and deliberately booking revenue in a premature manner. *Id.* at 11.

As noted above, the Amended Complaint fails to cite a single interaction, directive, or conversation, between a confidential witness and a Defendant. Moreover, it fails to explain the basis for which the confidential witnesses attribute statements, beliefs, or knowledge to Defendants. For instance, CW1 indicates Mr. Quinn informed her to "get rid of documents," yet the amended complaint fails to provide a basis for attributing this statement to a named Defendant. While CW1 describes a process where Mr. Quinn gave forecasts to Mr. Hathaway and Mr. Gray, the Amended Complaint fails to explain the interrelation in departments or Mr. Quinn's role.

*13 Similarly, the fact that the confidential witnesses agree management was concerned with numbers and there was insufficient budgeting for the fleet, does not give rise to a strong inference of scienter and instead speaks to the confidential witnesses' disagreement with management's decisions. CW2, an Assistant Controller, indicated that the impression

was "do not spend any money," which required CW2 to tell facilities to make budget cuts, that EBITDA was overestimated, and Messrs. Van Weelden, Slager and Hathaway *knew* this because they "lived and died by the numbers." Am. Compl. ¶¶ 60-63. It is unclear to the Court how CW2 had knowledge of the accuracy of EBITDA forecasts; it begs the question how CW2 knew senior management's impressions.

Although the Amended Complaint provides statements of numerous confidential witnesses who worked on forecasts and budgets, the allegations fail to give rise to a strong inference of scienter. CW3 was an Assistant Controller from 2000 to 2003. CW3 "attributed to Slager" a memorandum containing 50-60 budget cuts, including directing employees to stop washing the trucks. *Id.* at ¶ 64. "CW3 believes that Defendants, including Hathaway and Van Weelden, knowingly announced exaggerated projections to the public." *Id.* at ¶ 67. CW4 was a Staff Accountant throughout the Class Period and was responsible for submitting figures and budgets to senior executives who "did not care" about the numbers and "did what they wanted to." *Id.* at ¶ 68.

The remaining confidential witnesses were employees in non-budgeting positions and generally allege mismanagement and the predictability of Allied Waste's financial problems. CW5, an employee in Human Resources alleges mismanagement, Allied Waste was having financial problems, people walked off their jobs, and Allied Waste was fined for violating EEOC regulations. *Id.* at ¶¶ 70,71. CW6, a regional Human Resources Manager, was not surprised to hear Allied Waste would not meets it 2004 forecasts and believed this to be due to Allied Waste's failure to maintain its trucks. *Id.* at ¶ 72. CW7, a Dispatcher, knew Allied Waste was having serious financial problems starting in October 2003, because the truck were in disrepair, employee turnover was high, and employees had not received a raise in two years. *Id.* at ¶ 73. CW8, a Lead Programmer Analyst, found the companies financial problems obvious. *Id.* at ¶ 75. CW9, a Group Manager of Sales and Marketing, indicated "[n]obody wanted us to spend any money." *Id.* at ¶ 76.

Thus, while the confidential witnesses were in accord regarding Allied Waste's budget cuts, there is no consensus related to falsifying EBITDA and FCF projections. As noted above, those statements related to the numbers being falsely inflated, fail to plead actionable misrepresentations. After reviewing each allegation and reasonable inferences therefrom, Plaintiffs failed to plead sufficient facts showing any Defendant's actual knowledge that any statement was false or misleading when made.

*14 The sole remaining allegation, Defendants sought to falsely inflate EBITDA and FCF so as to obtain favorable debt financing, is insufficient to give a strong inference of scienter. *Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1039 (9th Cir.2002)* (concluding "PathoGenesis' alleged desires to obtain favorable financing and to expand abroad are in themselves ordinary and appropriate corporate objectives. Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud. To hold otherwise would be to support a finding of fraudulent intent for all companies that plan to lower costs and expand sales.")

FN5. Plaintiffs have withdrawn allegations regarding insider trading. Resp p. 28 n. 34.

Finally, the individual defendants increased their stock holdings during the class period, which gives rise to an inference of good faith conduct, instead of the requisite scienter. The individual defendants here collectively increased their stock holdings by 31 percent during the class period, resulting in a loss of 3 million dollars. Dkt. # 25. Ex.O-R. Those are not actions demonstrating an intent to commit fraud, and instead gives rise to an inference of good faith. *See In re Allergan Inc. Sec. Litig.*, No. SACV 89-643AHS, 1993 WL 623321, *23 (C.D. Cal. Nov 29, 1993) (unpublished opinion) (concluding fact defendants made significant investments during class period in the stock plaintiffs allege defendants were scheming to inflate rendered plaintiff's claims implausible).

C. Conclusion

Plaintiffs have failed to plead fraud with particularity. Furthermore, Plaintiffs have failed to demonstrate any statements are actionable: many statements are forward-looking statements entitled to safe-harbor exemption; other statements are non-actionable puffery. Finally, the Amended Complaint is devoid of allegations of scienter because confidential witnesses' statements regarding what Defendants "knew" are conclusory and desires to obtain favorable financing does not give rise to a strong inference of scienter.

Fed. R. Civ. Pro. 15 provides that leave to amend complaints "shall be freely granted." As a general rule, it is an abuse of discretion for the district court

Slip Copy
Slip Copy, 2005 WL 3501414 (D.Ariz.), Fed. Sec. L. Rep. P 93,706
**(Cite as: Slip Copy)**

Page 11

to dismiss the plaintiff's complaint without first affording opportunity for amendment to state a claim for which relief can be granted. Absent unusual circumstances, "[d]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Polich v. Burlington Northern, Inc.,* 942 F.2d 1467, 1472 (9th Cir.1991). While some circuits have concluded the Reform Act has modified Rule 15's leave to amend with extreme liberality, the Ninth Circuit has held "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003).

Given the fact Plaintiffs have had an opportunity to amend their complaint, this litigation was commenced over a year ago, and the Amended Complaint fails to provide any basis whatsoever to infer the requisite scienter, the Court finds dismissal with prejudice is warranted. The Court has reviewed the basic facts as alleged and finds amendment would be futile due to the lack of any evidence giving rise to a strong inference of scienter and facts of increased stock holding demonstrating good faith conduct of the Defendants. See *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038-39 (9th Cir.2002) (affirming dismissal with prejudice where district court analyzed basic facts alleged and concluded any amendment would be futile).

*15 Accordingly,

IT IS HEREBY ORDERED Defendants' Motion to Dismiss is GRANTED. (Dkt.# 26). The Complaint is dismissed WITH PREJUDICE.

IT IS FURTHER ORDERED Defendants' Motion to Strike Plaintiffs' Unauthorized Supplemental Briefing is GRANTED. (Dkt.# 52).

IT IS FURTHER ORDERED directing the Clerk of Court to enter judgment accordingly.

D.Ariz.,2005.
Zack v. Allied Waste Industries, Inc.
Slip Copy, 2005 WL 3501414 (D.Ariz.), Fed. Sec. L. Rep. P 93,706

Briefs and Other Related Documents (Back to top)

• 2:04CV02058 (Docket) (Sep. 30, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.