ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: THE GOODYEAR TIRE & RUBBER COMPANY SECURITIES LITIGATION. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **LEAD CASE NO. 5:03CV2166** 1:03CV2294; 1:03CV2344; 5:03CV2168; 5:03CV2176; 5:03CV2188; 5:03CV2192; 5:03CV2203; 5:03CV2210; 5:03CV2227; 5:03CV2233; 5:03CV2285; 5:03CV2286; 5:03CV2287; 5:03CV2297; 5:03CV2298; 5:03CV2299; 5:03CV2443; 5:03CV2447; 5:03CV2592 <u>Judge John R. Adams</u> MEMORANDUM OPINION & ORDER [Resolving Doc. 82] |

## I.  Introduction

This is an action for securities fraud brought on behalf of shareholders of The Goodyear Tire & Rubber Company against Defendants The Goodyear Tire & Rubber Company, Samir G. Gibara, Robert J. Keegan, Robert W. Tieken, Richard J. Kramer, and Stephanie W. Bergeron (collectively referred to as "Defendants").  The action was filed as a class action, excluding from the class Defendants, directors and officers of Goodyear, their families and affiliates.[1]

Plaintiffs base their claims on violations of Section 10(b) of the Securities and Exchange Act of 1934, Section 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, which was promulgated thereunder.  In essence, Plaintiffs claim that Defendants made a series of allegedly

---

[1] The first class action complaint in this case was filed on October 23, 2003.  Later, the Court consolidated other related cases under the above-captioned action.  *See* ECF Doc. 20 for the Court's consolidation Order.

false statements regarding the financial health of The Goodyear Tire & Rubber Company and that those statements materially misled the investing public.

Defendants have filed a motion seeking the dismissal of Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint"), which presents the Court with the following issues: (1) whether the Amended Complaint fails to plead fraud with particularity and fails to properly plead a strong inference of scienter; (2) whether the Amended Complaint fails to adequately plead loss causation; and (3) whether the Amended Complaint sufficiently alleges damages on behalf of all putative class members.

The parties have extensively briefed the matter and the Court has reviewed the pleadings, motion, opposition and reply thereto.  And for the reasons that follow, the Court grants Defendants' motion because Plaintiffs have failed to plead scienter as required by both the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule 9(b).  Alternatively, Defendants do not plead fraud with the particularity required by the PSLRA and Rule 9(b).  Dismissal of Plaintiffs' claims, therefore, is warranted.  Furthermore, without any primary liability, Plaintiffs cannot state a claim under Section 20(a) for control person liability.  Having found the pleading insufficient for the above-stated reasons, the Court need not reach the remainder of the issues presented in Defendants' motion.

## II.  Factual Background

For purposes of its consideration of Defendants' motion, the Court must assume the truth of the following facts, which were drawn from the Amended Complaint.

### A.     The Parties

Capital Invest die Kapitalanlagegsellschaft der Bank Austria Creditanstalt Gruppe GmgH

is the lead plaintiff in this action.[2]  It is a fund management company located in Vienna, Austria, that has approximately $20 billion in assets under management.  Capital Invest purchased shares of Goodyear common stock on the New York Stock Exchange during the period of time relevant to this action.  It represents the class of plaintiffs injured by Defendants' allegedly fraudulent activity (Capital Invest and the class itself are collectively referred to as "Plaintiffs").

Defendant The Goodyear Tire & Rubber Company is an Ohio corporation.  Its principal place of business is in Akron, Ohio.  Goodyear manufactures and markets tires, belts, hoses, and other engineered rubber products for the transportation industry and for the consumer market. Gibara, Keegan, Tieken, Kramer, and Bergeron (the "Individual Defendants") all served in various executive capacities during the relevant time frame.  Gibara served as Goodyear's Chief Executive Officer and President from January 1996 through December 2002.  He also served as Chairman of the Board of Directors of Goodyear ("the Board") from July 1996 through July 2003. Keegan succeeded Gibara as Chairman of the Board in July 2003 and succeeded him as Chief Executive Officer in January 2003.  Tieken served as Goodyear's Chief Financial Officer and Executive Vice President from May 1994 throughout the relevant time frame.  Kramer served as Goodyear's Vice President of Corporate Finance from February 2000 through June 2004 and has since replaced Tieken as Chief Financial Officer and Executive Vice President.  Bergeron served in the capacity of Senior Vice President of Corporate Financial Operations and Treasurer from February 2002 through August 2002.

---

[2] *See* ECF Doc. 60 for the Court's Order granting Capital Invest's Motion for Appointment of Lead Plaintiff.

### B.     Substantive Allegations

According to Plaintiffs, Goodyear faced significant problems with its business operations and financial condition prior to and throughout April 2001 and October 2003 (the "Class Period").  Plaintiffs claim that Goodyear was a "cash-strapped and debt-choked" company that was close to defaulting on billions of dollars of debt and being forced into bankruptcy. (Compl. ¶ 2).

Goodyear's mounting debt was discussed in a series of press releases, which became the subject of industry commentary.  For instance, on June 29, 2000, a Goodyear press release received news coverage when the company lowered its earnings guidance for the second quarter of fiscal 2000.  Goodyear attributed this to an increasingly competitive environment coupled with increases in raw material and energy costs.  Gibara stated that although the books had not closed for the month, it was clear that Goodyear would not be able to overcome the volume shortfall resulting from the previous months' increases.  (Compl. ¶¶ 33 - 34).  The next day, a J.P. Morgan research analyst commented on Goodyear's downward earnings guidance.  According to the analyst, Goodyear's "problems [were] deeper and more intractable than earlier believed . . . ."  The analyst also stated that J.P. Morgan was lowering its earnings per share ("EPS") considerably. (Compl. ¶ 35).

On September 21, 2000, Goodyear announced that it had revised its earnings guidance downward for the second half of fiscal 2000.  It again cited escalating costs, along with the deterioration of the euro, weak pricing conditions in markets around the world, and lower than expected tire industry volumes in North America and Europe.  Goodyear estimated that its net income in the third quarter 2000 would either break even or produce a loss.  It estimated the same

4

for the fourth quarter 2000.  (Compl. ¶ 36).  Again, J.P. Morgan issued a research report

highlighting the severity of Goodyear's problems.  The analyst noted that the company's earnings

and cash flow outlook was poor.  Other industry commentators echoed this concern.  (Compl. ¶¶

37-38).

On February 14, 2001, Goodyear issued another press release that reported a loss of $16.5

million for the fourth quarter 2000.  Gibara commented that Goodyear's results for both the fourth

quarter and the full year were disappointing.  (Compl. ¶ 39).  The next day, the *Wall Street*

*Journal* publicly commented that Goodyear was hurt badly in its last quarter "by a severe

downturn in business from auto makers as well as other factors that have dogged the company for

some time, including high oil prices and the weakness of the euro . . . ."  (Compl. ¶ 40).

As a result of these losses, Plaintiffs allege that Goodyear's debt began to grow.   They

claim that Goodyear's fixed charges exceeded its earnings by almost $216 million in 2001 – in

contrast to previous years when Goodyear's earnings covered its fixed charges.  (Compl. ¶ 41).

According to Plaintiffs, Goodyear's mounting debt impacted certain covenants on its bank credit

facilities that required it to: (1) maintain a minimum consolidated net worth; (2) maintain a

minimum interest coverage ratio; and, (3) remain within a total debt ceiling.  (Compl. ¶ 42).

Plaintiffs claim that as 2001 progressed, it became clear that Goodyear was likely to violate the

interest coverage covenant.  At some point in time, Goodyear amended certain bank credit facility

agreements and other agreements with banks to modify the interest coverage ratio and

consolidated net worth covenants to reflect its current operating conditions.  Goodyear filed these

changes in a report with the Securities Exchange Commission ("SEC").  (Compl. ¶ 43).  Then, in

an effort to avoid an impending bankruptcy, Defendants allegedly engaged in widespread

accounting fraud by overriding its accounting systems to manufacture false profits. Their goal, according to Plaintiffs, was to inflate earnings and understate losses in an attempt to create the illusion that Goodyear was a healthy company. (Compl. ¶¶2, 47).

**1.      Defendants' False Statements**

Plaintiffs claim that Goodyear either knowingly or recklessly made materially false and misleading statements, or omitted material information relating to its financial results and compliance with Generally Accepted Accounting Principles ("GAAP"). The false statements, on which Plaintiffs base their claims, relate to ten press releases (and in some instances a conference call with industry analysts) that Goodyear issued regarding its quarterly and year-end financial results during the Class Period and the formal SEC reports that were filed thereafter. Each of the SEC reports was also signed by one or more of the Individual Defendants and contained a statement that certified the accuracy of the report.

• **The First Report:**

On April 24, 2001, Goodyear issued a press release announcing its financial results for the first quarter 2001. The press release noted an improved performance over the previous quarter, but admitted a net loss of $46.7 million. The release also stated that Goodyear's Chemical Products Division reported an operating income of $16.4 million and that its Engineered Products Division reported an operating income of $9.5 million. (Compl. ¶108).

On May 15, 2001, Goodyear filed its quarterly report with the SEC ("2001 First Quarter 10-Q"). Kramer signed the form, which confirmed and reiterated the financial results announced in the April 24th press release. (Compl. ¶ 109).

6

- **The Second Report:**

On July 23, 2001, Goodyear issued a press release for the second quarter 2001, which reported a net income of $7.8 million, an operating income of $12.9 million from its Chemical Products Division, and an $8.4 million operating income in the Engineered Products division. Gibara commented on Goodyear's "improved results" and stated that he expected this "positive momentum" to continue.  (Compl. ¶ 112).

On August 1, 2001, Goodyear filed its quarterly report with the SEC ("2001 Second Quarter 10-Q").  Kramer also signed this form, which confirmed and reiterated the results in the July 23, 2001 press release.  (Compl. ¶ 113).

- **The Third Report:**

On October 25, 2001, Goodyear issued a press release announcing its results for the third quarter 2001, which reported a net income of $9.3 million.  The release reported operating losses in the Engineered Products Division of $1.2 million and losses in the Chemical Products Division of $16.4 million.  (Compl. ¶ 117).

On November 14, 2001, Goodyear filed its quarterly report with the SEC ("2001 Third Quarter 10-Q").  Again, Kramer signed the form.  The 2001 Third Quarter 10-Q reiterated the results stated in the October 25, 2001 press release.  (Compl. ¶ 118).

- **The Fourth Report:**

On February 8, 2002, Goodyear issued a press release reporting its financial results for the fourth quarter 2001. It reported a net loss of $174 million for the fourth quarter and a net loss of $203.6 million for the year.  The Chemical Products Division reported an operating income of $14.5 million for the fourth quarter and $60.2 million for the 2001 year.  The Engineered

7

Products Division reported operating losses of $5.1 million for the fourth quarter and an operating income of $11.6 million for the year. (Compl. ¶ 121). That same day, Goodyear conducted a conference call with Wall Street analysts to discuss its fourth quarter and year end results. Gibara, Keegan and Tieken participated in the call and reiterated Goodyear's reported net loss for the period of $174 million. (Compl. ¶ 122).

On March 11, 2002, Goodyear filed its annual report for 2001 on a Form 10-K ("2001 10-K"). Defendants Gibara, Tieken, and Kramer signed the report, which reaffirmed the previously announced financial results for 2001 as they were reported in the February 8th press release. (Compl. ¶ 124).

- **The Fifth Report:**

On April 24, 2002, Goodyear issued a press release for the first quarter 2002. The release reported a net loss of $63.2 million for the first quarter 2002. (Compl. ¶ 126). That same day, Goodyear conducted a conference call with Wall Street analysts to discuss its first quarter 2002 results and reiterated the financial results announced in the press release. Gibara, Keegan, and Bergeron participated in the call and Gibara confirmed that Goodyear had net losses for the first quarter 2002 of $63.2 million. (Compl. ¶ 126).

On May 2, 2002, Goodyear filed its quarterly report for the first quarter 2002 ("2002 First Quarter 10-Q"). Kramer signed the form. It reaffirmed the previously announced results. (Compl. ¶ 127).

- **The Sixth Report:**

On July 23, 2002, Goodyear issued a press release announcing its financial results for the second quarter 2002. The press release reported net income of $28.9 million for the second

quarter 2002.  Gibara commented that Goodyear's earnings more than tripled and that it was Goodyear's best earnings performance since the second quarter 2000.  (Compl. ¶ 129).  That same day, Goodyear conducted a conference call with Wall Street analysts and confirmed the financial results for the second quarter 2002.  Gibara, Keegan, Tieken and Bergeron participated in the call and Gibara stated that the net income was $29 million.  (Compl. ¶ 129).

On August 6, 2002, Goodyear filed is quarterly report for the second quarter 2002 ("2002 Second Quarter 10-Q").  Tieken signed the form. Gibara and Tieken also certified that the information presented, in all material respects, represented Goodyear's financial condition and results of operations.  (Compl. ¶ 130).

- **The Seventh Report:**

 On October 30, 2002, Goodyear issued a press release reporting its financial results for the third quarter 2002.  It reported its net income as $33.7 million.  (Compl. ¶ 132).  That same day, Goodyear held a conference call with analysts and reiterated its previously announced third quarter results.  Gibara, Keegan, Bergeron, and Tieken participated in the call, and Gibara stated that the reported net income for the third quarter 2002 was $33.7 million.  (Compl. ¶ 134).

It also filed its quarterly report with the SEC ("2002 Third Quarter 10-Q").  The form confirmed the results set forth in the press release. Gibara and Tieken also certified that the financial statements were fairly presented in all material respects and that the report did not contain any untrue statements of material fact or omit to state a material fact necessary to make a statement not misleading.  (Compl. ¶ 133).

- **The Eighth Report:**

On April 3, 2003, Goodyear issued a press release and reported its financial results for

the fourth quarter, as well as for the year ended December 31, 2002.  The release reported a net

loss of $1.1 billion.  (Compl. ¶ 136).  That day, Goodyear also filed its annual report for 2002

with the SEC ("2002 10-K").  Gibara, Keegan, Tieken, and Bergeron signed the form.  It

confirmed and reiterated the previously announced financial results for the fourth quarter and full-

year ended 2002.  It stated that Goodyear reported liabilities totaling $136.7 million for

anticipated costs relating to workers' compensation liability; and reported a net loss of $1.1

billion primarily resulting from a non-cash charge of $1.08 billion to establish a valuation

allowance against Goodyear's deferred tax assets. (Compl. ¶ 137).

Keegan and Tieken certified under oath that the annual report did not contain any

untrue statements of material fact or omit to state a material fact necessary to make the statements

not misleading and that all information was accurate.  (Compl. ¶ 138).   Also that day, Keegan,

Tieken, and Bergeron participated in a conference call with analysts and reiterated Goodyear's

financial results including its loss of $1.1 billion.  Tieken also discussed a reduction in

shareholder equity of $651 million as a result of an increase in pension liability and a net loss of

$1.1 billion. (Compl. ¶ 139).

- **The Ninth Report:**

On April 30, 2003, Goodyear issued a press release reporting its financial results for

the first quarter 2003.  It reported a net loss of $163.3 million for the first quarter.  The press

release reported an operating income for the Engineered Products Division for the first quarter

2003 as $10.8 million.  Keegan stated that Goodyear remained pleased with the strength of its

international tire business, its Engineered Products Division, and its chemical units.  (Compl. ¶

141).

10

That same day, Goodyear filed its quarterly report for the first quarter 2003 with the SEC ("First Quarter 2003 10-Q"). Bergeron signed the form. It reaffirmed the previously announced financial results. Keegan and Tieken certified under oath that the financial statements were fairly presented in all material respects. (Compl. ¶ 142). The First Quarter 2003 10-Q stated that Goodyear had recorded liabilities totaling $141.1 million for anticipated costs related to workers' compensation. (Compl. ¶ 143).

- **The Tenth Report:**

On July 30, 2003, Goodyear issued a press release reporting its financial results for the second quarter 2003. It reported a net loss of $73.6 million and an operating income of $23.7 million for the Chemical Products Division. (Compl. ¶ 145). That same day, Goodyear filed its quarterly report with the SEC ("2003 Second Quarter 10-Q"). Bergeron signed the form. It reaffirmed the previously announced financial results. Keegan and Tieken certified under oath that the financial statements were fairly presented in all material respects. (Compl. ¶ 146).

### 2. Pre-Restatement Press Releases

Plaintiffs assert that Goodyear's improper earnings management began to unravel on October 22, 2003 when Goodyear announced that it would restate its earnings for the time period of 1998 through 2002 and for the first two quarters of 2003. Goodyear stated that it expected to decrease its net income by up to $100 million and reported a reduction in shareholders' equity of up to $120 million. (Compl. ¶¶ 3, 84). Immediately following the news of the intended restatement, shares of Goodyear stock fell more than 10%. When the stock market closed the following day, shares were down even further. (Compl. ¶ 85).

On November 19, 2003, Goodyear issued a press release in which it reported its third

11

quarter 2003 financial results and provided more details about its upcoming restatement. It predicted that its prior-period net income would be reduced by $84.7 million. (Compl. ¶ 86). In this same press release, Goodyear stated that its second quarter 2003 net income would be reduced by $31.3 million. (Compl. ¶ 87).

During this time, the SEC began an informal investigation into the facts and circumstances regarding Goodyear's upcoming restatement. Shortly thereafter, the informal investigation was upgraded to a formal investigation. (Compl. ¶¶ 9, 88, 90).

From December 2003 through March 2004, Goodyear issued more press releases. In these releases, Goodyear announced that it was conducting its own internal investigations regarding the improper accounting issues in its European divisions. It also announced that it had fired several senior managers and reprimanded other personnel regarding the improper accounting issues. (Compl. ¶¶ 89, 91).

On April 12, 2004, Goodyear announced that it had concluded its overseas investigation and expected its reduction in net income to total approximately $10 million. It stated that this would primarily impact its European Union business. Goodyear also announced that even more accounting violations might be included in its restatement to the amount of $65 million. (Compl. ¶ 92).

### 3. The Restatement

On May 19, 2004, Goodyear restated its earnings (hereinafter "the Restatement") as part of its 2003 annual report filed with the SEC on a Form 10-K ("2003 10-K"). It provided the details regarding the Restatement and, according to Plaintiffs, admitted that its financial results during the Class Period included materially false and misleading statements. In the Restatement,

Goodyear announced that it had identified accounting irregularities related to its earnings management. Specifically, accounts were improperly adjusted between periods and expenses improperly deferred.  (Compl. ¶ 94).  As a result, Goodyear was forced to reduce its earnings per share and restate its shareholders' equity to reflect a loss.  (Compl. ¶ 97).

The Restatement contained numerous adjustments, including the following: (1) net income for the fiscal year ended December 31, 2001 was overstated by $50 million; (2) net income for the second quarter 2001 was overstated by $50.5 million; (3) net income for the second quarter 2002 was overstated by $4.2 million; (4) net income for the third quarter 2002 was overstated by $5.5 million; (5) net loss for the fourth quarter 2002 was understated by $115.7 million; (6) net loss for the year ended 2002 was understated by $121.2 million; and, (7) net loss for the first quarter 2003 was understated by $33.2 million.  (Compl. ¶ 110, 115, 125, 131, 135, 140, 143).  In total, Goodyear admitted that it had overstated its income by $280.8 million – $52.9 million prior to 2001, $50.5 million in 2001, $121.2 million in 2002, and $56.2 million in 2003.  (Compl. ¶¶ 4, 93).

**4.      Allegations of Accounting Improprieties**

According to Plaintiffs, Goodyear admitted to intentionally misstating its financial results throughout the Class Period when it issued the Restatement, which reduced its previously reported after-tax income by $280.8 million.  (Compl. ¶ 48).  Plaintiffs also allege that Goodyear admitted to the following: (1) intentionally engaging in fraud by overriding internal controls and failing to correct material weaknesses in those controls, which resulted in $65 million of the Restatement; (2) intentionally undervaluing Goodyear's exposure to workers' compensation claims, which resulted in $17.7 million of the Restatement; (3) intentionally holding down the

amount of claim reserves; (4) intentionally engaging in fraudulent accounting procedures for Goodyear's general and products liability; (5) intentionally understating expenses and net income by deliberately failing to record $11.6 million of additional costs in its financial statements, even though certain claims had been resolved; and (6) improperly adjusting accrual accounts between periods and improperly deferring accounts beyond the third quarter 2003, which resulted in the need for a $9.2 million write-off.  (Compl. ¶¶ 51, 53, 55, 56, 57, 59, 60).

> ### 5.   Goodyear's Explanation of the Restatement & Plaintiffs' Contrary Allegations

In the Restatement, Goodyear attributed a large portion of the accounting errors to its Enterprise Resource Planning system ("ERP").  (Compl. ¶ 61).  Specifically, Goodyear attributed the following amounts to the ERP's failures: (1) $13.1 million to the failure of the system to properly depreciate fixed assets and to remove from the fixed assets account the carrying value of disposed assets; (2) $25 million to the failure of the system to balance the accounts receivable control account in the general ledger with the subsidiary accounts receivable trial balance; and, (3) $15.2 million to system errors related to inventory and fixed assets at Wingfoot,[3] which resulted in an understatement of the cost of goods by $11 million. (Compl. ¶¶ 66, 70).  Goodyear also attributed $28.8 million to its Interplant System, which tracks the procurement and transfer of fixed assets, raw materials, and spare parts acquired or manufactured by Goodyear units in the United States for Goodyear's foreign manufacturing locations.  (Compl. ¶ 66).

Goodyear admitted that $7.7 million of the Restatement was required as a result of intentional manipulations at Goodyear's chemical products segment.  Specifically, Goodyear

---

[3] In 2003, Goodyear purchased Arkansas Best Corporation's 19% ownership interest in Wingfoot Commercial Tire Systems, LLC, a joint venture company formed by Goodyear and Arkansas Best Corporation to sell and service commercial truck tires, provide retread services, and conduct related business.

admitted that the adjustments were required because of improprieties concerning the timing of the recognition of manufacturing variances to reflect the actual cost of inventories, the fair-valued adjustment of a hedge for natural gas, and the correction of inter-company profit elimination in inventory to eliminate selling and administrative expenses in inventory. (Compl. ¶ 71).

On the contrary, Plaintiffs allege that the ERP is a sophisticated and highly reliable accounting and reporting system that is incapable of such errors, and that but for Defendants' override of the ERP system controls, and their failure to monitor the reports and other information, such errors would not have gone undetected. (Compl. ¶ 62). According to the allegations in the Amended Complaint, the ERP system would have quickly detected accounting errors of the magnitude listed in the Restatement and would have produced reports alerting Defendants of any errors. (Compl. ¶ 63). Plaintiffs claim that the chances of random errors in the ERP system were extremely minimal and that if they were truly random errors, as Goodyear claims, they would not have improved Goodyear's financial results. (Compl. ¶ 64).

Plaintiffs also allege that PricewaterhouseCoopers, LLP ("PwC"), Goodyear's independent auditor, considered Goodyear's management override material enough to characterize it as a "reportable condition," which under Generally Accepted Auditing Standards ("GAAS") represents a significant deficiency in the design or operation of Goodyear's internal controls that could adversely affect its ability to initiate, record, process, and report financial data consistent with its financial statements. (Compl. ¶ 58).

Plaintiffs allege that Defendants failed to monitor the reports and other information that the ERP system produced to alert Goodyear of the reporting problems. (Compl. ¶ 63). According to an unnamed former Goodyear Tire Plant Controller, Tieken knew that the system was reporting

15

errors, but directed that those errors remain uncorrected because correcting them would have reduced Goodyear's financial results.  (Compl. ¶ 65).

Plaintiffs contend that the "failures" described regarding the $28.8 million attributed to the Interplant System, the $13.1 million attributed to the ERP system, and the $21.3 million attributed to the failure of the ERP to account for transactions related to the Engineered Products Division were actually the result of intentional or highly reckless conduct because the failures "would have been obvious" and "should have been detected" by Goodyear employees and/or Defendants themselves.  Plaintiffs also claim that Goodyear's sophisticated system would not have recorded half of a transaction, i.e., it would not have billed a transfer without recording the other half.  And, that even if it did, the system would have reported the imbalance and required that the error be corrected.  (Compl. ¶ 67).

Plaintiffs also allege that Tieken discussed the seriousness of these imbalances at weekly meetings that involved Goodyear's senior financial officers.  Another unnamed former Goodyear employee, who worked as a finance director between 1996 and 2001, claims to have attended these meetings where Tieken allegedly discussed the financial reporting issues caused by the inter-company transactions and imbalances.  According to this employee, the participants at the meetings suspected that the inter-company imbalances overstated Goodyear's financial results.  (Compl. ¶ 68).

According to Plaintiffs, there  "simply is no credible explanation"  – with respect to the $25.5 million attributed to the ERP's failure to balance accounts receivable – as to why or how these errors went undetected for over four years.  Plaintiffs again allege that the safeguards built into the ERP system would have ensured that these errors were detected, and that only a manual

16

override bypassing system controls could have caused the condition to remain undetected for such a length of time. (Compl. ¶ 69).

With respect to the $15.2 million attributed to ERP system errors at Wingfoot, Plaintiffs again allege that there is no explanation for how the ERP system recorded the sale without properly relieving the inventory and charging the cost of goods sold. Plaintiffs claim that this is true with respect to the fixed asset losses. According to Plaintiffs, when the sale or disposition is recorded, the system – unless it is overridden – relieves the carrying value of the asset and recognizes any losses. (Compl. ¶ 70).

### 6. Goodyear's Pension Discount Rate

In the Restatement, Goodyear also announced that it was shaving fifty basis points from the discount rates it had used to calculate its current domestic pension fund costs for 2001-2003. Goodyear detailed the impact of the discount rate reduction and the increased pension plan expenses, which resulted from the reduction. It explained the financial statement impact of the retroactive reduction in the discount rate, including the tax consequences. (Compl. ¶ 72, 75).

According to Plaintiffs, Defendants knowingly and/or recklessly allowed these rates to be dramatically overstated in 2001, 2002, and 2003. This, Plaintiffs allege, caused Goodyear's originally reported pension liabilities, other comprehensive income ("OCI"), deferred tax assets, and valuation allowance all to be materially misstated. (Compl. ¶ 73). Plaintiffs claim that the lower the discount rate, the larger the size of the obligation to future retirees, and that by using an inflated discount rate, Goodyear materially understated its pension expenses and overstated its financial results. (Compl. ¶ 74).

They allege that Goodyear admitted that it had improperly inflated the original rates as

17

evidenced by the retroactive revision of the discount rates used for the prior three years. Moreover, Plaintiffs allege that a Goodyear spokesperson acknowledged this much when he stated that "when you do restate it's because the numbers aren't right."  Plaintiffs point to the fact that industry commentators noted that such restatements typically imply some sort of error or irregularity in past accounting.  (Compl. ¶ 76).

With respect to the original discount rates, Plaintiffs claim that they were extremely high compared to the discount rates used at other companies.  Plaintiffs reference articles by certain commentators who noted that other companies were using lower discount rates than Goodyear. According to Plaintiffs, one commentator in particular stated that Goodyear used an "uncommon" way of calculating the rate.  (Compl. ¶ 77).

Plaintiffs allege that Goodyear's restatement of its prior discount rates "appears to have been unprecedented." (Compl. ¶ 78).  They further allege that Defendants knew that a reduction in discount rates would have a substantial impact.  According to Plaintiffs, Goodyear knew that it was using unconventionally high discount rates and thereby putting its financial results and condition at risk during a presentation prepared in connection with its 2003 fourth quarter conference call.  (Compl ¶ 79).  Goodyear's reduction in discount rates resulted in an increase in liabilities (pension costs) of $160.9 million and a charge to OCI totaling $150.1 million for the years ended 2001 and 2002. (Compl. ¶ 80).

As part of the Restatement, Goodyear concluded that it was required to create a valuation allowance to reflect the reality that its deferred tax assets, which were created as a result of the discount rate restatement, would not be realized.  Goodyear disclosed in its 2003 10-K that it was going to maintain a valuation allowance until sufficient positive evidence existed to support a

18

realization of its deferred tax assets. The creation of a valuation allowance caused Goodyear to increase its income tax expense. (Compl. ¶ 82).

A further effect of the discount rate adjustments was to render income tax expenses understated by $122.5 million in 2002 and $3.5 million in 2002. It was overstated by $1.2 million prior to 2001. The discount rate adjustment accounted for $81.2 million of the of the $122.5 million understatement for 2002, and the balance of the net understatement of $43.6 million related to the correction of errors in the computation of Goodyear's deferred tax assets and liabilities. (Compl. ¶ 35).

**C.** **Scienter Allegations**

Plaintiffs claim that each of the Individual Defendants acted with scienter because they had actual knowledge that their statements were materially false and misleading. Alternatively, Plaintiffs claim that they acted with reckless disregard for the truth. According to Plaintiffs, the fact that the Individual Defendants acted with the intent to deceive is demonstrated by both circumstantial evidence and the fact that they had motive and opportunity to commit fraud. (Compl. ¶ 148). Specifically, Plaintiffs claim that scienter is evidenced because: (1) Defendants admitted that they deliberately managed earnings and intentionally overrode internal controls; (2) there were overwhelming weaknesses in Goodyear's internal controls; and, (3) Defendants failed to disclose the $31.3 million charge in the second quarter 2003 report.

**1.** **Admissions of Earnings Management and Intentional Overrides**

Goodyear admitted in the Restatement that the "accounting irregularities primarily related to earnings management whereby accrual accounts were improperly adjusted between periods or expenses were improperly deferred." Goodyear also admitted that PwC uncovered material

weaknesses resulting from "intentional overrides of internal controls by those in authority . . . ." According to Plaintiffs, these admissions evidence an intentional scheme to manipulate the financial results by those persons in authority at Goodyear.  (Compl. ¶ 149).

Plaintiffs also allege that certain statements of former Goodyear employees show that Defendants acted fraudulently or recklessly .  For instance, Plaintiff's point to the former financial analyst at Goodyear who said that dollar amounts in certain accrual accounts often became too high and were reversed in the Company's profit and loss statements as needed in order to meet quarterly earnings targets.  This employee stated that the reversals were deliberate and that the people doing the reversals were aware that their actions could violate GAAP.  This employee also stated that there was extreme pressure to meet quarterly earnings at all costs.  (Compl. ¶ 150). Another former Goodyear employee, who worked as a finance director, stated that the intentional overrides in the inter-company billing systems were widely known at Goodyear and that there were open discussions at Goodyear's headquarters in Akron about this.  The employee stated that Tieken held weekly meetings on this topic, at which seven to eight other Goodyear employees discussed these problems.  (Compl. ¶ 151).  A third individual formerly employed at Goodyear, who at one time worked as a plant controller, indicated that Tieken was aware that Goodyear's accounts receivable were overstated in 2000, and that Goodyear had problems with other balance sheets prior to June 2000.  This employee indicated that Tieken left them alone, however, because to fix them would have reduced Goodyear's reported financial results.  (Compl. ¶ 153).

Plaintiffs also allege that Defendants' attempt to blame the Restatement on the ERP system supports scienter.  According to Plaintiffs, Goodyear's claim disregards the fact that its ERP system is one of the most sophisticated and relied upon systems in the market and

Goodyear's own independent auditor did not fault the ERP system for these problems. (Compl.

¶ 153). They claim that the ERP would have generated reports and would have recorded any

imbalances obvious to those employees responsible for maintaining the accounts and that the

errors were openly discussed at meetings. Furthermore, Plaintiffs allege that there is

circumstantial evidence of scienter from the fact that each of the accounting violations caused an

overstatement in Goodyear's net income and not one violation caused an understatement of net

income. (Compl. ¶ 154).

**2.      Weaknesses in Goodyear's Internal Controls**

The Amended Complaint states that Goodyear's lack of proper internal controls gives rise

to a strong inference that Defendants knew or were reckless in not knowing that Goodyear's Class

Period financial results were materially false and misleading. (Compl. ¶ 155). Plaintiffs also cite

to the fact that PwC identified material weaknesses in Goodyear's internal controls as evidence of

scienter. (Compl. ¶¶ 156, 157). Plaintiffs claim that Goodyear's remedial measures, after the

fraud was revealed, further demonstrate the "complete absence" of internal controls because

Goodyear acknowledged the need to make certain changes.[4]

---

[4] Specifically, Goodyear stated that it needed to make the following changes: (1) restructure reporting
relationships so that the finance directors report directly to the Chief Financial Officer and the controllers report
directly to the Corporate Controller; (2) change Goodyear's compensation structures for business unit finance
directors so that compensation is not directly tied to financial performance of the business unit; (3) increase
staffing with respect to its finance and internal audit functions; (4) increase management oversight by creating a
disclosure committee; (5) streamline the organization of the European Business Unit to eliminate a level of
management and financial reporting; (6) conduct enhanced training on the certification process whereby senior
finance management explain each matter to be certified; (7) commission a review of a significant portion of open
workers' compensation claims, including certification by an outside administrator that such claims had been
properly valued; (8) revise procedures with respect to opening bank accounts to ensure appropriate oversight by
the Treasury Department; (9) expand the personnel, resources, and responsibilities of the internal audit function;
(10) increase finance staff and upgrade the technical capabilities of individuals within the finance function
through improved and formalized training; (11) develop new and enhanced monitoring controls; (12) simplify the
financial processes and information technology systems; (13) create a "Remediation Project Management Office"
responsible for the design and implementation of Goodyear's long-term remediation plan; (14) establish a
communications program to improve inter-department and cross-functional communications; (15) maintain

### 3.    Failure to Disclose $31.3 Million Charge in Second Quarter 2003 Report

Plaintiffs allege that Keegan and Tieken either knew, or were reckless in not knowing, that the 2003 Second Quarter 10-Q omitted that Goodyear had recorded a $31.3 million charge to its net income.  The report stated that Goodyear had recorded a net loss of $73.6 million for the quarter, but it did not reveal that $31.3 million of the loss resulted from an adjustment to reconcile imbalances in Goodyear's general ledger accounts.  (Compl. ¶¶ 160, 161).  Goodyear did not disclose this amount, despite having had the opportunity to do so, until November 19, 2003 when it provided more detail regarding the impending Restatement.  (Compl. ¶ 162).  Plaintiffs allege that Keegan and Tieken's failure to disclose this amount evidences their intent to deceive investors and to disguise the existence of the fraud.  (Compl. ¶ 163).

### 4.    Motive and Opportunity

Plaintiffs further allege that Defendants also had motive and opportunity to artificially inflate Goodyear's stock price to finance its underfunded pension obligations and avoid detrimental financial consequences with respect to its satisfaction of debt obligations.  (Compl. ¶ 164).  According to Plaintiffs, Goodyear issued a certain amount of shares of its common stock to its Common Trust for the Collective Investment of Plan Funds on September 10, 2001 and then issued an additional amount of shares to its Directed Retirement Trust on September 12, 2002. Goodyear issued these shares as a contribution to the assets of these pension plans.  (Compl. ¶ 165).  Plaintiffs allege Defendants' accounting improprieties artificially inflated this stock, and, as a result, Defendants were able to issue fewer shares to satisfy Goodyear's pension fund

---

awareness of the financial statement certification process and finance issues in general, and encourage associates to raise issues for review and/or resolution; and (16) review all accounting policies and procedures, making modifications where appropriate.  (Compl. ¶¶ 158, 159).

commitments. (Compl. ¶ 166). Lastly, Plaintiffs allege that Goodyear's increasing debt and employee benefit obligations, coupled with its poor earnings, provided motive for fraud because Goodyear was close to losing its credit facilities and defaulting on its loan covenants. (Compl. ¶¶ 167, 168).

Plaintiffs also allege that the Individual Defendants Gibara, Keegan, and Tieken, by virtue of their high-level positions with Goodyear, participation and/or awareness of Goodyear's operations, and/or intimate knowledge of Goodyear's performance – had (and exercised) the power to influence and control the decision-making at Goodyear either directly or indirectly. Moreover, Plaintiffs allege that these Defendants were provided with or had unlimited access to copies of Goodyear's press releases and public filings, and had the ability to either prevent the dissemination of such statements or correct them. (Compl. ¶ 170).

Additionally, Plaintiffs claim that these Defendants had direct involvement in Goodyear's day-to-day operations, and are therefore presumed to have had the power to control or influence the transactions at issue. (Compl. ¶ 171). The Amended Complaint alleges that these Defendants did not possess reasonable grounds for the belief that the statements contained in the SEC filings, press releases, etc. were true and devoid of any misstatements or omissions of material fact. Therefore, according to Plaintiffs, each of the Individual Defendants are liable by virtue of their position of control within Goodyear. (Compl. ¶ 172). The Complaint alleges that Gibara, Keegan, and Tieken were all "control persons" at Goodyear. (Compl. ¶¶ 173 - 176).

### III. Applicable Pleading Standards

**A.**     **Rule 12(b)(6)**

In applying the typical Rule 12(b)(6) motion to dismiss, the Court "must construe the

complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)). If an allegation is capable of more than one inference, the Court must construe it in the plaintiff's favor. *Id.* The Court may not grant a Rule 12(b)(6) motion merely because it may not believe a plaintiff's factual allegations. *Id.* Although this is a liberal standard of review, the plaintiff still must do more than merely assert bare legal conclusions. *Id.* To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's complaint must allege either "direct or inferential" allegations regarding all of the material elements necessary to sustain recovery under "some" viable legal theory. *Id.*

## B.       Pleading Securities Fraud

Because this is a securities action, however, the Court is required to apply a more vigorous standard of review. The Court must first view the allegations under Federal Rule 9(b)'s requirement that claims of fraud be plead with particularity. Fed. R. Civ. P. 9(b). Specifically, this rule states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* In order to satisfy this heightened requirement, a plaintiff must detail specifically the facts and circumstances it claims constitute the defendant's fraudulent conduct. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) (quotation omitted). In other words, the plaintiff must "allege the time, place, and content of the alleged misrepresentation," the fraudulent intent of the defendants and the resulting injury. *Id.* (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)).

24

Generalized and conclusory allegations that the defendant's conduct was fraudulent do not satisfy Rule 9(b). *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (quotations omitted).

Notwithstanding Rule 9(b)'s mandate that fraud must be plead with particularity, the Court must also apply the strictures of the PSLRA, which requires that a plaintiff state with particularity all facts supporting an allegation made on information and belief, as well as all facts establishing scienter. Section 78u-4(b) states, in relevant part:

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant - -

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b) (1)-(2).

Thus, Plaintiffs must set forth specific facts not only in support of allegations of falsity and fraud, but also to support allegations of the requisite state of mind. In other words, Plaintiffs must plead *facts* giving rise to a strong inference of scienter – complaints containing conclusory allegations are properly dismissed. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 565 (6th Cir. 2001). This does not change the fact that the Court is still required to draw inferences in favor of the plaintiff; however, the Court is required to accept plaintiff's inferences of scienter only if those inferences are the most plausible of competing inferences. *Id.* at 553.

### IV. Discussion

Section 10(b) of the Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Under Rule 10b-5, it is illegal for one "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5.

To establish a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege – in connection with the purchase or sale of securities – the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) justifiably relied on by the plaintiff; and (5) proximately causing their injury. *See e.g.*, *Helwig,* 251 F.3d at 554. Control person liability under Section 20(a) is contingent upon the plaintiff's ability to prove a primary violation under Section 10(b). *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004). Dismissal of

the control person claims is appropriate where the plaintiff does not establish the primary violation alleged. *Id.*

Here, Plaintiffs have failed to satisfy, as a matter of law, the first and second requirements. In other words, dismissal is appropriate because Plaintiffs have failed to (1) specify "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (2) they have failed to allege the "facts giving rise to a strong inference that [Defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2).

**A.     Plaintiffs Have Failed to Plead Scienter**

The Court will first address the scienter element of Plaintiffs' claims under Section 10(b) and Rule 10b-5 because scienter is the linchpin of those claims. In order to determine whether Plaintiffs have sufficiently alleged scienter, the Court must engage in a fact-intensive analysis based on the totality of the circumstances. *In re FirstEnergy Corp. Securities Litigation*, 316 F.Supp.2d 581, 597 (N.D. Ohio 2004). In securities fraud claims based on statements of present or historical fact, such as Plaintiffs' claims in this case, scienter can be established by knowledge or recklessness. *PR Diamonds, Inc.*, 364 F.3d at 681.[5]

As the Court previously indicated, Plaintiffs are not entitled to all inferences of scienter in their pleading. Rather, Plaintiffs' allegations of scienter will only survive Defendants' motion if those inferences are both reasonable and strong. *Helwig*, 251 F.3d at 551 (citation omitted). The Court must balance competing interests and credit to Plaintiffs their inferences only if it appears

---

[5] Plaintiffs do not allege forward-looking statements, to which the PSLRA applies a different scienter requirement pursuant to its "safe harbor" provision. *Id.* at 681 n. 3. "Forward-looking statements include projections and estimates of a company's future economic performance, including statements related to revenues, earnings per share, income, dividends, capital expenditures, capital structure, and other financial items." *Id.* (citing 15 U.S.C. § 78u-5(i)(1)).

from all the facts and circumstances that those are the most plausible. *PR Diamonds, Inc.*, 364

F.3d at 683-84. Moreover, it is not enough for Plaintiffs to show that Defendants were negligent

– there must be sufficient allegations of *knowing* or *reckless* conduct. *Id.* at 686-87.

In securities fraud cases, recklessness is defined as "highly unreasonable conduct which is

an extreme departure from the standards of ordinary care." *In re Comshare Inc. Sec. Litig.*, 183

F.3d 542, 550 (6th Cir. 1999) (quoting *Mansbach v. Prescott, Ball & Turben*, 592 F.2d 1017,

1025 (6th Cir. 1979)). Recklessness under the PSLRA is "a mental state apart from negligence

and akin to conscious disregard." *Id.* Moreover, "[w]hile the danger need not be known, it must

at least be so obvious that any reasonable man would have known of it." *Id.* (quoting *Mansbach*,

592 F.2d at 1025). Thus, the Court must determine whether Plaintiffs have alleged facts

sufficient to give rise to a strong inference that, when Defendants made the alleged

misrepresentations or materially misleading omissions, they did so with at least a conscious

disregard of the falsity of that information.

According to Defendants, Plaintiffs have failed to raise a strong inference of scienter.

Plaintiffs, however, assert that they have indeed set forth sufficient allegations to create a strong

inference of scienter. Specifically, Plaintiffs argue that the Amended Complaint shows a strong

inference of scienter because: (1) Goodyear was on notice of accounting irregularities prior to,

and during, the Class Period; (2) deliberate acts of fraud were specifically alleged; (3) Goodyear

used an improper discount rate for its future pension obligations; (4) Defendants had motive and

opportunity to commit fraud; (5) the Individual Defendants signed and certified the accuracy of

the financial statements, and knew or should have known of the accounting irregularities; (6) the

Individual Defendants are liable under the group pleading doctrine; and, (7) the Amended

28

Complaint meets at least six of the nine *Helwig* factors.

Although the Court will address each these allegations in turn, its ultimate conclusion is that Plaintiffs have failed to adequately plead scienter. In other words, Plaintiffs have failed to meet their burden of pleading specific facts, which, when viewed cumulatively, persuade the Court that the most plausible conclusion is that Defendants must or should have known about Goodyear's problems. "While the allegations no doubt merit drawing *some* inference of scienter, that it not enough. The PSLRA requires the [Amended] Complaint to establish a *strong* inference [of scienter]." *PR Diamonds*, 364 F.3d at 684 (emphasis in original). They must show that Defendants "acted at least recklessly, meaning that their states of mind were reflected in highly unreasonable conduct constituting an extreme departure from the standards of ordinary care so obvious that any reasonable person would have known of it." *Id.* The Amended Complaint fails in this respect.

### 1.        Admission of Accounting Irregularities and Earnings Management

The primary allegation of scienter found throughout the Amended Complaint is Plaintiffs' assertion that Goodyear admitted to accounting irregularities and earnings management in the Restatement, and that such admissions evidence scienter. According to Plaintiffs, "accounting irregularities" is the technical term for fraud when it is used in a restatement. In other words, Plaintiffs argue that when a company states that it has made "accounting irregularities" in a restatement, this denotes scienter. In support of this argument, Plaintiffs cite to *In re Baker Hughes Securities Litigation*, 136 F.Supp.2d 630, 649 (S.D. Texas 2001) (quoting *In re Paracelsus Corp. Securities Litigation*, 61 F.Supp.2d 591, 599 (S.D. Texas 1998)). However, while the term "accounting irregularities" generally denotes "intentional misstatements or

29

omissions" under the American Institute of Certified Public Accountant's Codification of

Statements on Accounting Standards § 316, the "[f]actual allegations that a company has *admitted*

to intentional misstatements . . . are sufficient to meet the heightened pleading standards of the

PSLRA *if* those admissions were made with regard to each of the false statements that the

complaint alleges were made with scienter." *In re Paracelsus Corp. Securities Litigation*, 61

F.Supp.2d at 599 (emphasis in original).

Here, Plaintiffs have not specifically pled the nexus between those "admissions" of

irregularities in the Restatement and the allegedly false statements in the Amended Complaint.

To explain, the Restatement makes admissions regarding accounting irregularities that were

discovered in December 2003 (and some later discovered irregularities).  Most of the

irregularities discussed in the Restatement pertain to accounting irregularities in Goodyear's

European Union Tire business segment.  The remainder of the irregularities mentioned in the

Restatement resulted from the following: (1) Goodyear's understatement of its workers'

compensation liability; (2) the valuation of real estate received in payment of trade accounts

receivable in Chile; and, (3) the improper deferral of manufacturing variances in 1998. (2003 10-

K at 70).  The Amended Complaint, however, does not plead the nexus between those

irregularities discussed in the Restatement and each of the allegedly false statements.

Furthermore, Goodyear's admission that the accounting irregularities were "primarily related to

earnings management" and due to "intentional overrides of internal controls by those in

authority" does not automatically require a finding of scienter.  In other words, the Court

disagrees with Plaintiffs that these are powerful admissions of complicity, intent, and deliberate

fraudulent activity.

30

Plaintiffs claim that the Restatement, by definition, is an admission that Goodyear committed intentional fraud.  Again, the Court disagrees.  Plaintiffs' assertion implies that there was fraud merely because there was a restatement.  This is simply not the case.  The need for a restatement, while it may demonstrate the falsity of a prior statement, does not automatically result in a finding of scienter.  It is self-evident that "the purpose of a restatement is to correct an error in a previously-issued financial statement.  By definition . . . a restatement says that the prior financial statement was false."  *In re FirstEnergy Corp. Securities Litigation*, 316 F.Supp.2d at 595 (discussing *Merzin v. Provident Financial Group, Inc.*, 311 F.Supp.2d 674, 679-81 (S.D. Ohio 2004)).  There is no disputing that Goodyear issued false statements – the issue this Court is called on to decide is whether the statements were fraudulent.

### 2.     Notice of Accounting Irregularities & Certification of Financial Statements

According to Plaintiffs, Goodyear was on notice of accounting irregularities prior to, and during the Class Period, which raises a strong inference of scienter.  Plaintiffs point to the fact that Goodyear admitted that it had discovered accounting irregularities in the second quarter 1999, but did not actually correct its financial statements until 2004.  This, Plaintiffs argue, belies Defendants' argument that they were unaware of any improprieties and that they undertook remedial measures and a full investigation as soon as they became aware that something was amiss.  In other words, Plaintiffs argue that Goodyear, by virtue of its 1999 discovery of the 1998 accounting irregularities, was put on notice that its financial reporting procedures were both prone to error and to intentional manipulation.

Plaintiffs' argument, however, is not well-taken.  First, Goodyear's discovery of accounting irregularities in 1999 cannot serve as notice of that which allegedly occurred during

the Class Period from April 2001 through October 2003.  As Defendants note, the discovery of

one accounting issue at a single manufacturing plant does not serve to put them on notice of

entirely unrelated and allegedly "fraudulent conduct" that occurred within Goodyear's entire

global financial reporting operation.  It is illogical for Plaintiffs to argue that Defendants, by

virtue of the 1999 discovery of an isolated accounting error, would be on notice of errors within

the ERP system that Goodyear did not even begin to implement until 1999, or of the need to

adjust its pension discount rates for the years 2001-2003 when those rates had not yet been

selected.  The Court agrees with Defendants that there is a total lack of similarity and temporal

proximity between that which Goodyear discovered in 1999 and that which was discovered and

set forth in the Restatement.  The Restatement sets forth a number of different accounting

adjustments in different segments of Goodyear's global business over a six-year period.  It is

difficult for this Court to find that Defendants' knowledge of one accounting issue that was

discovered *before* the Class Period indicates that there was fraud or recklessness with respect to

the entire Restatement.

Plaintiffs also make much out of the allegations that Defendants had knowledge that its

financial results were inflated.  Specifically, Plaintiffs point to the allegations in the Amended

Complaint regarding the 2003 Second Quarter 10-Q where Keegan and Tieken allegedly "knew

or were reckless" in not knowing that Goodyear had recorded a $31.3 million charge to its net

income, but did not reveal that the loss resulted from an adjustment to reconcile imbalances in

Goodyear's general ledger accounts.  According to Plaintiffs, scienter can be inferred because

Goodyear made no disclosure of this adjustment until November 2003 when it provided more

detail regarding the Restatement.  Once again, however, the Amended Complaint does not state

with particularity facts giving rise to a strong inference that Defendants acted with the required state of mind. *See generally* 15 U.S.C. § 78u-4(b)(2).

Contrary to Plaintiffs assertion, the instant matter is unlike *City of Monroe v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005), which arguably stands for the proposition that prior notice of improper conduct is evidence of a strong inference of scienter. In *City of Monroe*, the Sixth Circuit found that the defendants' specific knowledge that a certain model of tires caused accidents raised a strong inference of scienter in connection with the subsequent recall of those same tires. *Id.* at 687-88. Here, there are no allegations that Defendants had specific knowledge of conduct that occurred later. And the allegations of Defendants' prior knowledge of accounting improprieties was unrelated to those alleged improprieties that occurred later. Although Defendants may have been negligent, or even remiss, in not diligently attempting to prevent further accounting improprieties from occurring, such carelessness does not give rise to a strong inference of scienter. *See generally In re Comshare Inc. Sec. Litig.*, 183 F.3d at 550 (noting that recklessness is a mental state apart from negligence and akin to conscious disregard).

Plaintiffs also argue that the Individual Defendants' certification of financial statements is indicative of scienter. According to Plaintiffs, those Individual Defendants who signed the financial statements during the Class Period "were on notice and knew, or should have known" about the subsequent accounting irregularities and errors. In support of their argument, Plaintiffs cite *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474 (S.D.N.Y. 2004). In *Atlas*, the district court held that the "[k]nowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's

33

financial statements were false when issued." *Id.* at 490. The court's holding in *Atlas*, however, was premised on the fact that specific allegations were made to establish that the individual defendants ignored reasonably available data that the value of their planes was impaired before they reported the company's financial results. *Id.* at 491. The *Atlas* court noted that the defendants had a duty to familiarize themselves with the facts relevant to the company's core operations and held that they were "not entitled to make statements concerning the company's financial statements and *ignore reasonably available data* that would have indicated that those statements were materially false and misleading." *Id.* at 491 (emphasis added). Specifically, the *Atlas* court noted that the plaintiffs had made a number of allegations that were sufficient to demonstrate that the high-level company officers that were signatories to the SEC filings and financial statements either knew or should have known that their planes were losing substantial value. *Id.*

Here, however, there are no sufficient factual allegations that Defendants knew or should have known that Goodyear's financial statements were false when issued. Plaintiffs allegations regarding an irregularity discovered *before* the Class Period and speculation regarding error reports from the ERP system that "should have" or "would have" been produced do not suffice to establish scienter. Furthermore, Plaintiffs cannot impute such knowledge to the Individual Defendants merely because they certified the financial statements. Plaintiffs do not sufficiently allege that Defendants ignored any reasonably available data that would have indicated that Goodyear's financial reports were materially false and misleading.

**3.      Deliberate Acts of Fraud**

According to Defendants, Plaintiffs' attempt to plead scienter against Defendants Keegan,

34

Gibara, Kramer, and Bergeron must fail because the Amended Complaint merely asserts that they knew or should have known of the alleged fraud because of their positions within the company. Defendants also assert that the claims against Tieken must fail because the Amended Complaint is devoid of specific details necessary to create a strong inference of scienter.  The Court agrees with Defendants on each of these points, but will briefly address each in turn.

> **a.      Scienter Against Defendants Keegan, Gibara, Kramer & Bergeron**

It is well-established in the Sixth Circuit that fraudulent intent cannot be inferred merely from one's position in a company and alleged access to information.  *PR Diamonds, Inc.*, 364 F.3d at 687-88.  Rather, the complaint must allege specific facts or circumstances that suggest knowledge.  *Id.* at 688.  As Defendants aptly note, the Amended Complaint in this case is devoid of such allegations.  Instead of pleading specific facts that are suggestive of scienter, Plaintiffs attempt to imply scienter by alleging that Keegan, Gibara, Kramer, and Bergeron: (1) signed company reports; (2) certified the accuracy and truthfulness of these reports; (3) participated in conference calls with research analysts on Goodyear's financial performance; and, (4) commented about Goodyear's financial performance to the press.  Nowhere in the Amended Complaint, however, are there specific allegations with respect to each of these Defendants.

> **b.      Scienter Against Defendant Tieken**

Plaintiffs argue that the Amended Complaint does adequately plead scienter against Defendant Tieken.  This, according to Plaintiffs, is because of the allegations from the independent sources that Tieken knew about the accounting irregularities.  Specifically, Plaintiffs point to the following:  (1) a former Goodyear Tire Plaint Controller's allegations that Tieken knew of accounting errors, but deliberately directed that those errors remain uncorrected;

(2) Tieken's alleged awareness and refusal to correct the account receivables that were overstated in 2000; (3) a former Goodyear finance director's allegations that there were intentional overrides in the inter-company billing systems that were widely known at Goodyear and allegations that there were open discussions about these issues; (4) the weekly meetings at which Tieken allegedly discussed these problems with others in Goodyear's finance departments; and, (5) a former Goodyear financial analyst's allegations that accrual accounts were deliberately manipulated to meet earnings targets and that there was extreme pressure to meet quarterly earnings at all costs.

As Defendants note, however, these allegations are insufficient under the PSLRA and fail to raise a strong inference of scienter.  First, the allegations from the former Goodyear Tire Plant controller fail to specify any detail regarding the "reporting errors," such as when the errors occurred, what type of errors occurred, and who Tieken deliberately directed to not correct the errors.  Furthermore, the allegations fail to specify when Tieken became aware of the purported overstatement of accounts in 2000 and fails to specify what "other" problems Goodyear had with its balance sheet accounts prior to June 2000.

Similarly lacking in specificity are the allegations from the former finance director because they fail to say when the alleged "weekly meetings" occurred and whether any wrongdoing was discussed.  As Defendants point out, all the Amended Complaint does is allege that Tieken held weekly meetings with others in the finance department to discuss problems with the inter-company billing systems.  The fact that Tieken held weekly meetings with others in the finance department to discuss problems with the inter-company billing system is not suggestive of scienter.  And mere allegations that these intentional overrides were "widely known" does not

cure this deficiency.

The allegations made by the former plant controller are also lacking in specificity.  The Amended Complaint neither makes reference to when Tieken allegedly became aware that Goodyear's accounts receivable were overstated in 2000 nor mentions when he became aware that Goodyear had problems with other balance sheet accounts prior to June 2000.  It also does not say what "other balance sheet" accounts with which Goodyear had problems.  In other words, Plaintiffs' allegations regarding former Goodyear employees may state the "who," but fail sufficiently to allege the "what/where/when/how" details.  *Cf. In re: Keithley Instruments, Inc. Sec. Litig.*, 268 F.Supp.2d 887, 899 (N.D. Ohio 2002).

### c.    Fraudulent Manipulation of the ERP System

Plaintiffs also argue that scienter can be inferred because of the allegations in the Amended Complaint that the ERP system was fraudulently manipulated to inflate earnings.  According to Plaintiffs, their investigation revealed that the ERP system's errors were not the result of innocent errors and mistakes, but were the result of the deliberate manipulation of financial results by those in authority.  Plaintiffs claim that the ERP system, which was manufactured by one of the leading software technology companies in the world, was one of the most sophisticated and reliable accounting reporting systems available.  Thus, as Plaintiffs argue, the system was not capable of such errors.  They claim that but for the deliberate override of the system and Defendants' failure to monitor the reports and other information, such errors would not have gone undetected.  Plaintiffs also claim that the ERP system would have quickly detected any accounting errors and produced reports to alert Defendants of them.  Furthermore, they claim that the chances of random errors were extremely minimal.

It is well-established, however, that "[c]laims of securities fraud cannot rest on speculation and conclusory allegations." *PR Diamonds, Inc.*, 364 F.3d at 692 (citation omitted). Here, Plaintiffs do no more than speculate that the system "would have" quickly detected accounting errors and alerted Defendants of any errors. There are no allegations (notwithstanding the vague allegations regarding Tieken that were discussed above) that the system actually did produce such reports and Defendants ignored them. It is not enough for Plaintiffs to merely argue that the system "would have" produced reports and that Defendants "should have" noticed the errors. The Amended Complaint simply does not plead specific factual allegations regarding the alleged reports. *Id.* at 686-87 (noting that *specific* factual allegations that a defendant ignored red flags may support a strong inference of scienter).

### 4.        Improper Discount Rate

Plaintiffs next argue that Defendants' reduction in the discount rate associated with Goodyear's deferred pension costs raises a strong inference of scienter. According to Plaintiffs, the reason why the reduction raises a strong inference of scienter is because Goodyear was forced to restate the discount rate, as opposed to merely reducing it going forward and because this was not the result of an error. Plaintiffs claim that by restating, Goodyear conceded that the discount rate it used was unreasonable at the time it was used. Furthermore, Plaintiffs claim that the discount rate used was wrong and that it should have never been used in the first place. The issue, as Plaintiffs frame it, is whether in using incorrect discount rates, Goodyear was reckless. Plaintiffs claim that accounting principles and securities laws require Goodyear to have made reasonable assumptions based on the information available to it at the time. They also claim that Goodyear's discount rate, which was significantly higher than those used by "nearly" every other

Fortune 500 company, was "unsupportable."

Defendants argue, among other things, that Goodyear's decision to restate its pension rate is not evidence of scienter because there is no well-pled allegation in the Amended Complaint that Defendants knew that the pension discount rates Goodyear was using should be changed until after the Class Period. According to Defendants, Goodyear made the decision to restate its pension rate when it reassessed its discount rates in preparation for the filing of its 2003 10-K. It is not enough, they argue, for Plaintiffs merely to say that Defendants were reckless in their selection of a discount rate because of their later decision to restate.

The Court agrees with Defendants. While the use of a high discount rate may be cause for suspicion, this alone does not lead to the inference of scienter. To explain, there are no well-plead allegations that Defendants knew that the pension rates Goodyear was using were too high until later. The only allegation relating to Defendants' knowledge was Goodyear's admission that it was using unconventionally high discount rates during a May 19, 2004 conference call, which occurred *after* the Class Period. In fact, the Amended Complaint is devoid of any particularized allegations that Defendants used an unconventionally high discount rate for the purpose of manipulating their financial results. It is not enough for Plaintiffs to allege merely that other companies used a lower rate and that Goodyear's rate was higher because they were engaging in fraud. Again, such logic amounts to nothing more than mere speculation and conjecture.

### 5.    Motive and Opportunity

Plaintiffs also argue that they have adequately plead scienter because of the allegations that Defendants had both motive to commit securities fraud and ample opportunity to do so. Defendants do not appear to challenge the "opportunity" prong, nor likely could they because all

39

of the Defendants are current or former officers and/or directors of Goodyear. Instead, Defendants argue that the motives alleged by Plaintiffs – that Goodyear was in danger of defaulting on loan agreements and that the compensation of its business units finance directors was directly tied to the financial performance of those units – are insufficient to give rise to a strong inference of scienter.

While facts showing motive and opportunity may be relevant to establishing the inference of scienter, *Helwig*, 251 F.3d at 550, a plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). Here, Plaintiffs' allegations – that Defendants must have committed fraud because they were likely to breach certain loan agreements and because the compensation of certain business unit finance directors were tied to the financial performance of those units – are conclusory. Again, no *specific* facts have been plead in the Amended Complaint to show that Defendants were motivated to commit fraud based on the fear of defaulting on certain loan covenants and credit agreements. *See In re Corrpro*, No. 1:02CV1198, 2003 WL 23138459 at *6 (May 27, 2003 N.D. Ohio) (citation omitted) ("Allegations of scienter should not be based on generalized theories or motives which are widely held by corporations and executives."). Furthermore, no *specific* facts have been plead in the Amended Complaint regarding the compensation of the finance directors that are sufficient to sustain a finding of scienter.

The fact that Goodyear was suffering financially during the period prior to the Class Period does not evidence fraud, just as the fact that Goodyear was operating at a loss does not automatically result in the conclusion that Defendants committed fraud to avoid bankruptcy. This is especially true considering that the Amended Complaint does not allege specific facts that

40

Goodyear "was dangerously close to defaulting on billions of dollars of debt" and that it was close to "being forced into bankruptcy." (Compl. ¶ 2). There are also no specific facts to show that Goodyear "was under extreme pressure to comply with its loan covenants." (Compl. ¶ 47). Moreover, the fact that Goodyear amended certain (unidentified) bank credit facility agreements is certainly not indicative of motive to commit fraud. If anything, the fact that Goodyear took steps to amend certain bank credit facility agreements to modify the interest coverage ratio, consolidated net worth covenants, and other provisions to reflect current operating conditions shows that the company was (1) aware of its financial condition, (2) not hiding it, and (3) taking steps to remedy the situation. Plaintiffs' allegations that Goodyear was "coming dangerously close to violating the interest coverage covenant" on its credit lines and that "loss of access to those credit facilities could have precipitated a liquidity crises" does not lend itself to the conclusion that Defendants "had a strong motive to manufacture additional profits through improper accounting machinations to avoid being shut out of the credit markets and suffering the severe consequences of a default" on its loan covenants. (Compl. ¶ 168). As previously stated, Plaintiffs' allegations amount to nothing more than mere speculation and conjecture.

Similarly, Plaintiffs' assertion that Defendants possessed the requisite motive because compensation was tied to the performance of certain business units is equally lacking in factual particularity. The section of the Amended Complaint to which Plaintiffs cite states only that Goodyear acknowledged the need to "change [its] compensation structures for business unit finance directors so that compensation is no longer directly tied to financial performance of the business unit." (Compl. ¶ 158). Notwithstanding that this allegation is not particularized to any of the Defendants and is devoid of a factual predicate, it does not suffice to allege that Defendants

possessed self-interested motivation in saving their salaries or jobs.  In fact, even if the Amended

Complaint sufficiently alleged that Defendants possessed such self-interested motivation, this is

only one factor relevant to determining scienter.  *Helwig*, 251 F.3d at 552 (citation omitted).  The

Court does note that motive allegations regarding the possibility of default on bank credit

agreements and loan facilities can be suggestive of scienter.  *See generally PR Diamonds, Inc.*,

364 F.3d at 690.   In this case, however, the allegations are vague and not particularized.

Furthermore, to the extent that Defendants were motivated by a desire to increase the overall

worth of Goodyear, such allegations would merely set forth "motives possessed by virtually all

corporate insiders" and are insufficient to demonstrate a particularized motive to commit fraud.

*Novak*, 216 F.3d at 307.

### 6.      *Helwig* Factors

In *Helwig*, the Sixth Circuit provided guidance as to how much scienter is enough and

what allegations satisfy the requirement of a "strong inference."[6] According to Defendants, the

Complaint is devoid of allegations regarding a vast majority of the *Helwig* factors, and the

absence of these factors militates in favor of dismissing the Complaint.  Plaintiffs, on the other

hand, argue that at least six of the nine *Helwig* factors are present in the Amended Complaint.

The Court disagrees with Plaintiffs that six of the nine factors are present.  And while the Court

---

[6] These factors are as follows: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission, and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) the existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) the disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and, (9) the self-interested motivation of the defendants in the form of saving their salaries or jobs.  *Helwig*, 251 F.3d at 552 (citation omitted).

recognizes that the *Helwig* factors are non-exhaustive, *Fidel v. Farley*, 392 F.3d 220, 233 (6th Cir. 2004), the absence of these factors indicates the absence of scienter.  Nevertheless, despite the Court's agreement with Defendants that these factors are not present, it will examine each of the factors in turn.

### a.    Second Factor – divergence between internal reports and external statements on the same subject:

Plaintiffs argue that they meet the second factor because there was a divergence between internal reports and external statements on the same subject.  According to Plaintiffs, this is "clearly established" by Goodyear's admission that it intentionally misstated its financial statements through accounting irregularities.  Plaintiffs also point to what they deem the specific allegations in the Amended Complaint from the former employee who claims that Tieken was the one who overrode the internal controls by directing senior finance officers to leave the errors uncorrected in order to inflate earnings.

Plaintiffs' allegations on the second factor, however, are conclusory and fail to specifically allege where there was a divergence between internal reports and external reports on the same subject.  Plaintiffs merely allege that there "were" reports, or that the ERP system "should have" produced reports and other documents, but the Amended Complaint never indicates any particular reports or documents to which these allegations refer.  Accordingly, Plaintiffs' allegations showing a supposed material divergence between Goodyear's unidentified internal reports and external statements do not satisfy the PSLRA's pleading requirements because the allegations are not specific.  *See PR Diamonds, Inc.*, 364 F.3d at 692 (finding "no *specific* allegations of a divergence between internal reports and external statements on the same subject.") (emphasis added); *but see City of Monroe*, 399 F.3d at 684 (finding that the plaintiffs

43

did make a showing on the second *Helwig* factor because there were several specific allegations that defendant had data concerning defective tires and then made unqualified positive comments on that data).

> **b.**     **Third Factor – closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information:**

Plaintiffs argue that there is also closeness in time of an allegedly fraudulent statement or omission and a later disclosure of inconsistent information because Goodyear filed its second quarter 2003 10-Q with the SEC in July 2003 without reporting that $31.3 million of its reported loss was a result of unreconciled accounts, announced its decision to restate its earnings in October 2003, and then admitted in November 2003 that the $31.3 million of the losses reported in July 2003 was due to unreconciled accounts.  Notwithstanding that this was the last statement in a series of allegedly fraudulent statements that began in 2002, this particular statement occurred approximately four months prior to the later disclosure of inconsistent information, and four months is "too distant in time to draw an adverse inference."  *City of Monroe,* 399 F.3d at 687-88 (finding disclosure of inconsistent information made four months after the allegedly fraudulent statement too distant to be probative of scienter). *See also PR Diamonds, Inc.*, 364 F.3d at 692-93 (finding "little temporal proximity" between statements made over the course of a twenty month class period and the inconsistent information disclosed thereafter).

> **c.**     **Fifth Factor – the existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit:**

Plaintiffs concede that there is no existence of an ancillary lawsuit charging fraud; however, they claim that this factor is present in substance – if not form – because Goodyear was allegedly on notice that there were accounting irregularities in 1999.  In support of this

44

proposition, Plaintiffs cite the Sixth Circuit in *City of Monroe*.  In that case, the court noted that the underlying principle of the fifth factor is whether the company at issue is on notice or aware of the improper nature of the practice being alleged, or at least of the perception of a given problem. *City of Monroe*, 399 F.3d at 685.  However, there are major differences between the facts of *City of Monroe* and the facts of this case.  Thus, Plaintiffs' reliance on *City of Monroe* is misplaced.

In *City of Monroe*, the Sixth Circuit analyzed the fifth *Helwig* factor and noted that there was not "strictly speaking, such evidence [in that case] because the claims in question were not based on fraud per se." *Id.*  The court found, however, that there was the presence of *closely related evidence* that carried some weight.  *Id.*  Namely, the court looked at the fact that the Defendant had entered into multiple settlement agreements in response to product liability suits that were filed, secretly settled claims for insurance in exchange for lack of disclosure by the insurance agency, and used a secrecy agreement with a foreign government to avoid having to disclose certain information regarding its tires.  *Id.*  It noted that, although the settlement agreements were premised on tort claims against the Defendant, they were closely parallel to the fraud claims because the gravamen of both claims was that the tires were not safe and that the Defendant should be held accountable for that fact.  It also noted that the evidence of the Defendant's secret settlements "gets at the same notion" as the fifth *Helwig* factor because "[t]he apparent animating idea is that a company engaging in such practices is, all things being equal, more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of a given problem, which puts it on notice and . . . generates a duty to inquire." *Id.*

There is no such comparison that can be made in this case.  Notwithstanding the complete

45

factual dissimilarity between *City of Monroe* and this case, Plaintiffs' argument is illogical. Goodyear's discovery of the apparent accounting irregularities in 1999 has no bearing on those allegations that occurred during the Class Period of April 2001 through October 2003. *City of Monroe* stands for the proposition of notice and duty to inquire.  Goodyear's discovery of accounting improprieties in 1999 could not have put them on notice of events that, according to the allegations in the Amended Complaint, had not yet occurred.

> **d.      Sixth Factor – disregard of the most current factual information before making statements**:

Plaintiffs argue that they meet the sixth factor because Goodyear disregarded, or at least seemingly disregarded, the most current factual information before making statements to the public.  According to Plaintiffs, the accounting irregularities themselves represent a deliberate disregard of the most current factual information through the alleged falsification of the reported information.  As Defendants aptly note, however, the Amended Complaint is devoid of particular allegations regarding what specific factual information Defendants disregarded.  Thus, Plaintiffs have not shown that this factor is satisfied because their allegations fail to set forth specific facts concerning how or when Defendants became aware of the alleged accounting improprieties.  *See PR Diamonds, Inc.*, 364 F.3d at 693 (finding that the sixth *Helwig* factor was not present because the plaintiffs' allegations lacked specific facts such as when the defendants became aware of the accounting improprieties).

> **e.      Seventh Factor – the disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication**:

According to Plaintiffs, the seventh *Helwig* factor is also present because the disclosure of the discount rate alluded to the underlying assumptions and the importance of those assumptions

to the discount rate, but failed to disclose them so that investors could evaluate their reasonableness.  Plaintiffs argue that the Restatement establishes that the assumptions were not reasonable and that only sophisticated investors could have surmised that the discount rates were too high.  Aside from the fact that the Amended Complaint itself contains no allegations that Goodyear disclosed accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication, Plaintiffs provide this Court with nothing – aside from their bare assertions – that only investors with a high degree of sophistication could have known that the 8.00% rate was too high.  Moreover, Plaintiffs point to nothing to show that the rate itself was improper.  In fact, the Amended Complaint quotes a *Wall Street Journal* article that admits that seven other companies had used rates higher than the discount rate Goodyear used.

According to Plaintiffs, Goodyear's discount rate was "grossly" and "dramatically" inflated for years and the rate was "extremely high when compared to the discount rates used at other companies. . . ." (Compl. ¶¶ 73, 74, 77).  The Court agrees with Defendants, however, that there are no allegations in the Amended Complaint that Defendants were trying to hide the discount rate from the public.  The rates were disclosed in percentage form and investors could have looked to the rates used by other companies to draw a comparison to the rates used by Goodyear.  Therefore, it is hard to argue that Goodyear was engaging in sophisticated accounting manipulations designed to hide information from investors.  The fact that Goodyear restated its discount rate and that such a restatement was allegedly "unprecedented" is not itself evidence of scienter.

47

f.      **Ninth Factor – the self-interested motivation of the defendants in the form of saving their salaries or jobs**:

As previously discussed, the Amended Complaint does not allege facts sufficient to support a showing that any of the Defendants were motived to commit fraud in order to save their salaries or jobs.

7.      **Fraud by Hindsight**

The Amended Complaint pleads generally, and without the specific averments required by the PSLRA, that Defendants had knowledge of the misrepresentations and/or acted with reckless disregard for the truth of the statements.  However, Plaintiffs have plead little or no facts to show that Defendants knew the statements were false at the time they were made and that Defendants acted with reckless disregard for the truth of each of the false statements.  What Plaintiffs attempt to do is to plead "fraud by hindsight," a technique that has been flatly rejected by Sixth Circuit. *See e.g. Fidel*, 392 F.3d at 231 (noting that the Court may not engage in "speculation and hindsight" because to do so is counter to the PSLRA's mandates).

In hindsight, it is clear that the statements on which Plaintiffs rely were not true, but the Court's duty is to determine whether the pleadings sufficiently allege scienter.  In other words, the Court must determine that Defendants knew that the statements were false when they were made or that they were made recklessly with a conscious disregard for the truth.  For the reasons previously discussed, the Court does not find that Plaintiffs have sustained their burden under the PSLRA to show a strong inference of scienter.  Arguably, the facts are such that there may be *some* inference of scienter, but the Court does not find this inference to be *strong* enough to sustain a securities fraud action.  *Helwig*, 251 F.3d at 551 (noting that inferences of scienter only survive a motion to dismiss if they are both reasonable and strong).

48

It appears as if Plaintiffs base their claim on the magnitude of the errors and specific dollar amounts in the Restatement. However, the amount of the Restatement cannot be considered because the Sixth Circuit has explicitly declined to follow those courts that have held that this can support an inference of knowledge or recklessness. *Fidel*, 392 F.3d at 231. According to the Sixth Circuit, allowing the inference of fraud from the magnitude of accounting errors would eviscerate the principle that accounting errors alone cannot support a finding of scienter. *Id.* (quotation omitted). Furthermore, to infer scienter from the magnitude of the errors would require hindsight, speculation, and conjecture. *Id.* (citation omitted).

Lastly, the Court declines to infer fraud from the mere fact that Goodyear recognized errors and made a number of remedial changes following the Restatement. The most plausible of competing inferences, as opposed to Plaintiffs' theory of divergent and wide ranging fraud, is that Defendants acted diligently in remedying problems as soon as they became aware of their existence. If the Court were to allow Plaintiffs to plead scienter on the fact that Goodyear recognized the need for remedial measures, it would give companies a disincentive to make public disclosures regarding their problems. *See Fadem Trust v. American Elec. Power Co., Inc.*, 334 F.Supp.2d 985, 1014 (S.D. Ohio 2004) (finding the most plausible of competing inferences was that the defendants acted diligently in remedying a problem when they became aware of it and to hold otherwise would give companies a disincentive to make disclosures of employee malfeasance).

## B. False Statements

According to Defendants, the Amended Complaint fails to plead fraud with the particularity required by both Federal Rule 9(b) and the PSLRA. Defendants deem Plaintiffs'

49

allegations of wrongdoing as based purely on conjecture and speculation, and therefore, insufficient to state a claim.  In other words, Defendants argue that Plaintiffs' allegations are insufficient because they fail to provide the necessary information regarding Defendants' knowledge that the statements were false prior to making the public disclosures.  Plaintiffs argue that the fact that the Restatement does not identify the individuals is irrelevant because those that did carry out the fraud bound the company.  Plaintiffs also argue that the Amended Complaint does specifically implicate Tieken as knowing that Goodyear's financial reporting was wrong and that he deliberately directed that those errors remain uncorrected in order to inflate Goodyear's financial results.

Despite Plaintiffs' arguments to the contrary, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."  15 U.S.C. § 78u-4(b)(1).  While the Amended Complaint does specify each statement that was allegedly misleading, it falls short of describing the reason or reasons *why* each statement was misleading.  To explain, the Amended Complaint repeatedly refers to a list of alleged improprieties that may or may not have anything to do with the statements. For example, each allegedly false series of statements refers back to section of the Amended Complaint that contains a laundry list of allegations purporting to pertain to each separate statement.  It is Plaintiffs' burden to plead fraud on a statement-by-statement basis, and they may not evade that requirement by requiring the Court to try to match the allegedly fraudulent statements to the allegations of wrongdoing that are scattered throughout the seventy-plus page Amended Complaint.

## V.  Conclusion

Plaintiffs have failed to plead fraud and scienter with the particularity required by both Rule 9(b) and the PSLRA.  The Court, therefore, DISMISSES Plaintiffs' claims under Section 10(b) and Rule 10b-5 against Goodyear and the Individual Defendants.  In addition, Plaintiffs' two-sentence request for leave to amend their Amended Complaint, which was made in the conclusion paragraph of their opposition, is DENIED for the reasons set forth in *PR Diamonds, Inc. v. Chandler*, 364 F.3d at 698-700 (noting that the plaintiffs, who failed to file a proper motion for leave to amend, were not entitled to an advisory opinion of the complaint and then an opportunity to cure the deficiencies).


IT IS SO ORDERED.

__March 22, 2006_____     __/s/ John R. Adams_____
Date     John R. Adams
    U.S. District Judge