UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE SONUS NETWORKS, INC.       )
SECURITIES LITIGATION            )
                                 )        CIVIL ACTION NO.
                                 )        04-10294-DPW
_____  )


MEMORANDUM AND ORDER
May 10, 2006

Lead Plaintiff BPI Global Asset Management LLP ("Plaintiff") brings this consolidated action[1] on behalf of a putative class comprising itself and all others similarly situated during the Class Period,[2] alleging that Sonus Networks, Inc. ("Sonus" or "the Company"), Sonus's Chief Executive Officer ("CEO") Hassan M. Ahmed, and the Company's former Chief Financial Officer ("CFO") Stephen J. Nill knowingly or recklessly disseminated a series of materially false and misleading financial statements. Plaintiff's claims arise out of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Sections 11, 12(a)(2), and 15 of the

_____

[1] By order dated June 28, 2004, I consolidated 20 cases under the lead case 04-10294 and, on August 10, 2004, I appointed BPI Global as Lead Plaintiff.

[2] The Class Period runs from March 28, 2002, the date Sonus filed its Form 10-K for the Year Ending December 31, 2001, through March 26, 2004 inclusive.  (Compl. ¶ 25).

Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. Defendants move to dismiss the consolidated action in its entirety. For the reasons set forth below, I grant the motion to dismiss as to the Section 12(a)(2) claims against all of the Defendants; I grant the motion to dismiss as to the Sections 10(b) and 11 claims against Defendants Nill and Ahmed; I deny the motion to dismiss as to the Sections 10(b) and 11 claims against Defendant Sonus; and I deny the motion to dismiss as to the Sections 20(a) and 15 claims against Defendants Nill and Ahmed.

## I. Background

### A. The Defendants

Sonus, a Delaware corporation with its principal place of business in Massachusetts, "is a leading provider of packet voice infrastructure solutions for wireline and wireless service providers." (Compl. ¶ 15.)[3] The individual Defendants, Mr. Ahmed and Mr. Nill, were the CEO and the CFO, respectively, of Sonus during the Class Period.

Mr. Ahmed assumed the position of CEO of Sonus in November 1998, a position he still holds. He also served as President of the company from November 1998 until April 2004, when he became Chairman of the Board. Mr. Ahmed owned nearly 9 million shares

_____

[3] All citations to the Complaint refer to the First Amended Consolidated Class Action Complaint filed on August 5, 2004.

of Sonus stock as of May 31, 2004 and was granted 640,000
"Securities Underlying Options/SARs" in 2001 and an additional
2,000,000 in 2003. (Compl. ¶ 16.)

In addition to serving as the CFO during the relevant times,
Mr. Nill also served as the Vice President of Finance and
Administration and Treasurer. After Sonus announced publicly
that there had been improper accounting of its revenue, Mr. Nill
was transferred to the position of Vice President of Operations
and later resigned at Sonus's request. (Compl. ¶ 17.)

**B. Allegedly Fraudulent Accounting**

In May 2000, Sonus conducted an initial public offering of
its shares in the NASDAQ capital market, raising $115 million.
(Compl. ¶ 34.) Although Sonus's business "was characterized by
'lumpy' ordering patterns and high customer concentration," the
Complaint alleges that the Company's finance and accounting
personnel improperly reported revenue "to make it appear as
though the Company's revenue model was capable of delivering
steady, reliable revenue growth." (Compl. ¶ 36.) Plaintiff
alleges that Sonus instituted this scheme to create the illusion
of predictable sequential growth, thereby providing confidence to
analysts and investors at a time when the Company's senior
management intended to issue Sonus shares in follow-on offerings
to raise needed capital. (Compl. ¶¶ 37-39.)

On April 21, 2003, Sonus did in fact file a Prospectus

Supplement relating to the offering of 200,000,000 shares of its common stock. (Compl. ¶¶ 72-73.)  And on September 23, 2003, Sonus filed another Prospectus Supplement, this time relating to the offering of 17,000,000 shares of its common stock. (Compl. ¶ 74.)

The appearance of "linearity" was purportedly accomplished not by recognizing sales that had not occurred, but rather through the improper timing of revenue recognition.  According to the Complaint, the "senior accounting and financial staff" of Sonus, "with the knowledge and approval of the Company's senior management," unbundled previously bundled hardware and software components and reported revenue software elements that had not yet been delivered, 'smoothing' out reported revenues, a practice violating GAAP and Statement of Position ("SOP") 97-2 in particular. (Compl. ¶¶ 40, 41.) The Complaint alleges that these practices were "known, and/or recklessly condoned, by the Individual Defendants." (Compl. ¶ 42.)

The Complaint alleges particular instances of revenue manipulation by Nill working in concert with Sonus's former controller, Peter Hemme, which I consider in detail later.  As for Ahmed, the Complaint alleges that "defendant Ahmed was made aware of these improper practices in 2001, specifically with regard to the Qwest contract, but took no action to stop them." (Compl. ¶ 46.) Consequently, the Complaint avers, Ahmed "approved of the plan to 'smooth out' Sonus's reported revenues because he

-4-

was the person within the Company who had primary responsibility

for interfacing with Wall Street analysts, and he was intent on

making analysts believe that the Company's revenues were, for the

most part, linear between reporting periods."  (Compl. ¶ 49.)

**C. Accounting Restatements**

On February 11, 2004, Sonus issued a press release,

informing the public that it:

> and its independent auditors have identified
> certain issues, practices and actions of
> certain employees relating to both the timing
> of revenue recognized from certain customer
> transactions and to certain other financial
> statement accounts, which may affect the
> Company's 2003 financial statements and
> possibly financial statements for prior
> periods . . . .  Revenue or deferred revenue
> in periods previously reported could
> increase, decrease or remain unchanged in
> those periods as a result of this
> reassessment.

(Compl. ¶ 53.)[4]  On June 29, 2004, the Company announced that the

Securities and Exchange Commission ("SEC") had sent it a formal

order of private investigation. (Compl. ¶ 53.) Then, on July 19,

---

[4] The ellipsis replaces the following text, which can be
found at ¶ 80 of the Amended Complaint:
The revenue issues identified relate to the proper
timing of recognizing revenue from certain
customer transactions, and not whether the sales
can be recorded as revenue.  For the customer
transactions under review, the products have been
delivered, customers are using the products in
their networks and Sonus Networks has either
received payment or is receiving payment for the
products in the ordinary course.  The Company is
reassessing the proper periods in which revenue
should be recognized for these transactions.

2004, Sonus announced that it would be issuing restatements of its financial results for fiscal years 2001 and 2002 and the first three quarters of 2003. (Compl. ¶ 53.)  Finally, on July 28, 2004, Sonus restated its revenues for fiscal years 2001 and 2002 and the first three quarters of 2003 in its Form 10-K/A (Amendment No. 1)("Form 10-K/A") amending the Annual Report for fiscal year 2003.  The accompanying press release stated that:

> As previously reported, the primary impact of the restatements is the adjustment to the timing of revenue recognition and certain other financial statement accounts. Principal adjustments to revenue relate to the timing of revenue where the revenue has been deferred and recognized in subsequent periods.  In addition, other material restatements include adjustments to purchase accounting, impairments, accruals, and deferred compensation.

(Compl. ¶ 53.)

The revenue adjustments in the Restatement were classified into five categories:  "deferral of product revenue," "maintenance revenue," "delivery," "customer acceptance," and "other."  (Compl. ¶¶ 58-63; Transmittal Affidavit for Sonus' Memorandum, Ex. E ("Form 10-K/A"), pp. 4-6.)  According to the Complaint and the Restatement, the first category relates to the premature recognition of revenue in contracts with Qwest, where Sonus "improperly recognized $52.9 million in revenue" in financial quarters predating the appropriate periods in which the revenue should have been recognized. (Compl. ¶ 60.)  The second

category relates to allegations that Sonus reclassified certain revenue that had been described as "product" revenue as "service" revenue. (Compl. ¶ 61.)  The last two named categories encompass the Company's premature recognition of revenue based on its improper treatment of delivery and customer acceptance.[5]

## D. Material Misstatements

Based on the accounting errors admitted in the Restatement, the Complaint alleges Sonus and its management issued a series of misstatements regarding revenues and expenses as well as their conformance with accounting principles through the issuance of press releases, certifications of public statements, and filings with the SEC including the September 23, 2003 Prospectus Supplement, which adopted the previously filed SEC reports that contained material misrepresentations.

Examples of public misstatements by Ahmed include an April

---

[5] Plaintiff's arguments on the motion to dismiss turn primarily on the timing of revenue recognition generally, and more specifically on the "deferral of product revenue" acts.

Plaintiff does, however, plead that in addition to incorrectly recognizing revenue, Sonus improperly allocated its "accrued expenses," (Compl. ¶ 65), and "restructuring expenses and associated benefits," (Compl. ¶ 66), during the relevant time periods as recognized in the Restatement.  Plaintiff includes a chart in the Complaint detailing the adjustments to the reported expenses and indicating that the restated expenses were considerably smaller than originally stated.

Sonus also re-appraised two acquisitions made in 2001 and restated the "impairment charge." (Compl. ¶ 68-69.)  The Company made "frequent material errors in accounting for compensation-related expenses."  (Compl. ¶ 69.)  Finally, there were mistakes made by Sonus in accounting for its inventory reserves and in recording certain checks. (Compl. ¶ 70.)

9, 2003 press release in which he said that "[w]e grew our revenues 27 percent over last quarter," whereas the Restatement indicates a decrease in revenue, (Compl. ¶ 141); a July 10, 2003 press release where he is quoted as saying "[w]e are pleased with the progress that we made in the second quarter, particularly with our 33% sequential growth" when the growth was actually 67%, (Compl. ¶ 152); and an October 8, 2003 press release where Ahmed is quoted as saying that the most recent quarter was the "fourth consecutive of revenue growth" and that "revenues grew 34% sequentially to $28.6 million," whereas the Restatement indicates that it was only the third consecutive quarter of growth and revenues for the quarter were only $22.251 million. (Compl. ¶ 165.) The misstated public statements and certifications are listed in paragraphs 76 and 77 of the Complaint.

**E. Scienter**

The Complaint suggests that:

> The magnitude, duration and pervasiveness of the accounting manipulations alleged herein, all of which violated the foregoing provisions of GAAP, compels the conclusion that these methods were implemented by defendants intentionally, or that, at a minimum, defendants recklessly disregarded the overwhelming prevalence of these improper procedures and the resulting material falsifications of Sonus's financial statements.

(Compl. ¶ 97.)

The Complaint also suggests that "all defendants knew or recklessly disregarded ... that Sonus was experiencing such

pervasive deficiencies in its internal controls and accounting practices that the financial information generated for inclusion in Sonus's financial statements was grossly inaccurate and unreliable." (Compl. ¶ 87.)[6]

**F. Claims**

1. <u>First Claim</u>

Plaintiff brings claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, contending that Sonus and the individual Defendants "carried out a plan, scheme and course of conduct" to "deceive the investing public" through the "issuance of materially false and misleading statements," thereby "artificially inflat[ing] and maintain[ing] the market price of Sonus's securities," which caused "Plaintiff and other members of the Class to purchase Sonus's securities at

---

[6]   In the explanatory remarks in the Form 10-K/A, Sonus indicated that it and its independent auditors had identified "material weaknesses" in its internal controls and procedures. (Compl. ¶ 55.)  Sonus listed these weaknesses as follows in its Form 10-Q for the financial quarter ending March 31, 2004:
> Insufficient contract review and documentation; inadequate supervision and review within the finance and accounting department; inadequate segregation of duties; insufficient supporting documentation for and review of account reconciliations; lack of adequate controls over cash receipts; lack of adequate technical accounting expertise; insufficient equity review procedures and documentation; flawed foundations for accounting estimates; and inadequate quarterly and year-end financial statement close and review procedures.

(Compl. ¶ 55.)

artificially inflated prices." (Compl. ¶¶ 181, 193.) Plaintiff also brings claims under Section 20(a) of the Exchange Act against Nill and Ahmed as the "controlling persons of Sonus" liable for Sonus's violations of Section 10(b).

2. <u>Second Claim</u>

Plaintiff brings claims against Sonus and the individual Defendants under Sections 11 and 15 of the Securities Act for the issuance of a registration statement that included untrue statements of material facts. Plaintiff "incorporates by reference and realleges" all the allegations underlying the Exchange Act claims, but "expressly disclaims and excludes any allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on a claim of strict liability (as to defendant Sonus) or negligence (as to defendants Ahmed and Nill)." (Compl. ¶ 196.)

3. <u>Third Claim</u>

Plaintiff seeks relief against Sonus and the individual Defendants for violations of Sections 12(a)(2) and 15 of the Securities Act for offering or selling a security by means of a Prospectus that included untrue statements of material facts. Again, Plaintiff "incorporates by reference and realleges" all the allegations underlying the Exchange Act claims, but "expressly disclaims and excludes any allegations that could be construed as alleging fraud or intentional or reckless misconduct."

As the basis for all of these claims, Plaintiff states:

> Lead Plaintiff makes the foregoing allegations based
> upon personal knowledge as to Paragraph 14 and as to
> all other allegations based upon the investigation of
> Lead Plaintiff's Counsel, which included review of SEC
> filings by Sonus, as well as regulatory filings and
> reports, interviews with percipient witnesses and
> former employees of the Company, securities analysts'
> reports and advisories about the Company, press
> releases and other public statements issued by the
> Company, media reports about the Company, and expert
> analysis.  Lead Plaintiff believes that substantial
> additional evidentiary support will exist for the
> allegations set forth herein after reasonable
> opportunity for discovery.

(Compl. ¶ 218.)

## II. Discussion

### A. Pleading Requirements

Securities fraud actions present unique circumstances on motions to dismiss.  Claims under Section 10(b) of the Exchange Act implicate Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  See, e.g., Chalverus v. Pegasystems, Inc., 59 F.Supp.2d 226, 231 (D. Mass. 1999).  Claims under Sections 11 and 12(a)(2) of the Securities Act that "sound in fraud" also trigger the pleading requirements of Rule 9(b).  Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1223 (1st Cir. 1996), superseded by PSLRA on others grounds.

### 1. Rule 9(b) and Sections 11 and 12(a)(2)

Under First Circuit precedent, claims under Sections 11 and 12(a)(2) of the Securities Act that "sound in fraud" trigger the

pleading requirements of Rule 9(b).  <u>See</u>, <u>e.g.</u>, <u>Suna v. Bailey
Corp.</u>, 107 F.3d 64, 71 (1st Cir. 1997). (Since the "appellants
failed to even meet the minimal requirements of a Section 12(2)[7]
claim, we need not decide whether their Section 12(2) claim
sufficiently sounds in fraud such that Rule 9(b)'s pleading
requirements apply."); <u>Glassman v. Computervision Corp.</u>, 90 F.3d
617, 628 n. 13 (1st Cir. 1996)(same).  As the First Circuit has
explained:

> [D]espite the minimal requirements of
> Sections 11 and 12(2), a complaint asserting
> violations of those statutes may yet "sound
> in fraud."  For example, if a plaintiff were
> to attempt to establish violations of
> Sections 11 and 12(2) as well as the anti-
> fraud provisions of the Exchange Act through
> allegations in a single complaint of a
> unified course of fraudulent conduct, fraud
> might be said to "lie[] at the core of the
> action."  In such a case, the particularity
> requirements of Rule 9(b) would probably
> apply to the Sections 11, 12(2), and Rule
> 10b-5 claims alike.  "It is the allegation of
> fraud, not the 'title' of the claim that
> brings the policy concerns underlying Rule
> 9(b) to the forefront."

<u>Shaw</u>, 82 F.3d at 1223 (citations and alterations omitted)
(concluding that complaint did not sound in fraud).

     Contrary to the First Circuit's position, some other courts
have decided that the heightened pleading standard does not apply
to Section 11 and 12 claims even if they are grounded in fraud,
because "a pleading standard which requires a party to plead

---

     [7] Prior to the PSLRA, Section 12(a)(2) of the Securities Act
was Section 12(2).

particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice' pleading embodied in the Federal Rules of Civil Procedure." In re NationsMart Corp. Securities Litigation, 130 F.3d 309, 315 (8th Cir. 1997). In contrast to Shaw, those cases also stand for the proposition that "[w]hether Rule 8(a) or 9(b) is triggered turns on the type of claim alleged (i.e., the cause of action) rather than the factual allegations on which that claim is based." In re Public Offering, 241 F.Supp.2d at 281, 341 (S.D.N.Y. 2003). Since one of the purposes of the PSLRA was to resolve the disagreement between the Circuits and "clarif[y] the pleading requirements for bringing securities fraud claims," Id. at 331 n. 52 quoting S. Rep. No. 104-98, at 7 (1995), one could infer, as Plaintiff points out, that this contrary position is correct because Congress specifically required particularized allegations for private actions under the Exchange Act (15 U.S.C. §78u-5(b)), but not the Securities Act (15 U.S.C. §77z-1(b)).

In defense of the sound in fraud doctrine, the Second Circuit explains that:

> By its terms, Rule 9(b) applies to 'all averments of fraud.' ... This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.... The particularity requirement of Rule 9(b) serves to 'provide a defendant with fair

> notice of a plaintiff's claim, to
> safeguard a defendant's reputation from
> improvident charges of wrongdoing, and
> to protect a defendant against the
> institution of a strike suit.' ... These
> considerations apply with equal force to
> 'averments of fraud' set forth in aid of
> Section 11 and Section 12(a)(2) claims
> that are grounded in fraud.

Rombach v. Chang, 355 F.3d 164, 171 (2nd Cir. 2004) quoting

O'Brien v. Nat'l Property Analysts Partners, 936 F.2d 674, 676

(2nd Cir. 1991).  See also In re Suprema Specialties, Inc.

Securities Litigation, 438 F.3d 256, 272 (3rd Cir. 2006)(holding

that Rule 9(b) applies to Securities Act claims that sound in

fraud); In re Daou Systems, Inc., 411 F.3d 1006, 1028 (9th Cir.

2005)(same).

The First Circuit has not chosen to revisit this issue and

its most recent decision continues to follow Shaw. See Cooperman

v. Individual, Inc., 171 F.3d 43, 47 n. 6 (1st Cir. 1999), where

the Court cited to Rule 9(b) and Shaw in noting "at the outset

that because plaintiffs' claim does not 'sound in fraud,' the

heightened pleading requirements of Fed. R. Civ. P. 9(b) do not

apply."  Consequently, despite contrary precedent elsewhere, I

follow the approach adopted in Shaw and in fully developed

opinions by the Second, Third, and Ninth Circuits.  However, I

recognize that "in order to prevent Section 11 [and 12(a)(2)]

claims from becoming analytically indistinct from 10(b) claims,

courts must ensure that the former truly do 'sound in fraud'

before the heightened pleading standard associated with the

latter attaches." <u>In re Number Nine Visual Tech. Corp.</u> <u>Securities Litig.</u>, 51 F.Supp.2d 1, 12 (D. Mass. 1999).

Plaintiff correctly points out that the <u>Shaw</u> decision does not foreclose the possibility that "a plaintiff may choose not to allege a unified course of fraudulent conduct in support of" its §§ 11 and 12(a)(2) claims, "but rather to allege some fraudulent and some non-fraudulent conduct." <u>Vess v. CIBA-Geigy Corp. USA</u>, 317 F.3d 1097, 1105 (9th Cir. 2003). Here, however, the only basis for Plaintiff's "non-fraudulent conduct" allegations, i.e. that Defendants Ahmed and Nill failed to make a reasonable investigation, (Compl. ¶ 201), originates in the following language in paragraphs 196 and 208 of the Complaint:

> [F]or purposes of this claim, Lead Plaintiff expressly disclaims and excludes any allegations that could be construed as alleging fraud or intentional or reckless misconduct.[8]

This conclusory disclaimer follows plaintiff's incorporation and reallegation of <u>all</u> the paragraphs underlying its Exchange Act claims, paragraphs comprising, in the eyes of Plaintiff, allegations supporting recovery for defendants' fraudulent conduct. For instance, the Complaint alleges that "defendants <u>misled</u> Sonus's public investors by disseminating a series of <u>materially</u> <u>false</u> and <u>misleading</u> statements," (Compl. ¶ 2), and

---

[8] As to the Section 11 claim, paragraph 196 also includes the following language: "... as this claim is based solely on a claim of strict liability (as to defendant Sonus) or negligence (as to defendants Ahmed and Nill) under the Securities Act."

that "Sonus's improper accounting practices were ongoing, pervasive and occurred with the <u>knowledge</u>, <u>acquiescence</u> and <u>direct participation</u> of at least two of Sonus's senior officers, defendants Ahmed and Nill."  (Compl. ¶ 5).  <u>See</u> <u>Rombach</u>, 355 F.3d at 172 (rejecting Plaintiffs' assertion that their Section 11 claims do not sound in fraud where "the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was 'inaccurate and misleading;' that it contained 'untrue statements of material facts;' and that 'materially false and misleading written statements' were issued").  Nevertheless, Plaintiff relies on <u>Number Nine</u> for the proposition that a simple disclaimer is sufficient.

In <u>Number Nine</u>, the court found that the "disclaimer of fraud-type allegations" was effective "to prevent the Securities Act claims from 'sounding in fraud.'"  51 F.Supp.2d at 12-13. But, the court also observed that the complaint was "crafted with the[] considerations [embraced by <u>Shaw</u>] in mind."  <u>Id.</u> at 12.  In particular, I note that the complaint in <u>Number Nine</u>, unlike here, not only disclaimed any reliance on allegations of fraud, but also excluded more than 30 particular paragraphs relating to defendants' scienter from its Section 11 allegations.  <u>Id.</u> at 12. There is no such exclusion here.  Rather, the Section 11 and 12(a)(2) claims incorporate <u>all</u> of the factual allegations underlying the Exchange Act claims.  To the extent <u>Number Nine</u> is read to stand for the proposition that a simple disclaimer,

-16-

without a parsing of factual allegations, is sufficient to save Section 11 and 12(a)(2) claims from heightened pleading requirements, I decline to adopt this blinkered reading of the more nuanced distinctions drawn in the case law relied upon for the Securities Act claims.

To effectuate Plaintiff's disclaimer in this case would require a court to parse -- when the Plaintiff has not bothered to do so itself -- a lengthy pleading to determine what, if anything, is left after the allegations of fraud are removed. See Daou Systems, 411 F.3d at 1029 citing Lone Star Ladies Inv. Club v. Schlotzsky's Inc., 238 F.3d 363, 368 (5th Cir. 2001) ("Rule 9(b) may prove fatal to 1933 Securities Act claims 'grounded in fraud' when the complaint makes a 'wholesale adoption' of the securities fraud allegations for purposes of the Securities Act claims. In such cases, a district court is not required to sift through allegations of fraud in search of some 'lesser included' claim of strict liability."); Suprema Specialties, 438 F.3d at 272 (same). And even if I accepted Plaintiff's apparent invitation that the court do this and "'disregard' [the fraud] averments, or 'strip' them from the claim" and "then examine the allegations that remain to determine whether they state a claim," Vess, 317 F.3d at 1105, Plaintiff would not benefit from the exercise. Since Plaintiff has used the same factual allegations for all of its claims, it would

appear that nothing would be left.[9]

Consequently, I reject Plaintiff's effort to plead some kind
of lesser included claim simply by inserting a talismatic
disclaimer in the Complaint.  See, e.g., In re Stac Elecs. Secs.
Litig., 89 F.3d 89 F.3d 1399, 1405 n. 2 (9th Cir. 1996)
(Plaintiff's "nominal efforts" in disclaiming allegations of
fraud "are unconvincing where the gravamen of the complaint is
plainly fraud and no effort is made to show any other basis for
the claims levied at the Prospectus.").  Compare Suprema
Specialties, 438 F.3d at 272-73 (holding that Rule 9(b) does not
apply "where the plaintiff has exercised care in differentiating
asserted negligence claims from fraud claims and in delineating
the allegations that support the negligence cause of action as
distinct from the fraud") with Cal. Pub. Employees Ret. Sys. v.
Chubb Corp., 394 F.3d 126, 161 (3d Cir. 2004)("CALPERS")(holding
that Rule 9(b) does apply where the complaint contains only a
one-sentence disavowal of fraud within the plaintiff's Section 11
count and where the complaint was "completely devoid of any
allegations that Defendants acted negligently").  By failing to
distinguish the underlying factual allegations, Plaintiff has
based liability on the same course of conduct and "attempt[s] to
establish violations of Sections 11 and 12(2) as well as the

---

[9] I note that Defendants raised this argument in their
initial motion to dismiss, yet Plaintiff continued to avoid
parsing out the fraud claims in the Amended Complaint.

anti-fraud provisions of the Exchange Act through allegations in a single complaint of a unified course of fraudulent conduct." Shaw, 82 F.3d at 1223.  Consequently, I apply the heightened pleading standards of Rule 9(b) to the Section 11 and 12(a)(2) claims in this case.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances of fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  This means the complaint must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state whether and when the statements were made, and (4) explain why the statements were fraudulent.'"  Suna, 107 F.3d at 68 quoting Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1127 (2nd Cir. 1994) (quoting Mills v. Polar Molecule Corp., 12 F.3d 1170, 1175 (2nd Cir. 1993)).  "To serve the purposes of Rule 9(b), [the court also] require[s] plaintiffs to allege facts that give rise to a strong inference of fraudulent intent."  Suna, 107 F.3d at 68.


2. PSLRA and Section 10(b)

The enactment of the PSLRA "did not ... change significantly this circuit's previous underlying substantive standards for adequately pleaded securities fraud, which were already strict" in applying Rule 9(b).  Cabletron, 311 F.3d 11, 28 (1st Cir. 2002) citing Greebel v. FTP Software, Inc., 194 F.3d 185, 193-94 (1st Cir. 1999).  Consequently, with respect to private actions

arising under the Exchange Act, the PSLRA also imposes two pleading requirements relevant here: (1) a "clarity-and-basis" requirement that is closely related to the Rule 9(b) particularity requirement; and (2) a "strong-inference" requirement regarding scienter that parallels the First Circuit's Rule 9(b) "strong inference of fraudulent intent" requirement. Suna, 107 F.3d at 68; In re Stone & Webster, Inc., Securities Litig., 414 F.3d 187, 195 (1st Cir. 2005), petition for reh'g denied, 424 F.3d 24 (2005).

The PSLRA's clarity-and-basis requirement demands that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA's strong-inference requirement "alters the usual contours of a Rule 12(b)(6) ruling" with respect to the scienter element, requiring that the complaint "state with particularity facts that give rise to a 'strong inference' of scienter rather than merely a reasonable inference." Cabletron, 311 F.3d at 28 quoting 15 U.S.C. § 78u-4(b)(2) and citing Greebel, 194 F.3d at 196-97. Furthermore, the complaint must assert facts supporting a strong inference that each of the Defendants acted with scienter at the time the revenue misstatements were made. Stone, 414 F.3d at 210. The

First Circuit has described this statutory requirement "as demanding a 'highly likely' inference that the defendant acted with the required state of mind." Stone, 414 F.3d at 195 citing Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002). "'Inferences must be reasonable and strong - but not irrefutable.... Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder.' The plaintiff must show that his characterization of the events and circumstances as showing scienter is highly likely." Id. at 82 quoting Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001).

The First Circuit looks to the totality of the circumstances in evaluating whether a complaint meets the pleading requirements of the PSLRA. Cabletron, 311 F.3d at 30, 32 (emphasizing that "[e]ach securities fraud complaint must be analyzed on its own facts"). "[T]he PSLRA does not require the plaintiff to 'plead evidence.'" Stone, 414 F.3d at 199. Rather, to meet the clarity-and-basis requirement, the plaintiff needs only to allege "clear and precise statements of what the alleged fraud consisted of," which must be "supported by details that provide factual support for plaintiffs' allegations of fraud." Id. at 198-99. Accordingly, "courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remain[] unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA."

<u>Cabletron</u>, 311 F.3d at 32.

Even though the PSLRA pleading requirements "are strict, they do not change the standard of review for a motion to dismiss. Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter." <u>Aldridge</u>, 284 F.3d at 78 <u>citing</u> <u>Greebel</u>, 194 F.3d at 194, 201.

Finally, I note that the extent of "discovery is relevant to a court's evaluation of sufficient particularity" because "the procedural posture of the case matters." <u>Cabletron</u>, 311 F.3d at 33. Thus, I scrutinize a pre-discovery motion to dismiss less stringently than I would a post-discovery dispositive motion. <u>Cf.</u> <u>id.</u> at 33.

**B. Primary Liability**

1. <u>Elements</u>

Plaintiff essentially alleges that the individual Defendants and Sonus, acting through "its agents, officers, and employees acting under the corporate manner," <u>Holmes v. Bateson</u>, 583 F.2d 542, 560 (1st Cir. 1978), carried out an accounting scheme misrepresenting the Company's quarterly financial status to deceive investors making them liable directly under Section

10(b)[10] of the Exchange Act and Sections 11 and 12(a)(2) of the
Securities Act.[11]  I will address those primary claims in this

---

[10] 15 U.S.C. § 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by
the use of any means or instrumentality of interstate commerce or
of the mails, or of any facility of any national securities
exchange--
    To use or employ, in connection with the purchase or sale of
    any security registered on a national securities exchange or
    any security not so registered, or any securities-based swap
    agreement . . . any manipulative or deceptive device or
    contrivance in contravention of such rules and regulations
    as the Commission may prescribe as necessary or appropriate
    in the public interest or for the protection of investors.

[11] Section 11, 15 U.S.C. § 77k, provides:

In case any part of the registration statement, when such part
became effective, contained an untrue statement of a material
fact or omitted to state a material fact required to be stated
therein or necessary to make the statements therein not
misleading, any person acquiring such security (unless it is
proved that at the time of such acquisition he knew of such
untruth or omission) may, either at law or in equity, in any
court of competent jurisdiction, sue--
    (1) every person who signed the registration statement;
    (2) every person who was a director of (or person performing
    similar functions) or partner in, the issuer at the time of
    the filing of the part of the registration statement with
    respect to which his liability is asserted.

Section 12(a)(2), 15 U.S.C. § 77l, (previously Section
12(2)) provides:

Any person who --
    offers or sells a security . . . by means of a prospectus or
    oral communication, which includes an untrue statement of a
    material fact or omits to state a material fact necessary in
    order to make the statements, in the light of the
    circumstances under which they were made, not misleading
    (the purchaser not knowing of such untruth or omission), and
    who shall not sustain the burden of proof that he did not
    know, and in the exercise of reasonable care could not have
    known, of such untruth or omission, shall be liable, subject
    to subsection (b), to the person purchasing such security

section.  I take up derivative liability under Section 20 in

Section II.C. _infra_.

a.  _Section 12(a)(2)_ - In order to recover under Section

12(a)(2), Plaintiff must establish that Defendants were statutory

sellers.  The language of § 12(a)(2) -- "purchasing from" --

could be read to require that only those who directly pass title

to the plaintiffs can be liable.  _See_ _Shaw_, 82 F.2d at 1215.

But, the Supreme Court has held that Section 12 liability is not

so limited, finding "it consistent with the policies of the

statute to permit imposition of liability on a non-owner of

securities who 'successfully solicits' the plaintiff's purchase

of the securities, provided that the solicitor is 'motivated at

least in part by a desire to serve his own financial interests or

those of the securities owner.'" _Id._ _quoting_ _Pinter v. Dahl_, 486

U.S. 622, 645, 647 (1988)(footnote omitted).

Plaintiff's attempt to avoid dismissal of the Section

12(a)(2) claims by relying on opinions from outside the First

Circuit are unavailing.  _Shaw_ is directly on point here and dooms

Plaintiff's 12(a)(2) claims.  First, "[i]n a firm commitment

underwriting, the issuer of the securities sells all the shares

to be offered to one or more underwriters, at some discount from

---

from him, who may sue either at law or in equity in any
court of competent jurisdiction, to recover the
consideration paid for such security with interest thereon,
less the amount of any income received thereon, upon the
tender of such security, or for damages if he no longer owns
the security.

the offering price." <u>Shaw</u>, 82 F.3d at 1215.  When title passes
in this way, as it apparently did in this case, "[the company]
and its officers cannot be held liable as 'sellers' under Section
12(2) unless they actively 'solicited' the plaintiffs' purchase
of securities to further their own financial motives, in the
manner of a broker or vendor's agent." <u>Id.</u>

  Plaintiff bases its opposition to dismissal on two
arguments. First, Plaintiff attempts to demonstrate that
Defendants did "solicit" the purchase of stock for purposes of
Section 12(a)(2) with the following factual allegations: (1)
"defendants signed materially misleading prospectus supplements,
prospectuses, registration statements, and/or SEC filings"; (2)
"defendants assisted in and/or supervised in the drafting,
producing, revising, reviewing, approving, and/or executing
relevant SEC documents"; (3) class members "who bought on the
September 2003 offering would not have been able to acquire the
Sonus shares without the 'selling efforts' undertaken by
defendants"; and (4) "defendants engaged in such solicitation in
order to further their own financial interests in the manner of a
broker or vendor's agent, including the financial interests of
Sonus." (Opposition, p. 40.)  Whether other courts might find
such allegations sufficient, the First Circuit clearly has not:

> The factual allegations in the complaint
> supporting the purported status of [the
> Company] and the individual defendants as
> Section 12(2) sellers are sparse, and all

pertain to those defendants' involvement in
preparing the registration statement,
prospectus, and other "activities necessary
to effect the sale of the[] securities to the
investing public."  Under <u>Pinter</u>, however,
neither involvement in preparation of a
registration prospectus nor participation in
"activities" relating to the sale of
securities, standing alone, demonstrates the
kind of relationship between defendant and
plaintiff that could establish statutory
seller status.  Although the complaint also
contains a conclusory allegation that each
defendant "solicited and/or was a substantial
factor in the purchase by plaintiffs" of
securities in the offering, the Supreme Court
specifically rejected a proposed test under
which a defendant's being a "substantial
factor" in bringing about a sale could
establish statutory seller status.
Furthermore, the term "solicitation" is a
legal term of art in this context.  In
deciding a motion to dismiss under Rule
12(b)(6), a court must take all well-pleaded
facts as true, but it need not credit a
complaint's "bald assertions" or legal
conclusions.  Here it is undisputed that the
public offering was conducted pursuant to a
firm commitment underwriting, and plaintiffs'
bald and factually unsupported allegation
that the issuer and individual officers of
the issuer "solicited" the plaintiffs'
securities purchases is not, standing alone,
sufficient.

<u>Shaw</u>, 82 F.3d at 1216 (citations omitted); <u>see also</u> <u>id.</u> at 1215

("[T]he [<u>Pinter</u>] Court stated that proof the defendant caused a

plaintiff's purchase of a security is not enough to establish

that the defendant 'solicited' the sale for Section 12

purposes."); <u>see also</u> <u>Lone Star</u>, 238 F.3d at 370("[I]n a firm

commitment underwriting ... the public cannot ordinarily hold the

issuers liable under section 12....  [Although, it] is true that

there are unusual cases in which the issuer is sufficiently active in promoting the securities as to essentially become the vendor's agent.").

Secondly, Plaintiff argues that the motion to dismiss should be denied because Plaintiff has insufficient information to know whether Sonus shares were in fact sold pursuant to a firm commitment offering. It offers, however, no reason to question that the shares were sold in that manner. The Complaint "does not contain sufficient non-conclusory factual allegations" on the question of the firm commitment offering to call the method of sale into question. Shaw, 82 F.3d at 1216. To find otherwise would permit a plaintiff to survive a motion to dismiss a Section 12(a)(2) claim simply by refusing to concede such a point.

In sum, Plaintiff's conclusory allegations regarding the role of Defendants as statutory sellers for purposes of Section 12(a)(2) are insufficient to survive Defendants' motion to dismiss as to the Section 12(a)(2) claims.

b. Section 10(b) - Section 10 (b) of the Exchange Act imposes liability on "any person" who uses, "in connection with the purchase or sale of any security registered on a national securities exchange, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe. Section 3(a)(9) defines "person" to include a "company." 15 U.S.C. § 78c(a)(9). The relevant rule allegedly violated that is enforceable pursuant to Section 10(b)

is SEC Rule 10b-5.[12]

Section 10(b) claims[13] require that "the defendant (i) made a material misrepresentation, (ii) with scienter, (iii) in connection with the purchase or sale of a security, (iv) on which the plaintiff relied, (v) to his or her detriment." <u>In re Credit Suisse First Boston Corp. (Agilent Technologies, Inc.</u>), 431 F.3d 36, 45 (1st Cir. 2005) <u>citing</u> <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 15 S.Ct. 1627, 1631 (2005); <u>see</u> 15 U.S.C. § 78j(b).  "In cases involving publicly traded stock, the ... PSLRA ... makes these elements important not only as a matter of proof but also as a matter of pleading.  In order to survive a motion to dismiss in such a case, a section 10(b) claimant cannot take refuge in the generous notice pleading formulation of Fed. R.

---

[12] SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2005):
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

[13] For simplicity's sake, as was done in <u>In re Credit Suisse First boston Corp. (Agilent Technologies, Inc.</u>), I "refer hereafter only to section 10(b) claims.  Those references encompass Rule 10b-5 claims wherever the context permits." 431 F.3d 36, 45 n. 1 (1st Cir. 2005).

Civ. P. 8(a)(2).  Rather, he or she must satisfy the more
stringent guidelines of the PSLRA" as discussed above.  <u>Credit
Suisse</u>, 431 at 46.

c.  <u>Section 11</u> - Section 11 of the Securities Act "allows
purchasers of a registered security to sue certain enumerated
parties in a registered offering when false or misleading
information is included in a registration statement."  <u>Herman &
MacLean v. Huddleston</u>, 459 U.S. 375, 381 (1983).  The default
rule is that a plaintiff who "purchased a security issued
pursuant to a registration statement ... need only show a
material misstatement or omission to establish his prima facie
case."  <u>Id.</u> at 382.  "[L]iability against the issuer of a
security is virtually absolute, even for innocent misstatements."
<u>Id.</u>  (footnote omitted).  However, as discussed above, actions
under Sections 11 that "sound in fraud" trigger Rule 9(b), which
demands that "[i]n all averments of fraud or mistake, the
circumstances of fraud or mistake shall be stated with
particularity."  Fed. R. Civ. P. 9(b).  "To serve the purposes of
Rule 9(b), [the court] require[s] plaintiffs to allege facts that
give rise to a strong inference of fraudulent intent."  <u>Suna</u>, 107
F.3d at 68 <u>quoting</u> <u>Shields</u>, 25 F.3d at 1128.  <u>See also</u> <u>Maldonado
v. Dominguez</u>, 137 F.3d 1, 9 (1st Cir. 1998)(same).

Defendants' motions as to the Section 10(b) and Section 11
claims turn on the arguable failure of the Complaint to
sufficiently plead scienter as required by the PSLRA and Rule

9(b).  Defendants do not press, at least at this stage, the question of the materiality of the allegedly false and misleading statements issued by the Company and the individual Defendants during the Class Period.  Consequently, I turn now to the focus of the current dispute -- the scienter requirement.

2. <u>Scienter</u>

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n. 12 (1976).  "[I]n the absence of knowing conduct, reckless statements of misleading facts may [also] be actionable under 10(b)-5; however, recklessness in this sense is more than mere negligence," <u>Geffon v. Micrion Corp.</u>, 249 F.3d 29, 35 (1st Cir. 2001), and "comes closer to bring a lesser form of intent." <u>Greebel</u>, 194 F.3d at 199.  "[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." <u>Id.</u> at 198 <u>quoting</u> <u>Sundstrand Corp. v. Sun Chem. Corp.</u>, 553 F.2d 1033, 1045 (7th Cir. 1977)(<u>quoting</u> <u>Franke v. Midwestern Okla. Dev. Auth.</u>, 428 F.Supp. 719, 725 (W.D.Okla. 1976)).

Proof of scienter in securities fraud cases "entails more than mere proof that the defendants knowingly made a particular statement." <u>Geffon</u>, 249 F.3d at 35.  A plaintiff cannot rely

only on the conclusory allegation that the defendants had actual knowledge of falsity. Rather, the plaintiff must "set[] forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading," Maldonado, 137 F.3d at 9, or in lieu of pleading actual knowledge, a plaintiff "must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." Id. at 9 n. 4. "Accordingly, under the PSLRA [and Rule 9(b)], the Complaint must state with particularity facts giving rise to a strong inference that the defendants acted with either knowing, intentional falsity or reckless disregard for the truthfulness of the statements." Stone, 414 F.3d at 199; Suna, 107 F.3d at 68.

The First Circuit has found the following facts relevant to the scienter issue:

- "insider trading in conjunction with false or misleading statements";
- "a divergence between internal reports and public statements";
- "disclosure of inconsistent information shortly after the making of a fraudulent statement or omission";
- "bribery by top company officials";
- "evidence of an ancillary lawsuit, charging fraud, which was quickly settled";
- "disregard of current factual information acquired prior to the statement at issue";
- "accounting shenanigans";
- "evidence of actions taken solely out of self-interest";
- "significant GAAP violations"; and
- "motive and opportunity."

Geffon, 249 F.3d at 36 citing Greebel, 194 F.3d at 196 (compiling

First Circuit cases); and <u>Cabletron</u>, 311 F.3d at 39 <u>citing</u>
<u>Greebel</u>, 194 F.3d at 203.

In this case, Plaintiff alleges that the numerous financial
statements, certifications and press releases listed in the
Complaint were false and misleading because Sonus did not, as was
its stated policy, recognize its revenue and other expenses and
charges in accordance with GAAP and SOP 97-2 in particular, (<u>see</u>
<u>e.g.</u>, Compl. ¶¶ 97, 111, 115, 120), and because there was a
material breakdown in internal controls contrary to the
certifications of Ahmed and Nill. (Compl. ¶¶ 102, 121-123.)

With respect to Plaintiff's allegation that "Defendants knew
or recklessly disregarded numerous red flags evidencing the fact
that the Company's internal controls were grossly deficient,"
(Compl. ¶ 92), I find that the Complaint does not allege any
particularized facts to support a finding that the individual
Defendants were reckless when they certified that they had
examined the Company's internal controls and believed they were
adequate. Similarly, I find that the Complaint does not allege
any particularized facts to support a finding that the individual
Defendants or other agents of Sonus were reckless with respect to
the improper allocation of expenses, the appraisal of two
acquisitions made in 2001, or the mistakes relating to impairment
charges, inventory reserves and certain checks, all of which were
also corrected in the Restatement. (<u>See</u> Compl. ¶¶ 65-66, 68-70.)
As a result, I focus on the scienter of each Defendant with

respect to the alleged improper revenue recognition scheme.

In arguing this motion, the parties cite a multitude of lower court securities fraud decisions. However, in analyzing motions to dismiss that challenge the sufficiency of scienter, I am mindful that courts are not to "categorize patterns of facts as acceptable or unacceptable to prove scienter," but instead must "analyzes the particular facts alleged in each individual case to determine whether the allegations [are] sufficient to prove scienter." Geffon, 249 F.3d at 36 citing Greebel, 194 F.3d at 196. "Sufficient evidence of one type may reduce or eliminate the need for evidence in other categories, without thwarting the legislative intent behind the PSLRA." Cabletron, 311 F.3d at 32. As a result, I am not persuaded at the outset by Defendant Sonus's list of elements missing from the Complaint. As in Cabletron, "the complaint does include some of the factors missing in Greebel; the absence of others is not decisive. Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template." Id. In evaluating this Complaint, I consider whether scienter is pleaded sufficiently against Sonus and each individual Defendant independently. See id. at 41.[14]

---

[14] In the Complaint, Plaintiff alleges that "[i]t is appropriate to treat the individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants

a. <u>Nill</u> - Synthesizing Plaintiff's various arguments in its Opposition, I find that it relies on the following allegations in the Complaint to meet its burden with respect to Nill: (i) motive and opportunity, (Compl. ¶¶ 37-39); (ii) the "fact of the multi-year Restatements themselves," (Opposition, pp. 23, 36-38); (iii) the "magnitude, duration and pervasiveness" of the accounting shenanigans, (Compl. ¶ 97; Opposition pp. 36-38); (iv) that the irregularities were violations of Sonus's own accounting policies, (Opposition, p. 42); (v) the lack of internal controls, (Opposition, p. 40); (vi) conscious misbehavior by Nill; (vii) the fact that he "had extensive experience working with some of the world's most prominent software companies and accounting firms and thereby was fully familiar with the requirements of GAAP and, in particular, SOP 97-2" and that as CFO he "was actively involved in the preparation, review, and authorization of Sonus's publicly-reported financial statements, reports on SEC Forms 10-K and 10-Q, annual shareholder reports, and press releases, (Compl. ¶¶ 17, 100; Opposition, pp. 9-10 n. 4); (viii) imputations of Controller Hemme's knowledge to Nill, (Opposition, pp. 38-41); and (ix) the fact that Nill was "terminated as a result of the wrongdoing," (Compl. ¶ 17; Opposition, p. 23).  I

---

identified[]."  (Compl. ¶ 20.) To the extent that Plaintiff is suggesting I apply the "group pleading doctrine" for securities fraud, I follow the First Circuit's example of "set[ting] the issue aside" and "determin[ing] whether the Complaint states a claim against each defendant."  <u>Cabletron</u>, 311 F.3d at 41.

do not credit the last two arguments,[15] but consider the others
in turn.

(i) _Motive and Opportunity_ - As part of the mix put forward
to support a strong inference of scienter, "the plaintiff may
allege that the defendants had the motive ('concrete benefits
that could be realized by ... the false statements and wrongful
nondisclosures') and opportunity ('the means and likely prospect
of achieving concrete benefits by the means alleged') to commit
the fraud." Aldridge, 284 F.3d at 82 citing Novak v. Kasaks, 216
F.3d 300, 307 (2nd Cir. 2000) quoting Shields, 25 F.3d at 1130).
Here, Plaintiff alleges that Sonus's senior managers continually
misrepresented or "smoothed out" Sonus's reported revenues in an
effort to create the illusion of linear revenues or "predictable,
sequential upward growth" in order to "meet or exceed Wall Street
earnings" for each quarter and to ensure they could "raise
capital by issuing shares of Sonus's common stock in follow-on

---

[15] I will not impute any scienter on Hemme's part to Nill.
"Mere allegations of knowledge on the part of subordinates do not
provide a sufficient basis for imputing knowledge to executives."
In re Bio-Technology General Corp. Securities Litig., 380
F.Supp.2d 574, 596 (D.N.J. 2005). Plaintiff has not cited to any
agency law principles convincing me otherwise.
   The Complaint alleges that "[a]fter information concerning
Sonus's improper accounting practices became publicly known,
defendant Nill was transferred to the position of Vice President
of Operations. He later resigned at the request of the company."
(Compl. ¶ 17). While the timing of the reassignment coincides
with the public revelations, I will not draw an inference of
scienter from this fact because, unlike Hemme, he was not
initially fired and there is nothing in the Complaint or the
Restatement tying the later request for resignation to the
activities underlying this lawsuit.

offerings." (Compl. ¶¶ 37-39.)  Several former employees, whose employment at Sonus is only described generally in the Complaint, also explained how "senior management was under pressure to report continual quarterly growth to Wall Street, notwithstanding the significant downturn in spending by major telecom companies in 2001 and 2002 and the fact that certain customers would fall out of the market from time to time, which, in the absence of defendants' ability to orchestrate the 'borrowing' of revenues between quarters, would have cause severe gyrations in reported revenues."  (Compl. ¶ 50.)

Defendants argue that these allegations are without foundation and that the alleged motive is insufficient in any event to create a "strong inference" of scienter because neither of the individual Defendants gained any "concrete and personal benefit" from the alleged fraud.  <u>See</u> Sonus' Reply at 19 <u>citing</u> among others <u>GSC Partners CDO Fund v. Washington</u>, 368 F.3d 228, 237 (3d Cir. 2004).  I agree with the Defendants.

The Complaint alleges that "[t]he following graph highlights the linearity of Sonus's reported revenues during the Class Period, as compared to how they should have been reported (per restatement." (Compl. ¶ 52.)

As Defendants point out, the Restatement covered eleven quarters (2001, 2002 and the first three quarters of 2003), yet this graph only compares the revenues originally reported to the Restatement values for the seven quarters in the Class Period.



Apparently the explanation for this choice is that Sonus only restated the <u>quarterly</u> operating results for the four quarters in 2002 and the first three quarters of 2003. (<u>See</u> Restatement, Notes to Consolidated Statement (18).) Thus, it is

-37-

impossible to determine from the Complaint and the Restatement the actual

pattern of the improper revenue recognition that led to the Restatement.  Even considering the quarters represented by the graph in the Complaint, I find it difficult to draw the conclusion that Sonus intentionally engaged in an improper revenue recognition scheme to 'smooth out' revenues when the restated revenue itself is fairly linear except for the second quarter in 2002.  In addition, as Defendant Sonus points out, the net result of the improper revenue recognition during the Class Period resulted in Sonus <u>under-reporting</u> about $13 million. Consequently, Sonus argues it defies logic that management would intentionally rig its accounting to create the illusion of "predictable, sequential upward growth" in order to "meet or exceed Wall Street earnings" by under-reporting its revenues.[16] In any event, I reject the simple "revenue linearity" theory, as a reason Sonus's management may have had for orchestrating the revenue scheme.

Even if I were to speculate what other business reasons for doing so may have been, which I will not do specifically, it would not matter.  Directors and officers of all public companies feel the same pressure to maximize the company's value and

---

[16] The graph in the Complaint does not tell the whole story. According to the Restatement, Sonus <u>over-reported</u> about $20 million in 2001.  But in order to capture that over-reporting one must look outside the class period at issue in this case.

-38-

project optimism to Wall Street.  For motive to support a strong
inference of scienter the plaintiff should plead facts showing
that the accused officer or director secured a particular
"concrete and personal benefit" from the alleged fraud.  Here,
Plaintiff does not plead any facts showing that Nill realized any
"concrete benefits" by supporting or recklessly permitting the
allegedly improper revenue recognition scheme.  Cf. Aldridge, 284
F.3d at 83-84 (where the court considered relevant the "financial
incentives to exaggerate earnings [that went] far beyond the
usual arrangements of compensation based on the company's
earnings" and that the jobs of the individual defendants "were in
jeopardy if the goals were not met").  Consequently, Plaintiff's
motive and opportunity allegations do little, if anything, to
support a strong inference of scienter on the part of Nill.

     (ii, iii & iv) - _Extent, Magnitude, Duration and_
_Pervasiveness of Accounting Irregularities_ - Plaintiff urges me
to infer that Nill must have known or been reckless as to the
truthfulness of the financial statements he signed because of the
extent of the multi-year multi-million dollar Restatements
themselves and due to the "magnitude, duration and pervasiveness"
of the accounting irregularities.[17]  In response, Defendants make

_____

     [17] Plaintiff suggests that scienter should also be inferred
from the fact that the accounting irregularities were violations
of Sonus's own accounting policies.  I do not consider this
argument independent of the GAAP violations because it was the
policy of Sonus to follow GAAP.

several rebuttal arguments, which I group into four points.

First, "[t]o support even a reasonable inference of scienter, ... the complaint must describe the [GAAP] violations with sufficient particularity; 'a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation.'" Greebel, 194 F.3d at 203 quoting Gross v. Suumma Four, Inc., 93 F.3d 987, 996 (1st Cir. 1996) (quoting Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 n. 2 (1st Cir. 1994)). Defendants argue that the allegations of accounting violations in the Amended Complaint fall short of establishing the particularity required. As Sonus points out, despite repeated use of the terms 'GAAP' and 'SOP 97-2,' not one paragraph of the Amended Complaint details the accounting violations. The Complaint does not include transaction specifics, such as dates, amounts, and terms, nor does it explain the particular SOP 97-2 rule that was violated and how. The Complaint only provides some details of alleged accounting improprieties in four instances. As to those allegations, Defendants argue that in "two of those instances (Compl. ¶ 45), the sources have both the dates and direction of the restatement completely wrong; revenue was moved into, not out of, the quarters at issue, a fact that Sonus has twice pointed out, but which plaintiff willfully continues to ignore." And, "in the fourth instance (Compl. ¶ 48), the source, although unable to identify any of the 'various features under the

-40-

contract,' claims an overstatement of revenues from an AT&T
contract for Q4 of 2003, even though the Complaint itself makes
clear that because the reporting for that quarter was delayed, no
defendant ever made a false public statement containing
'overstated' AT&T revenues and none is alleged in the Complaint."

As to the lack of detail, it is true that in Greebel the
First Circuit suggested a complaint should "include such basic
details as the approximate amount by which revenues and earnings
were overstated; the products involved in the contingent
transactions; the dates of any of the transactions; [and] the
identities of ... the customers or [the Defendant company's]
employees involved in the transactions." Id. at 204 (citations
omitted).  However, in listing these details, the Court was not
suggesting "that each of these particulars must appear in a
complaint, but [only that] their complete absence ... is
indicative of the excessive generality of these allegations."
Id.  Here, the Complaint does make reference to some details like
the customers. See, e.g., Compl. ¶ 51.  But an even more
fundamental problem with Defendants' argument is that the
Restatement essentially amounts to an admission by Sonus that it
overstated and understated its revenues and earnings by
quantified amounts in contravention of GAAP and SOP 97-2.  In
Greebel, the defendant company had not restated its finances or
admitted its GAAP violations.  Here Sonus admitted that certain
of its employees "were engaged in behavior that violated our code

-41-

of conduct and may have compromised the integrity of our
financial reporting" to a degree that required Sonus to restate
its consolidated financial results by millions of dollars for
fiscal years 2001 and 2002 and the first three quarters of fiscal
year 2003. (Compl. ¶ 80.) Furthermore, Sonus admitted that the
reason for the Restatement was that "accounting with respect to
certain prior period transactions required adjustment" with "the
primary impact" affecting "the timing of revenue recognition and
certain other financial statement accounts."  (Compl. ¶¶ 53, 54.)

As to the discrepancy between the specific transactional
allegations in the Complaint and the Restatement, Plaintiff
attempted to clarify its position at the hearing.  As I
understand Plaintiff's position, I ought to consider the
Restatement as an admission of error that corroborates
Plaintiff's allegations, but I ought not to assume that
everything in Sonus's Restatement is true and accurate.[18]  The
Restatement was issued on July 28, 2004 <u>after</u> the present lawsuit
was filed on February 12, 2004.  Thus, as Plaintiff urges, some

---

[18] Ordinarily, a court confronting a motion to dismiss is
limited to the pleadings unless "the proceeding is properly
converted into one for summary judgment under Rule 56.  However,
courts have made narrow exceptions for documents the authenticity
of which are not disputed by the parties; for official public
records; for documents central to plaintiff's claim; or documents
sufficiently referred to in the complaint."  <u>Watterson v. Page</u>,
987 F.2d 1, 3 (1st Cir. 1993).  Here, the parties do not dispute
the authenticity of the Form 10-K/A, but Plaintiff questions the
reliability of the Restatement, especially the self-serving
explanatory notes accompanying the Restatement.

of the explanatory notes are self-serving justifications in anticipation of defending this lawsuit.  In addition, the restated financial information for four quarters in 2002 and 2003 in the Form 10-K/A is unaudited. (Restatement, Notes to Consolidated Statement (18).) As a result, what I am left with is that the Complaint provides some particulars about four specific intentional accounting manipulations that contradict Sonus's self-reported corrections.  Given that this dispute is before me on a motion to dismiss, I will not ignore Plaintiff's allegations, but I consider them weak and uncorroborated at best.

Defendants' second point is that, a voluntary "restatement of earnings, without more, does not support a 'strong inference' of fraud, or for that matter, a weak one."  In re Seque Software, Inc., 106 F.Supp.2d 161, 169 (D. Mass. 2000).  In Seque, the Court reasoned that "[t]o reflexively punish a company for correcting its earning statements when subsequent events disclose errors in the originals would create a perverse incentive for management to conceal mistakes, thereby defeating a core purpose of the securities laws."  Id. at 170.  While I heed this warning, I find that there is a significant difference between the improper "estimates of expected returns" that occurred in Seque and the allegations of an ongoing scheme to manipulate revenues in this case.  Acknowledging one's wrongdoing does not excuse it.

Third, Defendants point out that "[a] host of courts have held that a mere failure to recognize revenue in accordance with

GAAP does not, in itself, suffice to establish scienter." In re Peritus Software Servs., Inc., 52 F.Supp.2d 211, 223 (D. Mass. 1999). Furthermore, courts have said this is true regardless of the size or duration. The Sixth Circuit, for example, has "decline[d] to follow the cases that hold that the magnitude of financial fraud contributes to an inference of scienter on the part of the defendant." Fidel v. Farley, 392 F.3d 220, 231 (6th Cir. 2004), reh'g en banc denied, 2005 U.S. App. LEXIS 5624 (April 6, 2005). But since the First Circuit has more recently held that "[t]he larger the distortion of the company's accounting figures, the more likely it might be that such distortion could not be accomplished without either complicity, or reckless irresponsibility, of top officers," Stone, 414 F.3d at 199, I am bound to disagree with the Sixth Circuit. However, I take notice of the Sixth Circuit's cautionary advice that "[a]llowing an inference of scienter based on the magnitude of fraud" could "allow the court to engage in speculation and hindsight." Fidel, 392 F.3d at 231. Thus, I will not draw the impermissible 'fraud-by-hindsight' inference, which proceeds on "the assumption that the defendants must have known of the severity of their problems earlier because conditions became so bad later on." Serabian, 24 F.3d at 367. Instead, I make the inference suggested by the First Circuit in Stone that if the accounting had a "significant effect on the Company's overall results," there would greater reason "to assume that the

-44-

Company's CEO and CFO must have known about the failure to follow accepted accounting practices.  Irregular financial statements which overstate estimated results to" a great degree "support a strong inference that the Chief Executive Office[r] [*sic*] or the Chief Financial Officer of the company acted with intent to defraud, or with reckless disregard for the truth of the statements."  Id. at 201.

Plainly, "[a]ccurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [the Company]'s stock."  Cabletron, 311 F.3d at 35. According to the Restatement, Sonus's revenue was misstated by tens of millions of dollars for the fiscal years 2001, 2002 and the first three quarters of 2003.  Given that Sonus's restated revenues ranged from approximately $47 million to $129 million for those years, Sonus's improper accounting likely had a significant effect on the Company's overall results.  Cf. id. ("Given that Cabletron's quarterly revenue ranged from $371 million to $381 million during the class period, reasonable investors unquestionably might consider a difference of such magnitude [the revenue was fraudulently inflated by tens of millions of dollars per quarter] material.")  Sonus also admitted in its Restatement that contrary to the directives in SOP 97-2, it "offered maintenance services at no additional charge or at discounted rates to certain customers but did not separate the fair value for the maintenance from product revenue.  This

-45-

resulted in revenue associated with the value of the undelivered
maintenance services not being recognized over the service
period." (Form 10-K/A, p. 5)  In other words, Sonus admits that
over $17 million dollars of maintenance revenue was recognized
when products were delivered and not recognized over the period
the services were actually provided as required by SOP 97-2.  See
also Compl. ¶¶ 42-43 (According to a "former Account Director who
reported directly to an officer-level sales executive during the
relevant time period,[19]... Sonus was able to, and did, manipulate
the timing of its reported revenues by claiming that the software
updates had in fact been delivered at the time revenue therefrom
was recorded.")  Furthermore, for the year ending December 31,
2002, only one customer, Qwest Communications, contributed more
than 10% to Sonus's revenues; Quest represented 42% of the total
restated revenues that year.  (Form 10-K/A, p. 22).  Quest also
contributed 18% of Sonus's revenues for the fiscal year 2003.
The Restatement shows that Sonus booked early $53 million dollars
of product revenue, which the Restatement attributed to
"undelivered software releases" for the "particular customer

---

[19] I remain troubled by Plaintiff's refusal to disclose the
multiple un-named sources.  The allegations initially attributed
only to "former employees" and "former senior Sonus employees"
now reference unnamed holders of more descriptive positions and
responsibilities. I will discuss the adequacy of this slight
improvement infra Section II.B.3.a(vii) in discussing the
allegations of conscious misbehavior by Nill.

transaction" identified as Qwest in the Complaint.[20]  See Form
10-K/A, p. 4-5; see also Compl. ¶ 44 ("According to a former
Sonus vice president who had responsibility for, *inter alia*, the
Company's soft switches (a significant component of the Qwest
contract), 'Sonus was simply gerrymandering results as to the
Qwest contract'.")

     Finally, Defendants suggest that I should not infer fraud
from the Restatement, despite the magnitude, because Sonus's
accounting "misjudgments" occurred as part of complex accounting
determinations and did not involve completely fictitious sales.
Furthermore, they contend that GAAP principles "tolerate a range
of 'reasonable treatments,' leaving the choice among alternatives
to management,'" and, therefore, "[a]ccounting judgments, even
imperfect ones that violate GAAP, do not, absent 'other
circumstances' support an inference of scienter." Seque, 106
F.Supp.2d at 170 quoting Greebel, 194 F.3d at 205.  These
justifications can be found in the Restatement itself.  For
instance, in Item 7 of Form 10-K/A Sonus explains that "[m]any of
our sales are generated from complex contractual arrangements,
which require significant revenue recognition judgments,

───────────────

     [20] The improper "unbundling" alleged in Paragraph 42 of the
Complaint appears to correspond to Sonus's admitted booking of
revenue for delivered products in certain transactions where
Sonus "should have deferred all revenue until all elements of the
transaction were delivered." (Form 10-K/A, p. 5).  The revenue
adjustment for 2001, 2002 and the first three quarters of 2003
attributed to this error accounted for significantly less of the
revenue adjustments in the Restatement.  (Form 10-K/A, p. 6.)

particularly in the case of multiple element arrangements."
(Restatement, p. 17.)

I recognize that there is a distinction between excusable or even negligent accounting misjudgments and intentional accounting manipulation, and that evidence of the former provides little support from which to infer scienter.[21] But here, Plaintiff challenges Defendants' attempt to excuse the improper accounting as simple misjudgment, arguing that "in truth there is no leeway under GAAP for falsely recognizing revenues on the performance of obligations which in reality were not performed in the accounting quarters in which they were recorded. Such practices are strictly forbidden under GAAP." At the hearing in this matter, Plaintiff also specifically argued against reliance on the self-serving complexity justification in Sonus's Restatement, which, as I mentioned earlier, was issued after the present lawsuit was filed. Plaintiff urges that I distinguish the self-serving notes in the Restatement from the Restatement's damaging admissions. I might ignore the complexity argument at this stage if Plaintiff had provided me with a detailed account of the improper revenue recognition and why the errors ought to be seen as more than

_____

[21] For instance, in Cabletron the Court held that "the nature of much of the alleged inaccuracy in earnings derives from systematic fraud, described in detail, that extends to completely fictitious sales. This distinguishes it from cases where the alleged GAAP violation consisted merely of questionable bookkeeping practices." Id., 311 F.3d at 35 comparing the facts to Gross, 93 F.3d at 995-96 and Serabian, 24 F.3d at 362.

questionable or even negligent accounting.  However, without that explanation I am left only with the language of the multi-year and multi-million dollar Restatement itself, without a clear and particularized set of allegations regarding the degree of culpability or negligence that was likely involved.

Considering all of the arguments for and against the probative value of this factor, I find that the magnitude of product revenue accounting errors lends at least some support to the inference that Nill as the CFO acted with reckless disregard for the truth of the financial statements.  A CFO, who was "actively involved in the preparation, review, and authorization of Sonus's publicly-reported financial statements," (Compl. ¶ 17), and who is responsible to certify a company's financial statements, ought to be familiar with the accounting for its most lucrative client.  However, while one might assume that a CFO would know that statements regarding total revenue over time were out of step with the level of business conducted by the company, here, the total revenue stated by the company over the course of the Restatement periods was overstated by approximately 12%.  Where reported revenue somewhat aligns itself as here with the long-term business conducted by the company, the magnitude of the errors is not sufficient, without more particularized information, to ground a strong inference that senior executives knew or were reckless that revenue recognition was being timed inappropriately.  Consequently, given the weaknesses identified,

-49-

I find that the "magnitude, duration and pervasiveness" of the accounting irregularities implicitly admitted in the Restatement cannot alone support a strong inference that Nill had the requisite scienter to meet the PSLRA and Rule 9(b) pleading requirements.

(v) _Internal Controls_ - Allegations that a company failed to "maintain adequate internal controls ... can add to the strength of a case based on other allegations." Crowell v. Ionics, Inc., 343 F.Supp.2d 1, 20 (D. Mass. 2004). In the Form 10-K/A filed July 28, 2004, Sonus indicated that it and its independent auditors identified "material weaknesses" in its internal controls and procedures. In its Form 10-Q for the financial quarter ending March 31, 2004, Sonus's listed weaknesses included "inadequate supervision and review within the finance and accounting department"; "lack of adequate technical accounting expertise"; "flawed foundations for accounting estimates"; and "inadequate quarterly and year-end financial statement close and review procedures." As in Crowell, I find that "[a]lthough it is likely true that standing alone, even this level of mismanagement does not constitute scienter, when considered in context with the other, stronger allegations, it at least strengthens [Plaintiff]'s case" that Nill signed and certified financial reports reckless as to their accuracy. Id. at 20. Furthermore, I observe that while most of the debate between the parties centers on whether Plaintiff can prove that Nill intentionally

helped orchestrate this scheme, Nill is equally liable if, in his capacity as CFO, Vice President of Finance and Administration and the Treasurer, he acted in a reckless or "highly unreasonable" fashion, "involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care" knowing that his actions presented a "danger of misleading buyers or sellers." Greebel, 194 F.3d at 198 quoting Sundstrand, 553 F.2d at 1045 (quoting Franke, 428 F.Supp. at 725).  Consequently, I find that the extent of the admitted "material weaknesses" in Sonus's internal controls and procedures strengthens the inference that Nill as Sonus's CFO, Vice President of Finance and Administration, and Treasurer, acted recklessly when he certified the financial statements.  But it is still insufficient to draw a strong inference of scienter when the revenue misstatements could have resulted from negligent management oversight.  So, I turn to the question of whether Plaintiff has provided sufficiently particularized allegations regarding Nill's intent or recklessness to permit a strong inference of scienter as required by the PSLRA and Rule 9(b).

(vi) _Conscious Misbehavior_ - Plaintiff only pleads two specific instances where Nill specifically participated or knowingly acquiesced in the alleged accounting fraud.  These allegations are based on reports attributed to un-named sources

in Paragraphs 45 and 46.[22]

Paragraph 45 alleges that a "former accounting department employee who reported directly to Hemme" reported that "Hemme 'was told to get a number' in order to make the quarter by senior Company managers, including defendant Nill." This allegation is ambiguous and fails to link Nill directly to any misconduct. Of course management puts pressure on employees to get results. But as Defendants point out, the source never reveals when, or by whom Hemme was told to get a number, and, more importantly, whether Hemme was told to do anything improper to get the number. Furthermore, the source does not allege that he or she interacted with Nill or that he or she had personal knowledge of this directive, only that his or her boss (Hemme) *was told by* senior managers, apparently *including* Nill, 'to get a number.' Consequently, this allegation does not contribute to a strong inference of scienter.

Paragraph 46 alleges that a "former Sonus vice president who had responsibility for, *inter alia*, preparing and interacting with Hemme on financial statement preparation" reported how:

_____

[22] I do not consider the un-sourced, conclusory allegations as to Nill's knowledge and acquiescence. See Compl. ¶ 40, 44, 45, 51; Stone, 414 F.3d at 214 ("[A] plaintiff does not satisfy the PSLRA's requirement of particularized facts supporting a strong inference of scienter by a conclusory assertion that the defendant knew the true facts, or knew that the challenged statement was false. What is needed is the allegation of particularized facts which give strong support to that conclusion.")

> In either Q3 or Q4 2001, defendant Nill,
> along with former Controller Hemme had
> requested that an acceptance letter be sent
> to Michael Perruse, a former senior vice
> president of Engineering at Qwest.  The
> purpose of the acceptance letter was to
> purportedly confirm the delivery of
> approximately $18 million worth of hardware
> and software to Qwest, pursuant to its $100
> million contract with Sonus.  The letter was
> in fact issued, under either Nill or Hemme's
> signature, even though the product had not
> been delivered, and in fact was not even
> ready to be delivered.  Instead, the product
> remained in the laboratory of Sonus's Telecom
> Technologies, Inc. subsidiary in Richardson,
> Texas, after the letter had been sent to
> Perruse.  Perruse went along with the fraud
> because of certain reciprocal revenue
> arrangements which he had entered into with
> Sonus.

Although this allegation pertains to an incident before the Class Period, I find that the details provide some factual support for Plaintiff's allegation that Nill participated in the accounting fraud when he certified the financial statements for fiscal year 2001 on March 28, 2002.  The question is whether this allegation is sufficiently reliable such that I can draw a strong inference that Nill knew or was at least reckless as to the truth of the financial documents for Year-End 2001 filed March 28, 2002.

As indicated above, the source for this allegation is a "former Sonus vice president who had responsibility for, *inter alia*, preparing and interacting with Hemme on financial statement preparation."  The conventional standard in the First Circuit for dealing with confidential source allegations under the PSLRA is drawn from the Second Circuit's <u>Novak</u> decision, which adopted a

"moderate view" of the "information and belief" particularity
requirements of section 78u-4(b)(1).  Cabletron, 311 F.3d at 28-
29.  According to this view, confidential sources need not be
named, "provided they are described in the complaint with
sufficient particularity to support the probability that a person
in the position occupied by the source would possess the
information alleged."  Novak, 216 F.3d at 314.  Drawing on Novak,
the First Circuit directs courts to evaluate, inter alia, "the
level of detail provided by the confidential sources, the
corroborative nature of the other facts alleged (including from
other sources), the coherence and plausibility of the
allegations, the number of sources, the reliability of the
sources, and similar indicia."  Cabletron, 311 F.3d 29-30 quoting
Novak, 216 F.3d at 314.  The First Circuit adopted this approach
over a per se rule that anonymous sources must be named at the
pleading stage because it "strikes the balance Congress intended
in the PSLRA.  The statute was designed to erect barriers to
frivolous strike suits, but not to make meritorious claims
impossible to bring."  Id. at 30.

    Defendants suggest that it would be speculative to infer
that the product had not been delivered by the end of 2001 since
the informant does not specify whether the alleged wrongdoing
occurred in Q3 or Q4.  However, as Sonus itself admits, "the
purpose of the alleged 'scheme' was to move revenue from quarter
to quarter."  Thus, even if the product was actually shipped

-54-

before the year end, it would have been improper for Sonus to get
the documentation in order to record the revenue in an earlier
quarter.  In any event, the allegation suffers from a more
fundamental flaw since the confidential informant is not
described in the complaint "with sufficient particularity to
support the probability that a person in the position occupied by
the source would possess the information alleged." Novak, 216
F.3d at 314.

In considering the appropriate standard for confidential
informants, the First Circuit listed, as an analogy, the factors
to be considered before granting a government request for a
search warrant based on tips from confidential informants.  These
factors include "the basis offered for the informant's knowledge,
the existence of other information corroborating the informant's
allegations, and the amount of self-verifying detail provided in
the allegations themselves." Cabletron, 311 F.3d at 30.  In
finding the particularization standard satisfied in Cabletron,
"[t]he court noted the witnesses' 'personal knowledge' and
'strong basis of knowledge' of the facts alleged, their 'specific
descriptions of the precise means through which [the fraud]
occurred,' their 'consistent accounts' which 'reinforce one
another and undermine any argument that the complaint relies
unduly on the stories of just one or two former employees,
possibly disgruntled,' and the independent evidence corroborating
their statements." In re Vertex Pharmaceuticals Inc., Securities

Litigation, 357 F.Supp.2d 343, 353 (D. Mass. 2005) quoting
Cabletron, 311 F.3d at 30-31.  Cabletron went on to find that the
complaint in that case created a strong inference of scienter for
several reasons including the express allegation that one of the
defendants specifically directed some of the fraudulent
activities at the heart of the complaint and the allegations that
many people within the company received regular information about
certain problems which they should have realized contradicted the
company's public statements.  Id. at 39.

Here, it is unclear whether the "former Sonus vice president
who had responsibility for, inter alia, preparing and interacting
with Hemme on financial statement preparation" had personal
knowledge of Nill's alleged fraudulent interaction with Perruse
of Quest.  The informant's inability to specify whether the
interaction took place in the third or fourth quarter of 2001
suggests he did not have personal knowledge of the arrangement.
Furthermore, the lack of basis offered for the informant's
knowledge and the lack of corroborating factual allegations as to
Nill's participation or acquiescence in some kind of elaborate
accounting scheme, detracts from the reliability of this single
allegation of conscious misbehavior by Nill.  Consequently, I
find that paragraphs 45 and 46 do not amount to sufficiently
particularized allegations regarding Nill's intent or
recklessness to permit a strong inference of scienter.

(vii) Active Involvement and Familiarity With Particular

-56-

_Accounting Principles_ - Finally, there is the argument that as CFO, Nill "was actively involved in the preparation, review, and authorization of Sonus's publicly-reported financial statements, reports on SEC Forms 10-K and 10-Q, annual shareholder reports, and press releases."  And, it is argued that, since Nill "had extensive experience working with some of the world's most prominent software companies and accounting firms and thereby was fully familiar with the requirements of GAAP and, in particular, SOP 97-2," an inference may be drawn that he was at least reckless when he certified plainly deficient financial statements.  However, "[c]ontrary to Plaintiffs' assertions, fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information.... [T]he Complaint must allege specific facts or circumstances suggestive of their knowledge.  Without more, Plaintiffs fail to meet the PSLRA requirement to state with particularity facts giving rise to a strong inference of scienter."  PR Diamonds, Inc. v. Chandler, 364 F.3d 671, (6th Cir. 2004).

Here, there is nothing more.  Considering all of the arguments, I cannot draw a strong inference of scienter as to Defendant Nill.  Consequently, I will grant the motion to dismiss the Section 10(b) and Section 11 claims against Nill for failure to plead with particularity facts supporting a strong inference of scienter as required by the PSLRA and Rule 9(b).

-57-

b. <u>Ahmed</u> - The only specific and sourced allegation about Ahmed's involvement and knowledge of the scheme is that according to the "former Sonus vice president who had responsibility for, *inter alia*, preparing and interacting with Hemme on financial statement preparation, ... defendant Ahmed was made aware of these improper practices in 2001, specifically with regard to the Qwest contract, but took no action to stop them." (Compl. ¶ 46). This vague allegation by a minimally described confidential informant is insufficient to draw a strong inference of scienter as to Defendant Ahmed. No basis is given for the allegation and it is presented in a manner more conclusory than factual. As a result, I will also dismiss the Section 10(b) and Section 11 claims against Ahmed.

c. <u>Sonus</u> - Fraud by agents of Sonus other than Nill and Ahmed may be attributable to Sonus and thereby serve as the predicate for Sonus's liability as to the Section 10(b) and Section 11 claims, despite the dismissal of those claims as to Nill and Ahmed. <u>See</u> <u>Stone</u>, 424 F.3d at 27. In this case, I find a strong inference of scienter can be imputed to Sonus given the allegations against its controller Hemme.

In addition to the general indicia suggesting intentionally fraudulent or reckless accounting practices discussed above in connection with Nill's scienter, Hemme was terminated in 2004 for breaching Sonus's Code of Business Conduct in connection with the Restatement, (Restatement, p. 43; Compl. ¶ 7.); according to a

"former Sonus vice president who had responsibility for, *inter alia*, preparing and interacting with <u>Hemme</u> on financial statement preparation," Hemme schemed with Perruse, (Compl. ¶ 46); "according to a former accounting department employee who reported directly to <u>Hemme</u>, Hemme materially overstated Sonus's reported revenues on its contract with AT&T in Q4 of 2003,"[23] (Compl. ¶ 23); and "[a]ccording to a former senior sales manager with responsibility for a significant contract with one of Sonus's larger telecom customers" Hemme "repeatedly [told] sales people that 'if you can get away from not including future deliverables in contracts - do it!'" (Compl. ¶ 25). While the allegations against Hemme present a close call, I conclude that the Complaint as a whole sufficiently pleads a strong inference of fraudulent intent as to Hemme.

In defending against the argument that Hemme's knowledge could be imputed to Nill and Ahmed, Sonus observed that "[a]t best, it would make him [Hemme] an agent of Sonus." Sonus later retreated from this comment arguing that only the knowledge of the officer making the statement at issue can be imputed to the corporation. In a case cited by Sonus, the Fifth Circuit explained that:

> For purposes of determining whether a

---

[23] I recognize that the Restatement does not restate the revenues for Q4 of 2003, but the fourth quarter of 2003 is still within the Class Period and relevant to Hemme's scienter and involvement in the scheme.

> statement made by the corporation was made by
> it with the requisite Rule 10(b) scienter we
> believe it appropriate to look to the state
> of mind of the individual corporate official
> or officials who make or issue the statement
> (or order or approve it or its making or
> issuance, or who furnish information or
> language for inclusion therein, or the like)
> rather than generally to the collective
> knowledge of all the corporation's officers
> and employees acquired in the course of their
> employment.

Southland Securities Corp. v. INSpire Insurance Solutions, Inc.,

365 F.3d 353, 366 (5th Cir. 2004). See also In re Apple

Computer, Inc. Sec. Litig., 243 F.Supp.2d 1012, 1023 (N.D.Cal.

2002) citing Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424,

1435-36 (9th Cir. 1995)("It is not enough to establish fraud on

the part of a corporation that one corporate officer makes a

false statement that another officer knows to be false.  A

defendant corporation is deemed to have the requisite scienter

for fraud only if the individual corporate officer making the

statement has the requisite level of scienter, i.e., knows that

the statement is false, or is at least deliberately reckless as

to its falsity, at the time that he or she makes the statement.")

The First Circuit has not expressly adopted this limiting

rule.  Rather, in Cabletron, the Court held that the case against

the company "itself is the clearest.  Most of the potentially

actionable statements in the complaint, including the SEC filings

and the press releases, were company documents.  The scienter

alleged against the company's agents is enough to plead scienter

for the company. [Plaintiff] has thereby stated a claim against
[the company] that survives the PSLRA's pleading requirements."
Cabletron, 311 F.3d at 40.  See also Stone, 424 F.3d at 27.
Furthermore, Nordstrom -- the case upon which the Fifth Circuit
in Southland Securities and the Northern District of California
in Apple rely -- stands for the rejection of the "independent
'collective scienter' theory," not the idea that a corporation
may be liable for the fraud of an individual officer who is not a
defendant.  Nordstrom, 54 F.3d at 1435.  In Nordstrom, the Ninth
Circuit cited to In re Warner Communications Securities
Litigation, 618 F.Supp. 735 (S.D.N.Y. 1985), aff'd, 798 F.2d 35
(2nd Cir. 1986), which "noted that a corporation's scienter could
be different from that of an individual director or officer,"
although the district court also "expressly stated that such
scienter would require a showing that 'one or more members of top
management knew of material information ... but failed to stop
the issuance of misleading statements ... or that Warner
management had recklessly failed to set up a procedure that
insured the dissemination of correct information.'" Nordstrom, 54
F.3d at 1435 quoting Warner Communications, 618 F.Supp. at 752.
Here, Plaintiff seeks to attribute the knowledge and intent of
Hemme, an individual officer who was "necessarily aware of the
requirements of SEC regulations and state law and of the 'danger
of misleading buyers and sellers'" to Sonus.  Nordstrom, 54 F.3d
at 1435.  At a minimum, more senior management than Hemme

recklessly failed to have a structure that would insure the
dissemination of correct information in an environment where
Hemme allegedly encouraged accounting fraud.

In sum, since the Complaint sufficiently pleads a strong
inference of scienter as to Hemme that is attributable to Sonus,
I deny Defendants motion to dismiss the Section 10(b) and Section
11 claims against Sonus.

**C. Control Person Liability**

Plaintiff asserts control person liability against the
individual Defendants pursuant to Section 20(a) of the Exchange
Act and Section 15 of the Securities Act.

Section 20(a)[24] attributes joint and several liability to
"control persons" for the controlled person's violation of the
securities laws. 15 U.S.C. § 78t(a). It "creates derivative
liability for those that directly or indirectly control a person
or firm found liable under a provision of the Securities Exchange
Act." <u>Credit Suisse</u>, 431 F.3d at 53. Section 15[25] also "imposes

_____

[24] Section 20(a) provides:

Every person who, directly or indirectly, controls any
person liable under any provision of this title or of any
rule or regulation thereunder shall also be liable jointly
and severally with and to the same extent as such controlled
person to any person to whom such controlled person is
liable, unless the controlling person acted in good faith
and did not directly or indirectly induce the act or acts
constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[25] Section 15 provides:

derivative liability upon persons who 'control' those liable under Section 11 or 12."  <u>Shaw</u>, 82 F.3d at 1201 n. 2.

In this case, both of the individual Defendants seek to have the claims against them dismissed in their entirety, however they make no argument with respect to the Section 20(a) claim except to incorporate Defendant Sonus's argument.  The only reference Sonus makes in its briefing to Section 20(a) is the argument that "[w]ith the failure of plaintiff's underlying Rule 10b-5 claims, plaintiff's § 20(a) 'controlling person' claim must also fail.[26]

---

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

[26] <u>In re Stone & Webster, Inc., Securities Litigation</u>, 414 F.3d 187 (1st Cir. 2005), <u>petition for reh'q. denied</u>, 424 F.3d 24 (2005), the First Circuit made some interesting comments about Section 20(a), <u>id.</u> at 201, n. 11, suggesting that the heightened pleading requirements of the PSLRA do not apply to Section 20(a) claims.  The parties largely ignored the discussion and did not take up my suggestion that <u>Stone</u> might be read to hold that a plaintiff has satisfied the pleading requirements for a Section 20(a) claim against the controlling party (<u>e.g.</u>, Nill and Ahmed) under Rule 8 by alleging facts that could only support an inference -- as opposed to a strong inference -- that the controlled party (<u>i.e.</u>, Sonus) acted with scienter in making materially false or misleading statements in violation of Section 10(b).  Nevertheless, given my decision that the Complaint sufficiently pleads facts giving rise to a strong inference of scienter on the part of Sonus itself, I need not explore this

See <u>In re Peritus Software Servs., Inc. Sec. Litig.</u>, 52 F.Supp.2d
211, 230 (D. Mass. 1999)."  Similarly, the only argument in the
briefing with respect to the Section 15 claim was Defendant
Ahmed's contention that "Plaintiff's § 15 'controlling person'
claims are derivative of its § 11 and § 12 claims, and fail for
that reason.  <u>See</u> <u>Shaw</u>, 82 F.3d at 1201 n. 2."

    At the hearing, Sonus did, however, argue that the "status
pleading" in this Complaint is insufficient under what counsel
referred to as either the "actual control" test advocated by
Judge Lynch in <u>Aldridge</u>, 284 F.3d at 84 ("To meet the control
element, the alleged controlling person must not only have the
general power to control the company, but must also actually
exercise control over the company"), or the "virtual hegemony"
test advocated by Judge Selya in <u>Sheinkopf v. Stone</u>, 927 F.2d
1259, 1270 (1st Cir. 1991) ("For [the Defendant lawyer] to be
liable on this basis, ... there must be 'significantly probative'
evidence that [his firm] exercised, directly or indirectly,
meaningful hegemony over the [controlled person].").  But, since
"control is a question of fact that will not ordinarily be
resolved summarily at the pleading stage," <u>Cabletron</u>, 311 F.3d

---

issue further.  I note only that more recently in <u>Credit Suisse</u>,
the First Circuit held simply that "Section 20(a) creates
derivative liability for those that directly or indirectly
control a person or firm found liable under a provision of the
Securities Exchange Act.  See 15 U.S.C. § 78t(a).  Thus, our
rejection of the underlying section 10(b) violations dooms the
plaintiffs' claims against CSFB and Quattrone under section
20(a)."  431 F.3d at 53.

at 41, I find that Plaintiff has satisfied the requirement at this stage of pleading facts supporting a "reasonable inference," id. at 42, "that the controlling [persons] were actively participating in the decision-making processes of the corporation[.]" Aldridge, 284 F.3d at 85.

In Aldridge, the Court found that the power of the trust defendants to elect two-thirds of the directors was not enough because they did not have "direct control over the management and operations of the company." That is not the circumstance with the individual Defendants in this case. Here, paragraphs 16-17, 19, and 192 of the Complaint plead sufficient facts to show that as CFO and CEO both Nill and Ahmed were controlling persons of Sonus under either the Aldridge and Sheinkopf test. Consequently, the motion to dismiss as to the Section 20(a) and Section 15 claims against both Nill and Ahmed as controlling persons of Sonus are denied.

### III. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED as to the Section 12(a)(2) claims against all of the Defendants; GRANTED as to the Sections 10(b) and 11 claims against Defendants Nill and Ahmed; DENIED as to the Sections 10(b) and 11 claims against Defendant Sonus; and DENIED as to the Sections 20(a) and 15 claims against Defendants Nill and Ahmed.

/s/ Douglas P. Woodlock

-65-

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE