Exhibit A

Charles Sweeney                                    11/21/2006

UNITED STATES DISTRICT
DISTRICT OF MASSACHUSETTS

Civ. Action No. 04-10294 DPW

DEBORAH CHIN, individually and on
behalf of all others similarly
situated,

        Plaintiff,                  **CERTIFIED ORIGINAL**
                                     **LEGALINK BOSTON**
vs.

SONUS NETWORKS, INC., HASSAN
AHMED, PH.D. AND STEPHEN NILL,

        Defendants.

_____/

DEPOSITION OF CHARLES SWEENEY

November 21, 2006
Wyndham Hotel
8100 International Drive
Orlando, Florida  32819
9:27 a.m. - 12:29 p.m.

Reported by:
Lori Junker, RPR
Notary Public, State of Florida

Charles Sweeney                                    11/21/2006

Page 8

1    **Q     Prior to your current situation as being**
2    **self-employed, where did you work?**
3         A    I was control and chief compliance officer
4    BPI Global Asset Management from April 1997 through
5    October of last year.
6    **Q     Did you hold both of those positions at**
7    **BPI Global throughout your tenure there?**
8         A    I would say -- I held the
9    responsibilities.  The chief compliance officer
10   designation came about as a result of changes and
11   regulations.  The SEC mandated that advisors must
12   have a CCO, and I was the person who was designated
13   as such.
14   **Q     Do you recall when you were designated as**
15   **CCO?**
16        A    Not specifically, no.
17   **Q     Would that have been in 2002?**
18        A    It had to do with -- there's a specific
19   regulation that the SEC put out related to investment
20   advisors and investment companies, nothing to do with
21   Sarbanes-Oxley.
22   **Q     If we break these down for a moment, what**
23   **were your duties and responsibilities as controller**
24   **of BPI Global?**
25        A    Anything from a financial accounting point

Charles Sweeney                                    11/21/2006

Page 10

1          Q      You said "client's mandate."    Would you

2    explain what a client mandate is?

3          A      Investment objectives for a client

4    account.

5          Q      Who were, as a general matter, BPI

6    Global's clients?

7                 MR. CERA:  Object to the form.

8    BY MR. PRENDERGAST:

9          Q      Types.  Do you understand the question?

10         A      Client types?

11         Q      Yes.

12         A      There was a group of Canadian mutual funds

13   that BPI Global Asset Management served as investment

14   advisor from April 1, 1997, through some point in

15   2005.  There were US Mutual Funds, there were

16   separate accounts; there were hedge funds, some of

17   which were Canadian hedge funds under the mutual fund

18   umbrella, others of which were domestic hedge funds.

19                Hedge funds is a broad term, you know, but

20   private funds as the SEC knows it.

21         Q      Just so I understand the structure, when

22   you say that they were BPI Global's clients, did BPI

23   Global have a direct relationship with them?

24                MR. CERA:  Object to the form.

25                THE WITNESS:  I'm not sure what a direct

Charles Sweeney                                              11/21/2006

Page 16

1       Q      The amended complaint in this matter

2    states as a class period March 28, 2002, through

3    March 26, 2004.  Do you know what the class period

4    means?

5       A      That's what I understand the class period

6    to be.

7       Q      Does this spreadsheet, which is attached

8    to Sweeney Exhibit No. 2, cover all Sonus purchases

9    and sales by these entities between the period March

10   28, 2002, and March 26, 2004?

11      A      It would be my belief, but with his

12   question, I too have a question.

13             MR. CERA:  He's confused you.

14             THE WITNESS:  Without looking at the

15       underlying detail --

16   BY MR. PRENDERGAST:

17      Q      Let me ask you this:  What does the begin

18   date on the fifth page of Sweeney Exhibit No. 2

19   signify?

20      A      That, I would say, would be the beginning

21   of the period that's covered in this report.

22      Q      Did you prepare this report?

23      A      I may have had someone else do the

24   underlying creation of the file and manipulated it

25   into this form.

Charles Sweeney                                        11/21/2006

Page 17

1        Q      Do you recall who you may have directed to

2    do this?

3        A      If I were to take a guess, it would

4    probably have been the operations manager.

5        Q      Do you recall providing the operations

6    manager with any directions regarding the dates to be

7    covered?

8        A      I don't have any specific recollection.

9        Q      Let me ask you this question:  Prior to

10   May of '03, are you aware of any transactions in

11   Sonus securities by these entities?

12       A      Not specifically, no.

13       Q      Generally?

14       A      I couldn't even venture a guess.

15       Q      I just thought because you said not

16   specifically, I don't know if you had any general --

17       A      I don't have any recollection of any

18   transactions over any period of time specifically

19   except for what I see here.

20       Q      That's fine.  Let's return to where I was

21   before in the questions of the legal relationship

22   between the entities identified on page 5 of Exhibit

23   2 or beginning of page 5, Exhibit 2 and BPI Global.

24              MR. CERA:  I'm sorry.  Just to be precise,

25       BPI Global Asset Management LLP; that's what

Charles Sweeney                                          11/21/2006

Page 29

1          A       1977.   From 1991 to '94 I was with Coopers

2    Lybrand and before that Laventhol & Horwath.

3          Q       **While you were employed by BPI Global were**

4    **you employed by any of the other BPI entities**

5    **simultaneously?**

6          A       No, sir.

7          Q       **Were you ever employed by CI Mutual Funds?**

8          A       No, sir.

9          Q       **Were you ever employed by Trilogy Global**

10   **Advisors?**

11         A       Let me step back -- I'm frankly not sure.

12   BPI Global and Trilogy Advisors merged in May of '05.

13         Q       **Right.**

14         A       Trilogy Global Advisors was the owner of

15   both entities after the transaction and -- I'm not

16   sure who paid me specifically, although I consider

17   myself employed by, I guess, both of them because I

18   was CCO of Trilogy and also BPI during those two

19   final months.

20         Q       **Why did you leave BPI Global?**

21         A       I was terminated.

22         Q       **Do you know the reasons for your**

23   **termination?**

24         A       The compliance function and financial

25   functions were moved to New York.

Charles Sweeney                                    11/21/2006

Page 30

1       Q       Were you given an opportunity to go to New

2  York?

3       A       No.

4       Q       Besides Mr. Burrow did you report to

5  anybody else at BPI Global?

6       A       I would say there was a dotted line to the

7  board of managers in my role as CCO.

8       Q       You understand that BPI Global is a

9  plaintiff in this lawsuit?

10      A       I do.

11      Q       Would you give me your understanding of

12  what this lawsuit is about, sir.

13      A       BPI was an investor in Sonus Networks for

14  a period of time.

15      Q       I'm sorry.  I don't mean to interrupt you,

16  but because we're trying to get some precision here

17  and because there are a lot of BPIs, there are Funds

18  and Global and Capital, I want to try, if we can, to

19  use whatever is the correct designation.

20      A       Okay.  BPI Global's clients became

21  investors as a result of our investment decision to

22  buy Sonus Networks stocks.  The period of time over

23  which we bought those, it's my understanding that

24  there were some erroneous revenue recorded to the

25  point of requiring a restatement of the financial

Charles Sweeney                                    11/21/2006

Page 31

1   statements. And there were some other matters, as I

2   understand it, expense accruals and so forth, and

3   that is -- once all that news was made public, the

4   value of the stock declined, our clients lost money,

5   and BPI being a fiduciary is looking to make our

6   clients whole.

7       Q    **You mentioned you had an understanding**

8   **there was erroneous revenue and some other things.**

9       A    Accruals or something like that.

10      Q    **Where did you gain your understanding in**

11  **that regard?**

12      A    I was made aware of it by counsel.

13      Q    **By counsel?**

14      A    Uh-huh.

15      Q    **What counsel?**

16      A    Sol's firm.

17      Q    **At some point did you have a discussion**

18  **with John Bichelmeyer regarding Sonus?**

19      A    I did.

20      Q    **Would you tell me what he said to you and**

21  **what you said to him regarding the erroneous**

22  **revenues.**

23      A    I don't have the specific recollection of

24  a conversation, but generally speaking, before we

25  decided to take this role, I spoke to John and

Charles Sweeney                                      11/21/2006

                                                        Page 33
1        Q      Did you approach your lawyers or did your
2    lawyers approach you?
3        A      We were approached by Mr. Cera's firm.
4        Q      Am I correct that BPI Global had used Mr.
5    Cera's firm previously in a class action?
6        A      We had not.
7        Q      You had not?
8        A      No.
9        Q      Had you ever used Mr. Cera's firm prior to
10   that?
11       A      We had not.
12       Q      Had anybody at the company at BPI Global
13   have a pre-existing relationship, to your knowledge,
14   with Mr. Cera's firm?
15       A      Not to my knowledge.
16       Q      Do you know how it was that Mr. Cera's
17   firm came to approach BPI Global with regard to this
18   lawsuit?
19       A      Our firm's clients were the firms that
20   lost the most money on the stock in that period of
21   time.  In the public domain there's information as to
22   who holds what and that information was out there
23   that he had garnered.  And because we had lost such
24   substantial amounts on behalf of our clients, he
25   approached us as being a prime candidate for this.

Charles Sweeney                                          11/21/2006

Page 34

1    Q    Who was the law firm that represented BPI

2   Global in the other class action, if you remember?

3    A    I do not remember.

4    Q    Did you have any other conversations with

5   any other law firms regarding a possible suit against

6   Sonus?

7    A    I want to say I think I did only just to

8   ask the question, Is this firm real?  I called my

9   lawyer or the firm's lawyer and asked him if he knew

10  anything about them and --

11   Q    I will stipulate that I think his firm is

12  real.

13        MR. CERA:  Oh, good.

14        MR. PRENDERGAST:  That's the last

15        concession you get from me.

16  BY MR. PRENDERGAST:

17   Q    Have you read the complaint in this case?

18   A    I've had the complaint, yes.  There was a

19  draft complaint that I was given and then from that

20  the first complaint was filed and then the first

21  amended complaint was filed.

22   Q    Did you provide any of the information

23  that went into the draft complaint?

24   A    I would say but for this schedule, you

25  know, there's little information we provided.

Charles Sweeney                                    11/21/2006

Page 35

1    Q    I'm sorry?

2    A    Little information, if any.

3    Q    But for the schedule, the losses?

4    A    Yes.

5    Q    Apart from what you may have learned from

6    your lawyers, did you make any assessment as to

7    whether or not the company had intentionally

8    misrepresented any facts to the public?

9              MR. CERA:  Object to the form.

10             THE WITNESS:  I would say we relied

11        principally on our lawyer.

12   BY MR. PRENDERGAST:

13   Q    Who at BPI Global -- strike that?

14        Who approved the filing of this lawsuit?

15   A    I would have signed the documents as

16   controller.

17   Q    Did you speak with any of the folks to

18   whom you reported before filing this lawsuit about

19   commencing this lawsuit?

20   A    I spoke, I think, briefly with Ryan

21   Burrow.

22   Q    Is it Brian or Ryan?

23             MR. CERA:  Ryan, R-Y-A-N.

24             THE WITNESS:  Ryan Burrow, the president,

25        and just had a short general conversation.  And

Charles Sweeney                                    11/21/2006

Page 36

1       because we had been through it before and

2       understand our fiduciary obligation to our

3       clients, you know, he realized it would be --

4       the onus would be on me, not him.

5   BY MR. PRENDERGAST:

6       Q    **Approval is easy when you don't have to do**

7   **anything.**

8            **I apologize, I should know this off the**

9   **top of my head, what was the name of the other**

10  **litigation?**

11      A    Turkcell.

12           MR. CERA:   T-U-R-K-C-E-L-L.

13  BY MR. PRENDERGAST:

14      Q    **Had BPI Global been involved in any other**

15  **class actions besides Turkcell at that point?**

16      A    No, sir.

17      Q    **Had BPI Global brought any other claims**

18  **against a company in which it invested in a legal --**

19  **strike that.  Bring any other lawsuits against**

20  **companies which any of your entities invested in?**

21      A    We were not involved in the filing of the

22  lawsuits; however, to the extent that we received the

23  flow of forms, you know, we would fill out the forms

24  and provide the paperwork as necessary.

25      Q    **Thank you.  Other than the one or two**

Charles Sweeney                                    11/21/2006

Page 37

1    conversations that you had with Mr. Bichelmeyer and

2    the conversation that you may have had with Mr.

3    Burrow, do you recall any other conversations with

4    anybody besides counsel regarding Sonus prior to

5    commencement of the lawsuit?

6        A     No.

7        Q     In engaging Mr. Cera's firm, did you come

8    to an understanding as to what would happen to a

9    recovery in this case should there be one?

10       A     Well, I don't know if we ever discussed --

11   it was a long time ago.  The recovery, if any, would

12   all go to the clients.

13       Q     Did you make any arrangements with Mr.

14   Cera's firm to share in that recovery on behalf of

15   BPI Global?

16       A     There would be no reason that we would

17   share in the recovery.  I should probably clarify

18   when I say "we."  I mean BPI even though I'm not

19   associated with any longer.  It's a hard thing to

20   drop.

21       Q     Fair enough.  We will go with that

22   understanding during the course of this deposition.

23             You understand whether -- did you reach

24   any arrangement with Mr. Cera's firm as to any

25   payment that might be made to BPI Global for serving

Charles Sweeney                                    11/21/2006

Page 38

1    as lead plaintiff in this case?

2        A     I'm not sure I understand the question.

3        Q     Was there any arrangement with Mr. Cera's

4    firm that BPI Global would be paid for its

5    participation in this case in any form?

6        A     There was no understanding that BPI would

7    be paid by anybody through anything.

8        Q     Fine, thank you.  Once the case commenced,

9    who at BPI Global had the responsibility for

10   overseeing the litigation?

11       A     It was me.

12       Q     Anybody else?

13       A     No.

14       Q     Did you speak with anybody at BPI Capital

15   regarding this litigation?

16       A     At one point or another, Michael Killeen,

17   K-I-L-L-E-E-N, general counsel of CI Mutual Funds

18   became involved and was asked to provide an

19   affidavit.

20       Q     Did you speak with Mr. Killeen?

21       A     At some point in time, yes.  As to timing,

22   I can't tell you.

23       Q     Do you recall the nature of your

24   conversation, the subject?

25       A     I believe it had to do with the affidavit

Charles Sweeney                                    11/21/2006

Page 39

1    and just making arrangements for him to speak with

2    Mr. Cera's firm.

3         Q     Did Mr. Killeen ever have responsibility

4    for overseeing this litigation?

5         A     No.

6         Q     Did you speak with anybody else at BPI

7    Capital regarding this litigation?

8         A     Not that I recall.

9         Q     After commencement of this litigation did

10   you speak with anybody at any of the clients

11   regarding this litigation?

12               MR. CERA:  Object to the form.

13               THE WITNESS:  No.

14   BY MR. PRENDERGAST:

15        Q     Do you understand that question?

16        A     There was no communication with any of the

17   clients regarding this litigation.

18        Q     What is your understanding, if any, as to

19   where BPI Global's authority to commence this lawsuit

20   comes from?

21               MR. CERA:  Object to the form.

22               THE WITNESS:  I would say as a fiduciary

23          pursuant to the terms of our agreements that we

24          have a place with a variety of clients that we

25          were in a position or we would have to come to

Charles Sweeney                                    11/21/2006

Page 40

1        bat for them.  There's no specific authority

2        that I'm aware of that says, you know, filing

3        lawsuits against companies that we invest in

4        that lose money.

5    BY MR. PRENDERGAST:

6        Q      Did you see the amended complaint in this

7    case --

8        A      I did.

9        Q      -- before it was filed?

10       A      I believe so.

11       Q      Now, in 2005 you left BPI Global, correct?

12       A      Yes.

13       Q      Did you speak with anybody upon your

14   departure from BPI Global regarding oversight of this

15   litigation?

16       A      John Myklusch, M-Y-K-L-U-S-C-H.

17       Q      Who is John Myklusch?

18       A      John is the chief financial officer and

19   now chief compliance officer of Trilogy Global

20   Advisors which is a successor entity to the

21   individual entities that merged in May of 2005.

22       Q      Why did you speak to Mr. Myklusch?

23       A      Because he is the chief financial officer

24   and chief compliance officer of the successive entity

25   and would be responsible for such matters.

Charles Sweeney                                    11/21/2006

Page 49

1      A      Yes, I have.

2      Q      **Just tell us for the record what it is.**

3      A      It's the investment advisor agreement

4  between BPI Global Asset Management and BPI Capital

5  Corporation for the investment management of certain

6  funds managed by BPI Capital Corporation.

7      Q      **Did you participate in the drafting of**

8  **this document?**

9      A      I did not.

10     Q      **When is the first time you saw this**

11 **document?**

12     A      The summer of 1999.

13     Q      **Now, if we turn to what is marked at the**

14 **bottom as page 2, I'm going to direct your attention**

15 **to Recital C.  Do you see that?**

16     A      Yes, sir.

17     Q      **In there it mentions attached as Schedule**

18 **1 to this document investment objectives,**

19 **restrictions, and practices.  Do you see where it**

20 **references that?**

21     A      Yes, I do.

22     Q      **It also talks about that those investment**

23 **objectives, restrictions and practices may be amended**

24 **from time to time by the manager.  Do you see that?**

25     A      Which would be BPI Capital Corporation.

Charles Sweeney                                    11/21/2006

Page 50

1      Q    Was it your understanding that the manager

2  had sole authority to amend those investment

3  objectives, restrictions and practices?

4          MR. CERA:  Object to the form.  Go ahead.

5          THE WITNESS:  As best as I know, yes.

6  BY MR. PRENDERGAST:

7      Q    If we turn to page 6, sir, duties of the

8  investment advisor, do you see that?

9      A    I do.

10     Q    It mentions that the investment advisor

11  shall provide the -- capital A -- Advice.  Do you see

12  that reference?

13     A    Yes.

14     Q    First of all, the investment advisor, is

15  that BPI Global?

16     A    Yes.

17     Q    And "Advice," I believe, is a defined

18  term.  If you would turn to page 3.

19     A    Yes.

20     Q    Do you have an understanding of what is

21  entailed in "Advice" as that term is used in this

22  document?

23     A    Well, it makes reference to item 5 in this

24  agreement, which is on page 5.

25     Q    Uh-huh.

Charles Sweeney                                    11/21/2006

Page 51

1      A      And it does not appear to be really

2    defined there as well.

3      Q      **That's why I asked the question.  Do you**

4    **have an understanding in terms of -- strike it out.**

5            **Do you have an understanding of the**

6    **meaning of "Advice" as it is used in this agreement**

7    **in practice?**

8      A      My understanding of the word "Advice" as

9    it is used in this agreement is that it involves

10   investing with full discretion the asset -- the money

11   that's invested in the various funds by the investors

12   of the individual funds and making a determination of

13   when to buy those funds, when to sell those funds,

14   from whom to -- you know, who to use as an executing

15   broker on either end of those transactions and to

16   vote proxies as need be.

17     Q      **Can you identify for me, sir -- strike it**

18   **out.  What do you mean by full discretion?**

19     A      It means -- as I say, we as investment

20   advisor -- BPI Global as an investment advisor makes

21   the decision what to buy, when to buy it, how much to

22   pay for it, who to buy it through, how to vote the

23   proxies and any other matters that pertain to the

24   security.

25     Q      **Within this agreement, sir, can you**

Charles Sweeney                                          11/21/2006

                                                        Page 52

1    identify for me what provision provides BPI Global

2    with full discretion as you have just described it?

3              MR. CERA:  I'll object to the form.

4         Document speaks for itself.  Take the time to go

5         through it.

6              THE WITNESS:  Initially on page 2 it

7         speaks of the fact that the investment advisor,

8         which is BPI Global, provides investment

9         management services to certain types of equity

10        stocks.

11   BY MR. PRENDERGAST:

12        Q    You're referring to which paragraph?

13        A    Paragraph D initially.

14        Q    Okay.  Is it easier to go through and tell

15   me all this first, or would you like --

16        A    Then the next section would lead one to

17   believe BPI Global is a fiduciary in paragraph 5D on

18   page 5, but then the bulk of what our

19   responsibilities as investment advisors as listed on

20   page 6 under item 6 and -- again it uses that word

21   that's poorly defined earlier and that being, Advice

22   in respect of each of the funds during the term of

23   this agreement in accordance with the investment

24   policy of each of the funds," and then it goes on to

25   say, And without limiting the generality of the

Charles Sweeney                                    11/21/2006

Page 53

1   foregoing, shall, on the instructions or approval of

2   the manager with respect to each of those funds

3   invest and reinvest the investment assets; implement

4   portfolio purchases and sales; provide or cause to be

5   provided to the manager such reports as they consider

6   necessary; to participate to the extent reasonably

7   required in marketing and other promotional efforts

8   to determine a cause to be determined in what manner

9   to vote or execute proxies; to determine whether to

10  exercise any rights to acquire, convert or exchange

11  into other securities the securities and investment

12  assets and other information that they may reasonably

13  require.

14          So that delineates our responsibilities

15  under the terms of this agreement without necessarily

16  saying that we have full discretion, this is what we

17  are instructed to do.

18          As an aside, I know that there is an

19  affidavit by Mr. Killeen acknowledging the full

20  discretion that BPI Global exercised during the

21  course of our providing this advice and gives his

22  understanding representing that it's his

23  understanding that we have full discretion.

24      **Q     Am I correct, sir, that the duty for the**

25  **investment advisor is subject to the instructions and**

Charles Sweeney                                    11/21/2006

Page 54

1    approval of the manager as set forth in the prefatory

2    paragraph, paragraph 6?

3        A    Again, I'm not a lawyer, but I would

4    interpret that as giving BPI Capital the ability to

5    step in, as the case might be.  But to the best of my

6    knowledge, during the entire history of this account,

7    they have not come and said you should invest in this

8    stock or you shouldn't invest in a particular name.

9        Q    You understand, and correct me if I'm

10   wrong, however, that they did have that right?

11            MR. CERA:  Object to the form.  Go ahead.

12            THE WITNESS:  As a two-thirds owner of BPI

13       Global, BPI Capital certainly could control

14       whatever BPI Global did, and they could somehow

15       instruct on any variety of topics.

16   BY MR. PRENDERGAST:

17       Q    Per this agreement did the manager have

18   the right to provide instructions or approval to BPI

19   Global as to how BPI Global executed securities

20   transactions?

21            MR. CERA:  I'll object to the form.  Vague

22       and ambiguous.

23   BY MR. PRENDERGAST:

24       Q    Do you understand that question?

25       A    I would say that they have a right,

Charles Sweeney                                    11/21/2006

Page 56

1    A    Yes, I do.

2    Q    There's a reference to that language.  Am

3  I correct that the manager could amend the investment

4  objectives and/or the investment restrictions and

5  practices without the approval of the advisor?

6    A    Yes.

7    Q    Now, in the sentence thereafter it says,

8  "The investment advisor agrees to make investment

9  recommendations and decisions thereafter."

10        Is there a difference between investment

11  recommendations and decisions?

12    A    In my mind, I would say that they're the

13  same.

14    Q    Do you know why two different phrases are

15  used for the same thought in this agreement?

16    A    I do not.

17        MR. CERA:  Object to the form.

18        THE WITNESS:  I do not.

19  BY MR. PRENDERGAST:

20    Q    Paragraph 8, with reference to the first

21  sentence of that paragraph, I think it's actually one

22  sentence, am I correct that the manager had the right

23  to direct the investment advisor regarding the

24  disposal of any investment asset?

25    A    Could you ask the question again, please.

Charles Sweeney                                    11/21/2006

Page 57

1          MR. PRENDERGAST:  Would you repeat it,

2      please.  Read it back.

3          (The preceding question was read back by

4       the court reporter.)

5          THE WITNESS:  I would say that the term

6      "investment assets" as it's referred to in here

7      is more of a collective group of assets which

8      includes all securities and cash and everything

9      else and that this paragraph would not

10     necessarily give them the ability to say you

11     should get rid of Security A, whatever that

12     might be, but rather in response to, as it

13     indicates here servicing redemption or

14     satisfying other liabilities of the fund, they

15     may direct us to raise cash in whatever manner

16     that we would deem appropriate.

17 BY MR. PRENDERGAST:

18     Q    Given that answer would you tell me what's

19 your understanding of the phrase, quote, or

20 otherwise, end quote, as used in this paragraph?

21         MR. CERA:  Object to the form.  He

22     testified he wasn't involved in preparing the

23     document.  You can answer as best you can.

24         THE WITNESS:  I don't have a specific

25     explanation as to what that could encompass.

Charles Sweeney                                    11/21/2006

                                                    Page 58

1    BY MR. PRENDERGAST:

2        Q      In executing your duties as compliance

3    officer, did you make reference to this agreement in

4    the investment objectives attached hereto?

5        A      From time to time.

6        Q      Would you agree with me that the phrase

7    "or otherwise" suggests that the purposes for which

8    the manager may direct the disposal of investment

9    assets is broader than servicing redemptions and

10   satisfying liabilities?

11           MR. CERA:  Object to the form.  Calls for

12       speculation.

13           THE WITNESS:  I would say that here and

14       other cases there are certain broad ambiguities

15       which entitles BPI Capital to exercise influence

16       to the degree they would deem warranted but in

17       practice never did so.

18   BY MR. PRENDERGAST:

19       Q      The paragraph also states that the

20   investment advisor agrees to comply with the

21   directions of the manager relating to any other

22   matters concerning the investment assets.  Do you see

23   that language?

24           MR. CERA:  Then there's a proviso.

25           MR. PRENDERGAST:  I understand.  I'm just

Page 59

1    directing him to the language at the moment.

2         THE WITNESS:  Yes, I see that language.

3    BY MR. PRENDERGAST:

4    Q    To your knowledge -- strike it out.

5         Is there any limit on the, quote, other

6    matters, end quote --

7         MR. CERA:  Object to the form.  The

8    document speaks for itself.

9         MR. PRENDERGAST:  If I could finish the

10   question, I'm happy to take your objection.

11        MR. CERA:  I'm sorry.

12   BY MR. PRENDERGAST:

13   Q    Are there any limits on the other matters,

14   end quote, concerning investment assets on which the

15   manager may provide direction pursuant to this

16   paragraph?

17        MR. CERA:  Same objection.

18        THE WITNESS:  None that I can see

19   specified in the agreement.

20   BY MR. PRENDERGAST:

21   Q    Do you know of any provision in this

22   agreement permitting the investment advisor to act

23   differently than the directions a manager may provide

24   pursuant to paragraph 8?

25        MR. CERA:  Object to the form.  Vague and

Charles Sweeney                                      11/21/2006

Page 60

1         ambiguous.  Lacks foundation.

2    BY MR. PRENDERGAST:

3         Q       Do you understand the question?

4         A       I don't understand the question.

5         Q       If the manager provides directions

6    pursuant to paragraph 8, can the investment advisor

7    pursuant to this agreement choose not to follow those

8    directions?

9              MR. CERA:  Object to form.

10             THE WITNESS:  I don't know the answer to

11        that question.  It's never occurred, to the best

12        of my knowledge.

13   BY MR. PRENDERGAST:

14        Q       If you turn to page 17 of this agreement,

15   which is the Schedule 1 to the agreement, Investment

16   Objectives, Practices and Restrictions.  Do you see

17   that?

18        A       Yes, I do.

19        Q       You understand that under the heading

20   Investment Restrictions of Securities Regulatory

21   Authorities there are certain restrictions as to what

22   BPI Global could do?

23        A       Yes.  It's more an indication of what they

24   cannot do as opposed to what they can do.

25        Q       Correct, correct, correct.  Among other

Charles Sweeney                                    11/21/2006

Page 61

1    things -- strike it out.

2              So I am correct that BPI Global did not

3    have the discretion to choose to do any of the items

4    enumerated under paragraph 1, subparagraphs A

5    through --

6         A    Pursuant to the terms of the agreement --

7         Q    -- J?

8         A    Pursuant to the terms of the agreement,

9    BPI Global as investment advisor is bound to manage

10   the portfolios in accordance with the investment

11   objectives, restrictions and practices set out in

12   that Schedule 1 of the agreement and as that may be

13   amended from time to time by prospectuses.

14        Q    To your knowledge, did any of the funds

15   listed on the schedule which is attached to Exhibit

16   2 -- I don't think that's the document in front of

17   you, sir.  It's the affidavit, declaration of Mr.

18   Barton.  Why don't you just get that in front of you

19   there.  Thank you, Mr. Cera.

20             Sir, to your knowledge -- are you

21   referring to the schedule which begins at page 5 of

22   Exhibit 2?  And there are three pages there which I

23   understand identify the investment transactions in

24   the class period of the clients of BPI Global.

25        A    Yes.

Charles Sweeney                                         11/21/2006

Page 63

1    transaction involving Sonus securities?

2         A    I'm not aware of any, you know, short

3    sales, puts, calls or anything else.  There may have

4    been, but I'm not aware of any.

5         Q    In providing instruction to whomever it

6    may have been to prepare this schedule, did you ask

7    this person to include transactions that would have

8    involved shorting or hedging?

9         A    I don't recall specifically.  My sense is

10   that this schedule was drafted pursuant to a request

11   from counsel and that the terms of that request would

12   have been provided to my operations manager to create

13   a report pursuant to those requests.

14        Q    You mentioned a --

15             MR. PRENDERGAST:  I'll have that marked as

16        No. 4, I think it is.

17                  (Whereupon, Defendant's Exhibit No. 4

18                  was marked for identification.)

19   BY MR. PRENDERGAST:

20        Q    Mr. Sweeney, we have just marked as

21   Exhibit No. 4 in this deposition a declaration of the

22   gentleman to your right, Mr. Solomon B. Cera.  It's a

23   declaration that's been filed in this case.  And let

24   me ask you first, sir, if you've ever seen this?

25        A    I don't specifically recall the

Page 69

1  rely for the authority to commence this lawsuit?

2            MR. CERA:  Object to the form.

3            THE WITNESS:  I don't have an answer for

4      that question.  As best as -- I did not refer to

5      the agreement at the commencement of the

6      lawsuit.

7  BY MR. PRENDERGAST:

8      Q    As we sit here today are you aware of any

9  other provision in this document which provides BPI

10 Global with the authority to commence this lawsuit?

11     A    I'm not aware of any provisions that would

12 indicate that the investment advisor, BPI Global,

13 would be responsible for filing lawsuits on behalf of

14 its clients.

15           MR. PRENDERGAST:  Can we take a few

16     minutes?

17           MR. CERA:  Yes.

18           MR. PRENDERGAST:  Thank you.

19           (A brief recess was taken.)

20 BY MR. PRENDERGAST:

21     Q    In retaining Mr. Cera's firm, did you have

22 discussions regarding the amount of fees that Mr.

23 Cera's firm would request as counsel in this case

24 should be there be a recovery?

25     A    It's a contingent fee arrangement.  BPI

Charles Sweeney                                    11/21/2006

Page 70

1    wouldn't have to pay any piece if they were handed

2    out an award.

3        Q    Did you discuss the percentage of the

4    recovery that Mr. Cera's firm would request from the

5    court?

6        A    I don't recall any discussions.

7        Q    So your only discussion was -- with regard

8    to fees was that BPI Global would not have to pay

9    any?

10       A    That it would be borne out of the

11   recovery, and if there were no recovery, there would

12   be no fees, a contingent basis.

13       Q    I just want to try to get down what the

14   current structure is with Trilogy and everybody.

15       A    That would -- the current structure --

16       Q    Hold on.  I will, in all fairness, ask a

17   question.

18       A    Okay.

19       Q    There was a transaction in 2005 with

20   Trilogy; is that correct?

21       A    That is correct.

22       Q    Who were the relevant Trilogy entities

23   involved in that transaction --

24            MR. CERA:  Object to the form of all these

25       questions.  They lack foundation.

Charles Sweeney                                    11/21/2006

Page 71

1    BY MR. PRENDERGAST:

2        Q    -- if you know?

3        A    I mean, the two parties to that agreement,

4    as best as I know, were Trilogy Advisors, LLC and BPI

5    Global Asset Management, LLP and then immediately

6    thereafter LLC or contemporaneously therewith.

7        Q    How, if at all, again, if you know, was

8    BPI Capital involved in this transaction?

9             MR. CERA:  I just -- a running objection.

10            I object.  Lacks foundation.  Calls for a legal

11            opinion and conclusion.  He's asking for your

12            knowledge, what you know about this merger

13            transaction.

14            THE WITNESS:  I'm trying to pull that

15            together.  I don't specifically recall the

16            details.  I know that in January certain

17            portfolios were transitioned from BPI Global to

18            Trilogy and that certain portfolios in the

19            Opportunities group or all those were

20            transferred to an advisor outside of BPI

21            Trilogy, but I don't recall the specifics of

22            their involvement in the transaction per se.  I

23            can't tell you when they stepped aside and --

24    BY MR. PRENDERGAST:

25        Q    Fair enough.  When you say that certain of

Page 78

1      think you got your answer.

2               MR. PRENDERGAST:  I don't think so.

3               MR. CERA:  He said he hadn't.  He never

4      had reason to.

5               MR. PRENDERGAST:  He said he had no reason

6      to; still he may have done it.

7               THE WITNESS:  No, I did not read any.

8      There may have been summaries in prospectuses

9      that I may have perused but not specific

10     agreements.

11  BY MR. PRENDERGAST:

12     **Q      Did you speak to any of the trustees of**

13  **any of the funds regarding commencement of this**

14  **lawsuit or maintenance of this lawsuit?**

15     A      No, I did not.

16     **Q      You understand by funds I mean those**

17  **listed on the schedule that is attached to Exhibit 2?**

18     A      The BPI funds that previously we

19  designated.

20     **Q      Right.  Did you speak to anybody on behalf**

21  **of the funds regarding this lawsuit?**

22               MR. CERA:  I'm sorry.  Read that back.

23               (The preceding question was read back by

24          the court reporter.)

25               MR. CERA:  Vague and ambiguous.  You can

Charles Sweeney                                          11/21/2006

Page 79

1      answer.

2              MR. PRENDERGAST:  Strike that out.

3      BY MR. PRENDERGAST:

4        Q      Did you speak to anybody employed by the

5      funds regarding this lawsuit?

6        A      The only party that I'm aware of that is

7      employed by the fund would be CI Mutual Funds and BPI

8      Capital Management and very limited conversations as

9      we spoke previously with Mike Killeen.

10       Q      I take it -- I know I'm going to butcher

11     this name, but John Myklusch, for how long did you

12     speak to him about this lawsuit?

13       A      I don't recall.

14       Q      More than an hour?

15       A      It was just part of the transition between

16     he and I of my responsibilities over the matters that

17     I was responsible for as I left BPI.

18       Q      And as you sit here today, are you able to

19     estimate or recall the amount of time that you spent

20     in that transition conversation speaking specifically

21     about this lawsuit?

22       A      No, I cannot.

23       Q      Following your conversation concerning the

24     transition did you have occasion to speak to Mr.

25     Myklusch again regarding this lawsuit?