# Exhibit B

John P. Bichelmeyer                                    11/15/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DEBORAH CHIN,
Individually and on
behalf of all others
similarly situated,

        Plaintiff,

    vs.                    Civil Action No.
                           04-10294-DPW

SONUS NETWORKS, INC.
LITIGATION,
HASSAN AHMED, Ph.D.,
and STEPHEN NILL,
        Defendants.

    30(b)(6) DEPOSITION OF JOHN P. BICHELMEYER,
            CORPORATE REPRESENTATIVE OF
        BPI GLOBAL ASSET MANAGEMENT, LLP,

produced, sworn, and examined on Wednesday, the 15th
day of November, 2006, between the hours of 8:00
o'clock in the forenoon and 6:00 o'clock in the
afternoon of that day at the Intercontinental Hotel,
401 Ward Parkway, in the City of Kansas City, County
of Jackson, State of Missouri, before:

        PEGGY E. CORBETT, RDR-CCR-CSR
        Registered Diplomate Reporter

a Notary Public within and for the County of
Jackson, State of Missouri.
Taken on behalf of Defendant Sonus Networks, Inc.
pursuant to Notice to Take Deposition and Subpoena.

John P. Bichelmeyer                                    11/15/2006

Page 13

1  the question?

2      A.    Yes.  Base salary, bonus.

3      Q.    And what were the factors that went into

4  the bonus?

5      A.    There were no quantifiable metrics that I

6  knew of that determined the bonus.

7      Q.    Was performance of the funds that you were

8  portfolio manager for one of the factors?

9      A.    I don't know for sure.  I didn't determine

10  the bonus pool.

11      Q.    Okay.  Do you hold any professional

12  certificates?

13      A.    Charter Financial Analyst.

14      Q.    And since when have you had that

15  designation?

16      A.    2001.

17      Q.    You said that you went to Creighton?

18      A.    Creighton University.

19      Q.    And what was your major there?

20      A.    Finance.

21      Q.    Do you still hold your CFA?

22      A.    Yes.

        Q.    Why did you leave BPI Global Asset

24  Management?

        A.    To pursue a career opportunity.

John P. Bichelmeyer                          11/15/2006

Page 14

1    Q.    Were you asked to leave BPI Global

2  Management?

3    A.    No.

4    Q.    While employed by BPI Global Management,

5  did you report to anyone at BPI Capital?

6    A.    No.

7    Q.    Were you still with BPI Global Asset

8  Management when it merged with Trilogy in May of

9  2005?

10    A.    No.

11    Q.    So you left I think you said in April?

12  I'm sorry.

13    A.    February when I ceased employment.

14    Q.    February of 2005?

15    A.    Yes.

16    Q.    Thank you.  And when you were portfolio

17  manager at BPI Global, could you please tell us what

18  your duties and responsibilities were?

19    A.    As a portfolio manager, it involved

20  research, marketing, execution of buy and sell

21  orders, and portfolio makeup.

22    Q.    What was the last one?  I'm sorry.

23        MR. CERA:  Portfolio makeup is what he

24  said, portfolio makeup, the content of the

25  portfolio.

John P. Bichelmeyer                                11/15/2006

Page 15

Q.    (BY MR. PRENDERGAST)  Okay, when you say

you were responsible for the content of the

portfolio --

       MR. CERA:  He didn't say that; I did.

He said "portfolio makeup."

       MR. PRENDERGAST:  There was a couple

of additional words in there I was trying to get,

Sol.

Q.    (BY MR. PRENDERGAST)  With respect to

portfolio makeup, what was your duty and

responsibility?

A.    It involved determining what securities

should be included or excluded, bought and sold,

contained within the portfolio.

Q.    Will you describe for me the process by

which a decision to purchase a security was made by

you as a portfolio manager for BPI Global.

       MR. CERA:  I object to the form.  It's

overbroad.

Q.    (BY MR. PRENDERGAST)   Do you understand

the question, sir?

A.    You would like to know the investment

process used to make a decision for any and all

securities?

Q.    Yes, as a general matter, yes.

John P. Bichelmeyer                                11/15/2006

Page 16

1    A.    The process was called Economic Darwinism.

2    Q.    Uh-huh.

3    A.    Segment the world by industry, not by

4 country.

5    Q.    Uh-huh?

6    A.    So by sector, and then evaluate the

7 companies within the sector, and focus on leading

8 companies within each sector.

9    Q.    Uh-huh.

10    A.    Identifying areas that had potential for

11 growth, and try to buy companies that could benefit

12 from that potential growth.

13         It involved research.  It involved reading

14 filings, conference calls, conferences, discussions

15 with brokers, analysts.

16    Q.    Uh-huh.

17    A.    And then form a conclusion, form an

18 opinion, decide whether to take action.

19    Q.    **Thank you.  So you had some responsibility**

20 **for forming conclusions?**

21    A.    Yes.

22    Q.    **Did anyone else have responsibility for**

23 **forming conclusions on equity purchases?**

24    A.    In the firm, yes.

     Q.    **Okay.  With respect to any of your**

John P. Bichelmeyer                                     11/15/2006

Page 17

1  portfolios?

2      A.    I was the lead portfolio manager.

3      Q.    Okay.  And what is the -- are there other

4  types of portfolio managers?

5      A.    There's --

6      Q.    Besides lead portfolio managers?

7      A.    There's co-managers.

8      Q.    And who were the co-managers for your

9  portfolio?

10     A.    I believe I was listed as the lead

11 portfolio manager, and the only portfolio manager on

12 the American Equity product, and then there would

13 have been co-managers on the Global Equity product.

14     Q.    And do you know who those co-managers

15 were?

16     A.    I'm not sure specifically which names were

17 listed.

18     Q.    When you reached a conclusion on a

19 purchase of an equity for your portfolio did you

20 have to obtain approval for the purchase from

21 anyone?

22     A.    No.

23     Q.    Did you have to report your decision to

24 purchase to anyone?

25     A.    No.

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

John P. Bichelmeyer                                        11/15/2006

Page 18

1          MR. CERA:  Let me just interject here

2    for a moment.  I think based on the testimony that

3    you've just elicited that there is one topic on

4    Schedule A of Exhibit 1 that John may have missed,

5    which he is prepared to speak to, which is 4.

6      **Q.    (BY MR. PRENDERGAST)  Uh-huh.**

7          MR. CERA:  Is that correct?

8          THE WITNESS:  Yes.

9          MR. CERA:  Okay.

10     **Q.    (BY MR. PRENDERGAST)  Were you still with**

11   **BPI Global when this lawsuit commenced?  I'm trying**

12   **to determine the dates.**

13         MR. CERA:  Well, we can help with

14   that.

15         MR. PRENDERGAST:  Go ahead.  I was

16   trying to figure it out chronologically.

17         MR. CERA:  I think it was roughly

18   April, May of 2004.

19     **Q.    (BY MR. PRENDERGAST)  So right before.**

20         **Did you participate in the decision to**

21   **bring this lawsuit?**

22     A.    I gave a "yes" to our controller to pursue

23   legal action.

24     **Q.    How did the idea to commence this lawsuit**

25   **begin, at least within your firm?**

Page 22

1          MR. PRENDERGAST:  He said he talked to

2    him.  I'm not sure that I got the substance of the

3    conversation.

4          A.    As I recall, he wanted to know if we

5    should pursue the lawsuit.  I said, I think, "yes"

6    was the answer.

7          Q.    (BY MR. PRENDERGAST)  On what basis did

8    you give him that answer?

9              MR. CERA:  I think he also answered

10   that question.  He already answered that.

11         A.    Failure to file financial statements.

12         Q.    (BY MR. PRENDERGAST)  Was that the sole

13   basis?

14         A.    Yes.

15         Q.    Did you reach a conclusion as to whether

16   or not you thought the company had any liability

17   under the Federal securities laws?

18              MR. CERA:  Objection.  That's absurd.

19              MR. PRENDERGAST:  I'm just asking.

20   It's just a question as to his state of mind.

21              MR. CERA:  But you haven't established

22   that he knows anything about any of those particular

23   provisions of the Federal securities laws, indeed,

24   he's not a lawyer, and I think that question lacks

25   foundation and calls for a legal conclusion and

John P. Bichelmeyer                                    11/15/2006

Page 37

1    Q.    Okay.  Do you understand what this
2    document is?
3    A.    It appears to be buys and sells of Sonus
4    securities.
5    Q.    Okay.  Now looking through the document,
6    there are a number of -- go to the far left.  Look
7    at the identification "Portfolio."  Do you see that?
8    A.    Yes.
9    Q.    And then to the right of that is "Client
10   Name"?
11   A.    Yes.
12   Q.    Have you seen the portfolio abbreviations
13   before that appear here in this document?
14         MR. CERA:  On the left-hand side.
15   A.    Yes.
16   Q.    (BY MR. PRENDERGAST)  Do they correspond
17   with the name to the right?
18   A.    As abbreviations, yes.
19   Q.    Okay.  Now on this sheet there are a
20   number of different portfolios or funds.  Could you
21   identify those for which you were portfolio manager?
22   A.    Just on this page?
23   Q.    Just on this sheet.  There are actually,
     it looks like there are three or four pages.
     A.    Okay.

John P. Bichelmeyer                          11/15/2006

Page 38

1    Q.    I forget what that last page is.

2    A.    So I can refer to them as the portfolio

3    name, the abbreviation?

4    Q.    Sure, that would be great.  The portfolio

5    name would be easier.  The abbreviation gets a bit

6    confusing.

7    A.    So if I say "AEV" -- do you want me to say

8    "BPI American Equity Fund"?

9    Q.    Please use the full name.

10   A.    So the first one is BPI American Equity

11   Fund.

12   Q.    Okay.

13   A.    The second one being BPI American Equity

14   Sector Fund.

15         DVG23, or Northern Trust Multi-Manager

16   Fund.

17   Q.    You were the portfolio manager for that?

18   A.    A co-manager.

19   Q.    A co-manager, okay.

20   A.    Then F-GBAT, which is Foundation --

21   forgive my French -- Generale de British American

22   Tobacco, I think, F-PBAT, Foundation Prevoyance, and

24   the F-PBAT, which is another Foundation, I think.

     Is that the same one?

     Q.    I think that's just a continuation.

John P. Bichelmeyer                                    11/15/2006

Page 39

1      A.    Okay.

2      Q.    **PBAT is a continuation of that.**

3      A.    Right. Then GEF or BPI Global Equity Fund,

4  BPI Global Equity Sector Fund.

5      Q.    **Uh-huh.**

6      A.    Mediolanum Top Managers Balanced Fund,

7  Mediolanum Top Managers Country Fund, and Mediolanum

8  Top Managers Opportunities Fund, and OPTIMA U.S.,

9  OPTIMA Strategy U.S. Diversified Pool.

10     Q.    **With the exception of Northern Trust**

11  **Multi-Manager Fund were you the portfolio manager of**

12  **all of the other ones that you mentioned?**

13     A.    No.

14     Q.    **I believe you called it lead portfolio**

15  **manager.**

16     A.    Right.  Lead portfolio manager of the BPI

17  American Equity Fund, BPI American Sector Fund, and

18  I believe OPTIMA U.S., I was the lead on that one,

19  as well, if I recall the account properly, and the

20  other ones I would have been a co-manager on.

21            MR. CERA:  You mean the Global Equity?

22     Q.    **(BY MR. PRENDERGAST)  I thought you were**

23  **the Global Equity --**

24     A.    As a co-manager.

25     Q.    **Oh, you were a co-manager on those, okay.**

John P. Bichelmeyer                              11/15/2006

Page 61

1           In terms of BPI American Equity Fund, it

2   was a Canadian mutual fund for Canadian retail

3   investors, and BPI Capital Corp. would provide the

4   prospectus for that fund.

5       Q.    You've used the word "mandate" a couple of

6   times.  What do you mean by mandate?

7       A.    Similar to goals and objectives, what the

8   objective mandate of that fund might be, what are

9   its goals and objectives.

10      Q.    Okay.  Would that include restrictions?

11      A.    It could, yes.

12      Q.    Did it include restrictions when it came

13  to BPI American Equity Fund?

14      A.    I don't -- the most simplistic example of

15  a restriction there could be is just a client that

16  says no sin stocks.

17      Q.    I'm sorry?

18      A.    No sin stocks, tobacco.

19      Q.    Oh, sin stocks?

20      A.    Yes, that's what a typical restriction

21  could be.

22           These were very, the way I understood

23  them, broad investment agreements between BPI

24  Capital and whoever, BGAM, BPAM Global.

25      Q.    Uh-huh.

John P. Bichelmeyer                                    11/15/2006

Page 62

1      A.     So it didn't really restrict from a

2   portfolio manager's point of view anything that I

3   could or could not do.

4      **Q.     Well, did you understand that you could**

5   **short stocks as portfolio manager for BPI American**

6   **Equity Fund?**

7      A.     It was not something that I ever did in

8   the American Equity Fund or the mutual funds.

9      **Q.     Do you know if you were permitted by BPI**

10   **Capital in its investment objectives, practices, and**

11   **restrictions?**

12      A.     I cannot say 100 percent if I was able to

13   do it or not, no.

14      **Q.     Okay.  Did you understand whether BPI**

15   **Capital was entitled to restrict your ability to**

16   **short stock?**

17             MR. CERA:  Object to the form, vague,

18   ambiguous, lacks foundation.

19             MR. PRENDERGAST:  Do you understand

20   the question?

21             THE WITNESS:  Can you repeat it?

22             MR. PRENDERGAST:  Would you repeat it,

23   please.

24   (Whereupon the prior question was read back by the

25   reporter.)

John P. Bichelmeyer                                    11/15/2006

Page 63

1    A.    We were independent investment advisors,

2  so we were allowed to exercise our discretion, our

3  full discretion on the purchase and sale of

4  securities.

5    Q.    (BY MR. PRENDERGAST)  Uh-huh.  Did you

6  understand that whether you had -- strike that.

7          Let's turn to that agreement again, which

8  is the attachment to what has been marked as Exhibit

9  3, and if we could go to where I previously

10 identified as Page 17 of that attachment.

11         With respect to the funds for which you

12 were manager, do you recall seeing any written

13 investment objectives, practices and restrictions?

14              MR. CERA:  Other than these, you mean?

15              MR. PRENDERGAST:  Well, he wasn't sure

16 whether he saw these, so that's why I asked the

17 question, Sol.

18    Q.    (BY MR. PRENDERGAST)  I'm asking if you

19 saw a written form of --

20    A.    Of this?

21    Q.    What you call a mandate or --

22    A.    I'm sure I did.  I can't say exactly which

23 ones I did see, though.

24    Q.    Did you understand, whatever form it was

25 you saw, do you recall if there were any

John P. Bichelmeyer                              11/15/2006

Page 66

1              MR. CERA:  Of Schedule I?

2              MR. PRENDERGAST:  Of Schedule I, yes,

3    the schedule that we're looking at.

4        A.    So the question is am I aware of any

5    restrictions?

6        Q.    (BY MR. PRENDERGAST)  Are you aware that

7    these restrictions set out in Paragraph 1 restricted

8    the nature of the investments that you could make

9    for your portfolios?

10       A.    These were very broad so it didn't impact

11   my strategy much, and didn't give a lot of leeway as

12   to what was allowed and what was not allowed, so my

13   strategy was simple and straightforward, and never

14   really to my knowledge cut across, or these impacted

15   my ability to execute.

16       Q.    But you understood that this was a limit

17   on what you could do, whether you understand it or

18   not?

19       A.    Generally there was a framework put in

20   place stating things that I could and could not do,

21   and once again, I stuck to straightforward, only for

22   investment purposes.

23       Q.    For example, you understood that you could

24   not purchase real estate fees or portfolios; is that

25   correct?

Page 73

1    Global.

2        A.    Uh-huh.

3        Q.    In connection with this document, do you

4    understand what investment management services

5    refers to?

6        A.    Yeah.  I mean this is my view, and it

7    entails us to exercise full discretion over the

8    accounts that we've been hired as investment advisor

9    for.

10       Q.    And on what basis do you reach the

11   understanding that you've just given us?

12       A.    You have I suppose a fiduciary duty to

13   your end client, if you've been hired for your

14   services.  Our service was investment management.

15       Q.    Have you ever read this document, this

16   amended and restated investment advisory

17   agreement?

18       A.    Yeah.

19            MR. CERA:  I'm sorry, go ahead.  What

20   I was going to say was as Pamela just pointed out,

21   it's quite clear there's a topic I guess that's

22   listed in your Rule 30(b)(6) Notice that's specific

23   to this agreement, and he was clear that he was not

24   the designated witness.

25            MR. PRENDERGAST:  Right.

John P. Bichelmeyer                                              11/15/2006

Page 108

1          MR. PRENDERGAST:  Sol, it's on the

2     document, but can you point to one single number

3     here where I can get it quickly?

4          MR. CERA:  All you have to do is take

5     a calculator and see.

6          MR. PRENDERGAST:  That's why I'm

7     trying to avoid five minutes, to see if he knew off

8     the top of his head.

9          MR. CERA:  All right.

10     A.    I don't know the exact number.  It's going

11     to be a million, a million and-a-half shares.

12     Q.    (BY MR. PRENDERGAST)  Okay.  How long did

13     you hold those shares, the ones from the offering?

14     A.    Purchased on the offering, and then 100

15     percent liquidation by the end of March of '04.

16     Q.    Okay.  Did you sell any of the shares

17     purchased in the offering prior to March?

18     A.    Yes, I believe I did.

19     Q.    Do you recall when?

20     A.    Not -- it would be on this, which I think

21     is what we went over previously.

22     Q.    Do you know who Matt Miller is?

23     A.    Yes.

24     Q.    Who is that?

25     A.    A trader and portfolio manager on one of

John P. Bichelmeyer                          11/15/2006

Page 128

1  to Boston for purposes of the trial?

2      A.    Is it legally required?

3      Q.    I'm not asking you that question.

4            MR. CERA:  Well, he's unclear by what

5  you mean by that.

6            MR. MATULE:   I'm not asking for you

7  to interpret his answer.

8            MR. CERA:  This is ridiculous.  These

9  questions are totally improper for this witness,

10  that's why we're here to have a deposition.

11            MR. MATULE:   Who other than Mr.

12  Bichelmeyer can answer the question as to whether he

13  will come to trial in Boston?

14            MR. CERA:  He asked you a question.

15  He's unclear about your question.

16            MR. MATULE:  Well, that's your

17  interpretation.  I'll ask it again.

18      Q.    (BY MR. MATULE)  Is there anything that's

19  unclear in the question?  Will you come to trial?

20      A.    Is it legally required?

21      Q.    I'm not going to give you legal advice.

22  You can ask your counsel about that.

23            I'm asking you as a matter of -- on a

24  voluntary basis, will you come to trial in Boston,

to the extent that there is a trial in this case?

John P. Bichelmeyer                              11/15/2006

Page 129

A.    If it comes to that point, I'll have to make a decision at that time.

Q.    Okay.  But sitting here today you can't say one way or another whether you would come to trial?

A.    Correct.

Q.    Your testimony previously was that you know of Steve Nill as the former CFO of Sonus; is that correct?

A.    Correct, that's what I said.

Q.    Do you have any recollection of any statements made by Mr. Nill?

A.    In regards to?

Q.    At all.  Do you recall ever hearing anything, any statements made by Mr. Nill?

A.    Nothing specifically that stands out that says I can say this came from Mr. Nill.

Q.    Have you invested in or made the investment decision with respect to buy or sell securities of any other company that has restated its financials?

A.    During what time frame?

Q.    At any time.

A.    It's possible.

Q.    Sitting here today, you don't have any

Page 130

recollection of it?

A.   There's been hundreds, if not thousands of
transactions, so it's possible.  I can't say "yes"
or "no."

Q.   **Is there any specific reason why you
thought that suit should be brought against Sonus?**

A.   It's one thing to make an investment and
lose money on it because you just got it wrong, and
it's another thing to make an investment based on
information that was false, and had the deck stacked
against you.

Q.   **And can you tell me what facts, sir, that
you're aware of that there was knowledge at Sonus of
any falsity of the statements?**

MR. CERA:  I object to the form.

THE WITNESS:  So the question is?

MR. CERA:  Lacks foundation.  He
didn't say anything about knowledge.  He said
falsity.

(Whereupon the prior question was read back by the
reporter.)

A.   I guess it goes back to the fact that
there was the lack of financial statements.

Q.   **(BY MR. MATULE)  When you -- well, let's
talk about this, because you described generally how**

12/19/2006 07:38 FAX                                                          ☑002/002

Errata Sheet

DEPOSITION OF: John P. Bichelmeyer dated November 15, 2006

CASE STYLE: Chin, et al. vs. Sonus Networks, et al.

At the time of reading and signing of the deposition, the following changes were noted:

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 22 | 11 | "Failure to file financial statements" should be replaced with, "Failure to file financial statements and the loss in the security." | Recalled an additional fact in response to the question. |
| 26 | 11 | "No." should be replaced with, "No, other than receiving a telephone call from Ryan Burrow of Trilogy sometime during this past summer telling me that attorneys may be contacting me about the Sonus litigation." | Recalled telephone call with Ryan Burrow. |
| 112 | 21 | remove word "he" | Transcription error. |

Under penalties of perjury, I have read my deposition in this matter and it is true and correct, subject to any changes in form or substance as reflected above.

Dated: 12/19/06          Signed: _John P. Bichelmeyer_

John P. Bichelmeyer