Exhibit C

UNITED STATES DISTRICT
DISTRICT OF MASSACHUSETTS

Civ. Action No. 04-10294 DPW

DEBORAH CHIN, individually and on
behalf of all others similarly
situated,

        Plaintiff,

vs.

SONUS NETWORKS, INC., HASSAN
AHMED, PH.D. AND STEPHEN NILL,

        Defendants.

_____/

DEPOSITION OF CHARLES SWEENEY

November 21, 2006
Wyndham Hotel
8100 International Drive
Orlando, Florida  32819
9:27 a.m. - 12:29 p.m.

Reported by:
Lori Junker, RPR
Notary Public, State of Florida

Charles Sweeney                                              11/21/2006

Page 8

1    Q      Prior to your current situation as being

2    self-employed, where did you work?

3    A      I was control and chief compliance officer

4    BPI Global Asset Management from April 1997 through

5    October of last year.

6    Q      Did you hold both of those positions at

7    BPI Global throughout your tenure there?

8    A      I would say -- I held the

9    responsibilities.  The chief compliance officer

10   designation came about as a result of changes and

11   regulations.  The SEC mandated that advisors must

12   have a CCO, and I was the person who was designated

13   as such.

14   Q      Do you recall when you were designated as

15   CCO?

16   A      Not specifically, no.

17   Q      Would that have been in 2002?

18   A      It had to do with -- there's a specific

19   regulation that the SEC put out related to investment

20   advisors and investment companies, nothing to do with

21   Sarbanes-Oxley.

22   Q      If we break these down for a moment, what

23   were your duties and responsibilities as controller

24   of BPI Global?

25   A      Anything from a financial accounting point

Charles Sweeney                                    11/21/2006

1       relationship is.

2   BY MR. PRENDERGAST:

3       Q      I understand that BPI Capital was the,

4   quote, end quote, manager?

5       A      That is correct.

6       Q      And BPI Global had an investment advisor

7   agreement in most cases with the manager; is that

8   correct?

9       A      That is correct.

10      Q      And then the manager had a direct

11  contractual relationship with the client?

12      A      Individual funds.

13      Q      The individual funds?

14      A      Correct.

15      Q      Now --

16      A      I stand corrected.

17      Q      Did BPI Global have any direct contractual

18  relationship with these clients?

19          MR. CERA:  Object to the form.

20  BY MR. PRENDERGAST:

21      Q      Do you understand the question?

22      A      Yes, I believe so.  The specific -- for

23  example, the Canadian mutual fund clients and

24  Canadian hedge fund clients that were structured as

25  mutual funds, our agreement was with BPI Capital

Charles Sweeney                                          11/21/2006

Page 12

1    Corporation.  The hedge funds were -- had a private

2    placement memorandum, limited partnership agreement

3    underlying it, and individuals subscribed to become

4    limited partners into those.

5         So the client there again was the fund or

6    the limited partnership or the LLC, as the case might

7    be, where individuals would indirectly be considered

8    clients but not truly clients.  Separate accounts

9    would be subject to an advisor agreement with BPI.

10   **Q    With respect to the LLPs and LLCs, what**

11   **was BPI Global's relationship with them?**

12        MR. CERA:  Object to the form.

13        MR. PRENDERGAST:  Legal relationship.

14        MR. CERA:  Which entities are you asking

15   about?

16        MR. PRENDERGAST:  He said the LLPs and

17   LLCs he was just describing.

18        THE WITNESS:  BPI Global Asset Management

19   was general partner of BPI Global Opportunities

20   Fund, LP; BPI Global Opportunities Fund VII, LP;

21   BPI American Opportunities Fund, LP.  There were

22   two LLCs for which it was only a member but also

23   served as investment advisor.  It was not the

24   managing member of the two LLCs, one of which I

25   think -- it's not on the list I think here, but

Charles Sweeney

1          MR. CERA:  Object to the form.

2          THE WITNESS:  Okay.

3    BY MR. PRENDERGAST:

4        Q     Do you understand the question?

5          MR. CERA:  I don't know what you mean by

6    legal relationship.

7          MR. PRENDERGAST:  Well, in some cases he

8    said they were a general partner and in some

9    cases he said they were investment advisors and

10   in some cases he said --

11         THE WITNESS:  In all cases we're an

12   investment advisor.

13         MR. PRENDERGAST:  In all cases you were

14   investment advisor, but in some cases you are

15   general partner.  In some cases you're just a

16   member, so I'm looking for those

17   identifications.

18         THE WITNESS:  Okay.  First of all, just to

19   clarify a point that you had made, you said

20   certain transactions, and I would like to say it

21   reflects all transactions in Sonus Networks

22   stock by -- by BPI Global Asset Management as

23   investment advisor for these various funds.  To

24   the best my knowledge, this is a complete list

25   of all such transactions, none of them omitted,

Charles Sweeney                                    11/21/2006

Page 15

1    and there are no extras as well.

2         MR. CERA:  Just so we're clear, this is

3    Sweeney Exhibit 2 beginning on page 5 of the

4    exhibit.

5         THE WITNESS:  It ends -- it's listed as

6    page 7 of --

7         MR. CERA:  Yeah, it's confusing, but it's

8    page 5 of Sweeney Exhibit 2.

9         MR. MATULE:  Just so I'm clear, the

10   statement that the witness just made, is that

11   for all time or only for the time frame listed

12   on the document?

13        THE WITNESS:  For the period subject to

14   the suit, so from March '02 to March '04.

15        MR. MATULE:  Okay.  Irrespective of the

16   fact that the document has a begin date of May

17   12, '03 and an end date of April 8, '04?

18        THE WITNESS:  I --

19        MR. CERA:  I'm not going to let you ask

20   questions out of turn.

21        MR. MATULE:  I'm looking for

22   clarification, that's all.

23        MR. PRENDERGAST:  I'll ask the question

24   then.

25   BY MR. PRENDERGAST:

Page 20

1  Q      Just identify those for me.

2  A      BPI American Equity Sector Fund, BPI

3  American Opportunities Fund, BPI Global Equity Fund,

4  BPI Global Equity Sector Fund, BPI Global

5  Opportunities Fund, BPI Global Opportunities II fund,

6  BPI Global Opportunities III Fund.  I believe those

7  are the ones that were subject to that agreement

8  dated May 31, 1999.

9  Q      So that's the May 31 agreement.

10  A      Okay.  Back to that first page.  BPI

11  American Opportunities Fund LP, BPI Global was the

12  general partner and investment advisor.

13         BPI Global Equity Hedge Fund, investment

14  advisor only for BPI Global.

15  Q      Can I stop you there for one moment?

16  A      Certainly.

17  Q      So I take it that BPI Global Equity Hedge

18  Fund, there was no separate manager?

19  A      I don't recall.  It is a foreign mutual

20  fund started by the former chairman, I think, of BPI

21  Capital years ago, but beyond that I don't know.

22  Q      So did BPI Global have a direct

23  contractual relationship with BPI Global Equity Hedge

24  Fund?

25  A      I do not recall specifically.  I would say

Charles Sweeney                                    11/21/2006

1    probably, but I don't know.

2        Q        Please continue.

3        A        BPI Select Opportunities Fund LP, BPI

4    Global was the general partner and investment

5    advisor; Dougherty Strategic Equity fund LLC, BPI

6    Global Asset Management was the investment advisor

7    and was a member but not a managing member; Northern

8    Trust Multi-Manager Fund DVG 23, BPI Global was the

9    investment advisor; Fondation Generale de British

10   American Tobacco, investment advisor only for BPI

11   Global; Fondation Prevoyance de British American

12   tobacco, also investment advisor only.

13       Q        Could I stop you there for one moment?

14       A        Certainly.

15       Q        On those three funds:  Northern Trust,

16   Fondation Generale de British American Tobacco, and

17   Fondation Prevoyance de British American Tobacco, was

18   there a manager for those funds?

19       A        I think there was, but I don't

20   specifically recall.  It would have been Northern

21   Trust.

22       Q        Do you know if BPI Global had any direct

23   contractual relationship with these funds?

24       A        Without looking at the advisor agreements,

25   I don't recall.

Charles Sweeney                              11/21/2006

Page 22

1    Q    I'm sorry.  Would you please continue.

2    A    BPI Global Opportunities Fund VII LP, BPI

3  Global was the general partner and investment

4  advisor; BPI Global Opportunities Fund LP, general

5  partner and investment advisor; Mediolanum Top

6  Managers Balanced Fund, investment advisor;

7  Mediolanum Top Managers Country Fund, investment

8  advisor; Mediolanum Top Managers Opportunities Fund,

9  investment advisor; OPTIMA Strategy US Diversified

10  Pool, investment advisor.

11    Q    For the last four that you mentioned, last

12  four funds, do you know whether these funds had a

13  separate manager?

14    A    Again, I would prefer to look at the

15  agreement itself.  I think the answer to that

16  question is yes.

17    Q    Do you know if BPI Global had a direct

18  contractual relationship with any of these last four

19  funds that you've mentioned?

20    A    Again, without looking at the document,

21  I'm not certain, but I would say the answer is

22  probably yes.

23    Q    Okay.  You mentioned one, and I believe

24  that was Dougherty Strategic Equity Fund LLC in which

25  BPI Global was both the investment advisor and a

Charles Sweeney                                      11/21/2006

Page 23

1    member.

2        A     Yes, sir.

3        Q     Was there a separate managing member for

4    Dougherty?

5        A     Yes, there was.

6        Q     Do you know who that was?

7        A     Not specifically.  It was in the

8    Dougherty --

9        Q     Family?

10       A     Family, yes.

11       Q     What's the difference between a managing

12   member and a member, if you know?

13             MR. CERA:  Object to the form.

14   BY MR. PRENDERGAST:

15       Q     Do you understand that question?

16       A     I would -- again, I can't give you a legal

17   definition.

18       Q     Your understanding.

19       A     But the managing member would make

20   decisions as to things like auditors, accountants,

21   operational decisions in terms of money being spent

22   if there were any; whereas the investment advisor

23   would be the person who was managing the assets, the

24   investment assets of the fund.

25       Q     Do you have an understanding one way or

Page 25

1  previously been done on the entity and the

2  individual who expressed the interest would sign

3  the subscription agreement agreeing to the terms

4  of the subscription agreement.

5  BY MR. PRENDERGAST:

6      Q    I take it one of the terms, and tell me if

7  you know or don't know, was that you had to put up

8  some amount of money?

9      A    I guess.  To subscribe to the partnership

10  you would invest a sum in the partnership or the LLC,

11  rather.

12      Q    Did BPI Global invest in Dougherty

13  Strategic Equity Fund?

14      A    It was an investor, yes.

15      Q    For those funds in which you identified

16  BPI Global as a general partner, did BPI Global

17  invest in those funds?

18      A    They had invested a sum of money, yes.

19          MR. CERA:  Object.  All of them?

20          THE WITNESS:  Where the firm was a general

21  partner in the limited partnerships, they were

22  also an investor and invested a sum of money.

23  BY MR. PRENDERGAST:

24      Q    In those partnerships, limited

25  partnerships in which it was a general partner, were

Charles Sweeney

11/21/2006

Page 29

1    A    1977.  From 1991 to '94 I was with Coopers

2 Lybrand and before that Laventhol & Horwath.

3    Q    While you were employed by BPI Global were

4 you employed by any of the other BPI entities

5 simultaneously?

6    A    No, sir.

7    Q    Were you ever employed by CI Mutual Funds?

8    A    No, sir.

9    Q    Were you ever employed by Trilogy Global

10 Advisors?

11    A    Let me step back -- I'm frankly not sure.

12 BPI Global and Trilogy Advisors merged in May of '05.

13    Q    Right.

14    A    Trilogy Global Advisors was the owner of

15 both entities after the transaction and -- I'm not

16 sure who paid me specifically, although I consider

17 myself employed by, I guess, both of them because I

18 was CCO of Trilogy and also BPI during those two

19 final months.

20    Q    Why did you leave BPI Global?

21    A    I was terminated.

22    Q    Do you know the reasons for your

23 termination?

24    A    The compliance function and financial

25 functions were moved to New York.

Charles Sweeney

11/21/2006

Page 31

1  statements.  And there were some other matters, as I

2  understand it, expense accruals and so forth, and

3  that is -- once all that news was made public, the

4  value of the stock declined, our clients lost money,

5  and BPI being a fiduciary is looking to make our

6  clients whole.

7      Q      You mentioned you had an understanding

8  there was erroneous revenue and some other things.

9      A      Accruals or something like that.

10     Q      Where did you gain your understanding in

11 that regard?

12     A      I was made aware of it by counsel.

13     Q      By counsel?

14     A      Uh-huh.

15     Q      What counsel?

16     A      Sol's firm.

17     Q      At some point did you have a discussion

18 with John Bichelmeyer regarding Sonus?

19     A      I did.

20     Q      Would you tell me what he said to you and

21 what you said to him regarding the erroneous

22 revenues.

23     A      I don't have the specific recollection of

24 a conversation, but generally speaking, before we

25 decided to take this role, I spoke to John and

Charles Sweeney                                        11/21/2006

Page 32

1   explained that there were some problems with Sonus in

2   terms of the investment that we made and we had lost

3   money on behalf of our clients and asked him what his

4   thoughts were, not telling him so much but asking

5   him, and he was aware of the situation and told me

6   about it and his reaction was that he thought that we

7   as investment advisors and fiduciaries should pursue

8   this action.

9       Q    How many conversations with Mr.

10  Bichelmeyer did you have on this topic?

11      A    I would say not a lot.  I mean, one or

12  two.

13      Q    Do you recall when you may have had those

14  conversations?

15      A    April '04.

16      Q    Did you approach Mr. Bichelmeyer or did

17  Mr. Bichelmeyer approach you?

18      A    I approached him.

19      Q    Prior to approaching Mr. Bichelmeyer what

20  did you do to learn of the situation at Sonus with

21  regard to revenues?

22      A    Basically listened to our lawyers who had

23  done a substantial amount of due diligence work and

24  hired people to investigate the problems that were

25  out there and to seek information.

Page 34

1    Q    Who was the law firm that represented BPI

2    Global in the other class action, if you remember?

3    A    I do not remember.

4    Q    Did you have any other conversations with

5    any other law firms regarding a possible suit against

6    Sonus?

7    A    I want to say I think I did only just to

8    ask the question, Is this firm real?  I called my

9    lawyer or the firm's lawyer and asked him if he knew

10   anything about them and --

11   Q    I will stipulate that I think his firm is

12   real.

13         MR. CERA:  Oh, good.

14         MR. PRENDERGAST:  That's the last

15   concession you get from me.

16   BY MR. PRENDERGAST:

17   Q    Have you read the complaint in this case?

18   A    I've had the complaint, yes.  There was a

19   draft complaint that I was given and then from that

20   the first complaint was filed and then the first

21   amended complaint was filed.

22   Q    Did you provide any of the information

23   that went into the draft complaint?

24   A    I would say but for this schedule, you

25   know, there's little information we provided.

Charles Sweeney                                                11/21/2006

Page 35

1       Q       I'm sorry?

2       A       Little information, if any.

3       Q       But for the schedule, the losses?

4       A       Yes.

5       Q       Apart from what you may have learned from

6    your lawyers, did you make any assessment as to

7    whether or not the company had intentionally

8    misrepresented any facts to the public?

9               MR. CERA:  Object to the form.

10              THE WITNESS:  I would say we relied

11       principally on our lawyer.

12   BY MR. PRENDERGAST:

13      Q       Who at BPI Global -- strike that?

14              Who approved the filing of this lawsuit?

15      A       I would have signed the documents as

16   controller.

17      Q       Did you speak with any of the folks to

18   whom you reported before filing this lawsuit about

19   commencing this lawsuit?

20      A       I spoke, I think, briefly with Ryan

21   Burrow.

22      Q       Is it Brian or Ryan?

23              MR. CERA:  Ryan, R-Y-A-N.

24              THE WITNESS:  Ryan Burrow, the president,

25       and just had a short general conversation.  And

Charles Sweeney                                    11/21/2006

Page 36

1   because we had been through it before and

2   understand our fiduciary obligation to our

3   clients, you know, he realized it would be --

4   the onus would be on me, not him.

5   BY MR. PRENDERGAST:

6       Q       Approval is easy when you don't have to do

7   anything.

8            I apologize, I should know this off the

9   top of my head, what was the name of the other

10  litigation?

11      A       Turkcell.

12           MR. CERA:  T-U-R-K-C-E-L-L.

13  BY MR. PRENDERGAST:

14      Q       Had BPI Global been involved in any other

15  class actions besides Turkcell at that point?

16      A       No, sir.

17      Q       Had BPI Global brought any other claims

18  against a company in which it invested in a legal --

19  strike that.  Bring any other lawsuits against

20  companies which any of your entities invested in?

21      A       We were not involved in the filing of the

22  lawsuits; however, to the extent that we received the

23  flow of forms, you know, we would fill out the forms

24  and provide the paperwork as necessary.

25      Q       Thank you.  Other than the one or two

Charles Sweeney

11/21/2006

Page 40

1       bat for them.  There's no specific authority

2       that I'm aware of that says, you know, filing

3       lawsuits against companies that we invest in

4       that lose money.

5   BY MR. PRENDERGAST:

6       Q     Did you see the amended complaint in this

7   case --

8       A     I did.

9       Q     -- before it was filed?

10      A     I believe so.

11      Q     Now, in 2005 you left BPI Global, correct?

12      A     Yes.

13      Q     Did you speak with anybody upon your

14  departure from BPI Global regarding oversight of this

15  litigation?

16      A     John Myklusch, M-Y-K-L-U-S-C-H.

17      Q     Who is John Myklusch?

18      A     John is the chief financial officer and

19  now chief compliance officer of Trilogy Global

20  Advisors which is a successor entity to the

21  individual entities that merged in May of 2005.

22      Q     Why did you speak to Mr. Myklusch?

23      A     Because he is the chief financial officer

24  and chief compliance officer of the successive entity

25  and would be responsible for such matters.

Charles Sweeney                                                    11/21/2006

Page 43

1    you like.

2                THE WITNESS:  I'm okay.

3                MR. CERA:  Just a couple minutes.

4                (A brief recess was taken.)

5    BY MR. PRENDERGAST:

6        Q    Turning back for a moment, sir, to Exhibit

7    No. 2, if we turn just before the schedule which we

8    were talking about earlier, there is a certificate of

9    plaintiff.  Do you see that?

10       A    Yes, I do.

11       Q    That's -- it bears an execution date of

12   April 8, 2004, and a signature on behalf of BPI

13   Global.  Is that your signature?

14       A    Yes, it is.

15       Q    When did you see this certificate?

16       A    I would guess April 8, 2004, or shortly

17   there before.

18       Q    What did you do to satisfy yourself

19   regarding the certifications that are set forth in

20   this document?

21               MR. CERA:  Object to the form.  You can

22          answer if you understand.

23               THE WITNESS:  I reviewed the complaint,

24          which is the first representation.  The second

25          item was that we did not buy the shares in order

Page 44

1    to enter into this lawsuit.  We were willing to

2    serve as a representative party on behalf of the

3    class having attempted to do so previously.  We

4    did buy and sell the stocks as indicated and the

5    three years prior -- I'm not sure where the

6    Turkcell matter fits into it, but we've not done

7    five, so certainly that's clear.  We're not

8    being paid to serve as the class representative.

9    And so having just reviewed them now, I'd say --

10   BY MR. PRENDERGAST:

11        Q    Say they were correct at the time you --

12        A    Yes, sir.

13        Q    Well, on the subject of the fourth

14   certification including providing testimony at

15   deposition and trial, if necessary, do you know who,

16   if anyone, at BPI is prepared to do that now that

17   you've left?

18        A    Well, I'm prepared still.  My successor,

19   John Myklusch, would be prepared to do so, and then

20   speaking with Mr. Bichelmeyer initially I said this

21   would require you to testify, and to the best of my

22   knowledge, he's willing and able to testify at trial

23   as well.

24        Q    Thank you.  At any point were you asked to

25   collect documents related to this case to provide to

Charles Sweeney

11/21/2006

Page 51

1    A    And it does not appear to be really

2    defined there as well.

3    Q    That's why I asked the question.  Do you

4    have an understanding in terms of -- strike it out.

5    Do you have an understanding of the

6    meaning of "Advice" as it is used in this agreement

7    in practice?

8    A    My understanding of the word "Advice" as

9    it is used in this agreement is that it involves

10   investing with full discretion the asset -- the money

11   that's invested in the various funds by the investors

12   of the individual funds and making a determination of

13   when to buy those funds, when to sell those funds,

14   from whom to -- you know, who to use as an executing

15   broker on either end of those transactions and to

16   vote proxies as need be.

17   Q    Can you identify for me, sir -- strike it

18   out.  What do you mean by full discretion?

19   A    It means -- as I say, we as investment

20   advisor -- BPI Global as an investment advisor makes

21   the decision what to buy, when to buy it, how much to

22   pay for it, who to buy it through, how to vote the

23   proxies and any other matters that pertain to the

24   security.

25   Q    Within this agreement, sir, can you

Charles Sweeney                                          11/21/2006

Page 54

1   approval of the manager as set forth in the prefatory

2   paragraph, paragraph 6?

3       A     Again, I'm not a lawyer, but I would

4   interpret that as giving BPI Capital the ability to

5   step in, as the case might be.  But to the best of my

6   knowledge, during the entire history of this account,

7   they have not come and said you should invest in this

8   stock or you shouldn't invest in a particular name.

9       Q     You understand, and correct me if I'm

10  wrong, however, that they did have that right?

11          MR. CERA:  Object to the form.  Go ahead.

12          THE WITNESS:  As a two-thirds owner of BPI

13      Global, BPI Capital certainly could control

14      whatever BPI Global did, and they could somehow

15      instruct on any variety of topics.

16  BY MR. PRENDERGAST:

17      Q     Per this agreement did the manager have

18  the right to provide instructions or approval to BPI

19  Global as to how BPI Global executed securities

20  transactions?

21          MR. CERA:  I'll object to the form.  Vague

22      and ambiguous.

23  BY MR. PRENDERGAST:

24      Q     Do you understand that question?

25      A     I would say that they have a right,

Page 55

1  certainly, but at the same time I would say that as a

2  practical matter BPI Global ran autonomously.

3          MR. PRENDERGAST:  Move to strike

4      everything after they had the right.

5          MR. MATULE:  I second the motion.

6          MR. CERA:  They didn't like your answer.

7  BY MR. PRENDERGAST:

8      Q     Turn to paragraph 6E.  With respect to

9  voting, am I correct that the manager could, if it

10 wanted, direct the advisor per this agreement as to

11 how to vote any security?

12     A     Again, they probably could, but as a

13 practical matter, they did not attempt or even unduly

14 influence any decisions that were made by BPI Global.

15         MR. PRENDERGAST:  Move to strike

16     everything after they probably could.

17         MR. MATULE:  Same.

18 BY MR. PRENDERGAST:

19     Q     Turn, if you will, sir, to paragraph 7 on

20 page 7, and directing your attention -- and please

21 read the full paragraph if you care to.  But

22 directing your attention to the sentence after the

23 parenthetical about midway through that begins, "The

24 manager will promptly advise."  Do you see that

25 language?

1    A    Yes, I do.

2    Q    There's a reference to that language. Am

3    I correct that the manager could amend the investment

4    objectives and/or the investment restrictions and

5    practices without the approval of the advisor?

6    A    Yes.

7    Q    Now, in the sentence thereafter it says,

8    "The investment advisor agrees to make investment

9    recommendations and decisions thereafter."

10        Is there a difference between investment

11   recommendations and decisions?

12   A    In my mind, I would say that they're the

13   same.

14   Q    Do you know why two different phrases are

15   used for the same thought in this agreement?

16   A    I do not.

17        MR. CERA: Object to the form.

18        THE WITNESS: I do not.

19   BY MR. PRENDERGAST:

20   Q    Paragraph 8, with reference to the first

21   sentence of that paragraph, I think it's actually one

22   sentence, am I correct that the manager had the right

23   to direct the investment advisor regarding the

24   disposal of any investment asset?

25   A    Could you ask the question again, please.

Charles Sweeney

11/21/2006

Page 68

1    A    BPI Global did not have any conversations

2 with anyone at BPI Capital at the inception of the

3 lawsuit, as we believed that we're a fiduciary and

4 have responsibility for our clients' assets.

5    **Q    Referring back to the investment advisor**

6 **agreement, which is attached to your affidavit, sir,**

7 **which is Exhibit 3, I believe, is there a specific**

8 **provision in there on which you rely for the**

9 **authority to commence this lawsuit?**

10    MR. CERA:  Object to form.  The document

11 speaks for itself.

12    THE WITNESS:  There is a section that I

13 read previously.  On page 5, Section 5D, wherein

14 we acknowledge -- BPI Global acknowledges it is

15 a fiduciary to the manager in each of the funds

16 and assumes the duties and responsibility of

17 such fiduciary.

18    In our capacity as fiduciary, we're

19 entrusted with protecting our clients' assets to

20 the best that we can and to represent those who

21 cannot represent themselves in such matters

22 because we are the people who made the ultimate

23 decision to buy and sell the securities.

24 BY MR. PRENDERGAST:

25    **Q    Is that the only provision on which you**

Charles Sweeney

11/21/2006

Page 69

1    rely for the authority to commence this lawsuit?

2              MR. CERA:  Object to the form.

3              THE WITNESS:  I don't have an answer for

4         that question.  As best as -- I did not refer to

5         the agreement at the commencement of the

6         lawsuit.

7    BY MR. PRENDERGAST:

8         Q    As we sit here today are you aware of any

9    other provision in this document which provides BPI

10   Global with the authority to commence this lawsuit?

11        A    I'm not aware of any provisions that would

12   indicate that the investment advisor, BPI Global,

13   would be responsible for filing lawsuits on behalf of

14   its clients.

15             MR. PRENDERGAST:  Can we take a few

16        minutes?

17             MR. CERA:  Yes.

18             MR. PRENDERGAST:  Thank you.

19             (A brief recess was taken.)

20   BY MR. PRENDERGAST:

21        Q    In retaining Mr. Cera's firm, did you have

22   discussions regarding the amount of fees that Mr.

23   Cera's firm would request as counsel in this case

24   should be there be a recovery?

25        A    It's a contingent fee arrangement.  BPI

Charles Sweeney                                    11/21/2006

Page 70

1   wouldn't have to pay any piece if they were handed

2   out an award.

3       Q      Did you discuss the percentage of the

4   recovery that Mr. Cera's firm would request from the

5   court?

6       A      I don't recall any discussions.

7       Q      So your only discussion was -- with regard

8   to fees was that BPI Global would not have to pay

9   any?

10      A      That it would be borne out of the

11  recovery, and if there were no recovery, there would

12  be no fees, a contingent basis.

13      Q      I just want to try to get down what the

14  current structure is with Trilogy and everybody.

15      A      That would -- the current structure --

16      Q      Hold on.  I will, in all fairness, ask a

17  question.

18      A      Okay.

19      Q      There was a transaction in 2005 with

20  Trilogy; is that correct?

21      A      That is correct.

22      Q      Who were the relevant Trilogy entities

23  involved in that transaction --

24            MR. CERA:  Object to the form of all these

25      questions.  They lack foundation.

**Charles Sweeney**                                    **11/21/2006**

Page 87

1          MR. CERA:  No, that's not what he said.

2          MR. MATULE:  Would you like to testify

3     too?

4          MR. CERA:  No.  I'm allowed to point out

5     that I think it's a misstatement of testimony.

6          MR. MATULE:  I think he's the one who is

7     most suited, other than the record, to reflect

8     what exactly he did testify to.

9          THE WITNESS:  I believe that was the

10    response that I gave, that I contacted our

11    attorney at Holland & Knight and just asked

12    about the firm in general.

13         MR. CERA:  Holland & Knight.

14         MR. MATULE:  That's what I was getting to,

15    that my recollection of the testimony was, in

16    fact, correct.

17         Thank you, Mr. Sweeney.  I have no further

18    questions.

19         MR. CERA:  Thank you.

20         THE COURT REPORTER:  Do you want the

21    witness to read and sign?

22         MR. MATULE:  Yes, I think he should read

23    and sign before the 30 days.

24         THE COURT REPORTER:  Would you like this

25    transcribed?