Exhibit F

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3    * * * * * * * * * * * * * * * *
                                    *
 4    IN RE:                        *
                                    *    CA-04-10294-DPW
 5                                  *
      SONUS NETWORKS, INC.          *    CA-04-10359-DPW
 6                                  *
      * * * * * * * * * * * * * * * *
 7
             BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
 8
              UNITED STATES DISTRICT COURT JUDGE
 9
                          HEARING
10
                     AUGUST 10, 2004
11
      APPEARANCES:
12
             SOLOMON B. CERA, ESQ., Gold, Bennett, Cera &
13           Sidener, LLP, 595 Market Street, Suite 2300,
             San Francisco, California  94105-2835, on
14           behalf of Lead Plaintiff Movant and BPI Global
             Asset Management LLP
15
             JOHN C. MARTLAND, ESQ., Gilman and Pastor, LLP,
16           Stonehill Corporate Center, 999 Broadway, Suite
             500, Saugus, Massachusetts  01906, on behalf of
17           Michelle Burk, plaintiff in derivative case

18           TRAVIS E. DOWNS, III, ESQ., Lerach, Coughlin,
             Stoia & Robbins, LLP, 401 B Street, Suite 1700,
19           San Diego, California  92101, on behalf of
             Global Undervalued Securities Master Fund
20
             MICHAEL K. MATTCHEN, ESQ., Dangel & Mattchen, LLP,
21           10 Derne Street, Boston, Massachusetts  02114, on
             behalf of Michael Pisnoy, plaintiff in derivative
22           action

23           WILLIAM B. FEDERMAN, ESQ., Federman & Sherwood,
             120 N. Robinson, Suite 2720, Oklahoma City,
24           Oklahoma  73102, on behalf of Daniel Williams,
             plaintiff in derivative action
25
```

```
1    APPEARANCES (Con'd.)

2         DARREN J. CHECK, ESQ., Schiffrin & Barroway,
          LLP, Three Bala Plaza East, Suite 400,
3         Bala Cynwyd, Pennsylvania  19004, on behalf
          of the Farhat Group, plaintiff in the securities
4         action

5         MICHAEL T. MATRAIA, ESQ., Berman, DeValerio,
          Pease, Tabacco, Burt & Pucillo, One Liberty
6         Square, 8th Floor, Boston, Massachusetts  02109,
          on behalf of James Brower, plaintiff in securities
7         action

8         JEFFREY B. RUDMAN, ESQ., DANIEL W. HALSTON, AND
          JAMES W. PRENDERGAST, ESQ., Wilmer, Cutler,
9         Pickering, Hale and Dorr, LLP, 60 State Street,
          Boston, Massachusetts  02109, on behalf of
10        Sonus Networks, Inc.

11        MATTHEW J. MATULE, ESQ., Skadden, Arps, Slate,
          Meagher & Flom, LLP, One Beacon Street, Boston,
12        Massachusetts  02109-3194, on behalf of Stephen J.
          Nill, Defendant
13
          JOHN D. HUGHES, ESQ., Edwards & Angell, LLP,
14        101 Federal Street, Boston, Massachusetts  02110,
          on behalf of Defendants Ruben Gruber, Paul R.
15        Jones, Edward N. Harris and J. Michael O'Hara

16        WILLEM F. JONCKHEER, ESQ., Schubert & Reed, LLP,
          Two Embarcadero Center, Suite 1660, San Francisco,
17        California  94111, on behalf of Michelle Burk,
          plaintiff in derivative case
18
          JOHN R. BARNIAK, ESQ., Choate, Hall & Stewart,
19        Exchange Place, 53 State Street, Boston,
          Massachusetts  02109-2804, on behalf of Hassan
20        Ahmed, Defendant

21                      Courtroom No. 1 - 3rd Floor
                        1 Courthouse Way
22                      Boston, Massachusetts 02210
                        2:35 P.M. - 2:55 P.M.
23
              Pamela R. Owens - Official Court Reporter
24            John Joseph Moakley District Courthouse
                 1 Courthouse Way - Suite 3200
25                 Boston, Massachusetts  02210
          Method of Reporting:  Computer-Aided Transcription
```

```
 1              CA-04-10294-DPW & CA-04-10359-DPW

 2                       AUGUST 10, 2004

 3              THE COURT:  Well, I've received the supplemental

 4    submissions of the parties.  And I guess I want to just

 5    ask -- is Mr. Cera here?

 6              MR. CERA:  Yes, Your Honor.

 7              THE COURT:  Do you have any further response

 8    to the supplemental submission or opposition of Global

 9    Undervalued here?

10              MR. CERA:  Well, Your Honor, I don't think

11    there are any compelling new points in there.  Their

12    primary first point they made were certain words that

13    appear in the --

14              THE COURT:  Well, let me ask you two things:

15    Number one, the language is somewhat open-textured in

16    the agreement that you had.  There is not a catch-all

17    phrase.  Am I simply going to rely upon -- I guess --

18    Mr. Sweeney's affidavit to show that you had that

19    authority?  And take it that the authority was delivered

20    orally, not in writing?

21              MR. CERA:  Your Honor, the authority is

22    reflected in both Mr. Sweeney's affidavit -- that's

23    correct -- and in Mr. Killeen's affidavit.

24              THE COURT:  Right.

25              MR. CERA:  In effect, you have the underlying
```

4

1   client here coming forward and providing under penalty

2   of perjury that they support and approve of the actions

3   of BPI Global in taking this.

4          THE COURT:  Yes.  That's a little difficult.

5   I'm really dealing with the question of whether or not

6   you were the purchaser and had the authority to

7   purchase.  As I said, it seems to be somewhat more

8   open-textured than the Rentway agreement.  But it

9   provides for their direction under their direction for

10  you to have that kind of authority.  I take it that this

11  authority was given orally to your client -- is that it --

12  and there's no other documentation that reflects this?

13         MR. CERA:  No, Your Honor.  This is the

14  governing agreement and the authority is, I think,

15  understood as reflected in the affidavits with respect

16  to the understanding of complete discretion, complete

17  ability to vote the shares, support of the action of

18  seeking the lead plaintiff position, and reliance on the

19  agreement.  In fact, the construction of the agreement,

20  although there is language that may appear to be broad,

21  it does say -- it has a qualifying phrase that says

22  "without limiting the generality of the foregoing."

23  I think that's the key language.  And then it's very

24  explicit.  It's very clear, Your Honor.  This is

25  actually not an unusual agreement in any way between

5

1      asset manager and an underlying client.

2              THE COURT:  That may be so.  The question is

3      whether or not it's adequate for these purposes.

4              MR. CERA:  Your Honor, I believe it is.

5      Because in paragraph 6(a) of the agreement, it's

6      absolutely crystal clear that BPI Global had full

7      discretion to purchase in its own determination whatever

8      stocks it thought were appropriate to purchase.

9              THE COURT:  Well, it says --  I just want to

10     be clear about this.  It says "on the instructions or

11     approval of the manager in respect of each of the

12     funds."

13             MR. CERA:  Your Honor, I can assure you that

14     that does not mean that if they make a decision, for

15     example, to purchase Sonus stock, they have to place a

16     phone call to the client to ask for permission.

17             THE COURT:  Why doesn't it mean that?  Because

18     there is an implicit understanding; is that it?

19             MR. CERA:  Yes.  This is full discretion, Your

20     Honor.  It is full discretion.  It is confirmed by both

21     affidavits.  And the agreement --

22             THE COURT:  Well, it's confirmed as an

23     historical matter by both affidavits.  I just want to

24     understand it for purposes of construing this document.

25             MR. CERA:  Sure.

```
 1              THE COURT:  It is possible that there would be
 2    some other form of direction under the opening paragraph
 3    of (6).
 4              MR. CERA:  Is it possible?
 5              THE COURT:  Right.
 6              MR. CERA:  It's possible, Your Honor.
 7              THE COURT:  But you're saying that these two
 8    affidavits are sufficient to establish that there wasn't
 9    -- that possibility was not realized here?
10              MR. CERA:  Absolutely that is the case.
11              THE COURT:  All right.  I just want to
12    understand that.
13              So, from Global Undervalued, is there
14    anything further?
15              MR. DOWNS:  Good afternoon, Your Honor, Travis
16    Downs, Lerach, Coughlin.  Just a few remarks.  I think
17    it is very important that you didn't get a straight
18    answer or the correct answer to your question is there
19    oral authority in those declarations of Sweeney and
20    Kilgun.  There is no representation that there is the
21    attorney of fact.  And if there isn't an oral --
22              THE COURT:  Well, is there a necessity for
23    there to an attorney of fact?  I look at the second
24    Rentway decision.  And the focus there was really on
25    whether or not the advisor was the purchaser.  And if
```

1    the advisor is the purchaser, it's got standing, right?

2            MR. DOWNS:  In Rentway, you did have the

3    attorney-in-fact language.  And in the second case of

4    Rentway, it was salvaged by the catch-all language

5    that you referred to.

6            THE COURT:  Well, it wasn't salvaged so much.

7    It was referenced.  But the question that the Judge

8    focused on was whether or not they were, in fact,

9    purchasers.  That's what he was talking about in -- what

10   is it, 136 F.2d -- and that's what he focused on in 216.

11   And he found that the Judge in Turkcel just didn't

12   get it quite right.

13           MR. DOWNS:  Correct.  Rentway is not the

14   only decision.  In the context of Rentway, in the

15   background of that, you have several other cases such as

16   Smith v. Suprema, Weinberger v. Atlas, and the

17   others that we've cited in our brief that all recognize

18   that you need to have complete and vested discretion and

19   the attorney-in-fact language.  That was no surprise

20   when BPI entered this case.  That was what the law was,

21   and they chose to pursue a different path.  And, yet,

22   initially they didn't make the showing that was

23   required.  Thankfully, we now have the investment

24   agreement itself.  And that agreement in paragraph (6)

25   does indicate or it can be read to indicate that you do

1    not have complete discretion and that they serve at the

2    pleasure of the client.

3          There is some other language that we didn't

4    cite, but is also in the agreement that I think makes

5    very clear that these guys don't have the appropriate

6    authority to sue.  For example, if you would go to page

7    15 and look at paragraph (33) of the agreement which

8    deals with the nature of the agreement, it talks about

9    it specifically.  "This agreement is intended to be

10   and shall not be treated as anything other than an

11   investment or advisement agreement regarding the

12   provisions of investment advisory services."

13         THE COURT:  I can see why you didn't cite

14   that.

15         MR. DOWNS:  It's entirely silent as to whether

16   or not --

17         THE COURT:  Right.  It's not relelvant.

18         MR. DOWNS:  Well, it is relevant to the

19   question of whether or not you have the authority to

20   sue.

21         THE COURT:  No.  It's relevant to the question

22   of whether or not they're constituted as a party or as a

23   partner or agent.

24         MR. DOWNS:  Well, in fact -- and you could

25   read that provision to make sure that you can imply in

1      this agreement that they are an attorney-in-fact.  This

2      agreement is written much more tightly than the Rentway

3      agreement was that allowed you to read in to rights

4      that may not exist on the facts.  If the agreement

5      is ambiguous, you need to construe it against the

6      proponent.  And if it raises a question as to --

7                    THE COURT:  What?  If it's ambiguous, I read

8      it against --

9                    MR. DOWNS:  It is their agreement.

10                   THE COURT:  Is it a contra preferentem?

11                   MR. DOWNS:  I'm sorry?

12                   THE COURT:  There's a contra preferentem

13     principle involved in the construction of this in the

14     context of whether or not somebody gets to be a class

15     representative.

16                   MR. DOWNS:  At a level, you have to interpret

17     this contract.  And I would suggest that it should be

18     read or interpreted as drafted and if there is ambiguity

19     as to a term of provision, that is construed against the

20     drafter.  But we've said essentially all that we meant

21     to say in our papers.  We still do not believe on the

22     fourth or fifth attempt now that they have been able to

23     provide satisfactory evidence that they are in control

24     of -- they have authority to represent their clients.

25     And in fact, I think it's interesting that when they

1    moved, they moved on behalf of 11 clients.  Nine of them

2    had been jettisoned.  Where did they go?  Did they know

3    they were in the case?  Do they know that they're out of

4    the case?  All we have now is a dissolving group which

5    is another way of saying lawyer-driven litigation, which

6    is what Congress meant to prevail or prevent when it

7    passed the PLSRA.  We are down from eleven to two

8    people.  And the two people that they did give you --

9                THE COURT:  And the two people have more

10   assets than anybody else, the two entities do.

11               MR. DOWNS:  They only have more assets if the

12   Court finds that they have authority to sue.  Otherwise,

13   those lawsuits belong to their clients.  Their clients

14   have not moved.  They don't have standing.  They cannot

15   go forward.

16               THE COURT:  So, what am I supposed to do with

17   Mr. Killeen's affidavit?

18               MR. DOWNS:  The affidavits don't get you

19   there, Your Honor.  They don't purport to look at the

20   language.  There is nothing in those affidavits that say

21   "look, paragraph (6)" -- it says, "Look, you can only

22   after instruction and approval" -- really, what we meant

23   to say was that "you have complete discretion and

24   authority to sue for us."  There is nothing in that in

25   the affidavit.

1          THE COURT:  CR Mutual Funds, Incorporated,

2     on behalf, among others of BPI Global Equity Fund and

3     BPI American Equity Fund fully supports BPI Global's

4     effort to be appointed lead counsel and agrees to be

5     bound by whatever result is ultimately reached in this

6     litigation.

7          MR. DOWNS:  And we dealt with that in our

8     brief in the footnote.  Expressions of support,

9     endorsement, cheerleading --

10         THE COURT:  No.  That's not an expression of

11    support or cheerleading.  That's simply that the

12    governing controlling entity --

13         MR. DOWNS:  Well, that's not the agreement,

14    Your Honor.  The agreement is what dictates the nature

15    of the relationship.

16         THE COURT:  Okay.  I think I have it.  Thank

17    you.

18         So, I am going to appoint BP Global Asset

19    Management as the lead plaintiff in this case.  Having

20    reviewed these additional materials, which seem to me to

21    indicate that it is properly to be understood as a

22    purchaser and a purchaser with the largest financial

23    interest here.  Furthermore, I have evaluated and had an

24    opportunity to review more carefully the qualifications

25    of its approved lead plaintiff's counsel, the Gold,

1    Bennett firm, and particularly Mr. Cera.  And I'm

2    satisfied that they will provide the kind of adequacy of

3    representation that is contemplated for these purposes.

4         And, so, for those reasons, I will appoint BP

5    Global Asset Management LLP as lead plaintiff, the firm

6    of Gold, Bennett, Sidener, LLP, as lead plaintiff's

7    counsel.  In that connection, Mr. Cera, do you have

8    liaison counsel and what are you doing about that?

9         MR. CERA:  No, Your Honor.  We do not have

10   liaison counsel.  We have associated with a firm from

11   Western Massachusetts.  But I'd like to proffer a

12   suggestion in that regard, that since we're doing all of

13   this by electronic filing, and we obviously can travel

14   to the court when necessary for appearances, I question

15   whether there really is a need for an additional liaison

16   counsel, although I'm happy to engage one, but I'm not

17   sure it's necessary.

18        THE COURT:  Well, is there something -- do the

19   defendants have any particular view?  I mean, it doesn't

20   strike me as it's necessary.

21        MR. RUDMAN:  We're agnostic on the point, Your

22   Honor.

23        THE COURT:  Okay.  So I'll leave it at that

24   and we'll consider whether or not we have a need for it

25   at some further point.  But I'm not sure that there is

1    any need that's yet been shown regarding that.

2            Now, let me understand:  Is there still no

3    decision from Mr. Judge Van Gestel?

4            MR. FEDERMAN:  That's correct.  There's no

5    decision.

6            MR. HALSTON:  There is no decision as of this

7    morning, Your Honor.  That matter is still under

8    advisement.

9            THE COURT:  Okay.  All right.

10            Now, let me then turn to the question of the

11    derivative cases.  I've had more of an opportunity to

12    reflect on this as well.  And I'm of the view that

13    Schubert & Reed should be appointed as the sole lead

14    derivative counsel.  And the question is the necessity

15    for liaison counsel here.  Does someone from Schubert &

16    Reed want to speak to that?

17            MR. JONCKHEER:  Your Honor, Willem Jonckheer,

18    Schubert & Reed.  In terms of liaison counsel, we've

19    worked very well with Gilman & Pastor over several

20    years.  And we do believe that --

21            THE COURT:  What do you need from them?

22            MR. JONCKHEER:  Well, mostly the filing of

23    documents.  I understand there is E-filing in the Court.

24    However, I also understand that from time to time,

25    documents need to be served or rather filed in paper

14

 1    form.  Also, they're very knowledgeable regarding the

 2    Boston court and we would like to retain them as liaison

 3    counsel and move forward.

 4          THE COURT:  Well, I'm skeptical about the use

 5    of liaison counsel.  I just am concerned about running

 6    the bills up here.  We do have -- and, in fact, in this

 7    session, I require -- electronic filing in all cases.

 8    From time to time, things have to be filed by paper --

 9          MR. JONCKHEER:  Right.

10          THE COURT:  -- but that's not a particular

11    burden.  You know, purported knowledge of the Court,

12    you're in Federal Court and this is a nationwide

13    practice here.

14          MR. JONCKHEER:  Yes.

15          THE COURT:  I'll permit liaison counsel, but

16    I'm not going to be particularly intrigued by extensive

17    billing unless there's some particular reason for doing

18    that.

19          MR. JONCKHEER:  Understood, Your Honor.

20          THE COURT:  And that's not in any way to

21    denigrate Gilman & Pastor.  It's simply I don't want to

22    pile up counsel fees in the case.  I share Mr. Cera's

23    view generally on that.  So, with that reflection then,

24    I'll put you on as having Gilman & Pastor as your

25    liaison counsel here.

1          MR. JONCKHEER:  Thank you, Your Honor.

2          THE COURT:  Now, in terms of schedule, one of

3     the things that I thought you brought to the table

4     -- I wasn't particularly impressed one way or the other

5     -- was the question of stay during the pendency of the

6     consideration by Judge Van Gestel of the case in the

7     Superior Court.  Are you now pressing for some sort of

8     discovery to go forward before we get beyond the stay

9     with Judge Van Gestel?

10         MR. JONCKHEER:  Not at the moment.  I

11    understand from the previous conference, that Your Honor

12    did agree to stay the matter pending a decision from

13    that court.  As soon as a decision is made, we will move

14    to lift the stay depending on the circumstances.  That

15    will be fine.

16         THE COURT:  Well, what do you want to do for

17    purposes of scheduling?  This is for you, it's for Mr.

18    Cera, and obviously for defense counsel.  How do you

19    want to handle this?  I mean, I just want to be ready to

20    get going if it's necessary.

21         MR. CERA:  Your Honor, I can't speak to the

22    derivative case, but we had a proposal that we had

23    submitted in a joint status report in connection with

24    the prior hearing where we would have the lead

25    plaintiff, whoever it was, within 60 days from the date

1    of the appointment to submit a consolidated complaint

2    and then I think there was 45 days for lead defendant to

3    respond.  I think that schedule probably works for the

4    securities class action case.

5              THE COURT:  Is that sufficient for you?

6              MR. HALSTON:  Yes, it is.

7              THE COURT:  It may be that, for whatever

8    reason, Judge Van Gestel just doesn't get to the

9    resolution of it.  But then that will be probably six

10   months under the present time frame.  And that seems not

11   unreasonable.

12             MR. HALSTON:  Are you addressing both the

13   securities and the derivative actions, Your Honor?

14             THE COURT:  Yes, I think so.  I don't see any

15   reason why it shouldn't be done in that fashion.

16             MR. JONCKHEER:  I agree, Your Honor.  In the

17   derivative case as well, a consolidated complaint will

18   need to be filed.

19             THE COURT:  Okay.  So let's use the 60-day

20   period from today with 45 days to respond.  Will that do

21   it?  And then I'm loath to do any other scheduling until

22   -- because to some degree, as I've indicated, I'm

23   interested in what Judge Van Gestel has to say.

24             MR. CERA:  I think the only other element in

25   the agreement we had was that once they submit, assuming

1    it's a motion to dismiss, we would have 45 days, I

2    think, to --

3              MR. HALSTON:  And we've built in our reply

4    period to that.

5              THE COURT:  Yes.  Let's just -- I'll look

6    and see once I get the responsive pleading from the

7    defendants here.

8              MR. HALSTON:  Very well.

9              THE COURT:  And maybe the way to deal with it

10   at that point is make a proposal when you file the

11   responsive pleading that takes into consideration

12   whether or not there has been a resolution in the

13   Superior Court case or not and why I should get to it in

14   that time period.  I'd be inclined to get to it or

15   require a briefing at that point even if there hasn't

16   been a resolution in the Superior Court case.

17             MR. HALSTON:  Fine, Your Honor.

18             THE COURT:  Okay.  Now, is there anything else

19   that we need to take up?

20             MR. CERA:  No.

21             THE COURT:  Okay.  Thank you very much.

22   We'll be in recess.

23                  RECESSED AT 2:55 P.M.

24

25

18

```
 1
 2
 3                    C E R T I F I C A T E
 4          I, PAMELA R. OWENS, Official Court Reporter,
 5     U. S. District Court, do hereby certify that the
 6     foregoing is a true and correct transcription of the
 7     proceedings taken down by me in machine shorthand and
 8     transcribed by same.
 9
10                         _Pamela R Owens 8/19/04_
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```