UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. LITIGATION | ) Civil Action No. 04-10294-DPW<br>) (Lead Case)<br>)<br>) |
| THIS DOCUMENT RELATES TO: ALL CASES | ) **AFFIDAVIT OF PAMELA A. MARKERT**<br>) **IN OPPOSITION TO DEFENDANT**<br>) **SONUS NETWORKS, INC.'S MOTION**<br>) **FOR PROTECTIVE ORDER**<br>)<br>)<br>)<br>)<br>) |

I, Pamela A. Markert, depose and state the following:

1. I am an associate attorney at Gold Bennett Cera & Sidener LLP, counsel for Lead Plaintiff BPI Global Asset Management LLP ("Lead Plaintiff"). I submit this declaration in opposition to the motion of defendant Sonus Networks, Inc. ("Sonus") for a protective order. The matters stated herein are true of my own personal knowledge and, if called to testify thereto, I could and would competently do so.

2. On July 6, 2006, Lead Plaintiff and defendants Sonus, Hassan M. Ahmed, and Stephen J. Nill submitted to the Court their Joint Statement Pursuant to Local Rule 16.1(d) ("Joint Statement"). A true and correct copy of the Joint Statement is attached hereto as Exhibit A. I was present during the teleconferences with defense counsel when the terms of this

#117817                                                                                                                                                     -1-

document were negotiated. During these discussions, Sonus did not argue that severe discovery limitations, such as those it is now proposing, should apply. Instead, at Paragraph IV.A.1. of the Joint Statement, Sonus expressly agreed to produce documents previously given to the Securities and Exchange Commission ("SEC") pursuant to a subpoena dated October 1, 2004 issued in connection with its formal investigation of Sonus. The parties frequently refer to these documents as the "SEC Production." Lead Plaintiff received Sonus's SEC Production, approximately 44,000 pages of documents, on August 15, 2006. Documents contained within the SEC Production relate to numerous issues and transactions beyond the four transactions Sonus identifies in its motion and include documents relating to Sonus customers XO Communications, Deutsche Telekom, T-Systems, Verizon, Alestra, Booz Allen Hamilton, Unefon, America Online, Epana Networks, Compta, IDT, Softbank, Nissho, Samsung, Global Crossing, Fusion, iNetworks, Unipoint, Nuvox, Callipso, Point One, Alcatel, Alltel, Bell South, Sumitronics, Touch America, Soma Networks, Aglient Technologies and Winphoria, among others.

    3.    On August 29, 2006, Lead Plaintiff served its First Set Of Document Requests to All Defendants. Sonus served its written objections and responses on September 28, 2006. However, no documents were received from Sonus beyond the SEC Production until January 26, 2007 and March 29, 2007. Although Sonus had raised objections to the scope of the discovery in its written response, its actual document productions included documents that: (a) pertained to transactions other than the four it now claims define the scope of the litigation; and (b) were generated or created prior to January 1, 2001 and after September 30, 2004, outside of the time period it is now asking the Court to impose.

4.  For example, contained within the January 26 and March 29, 2007 productions, Sonus produced documents relating to customers Level 3, Nuvox, Slovak, Time Warner Telecom, Deutsche Telecom, Volo, XO Communications, CSC Holdings, Verizon, Aelstra, America Online, Callipso, IDT, BellSouth Telecommunications, Broadwing, Global Crossing, Nissho Electronics, and Point One, among others. In several instances, the documents came from what appear to be file folders or binder tabs labeled with each customer's name and containing documents such as purchase orders, contracts and addenda, emails, and internal memoranda. For several customers, the documents included checklists and memoranda that analyzed contract terms and the timing of revenue recognition.

5.  Sonus's document productions also included documents dated after September 30, 2004, including internal memoranda discussing accounting transactions in 2003, purchase orders, e-mail messages, and letters relating to customers Sumitronics, Inc., Softbank BB Corp., Advance Global Communications, Alwayson LTD, AOL. These are only a few examples of documents produced by Sonus outside the relevant time period Sonus now seeks to impose. There are numerous other examples.

6.  Between July and October 2006, Lead Plaintiff served subpoenas on several third-parties, including Sonus's customers, its underwriter, securities analysts, and its accountants and consultants. The scope of the subpoenas included documents pertaining to communications between the third parties and Sonus, products and services purchased from Sonus, as well as Sonus's financial statements, among other topics. Sonus did not object (formally or informally) to the scope of records requested in any of the subpoenas served on its customers or the securities firms. I am informed that Sonus performed a privilege review of the documents possessed by the

accounting firms and consultants, but it did not otherwise object to those subpoenas.

7. Although some third-parties tendered objections to the subpoenas, the vast majority have nonetheless produced responsive documents and electronically stored information ("ESI"). To date, all but two customers, all of the accounting and consulting firms, and most of the securities firms have either produced documents or confirmed that they have no responsive documents. To my knowledge, none of the third parties have withheld documents pursuant to the objections made by Sonus in its motion. Gold Bennett Cera & Sidener LLP has devoted substantial resources to reviewing these documents and ESI since August 2006.

8. During Lead Plaintiff's review of documents produced by third parties, there have been numerous instances where documents relating to the Class Period were prepared prior to January 1, 2001 and after September 30, 2004. These documents include correspondence, spreadsheets and memoranda prepared by Sonus, its former auditor, Ernst & Young, its consultants and other outside sources. These are only a few examples of types of documents produced by third parties outside the relevant time period Sonus now seeks to impose. There are numerous other examples.

9. Sonus did not file its amended Form 10-Qs for the first three quarters of Fiscal Year 2003 until June 10, 2005, well after the date Sonus proposes as the end date for the relevant time period. True and correct copies of those Form 10-Qs are attached hereto as Exhibits B, C, and D. Sonus subsequently announced that it had found additional errors in its financial statements for Fiscal Years 2001, 2002, and 2003, as well as other years. A true and correct copy of Sonus's Form 8-K, dated August 2, 2007, is attached hereto as Exhibit E.

10. Attached hereto as Exhibit F is a true and accurate copy of an email I received

from Melissa Coffey dated March 21, 2007 discussing Sonus's proposal that Lead Plaintiff propose queries designed to capture documents beyond the four alleged accounting issues listed in Sonus's General Objection Number 1 or otherwise beyond the scope of its responses to Lead Plaintiff's document requests.

11.    I am informed that Sonus has provided copies of selected sources of its ESI to a third party vendor called Zantaz. It is my understanding that Zantaz has loaded this data into its computer system, which may then be searched electronically using search terms, queries, and other criteria to identify responsive materials. The queries proposed by Sonus and Lead Plaintiff were applied to the uploaded data, from which reports were generated identifying the number of times specific terms and criteria were identified. The report is commonly referred to as a "hit" report. It is a preliminary report used to identify the scope of data responsive to the criteria in order to make modifications, as necessary. After the search criteria is finalized, responsive ESI is then culled and segregated into a separate area. I am informed that further search queries may be applied to this culled ESI to identify potentially privileged data. At the time Sonus filed its motion for protective order, the parties were in the process of modifying the search criteria based on the initial hit results.

12.    During a teleconference with Sonus counsel on December 20, 2006 and subsequent teleconferences in March and April of 2007 regarding Sonus's ESI, the parties discussed how development of the search protocol would be an iterative process. Sonus has now effectively chosen to curtail that ongoing process by its motion.

13.    Attached hereto as Exhibit G are a true and accurate copies of emails dated July 19 and July 24, 2007 that I exchanged with Sonus's counsel regarding the status of Lead

Plaintiff's response to Sonus's June 15, 2007 letter and a copy of the hit report from Sonus's vendor for Sonus's original 52 proposed search queries. According to an email I received on August 22, 2007 from Sonus's counsel, Melissa Coffey, Sonus had received this report from Zantaz in early June of 2007. This report was provided to me approximately two months later, and only at my written request. Attached hereto as Exhibit H is a true and accurate copy of Ms. Coffey's email. On pages 3 and 4 of Exhibit G are the hit report. Under the column entitled "Search Hits" there are two queries proposed by Sonus that generated a single hit. In one instance, a query proposed by Sonus generated zero hits.

14. Attached hereto as Exhibit I is a true and accurate copy of the hit report from Sonus's vendor for the proposed query list that contains Sonus's original queries, Sonus's original queries with Lead Plaintiff's proposed revisions, and Lead Plaintiff's proposed search queries. This report was provided to Lead Plaintiff on June 15, 2007.

15. Lead Plaintiff and Sonus recently entered into an agreement outlining the protocol to be followed in connection with Ernst & Young's production of 3.5GB of ESI. A true and accurate copy is attached hereto as Exhibit J. I am informed that search terms were run against the data to identify and separate any information that may be privileged. The segregated data will be reviewed by Sonus to ensure that discoverable documents are not withheld. To alleviate concerns that a privileged document may inadvertently be produced, the agreement includes a non-waiver stipulation that calls for the return of any such documents.

16. On August 20, 2007 Lead Plaintiff received a letter from Deloitte & Touche LLP ("Deloitte") containing its general objections to a subpoena served by Lead Plaintiff. Contained within the letter (attached as Exhibit I to Ms. Haus's Affidavit) was a request by Deloitte to meet

and confer to discuss its objections with the intent of reaching an agreement, if possible. Shortly thereafter, I had a teleconference with Deloitte's counsel, who requested a copy of the pleadings and confidentiality order to review prior to beginning our discussion. I informed Sonus's counsel of my meet and confer communications with Deloitte in a letter I emailed on August 28, 2007. By the filing of this motion, Sonus has disrupted the ongoing meet and confer between Lead Plaintiff and Deloitte, which now must be suspended pending the Court's ruling.

17. Attached as Exhibit K hereto is a true and correct copy of "AU Section 315 Communications Between Predecessor and Successor Auditors" published by the American Institute of Certified Public Accountants.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 19th day of September 2007.

/s/ Pamela A. Markert
Pamela A. Markert