UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE SONUS NETWORKS, INC.        )
SECURITIES LITIGATION             )
_____ )        CIVIL ACTION NO.
                                  )        04-10294-DPW
                                  )        (LEAD CASE)
THIS DOCUMENT RELATES TO:         )
     ALL CASES                    )


MEMORANDUM AND ORDER
September 25, 2007

Lead Plaintiff BPI Global Investments, Inc. ("BPI Global")
seeks to bring this consolidated securities fraud action on
behalf of a class and a subclass against Sonus Networks, Inc.
("Sonus"), Hassan M. Ahmed, Sonus's Chief Executive Officer, and
Stephen J. Nill, Sonus's former Chief Financial Officer.  BPI
Global alleges that Defendants violated sections 10(b) and 20(a)
of the Securities Exchange Act of 1934 and sections 11, 12(a)(2),
and 15 of the Securities Act of 1933 by intentionally
misrepresenting Sonus's financial statements between March 28,
2002 and March 26, 2004 ("Class Period").  I appointed BPI Global
Lead Plaintiff on August 10, 2004.  Thereafter, in response to
Defendants' motion, I dismissed part of the complaint on May 10,
2006.  *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165
(D. Mass. 2006).  BPI Global has moved to certify the class as
well as one subclass.  For the reasons stated below, I will grant

-1-

the motion for class certification of the requested class and subclass.

## I.  Background

The allegations in the case are detailed fully in the Memorandum in which I addressed Defendants' motion to dismiss. *See In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165 at *1-*5.  To summarize, BPI Global and other plaintiffs similarly situated allege that Sonus, a provider of "packet voice infrastructure solutions," and Sonus officers Ahmed and Nill misrepresented the revenues of Sonus, engaged in erroneous purchase accounting, and erroneously recorded impairments, accrued expenses, and deferred compensation.  Specifically, BPI Global alleges that Defendants recorded revenues in quarters in which they had not been earned, made false and misleading statements of finances in ten SEC filings issued during the alleged Class Period, and knowingly engaged in improper accounting practices in order to create the illusion that the company's revenues were growing in a stable, linear pattern.  BPI Global argues that this publication of materially false statements caused the shares of the company to rise to artificially high levels during the Class Period.

BPI Global also alleges that Defendants made materially false statements with respect to a Prospectus Supplement in September 2003.  Sonus had conducted its initial public offering

in May 2000 in the NASDAQ capital market, raising $115 million. Sonus then filed a Prospectus Supplement relating to the offering of 200,000,000 shares of its common stock on April 21, 2003, and another on September 23, 2003 relating to an offering of 17,000,000 shares of its common stock.  BPI Global asserts it relied specifically on allegedly false statements in the September 2003 Prospectus Supplement and seeks certification for a subclass of plaintiffs that relied on the same misstatements.

BPI Global claims that it sustained losses exceeding $5.3 million from the purchases of Sonus shares during the Class Period.  Of this amount, two funds that BPI Global advised allegedly suffered substantial losses as a result of the September 2003 Prospectus Supplement.  Specifically, BPI Global Equity Fund is alleged to have suffered a loss of $2,370,550 and BPI American Equity Fund a loss of $1,202,752.

BPI Global did not, however, sustain $5.3 million in losses directly.  The $5.3 million in damages for the most part arose out of the purchases of Sonus stock that BPI Global made for clients.  BPI Global, however, was also the sole general partner of four limited partnerships which purchased Sonus stock in 2003. As general partner, BPI Global invested money in the limited partnerships and those funds sustained close to $66,000 in damages.

**A.  BPI Global's Role as Investment Advisor**

-3-

BPI Global (now Trilogy, *see* Section I.B. below) was an investment advisor to several funds which purchased Sonus stock during the Class Period.  Specifically, BPI Global entered into an agreement with BPI Capital Corporation, a company which is the two-thirds owner of BPI Global, on May 31, 1999 under which BPI Global would purchase certain securities on behalf of BPI Capital Corporation and their multiple mutual funds and hedge funds. According to Charles Sweeney, who was control and chief compliance officer at BPI Global from April 1997 to October 2005, BPI Capital[1] was considered the "manager" of the funds that held Sonus securities and it was BPI Capital that had a "direct contractual relationship" with the funds.  BPI Global, on the other hand, was advisor to BPI Capital, and there is no evidence that it had any formal legal relationship with most of the funds themselves except through BPI Capital.

Independent from being investment advisor to BPI Capital, BPI Global was also general partner of several of the mutual funds for which it purchased Sonus stock.  For example, BPI Global was general partner for BPI Global Opportunities Fund, LP, BPI Global Opportunities Fund VII, LP, and BPI American Opportunities Fund, LP.  According to Charles Sweeney, "[w]here [BPI] was a general partner in the limited partnerships, they

---

[1]BPI Capital has since merged into CI Mutual Funds, Inc. (as of January, 1, 2000), and, according to Lead Plaintiff's submissions, CI Mutual Funds, Inc. now "stands in the shoes" of BPI Capital.

were also an investor and invested a sum of money" in the funds. With respect to certain other funds, BPI Global was a member of the limited partnership though not general partner.

BPI Global has submitted testimonial evidence that it had complete discretion with regard to the securities purchases it made on behalf of BPI Capital. That evidence includes the following:

- "We were independent investment advisors, so we were allowed to exercise our discretion, our full discretion on the purchase and sale of securities." Bichelmeyer Dep. at 63.[2]

- BPI Global was subject to certain broad restrictions when purchasing stock. For example, the agreement prohibited the purchasing of real estate portfolios and short-selling stock without BPI Capital's approval. *See* Bichelmeyer Dep. at 61. With regard to the broad restrictions on purchasing, John Bickelmeyer stated that the restrictions were broad and thus "didn't impact my strategy much." *Id.* at 66.

- Charles Sweeney would "interpret [the agreement between BPI Capital and BPI Global] as giving BPI Capital the ability to step in, as the case might be. But to the best of my knowledge, during the entire history of this account, they have not come and said you should invest in this stock or you shouldn't invest in a particular name." Sweeney Dep. at 54.

- "BPI Global as an investment advisor makes the decision what to buy, when to buy it, how much to pay for it, who to buy it through, how to vote the proxies and any other matters that pertain to the security." Sweeney Dep. at 51.

- "As a practical matter, BPI [Global] ran autonomously." Sweeney Dep. at 55.

---

[2]John Bichelmeyer was a Controller and Chief Compliance Officer at BPI Global and a portfolio manager for funds including BPI American Equity Fund, BPI American Equity Sector Fund, Northern Trust Multi-Manager Fund, BPI Global Equity Fund, and BPI Global Equity Sector Fund.

- "CI Mutual Funds, Inc. is the ultimate controlling entity of among other related mutual funds, BPI Global Equity Fund and BPI American Equity Fund, which is sometimes also referred to as BPI American Value Fund.  CI Mutual Funds Inc. acts as the manager and trustee for these funds."  Killeen Aff. at ¶ 2 (Killeen is Senior Vice-President and General Counsel of CI Mutual Funds, Inc., formerly BPI Capital.).

  "BPI Global acts as the investment advisor for the mutual funds identified above, and has full discretion in making purchase decisions on the funds' behalf and in voting the shares purchased." *Id.* at ¶ 3.

  Apart from the fiduciary relationship between BPI Global and BPI Capital, there is no evidence in the record that BPI Global had formally been designated attorney-in-fact for BPI Capital.

## B.  Merger with Trilogy Advisors

On May 31, 2005, BPI Global merged with Trilogy Advisors to form Trilogy Global Advisors, Inc. ("Trilogy").  Under the merger agreement, "[a]ny claim existing or action or proceeding, whether civil, criminal or administrative, pending by or against any of the Non-Surviving LLC may be prosecuted to judgment or decree as if the Merger had not taken place, or the Surviving LLC may be substituted in such action or proceeding."

## II.  Discussion

BPI Global seeks to certify a class consisting of:

  All persons or entities who purchased or otherwise acquired Sonus Networks, Inc. ("Sonus") securities from March 28, 2002 through March 26, 2004 and who were damaged thereby. Excluded from the Class are the defendants, officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

and a subclass consisting of:

> All persons or entities who purchased or otherwise acquired
> newly issued Sonus securities pursuant to the Prospectus
> Supplement dated September 23, 2003 and who were damaged
> thereby. Excluded from the Subclass are the defendants,
> officers and directors of the Company at all relevant times,
> members of their immediate families and their legal
> representatives, heirs, successors or assigns and any entity
> in which the defendants have or had a controlling interest.

Under Rule 23, "[o]ne or more members of a class may sue or
be sued as representative parties on behalf of all only if (1)
the class is so numerous that joinder of all members is
impracticable, (2) there are questions of law or fact common to
the class, (3) the claims or defenses of the representative
parties are typical of the claims or defenses of the class, and
(4) the representative parties will fairly and adequately protect
the interests of the class." Fed. R. Civ. P. 23(a). In addition
to the Rule 23(a) requirements, the court must also find that one
of the 23(b) requirements is met. In order to certify a 23(b)(3)
class, the court must find that "the questions of law or fact
common to the members of the class predominate over any questions
affecting only individual members, and that a class action is
superior to other available methods for the fair and efficient
adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).


**A.  Rule 23(a) Requisites**

Defendants do not dispute that the plaintiff has shown
numerosity or commonality, but argue that the typicality and

adequacy of representation requirements have not been met.
Specifically, they argue that (1) BPI Global has not suffered any
out-of-pocket expenses, does not have a cognizable injury, and
thus does not have Article III standing, (2) BPI Global is not a
purchaser as required by statute and thus does not have standing
to sue under the Securities Exchange Act, (3) BPI Global no
longer exists and does not have sufficient oversight of the
litigation to be a class plaintiff, and (4) BPI Global has not
shown there is a "particular person among the proposed class
representative who can prove that she or he suffered a loss from
that particularized fraud."  I address these arguments in the
discussion of adequacy in Section II.A.4.[3]

---

[3]It is apparent the defendants were aware of the broad outlines
of these objections to the adequacy of BPI Global as
Lead Plaintiff for this class action when appointment of BPI
Global was disputed in the summer of 2004 by the several named
plaintiffs and their counsel.  At the hearing on the appointment
of Lead Plaintiff and Lead Counsel, I inquired of defendant's
counsel regarding their views.  They demurred, contending that
they were precluded from offering views by *Greebel v. FTP
Software*, 939 F. Supp. 54, 60 (D. Mass. 1996).  *Greebel* was an
initial effort by Judge Tauro, shortly after the Private
Securities Litigation Reform Act was enacted, to identify
protocols for the treatment of PSLRA cases.  In doing so, he
suggested that the new statute indicated that the "issue [of who
will stand as the lead plaintiff] is one over which only
potential plaintiffs will be heard" and that accordingly a
defendant "lacks standing" to challenge whether a particular
plaintiff can meet the criteria for appointment as lead
plaintiff.  *Id.*  At the same time, Judge Tauro recognized that a
"determination to appoint a person or persons as lead plaintiff
must be without prejudice to the possibility of revisiting that
issue in considering a motion for class certification."  *Id.*
    Given the iterative procedures employed in PLRSA class
actions and the experience of managing a number of them during

## 1. Numerosity

The numerosity requirement of Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  The parties do not dispute that numerosity is sufficient in this case.  Indeed, joinder is especially impracticable where the class is made up of many shareholders.  Thus, in a securities class action, a plaintiff can generally demonstrate numerosity on the basis of a large number of shares outstanding and traded.  *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 167 (D. Mass. 1989)

---

the past decade, I have concluded a categorical rule that a court will not hear what a defendant might have to say at the lead plaintiff appointment stage is improvident.  At each stage, a court benefits from whatever insights interested parties may have to offer.  Indeed, turning a deaf ear at an early stage when the perspective of a party will necessarily be heard at a later stage creates a perverse incentive.  Under the guise of being muzzled by the court, a defendant can impose substantial transaction costs on plaintiffs by lying in wait at the appointment of lead plaintiff stage only to strike at the lead plaintiff appointment during the class certification stage and thereby force appointment of a new lead plaintiff with disruption, duplication and perhaps even abandonment of the plaintiff class organization efforts to date.  As a consequence, and with the recognition that I can always benefit from all the help I can get in analyzing issues, I have begun taking the position that defendants must speak up at the lead plaintiff appointment stage or risk being deemed later to have waived adequacy arguments regarding which they were then aware.  Of course, when--as here--the arguments go to standing and the jurisdiction of the court even to consider a plaintiff's claims--the imputed waiver of an argument cannot vest the court with jurisdiction.  Nevertheless, gamesmanship in the unnecessarily delayed assertion of arguments regarding the adequacy of plaintiffs and their counsel to manage complex litigation cannot expect to be met with any great hospitality if, without good reason--and the purported *Greebel* muzzle rule is not one--such arguments are only belatedly disclosed.

("Even if the number of persons who bought stock during the class
period is unknown, numerosity can be assumed where the number of
shares traded is so great that common sense dictates the class is
very large."); *In re Relafen Antitrust Litig.*, 218 F.R.D. 337,
342 (D. Mass. 2003) (finding that "forty individuals [are]
generally found to establish numerosity").  Although BPI Global
does not yet know the exact number of class and subclass members,
it has submitted evidence that the number of shares traded during
the Class Period was 2.9 billion.  Common sense dictates that
joinder in this case would be impracticable:  I find the
plaintiffs have satisfied the numerosity requirement.

     **2.  Commonality**

     BPI Global has similarly satisfied the commonality
requirement.  Because "[a] single common legal or factual issue
can suffice" to satisfy the 23(a)(2) requirement, "the
commonality requirement ordinarily is easily met."  *Payne v.
Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003).
The plaintiff class alleges that Sonus and its agents published
material misrepresentations regarding its revenues and financial
statements.  Thus, there are common questions of law and fact as
laid out in the complaint, including:  whether the Defendants'
actions constituted securities fraud; whether the Defendants knew
that the statements were false; whether defendants Nill and Ahmed
are control persons within the meaning of the Securities Act; and

whether plaintiffs suffered damages in the amount of the fall in
stock price. *See also Guckenberger v. Boston Univ.*, 957 F. Supp.
306, 325 (noting that the "commonality" and "typicality"
requirements of Rule 23(a) "do not require that all of the
putative class members share identical claims, rather these
prerequisites mandate only that complainants' claims be common,
and not in conflict"); *Kirby v. Cullinet Software, Inc.*, 116
F.R.D. 303, 306 (D. Mass. 1987) (finding that the commonality
requirement was satisfied in securities litigation content when
common questions included "(1) [w]hether the statements and
omissions complained of were false and misleading; (2)[w]hether
they were made with the requisite scienter; (3) [w]hether the
statements were material; (4)[w]hether the conduct alleged
inflated the market price; and (5)[w]hether they were part of a
common course of conduct designed to inflate the market price of
[the defendant company's] stock"); *In re Eaton Vance Corp. Sec.
Litig.*, 219 F.R.D. 38, 43 (D. Mass. 2003) (finding that the
commonality requirement was satisfied in a securities fraud
putative class action where "all the plaintiffs purchased shares
in [one of the defendant's mutual funds] and all the plaintiffs
allege that the defendants issued false and misleading statements
in violation of Sections 11 and 15 [of the Securities Act of
1933]"); *Grace*, 128 F.R.D. at 167 (determining that where "all
plaintiffs will have to prove the same misrepresentations and

omissions, as well as their materiality and defendants'
knowledge," the commonality requirement was met in a putative
class action alleging securities fraud).

### 3. Typicality

Typicality does not require a showing that the named
plaintiff's claims are identical to those of the class members
but simply that the claims arise from the same course of events.
*Guckenberger*, 957 F. Supp. at 325 ("The typicality requirement is
satisfied when the [named] plaintiff's injuries arise from the
same events or course of conduct as do the injuries that form the
basis of the class claims, and when the plaintiff's claims and
those of the class are based on the same legal theory."). 
Defendants argue that BPI Global is atypical because it does not
have standing.  On this issue, typicality merges with the
adequacy of representation discussion, and thus I will address it
in Section II.A.4. below.  Defendants do not argue that BPI
Global is atypical for any reason other than lack of standing.

### 4. Adequacy of Representation

Defendants Sonus and Ahmed raise three objections to the
adequacy of BPI Global as class representative: (1) BPI Global
does not have Article III standing because it is bringing claims
on behalf of investors in funds for which it merely served as
investment advisor, (2) BPI Global does not have statutory
standing because it did not have unfettered discretion to buy

-12-

securities under its agreement with BPI Capital and thus was not a "purchaser" of Sonus stock under Section 10(b) of the Exchange Act, and (3) BPI Global is inadequate because it is a defunct entity with little or no oversight of the case.  Defendant Nill joins the Sonus and Ahmed objections and asserts a fourth ground for denying class certification:  BPI Global has not shown there is a "particular person among the proposed class representative who can prove that she or he suffered a loss from that particularized fraud."

The First Circuit has interpreted the Rule 23(a)(4) adequacy prerequisite to entail a two part test: "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).  Plaintiffs have satisfied this requirement of Rule 23, notwithstanding Defendants' arguments to the contrary. In particular, I find that BPI Global has constitutional and statutory standing and would be an adequate class representative in this case.

### a.  Article III Standing ("Injury-in-Fact")

Defendants' argument that BPI Global does not have constitutional standing ignores the fact that BPI Global is a

direct investor in several of the funds for which it served as investment advisor. Defendants argue that because BPI Global was a mere advisor (through BPI Capital) to the mutual funds for which it purchased Sonus stock, it never suffered any injury itself. They rely upon a recent case denying standing to an investment advisor. *See In re Tyco Int'l*, Ltd., 236 F.R.D. 62, 73 (D.N.H. 2006) (holding that "[b]ecause [plaintiff] does not allege that it was directly injured by the defendants' alleged misconduct, it lacks [Article III] standing to sue on its clients' behalf"). However, *Tyco* is inapplicable in this case because BPI Global did in fact suffer a direct injury.

Having invested its own money in several limited partnerships, BPI Global has shown that it suffered a direct injury. It is true that the case-and-controversy requirement of Article III and its injury-in-fact corollary provide a necessary condition to the jurisdiction of the federal courts, and that BPI Global must meet this requirement regardless of whether Congress has passed a statute granting standing to sue as a purchaser. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)(noting that injury-in-fact is a constitutional minimum). Thus, to prove constitutional standing, a plaintiff must show that it has suffered a cognizable "injury-in-fact" that has been caused by the defendant and is redressable by the court. *See generally, Nulankeyutmonen Nkihtaqmikon v. Impson*, No. 06-2733, __F.3d__,

2007 WL 2685200, at *3 (1st Cir. Sept. 14, 2007); *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006). BPI Global has satisfied that requirement here by showing that it took on investment risk as general partner for several of the very funds it managed.[4] Whether less would be sufficient to satisfy the

--------

[4]BPI Global in its briefing essentially elides the injury-in-fact requirement by characterizing the issue as a matter of prudential standing regarding *who* should sue on the clients' legal rights. But the constitutional issue cannot be bypassed. Every plaintiff in federal court (perhaps especially a plaintiff suing with respect to a third-party's rights) must show that it suffered some separate and cognizable injury-in-fact as a result of the defendant's actions. *See Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006)(observing that prudential standing limitations are secondary to the constitutional limitations).

With the exception of *In re Tyco Int'l, Ltd.*, 236 F.R.D. 62 (D.N.H. 2006), cases addressing investment advisor standing have generally tended to bypass the Article III standing issue and turn directly to the prudential issue presented by construing the Congressional grant of statutory standing to "purchasers" of securities. *Tyco* was correct in first calling out and confronting the constitutional issue because Congress can grant no broader standing than Article III provides. Nevertheless, in doing so, *Tyco* appears to have formulated an overbroad categorical Article III bar to investment advisor standing with its holding that "[b]ecause Voyageur [an investment manager] does not allege that it was directly injured by the defendants' alleged misconduct, it lacks standing to sue on its clients' behalf." *Id.* at 72. The demands of Article III standing require a more nuanced analysis because, as Chief Judge Boudin has observed, "the requirements present endless complexities." *Baena v. KPMG LLP*, 453 F.3d 1, 4 (1st Cir. 2006). In that connection, he noted that "courts can be empowered to hear claims of injury to others." *Id.* at 5. Here, "[t]he constitutional prerequisites of Article III standing are satisfied [because BPI Global] colorably alleges an actual injury that is both traceable to the defendants' conduct and redressable by a favorable decision." *Nisselson*, 469 F.3d at 150 (citations omitted). Consequently, there is no need to examine further the complexities of Article III standing for investment advisors suing on behalf of their clients.

Constitutional minimum is a question I need not answer in this case.

### b.  "Purchaser" Standing

I am satisfied the plaintiff also has purchaser standing under the Exchange Act.  It is well-settled that a plaintiff may bring a 10(b) action only if it is related to a "purchase or sale" of securities.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).  Thus, a plaintiff in a securities fraud case must show that it was an actual purchaser of stock to have standing to sue under the Exchange Act.  Defendants argue that although BPI Global did actually purchase the Sonus stocks in this case, it did so as an agent for BPI Capital and thus was not truly a purchaser.  Defendants argue that unless BPI Global had "unfettered discretion" to purchase Sonus stocks on behalf of BPI Capital, it does not have statutory standing.

Courts are not in agreement regarding whether an investment advisor purchasing securities on behalf of its clients qualifies as a purchaser under the Exchange Act.  *See generally* Brian P. Murray, *Does An Asset Manager Have Standing Under the Federal Securities Laws?*, 79 St. John's L. Rev. 405 (2005).  *Compare In re Enron Corp. Sec.*, No. H-01-3624, 2006 WL 4381143 at *66-67 (S.D. Tex. June 5, 2006) (listing cases and concluding an advisor with discretionary authority qualifies as a purchaser), *with In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 311 (S.D.

Ohio 2005) (noting disagreement and concluding an advisor does not qualify as a purchaser).  Some courts have focused on whether an investment advisor is authorized to be its clients' attorney-in-fact.  *Id.*  "[W]hen the investment advisor is also the attorney-in-fact for its clients with unrestricted decision making authority, the investment advisor is considered the 'purchaser' under the federal securities law with standing to sue in its own name."  *Weinberg v. Atlas Air Worldwide Holdings*, 216 F.R.D. 248, 255 (S.D.N.Y. 2003); *see also Kaplan v. Gelfond*, 240 F.R.D. 88, 95 (S.D.N.Y. 2007) (holding that an investment advisor has standing in a securities fraud litigation because its clients appointed it as their attorney-in-fact).[5]

Rather than relying on formal attorney-in-fact status, other

---

[5]I note that in holding that an investment advisor with the status of attorney-in-fact had standing, Judge Buchwald underscored in *Kaplan v. Gelfond*, 240 F.R.D. 88, 95 (S.D.N.Y 2007) her consistent position that formal appointment as attorney-in-fact is a necessary condition for an investment advisor to establish statutory standing to sue on behalf of clients under the federal securities laws.  In doing so, she carefully distinguished her decision in *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 358 (S.D.N.Y 2002) that the plaintiff here, BPI Global, lacked standing to sue on behalf of its clients in *Turkcell*.  *Kaplan*, 240 F.R.D. at 95 n.8.  Here, unlike in *Turkcell*, I find BPI Global has standing not merely as an investment advisor based upon its advisor fees but also as the general partner directing investments in certain limited partnerships for which it purchased Sonus shares.  And as will appear below, I reject, in favor of a functional test relying upon actual authority to make the purchase decision, the formal requirement of an executed power of attorney employed by Judge Buchwald as a necessary condition to investment advisor standing.

courts have focused on the decision making authority of investment advisors. Without resolving the issue, the Ninth Circuit last month described this approach as finding "an investment advisor has an interest in its own right to receive full and fair disclosures regarding the true value of a company's stock". *Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, No. 04-56791, __ F.3d __, 2007 U.S. App. LEXIS 19465 at *4 n.1 (9th Cir. Aug. 16, 2007). Thus, from this approach, as long as the investment advisor has discretion in determining what securities to buy and sell, it qualifies as a purchaser with standing to bring a securities fraud claim. *See In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 108 (W.D. Penn. 2003) (basing its inquiry "not on the presence or absence of specific 'attorney-in-fact' language in the agreements, but on the level of discretion exercised by [the investment advisor] in the day-to-day purchase of securities for its clients."); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 299 (D. Del. 2003) (holding that investment advisors with "authority to make investment decisions for their clients" have standing); *see also Newman v. Eagle Bldg. Technologies*, 209 F.R.D. 499, 506 (S.D. Fla. 2002) (holding banks that bought securities on behalf of their clients had sufficient interest in the case to serve as lead plaintiffs). Instead of focusing on form, these courts look at the actual authority exercised by the

investment advisor for its clients. *See Lemanik, S.A. v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 607 (S.D.N.Y. 1989) (holding that a fiduciary corporation was a purchaser within the meaning of § 12(a)(2) and was entitled to bring suit on its own behalf or on behalf of its clients); *Monetary Mgmt. Group of St. Louis, Inc. v. Kidder, Peabody & Co., Inc.*, 604 F. Supp. 764, 767 (D.C. Mo. 1985) (holding that a purchaser for the purposes of § 12(a)(2) includes a representative or an agent for a purchaser).

Although the First Circuit has not to date adopted a particular approach to this issue, I am of the view that employing a functional test makes the most sense in light of the First Circuit's practical jurisprudence in this area. The most reasonable test, I believe, should turn on whether BPI Global had the discretionary authority to make the Sonus purchases. This is because a key question is whether BPI Global *relied* upon the alleged false statements of Defendants in purchasing Sonus stock. If BPI Global was not the decisionmaker, then BPI Global would have a difficult time proving that it made any decisions that could constitute reliance.

Based on the record before me, I am satisfied that for all the funds it advised, BPI Global was the ultimate decisionmaker with respect to purchasing and selling Sonus stock. The agreement between BPI Capital and BPI Global placed some restrictions on the type of securities BPI Global could purchase,

as well as the kinds of decisions that would need BPI Capital's
approval, but there is no evidence that any of those restrictions
affected BPI Global's decision to make the Sonus securities
purchase at issue here.

The Defendants argue that because the Agreement between BPI
Global and BPI Capital generally limited BPI Global's authority
on management services "on the instructions or approval of the
Manager in respect to each of the Funds," that BPI Global was not
the ultimate decisionmaker with respect to the purchasing of
Sonus shares.  Defendants argue, essentially, that BPI Capital
could "step in" at any time and stop the BPI Global purchase.

BPI Global has submitted testimonial evidence that BPI
Capital never "stepped in" to displace BPI Global's securities
purchasing, and that the practical effect of the agreement
between BPI Global and BPI Capital was that, aside from some
broad restrictions that "did not affect strategy," BPI Global was
given free rein as to the purchasing decision with respect to
Sonus stock.  Defendants provide no evidence contradicting this
testimony or showing that the practical effect of the agreement
was otherwise.  Even if I were to accept Defendants' premise that
only "unfettered" decisionmakers can be purchasers, the record
shows that BPI Global did, in fact, have unfettered discretion
when it decided to purchase Sonus stock.  Thus, BPI Global has
statutory standing, as purchaser, not merely for the partnerships
it served as general partner but for all entities it served as

investment advisor.[6]

### c. BPI Global's Defunct Entity Status and Limited Oversight of the Litigation

Defendants argue that BPI Global has little incentive to litigate the case because it no longer exists as a formal entity and because the evidence does not show that it exercises meaningful control in the litigation.

It is true that BPI Global has since merged with Trilogy Investments to form Trilogy Global Investments.  However, the merger agreement expressly provides that pending litigation will go on in BPI Global's name or, if more appropriate, with Trilogy as substituted plaintiff.  The fact that BPI Global has a different name does not make it an inadequate plaintiff.

I addressed the direct injury argument above and the record shows that BPI Global has a direct financial stake in the case. Although the alleged $66,000 in direct damages are much less than the full $5.3 million in damages that it claims it suffered from its purchase of Sonus stock for BPI Capital, BPI Global has also expressed concern regarding its fiduciary duty to its clients.

---

[6]The defendants do not dispute that the several funds advised or administered by BPI Global would have standing to pursue this litigation.  While I am satisfied BPI Global will continued to perform its function as Lead Plaintiff in this litigation adequately, in order to assure that all voices will have an opportunity to be heard directly, I will nevertheless require that class action notices be sent not merely to investment adviser purchasers such as BPI Global but also to the funds, entities or individuals for whom such advisers purchased Sonus securities.

BPI Global's stake in the case is sufficiently tangible that it can be expected to litigate the interests of the class adequately.

A close review of the record also shows that BPI Global has adequate oversight and engagement in the case. The witnesses deposed appeared to support the case, generally to comprehend the interests at stake, and to understand the thrust of the allegations against Sonus and its agents. BPI Global has adequately litigated on behalf of the class for the past several years, and there is no reason to conclude that BPI Global's merger has changed that.

### d. Inadequate Particularized Knowledge

Finally, Defendant Nill argues in his opposition that BPI Global is an inadequate class representative because it has not shown that any member of BPI Global has particularized and personal knowledge of the Defendants' alleged fraudulent activity. Nill cites *Interneuron Pharm.'s Litig.*, 188 F.R.D. 3 (D. Mass. 1999), for this proposition. I find that case is distinguishable as a result of its procedural posture. In *Interneuron*, Judge Keeton had yet to decide whether the pleadings were sufficient. He ruled that until the plaintiffs could provide some evidence that they knew of particularized facts sufficient to support an allegation that would survive a motion to dismiss, he would not certify the class. Here, the case

already has been through the rigorous motion to dismiss analysis
mandated by the Private Securities Litigation Reform Act and I
have determined that the facts pleaded are sufficient to support
a strong inference of scienter against Sonus.[7]  This case, of
course, is not yet at the summary judgment stage, and I cannot
determine the merits of the case based upon the limited discovery
that has taken place for the purposes of class certification.
Nevertheless, I find BPI Global has access to the knowledge
necessary to represent the class.

### 5. Rule 23(b)(3) Class Action Qualification

Pursuant to Rule 23(b)(3), a case may be maintained as a
class action if the 23(a) prerequisites are satisfied and,
additionally, "the court finds that the questions of law or fact

---

[7]I note Defendants have requested, in light of *Tellabs, Inc.
v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S.Ct. 2499 (June
21, 2007), that I reconsider my order denying their motion to
dismiss.  Under *Tellabs*, in determining whether there is a strong
inference of scienter, "the court must take into account
plausible opposing inferences."  *Tellabs*, 127 S.Ct. at 2509.  "A
complaint will survive . . . only if a reasonable person would
deem the inference of scienter cogent and *at least as* compelling
as any opposing inference one could draw from the facts alleged."
*Id*. at 2510 (emphasis added).  Defendants argue that I failed to
anticipate *Tellabs* and consider a competing and more "compelling"
inference of negligence when I determined that Sonus recklessly
failed to implement adequate internal controls. Based on the
facts alleged regarding Sonus senior management's failure to
implement adequate internal controls in light of Hemme's
behavior, I remain of the view that an inference of recklessness
is at least as likely, if not more likely, than any inference of
negligence on the part of Sonus's management.  Accordingly, I
will deny Defendants' renewed motion for reconsideration.

common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The predominance requirement is easily met in this securities class action. Indeed, there is no objection by the Defendants to this portion of the requirement, nor is there evidence that individual issues differ sufficiently from those advanced by BPI Global so as to predominate in the case.

The Defendants also do not challenge BPI Global's assertion that a class action would be a superior method of adjudication. It is certainly superior to the litigation of individual claims brought by individual investors; that approach could lead to thousands of different cases brought throughout the nation on the same operative nucleus of facts. The only other possibly superior forum for litigating these claims would be a shareholder derivative action. However, I have dismissed related cases in which derivative actions were brought in this court finding them barred by a judgment of dismissal in an earlier state court derivative action. My order of dismissal was recently upheld by the First Circuit. *In re Sonus Networks, Inc., S'holder Derivative Litig.*, __F.3d__, 2007 WL 2325819 (1st Cir. Aug. 16, 2007), *aff'g* 422 F.Supp.2d 281 (D. Mass. 2006). Consequently, I find class action aggregation is the superior available method of

adjudication.

### 6. Subclass Certification

BPI Global moves to certify a subclass based on the
September 2003 Prospectus Supplement that Sonus issued in
connection with a stock offering.  The subclass meets all of the
Rule 23 requirements.  It is likely to be numerous.  There are
common questions of law and fact including whether Sonus made a
false representation in its September 2003 Prospectus Supplement
and, if so, whether this constituted securities fraud.
Furthermore, since BPI Global bought shares based upon the
September 2003 Prospectus Supplement not only for funds it
advised but also for those of which it was general partner, BPI
Global has standing to pursue the claims arising from the
Prospectus Supplement.  Thus, the typicality and adequacy
requirements are also satisfied.

The purpose of the subclass is plainly to take advantage of
the rigorous liability provision found in § 11 of the Securities
Act of 1933.  Focus on purchases influenced by the September 2003
Prospectus Supplement as the basis for a subclass appears
appropriate.


### III. Conclusion

For the reasons stated above, I GRANT Plaintiff's motion for
class certification.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE