UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE SONUS NETWORKS, INC. SECURITIES LITIGATION | ) Civil Action No. 04-10294-DPW<br>) (Lead Case)<br>)<br>) |
| THIS DOCUMENT RELATES TO: ALL CASES | )<br>)<br>)<br>)<br>) |

**LEAD PLAINTIFF'S MEMORANDUM IN
SUPPORT OF FINAL APPROVAL OF PROPOSED
CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
Gwendolyn R. Giblin
Pamela A. Markert
Kenneth A. Frost
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Attorneys for Lead Plaintiff
BPI Global Asset Management LLP

#118828

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS AND PROCEDURAL HISTORY ....................................................... 3

      A.    Summary of Facts ................................................................................. 3

      B.    Procedural History ............................................................................... 5

III.  ARGUMENT ..................................................................................................... 7

      A.    Standards For Approval Of Class Action Settlements ............................ 7

      B.    The Proposed Settlement Is Fair, Reasonable, And Adequate ............... 9

            1.   The Complexity, Expense, And Likely Duration Of The Litigation ............... 9

            2.   The Reaction Of The Class To The Settlement ................................. 10

            3.   The Stage Of The Proceedings And Amount Of Discovery Completed ........ 12

            4.   The Risks Of Establishing Liability ................................................. 13

            5.   The Risks Of Establishing Damages ............................................... 16

            6.   The Risks Of Maintaining The Class Action Through Trial .......................... 17

            7.   The Defendants' Ability To Withstand A Greater Judgment ......................... 18

            8.   The Range Of Reasonableness Of The Settlement In Light Of The Likely
                 Recovery And All The Attendant Risks Of Litigation ................................... 18

      C.    The Plan Of Allocation Is Fair, Reasonable, And Adequate ................ 20

III.  CONCLUSION ................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Bd. of School Dir. of Milwaukee,*
616 F.2d 305 (7th Cir. 1980) ............................................................. 12

*Behrens v. Wometco Enterprises, Inc.,*
118 F.R.D. 534 (S.D. Fla. 1988) ......................................................... 19

*Bussie v. Allamerica Fin. Corp.*
50 F.Supp.2d 59 (D. Mass. 1999) ....................................................... 11

*Cagan v. Anchor Sav. Bank FSB,*
1990 WL 73423 (E.D.N.Y. May 17, 1990) ......................................... 19

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974).................................................................. 9

*City P'Ship Co. v. Atlantic Acquisition Ltd. P'ship,*
100 F.3d 1041, 1043 (1st Cir. 1996)................................................... 8, 9

*Duhaime v. John Hancock Mut. Life Ins. Co.*
183 F.3d 1 (1st Cir. 1999) ........................................................ 7, 12, 19

*Durrett v. Housing Auth. Of City of Providence,*
896 F.2d 600 (1st Cir. 1990)................................................................. 7

*Fisher Bros., Inc. v. Mueller Brass Co.*
630 F.Supp. 493 (E.D. Pa. 1985) ....................................................... 11

*Green v. Occidental Petroleum Corp.,*
541 F.2d 1335 (9th Cir. 1976) ........................................................... 16

*Greenspun v. Bogan*
492 F.2d 375 (1st Cir. 1974)............................................................... 11

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
855 F.Supp. 825 (E.D.N.C. 1994)....................................................... 13

*In re Aetna Sec. Litig.,*
2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ............................................ 19

*In re American Bank Note Holographics, Inc.,*
127 F.Supp.2d 418, 426 (S.D.N.Y. 2001) ..................................... 14, 21

*In re AOL Time Warner ERISA Litig.*,
   2006 WL 2789862 (S.D.N.Y. 2006) ........................................................................ 9

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) .............................................................................. 21

*In re Cardizem CD Antitrust Litig.*
   218 F.R.D. 508 (E. D. Mich. 2003) ...................................................................... 8

*In re Cendant Corp. Litig.*
   265 F.3d 201 (3d Cir. 2001) ..................................................................... 14, 16, 17

*In re Cendant Corp. Sec. Litig,*
   109 F.Supp.2d 235 (D.N.J. 2000) ................................................................. 16, 17

*In re Chambers Development Sec. Litig.*,
   912 F.Supp. 822 (W.D. Va. 1995) ....................................................................... 15

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*
   216 F.R.D. 197 (D. Me. 2003) ............................................................................. 8

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*
   292 F.Supp.2d 184 (D. Me. 2003) ....................................................................... 11

*In re Computron Software, Inc.*,
   6 F.Supp.2d 313 (D.N.J. 1998) ........................................................................... 17

*In re Fleet/Norstar Sec. Litig.*,
   935 F. Supp. 99 (D.R.I. 1996) .............................................................................. 7

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) .................................................................................. 10

*In re Global Crossing Sec. and ERISA Litig.*
   225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................... 20

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) .......................................................... 9, 10, 19, 20

*In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions,*
   148 F.3d 283 (3d Cir. 1998) .................................................................. 10, 13, 18

*In re Relafen Antitrust Litig.*
   231 F.R.D. 52 (D. Mass. 2005) ..................................................................... 9, 13

*In re Stone & Webster Sec. Litig.*
   424 F.3d 24 (1st Cir. 2005) ............................................................................. 3

*In re Warner Comm. Secs. Litig.,*
   618 F.Supp. 735 (S.D.N.Y. 1985) ............................................................. 9, 17

*Isby v. Bayh*
   75 F.3d 1191 (7th Cir. 1996) ...................................................................... 7

*Lazy Oil Co. v. Wotco Corp.,*
   95 F.Supp.2d 290 (W.D. Pa. 1997) ............................................................ 19

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
   671 F.Supp. 819 (D. Mass. 1987) ................................................................ 8

*Rolland v. Celluci*
   191 F.R.D. 3 (D. Mass. 2000) ..................................................... 8, 9, 11, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
   511 U.S. __, 127 S.Ct. 2499 (2007) ...................................................... 2, 12

*Triangle Industries, Inc. v. Kennecott Copper Corp.,*
   402 F. Supp. 210 (S.D.N.Y. 1975) .............................................................. 7

*U.S. v. 412.93 Acres of Land,*
   455 F.2d 1242 (3d Cir. 1972) .................................................................... 17

*Wal-Mart Stores, Inc. v.. Visa U.S.A., Inc.,*
   396 F.3d 96 (2d Cir. 2004) .......................................................................... 7

*Winters v. Stemberg*
   529 F.Supp.2d 237 (D. Mass. 2008) .......................................................... 14

## STATUTES, RULES AND REGULATIONS

15 U.S.C. §77k .............................................................................................. 2, 4

15 U.S.C. §77l(a)(2) .......................................................................................... 4

15 U.S.C. §77o ............................................................................................... 2, 4

15 U.S.C. §78j(b) ........................................................................................... 2, 4

15 U.S.C. §78t(a) ........................................................................................... 2, 4

15 U.S.C. §78u-4(f)(2)(A) ............................................................................... 17

15 U.S.C. §78u-4(f)(3) ........................................................................................ 17

17 C.F.R. §240.10b-5 .......................................................................................... 4

Federal Rules of Civil Procedure

    Rule 23(c)(1)(C) ............................................................................................ 17

    Rule 23(e) ...................................................................................................... 9

## I.    **INTRODUCTION**

Lead Plaintiff BPI Global Asset Management LLP ("Lead Plaintiff") respectfully submits this memorandum of law in support of its motion for final approval of the Stipulation and Agreement of Settlement, filed December 21, 2007 (the "Proposed Settlement") and approval of the proposed Plan of Allocation of Settlement Proceeds.[1]  The Proposed Settlement between Lead Plaintiff and the Defendants[2] is for $40,000,000 in cash, which has already been deposited into an interest bearing escrow account.  ¶4.  By this motion, Lead Plaintiff seeks entry of the stipulated final judgment.[3]

The Proposed Settlement provides an excellent result for the Class.  It was achieved after Lead Plaintiff engaged in four (4) years of litigation, including significant motion practice, intensive discovery, consultation with experts, and a protracted settlement dialogue at arm's length.  Hundreds of thousands of documents were produced by the Defendants and more than two dozen third-parties, and were organized and reviewed by Lead Plaintiff's Counsel.  Although the Defendants at all times vigorously denied Lead Plaintiff's allegations, the parties nonetheless managed to responsibly resolve this highly complex accounting case.

---

[1]    This memorandum is supported by the Declaration of Solomon B. Cera (the "Cera Decl."), filed herewith.  All references to "¶__" are to the Cera Declaration.

[2]    The Defendants are Sonus Networks, Inc., Hassan M. Ahmed, and Stephen J. Nill.

[3]    Subsequent to submission of the proposed final judgment on December 21, 2007, which was attached as Exhibit B to the Stipulation and Agreement of Settlement (Docket No. 221), the parties have agreed upon a modification thereof which incorporates directly in the text of the judgment the definition of "Settled Claims" as set forth in the Stipulation and makes clear that such claims encompass only claims relating to the Class Period.  One other immaterial modification has been made to paragraph 5 of the form of proposed judgment.  For the Court's convenience, a red-lined copy of the [Revised Proposed] Final Judgment and Order of Dismissal with Prejudice is attached hereto as Exhibit A.  A clean copy of this document is also submitted separately herewith.

The Proposed Settlement provides the Class with an immediate, guaranteed recovery. It also eliminates the enormous risks of summary judgment, trial, the inevitable appeal process, and issues concerning collectibility of any judgment that might be obtained down the road. Most of the damages in this case arise from the claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §78j(b). The Class faced a huge risk of carrying its burden on summary judgment, and proving at trial, all the elements of the Section 10(b) claim. ¶61. To prevail, the Class would have to show, *inter alia*, that Sonus acted with *scienter*, which is an intent to deceive or defraud, or reckless disregard for the truth. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 511 U.S. __, 127 S.Ct. 2499, 2507 (2007).

The Subclass's claim pursuant to Section 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §77k, was based solely on an allegation of strict liability for misstatements in connection with the offering of newly issued Sonus stock pursuant to a Prospectus Supplement dated September 23, 2003. The damages for this claim were comparatively small, estimated by Lead Plaintiff's expert to be approximately $20 million if Lead Plaintiff were to prevail on all aspects of the claim. ¶¶8, 53. In its May 10, 2006 Memorandum and Order, the Court held that, as pled, the heightened pleading standard for fraud applied to this claim. *See* May 10, 2006 Memorandum and Order (Docket No. 149) ("May 10, 2006 Order") at 19. This potentially greatly increased Lead Plaintiff's burden in proving the Section 11 claim. The May 10, 2006 Order also limited the potential liability of defendants Ahmed and Nill to the "control person" claims under Section 20(a) of the 1934 Act, 15 U.S.C. §78t(a), and Section 15 of the 1933 Act, 15 U.S.C. §77o. These claims allow for a "good faith" defense pursuant to which a control person can avoid liability by showing, for example, lack of awareness of any accounting violations and/or reliance on auditors. *In re Stone & Webster Sec. Litig.*, 424 F.3d 24, 26 (1st

Cir. 2005) (Section 20(a) "treats the defendant's good faith as part of the defendant's affirmative defense").

The proper measure and amount of recoverable damages was another difficult issue if the case were to proceed. Lead Plaintiff's expert estimated potential maximum recoverable damages in the hundreds of millions of dollars if Lead Plaintiff prevailed on every claim and the Court and jury accepted Lead Plaintiff's damage theory. The Defendants contended that the maximum recoverable damages were far less than even the amount that was ultimately recovered, due to purported loss causation issues. Indeed, the Defendants have consistently denied, and continue to deny, the allegations stated in the Complaint, and deny that they are responsible for any damages to the Class. How issues relating to damages would ultimately play out was highly uncertain. ¶58. Accordingly, in the face of such enormous risks, Lead Plaintiff has secured an excellent result for the Class.

Pursuant to the [Revised] Preliminary Order in Connection with Settlement Proceedings, filed January 22, 2008 (the "Order") (Docket No. 225), the Claims Administrator caused notice of the Proposed Settlement to be mailed to more than 92,000 potential Class members and to be published in the national edition of *The Wall Street Journal*. ¶45. No objections have been submitted by Class members to either the terms of the proposed Settlement or the Proposed Plan of Allocation. Lead Plaintiff therefore submits the Proposed Settlement and Plan of Allocation are fair, reasonable, and adequate, and merit final approval.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    Summary of Facts

This securities class action was brought on behalf of all purchasers of the common stock of Sonus during the period of March 28, 2002 through March 26, 2004, inclusive (the "Class

Period"), for alleged violations of Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b)

and 78t(a), SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and Sections 11,

12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§77k, 77l(a)(2), and 77o.  ¶¶1, 11, 19.

Initiated more than four years ago, the case arises from an alleged accounting fraud that affected

at least two years of Sonus's financial statements.  ¶¶12, 15.  Lead Plaintiff alleged that as a

result of the issuance of materially false and misleading financial statements, the price of Sonus's

common stock was artificially inflated during the Class Period.  *Id.*  Based on the matters at issue

in the case, Sonus was forced to restate its financial statements for fiscal years ended December

31, 2002 and 2001, as well as all of its quarterly reports for 2003.  ¶12.

On the operative First Amended Consolidated Class Action Complaint (the "Complaint"),

filed on August 5, 2005, alleges that Sonus recorded revenue in quarters in which they had not

been earned, in violation of Generally Accepted Accounting Principles ("GAAP"), Statement of

Position ("SOP") 97-2 regarding recognition of revenue for software license transactions, and

Sonus's own publicly stated revenue recognition policy.  ¶11.  Sonus also is alleged to have

experienced pervasive deficiencies in its internal controls and accounting practices.  ¶¶12, 13.

On February 11, 2004, Sonus publicly acknowledged that it, along with its independent

auditor, had "identified certain issues, practices and actions of certain employees relating to the

timing of revenue recognized from certain customer transactions that could affect the Company's

current and past financial statements."  ¶15.  By the close of the market the following day, the

price of Sonus shares had dropped 28.5%.  Subsequently, on March 29, 2004, Sonus announced

that it was "performing a detailed review of the timing of revenue recognized from customer

transactions and of other financial statement accounts" relating to "the proper timing of revenue

recognition. . . ."  *Id.*  The price of Sonus shares then further dropped to close at $3.92, a decline

of 60% from the Class Period high of $9.91 on January 20, 2004. *Id.* Ultimately, Sonus's restatement revealed that the Company misstated its revenues by millions of dollars for the fiscal years 2001, 2002 and the first three quarters of 2003. *Id.* Multiple securities fraud class action lawsuits were filed in response to these events. *Id.*

### B.    Procedural History

From February 2004 through April 2004, shareholders who believed they had purchased Sonus stock at prices artificially inflated by accounting irregularities filed twenty (20) separate class action securities fraud lawsuits that were consolidated pursuant to an Order entered by the Court on June 28, 2004. ¶15. On August 10, 2004, the Court formally approved BPI Global Asset Management LLP as Lead Plaintiff and Gold Bennett Cera & Sidener LLP ("GBCS") as Lead Plaintiff's counsel. ¶16. As noted, the operative Complaint was filed on August 5, 2005. ¶20. On May 10, 2006, the Court issued its Memorandum and Order denying defendants' motions to dismiss the Section 10(b) and Section 11 claims against Sonus and the Section 15 and Section 20(a) "control person" claims against defendants Ahmed and Nill. ¶22.

Thereafter significant litigation concerning the propriety of class certification ensued. ¶¶34-38. This was a hotly contested matter, especially in light of BPI Global's status as an investment advisor. On September 25, 2007, the Court issued its Memorandum and Order certifying a Class and Subclass of Sonus investors. ¶39. The Class members who will be bound by the final judgment are all persons and entities who purchased the common stock of Sonus during the Class Period and who suffered damages, including a Subclass consisting of all persons

and entities who acquired newly issued Sonus common stock pursuant to the Prospectus Supplement dated September 23, 2003, and who were damaged (collectively, the "Class"). [4]  ¶1.

The parties engaged in intensive merits discovery during the pendency of the case. ¶¶26-33. Defendants and third parties produced hundreds of thousands of documents which were inspected and analyzed. ¶¶26, 27, 30. These materials made abundantly clear that this was a highly complex accounting case which presented serious risks for both sides. Sonus's Class Period transactions with its customers that were at the heart of the case involved multi-year, multi-layered, factually dense agreements which, Defendants argued, could give rise to differing judgments as to appropriate accounting treatment. Lead Plaintiff at all times was required to carry the burden of showing that the Defendants had actual knowledge of material violations of GAAP, or were reckless in applying GAAP. Given the presence of independent auditors who were advising Sonus on the proper accounting treatment, and the extreme complexity of many of the customer arrangements, this was a very heavy burden.

Settlement discussions occurred throughout the course of the litigation. ¶41. Counsel held numerous meetings, both in person and by telephone, and exchanged a substantial amount of information. *Id.* With the assistance of a highly regarded mediator, the parties finally reached an agreement on October 29, 2007. ¶¶41-43, 46. Counsel for the parties prepared the complex settlement documentation, which was lodged with the Court on December 21, 2007. ¶44.

On January 18, 2008, the Court signed the Order preliminarily approving the $40,000,000 settlement and authorizing dissemination of the notice. ¶¶44, 45. Notice was provided to the

---

[4]    Excluded from the Class are Defendants, officers and directors of Sonus at all relevant times, members of the immediate families (parents, siblings, and children) of each of the individually named Defendants, their legal representatives, heirs, successors in interest or assigns, and any entity in which Defendants have or had a controlling interest. ¶1.

Class as the Court directed. *See* Declaration of Carole K. Sylvester re Mailing of Notice of

Pendency of Class Action and Proof of Claim and Publication of Summary Notice ("Sylvester

Decl."), submitted herewith, at ¶¶3-5. Class members choosing to exclude themselves from the

Settlement or object to the terms of the Settlement and/or the Plan of Allocation were instructed

to do so by March 14, 2008. *Id.* at Exhibits A and C. In response to more than 92,000 mailed

notices and nationwide publication, no objections to either the Settlement or to the Plan of

Allocation were submitted. [5]  ¶51.

## III.    ARGUMENT

### A.    Standards For Approval Of Class Action Settlements

A class settlement will be approved if it is fair, reasonable, and adequate. *See Duhaime v.*

*John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2 (1st Cir. 1999); *Durrett v. Housing Auth. Of City*

*of Providence*, 896 F.2d 600, 604 (1st Cir. 1990). This determination is addressed to the Court's

sound discretion, which "is circumscribed by the long-recognized policy of encouraging

settlements." *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I. 1996).[6]

Although no single test applies in the First Circuit for determining whether a class action

settlement is fair, reasonable, and adequate, courts in this Circuit have considered the following

factors, *inter alia*: (1) plaintiff's likelihood of success on the merits; (2) the stage of the litigation

and the amount of discovery completed; (3) the terms of the settlement; (4) the recommendations

and quality of counsel; (5) the future expense and likely duration of litigation; (6) the nature and

---

[5]    Only five relatively small shareholders chose to exclude themselves. *Id.*

[6]    *See also Wal-Mart Stores, Inc. v.. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2004) (courts
should be "mindful of the strong judicial policy in favor of settlements, particularly in the class
action context") (citation omitted), *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) ("Federal
courts naturally favor the settlement of class action litigation."); *Triangle Industries, Inc. v.
Kennecott Copper Corp.*, 402 F. Supp. 210, 212 (S.D.N.Y. 1975) (It is the "policy of the courts
to encourage settlements").

number of objections; and (7) the presence of good faith and the absence of collusion.[7]  As discussed herein, all of these factors support approval of the Proposed Settlement.  In applying these factors, the court should not "prejudge the merits of the case" or "second-guess the settlement." *Compact Disc*, 216 F.R.D. at 210 .  The court's role is instead to "determine if the parties' conclusion is reasonable." *Id.* at 211.

Lead Plaintiff respectfully submits that the Proposed Settlement is eminently fair, reasonable, and adequate. ¶46.  The parties have litigated at length, have thoroughly weighed the strengths and weaknesses of their respective positions, and after extensive arm's length negotiations, facilitated in the end by a skilled mediator, reached an informed compromise to end this intense litigation.  ¶¶40-43.  The mediator's supervision and facilitation of the settlement negotiations establishes that there was no collusion, and strongly supports a presumption that the settlement is fair.  *See In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E. D. Mich. 2003) (settlement was "the product of arm's length settlement negotiations" where negotiations were facilitated by a disinterested and respected mediator); *Compact Disc*, 216 F.R.D. at 212; *City P'Ship Co. v. Atlantic Acquisition Ltd. P'Ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement."); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819, 822 (D. Mass. 1987) ("Where, as here, a proposed class settlement has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is presumptively fair.").  Application of the foregoing standards points clearly to the conclusion that the Proposed Settlement merits final approval.

//

---

[7]    *See Rolland v. Celluci*, 191 F.R.D. 3, 8 (D. Mass. 2000); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 206-207 (D. Me. 2003)  (citing cases).

**B.    The Proposed Settlement Is Fair, Reasonable, And Adequate**

Rule 23(e), Fed.R.Civ.P., requires judicial approval of any compromise of claims brought on a class basis. Approval of a proposed settlement is a matter within the broad discretion of the district court. *City P'Ship. Co.*, 100 F.3d at 1044 ("Great deference is given to the trial court."). "The court may not engage in mere 'rubber stamp approval' of the settlement, yet it must 'stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" *In re AOL Time Warner ERISA Litig.*, 2006 WL 2789862 at *4 (S.D.N.Y. 2006), quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974). In determining whether "the interests of the class are better served by the settlement than by further litigation" (*In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 58 (D. Mass. 2005) (Young, C.J.)), relevant considerations include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 72, quoting *Grinnell*, 495 F.2d at 463; *see also Rolland*, 191 F.R.D. at 8-9. Each of these factors is satisfied by the Proposed Settlement.

**1.    The Complexity, Expense, And Likely Duration Of The Litigation**

Securities fraud cases are inherently difficult and expensive to litigate. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (noting the "complicated nature of large class actions alleging securities fraud" where "there are literally thousands of shareholders, and any trial on these claims would rely heavily on the development of a paper trail

through numerous public and private documents"). This is particularly true where, as here, complicated accounting principles are involved:

> An equally significant issue is the likely complexity of proof. Many of the allegations relate to defendants' accounting decisions, and extensive expert testimony would certainly be required on the nature of the accounting practices, the significance of various decisions in relation to GAAP, and the effect that those practices ultimately had on stock prices and the plaintiffs' finances. The difficulty of presenting these issues either in the context of a motion for summary judgment or at trial thus weighs in favor of settlement, particularly when considered in conjunction with the corresponding financial outlays by both sides.

*Ikon*, 194 F.R.D. at 179. Indeed, Lead Plaintiff retained accounting and financial experts to assist in the litigation. ¶¶17, 52. The need for expert analysis (and resulting expenses) will significantly increase as the case proceeds toward expert disclosures, summary judgment, and trial. *Compact Disc*, 216 F.R.D. at 212 (". . . I am confident that this is both a complex and a difficult case. Significant and expensive discovery remain for the plaintiffs on liability and damages. More experts will have to be hired at significant expense."). On the other hand, the Proposed Settlement provides an immediate benefit to the Class and avoids years of delay, expense, and uncertainty. Accordingly, the complexity, expense, and likely duration of this case weigh strongly in favor of granting final approval to the settlement.

## 2.    The Reaction Of The Class To The Settlement

"This factor attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions,* 148 F.3d 283, 318 (3d Cir. 1998). "In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 812 (3d Cir. 1995).

The Proposed Settlement has overwhelming support from Class members. No class members have filed objections, which weighs strongly in favor of approval:

> . . . it should be noted that between the time that notice of the hearing on the settlement was issued . . . and the hearing itself . . . not a single discordant sound was heard from any shareholder concerning the advisability of the settlement. No shareholder filed an objection . . . Many shareholders were large, institutional investors, who could be expected to safeguard their interests with a modicum of diligence.

*Greenspun v. Bogan*, 492 F.2d 375, 379 (1st Cir. 1974); *see also Rolland*, 191 F.R.D. at 11; *Bussie v. Allamerica Fin. Corp.*, 50 F.Supp.2d 59 (D. Mass. 1999) (favorable reaction of class is strong evidence of fairness of settlement); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F.Supp.2d 184, 188 (D. Me. 2003).

The same is true here. No objections have been presented. ¶71. It is significant to note that during the Class Period, at least 245 institutional investors owned more than 143,000,000 shares of Sonus stock. *See* Declaration of Bjorn I. Steinholt, CFA (Docket No. 171), filed July 31, 2006, ¶21. They included sophisticated investors such as the California Public Employment Retirement System, IBM Retirement Funds, and the New York State Teachers Retirement System. *Id.* at Ex. F. Such large institutional investors could be expected to step forward if they believed the Proposed Settlement was inadequate. *Greenspun*, 492 F.2d at 379.

The deadline for submitting Proof of Claim forms is not until April 30, 2008, but the Claims Administrator has already received 2,225 claims. ¶70. This affirmative response from Class members supports approval of the settlement. *See, e.g., Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F.Supp. 493, 498 (E.D. Pa. 1985) (where approximately 1,890 of 37,000 potential class members filed claim forms, the court found that "[t]his demonstrates considerable satisfaction with the results of this litigation"). The Class clearly supports the Proposed Settlement.

**3.    The Stage Of The Proceedings And Amount Of Discovery Completed**

The stage of the proceedings where settlement is reached shows how well the court and the attorneys are able to evaluate the merits of the plaintiffs' claims. *Duhaime*, 177 F.R.D. at 67; *Rolland*, 191 F.R.D. at 10. Here, the Court has actively managed and overseen the case from its earliest stages, and the following significant events have occurred: (i) the appointment of a Lead Plaintiff and Lead Counsel (¶16); (ii) the filing of an Amended Consolidated Complaint and briefing and argument on the related motions to dismiss (¶¶ 17-19); (iii) the filing of the operative Complaint and briefing and argument on additional motions to dismiss (¶¶ 20-22); (iv) the Defendants' motion for reconsideration of the Court's May 10, 2006 Memorandum and Order regarding the motions to dismiss the Complaint or, in the alternative, for certification of the Memorandum and Order for interlocutory appeal (¶23); (v) the July 27, 2006 scheduling order regarding class certification, dispositive motions, amendment of pleadings, and discovery-related matters (¶25); (vi) the Defendants' renewed motion for reconsideration of the denial, in part, of the motions to dismiss the Complaint, based on *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 511 U.S. __, 127 S.Ct. 2499 (2007) (¶38); and (vii) discovery, briefing, argument, and issuance of a ruling on the class certification motion (¶¶34-39).

In addition, GBCS has conducted an extensive investigation and formal discovery regarding the alleged accounting improprieties at Sonus. As more thoroughly discussed in the Cera Declaration, counsel has engaged in substantial discovery, including:

- Analyzing more than 80,000 documents produced by the Defendants (¶¶26-27);

- Subpoenaing and reviewing hundreds of thousands of documents from: (i) five Sonus customers (ii) the underwriter of Sonus's secondary offerings; (iii) The NASDAQ Stock Market; (iv) two outside auditors and accounting and forensic investigators retained by the Audit Committee of Sonus's Board of Directors; and (v) 17 securities analysts that covered Sonus (¶30);

- Reviewing 16 privilege and redaction logs produced by the Defendants and challenging parts of them in a motion to compel (¶33);

- Responding to Sonus's motion for a protective order which sought to significantly limit the scope and relevant period for discovery directed to Defendants and third-parties (¶29);

- Consulting with experts in accounting and damages in connection with analysis of the documents (¶¶8, 17, 40);

- Conducting extensive interviews of a multitude of fact witnesses (¶17);

- Providing written responses, and producing nearly 16,000 documents, to the Defendants in response to discovery related to class certification (¶34); and

- Preparing its clients for and participating in three depositions noticed by the Defendants in connection with the class certification motion (¶36).

In other words, this has not been a case where most of the time was spent negotiating a proposed settlement. Quite to the contrary, this case was intensively litigated over many years, and very significant discovery was obtained. ¶52. The parties were therefore in a position to make a fully informed evaluation of the strengths and weaknesses of the claims and the risks of continued litigation before agreeing to settle. *See, e.g., Relafen,* 231 F.R.D. at 73. Accordingly, the stage of the proceedings and amount of discovery conducted weigh heavily in favor of granting final approval of the Proposed Settlement.

### 4.    The Risks Of Establishing Liability

"Perhaps the most important factor in evaluating the adequacy of a class action settlement is the relative strength of plaintiff's case and the existence of any defenses or difficulties of proof." *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 855 F.Supp. 825, 831 (E.D.N.C. 1994). This requires balancing of the "likelihood of success . . . if 'the case were taken to trial against the benefits of immediate settlement.'" *In re Safety Components Int'l, Inc.,* 166 F.Supp.2d 72, 89 (D.N.J. 2001), quoting *Prudential,* 148 F.3d at 319; *see also In re Cendant*

*Corp. Litig.*, 265 F.3d 201, 237 (3d Cir. 2001) (court is to consider "what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them").

The risks of establishing liability in this action are significant. ¶7. The Defendants have always (and continue to) completely disclaim liability. *Id.* They filed lengthy motions to dismiss the Complaint, raising every argument imaginable, and have indicated that their vigorous defense would continue through trial, if necessary. For example, the Defendants have taken the position that only four specific transactions remained in the case based on the Court's May 10, 2006 Memorandum and Order. ¶14. Lead Plaintiff disagrees with the Defendants' position and believes it misconstrues the Order. However, the Defendants have made it clear that this issue would be raised at every possible opportunity. Lead Plaintiff has no guarantee that it would prevail.

To prove the claims under Section 10(b) and Rule 10b-5 promulgated thereunder, the Class would bear the heavy burden of demonstrating that: (i) the Defendants were responsible for material misstatements or omissions in connection with the purchase of Sonus stock; (ii) that the Defendants made the misleading statements with *scienter*, *i.e.,* intending to defraud, or with a reckless disregard for the truth; (iii) that the Class justifiably relied on the alleged misconduct; and (iv) that the Class suffered damages as a result. *Winters v. Stemberg*, 529 F.Supp.2d 237, 249 (D. Mass. 2008). Lead Plaintiff believes it has significant support for its allegations, but also recognizes that proving the *scienter* of any defendant is always difficult and could go either way before a jury. Especially in this case, premised largely on the accounting treatment of factually complex transactions, such concerns carry considerable weight. *In re American Bank Note Holographics, Inc.*, 127 F.Supp.2d 418, 426 (S.D.N.Y. 2001) ("Plaintiffs acknowledge the

substantial risk involved in proving *scienter*, because it goes directly to a defendant's state of mind, and proof of state of mind is inherently difficult."). Indeed, in ruling upon the motions to dismiss, this Court has already ruled that *scienter* was not adequately alleged as to defendants Ahmed or Nill. May 10, 2006 Memorandum and Order (Docket No. 149), at 2. As for Sonus's *scienter*, that issue would arise again at both the summary judgment stage and trial. The Defendants would also claim that any misconduct of Sonus employees cannot properly be imputed to the Company for *scienter* purposes. ¶61. How this question would be resolved on summary judgment or by a jury, let alone before an appellate court, remains unknown.

Notably, the Proposed Settlement was obtained even though the SEC terminated its investigation with no action being taken against Sonus. ¶9. This too supports the Proposed Settlement:

> Plaintiffs believed they had a great case on liability; defendants believed they had great defenses in whole or in part. Each side has submitted their views of the merits of the case, and this Court has had the benefit of the resolution of the related SEC proceedings which, while evidencing that Chambers, Mr. Rangos, Sr. and other officers and directors had violated some SEC rules, did not provide the "killer" resolutions of the fraud charges that plaintiffs certainly would like to have seen.
>
> The point is, while the Court agrees the plaintiffs had a strong case against both the Chambers defendants and the Grant Thornton defendants, they clearly had their work cut-out for them to convince a jury of their allegations, especially with the defendants squaring-off against one another. A major battle would have been the one between the numerous experts the trial most certainly would have produced and the risks of convincing the jury which expert to believe.

*In re Chambers Dev. Sec. Litig.,* 912 F.Supp. 822, 838 (W.D. Pa. 1995). Accordingly, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the

bushes." *Id.*, at 838.  Considered in this light, the Proposed Settlement of $40,000,000 in cash is a sound result given the risks of establishing liability.

### 5.    The Risks Of Establishing Damages

Establishing damages in a securities class action is difficult.  Many factors affect the amount by which a stock price is inflated, if at all, at various points during the Class Period and expert analysis is almost always necessary.  *In re Cendant Corp. Sec. Litig*, 109 F.Supp.2d 235, 264-265 (D.N.J. 2000); *Blackie v. Barrack*, 524 F.2d 891, 909 n. 25 (9th Cir. 1975).

Here, the Class Period spans two years (March 28, 2002 through March 26, 2004) and includes the issuance of multiple allegedly false or misleading statements.  ¶¶1, 8.  The level of inflation in Sonus's stock price presumptively changed each time an allegedly false or misleading statement came into the market.  ¶8; *id.* ("market variables . . . may affect the amount the market reacted to disclosures at different times during the class period"); *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1345 (9th Cir. 1976) ("The spread, or value of the misrepresentations, may increase or decrease as a result of market forces operating on the misrepresentations.").  Where a complex formula for determining damages is clearly necessary, as here, uncertainty exists as to whether a jury will find that the Class suffered damages at all and, if so, which party's damage calculation the jury will accept.  As explained in *Cendant*:

> . . . the damages determination proffered by Lead Plaintiff's expert is complex and hard to follow, freighted with involved calculations and conceptually difficult issues.  Were a jury confronted with competing expert opinions of corresponding complexity, there is no compelling reason to think that it would accept Lead Plaintiff's determination rather than Cendant's which would posit a lower figure for the Class's damages.  This risk in establishing damages means that this factor weighs in favor of approval of the Settlement.

*Cendant*, 265 F.3d at 239; *see also In re Warner Comm. Sec. Litig.*, 618 F.Supp. 735, 744-45 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("It is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions."); *In re Computron Software, Inc.*, 6 F.Supp.2d 313, 320 (D.N.J. 1998) (in the inevitable "battle of experts," the jury might disagree with plaintiff's expert).; *U.S. v. 412.93 Acres of Land*, 455 F.2d 1242, 1247 (3d Cir. 1972) ("The jury . . . is under no obligation to accept as completely true the testimony of any expert witness. It may adopt as much of the testimony as appears sound, reject all of it, or adopt all of it.").

The risk of establishing damages is increased in light of application of the PSLRA. Under that statute, joint and several liability among the defendants exists "only if the trier of fact specifically determines that such covered person **knowingly** committed a violation of the securities laws." 15 U.S.C. §78u-4(f)(2)(A) (emphasis added). The statute includes a very complex inquiry that must be performed by jurors. 15 U.S.C. §78u-4(f)(3). For example, if a defendant with no financial resources is deemed 90% responsible for the fraud, and the plaintiff cannot show that the other defendants "knowingly" participated in the fraud, the plaintiff may only be able to recover, at most, 10% of its proven damages from such other defendants. The risk of demonstrating recoverable damages is therefore significant. *Cendant*, 109 F.Supp.2d at 260. This unpredictability regarding damages is avoided by the Proposed Settlement.

### 6.    The Risks Of Maintaining The Class Action Through Trial

The Court has certified a Class and Subclass. ¶39. Nonetheless, a district court has the power to decertify or modify a class if the case becomes unmanageable, or if other factors call into question the initial certification. Rule 23(c)(1)(C), Fed.R.Civ.P.; *see also Cendant*, 265 F.3d

at 239 (3d Cir. 2001). Thus, while Lead Plaintiff strongly believes that certification was appropriate and would stand up over time, the decision could be attacked and revisited.

### 7.     The Defendants' Ability To Withstand A Greater Judgment

Although Sonus is solvent, it is a relatively young company in an extremely competitive market. Since its IPO, Sonus has turned to the financial markets to obtain additional funding it needed to grow its business. The current downturn in the economy makes it unclear whether this will be a viable option in the future. In addition, during turbulent economic times, Sonus's current and potential customers are less likely to make major investments in technology such as that sold by Sonus. Thus, while Sonus presently appears to be on sound financial footing, there is absolutely no assurance that down the road it would be able to satisfy a significant judgment should one be obtained.

Sonus had limited director and officer insurance coverage, much of which has already been used for defense costs. Lead Plaintiff obtained all of the remaining insurance in the Proposed Settlement. ¶60. If litigation were to continue, the amount of insurance ultimately available to the Class would be substantially diminished or completely gone. There is also no reason to believe that Defendants Ahmed and Nill have the financial resources to individually satisfy any significant judgment against them. Lead Plaintiff had to consider that taking the case through summary judgment and trial could be a futile exercise if any judgment obtained were uncollectible. This factor weighs strongly in support of the $40,000,000 Settlement.

### 8.     The Range Of Reasonableness Of The Settlement In Light Of The Likely Recovery And All The Attendant Risks Of Litigation

These final factors essentially ask whether "the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential*, 148 F.3d at 322. "In conducting this evaluation, it is recognized 'that settlement

represents a compromise in which the highest hopes for recovery are yielded in exchange for

certainty and resolution[.]'" *Safety Components*, 166 F.Supp.2d at 92, quoting *In re Aetna Sec.*

*Litig.*, 2001 WL 20928 at *11 (E.D. Pa. Jan. 4, 2001). "[T]he court cannot, and should not, use

as a benchmark the highest award that could be made to the plaintiff after full and successful

litigation of the claim." *Duhaime*, 177 F.R.D. at 68. Furthermore, the determination of a

"reasonable" settlement is not susceptible to a mathematical equation yielding a particularized

sum:

> In light of the well-recognized risks faced by litigants in proving
> liability and damages in cases of this type, court have determined
> that a settlement can be approved even if benefits amount to a
> small percentage of the recovery sought. *Grinnell*, 495 F.2d at
> 455, impliedly overruled in non-relevant part by *Missouri v.*
> *Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989),
> the Second Circuit stated: "The fact that a proposed settlement may
> only amount to a fraction of the potential recovery does not, in and
> of itself, mean that the proposed settlement is grossly inadequate
> and should be disapproved." And, "there is no reason, at least in
> theory, why a satisfactory settlement could not amount to a
> hundredth or even a thousandth part of a single percent of the
> potential recovery." 495 F.2d at 455 n. 2.

*Lazy Oil Co. v. Wotco Corp.,* 95 F.Supp.2d 290, 339 (W.D. Pa. 1997); *see also Ikon*, 194 F.R.D.

at 183-84 (approving settlement of approximately 5.2% of the best possible recovery); *Cagan v.*

*Anchor Sav. Bank FSB*, 1990 WL 73423 at *12-13 (E.D.N.Y. May 17, 1990) (approving $ 2.3

million class settlement over objections that "best possible recovery would be approximately

$121 million"); *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988)

("The mere fact that the proposed settlement of $.20 a share is a small fraction of the desired

recovery of $3.50 a share is not indicative of an inadequate compromise."), *aff'd*, 899 F.2d 21

(11th Cir. 1990).

Based on the Preliminary Approval Hearing, the Court is aware of the vastly divergent positions of the parties on damages. Regardless of which view is accepted, a recovery of $40,000,000 is unquestionably a reasonable compromise considering the totality of factors.

In sum, when considering all relevant factors, the Proposed Settlement merits final approval.

**C.    The Plan Of Allocation Is Fair, Reasonable, And Adequate**

In evaluating the Plan of Allocation, the same standards applicable to the settlement as a whole also apply to a plan of allocation: it must be fair, reasonable and adequate. *Compact Disc*, 216 F.R.D. at 213; *Ikon*, 194 F.R.D. at 184. "When formulated by competent and experienced class counsel," a plan for distribution "need have only a reasonable, rational basis." *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (citation omitted). Those requirements are satisfied here.

The Plan of Allocation, which is set forth fully in the notice, recognizes the existence of both a Class and a Subclass, and that the interests of both the Class and Subclass must be properly protected. Lead Plaintiff's counsel determined an appropriate allocation of settlement funds between the Class and Subclass with the assistance of the damages expert. ¶8. The Plan of Allocation takes into consideration that the Subclass has a claim under Section 11 of the Securities Act of 1933, which involves a more lenient standard of proof than does Section 10(b) of the 1934 Act, which has a difficult *scienter* standard. *Id.* Accordingly, there is a larger *pro rata* recognized loss per share for the Subclass members who have Section 11 claims. *Id.* The Plan of Allocation also accounts for differences in recoverable damages at different points during the Class Period based on the information in the market, as determined by Lead Plaintiff's damages expert. *Id.* This is an appropriate and fair way to allocate the recovery among the Class

members. *American Bank Note*, 127 F.Supp.2d at 429-430 ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel.").

No Class members have objected to the Plan of Allocation, which weighs in favor of its approval. *Id.; In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 127 (D.N.J. 2002) ("Because the Plan of Allocation compensates Class Members according to injuries they incurred, and because no Class Member has objected to the Plan, the proposed Plan of Allocation is a fair, reasonable, and adequate method for allocating the Net Settlement Fund among the various members of the Class."). Accordingly, the Plan of Allocation warrants final approval.

## III.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant final approval of the Proposed Settlement and approve the Plan of Allocation of the settlement proceeds. The [Revised Proposed] Final Judgment and Order of Dismissal with Prejudice should be entered.

Dated: March 24, 2008                    GOLD BENNETT CERA & SIDENER LLP


                                         By: _____ /s/Solomon B. Cera _____
                                                          Solomon B. Cera

                                         Attorneys for Lead Plaintiff
                                         BPI Global Asset Management LLP