UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE SONUS NETWORKS, INC. SECURITIES LITIGATION | )  Civil Action No. 04-10294-DPW<br>)  (Lead Case)<br>)<br>) |
| THIS DOCUMENT RELATES TO: ALL CASES | )<br>)<br>)<br>)<br>) |

**DECLARATION OF SOLOMON B. CERA IN SUPPORT
OF FINAL APPROVAL OF SETTLEMENT, PLAN OF
ALLOCATION OF SETTLEMENT PROCEEDS, AND AWARD
OF ATTORNEY'S FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
Gwendolyn R. Giblin
Pamela A. Markert
Kenneth A. Frost
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Attorneys for Lead Plaintiff
BPI Global Asset Management LLP

#118820

## TABLE OF CONTENTS

A.    Summary Of Settlement Terms And Reasons Therefor .......................................2

B.    Nature Of This Case.............................................................................................6

C.    Overview Of Procedural History Of The Litigation .............................................8

    1.    Commencement Of The Action .................................................................8

    2.    Motions To Serve As Lead Plaintiff ........................................................9

    3.    Filing Of Amended Consolidated Class Action Complaint And First
        Round Of Motions To Dismiss...............................................................10

    4.    Filing Of First Amended Consolidated Class Action Complaint And
        Second Round Of Motion Practice Pertaining To Motion To Dismiss .....11

    5.    Defendants' Motion For Reconsideration Or, In The Alternative, For
        Certification Of Order For Interlocutory Appeal.......................................13

    6.    Joint Submission Pursuant To Fed.R.Civ.P. 26(f) And Local Rule
        16.1(D) And Hearing ..............................................................................14

    7.    Merits-Based Discovery And Investigation..............................................14

        a.    Discovery Of Defendants..............................................................15

        b.    Third Party Discovery...................................................................16

    8.    Class Certification Discovery And Motion Practice..................................19

    9.    The Settlement .......................................................................................21

    10.   Preliminary Approval Of The Settlement .................................................23

D.    Evaluation Of The Proposed Settlement...............................................................24

    1.    The Complexity, Expense And Likely Duration Of The Litigation ..........24

    2.    The Reaction Of The Class To The Settlement .........................................25

    3.    The Stage Of The Proceedings And The Amount Of Discovery
        Completed...............................................................................................26

    4.    The Risks Of Establishing Liability.........................................................26

    5.    The Risks Of Establishing Damages And Causation.................................27

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| | 6. | The Ability Of The Defendants To Withstand A Greater Judgment | 27 |
| | 7. | The Amount Of The Settlement Fund In Contrast To The Best Possible Recovery | 28 |
| E. | | The Fee Application | 28 |
| | 1. | General Statement | 28 |
| | 2. | Size Of The Fund Created And Number Of Persons Benefited | 30 |
| | 3. | Presence Or Absence Of Objections | 31 |
| | 4. | Skill And Efficiency Of Attorneys Involved | 31 |
| | 5. | The Risks Undertaken By Counsel In Pursuing This Case | 32 |
| | 6. | Risks Of Contingent Fee Litigation Generally | 33 |
| | 7. | The Significant Amount Of Time Devoted To The Case By Plaintiff's Counsel | 33 |
| | 8. | Awards In Similar Cases | 34 |
| F. | | Conclusion | 34 |

I, Solomon B. Cera, declare:

1.    As Lead Plaintiff's counsel in the above-captioned securities class action (the "Litigation"), I submit this declaration in support of final approval of the proposed settlement of this Litigation with defendants Sonus Networks, Inc. ("Sonus" or the "Company"), Hassan M. Ahmed ("Ahmed") and Stephen J. Nill ("Nill") which is reflected in the Stipulation and Agreement of Settlement, filed on December 21, 2007 (Docket No. 221) (hereinafter referred to as the "Proposed Settlement"). If approved, the Proposed Settlement will result in the release of all Class claims alleged against Sonus, Ahmed, and Nill (collectively, the "Defendants"). The Class members who will be bound by the proposed final judgment are all persons and entities who purchased the common stock of Sonus during the period from March 28, 2002 through March 26, 2004, inclusive (the "Class Period"), and who suffered damages; included as well is a Subclass consisting of all persons and entities who acquired newly issued Sonus common stock pursuant to the Prospectus Supplement dated September 23, 2003, and who were damaged (collectively, the "Class"). Excluded from the Class are Defendants, officers and directors of Sonus at all relevant times, members of the immediate families (parents, siblings, and children) of each of the individually named Defendants, their legal representatives, heirs, successors in interest or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are any persons who timely exercised their right to exclude themselves by filing a Request for Exclusion in accordance with the requirements set forth in the Notice of Pendency of Class Action and Hearing on Proposed Settlement and Attorneys' Fee Petition and Right to Share in Settlement Fund (the "Notice"), mailed to Class members in this Litigation.

2.    This declaration sets forth the facts in support of final approval of: (i) the Proposed Settlement based on its fairness, reasonableness, and adequacy, (ii) the proposed Plan

of Allocation of Settlement Proceeds; and (iii) Lead Plaintiff's counsel's application for an award of attorney's fees and reimbursement of costs and expenses incurred in prosecuting this Litigation.

3.      The firm of Gold Bennett Cera & Sidener LLP ("GBCS") was designated as Lead Plaintiff's Counsel by Order of this Court dated August 10, 2004.  GBCS directed the prosecution of this Litigation and was actively involved in every phase of the Litigation.  If called upon, I would be competent to testify that the following facts are true to the best of my knowledge, information and belief.

### A.      <u>Summary Of Settlement Terms And Reasons Therefor</u>

4.      The Proposed Settlement is for total cash consideration of $40,000,000, together with interest earned thereon.  Pursuant to the terms of the Proposed Settlement, on November 19, 2007, the Defendants caused to be deposited in an interest bearing escrow account the amount of $25,000,000.  On January 28, 2008, an additional $15,000,000 was deposited.  Since deposit, these sums have earned in excess of $376,000 in interest as of March 18, 2008.

5.      On January 22, 2008, this Court entered its [Revised] Preliminary Order in Connection with Settlement Proceedings, signed January 18, 2008, thereby preliminarily approving the Proposed Settlement, approving the forms of mail and publication notice, and setting a final fairness hearing for March 31, 2008.

6.      As explained herein, the Proposed Settlement is an excellent result for the Class. The Proposed Settlement occurred after: (i) significant motion practice pursuant to which several of Lead Plaintiff's key claims survived; (ii) certification of the Class following extensive class certification discovery, briefing, and argument; (iii) more than a year of intensive merits discovery; and (iv) arms-length bargaining between experienced and knowledgeable counsel with the assistance of an accomplished mediator.  After mailing notice to at least 92,093

individual and institutional Class members, as well as publication in the national edition of *The Wall Street Journal* on February 5, 2008, there are no objections to the Proposed Settlement. This in itself is a weighty factor in support of the fairness of all aspects of the Proposed Settlement.

7.    The Proposed Settlement at this time avoids enormous risks for the Class if the claims against the Defendants continued to be litigated, including the uncertainty of summary judgment, trial, the inevitable appeal process, and questions concerning the ultimate collectibility of any sizeable judgment. The vast bulk of the damages in this case arose from the claim under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §78j(b). This is a fraud statute which imposes an onerous burden of proof. *Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 199 (1976) (plaintiffs in a 10b-5 action must show intent to deceive, manipulate, or defraud). While the Subclass's claim pursuant to Section 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §77k, was based solely on an allegation of strict liability for Sonus common shares issued pursuant to the Prospectus Supplement dated September 23, 2003, the Court held in its May 10, 2006 Memorandum and Order that, as pled, the heightened pleading fraud standard under Rule 9(b), Fed.R.Civ.P. applied even to the Section 11 claim. *In re Sonus Networks, Inc. Sec. Litig.*, 04-10294-DPW, 2006 WL 1308165 at *6-7 (D. Mass. May 10, 2006). Most significantly, however, the Class faced a huge risk of carrying its burden on summary judgment, and proving at trial against Sonus, all of the elements of the claim under Section 10(b) of the 1934 Act. Specifically, to prevail, the Class would have to prove that Sonus acted with *scienter*, which is an intent to deceive or defraud or with reckless disregard for the truth. Moreover, the liability of Ahmed and Nill was limited by this Court in its May 10, 2006 Memorandum and Order to "control person" claims under Section 20(a) of the 1934 Act, 15

U.S.C. §78t(a), and Section 15 of the 1933 Act, 15 U.S.C. §77o. These claims allow for a "good faith" defense pursuant to which the control person can avoid liability by showing, for example, lack of awareness of any accounting violations and/or reliance on auditors. In addition to the fundamental dispute over liability factors, there were major disagreements concerning the proper measure and amount of recoverable damages in the case. While Lead Plaintiff's expert estimated potential maximum recoverable damages in the hundreds of millions of dollars if Lead Plaintiff prevailed on every claim and its damage theory was accepted by the Court and jury, Defendants claimed the maximum recoverable damages were in fact far less than the amount ultimately recovered. In the face of such enormous litigation risks, GBCS was able to achieve for the Class the result reflected in the Proposed Settlement based on its expertise, preparedness, and tenacity.

8.    The proposed Plan of Allocation of Settlement Proceeds merits final approval. This Plan, which is set forth fully in the Notice that has been mailed to members of the Class, is a reasonable proposal for allocation of the settlement proceeds. It reflects a larger *pro rata* recognized loss per share to persons who purchased Sonus common shares pursuant to the Prospectus Supplement dated September 23, 2003, which is subject to the lesser burdens of proof under the claim under Section 11 claim of the 1933 Act. Lead Plaintiff's expert estimated the damages for this claim to be approximately $20 million if Lead Plaintiff were to prevail on all aspects of the claim. The Plan also takes into account the differences in the amount of recoverable damages at different points in time throughout the Class Period based on the information in the market, as determined by Lead Plaintiff's damages expert. The allocation plan sets out six different price inflation rates, which correlate to significant announcements made by Sonus during the Class Period where Lead Plaintiff's expert concluded Sonus's stock

traded at higher prices than it should have if all available truthful information regarding Sonus was in the market. For example, on July 10, 2003, Sonus reported its financial results for the second quarter of 2003. The numbers reported on July 10, 2003 were alleged to be false and misleading, and they were restated such that the originally reported loss of $3.2 million was in fact $7.3 million. According to Lead Plaintiff's expert, this false information artificially inflated the stock price by 41% from July 11, 2003 until Sonus's next quarterly financial results were announced on October 8, 2003. The inflation rates initially increased, then decreased beginning on January 20, 2004 when Sonus announced that its fourth quarter results would be delayed. The inflation rate continues to decrease in response to Sonus's partial disclosures in February 2004 that its financials were still unavailable and previously reported financials may need to be restated. To the extent shares purchased in the Class Period at inflated prices were subsequently sold at even higher-inflated prices, no claim is allowed as no compensable damages were incurred in this scenario. No Class member has objected to this Plan. This carefully crafted proposal for allocating the settlement monies is fair, adequate, and reasonable.

9.     This declaration is also submitted in support of the application by GBCS for an award of attorney's fees in the amount of 25% of the settlement consideration, including interest through the date of payment to counsel, and reimbursement of $383,790.94 in GBCS's out-of-pocket and unreimbursed expenses, plus interest. GBCS worked on a wholly contingent fee basis and without any assistance from any government investigation. A confidential formal investigation of Sonus was ultimately terminated with no action taken by the Securities and Exchange Commission ("SEC"). GBCS shouldered the risk of committing substantial resources to this Litigation, and of working diligently to litigate the Class claims and to bring about the Proposed Settlement. GBCS's efforts have now produced a result for the Class members that is

highly beneficial under the circumstances. The requested fee falls well within the parameters recognized as appropriate by this Court and others in complex federal securities class actions such as this. Significantly, there are no objections to the requested fee.

10.     For these reasons and those discussed below, the Proposed Settlement is worthy of immediate final approval, the proposed Plan of Allocation is equitable and just, and the requested fee should be awarded, together with expenses and interest. The relevant law supporting the requested approvals is set forth in the accompanying Lead Plaintiff's Memorandum in Support of Final Approval of Settlement and Plan of Allocation and Lead Plaintiff's Counsel's Memorandum in Support of Application for Attorney's Fees and Reimbursement of Litigation Expenses.

**B.     Nature Of This Case**

11.     The following discussion is based on allegations made in the First Amended Consolidated Class Action Complaint ("Complaint"), filed August 5, 2005. This case arises from an alleged accounting fraud which appears to have gone on for more than two years and that artificially inflated the price of Sonus's common stock during the Class Period. During the Class Period, the Defendants allegedly misled Sonus's public investors by disseminating a series of materially false and misleading statements concerning Sonus's revenues, earnings, profitability, and financial condition. It has been alleged that the material misstatements regarding the Company's financial results occurred in large part because revenue was recorded in quarters in which it had not been earned, in violation of Generally Accepted Accounting Principles ("GAAP"), Statement of Position ("SOP") 97-2 regarding recognition of revenue for software license transactions, and Sonus's own publicly stated revenue recognition policies.

12.     The Complaint alleged that the following Sonus financial statements were materially misstated: (1) Annual Report on Form 10-K for Year-End 2001; (2) Quarterly reports

for each quarter of 2002; (3) Annual Report on Form 10-K for Year-End 2002; (4) Quarterly

reports for the first three quarters of 2003; and (4) Prospectus Supplements dated April 21, 2003

and September 24, 2003. As the Company acknowledged in its July 28, 2004 restatement, Sonus

"identified material weaknesses in our controls and procedures" and that "[t]he consolidated

financial statements and related consolidated financial information contained in previously filed

reports, including for the years ended December 31, 2002 and 2001 and first three quarters of

2003 should no longer be relied upon." As a result of the alleged improper conduct, Sonus was

forced to issue restated financials for these periods.

   13. The Complaint alleges that, during the Class Period, certain Sonus personnel

engaged in a range of improper financial and accounting practices, including: (i) improperly

unbundling certain software delivery elements in order to manipulate the timing of revenue

recognition; (ii) making the delivery of the updates and releases subject to separate "side

agreements" in order to manipulate the recognition of future revenues by controlling the delivery

of the updates and releases; (iii) improperly manipulating the timing of its reported revenues by

claiming that software updates had been delivered at the time revenue therefrom was recorded

where updates were not delivered and, in some instances, were not even ready to be delivered;

(iv) working with customers to obtain acceptance letters to purportedly confirm the delivery of

hardware and software, even though the product had not been delivered; (v) manipulating the

delivery of various features under customer contracts; (vi) improperly segregating out future

"deliverables" from major contracts, for the purpose of "pushing" reported revenues in violation

of GAAP and SOP 97-2; and (vii) approving practices of pulling out Sonus's obligations to

provide future deliverables (i.e., software updates and releases) from customer contracts, and

agreeing to deliver them as special "side deals" in order to spread revenues over several

reporting quarters, instead of waiting until such time that the software updates had in fact been delivered.

14.    Based on the May 10, 2006 Memorandum and Order, Defendants maintained that only "four transactions" were at issue in the case: (1) improper revenue recognition in connection with a Qwest contract in Q2 2002; (2) improper revenue recognition in connection with a Qwest contract in Q4 2003; (3) the purported issuance of an acceptance letter to Qwest, in either Q3 or Q4 2001, to confirm a delivery that allegedly had not been made; and (4) improper revenue recognition in connection with an AT&T contract in Q4 2003. Discovery showed that these transactions were highly complex and concerned evolving, multi-layered relationships between Sonus and its customers. To add to the complexity, the relationship between Sonus and Qwest was derived, in part, from an earlier relationship between another company, telecom technologies, inc. and Qwest. Based on the complexity of these transactions, the evolution of the relationships between Sonus and its customers, the sophistication of the technology at issue, potentially voluminous factual disputes, the real possibility of jury confusion, and hotly disputed questions concerning what constitutes improper revenue recognition, it is obvious that, just on the facts, this was a very difficult case for the Class. Given the nature of these allegations, it is clear that the transactions challenged in the Complaint were highly complex both factually and in terms of the proper accounting treatment. The inherent complexity of the challenged transactions rendered establishing *scienter* an even more difficult hurdle for the Class than is typically the case, even in the face of a restatement.

C.    **Overview Of Procedural History Of The Litigation**

1.    **Commencement Of The Action**

15.    The origin of the case was in Sonus's announcement on February 11, 2004 that Sonus and its independent auditor had "identified certain issues, practices and actions of certain

employees relating to the timing of revenue recognized from certain customer transactions that could affect the Company's current and past financial statements." By the close of the market the following day the price of Sonus shares had dropped 28.5%. Subsequently, on March 29, 2004, Sonus announced that it was "performing a detailed review of the timing of revenue recognized from customer transactions and of other financial statement accounts" relating to "the proper timing of revenue recognition. . . ." The price of Sonus shares then further dropped to close at $3.92, a decline of 60% from the Class Period high of $9.91 on January 20, 2004. Ultimately, Sonus's restatement revealed that the Company misstated its revenues by millions of dollars for the fiscal years 2001, 2002 and the first three quarters of 2003. In response to these events, shareholders who believed they had purchased Sonus stock at prices artificially inflated by accounting irregularities filed twenty (20) separate class action securities fraud lawsuits. The cases were ultimately consolidated pursuant to an Order entered by the Court on June 28, 2004. GBCS was retained by BPI Global Asset Management LLP ("BPI Global") to investigate the circumstances giving rise to losses it experienced as a result of its purchases of Sonus stock and to pursue litigation if warranted.

### 2.    Motions To Serve As Lead Plaintiff

16.    Pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §78u-4(a)(3)(B), shareholders who purchased Sonus stock during the relevant period were given notice on or about February 12, 2004 of their right to move to serve as Lead Plaintiff in this action. Several shareholders or shareholder groups, including BPI Global, filed such motions. These filings gave rise to significant briefing and argument to the Court on June 28, 2004 regarding the comparative losses of the movants and their adequacy as potential lead plaintiffs and class representatives. Vigorous challenges were raised to BPI Global's adequacy

in light of its investment advisor status. While investment advisors had been appointed as lead

plaintiff in a handful of other securities class actions, it was not the usual practice in such cases.

Based on a July 6, 2004 supplemental submission confirming that BPI Global's underlying

mutual fund clients supported its effort to secure the lead plaintiff position, GBCS established to

the Court's satisfaction that BPI Global not only had standing as a purchaser of Sonus shares, but

that it would adequately represent the interests of absent class members. Accordingly, on August

10, 2004, the Court formally approved BPI Global as Lead Plaintiff and GBCS as Lead

Plaintiff's counsel.

### 3. Filing Of Amended Consolidated Class Action Complaint And First Round Of Motions To Dismiss

17.    After the Court appointed GBCS as Lead Counsel, a more intensive factual

investigation was undertaken by the firm to ascertain facts concerning the alleged accounting

fraud at Sonus. Numerous percipient witnesses were interviewed by GBCS at length and

sometimes multiple times. These interviews were documented in lengthy internal memoranda.

In addition, GBCS continued to pour over Sonus's public disclosures, including press releases

and financial statements, and other publicly-available information. GBCS also worked with a

consulting expert in accounting matters to help understand the issues raised under GAAP,

including revenue recognition issues related to timing for recording of revenue and the

application of SOP 97-2, a highly complex accounting pronouncement which was directly

applicable to the key transactions at issue.

18.    It is significant to note that the accounting issues raised by this case were so

highly complex that from the January 20, 2004 announcement of Sonus's intention to delay the

release of its financial results to the filing of its restated Third Quarter 2003 financial results on

November 9, 2004, it took Sonus and its team of forensic accountants, consultants, and attorneys

over nine months and several million dollars to determine the amounts by which Sonus's financial results needed to be restated.

19.     On December 1, 2004, Lead Plaintiff filed its 119-page Amended Consolidated Class Action Complaint For Violation of The Federal Securities Laws. This Complaint named Sonus, Ahmed, and Nill as defendants and alleged violations of Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, and Sections 11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o. This complaint alleged both a Class of purchasers during the Class Period for the 1934 Act claims and a Subclass of purchasers, including BPI Global, who bought shares pursuant to a Prospectus Supplement issued September 23, 2003 for purposes of the 1933 Act claims. The first round of motion practice followed. On January 28, 2005, each defendant separately filed a motion to dismiss which, taken together totalled some 200 pages. In response, Lead Plaintiff filed a single oversized memorandum of law in opposition to these motions on March 22, 2005. This was followed by the submission on April 29, 2005 of the Defendants' three reply memoranda. GBCS prepared intensively for the hearing on these motions. The Court conducted a hearing on June 1, 2005 at which time it heard extensive argument. At the conclusion of the hearing, the Court denied the motions to dismiss as moot and granted Lead Plaintiff leave to amend.

### 4.     Filing Of First Amended Consolidated Class Action Complaint And Second Round Of Motion Practice Pertaining To Motion To Dismiss

20.     Following the June 1, 2005 hearing, GBCS spent a significant amount of additional time on the investigatory process in an effort to provide greater specificity, especially in the *scienter* allegations. On August 5, 2005, Lead Plaintiff filed its First Amended Consolidated Class Action Complaint for Violation of The Federal Securities Laws (the

"Complaint"). The Complaint was 122 pages in length. Significant detail was added to the

Complaint pertaining to the confidential sources and information supporting the probability that

the source was likely to possess the information alleged. As well, GBCS expanded on a theory

supporting the *scienter* allegations, to wit, that Defendants were motivated to "manage earnings"

so as to give the market the misleading impression that the Company had consistent sequential

revenue growth quarter by quarter.

      21.    On or about September 12, 2005, the Defendants filed three (3) separate motions

to dismiss the Complaint. The defendants' motion papers, which included more than 400 pages

of argument, exhibits, and legal authority, vigorously contested the sufficiency of the Complaint

and raised numerous legal and pleading issues. GBCS prepared opposition papers in excess of

50 pages, which were filed on or about October 11, 2005. Defendants filed reply briefs and

supporting documents totaling in excess of 90 pages on October 24, 2005. Significant time was

spent preparing for the hearing on the motions to dismiss, which was conducted on December 7,

2005, and at which I presented argument for Lead Plaintiff in opposition to the motions. The

Court heard three hours of oral argument. During this hearing, several difficult, complex, and

novel issues were raised and argued to the Court. Among these issues were whether a strong

inference of *scienter* had been properly pleaded, whether confidential sources had been described

with the requisite particularity, the existence of motive and opportunity, the significance and

accuracy of the allegations that an accounting manipulation occurred to establish linearity of

revenue growth, the significance of the terminations of the Company's CFO and controller,

whether the Section 11 claim under the 1933 Act "sounded in fraud," the sufficiency of the

allegations made against individually named defendants Nill and Ahmed, and whether Sonus

could be kept in the case based on the acts of Sonus's controller at relevant times, who was not a defendant.

22.    On May 10, 2006, the Court issued its Memorandum and Order granting in part and denying in part the motions to dismiss. *In re Sonus*, 2006 WL 1308165. The Court granted Defendants' motions to dismiss with respect to the Section 12(a)(2) claims against all defendants and the Section 10(b) and Section 11 claims against Nill and Ahmed. *Id.* at *1. Significantly, however, the Court denied Defendants' motions to dismiss with respect to the Section 10(b) and Section 11 claims against Sonus and the "control person" claims against defendants Nill and Ahmed. *Id.* Among the Court's significant holdings were that, " a strong inference of scienter can be imputed to Sonus given the allegations against its controller Hemme . . . . At a minimum, more senior management than Hemme recklessly failed to have a structure that would insure the dissemination of correct information in an environment where Hemme allegedly encouraged accounting fraud." *Id.* at *22-23.  Following this ruling, GBCS was in a position to begin to propound merits discovery.

### 5.    Defendants' Motion For Reconsideration Or, In The Alternative, For Certification Of Order For Interlocutory Appeal

23.    On May 19, 2006, the Defendants filed a motion seeking to convince the Court to reconsider its ruling denying the motions to dismiss or to certify the order for interlocutory appeal pursuant to 28 U.S.C. §1292(b).  This motion focused on the Court's decision to attribute the controller's misconduct to Sonus for purposes of Section 10(b)'s *scienter* requirement.  Lead Plaintiff opposed Defendants' motion on June 2, 2006, to which Defendants replied on June 8, 2006. On June 15, 2006, the Court issued an "electronic order" denying Defendants' motion. On this same date, a status conference was set for July 13, 2006, requiring the parties to submit a proposed schedule for further proceedings by July 6, 2006.

24.    On or about June 29, 2006, the Defendants each filed their Answers to the Complaint, in which they denied any wrongdoing and set forth numerous affirmative defenses. The Defendants' three Answers of over 150 pages were carefully analyzed by GBCS.

### 6.    Joint Submission Pursuant To Fed.R.Civ.P. 26(f) And Local Rule 16.1(D) And Hearing

25.    Following denial of the motions to dismiss, in part, the parties engaged in several teleconferences and exchanged drafts for the purpose of developing a joint discovery plan and motion schedule pursuant to Local Rule 16.1(D). On July 6, 2006, the parties filed their Joint Statement Pursuant to Local Rule 16.1(D), which documented that the opposing parties had met and conferred by telephone and email pursuant to Rule 26(f), Fed.R.Civ.P. and discussed a discovery plan, the scheduling of dispositive motions, the joinder of parties, the amendment of pleadings, and other discovery-related litigation events and procedures. On July 13, 2006, the parties appeared before the Court to establish a litigation schedule, which included setting briefing and hearing dates for a motion for class certification, class certification-related discovery deadlines, and dates for the conclusion of all merits-related discovery. On July 27, 2006, the Court entered its scheduling order establishing deadlines for these events, adopting the parties' suggestions.

### 7.    Merits-Based Discovery And Investigation

26.    The Joint Statement contemplated two parts to merits-based discovery. First, Lead Plaintiff was permitted to conduct document discovery of the Defendants and any third parties, except for Sonus's present or former directors, officers and employees not named as defendants, until such time as the Court ruled on Lead Plaintiff's motion for class certification. Second, following the date of the Court's class certification ruling, Lead Plaintiff would be permitted to conduct all forms of discovery as to Defendants and any third party. Also pursuant

to the Joint Statement, Sonus agreed to produce, on August 14, 2006, documents asserted by Sonus to be non-privileged which it had previously produced to the SEC pursuant to its formal investigation. Approximately 44,000 documents were initially produced by Sonus pursuant to this agreement (the "SEC Production"). Significant resources were expended by GBCS in carefully organizing and analyzing these documents.

### a.    Discovery Of Defendants

27.    On August 29, 2006, Lead Plaintiff propounded its First Set of Document Requests to All Defendants consisting of 152 requests that were drafted based on the knowledge GBCS had obtained through its factual investigation. The Defendants each served their responses and objections on September 28, 2006 but no documents were produced at that time. GBCS analyzed the responses and objections, identifying deficiencies in Defendants' position. GBCS prepared and sent a meet and confer letter to Sonus's counsel on December 6, 2006. The parties engaged in a lengthy teleconference on December 20, 2006 regarding this matter. As a result, in addition to the SEC Production previously produced, Sonus produced approximately 43,000 documents responsive to these requests between late January 2007 and the end of March 2007. Again, extensive efforts were made by GBCS to carefully organize and analyze these additional documents.

28.    During this time, the parties also engaged in protracted negotiations regarding the Stipulated Protective Order Concerning Disclosure of Confidential Information, which was entered by the Court on December 26, 2006. That protective order sets forth, at length, agreed-upon procedures for designating and handling information the parties believe to constitute trade secrets, "know-how," competitive information, or other proprietary information pursuant to Rule 26(c), Fed.R.Civ.P.

29.    The vast majority of Sonus's responsive documents existed in electronically stored information ("ESI") format.  Therefore, beginning with the December 20, 2006 teleconference through the first eight months of 2007, the parties engaged in a lengthy and detailed dialogue concerning the types of electronic sources to be analyzed and the search protocol to be applied.  Due to the nature of the case and the complexity of e-discovery, numerous teleconferences and extensive correspondence occurred between Sonus and GBCS regarding this subject.  The parties spent a considerable amount of time analyzing and comparing the results of search protocols (including both search criteria and sources of ESI) as proposed by each side in an attempt to reach an acceptable compromise.  Ultimately, after literally months of interaction between GBCS and Sonus regarding the ESI search protocol, progress came to an abrupt end in early September 2007 when Sonus filed a motion for a protective order on September 5, 2007 seeking to severely limit the time period and scope of discovery as to itself, the other defendants, and any third party.  In response, GBCS drafted a detailed opposition which was filed on September 19, 2007 and prepared for the hearing on this motion calendared for October 30, 2007.  However, the hearing did not go forward, as the parties reached a settlement in principle on October 29, 2007.

### b.    Third Party Discovery

30.    GBCS subpoenaed and obtained documents from numerous third parties, including:  Sonus's customers (Epana Networks, Inc., IDT Corporation, Qwest Communications Corporation, Verizon Communications, Inc., and XO Communications, Inc.), Sonus's underwriter for its secondary offerings and securities analysts that covered Sonus (Goldman Sachs & Co., Arnhold & S. Bleichroeder, Inc., CIBC World Markets Corp., Hudson River Analytics, Inc., J.P. Morgan Chase & Co., Legg Mason Wood Walker, Inc., Lehman Brothers, Moors & Cabot, Punk, Ziegel & Company, L.P., Raymond James & Associates, RBC Capital

Markets Corporation, Salomon Smith Barney, Thomas Weisel Partners, UBS Warburg, US

Bancorp Piper Jaffray, and Wachovia Securities), and Sonus's accountants and consultants

(Ernst & Young, LLP, Arthur Andersen LLP, Huron Consulting Group, and

PricewaterhouseCoopers LLP). In addition, GBCS also sought documents pursuant to the

Freedom of Information Act from the SEC and subpoenaed documents from The NASDAQ

Stock Market Inc. After significant negotiation between my office and these third parties, they

produced more than 490,000 paper or static image documents (*e.g.*, TIFF images) and 1.8

gigabytes of ESI in native format. Enormous resources were devoted by GBCS to analyzing and

coding these documents so as to gain a more detailed understanding of the facts and transactions

at issue in the case.

  31. Very significant amounts of time were spent resolving a matter involving the ESI

of Sonus's auditor during the Class Period, Ernst & Young LLP ("E&Y"). Obviously, the

records of Sonus's Class Period independent auditor were among the most critical to the case. In

addition to more than 150,000 paper documents, E&Y had 3.5 gigabytes (more than 355,000

documents) of ESI responsive to Lead Plaintiff's subpoena that E&Y had agreed to make

available to the parties for review in native format at E&Y's offices. Prior to E&Y making its

ESI available to GBCS, Sonus required that the ESI be provided to Sonus first, for purposes of

conducting a privilege review. GBCS had serious reservations about the validity of any claim of

privilege over documents in the possession of the independent auditor and ultimately moved to

compel on this point. Sonus also objected to conducting its review of E&Y's ESI in native

format. As a result, the parties became engaged in another protracted dispute spanning several

months as to a mutually agreeable production format, the apportionment of costs, and a

stipulation regarding a limited privilege review by Sonus that included "claw-back" and non-waiver provisions.

32.    Another discovery dispute that took considerable effort and resources involved the document productions of several third parties, to which Sonus objected on privilege and work product grounds. Sonus withheld certain documents it had previously produced to the SEC on privilege and work product grounds and instructed third parties E&Y, Huron Consulting Group ("Huron") and PricewaterhouseCoopers LLP ("PwC") to withhold documents responsive to Lead Plaintiff's subpoenas on these same grounds. As noted, E&Y served as Sonus's independent auditor during most of the relevant time period. PwC and Huron were retained by Sonus's Board of Directors to assist with the accounting investigation in early 2004. Sonus would not permit these third parties to release documents to GBCS until after Sonus had reviewed them, and it also directed the third parties to withhold select documents. Sonus then produced to GBCS "third party privilege logs" it created on behalf of these entities. Sonus also produced privilege logs for documents Sonus withheld that had been produced to the SEC.

33.    As to these third parties and SEC-related document productions, Sonus provided no less than sixteen (16) privilege and redaction logs identifying numerous withheld documents and several ESI sources, including hard drives and email folders. While Sonus made supplemental productions containing some of the withheld documents and agreed to search some of these ESI sources, after intensive and drawn out efforts, an acceptable compromise could not be reached, thereby necessitating a motion to compel by Lead Plaintiff. GBCS spent significant time analyzing the logs, conferring with Sonus counsel, and preparing the moving papers. This motion was filed on October 16, 2007. GBCS prepared to argue the motion, which was set for

hearing on October 30, 2007. However, the parties reached a settlement in principle on October 29, 2007 and the motion was taken off calendar.

### 8.    Class Certification Discovery And Motion Practice

34.    In accordance with the Court's directive, GBCS prepared and filed a motion for class certification on July 31, 2006. Pursuant to the Joint Agreement, on July 13, 2006, Defendants served on Lead Plaintiff 39 document requests directed to class certification issues. Then, on August 4, 2006, Sonus served 11 interrogatories (the majority of which contained numerous subparts) directed to class certification issues to Lead Plaintiff. After consulting extensively with its client, GBCS served written responses and objections to that discovery. Over a 2 and 1/2 month period, my office produced nearly 16,000 documents on behalf of Lead Plaintiff. The responsive documents produced were obtained by conducting an extensive search -- both by Lead Plaintiff and by GBCS -- at Lead Plaintiff's offices and by searching Lead Plaintiff's ESI. This included the identification and restoration of Lead Plaintiff's ESI from back up tapes that GBCS loaded into a third-party system allowing for identification of documents which were responsive to Defendants' requests.

35.    The parties had significant disagreements regarding the class certification discovery served by Defendants. After certain issues were resolved through the meet and confer process, on September 8, 2006, Lead Plaintiff served supplemental objections and responses to the class certification document requests.

36.    On September 13, 2006, Defendants served Lead Plaintiff with a "person most knowledgeable" Notice of Deposition pursuant to Rule 30(b)(6), Fed.R.Civ.P., identifying 21 areas of inquiry. GBCS objected to the notice on September 25, 2006. After a series of telephone and written communications among counsel, GBCS produced three individuals,

including two former employees, as persons most qualified to testify on the requested topics. The depositions were taken on November 3, 2006 in New York City, on November 15, 2006 in Kansas City, Missouri, and on November 21, 2006 in Orlando, Florida. GBCS prepared its clients and defended them at these depositions.

37.    Defendants filed their papers in opposition to Lead Plaintiff's motion for class certification on January 5, 2007. They vigorously opposed Lead Plaintiff's motion, raising numerous alleged impediments to certification, asserting that Lead Plaintiff lacked Article III standing and was inadequate to represent the class on the grounds that Lead Plaintiff had not suffered a cognizable injury, lacked "purchaser" standing, was not in control of the Litigation due to its subsequent merger with another investment advisory firm, and had exercised inadequate supervision of counsel. GBCS refuted these claims in detailed reply papers filed February 7, 2007. During the February 28, 2007 class certification hearing, there was a lengthy discussion as to Lead Plaintiff's Article III and purchaser standing as well as other points of contention. In response to these arguments, the Court requested additional documentation regarding Lead Plaintiff's equity participation in funds that invested in Sonus during the Class Period and had sustained losses. On March 9, 2007, Lead Plaintiff's affidavit and exhibits in response to the Court's request were filed.

38.    On June 29, 2007, while awaiting the Court's ruling on the motion for class certification, the Defendants filed a renewed motion for reconsideration of the Court's May 10, 2006 Order denying, in part, Defendants' motions to dismiss in light of the Supreme Court's new decision in *Tellabs, Inc. v. Makor Issues & Rights Ltd.,* 511 U.S. ___, 127 S.Ct 2499 (2007). GBCS opposed the motion on July 18, 2007, and the Defendants replied on July 23, 2007. Less than three weeks later, on August 9, 2007, the Defendants moved for leave to file supplemental

authority in support of their renewed motion for reconsideration, citing the Seventh Circuit's

decision in *Higginbotham v. Baxter, Int'l, Inc.,* 495 F.3d 753 (7th Cir. 2007). On August 15,

2007, GBCS responded to this new authority.

39.     The Court issued its Memorandum and Order granting the class certification

motion on September 25, 2007, setting forth in detail its analysis of the Rule 23 requirements.

The Court granted Lead Plaintiff's motion to certify both a Class and Subclass of Sonus

investors. In the same Memorandum and Order, the Court addressed and denied the Defendants'

renewed motion for reconsideration based on *Tellabs.*

### 9.     The Settlement

40.     Throughout the course of this litigation, and with the assistance of attorneys and

paraprofessionals in my office, I became thoroughly familiar with the facts of the case. I have

also had extensive discussions with consulting experts on both the liability/accounting issues and

damages. I and others in my firm studied, in great detail, Sonus's financial statements and press

releases and considered and analyzed the discovery materials obtained during the course of the

Litigation. This preparation helped me to fully understand and appreciate the liability factors

and damages sustained by the Class, as well as Sonus's financial condition, so I could make

reasonable assessments as to whether a proposed settlement was fair, reasonable, and adequate.

41.     The parties periodically conferred about settlement throughout the entire course of

this Litigation. Such discussions occurred at times when the parties were present to appear in

Court in Boston, and often over the telephone on other occasions. These were frank exchanges

on the parties' settlement positions. On January 31, 2007, the parties, along with their retained

experts, met in Chicago for formal settlement discussions. However, this meeting did not result

in any meaningful progress. Informal settlement discussions nonetheless continued thereafter.

The parties then agreed to mediate and selected as a mediator David Geronemus, Esq. from Judicial Arbitration and Mediation Services, Inc. in New York City. A true and correct copy of his resume is attached as Exhibit A hereto. A mediation was scheduled for October 26, 2007 in New York. GBCS prepared intensively for the mediation, including submitting a mediation brief and expert damage report.

42.    At all times, the parties' settlement discussions took place at arm's length between experienced counsel. During the early discussions, it was clear that the parties were far apart in their assessments of liability, damages, and what would be a realistic settlement value. The October 2007 settlement mediation was complicated by the then-scheduled discovery and privilege-related motions immediately pending before the Court.

43.    The October 26, 2007 mediation with Mr. Geronemus lasted an entire day. This was an intensive exercise, with the parties vigorously contesting each other's positions on the facts and damages. The mediator was deeply engaged in the process and evinced an excellent grasp of the facts and the issues in dispute. A settlement was not reached that day. However, the diligence and skill exhibited by the negotiating attorneys and the mediator resulted in an agreement in principle the following Monday morning, October 29, 2007.

44.    On October 29, 2007, the parties informed the Court that they had reached an agreement in principle to settle. The following day, October 30, 2007, the Court held a status conference with respect to the previously-scheduled hearing on pending discovery motions set for October 30, 2007 and to discuss the timing and procedures for considering approval of the settlement. The Court ordered that preliminary settlement documents be filed by November 19, 2007 and scheduled a Preliminary Settlement Hearing for December 3, 2007. On November 15, 2007, Lead Plaintiff filed an assented-to motion to continue this hearing. An Order was entered

on November 27, 2007 terminating the aforementioned discovery motions and continuing the

Preliminary Settlement Conference to January 15, 2008.  GBCS prepared the complex settlement

documentation and worked with defendants' counsel on finalizing the Stipulation of Settlement

which was lodged with the Court on December 21, 2007.  The Court signed an order

preliminarily approving the $40,000,000 settlement on January 18, 2008.  The settlement funds

are presently in escrow earning interest.

### 10.    Preliminary Approval Of The Settlement

45.    At the January 15, 2008 Preliminary Settlement Conference, the Court inquired

about settlement-related issues including the difference between the parties' respective damage

calculations.  The Court also inquired about such issues as the significance of loss causation in

damage calculations, a schedule for providing notice of the settlement to members of the class,

and the participation of a professional mediator in the settlement negotiation. The Court allowed

the motion for preliminary approval, subject to modifications to the Notice discussed at the

hearing.  As such, the Court ordered Lead Plaintiff to submit a revised Preliminary Order in

Connection with Settlement Proceedings and scheduled a Final Fairness Hearing for March 31,

2008.  On January 17, 2008, Lead Plaintiff submitted the [Revised] Preliminary Order in

Connection With Settlement Proceedings (the "Revised Order").  The Revised Order was signed

on January 18, 2008 and filed on January 22, 2008.  The Revised Order directed GBCS to, no

later than January 30, 2008, cause the mailing of the Notice and the Proof of Claim form to Class

members.  The Revised Order also directed GBCS to cause a Summary Notice to be published in

the national edition of *The Wall Street Journal* within ten days of mailing the Class Notice.

Submitted concurrently herewith is the Declaration of Carole K. Sylvester ("Sylvester Decl.") of

Gilardi & Co., LLC, the claims administrator, stating that 92,093 Notices and Proof of Claim

forms were mailed to Class members. There have been no objections to the settlement, no

objections to the Plan of Allocation, and no objections to the request for 25% in attorneys' fees.

**D.    Evaluation Of The Proposed Settlement**

46.    The Proposed Settlement is the result of extensive arms-length negotiations

between experienced counsel who have concluded that it represents a fair, reasonable and

adequate resolution of this litigation and should be approved by the Court. Settlement at this

time avoids lengthy and costly further additional litigation, including the inevitable appeal after

trial.

47.    Pertinent criteria for evaluating the fairness of a proposed class action settlement

include the following factors: (1) the complexity, expense and likely duration of the litigation,

(2) the reaction of the class to the settlement, (3) the stage of the proceedings, (4) the risks of

establishing liability, (5) the risks of establishing damages, (6) the ability of the defendants to

withstand a greater judgment, and (7) the amount of the settlement compared to the best possible

recovery. As set forth below, based on an analysis of the appropriate factors, the Proposed

Settlement is fair, reasonable and adequate and should be approved.

48.    Although GBCS believes that Lead Plaintiff and the Class have a strong case on

the merits, it is aware that there are very difficult issues of fact and law involved in this case.

Numerous defenses to the claims exist, including the adequacy of proof that Sonus acted with

*scienter* and the proper measure of damages. There are other issues related to loss causation,

proportionate liability and damages which would have undoubtedly been raised by the

Defendants.

**1.    The Complexity, Expense And Likely Duration Of The Litigation**

49.    This action is replete with complexity both in establishing liability and in proving

damages. Many thousands of hours of experienced attorney work remain before this case could

be tried against the Defendants.  Counsel have expended considerable amounts of time in reviewing and analyzing hundreds of thousands of pages of documents produced by Defendants and third parties, dissecting Sonus's financials, pursuing every possible avenue to interview anyone with knowledge about the underlying facts of the Litigation, analyzing SEC filings and responding to motions to dismiss and a motion for protective order, and bringing a motion for class certification and a motion to compel.  These were all very significant motions.  Further significant time would need to be expended to complete merits discovery, conduct expert discovery, oppose summary judgment and prepare this case for trial.

50.    Moreover, whatever the outcome of a trial, it is more than probable that appeals would have been taken to the Court of Appeals for the First Circuit and perhaps even to the United States Supreme Court.  All of the foregoing would have delayed, for years, the ability of the Class to recover anything.  Settlement at this time results in a substantial and tangible present recovery, without the attendant expense, risk and delay of trial and post-trial proceedings.  Given the time value of money, a future recovery, even one in excess of the Proposed Settlement, may be less valuable to the Class than receiving the benefits of this settlement which can be distributed promptly to the Class once it is final.

### 2.    The Reaction Of The Class To The Settlement

51.    Notice of the Proposed Settlement, in the form approved by the Court, was mailed to at least 92,093 Class members on or about January 30, 2008 and published in the national edition of *The Wall Street Journal* on February 5, 2008.  *See* Sylvester Decl., filed herewith. Class members had until March 14, 2008 to object and/or to request exclusion from the Class. There are no objections to the Proposed Settlement.  The Claims Administrator has advised me

that there have been only five (5) valid requests for exclusion from the Class representing 1,500 shares of approximately 200 million shares outstanding during the Class Period.

### 3.    The Stage Of The Proceedings And The Amount Of Discovery Completed

52.    This litigation has been prosecuted for almost four (4) years. Substantial time has been spent understanding the facts and litigating numerous issues. GBCS has consulted with accounting and damages experts, conducted very substantial and extensive discovery, and engaged in a comprehensive investigation of the strengths and weaknesses of the claims. Counsel has the information necessary to evaluate the relative merits of the case with respect to both liability and damages and to evaluate collectibility issues.

### 4.    The Risks Of Establishing Liability

53.    Litigations such as this, which arise primarily under Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, generally involve complex issues of fact and law and this Litigation is no exception. The vast bulk of the damages in this case arises out of the Section 10(b) claim. Indeed, plaintiff's damage expert estimated that the Section 11 claim involved a maximum of $20 million of damages. To prevail on the Section 10(b) claim, not only must plaintiffs show that the Defendants' public statements during the Class Period misrepresented or omitted "material" information, but they must also establish that the material misstatements were made with *scienter* (*i.e.*, actual knowledge of falsity or reckless disregard for the truth) and that the Defendants' conduct caused the Class damages.

54.    While the investigation conducted in this Litigation provided evidence that clearly supports the allegations, there can be no assurance in litigation such as this as to what the ultimate result might be before a jury, possibly years down the road.

55.    Given the major uncertainties regarding the nature of the "battle of the experts" that would have ensued at trial on various issues, including accounting and damages, the unpredictability of juries, and the size of the sum obtained in settlement, GBCS believes that this is an excellent settlement for the Class and merits the Court's approval.

### 5.    The Risks Of Establishing Damages And Causation

56.    In addition to defenses to liability, including insufficient evidence of *scienter*, the Defendants would surely have asserted substantial defenses regarding damages.

57.    Under the federal securities laws, market loss does not equate with damages. Rather, under Section 10(b) of the 1934 Act, only the amount of stock price inflation caused by defendants' misleading statements and omissions is recoverable.  In this action, the amount of damages which the Class could prove was a matter of great dispute.

58.    A jury would have been presented with very different damage estimates by the Class and the Defendants at trial.  The determination of damages, like the determination of liability, is a complicated and uncertain process, always involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable.  Conceivably, a jury could find that damages were only a fraction of the amount that the Class contended.

59.    Consequently, while GBCS submits that the Class claims are clearly meritorious and substantial damages were incurred, the fairness and reasonableness of the Proposed Settlement is manifest in light of the risks, burdens and uncertainties of continued litigation.

### 6.    The Ability Of The Defendants To Withstand A Greater Judgment

60.    Courts have held that, in assessing the adequacy of a class action settlement, they may consider the financial condition of the defendants and the ability of the defendants to withstand a substantially greater judgment.  Here, as with many young technology companies in

a highly competitive industry, coupled with a fragile U.S. economy, there is always the concern

as to the ability of Sonus to pay a settlement, let alone withstand a judgment. Moreover, there

was limited available director and officer insurance, and GBCS obtained the entirety of the

available insurance in the settlement.

### 7.    The Amount Of The Settlement Fund In Contrast To The Best Possible Recovery

61.    The evidence in this action would be comprised of documents and testimony

which, when pieced together, GBCS believes would indicate that Sonus knowingly or recklessly

made misstatements during the Class Period that caused damages. The Defendants, however,

would likely present a very different picture of the relevant facts and circumstances, relying on

the extreme complexity of the key accounting transactions to undermine any showing of *scienter*,

as well as arguments limiting damages based on lack of a showing of loss causation. Further,

Sonus may have argued that a rogue controller committed *ultra vires* acts which cannot give rise

to liability. Indeed, at one point in the litigation they suggested this issue was ripe for immediate

appellate review. The outcome of the Litigation was therefore uncertain, an uncertainty which is

eliminated by the Proposed Settlement. In the face of the foregoing, in light of all the risks, the

Proposed Settlement represents a good result for the Class.

### E.    The Fee Application

### 1.    General Statement

62.    GBCS requests a fee of 25% of the Settlement Fund, including interest earned

thereon. The counsel fee requested is $10,000,000 (25% of $40,000,000), plus interest. The

percentage sought is well within the range of fees awarded in similar class actions. As set forth

in the memorandum of law submitted in support of the fee application, this simple and direct

method of computing fees is practical, is supported by public policy, and is in line with the

authorities in the First Circuit, the United States Supreme Court and federal courts throughout the country.

63.    If the Court elects to also consider a lodestar method as a cross-check in awarding counsel's fees, the appropriate information is presented herein and also supports the full fee award.  Lodestar is the arithmetic calculation of the number of hours each attorney and paraprofessional spent on a matter multiplied by hourly rate.

64.    The total number of hours expended on this litigation by my firm through March 20, 2008 is 12,920.25 hours.  The total attorney and paraprofessional lodestar for my firm is $5,068,951.  The requested fee therefore represents a multiple of 2, which is well within the range adopted by courts throughout the country.  GBCS submits that this additional method of analysis confirms that the requested fee is fair and appropriate.

65.    My firm's lodestar figures are based upon the firm's current billing rates, which rates do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

66.    GBCS has incurred a total of $383,790.94 in unreimbursed expenses in connection with the prosecution of this litigation.  The expenses are broken down as follows:

| CATEGORIES | EXPENSES |
|---|---|
| Arbitrator/Mediator | $7,481.18 |
| Photocopies/Reproduction/Data Restoration/ESI Processing | $113,589.69 |
| Court Fees (filings, etc.) | $400.00 |
| Court Reporters/Transcripts | $2,910.20 |
| Computer Research | $31,149.13 |
| Telephone/Fax | $20,454.38 |
| Postage/Express/Delivery/Messenger | $5,951.56 |
| Professional Fees (expert, investigator, accountant, etc.) | $150,946.00 |
| Witness/Services | $2,939.65 |
| Travel Expenses | $47,969.15 |
| **TOTAL EXPENSES** | **$383,790.94** |

#118820

67.    The expenses incurred in this action are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records and other source materials and represent an accurate recordation of the expenses incurred.

68.    The Notice mailed to Class members disclosed that counsel would seek an award of attorney's fees from the Settlement Fund in an amount of 25% of the Settlement Fund and for reimbursement of their expenses up to a maximum of $600,000, plus interest at the same rate as earned by the Settlement Fund.  As noted, fees in the amount of 25% of the recovery are requested.  GBCS is seeking reimbursement of expenses of $383,790.94 which is lower than the amount set forth in the Notice.

69.    Among the factors courts typically look to in determining a fee award include the following: (1) the size of the fund created and number of persons benefited; (2) presence or absence of objections; (3) skills and efficiency of attorneys involved; (4) complexity and duration of the litigation; (5) risk of non-payment; (6) amount of time devoted to the case by counsel; and (7) awards in similar cases.  Factor number (4) has already been discussed herein.  In addition, the risk of non-payment, factor number (5), with regard to the Defendants has also been discussed.

## 2.    Size Of The Fund Created And Number Of Persons Benefited

70.    The size of the Settlement Fund created is substantial.  All Class members who file valid Proofs of Claim and demonstrate they sustained compensable damage will benefit from this recovery.  The claim deadline is April 30, 2008, but the Claims Administrator has advised me that 2,225 claims have been received as of March 20, 2008.

//

### 3.    Presence Or Absence Of Objections

71.    Pursuant to this Court's Order, all objections had to be served and filed no later than March 14, 2008.  No objections were filed by this date.  No institutional investor has objected to the requested fee.  The positive reaction of the Class is a testament to the quality of the Proposed Settlement and a compelling factor justifying its approval by the Court and the award of attorney's fees.

### 4.    Skill And Efficiency Of Attorneys Involved

72.    The firm which acted as Lead Plaintiff's counsel, GBCS, has significant experience in complex federal civil litigation, particularly the litigation of securities and other class actions.  *See* Ex. B attached hereto which is a current resume of the firm.  Its experience in the field allowed it to identify the complex issues involved in this case and to formulate strategies to investigate, prosecute and settle it effectively and efficiently.  The expertise and experience of counsel is another important factor in setting a fair fee.  GBCS is an experienced and skilled firm in the securities litigation field, responsible for other significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted.

73.    The Proposed Settlement is a good result for the Class.  There was no guarantee that the Class would have succeeded in convincing the Court or a jury that they should ultimately prevail on their securities law claims, that there was *scienter*, or that the damages were what were claimed.

74.    The quality of the work performed is reflected in the fact that GBCS was able to obtain a settlement of $40,000,000, even though trial might have resulted in no finding of liability and/or damages, or an inability to collect on any significant judgment obtained on behalf of the Class.

75.    Settlement at this juncture represents the responsible determination by GBCS to secure substantial value for the Class now.  The decision to settle this Litigation at this stage warrants favorable consideration by the Court.

76.    The quality of work performed by counsel for the Class in attaining the Proposed Settlement may also be evaluated, in part, in light of the quality of the opposition.  Counsel for Defendants, Wilmer Cutler Pickering Hale and Dorr LLP, Choate, Hall & Stewart, LLP, and Skadden, Arps, Slate, Meagher & Flom LLP, are skilled and experienced in defending actions such as these.  As the motions relating to dismissal, class certification, and discovery demonstrate, GBCS was confronted with formidable opposition.

### 5.    The Risks Undertaken By Counsel In Pursuing This Case

77.    As shown in the accompanying memorandum of law, determination of a fair fee must include consideration of the contingent nature of counsel's retainer and of the extent of the difficulties and uncertainties which were overcome in obtaining the Proposed Settlement.

78.    Here, counsel agreed to prosecute this case on a wholly contingent fee basis. GBCS received no retaining fees from its client.  Yet GBCS immediately began incurring the substantial expense of investigators and experts and spending thousands of hours of valuable attorney time prosecuting this case.  Counsel knew from the outset that they might expend many millions of dollars worth of attorneys' time in pursuing this action on behalf of the Class, yet receive no compensation whatsoever if the action ultimately proved unsuccessful.  In addition, contingent fee litigation also carries the risk that, even if successful, the Class might receive an amount smaller than needed to provide a fully compensatory fee to counsel.  GBCS expended over 12,000 hours with no assurance of success.

79.     This declaration and the memorandum in support of the Proposed Settlement describes the substantial risks of Litigation.  These same difficulties also constituted risks that counsel might never be paid for their efforts.

### 6.     Risks Of Contingent Fee Litigation Generally

80.     There are numerous cases where plaintiff's counsel in contingent fee cases, after expenditures of thousands of hours, have received no compensation whatsoever.

81.     GBCS knows from personal experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this is never assured. Several plaintiffs' law firms have suffered major defeats after years of litigation and trial, where they expended millions of dollars of time and received no compensation at all.

82.     Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would in all likelihood be realized only after a lengthy and difficult effort.  The market rate for contingent fees in these kinds of cases is commonly 25% to 33%.

83.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations.  If this important public policy is to be carried out, courts should award fees which will adequately compensate plaintiff's counsel, taking into account the risks undertaken with a clear view of the economics of the situation.

### 7.     The Significant Amount Of Time Devoted To The Case By Plaintiff's Counsel

84.     As set forth herein, GBCS devoted a significant amount of time to this case, over 12,000 hours since the outset.  Notably, the Proposed Settlement was obtained even though the SEC terminated its investigation with no action being taken against Sonus.

//

8.    **Awards In Similar Cases**

85.    Awards given in similar class action cases have been compiled and discussed in

Lead Plaintiff's Counsel's Memorandum in Support of Application For Attorneys' Fees And

Reimbursement Of Expenses.  The request for 25% of the Settlement Fund is well within the

range of fees awarded in cases such as this.

F.    **Conclusion**

86.    In view of the substantial cash benefit conferred on the Class, the risks of this

Litigation, the effort of counsel, the quality of the work performed, the contingent nature of the

fee, and the complexity of the case, it is respectfully submitted that the Proposed Settlement in

the amount of $40,000,000, plus interest, should be approved as fair, reasonable and adequate;

that the Plan of Allocation should be approved; and that a fee should be approved in the amount

of 25% of the Settlement ($10,000,000 of $40,000,000), together with reimbursement of

litigation expenses in the amount requested with interest on these amounts at the same rate as

earned by the Settlement Fund through the date of payment.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed this 24th day of March 2008 at San Francisco,

California.

_____/s/Solomon B. Cera_____
Solomon B. Cera
